## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff,** | § § | **CIVIL CASE NO.** __1:18-cv-566 (LEK/CFH)__ |
| **v.** | § § | |
| **ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,** | § § § § § § § § | |
| **Defendants.** | § § | |

### NATIONAL RIFLE ASSOCIATION OF AMERICA'S
### ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff the National Rifle Association of America (the "NRA") files this Original Complaint and Jury Demand ("Complaint") against defendants New York Governor Andrew Cuomo ("Cuomo"), both individually and in his official capacity; Maria T. Vullo ("Vullo"), both individually and in her official capacity; and the New York State Department of Financial Services ("DFS") (collectively, "Defendants"), upon personal knowledge of its own actions, and upon information and belief as to all others matters, as follows:

### I.

### PRELIMINARY STATEMENT

This case is necessitated by an overt viewpoint-based discrimination campaign against the NRA and the millions of law-abiding gun owners that it represents. Directed by Governor Andrew Cuomo, this campaign involves selective prosecution, backroom exhortations, and public threats

with a singular goal – to deprive the NRA and its constituents of their First Amendment right to speak freely about gun-related issues and defend the Second Amendment.

The foundation of Defendants' selective-enforcement and retaliation campaign is a series of threats to financial institutions that DFS, an agency created to ensure the integrity of financial markets after the 2008 credit crisis, will exercise its extensive regulatory power against entities that fail to sever ties with the NRA.  To effect their sweeping agenda, Defendants issued public demands that put DFS-regulated institutions on notice to "discontinue[] their arrangements with the NRA" and other "gun promotion organizations" if they planned to do business in New York.

At the same time, Defendants engaged in back-channel communications to reinforce their intended purpose.  Simply put, Defendants made it clear to banks and insurers that it is bad business in New York to do business with the NRA.

As a direct result of this coercion, multiple firms have succumbed to Defendants' demands and entered into consent orders with DFS that compel them to terminate longstanding, beneficial business relationships with the NRA, both in New York and elsewhere.  Tellingly, several provisions in the orders bear no relation to any ostensible regulatory infraction.  Instead, the orders prohibit lawful commercial speech for no reason other than that it carries the NRA brand.

Absent injunctive relief, Defendants' blacklisting campaign will continue to damage the NRA and its members, as well as endanger the free speech and association rights guaranteed by the constitutions of the United States and the State of New York.  It is well-settled that viewpoint discrimination applied through "threat[s] of invoking legal sanctions and other means of coercion, persuasion, and intimidation" violates the Constitution where, as here, such measures chill

protected First Amendment activities.[1]   Defendants' *de facto* censorship scheme cannot survive judicial scrutiny.  Nor should it.

## II.

## PARTIES

1.      Plaintiff the National Rifle Association of America is a nonprofit corporation organized under the laws of the State of New York with its principal place of business in Fairfax, Virginia.  The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement.  It is also the foremost defender of the Second Amendment to the United States Constitution.  The NRA has over five million members, and its programs reach millions more.

2.      Defendant New York State Department of Financial Services is an agency of the State of New York that regulates financial services firms operating in New York in order to guard against financial crises and to protect New York consumers and markets from fraud.  DFS has a regional office at One Commerce Plaza, Albany, New York 12257.  Its main office is located at One State Street, New York, New York 10004-1511.  It regulates more than 1,400 insurance companies with assets in excess of $4.3 trillion, including 200 life insurers, 1,100 property casualty insurers, and 100 health insurance companies.  DFS also regulates over 1,900 banking and other financial institutions with assets over $2.9 trillion.

3.      Defendant Maria T. Vullo is the Superintendent of the New York State Department of Financial Services and, at all times relevant to the Complaint, was acting under color of state law.  Her principal place of business is One State Street, New York, New York 10004-1511.  Vullo is sued in her individual and official capacities.

---

[1] *See, e.g.*, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 72 (1963).

4.     Defendant Andrew Cuomo is the Governor of the State of New York and, at all times relevant to the Complaint, was acting under color of state law.  His principal place of business is The State Capitol Building, Albany, New York 12224.  Cuomo is sued in his individual and official capacities.

### III.

### JURISDICTION AND VENUE

5.     Pursuant to 28 U.S.C. § 1331, the Court has subject matter jurisdiction over the claims asserted in this action because this action involves claims based on the First and Fourteenth Amendments to the United States Constitution (U.S. Const. amend. I, XIV), and because the action seeks to prevent state officials from interfering with federal rights.  Further, subject matter jurisdiction is conferred on this Court by 28 U.S.C. § 1343(a)(3) because this action is brought to redress deprivations under color of state law of rights, privileges, and immunities secured by the United States Constitution.  This Court has supplemental jurisdiction over all state-law claims asserted in this action under 28 U.S.C. § 1367.

6.     Pursuant to 28 U.S.C. § 1391(b), venue is properly vested in this Court because defendant Cuomo resides in this judicial district.

7.     There is a present and actual controversy between the parties.

8.     The relief requested is authorized pursuant to 28 U.S.C. § 1343(a)(4) (recover damages or equitable relief or any other such relief for the protection of civil rights), 28 U.S.C. § 1651(a) (injunctive relief), 28 U.S.C. §§ 2201 and 2202 (declaratory and other appropriate relief), 42 U.S.C. § 1983 (deprivation of rights, privileges, and immunities secured by the Constitution), and 42 U.S.C. § 1988 (award of attorneys' fees and costs).

## IV.

## STATEMENT OF RELEVANT FACTS

**A.      The NRA:  History Of Dedicated Support For Gun Safety And A Commitment To Core Political Speech.**

9.      After the Civil War, two Union Army officers created a private association to promote marksmanship among the citizenry.  The officers believed that the war would have ended significantly sooner if the northern troops had been able to shoot as well as the Confederate soldiers.  They obtained a charter from the State of New York in November of 1871; thereafter, the National Rifle Association built a proud legacy in the State of New York.

10.      From the NRA's inception, it received praise from the State of New York for its many public contributions.  In 1872, the New York State legislature and the NRA jointly dedicated funds for the creation of a rifle range on Creed Farm, in what is now Queens Village, Queens, New York.  For many decades, the NRA partnered with the State to advance firearms safety, education, conservation, and other laudable public policy goals.  For example, when New York City public schools sought to educate boys in marksmanship and gun safety, NRA co-founder Gen. George Wingate designed and headed the resulting Public Schools Athletic League (PSAL) marksmanship program.[2]  Likewise, in 1949, the NRA worked with the State of New York to create the nation's first hunter education program.  Similar courses were subsequently adopted by state fish and game departments across the country and in Canada, and make hunting among the safest sports in existence.

---

[2] *See e.g.*, STEVEN A. RIESS, SPORTS IN AMERICA FROM COLONIAL TIMES TO THE TWENTY-FIRST CENTURY: AN ENCYCLOPEDIA 736 (Steven A. Riess ed., 2015); ROBERT PRUTER, THE RISE OF AMERICAN HIGH SCHOOL SPORTS AND THE SEARCH FOR CONTROL, 1880-1930 122 (1st ed. 2013); Robert Pruter, *Boys Rifle Marksmanship*, ILLINOIS HIGH SCHOOL ASSOCIATION, http://www.ihsa.org/archive/hstoric/marksmanship_boys.htm?NOCACHE=5:53:58%20PM  (last visited May 11, 2018).

11.     First among the "Purposes and Objectives" contained in the NRA's bylaws is "[t]o protect and defend the Constitution of the United States."  Accordingly, political speech is a major purpose of the NRA.  The NRA engages in extensive legislative advocacy to promote its purposes, as well as to vindicate the rights of its members and all Americans.

12.     The NRA spends tens of millions of dollars annually distributing pamphlets, fact sheets, articles, electronic materials, and other literature to advocate for its view of the Second Amendment and to assist NRA members engaging in national, state, and local firearm dialogue. The NRA's direct mail, television, radio, and digital communications seek to educate the public about issues bearing on the Second Amendment, defend the NRA and its members against political and media attacks, and galvanize participation in the political process by NRA members and supporters.

13.     To its critics, the NRA is best known as a "superlobby – one of the largest and most truly conservative lobbying organizations in the country," able to mobilize its millions of members in concerted efforts to protect the Second Amendment rights of all Americans.[3]  Of course, the NRA's letter-writing campaigns, peaceable public gatherings, and other grassroots "lobbying" activities constitute precisely the type of political speech which rests "[a]t the core of the First Amendment."[4]

---

[3] Christina Robb, *HANDGUNS AND THE AMERICAN PSYCHE THE ATTEMPTED ASSASSINATION OF A PRESIDENT BRINGS THE ISSUE INTO SHARP FOCUS ONCE AGAIN. HANDGUNS – WHAT DO THEY MEAN TO AMERICANS? TO THE NRA, THEY ARE A SYMBOL OF FREEDOM; TO THOSE FRIGHTENED OF CRIME, THEY REPRESENT SAFETY – EVEN IF THE OWNER DOESN'T KNOW HOW TO USE THEM; TO GUN CONTROL ADVOCATES, THEY ARE SYMBOLS OF ULTIMATE* EVIL., BOSTON GLOBE, 1981 WLNR 68847 (June 7, 1981).

[4] *See, e.g., Brown v. Hartlage*, 456 U.S. 45, 52 (1982).

B.    **Cuomo's Political Vendetta Against The NRA.**

14.    Andrew Cuomo has criticized the political speech and influence of "Second Amendment types"[5] generally, and the NRA specifically, for decades.  Moreover, Cuomo has a history of abusing his regulatory power to retaliate against his political opponents on gun control issues.

15.    The son of former Governor Mario Cuomo, Andrew Cuomo is a political opportunist who has consistently sought to gain political capital by attacking the NRA.  During his tenure as Housing and Urban Development ("HUD") Secretary in the 1990s, Cuomo coordinated a campaign of lawsuits (nearly all dismissed) against gunmakers that purported to hold them liable for crimes committed in public housing projects using illegally obtained firearms.  Cuomo admitted that his real aim was to coerce, via settlement, the "voluntary" industrywide adoption of certain equipment and sale restrictions, and warned that any manufacturer who refused to settle would suffer "death by a thousand cuts."[6]  Decried by even gun-control supporters as "wrong" and

---

[5] On February 15, 2018, Cuomo appeared on the MSNBC program "The Beat," where he discussed championing legislation that some believed "trampled the Second Amendment." YOUTUBE, Gov. *Andrew Cuomo On Background Checks: "Bunch Of Boloney" | The Beat With Ari Melber | MSNBC*, https://www.youtube.com/watch?v=Tz8X07fZ39o (last visited May 7, 2018).  However, Cuomo lamented that his "favorability rating" had dropped thereafter due to "backlash from conservatives and Second Amendment types."  *Id.*

[6] Bill McAllister, *Gun Industry Rejects Settlement Effort*, THE DENVER POST (Feb. 1, 2000), http://www.wagc.com/gun-industry-rejects-settlement-effort/.

an abuse of agency authority,[7] the Cuomo campaign failed after the NRA and other pro-gun groups organized legislative and grassroots opposition.[8]

16.     Cuomo blamed "gun lobby extremists" for the collapse of his efforts at HUD.[9]  At a press conference on June 20, 2000, he referred to gun-rights supporters as "the enemy," and announced a blueprint for defeating the NRA and its allies that would emphasize the use of state and municipal retaliatory authority: "If we engage the enemy in Washington we will lose.  They will beat us in this town.  They are too strong in this town.  Their fortress is within the Beltway. We're going to beat them state by state, community by community."[10]

17.     As governor of New York, Cuomo has loudly supported the enactment of some of the nation's harshest gun-control laws.[11]   But rather than debate opponents of his anti-gun

---

[7] In an editorial dated December 17, 1999, the Washington Post described the Cuomo campaign as "disquieting even for those who, like us, strongly support rigorous controls on handguns."   *The HUD Gun Suit*, THE WASHINGTON POST (Dec. 17, 1999), https://www.washingtonpost.com/archive/opinions/1999/12/17/the-hud-gun-suit/48ee0a45-18da-4e8d-9b86-b9512172ae09/?utm_term=.9a74ce83f538.  Anticipating themes that would continue to characterize Cuomo's gun-control efforts over the next nineteen years, the editorial board stated that "it . . . seems wrong for an agency of the federal government" to put "pressure on an industry . . . to achieve policy results the administration has not been able to achieve through normal legislation or regulation."  *Id.*

[8] *See, e.g.*, *House Blocks Money For Gun Pact*, CBS NEWS (June 21, 2000, 11:58 PM), https://www.cbsnews.com/news/house-blocks-money-for-gun-pact/.

[9] *HUD Archives: News Releases, HUD No. 00-150, COMMUNITIES FOR SAFER GUNS COALITION JOINS CUOMO IN CRITICIZING EFFORT IN CONGRESS TO KILL THE COALITION*, U.S. DEP'T OF HOUS. AND URBAN DEV. (June 27, 2000, archived Dec. 13, 2009).

[10] *Remarks by Secretary Andrew Cuomo Handgun Control, Inc, Washington, D.C. Tuesday, June 20, 2000*, U.S. DEP'T OF HOUS. AND URBAN DEV. (Jan. 20, 2009), https://archives.hud.gov/remarks/cuomo/speeches/handguncontrl.cfm.

[11] *See, e.g.*, Teri Weaver, *Judge: NY must release Safe Act stats from assault weapons registry*, SYRACUSE (May 7, 2015, 9:09 PM),

initiatives, he declared that conservative firearms advocates "have no place in the state of New York."[12] In particular, Cuomo has sought to banish "the enemy" from public discourse altogether, and remains dissatisfied with what he perceives to be the excessive political influence of "conservatives and the Second Amendment types."[13]

18. In truth, Cuomo bears distinct animus toward the NRA, which he accuses of exerting a "stifl[ing] . . . stranglehold" over national gun policy.[14] For Cuomo, weakening the political advocacy of the NRA is a career strategy.

## C. Defendants Attempt To Chill The NRA's Political Speech In Support Of Americans' Second Amendment Rights.

19. Against the backdrop of recent tragedies and a polarized public gun-control debate, Cuomo and the other Defendants have abused their authority in an effort to stifle the NRA's political advocacy and to retaliate against the NRA for the effectiveness of that advocacy.

20. Together with DFS Superintendent Vullo, Cuomo has used, and continues to use, state power to chill the political speech of the NRA and other "gun promotion" organizations by punishing financial institutions which do "business with NRA." To achieve this, Defendants draw

---

http://www.syracuse.com/news/index.ssf/2015/05/judge_ny_must_release_safe_act_data_on_assault_weapons_registry.html.

[12] Heather Long, *Conservatives aren't welcome in New York, according to Governor Cuomo*, THE GUARDIAN (Jan. 14, 2014, 8:49 AM), https://www.theguardian.com/commentisfree/2014/jan/24/governor-cuomo-conservatives-not-welcome-new-york.

[13] YOUTUBE, Gov. *Andrew Cuomo On Background Checks: "Bunch Of Boloney" | The Beat With Ari Melber | MSNBC*, https://www.youtube.com/watch?v=Tz8X07fZ39o (last visited May 7, 2018).

[14] Kenneth Lovett, *Exclusive: Cuomo fires back at Jeb Bush for 'stupid' and 'insensitive' gun tweet*, NY DAILY NEWS (Feb. 17, 2016), http://www.nydailynews.com/news/politics/cuomo-blasts-jeb-stupid-insensitive-gun-tweet-article-1.2534528.

upon the formidable regulatory powers of DFS—an agency charged with ensuring the stability and integrity of New York's financial markets.

21.     At Cuomo's behest, Vullo and DFS have threatened, and continue to threaten, regulated institutions with costly investigations and penalties should they fail to "discontinue[] . . . their arrangements with the NRA."[15]   And Defendants have already carried out some of these threats.  Within a single week, DFS levied multi-million dollar fines against two insurance-industry firms that dared to do business with the NRA.  Under intense scrutiny, both firms were coerced to terminate their business arrangements with the NRA and its members—including arrangements having nothing to do with the allegedly unlawful conduct cited by DFS.

22.     A DFS press release publicizing one recent enforcement action makes clear the gravamen of Defendants' campaign: financial institutions regulated by DFS must refrain from "[e]ntering into any . . . agreement or arrangement," which "involv[es] the NRA, directly or indirectly"[16]—or face the consequences.

---

[15] *GOVERNOR CUOMO DIRECTS DEPARTMENT OF FINANCIAL SERVICES TO URGE COMPANIES TO WEIGH REPUTATIONAL RISK OF BUSINESS TIES TO THE NRA AND SIMILAR ORGANIZATIONS*, N.Y. STATE GOVERNOR ANDREW M. CUOMO (Apr. 19, 2018), https://www.governor.ny.gov/news/governor-cuomo-directs-department-financial-services-urge-companies-weigh-reputational-risk.

[16] *DFS FINES LOCKTON COMPANIES $7 MILLION FOR UNDERWRITING NRA-BRANDED "CARRY GUARD" INSURANCE PROGRAM IN VIOLATION OF NEW YORK INSURANCE LAW*, N.Y. STATE DEP'T OF FIN. SERVS. (May 2, 2018), https://www.dfs.ny.gov/about/press/pr1805021.htm; *see also* DFS FINES CHUBB SUBSIDIARY ILLINOIS UNION INSURANCE COMPANY $1.3 MILION FOR UNDERWRITING NRA-BRANDED "CARRY GUARD" INSURANCE PROGRAM IN VIOLATION OF NEW YORK INSURANCE LAW, N.Y. STATE DEP'T OF FIN. SERVS. (May 7, 2018), https://www.dfs.ny.gov/about/press/pr1805071.htm.

1.     <u>**DFS And Its Regulatory Mission.**</u>

23.     In 2011, as part of his state budget, Cuomo announced the merger of the New York State Insurance Department and the Banking Department to create DFS.  The mandate of the new agency, which consolidated supervisory and enforcement powers previously vested in separate departments, is to "reform the regulation of financial services in New York to keep pace with the rapid and dynamic evolution of these industries, to guard against financial crises and to protect consumers and markets from fraud."[17]

24.     DFS has broad regulatory powers, which encompass the ability to initiate civil and criminal investigations and enforcement actions.  In addition, pursuant to Financial Services Law, Article 3, § 301, the DFS superintendent has the power to refer matters to the attorney general for criminal enforcement.  The creation of an agency with such expansive prerogatives and capabilities "grab[bed] power and headlines," and the New York Times reported in 2015 that the first DFS superintendent, Benjamin Lawsky, was popularly caricatured as "the new sheriff of Wall Street" and an all-powerful monarch ("King Lawsky").[18]

25.     New York Financial Services Law, Article 2, § 201, provides the superintendent of DFS with formidable authority to, among other things, "ensure the continued solvency, safety, [and] soundness" of banks and insurance companies.[19]  Accordingly, DFS directives regarding

---

[17]     N.Y. STATE DEP'T OF FIN. SERVS. (Dec. 12, 2017), https://www.dfs.ny.gov/about/mission.htm.

[18] Jessica Silver-Greenberg and Ben Protess, *Benjamin Lawsky, Sheriff of Wall Street, Is Taking Off His Badge*, THE NEW YORK TIMES (May 20, 2015), https://www.nytimes.com/2015/05/21/business/dealbook/benjamin-lawsky-to-step-down-as-new-yorks-top-financial-regulator.html.

[19] New York Financial Services Law Article 2, § 201 ("Declaration of Policy").

"risk management" must be taken seriously by financial institutions—as risk-management deficiencies can result in fines of hundreds of millions of dollars.

26.    DFS's regulatory mandate does not include setting gun-control policy.  Nor does any statute or other authority empower DFS to blacklist, from receipt of insurance or banking services, speakers with political viewpoints objectionable to the governor or DFS superintendent. In addition, DFS has no authority to engage in unlawful viewpoint discrimination with respect to commercial speech.

## 2.    NRA Member Insurance Programs.

27.    Like many affinity groups and organizations nationwide, the NRA seeks to make life, health, and other insurance coverage available to its members on affordable, tailored terms. To this end, the NRA contracted with multiple insurance-industry firms to develop, market, and underwrite insurance policies endorsed by the NRA.  Pursuant to these arrangements, the NRA performs none of the functions of an insurer.  It does lend its valuable logos, marks, and endorsements to insurance policies brokered and serviced by others.  Such "affinity insurance plans" are common, and believed by many to be a suitable substitute for employer-based coverage.[20]

28.    From 2000 onward, the NRA contracted with affiliates of the world's largest privately-held insurance broker, Lockton Companies, LLC (collectively with pertinent affiliates, "Lockton"),[21] for affinity-program brokerage and administration services.  Lockton has provided

---

[20] *See, e.g.,* Rachel Louise Ensign, *Affinity-Group Plans*, THE WALL STREET JOURNAL (Sept. 11, 2011),
http://online.wsj.com/article/SB10001424053111904836104576563341686006336.html.

[21] In particular, the NRA contracted with Lockton Affinity Series of Lockton Affinity, LLC (f/k/a Lockton Risk Services, Inc.) ("Lockton Affinity") and Kansas City Series of Lockton Companies, LLC ("Lockton KC").

services in the affinity-insurance market for decades, and caters to a wide array of industries and clients including franchises, professional and trade organizations, fraternal organizations, and common-cause groups such as the NRA. For roughly seventeen years, Lockton entities administered and marketed NRA-endorsed insurance in New York State and across the nation without incident.

29. The NRA-endorsed insurance programs administered by Lockton consist primarily of life, health, property, and casualty insurance that resemble policies offered by Lockton to other affinity groups. In addition, Lockton administers certain products, including a product known as "Carry Guard," that provide coverage for expenses arising out of the lawful self-defense use of a legally possessed firearm. Illinois Union Insurance Company ("Illinois Union"), a subsidiary of Chubb Ltd., underwrote Carry Guard while doing business under the name "Chubb."

### 3. DFS Commences A Politically Motivated Investigation Of NRA-Endorsed Insurance Programs.

30. In 2017, Cuomo conspired with DFS and Vullo to initiate an investigation into Carry Guard in an attempt to collaterally attack the NRA and stifle its gun-rights advocacy (the "DFS Investigation"). From the outset, it was clear that the investigation was meant to advance Cuomo's political agenda by stifling the NRA's speech and retaliating against the NRA based on its viewpoint on gun control issues. DFS did not announce inquiries regarding any self-defense insurance products apart from the ones endorsed by the NRA. The DFS Investigation was chronicled in the national media before official notice was provided to the NRA or its principals.

31. In fact, the DFS Investigation was orchestrated by anti-gun activists. The day after the investigation became public, a non-governmental activist organization known as Everytown for Gun Safety ("Everytown") took credit for instigating the DFS Investigation, explaining that it previously undertook its own "investigation and legal analysis" of Carry Guard which it "shared"

with regulators in New York and elsewhere.[22]  Notably, Everytown's explicit political mission is to oppose the NRA.[23]

32.     Many other membership organizations in New York endorse to their members affinity-type insurance programs similar to those endorsed by the NRA.  These organizations include, *inter alia*, the National Association for the Self-Employed, the New York State Bar Association, the New York City Bar, the New York Association of Professional Land Surveyors, and the New York State Psychological Association.  However, the DFS has not announced similar inquiries concerning any of these other membership organizations, even though their affinity programs involve most, if not all, of the practices and features that were the subject of DFS's investigations into the NRA's affinity programs.  Instead, Defendants selectively targeted the NRA because of the NRA's legislative and grassroots advocacy activities. Defendants specifically intend to undermine the NRA's ability to conduct its affairs in New York—and to advance Cuomo's anti-NRA political agenda.

### 4.     Over The Course Of The Investigation, Cuomo And DFS Exhort Firms To Sever Ties With The NRA.

33.     Throughout its purported investigation of Carry Guard in late 2017 and early 2018, DFS communicated to banks and insurers with known or suspected ties to the NRA that they would

---

[22] *Everytown, Moms Demand Action Statements Responding to Report That New York Department of Financial Services is Investigating NRA Carry Guard Insurance*, MOMS DEMAND ACTION FOR GUN SENSE IN AMERICA (Oct. 25, 2017), https://momsdemandaction.org/everytown-moms-demand-action-statements-responding-to-report-that-new-york-department-of-financial-services-is-investigating-nra-carry-guard-insurance.

[23] Aaron Blake, *Bloomberg launches new $50 Million gun control effort*, THE WASHINGTON POST (Apr. 16, 2014), https://www.washingtonpost.com/news/post-politics/wp/2014/04/16/bloomberg-aims-to-spend-50-million-on-gun-control/?noredirect=on&utm_term=.703fe67ee197 (explaining that Everytown "will attempt to combat the vast influence of the National Rifle Association").

face regulatory action if they failed to terminate their relationship with the NRA. These exhortations extended far beyond Carry Guard (the policy purportedly raising regulatory concerns), indicating that any business relationship whatsoever with the NRA would invite adverse action.

34.     Cuomo directed DFS to publicly "urge insurers and bankers statewide to determine whether any relationship they may have with the NRA or similar organizations sends the wrong message to their clients and their communities who often look to them for guidance and support."[24]

35.     Accordingly, on April 19, 2018, Vullo, as Superintendent of DFS, issued a pair of ominous "guidance" letters (the "April 2018 Letters") directed at the chief executive officers, or equivalents, of all New York State chartered or licensed financial institutions and all insurers doing business in New York. The April 2018 Letters urged recipients to sever ties with the NRA and other "gun promotion organizations."[25]  The directive was packaged in a sharply worded media advisory meant to generate headlines – and apply maximum public pressure on the NRA and those with whom it associates.

---

[24] *GOVERNOR CUOMO DIRECTS DEPARTMENT OF FINANCIAL SERVICES TO URGE COMPANIES TO WEIGH REPUTATIONAL RISK OF BUSINESS TIES TO THE NRA AND SIMILAR ORGANIZATIONS*, N.Y. STATE GOVERNOR ANDREW M. CUOMO (Apr. 19, 2018), https://www.governor.ny.gov/news/governor-cuomo-directs-department-financial-services-urge-companies-weigh-reputational-risk, attached hereto as Exhibit A.

[25] Maria T. Vullo, *Guidance on Risk Management Relating to the NRA and Similar Gun Promotion Organizations*, N.Y. STATE DEP'T OF FIN. SERVS. (Apr. 19, 2018), https://www.dfs.ny.gov/legal/dfs/DFS_Guidance_Risk_Management_NRA_Gun_Manufacturers-Insurance.pdf (addressed to the CEOs or equivalents of insurers doing business in the State of New York), attached hereto as Exhibit B; Maria T. Vullo, *Guidance on Risk Management Relating to the NRA and Similar Gun Promotion Organizations*, N.Y. STATE DEP'T OF FIN. SERVS. (Apr. 19, 2018), https://www.dfs.ny.gov/legal/dfs/DFS_Guidance_Risk_Management_NRA_Gun_Manufacturers-Banking.pdf (addressed to the CEOs or equivalents of New York State chartered or licensed financial institutions), attached hereto as Exhibit C.

36.     The April 2018 Letters are suffused with political concerns far afield from DFS's mandate to prevent financial crises and financial fraud.  For example, they urge banks and insurers to heed "the voices of the passionate, courageous, and articulate young people" speaking out in favor of gun control, and to reconsider any business relationships with "the [NRA], and similar organizations that promote guns and lead to senseless violence."  However, the April 2018 Letters do not merely express Defendants' own political opinions: they invoke the "risk management" obligations of recipients, and direct banks and insurers to "take prompt actions to manage" purported "reputational risks" arising from "dealings with the NRA or similar gun promotion organizations."

37.     Read in the context of the preceding months' private communications—as well as disclosures that would soon follow concerning consequences imposed on firms doing business with the NRA—the April 2018 Letters were threats that deliberately invoked DFS's "risk management" authority to warn of adverse action if institutions failed to support Defendants' efforts to stifle the NRA's speech and to retaliate against the NRA based on its viewpoint.

38.     Importantly, the April 2018 Letters contain no language clarifying that DFS would forebear from directly enforcing the letters' terms.  Nor do the April 2018 Letters provide regulated institutions with any objective criteria for measuring the "reputational risks" imposed by dealings with entities that "promote guns that lead to senseless violence."  This is because Defendants intend the April 2018 Letters to intimidate institutions into acceding to a political blacklisting campaign, and have nothing to do with the types of market "risks" properly regulated by DFS.

39.     To further dispel any ambiguity surrounding the April 2018 Letters, Cuomo and Vullo issued the contemporaneous press release, containing and endorsing a statement by Vullo

that directly "urge[s] all insurance companies and banks doing business in New York to join the companies that have already discontinued their arrangements with the NRA."[26]

40.    Likewise, on April 20, 2018, Cuomo publicly tweeted: "The NRA is an extremist organization. I urge companies in New York State to revisit any ties they have to the NRA and consider their reputations, and responsibility to the public."[27]

41.    The intended and actual effect of the April 2018 Letters, and the actions by Cuomo and Vullo, is to coerce insurance agencies, insurers, and banks into terminating business relationships with the NRA that were necessary to the survival of the NRA as a charitable organization.

**D.    The Damage Done.**

**1.    DFS Permanently Restricts Lockton From Doing Business With The NRA In New York.**

42.    On May 2, 2018, two weeks after Vullo issued the April 2018 Letters, Lockton entered into a consent order Under Articles 21, 23, and 34 of the Insurance Law (the "Lockton Consent Order") with DFS—signed by Vullo—which imposes a civil monetary penalty of $7 million.[28]   Although the Lockton Consent Order ostensibly addresses discrete violations by specific Lockton entities of New York's Insurance Law, its provisions go much further.  Most notably, the Lockton Consent Order purports to restrict Lockton's participation in *any* NRA-

---

[26] *Governor Cuomo Directs Department of Financial Services to Urge Companies to Weigh Reputational Risk of Business Ties to the NRA and Similar Organizations*, N.Y. STATE GOVERNOR ANDREW M. CUOMO (Apr. 19, 2018), https://www.governor.ny.gov/news/governor-cuomo-directs-department-financial-services-urge-companies-weigh-reputational-risk.

[27] Andrew Cuomo (@NYGovCuomo), TWITTER (Apr. 20, 2018, 8:58 AM), https://twitter.com/NYGovCuomo/status/987359763825614848.

[28] The Lockton Consent Order is attached hereto as Exhibit D.

endorsed insurance programs in New York State, irrespective of whether such programs comply with the Insurance Law.

43.     Specifically, the Lockton Consent Order requires that Lockton agree "not to participate in . . . any other NRA-endorsed programs with regard to New York State."  Nor may Lockton "enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance to be issued or delivered in New York State or to anyone known to Lockton to be a New York resident."  As a result, Lockton is prohibited from selling NRA affinity insurance outside New York to any individual who maintains a New York residence.

44.     DFS and Vullo have no legal basis to restrict Lockton's involvement with insurance programs that do not violate New York's Insurance Law; nor do they have authority to regulate insurance transactions outside of New York.  Nevertheless, DFS mandated that Lockton never enter into any future agreements with the NRA for legitimate and fully compliant insurance programs in New York.

45.     Furthermore, Lockton would violate the Lockton Consent Order if it markets an ordinary property, casualty, or life insurance policy in the State of New York that was accompanied by an NRA logo or endorsement—notwithstanding that a comparable logo or endorsement referencing any other affinity or common-cause organization is permissible.   This provision of the Lockton Consent Order is deliberate and intended to impair the NRA's ability to negotiate insurance benefits for its members, damage the NRA's goodwill among its membership, and unconstitutionally restrict the NRA's commercial speech on the basis of political animus.

46.     Several of the purported "violations" assessed pursuant to the Lockton Consent Order concern programs commonly engaged in by numerous additional affinity associations that

do not publicly advocate for Second Amendment rights and, therefore, are <u>not</u> targets of Defendants' unconstitutional conduct. Several such organizations are clients of Lockton—yet the Consent Order does not compel Lockton to discontinue its purportedly unlawful conduct with respect to these clients.

47.     For example:

- DFS claims that Lockton Affinity violated Insurance Law § 2122(a)(1) by referring to the insurer's AM Best rating. Yet, in reference to Lockton Affinity's affinity program for the American Optometric Association through AOAExcel ("AOAExcel"), Lockton Affinity states that it has the "backing of a carrier that is rated A+ (Superior) by A.M. Best.[29]   Similarly, Lockton Affinity currently advertises that coverage for the affinity programs designed for the Veterans of Foreign Wars ("VFW") and Moose International Inc. ("Moose") is through companies "rated 'Excellent' or higher by A.M. Best."[30]

- DFS claims that Lockton Affinity violated Insurance Law § 2324(a) by giving or offering to give no cost insurance to NRA members in good standing. Yet, Lockton Affinity currently makes that same offer to members of both the Professional Photographers of America ("PPA")[31] and the VFW.[32]

- DFS claims that Lockton Affinity violated Insurance Law § 2116 by compensating the NRA based on actual premiums collected. Yet, Lockton Affinity paid AOAExcel, Moose, the VFW, and the PPA in the same or similar manner.

---

[29]   *Questions? We have answers for you.*, AOA INSURANCE ALLIANCE, http://aoainsurancealliance.com/faq/ (last visited May 7, 2018).

[30]   *FVW Post Insurance Program, Program Information*, VFW INSURANCE, http://vfwinsurance.com/wp-content/uploads/sites/29/2017/12/VFW_Post_Insurance_Information_Packet.pdf   (last visited May 7, 2018); MOOSE INSURANCE PROGRAM, http://mooseinsuranceprogram.com/ (last visited May 7, 2018).

[31] INSURANCE FOR PPA, https://insuranceforppa.com/ (last visited May 7, 2018).

[32] VFW INSURANCE, http://vfwinsurance.com/life-insurance/#no-cost (last visited May 7, 2018).

48.     Even if such conduct does violate insurance law, DFS's selective enforcement of such offenses as to NRA-endorsed policies—but not as to other policies marketed by Lockton in an identical fashion—constitutes impermissible viewpoint discrimination and a denial of equal protection under the law.

2.      **DFS Purports To Prohibit Chubb From Doing Business With The NRA Anywhere.**

49.     On May 7, 2018, Chubb Group Holdings, Inc. and Illinois Union (together, "Chubb") entered into a Consent Order Under Sections 1101 and 3420 of the Insurance Law (the "Chubb Consent Order") with DFS—signed by Vullo—which imposes a civil monetary penalty of $1.3 million.[33]  Similar to the Lockton Consent Order, in the Chubb Consent Order, DFS overextends its authority and purports to restrict Chubb's participation in *any* affinity-type insurance program with the NRA, irrespective of whether such programs comply with the Insurance Law.

50.     Although DFS restricts Lockton from participating in any affinity-type insurance programs with the NRA in New York or with New York residents, Defendants' restrictions in the Chubb Consent Order contain no geographic constraint whatsoever.  Instead, the Chubb Consent Order purports to limit Chubb's involvement with the NRA anywhere, and everywhere, in the world.

51.     Nevertheless, DFS allows Chubb to continue to underwrite affinity-type insurance programs with other affinity or common-cause organizations that do not publicly advocate for Americans' Second Amendment rights, so long as Chubb undertakes "reasonable due diligence to

---

[33] The Chubb Consent Order is attached hereto as Exhibit E.

ensure that any entity involved . . . is acting in compliance with the Insurance Law."[34]   The only

plausible explanation for the DFS's complete exclusion of NRA-endorsed policies, even those "in

compliance with the Insurance Law," is that Defendants seek to misuse DFS's power to deprive

the NRA of insurance and financial services, on the sole ground that Defendants disapprove of the

NRA's viewpoint regarding gun control.

### 3.   Defendants' Actions Are Causing Other Financial Institutions To Re-Evaluate Their Relationships With The NRA For Fear Of Significant Adverse Action By Defendants.

52.     Defendants' concerted efforts to stifle the NRA's freedom of speech and to retaliate

against the NRA based on its viewpoints are causing other insurance, banking, and financial

institutions doing business with the NRA, such as Lloyd's of London ("Lloyd's"), to rethink their

mutually beneficial business relationships with the NRA for fear of monetary sanctions or

expensive public investigations.[35]   Indeed, Lloyd's announced on May 9, 2018, that it would

"terminate all insurance offered, marketed, endorsed, or otherwise made available" through the

NRA in light of the DFS Investigation.[36]   Moreover, Defendants have impaired the NRA's ability

to engage in lawful, truthful commercial speech in connection with affinity-insurance

endorsements.

53.     The NRA has suffered tens of millions of dollars in damages based on Defendants'

conduct described above.  Such damages include, without limitation, damages due to reputational

harm, increased development and marketing costs for new NRA-endorsed insurance programs,

---

[34] Exhibit E (Chubb Consent Order), at 7.

[35] *See, e.g.*, *Lloyd's Underwriters Told to Stop Insurance Linked to NRA*, THE NEW YORK TIMES (May 9, 2018), https://www.nytimes.com/reuters/2018/05/09/business/09reuters-lloyds-of-london-nra.html, attached hereto as Exhibit F.

[36] *Id.*

and lost royalty amounts owed to the NRA, as well as attorneys' fees, legal expenses, and other costs.

## V.

## CLAIMS

**A.    Count One: Violation Of The NRA's First And Fourteenth Amendment Rights Under 42 U.S.C. § 1983, And Article 1, Section 8 Of The New York Constitution By The Establishment Of An Implicit Censorship Regime (As To All Defendants).**

54.      The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

55.      The First Amendment, which applies to Defendants by operation of the Fourteenth Amendment, and Section Eight of the New York Constitution secure the NRA's right to free speech, including its right to express its viewpoints and political beliefs regarding the constitutionally protected right to keep and bear arms.

56.      The NRA has a longstanding history of political advocacy advancing the Second Amendment rights of all Americans.  Although Cuomo and Vullo disagree with and oppose the NRA's political views, the NRA's freedom to express its views with respect to the gun-control debate is a fundamental right protected by the First Amendment.

57.      Defendants have regulatory authority over financial institutions and insurance entities that have done or are doing business with or are otherwise associated with the NRA, including Chubb, Lockton, and Lloyd's.

58.      Defendants' actions—including but not limited to the issuance of the April 2018 Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon

Chubb and Lockton, and the issuance of the press release dated April 19, 2018—established a "system of informal censorship" designed to suppress the NRA's speech.[37]

59.     Defendants' actions were for the purpose of suppressing the NRA's pro-Second Amendment viewpoint.  Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech.

60.     Defendants' unlawful exhortations to New York insurance companies, banks, and financial institutions that they, among other things, "manag[e] their risks, including reputational risks, that may arise from their dealings with the NRA . . ., as well as continued assessment of compliance with their own codes of social responsibility[,]" as well as "review any relationships they have with the NRA[,]" and "take prompt actions to managing these risks and promote public health and safety[,]" constitute a concerted effort to deprive the NRA of its freedom of speech by threatening with government prosecution services critical to the survival of the NRA and its ability to disseminate its message.  Defendants' actions constitute an "implied threat[ ] to employ coercive state power" against entities doing business with the NRA, and they are reasonably interpreted as such.[38]

61.     Defendants' concerted efforts to stifle the NRA's freedom of speech caused financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations. For example, Defendants caused Lockton and Chubb to cease their participation in NRA-endorsed insurance programs, regardless of whether the insurance programs met all legal qualifications under New

---

[37] *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71 (1963).

[38] *Okwedy v. Molinari*, 333 F.3d 339, 342 (2d Cir. 2003).

York's Insurance Law.  Defendants' implied threats also caused Lloyd's to cease doing insurance business with the NRA.

62.     Furthermore, Defendants' unlawful and intentional restriction on the use of the NRA's logo or endorsement in marketing efforts for insurance products—notwithstanding that a comparable logo or endorsement referencing any other affinity or common-cause organization is permissible—is a deliberate attempt to unconstitutionally restrict the NRA's commercial speech on the basis of political animus.

63.     Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

64.     Absent an injunction against Defendants, the NRA will suffer irrecoverable loss and irreparable harm if it is unable to acquire insurance or other banking services due to Defendants' actions.

65.     Defendants' intentional actions resulted in significant damages to the NRA, including but not limited to damages due to reputational harm, increased development and marketing costs for new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA.  The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

66.     In addition to the above-described damages, the NRA seeks an order preliminarily and permanently enjoining Cuomo and Vullo (in their official capacities) and DFS—including its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction—from threatening or encouraging insurance companies, banks, or financial institutions to sever ties with or discontinue services to the NRA.

**B.    Count Two: Violation Of The NRA's First And Fourteenth Amendment Rights Under 42 U.S.C. § 1983 And Article 1, Section 8 Of The New York Constitution By <u>Retaliating Against The NRA Based On Its Speech (As To All Defendants).</u>**

67.    The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

68.    The First Amendment, which applies to Defendants by operation of the Fourteenth Amendment, and Section Eight of the New York Constitution, secures the NRA's right to free speech, including its right to express its viewpoints and political beliefs regarding the constitutionally protected right to keep and bear arms.

69.    The NRA has a longstanding history of political advocacy advancing the Second Amendment rights of all Americans.  Although Cuomo and Vullo disagree with and oppose the NRA's political views, the NRA's freedom to express its views with respect to the gun-control debate is a fundamental right protected by the First Amendment.

70.    Defendants' actions—including but not limited to the issuance of the April 2018 Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon Chubb and Lockton, and the issuance of the press release dated April 19, 2018—were in response to and substantially caused by the NRA's political speech regarding the right to keep and bear arms.   Defendants' actions were for the purpose of suppressing the NRA's pro-Second Amendment viewpoint.  Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech

71.    Defendants' actions have concretely harmed the NRA by causing financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations. For example, Defendants caused Lockton and Chubb to cease their participation in NRA-endorsed insurance programs in New York and elsewhere, regardless of whether the insurance programs met all legal

qualifications under New York's Insurance Law.  Defendants' implied threats also caused Lloyd's to cease participating in affinity insurance programs with the NRA.

72.     Defendants had discretion in deciding whether and how to carry out their actions, including but not limited to the types of demands imposed on Chubb and Lockton in the Consent Orders, whether to issue the press release dated April 19, 2018, and the type of guidance provided in the April 2018 Letters.  They exercised this discretion to harm the NRA because of the NRA's speech regarding the Second Amendment.

73.     Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

74.     Absent an injunction against Defendants, the NRA will suffer irrecoverable loss and irreparable harm if it is unable to acquire insurance or other financial services due to Defendants' actions.

75.     Defendants' intentional actions resulted in significant damages to the NRA, including but not limited to damages due to reputational harm, increased development and marketing costs for new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA.  The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

76.     In addition to the above-described damages, the NRA seeks an order permanently enjoining Cuomo, Vullo, and DFS—including its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction— from threatening or encouraging insurance companies, banks, or financial institutions to sever ties with or discontinue services to the NRA.

C.     **Count Three: Violation Of The Equal Protection Clause Of The Fourteenth Amendment Under 42 U.S.C. § 1983, And Article 1, Section 11 Of The New York Constitution (As To All Defendants).**

77.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

78.     Defendants knowingly and willfully violated the NRA's equal protection rights by seeking to selectively enforce certain provisions of the Insurance Law against Lockton's affinity-insurance programs for the NRA.  Meanwhile, other affinity-insurance programs that were identically (or at least similarly) marketed by Lockton, but not endorsed by "gun promotion" organizations, have not been targeted by DFS's investigation.

79.     Defendants' selective enforcement of the Insurance Law against the NRA and its business partners has been knowing, willful, arbitrary, capricious, unreasonable, discriminatory, and undertaken in bad faith and without a rational basis.  Defendants' conduct does not further any legitimate government interest.

80.     Defendants' selective enforcement of the Insurance Law against the NRA and its business partners is based on the NRA's political views and speech relating to the Second Amendment.  These considerations are impermissible bases for an enforcement action.

81.     Defendants' unlawful conduct inflicted, and threatens to continue to inflict immediate, irreparable harm on the NRA.  Additionally, Defendants' actions have resulted in significant damages to the NRA, including but not limited to damages due to reputational harm, increased development and marketing costs for new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA.  The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Laws and Rules § 8601.

82.     In addition, the NRA seeks an order preliminarily and permanently enjoining Cuomo and Vullo (in their official capacities) and DFS—including its officers, agents, servants,

employees, and all persons in active concert or participation with them who receive actual notice of the injunction—from selectively enforcing the Insurance Law by requiring Lockton or Chubb, through their respective consent orders, to forbear from doing business with the NRA which they could otherwise permissibly conduct with other affinity organizations.

**D.      Count Four: Conspiracy Under 42 U.S.C. § 1983 (As To Cuomo And Vullo In Their Individual Capacities).**

83.      The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

84.      Cuomo and Vullo, acting under color of state law, agreed with each other, and with others known and unknown, to deprive the NRA of rights secured and guaranteed by the First and Fourteenth Amendments to the United States Constitution and Sections Eight and Eleven of the New York Constitution.

85.      In furtherance of these objectives, Cuomo directed Vullo to issue statements targeted at New York insurance and financial institutions to cause them to sever existing relationships with the NRA.  Vullo subsequently released the April 2018 Letters, implicitly threatening DFS-regulated entities with potential prosecutorial action should they fail to sever ties with the NRA.

86.      Less than two weeks after the April 2018 Letters, Vullo signed the Lockton Consent Order, imposing a monetary sanction of $7 million against Lockton Affinity and Lockton Companies, and requiring them to never again participate in any lawful NRA-endorsed insurance program in New York.  Shortly thereafter, Vullo signed the Chubb Consent Order imposing a monetary sanction of $1.3 million against Chubb, and requiring them to never again participate in any lawful NRA-endorsed insurance program no matter where in the world the insured is located.

87.     Cuomo's and Vullo's conspiracy was chiefly motivated by discriminatory animus against the NRA on account of its political speech, beliefs, and associations—in particular, its advocacy on behalf of Second Amendment rights.  Vullo, at Cuomo's direction, issued the April 2018 Letters in an apparent effort to silence, intimidate, and deter those possessing a particular viewpoint from participating in the debate with respect to gun control.  This effectively prevents, or at a minimum chills, the NRA's enjoyment and exercise of its right to freedom of speech. Cuomo's and Vullo's intentional actions spawned by the conspiracy were motivated by an unlawful motive or intent and involved a reckless or callous indifference to, or disregard of, the NRA's protected constitutional rights.

88.     Cuomo's and Vullo's unlawful actions, undertaken separately and jointly under color of state law, resulted from a concerted and malicious conspiracy to abridge the NRA's freedom of speech under the First and Fourteenth Amendments to the United States Constitution and Section Eight of the New York Constitution and the NRA's right to equal protection under the Fourteenth Amendment to the United States Constitution and Section Eleven of the New York Constitution.

89.     Cuomo's and Vullo's conspiracy to stifle the NRA's speech and induce a boycott of the NRA has caused, and continues to cause, significant damages to the NRA.  For example, the NRA is entitled to compensatory damages resulting from the loss of insurance program revenues.  The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

**E.     Count Five: Violation Of The NRA's Fourteenth Amendment Due Process Rights Under 42 U.S.C. § 1983, And Article 1, Section 6 Of The New York Constitution (As To All Defendants).**

90.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

91.     Defendants' actions have deprived the NRA of its constitutionally protected interests in engaging in core political advocacy and pursuing revenue opportunities free from unreasonable government interference by coercing financial institutions to cease providing essential services to the NRA and other "gun promotion" organizations.

92.     For decades, the NRA has contracted with insurance-industry firms and professionals to create affinity-insurance programs providing life, health, property, casualty, and other similar types of insurance to NRA members, as well as club and business affiliates.   The NRA has invested significant time, money, and effort into these insurance program in order to provide a valuable benefit to its members.   Accordingly, the NRA has a property interest in the NRA-endorsed insurance policies, as well as a liberty interest in being able to endorse insurance products to its membership.

93.     Defendants' April 2018 Letters, backroom exhortations during the DFS Investigation, and public statements caused, at a minimum, Lockton Affinity, Lockton Companies, and Chubb to discontinue their NRA-endorsed insurance options in New York or (in Chubb's case) nationwide and to never again participate in such programs, thus depriving the NRA of its property interest without due process of law.

94.     Defendants, in their April 2018 Letters and in other public pronouncements, have made stigmatizing statements, including that the NRA represents a potential reputation risk to insurance companies and financial institutions, that the NRA is responsible for "senseless violence," and that the NRA is a threat to the public health and safety, that call into question the NRA's good name, reputation, honor, and integrity.

95.     As evidenced by the actions multiple insurance companies have taken to terminate their business relationships with the NRA, Defendants' public statements and other unlawful

conduct have impugned the NRA's reputation in such a fashion as to materially obstruct and hinder the NRA's ability to carry its affinity insurance programs.

96.    Defendants made these stigmatizing statements publicly, both through the release of the April 2018 Letters and in other public pronouncements.

97.    Defendants made these statements concurrently with, or in close temporal relationship to, the decision by each of Lockton and Chubb to terminate one or more key business relationships with the NRA; those termination directly resulted from the coercion applied by Defendants to Lockton and Chubb.

98.    Defendants' violation of the NRA's due process rights and deprivation of the NRA's interest in its NRA-endorsed insurance programs, as well as its other property and liberty interests, has resulted in significant damages to the NRA, including increased development and marketing costs for new NRA-endorsed insurance programs.  The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

99.    The NRA also seeks an order preliminarily and permanently enjoining Cuomo and Vullo (in their official capacities) and DFS—including its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction—from engaging in any conduct or activity which has the effect of interfering with, terminating, or diminishing any of the NRA's contracts and/or lawful business relationships with any organizations.

## VI.

## <u>DEMAND FOR JURY TRIAL</u>

100.    The NRA hereby demands a trial by jury on all issues so triable.

## VII.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE the NRA respectfully requests that the Court enter judgment in the NRA's favor and against Defendants, as follows:

a.      Declaring, pursuant to 28 U.S.C. § 2201, that Defendants have violated the NRA's rights to free speech, due process, and equal protection under both the Federal and New York Constitutions;

b.      Granting a preliminary and permanent injunction, pursuant to 28 U.S.C. § 1651 (a), 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure, ordering DFS, its agents, representatives, employees and servants and all persons and entities in concert or participation with it, Cuomo (in his official capacity), and Vullo (in her official capacity):

(1)     to immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with the NRA's exercise of the rights afforded to it under the First and Second Amendment to the United States Constitution and Section 8 to the New York Constitution;

(2)     to immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with, terminating, or diminishing any of the NRA's contracts and/or business relationships with any organizations;

(3)     to immediately cease and refrain from further selective enforcement of the Insurance Laws to the NRA endorsed policies; and

(4)     to enjoin or preclude the enforcement of the provisions of the Lockton and Chubb Consent Orders purporting to prohibit Lockton and Chubb from doing business with the NRA;

b.      Granting such other injunctive relief to which the NRA is entitled;

c.      Awarding the NRA actual damages, including compensatory and consequential damages, in an amount to be determined at trial;

d.      Awarding the NRA exemplary or punitive damages;

e.      Awarding the NRA pre-judgment and post-judgment interest at the highest lawful rates;

f.      Awarding the NRA such costs and disbursement as are incurred in prosecuting this action, including reasonable attorneys' and experts' fees; and

g.      Granting the NRA such other and further relief as this Court deems just and proper.

Respectfully submitted,

By:   *s/ William A. Brewer III*
      William A. Brewer III (Bar No. 700217)
      wab@brewerattorneys.com
      Sarah B. Rogers (Bar No. 700207)
      sbr@brewerattorneys.com
      Stephanie L. Gase (Bar No. 700205)
      sgase@brewerattorneys.com

      BREWER, ATTORNEYS & COUNSELORS
      750 Lexington Avenue, 14th Floor
      New York, New York 10022
      Telephone:  (212) 489-1400
      Facsimile:  (212) 751-2849

      Charles J. Cooper (Bar No. 103729)
      ccooper@cooperkirk.com
      Michael W. Kirk (*pro hac vice* to be filed)
      mkirk@cooperkirk.com
      J. Joel Alicea (*pro hac vice* to be filed)
      COOPER & KIRK, PLLC
      1523 New Hampshire Ave., NW
      Washington D.C., 20036
      Telephone: (202) 220-9660

      **ATTORNEYS FOR THE NATIONAL RIFLE
      ASSOCIATION OF AMERICA**