1:18-cv-566 (LEK/CFH)

# EXHIBIT D

NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES

In the Matter of

LOCKTON AFFINITY, LLC and
LOCKTON COMPANIES, LLC

**CONSENT ORDER UNDER**
**ARTICLES 21, 23 AND 34 OF THE INSURANCE LAW**

Lockton Affinity, LLC, on behalf of each of its separate operating series, one of which, Lockton Affinity Series of Lockton Affinity, LLC, is the successor entity to Lockton Risk Services, Inc. ("Lockton Affinity"), Lockton Companies, LLC, on behalf of each of its separate operating series ("Lockton Companies") (together, Lockton Affinity and Lockton Companies, "Lockton"), and the New York Department of Financial Services (the "Department") (collectively, the "Parties") are willing to resolve the matters described herein without further proceedings.

**THE DEPARTMENT'S FINDINGS FOLLOWING INVESTIGATION**

1.     Lockton, together with its affiliates, is the world's largest privately owned, independent insurance brokerage firm, offering customers risk management, insurance and employee benefits services.  At least one Lockton affiliate has been licensed by the Department since approximately 1987, and Lockton Affinity has been licensed by the Department to act as an insurance producer, including as an excess line broker, since at least 2013.

2.     Illinois Union Insurance Company ("Illinois Union") is an unauthorized insurer eligible to write excess lines insurance in New York State.  It is a subsidiary of Chubb Ltd., and

1

in connection with the "Carry Guard" program discussed herein, Illinois Union held itself out to the public simply as "Chubb" (hereinafter, "Chubb").

3.      Lloyd's of London is an insurance market encompassing more than 50 insurance companies, over 200 registered brokers, and global network of over 4,000 local agents who manage these arrangements, known as "coverholders."[1]   The Lloyd's market is backed by the Lloyd's Corporation (hereinafter, together with Lloyd's of London, collectively referred to as "Lloyd's").

4.      The National Rifle Association of America ("NRA") is a New York not-for-profit corporation incorporated in 1871.  The NRA describes its mission as "firearms safety, education, and training and advocacy on behalf of safe and responsible gun owners."  The NRA is not licensed by the Department.

**The Carry Guard Program**

5.      From approximately April through November 2017, Lockton Affinity and the NRA offered an insurance program to new and existing NRA members in New York and elsewhere called "Carry Guard."  During that time, the NRA's website described the program as follows:

> *NRA Carry Guard is a two-pronged program.  It was created to provide dynamic, state-of-the-art insurance protection to those who legally defend themselves with a firearm, and to offer an elite, one-stop training option.  The insurance provides a cutting edge set of features that will help gun owners mitigate the potentially costly financial and legal consequences flowing from armed encounters, even if they did everything right.*

6.      The NRA website further described the Carry Guard program as "the only membership carry program *developed and supported by the National Rifle Association*, the

---

[1] A "coverholder" in the Lloyd's syndicate is an insurance intermediary authorized by a managing agent to enter into contracts of insurance to be underwritten by the members of a syndicate managed by it, in accordance with the terms of a binding authority.  *See* https://www.lloyds.com/lloyds-around-the-world/europe/switzerland/becoming-an-intermediary-and-coverholder.

most powerful civil rights organization in American history." The website further stated that

Carry Guard was "*created by the NRA*."

       7.     Additional promotional materials disseminated by the NRA stated:

> **Why do I need Carry Guard**? Although millions of Americans are prepared to use a firearm in self-defense, very few families can withstand the financial consequences that may come next. The legal fees to clear your good name could be enormous. Likewise, the costs of defending and potentially losing a civil lawsuit could cripple your finances for the rest of your life. *And many homeowners' policies have severe limitations or exclusions related to intentional acts such as self-defense*.

These materials stated at the bottom of the page: "NRA CARRY GUARD™ Insurance Program

Administered by Lockton Affinity, LLC • D/B/A/ Lockton Affinity Insurance Brokers, LLC."

       8.     Pursuant to written agreements with Chubb and the NRA, Lockton Affinity served as the administrator for the Carry Guard program, carrying out such functions as marketing the insurance, binding the insurance, collecting and distributing premiums, and delivering policies to insureds.

       9.     Pursuant to written agreements with Lockton Affinity, Chubb -- through its Illinois Union subsidiary -- served as the underwriter for the Carry Guard insurance program, providing insurance policies to individuals who purchased Carry Guard insurance. According to the marketing and promotion website for the Carry Guard program, www.nracarryguard.com (in effect from April to mid-December 2017), the Carry Guard insurance program "*is backed by insurance leader Chubb*" and is underwritten by a "*group within Chubb the world's largest publicly traded property and casualty insurance company*." The Carry Guard insurance program is referred to herein as the "Carry Guard Program."

       10.    The Carry Guard Program tied insurance to free NRA membership, in violation of the New York Insurance Law (the "Insurance Law"). When purchasing Carry Guard insurance, members would also receive one year of free NRA membership. The NRA membership benefit

was not specified in the insurance policy, and one year of membership exceeded $25 in market value. The NRA directly managed the membership aspect of the Carry Guard program.[2]

11.     Lockton Affinity placed these insurance policies through New York's excess line market. Excess line coverage offers policyholders an opportunity to obtain insurance that could not be procured from an authorized insurer. An "authorized insurer" is an insurance company that has received a license from the Department to provide specified types of insurance to customers in New York. Authorized insurers are fully regulated by the Department in order to ensure solvency and adherence to consumer protection standards.

12.     Excess line insurers are not licensed or authorized by the Department, but are permitted to do business in New York through an excess line broker.  Unless another exemption applies, an insurance policy may be procured from an excess line insurer only after an excess line broker has obtained declinations of coverage from three authorized insurers.

13.     The Carry Guard insurance program, as underwritten by Chubb and administered, solicited and marketed by Lockton Affinity, provided insurance coverage that may not be offered in the New York State excess line market, specifically: (a) defense coverage in a criminal proceeding that is not permitted by law; (b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property; and (c) coverage for expenses incurred by the insured for psychological counseling support.

14.     Moreover, although it did not possess an insurance producer license from the Department, the NRA nonetheless engaged in aggressive marketing of and solicitation for the Carry Guard Program.  For example (and without limitation):

---

[2] In the event the purchaser was already an NRA member, the Carry Guard program allowed the member to carry a credit for a free one year membership forward, or allowed a transfer of the credit to a family member for use in obtaining NRA membership at no cost.

o   The NRA broadcasted NRA-produced videos promoting the Carry Guard Program on YouTube;

o   The NRA solicited participation in the Carry Guard Program through mass e-mail marketing, direct mail, banner ads, and articles in NRA publications;

o   The NRA heavily promoted the Carry Guard Program at its 2017 "Carry Guard Expo" and its annual meetings;

o   The NRA operated the website "www.nracarryguard.com," which was an important marketing portal for the Carry Guard Program and linked to a website operated by Lockton Affinity (www.lockton.nracarryguard.com), which provided additional information about the Carry Guard Program;

o   The NRA promoted Carry Guard insurance on its main website, www.nra.org, which, among other things, featured an NRA spokesperson making claims such as, "***We're proud to have developed*** the one carry membership program that stands above all others – NRA Carry Guard"; and "I will never carry a gun without carrying this."

o   "Pop-up" internet advertising for the Carry Guard Program that featured one or more NRA spokespersons.

## Other NRA-Endorsed Programs

15.   From approximately January 2000 through March 2018, Lockton Affinity and the NRA together offered at least 11 additional insurance programs to new and existing NRA members in New York and elsewhere, including:

a.   "Retired Law Enforcement Officer Self-Defense Insurance," which provided coverage for criminal and civil defense costs, and bodily injury and damage caused by the use of a firearm;

b.   "ArmsCare Plus Firearms Insurance," which provided coverage for legal firearms and attached accessories against loss, damage, flood, fire, and theft (including theft from a locked vehicle);

c.   "No Cost ArmsCare Firearms Insurance," which provided free coverage to NRA members in good standing for legal firearms and their attached accessories, up to $2,500 in value, against loss, damage, flood, fire, and theft (including theft from a locked vehicle);

d.   "Firearms Instructor Plus Liability Insurance," which provided coverage for injuries or damage the insured causes while acting as an instructor during a lesson, medical expenses up to $5,000, legal expenses from lawsuits related to the injuries or damage,

and professional liability coverage that protects the member from allegations of negligent training;

e. "Personal Firearms Protection Insurance," which provided coverage for any unintentional injuries or damage an insured causes while hunting or trapping on public or private land, shooting in competitions, or shooting at private shooting ranges, with a firearm, air gun, bow and arrow, or trapping equipment, and coverage for lawsuit defense costs;

f. "Gun Collector Insurance," which provided coverage for certain firearms and their attached accessories against loss, damage, fire, and theft (including theft from a locked vehicle);

g. "Gun Club Insurance," which provided coverage for loss or damage to any assets the gun club rents, leases or owns, coverage for general liability plus medical payments, coverage for claims of false advertising, and optional coverage for business income, boiler and machinery, glass, computers, valuable papers and records, and accounts receivable;

h. "Hunt Club Insurance," which provided coverage for hunt clubs and the landowners to protect against injury and damage, provides host liquor coverage, and provided hired and non-owned auto coverage.  In addition, an insured could select coverage for "personal and advertising," products/completed operations, and medical expenses up to $5,000 for any one person;

i. "NRA Business Alliance Insurance," which provided coverage for a firearms-related business, including coverage for loss or damage to any assets the insured business rents, leases or owns, coverage for general liability plus medical payments, coverage for claims of false advertising, gunsmith coverage, and optional coverage for business income, boiler and machinery, glass, computers, valuable papers and records, and accounts receivable;

j. "Gun Show Insurance," which provided coverage for the insured's liability arising out of the insured's occupation as a gun show promoter; and

k. "Home-Based Federal Firearms License Insurance" for gun dealers and gunsmiths, which provided coverage for the insured's business location, equipment and tools, and gear entrusted to the insured by the insured's clients, against theft, damage and other loss, and provides general liability coverage, including products/completed liability to insure the insured's finished work against later claims.

Together, these Lockton Affinity-administered Lloyd's insurance programs (and for a brief period, Lockton Affinity-administered Alea London Ltd. ("Alea") insurance programs), are referred to herein as the "Other NRA Programs."

16.     Pursuant to written agreements with Lloyd's and the NRA, Lockton Affinity served as the administrator for the Other NRA Programs, carrying out such functions as marketing the insurance, binding the insurance, collecting and distributing premiums, and delivering policies to insureds.

17.     Pursuant to written agreements with Lockton Affinity, Lloyd's and Alea served as the underwriters for the Other NRA Programs, providing insurance policies to individuals who purchased NRA-sponsored insurance.  Lockton Affinity also placed these insurance policies through New York's excess line market.

**Lockton Affinity's NRA Programs Violated New York Laws and Regulations**

18.     In violation of the Insurance Law, the Carry Guard Program, as brokered, administered, solicited and marketed by Lockton Affinity, provided insurance coverage that may not be offered in the New York State excess line market, specifically:  (a) defense coverage in a criminal proceeding that is not permitted by law; (b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property; and (c) coverage for expenses incurred by the insured for psychological counseling support.

19.     Similarly, the NRA Retired Law Enforcement Officer Self-Defense Insurance Program provided insurance coverage that may not be offered in the New York State excess line market, specifically:  (a) defense coverage in a criminal proceeding that is not permitted by law; and (b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property.

7

20.     Additionally, the Carry Guard insurance program, as administered by Lockton Affinity, failed to comply with Section 3420 of the Insurance Law, which sets forth minimum requirements for liability insurance policies.

21.     Lockton Affinity also violated the Insurance Law by giving or offering to give: (a) the No Cost ArmsCare Firearms Insurance for free to NRA members in good standing; and (b) free NRA membership, which the insured could use him or herself, or transfer to a family member, if a person purchased the Carry Guard insurance, when the free NRA membership was not specified in the insurance policy and exceeded $25 in market value.

22.     Lockton has represented to the Department that, between approximately April and November 2017, 680 Carry Guard insurance policies were issued to New York residents. Lockton has further represented to the Department that no claims have been submitted under the New York Carry Guard insurance policies to date.

23.     Lockton has also represented to the Department that, for the period January 2000 through March 25, 2018, 28,015 insurance policies were issued to New York residents under the Other NRA Programs.

24.     Under written agreements between Lockton Affinity and the NRA, as of March 25, 2018, Lockton has represented that the NRA received royalties on the Carry Guard Program in the amount of about $21,198, an amount based on a percentage of the actual premiums collected by Lockton Affinity under the Carry Guard Program from New York residents, in violation of the Insurance Law.  Similarly, under written agreements between Lockton Affinity and the NRA, the NRA received additional royalties under the Other NRA Programs based on a percentage of premiums collected by Lockton Affinity from New York residents, similarly violating the Insurance Law.

8

25.     Lockton has represented to the Department that revenue to the NRA from the Carry Guard Program and the Other NRA Programs in New York totaled approximately $1,872,737 for the period January 2000 through March 25, 2018.  Under written agreements between Lockton Affinity and the NRA, the NRA also received profit-sharing disbursements from Lockton Affinity based on a schedule agreed to by the parties in conjunction with the Other NRA Programs.

26.     Between January 2000 and March 25, 2018, Lockton has represented to the Department that Lockton Affinity collected premiums from the Carry Guard Program and the Other NRA Programs in New York amounting to approximately $12,056,627.  Lockton has also represented that it collected approximately $785,460 in administrative fees from insureds under the Carry Guard Program and the Other NRA Programs in New York during this time period.

**Lockton Affinity Submitted Inaccurate Affidavits Required By the**
**Insurance Law Pertaining to Excess Lines Insurance Coverage**

27.     Lockton Affinity, through one or more of its sublicensees, submitted affidavits to the Excess Line Association of New York ("ELANY") required by Insurance Law § 2118 in connection with the Carry Guard Program and the Other NRA Programs.  As set forth below, those affidavits contained inaccurate information concerning compliance with the Insurance Law and regulations promulgated thereunder.

28.     As noted above, an authorized insurer is an insurance company that is licensed by the Department to write certain kinds of insurance in New York, as specified in Insurance Law § 1113(a).  Authorized insurers are fully regulated by the Department in order to ensure solvency and adherence to consumer protection standards.  An unauthorized insurer is an insurer not licensed by the Department to write insurance in New York, and may be an insurer that provides "excess line" insurance only under prescribed rules.

9

29.     Under the Insurance Law, unless another exemption applies, an excess line broker like Lockton Affinity that seeks to procure excess line insurance must first approach three separate authorized insurers to determine if any one of those insurers will write coverage for the risk. If all three authorized insurers decline to provide the requested coverage, only then may the excess line broker place the insurance with an unauthorized insurer like Chubb. An excess line broker must seek three declinations for each insured; the broker may not rely upon declinations obtained with respect to other insureds.

30.     In placing the Carry Guard Program and Other NRA Program insurance policies, Lockton Affinity only obtained declinations from three authorized insurers once annually for a single policy for each of these insurance programs, and then relied upon the single annual declination with respect to all other insureds who received policies under these programs. At least one Lockton Affinity sublicensee affirmed that, to the best of his knowledge and belief, every policy procured by the sublicensee on behalf of Lockton Affinity was in full compliance with the Insurance Law and regulations promulgated thereunder, when, in truth and in fact, the sublicensee had not secured such declinations in compliance with the Insurance Law.

**The Department's Investigation**

31.     Since October 2017, the Department has been conducting an investigation of the involvement of Chubb, Lloyd's, Lockton and the NRA in the Carry Guard Program, the Other NRA Programs, and other matters, including review of thousands of pages of documents obtained from Chubb, Lockton and the NRA, and review of other information obtained from investigative resources (the "DFS Investigation").

32.     Lockton has represented to the Department that, following initiation of the DFS Investigation in October 2017, which included information requests sent to Lockton in October

2017, Lockton Affinity suspended the Carry Guard Program on or about November 17, 2017, no longer making Carry Guard policies available for New York residents to purchase.

33.     **NOW THEREFORE**, to resolve this matter without further proceedings, pursuant to Articles 21, 23 and 34 of the Insurance Law, Lockton Affinity, Lockton Companies, and the Department hereby stipulate and agree as follows:

<u>**VIOLATIONS OF LAW AND REGULATIONS**</u>

34.     Lockton Affinity compensated the NRA based on actual premium collected when the NRA was acting as an unlicensed insurance broker by selling and soliciting insurance in New York, in violation of Insurance Law § 2116.

35.     Lockton Affinity acted for and aided an unauthorized Chubb insurer, Illinois Union, in connection with Illinois Union's issuing or delivering policies in New York State, or otherwise issuing policies covering New York State residents, which provided insurance coverage that may not be offered in the New York State excess line market, specifically: (a) defense coverage in a criminal proceeding that is not permitted by law; (b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property; and (c) coverage for expenses incurred by the insured for psychological counseling support, in violation of Insurance Law § 2117.

36.     Lockton Affinity gave, or offered to give, a free one-year NRA membership if a person purchased the Carry Guard Program insurance policy, when the NRA membership benefit was not specified in the policy and exceeded $25 in market value, in violation of Insurance Law § 2324(a).

37.     Lockton Affinity gave, or offered to give, the No Cost ArmsCare Firearms Insurance at no cost to NRA members in good standing, in violation of Insurance Law § 2324(a).

38.     Lockton Affinity advertised the financial condition of a Chubb insurer by referring to the insurer's AM Best rating, in violation of Insurance Law § 2122(a)(1).

39.     Lockton Affinity called attention to an unauthorized Chubb insurer by advertising Chubb's participation in the Carry Guard Program on the Carry Guard website, in violation of New York Insurance Law § 2122(a)(2).

40.     Lockton Affinity failed to properly secure declinations from authorized insurers for each insured, in violation of Insurance Law § 2118.

## SETTLEMENT PROVISIONS

### Civil Monetary Penalty

41.     Lockton Affinity shall pay a civil monetary penalty to the Department pursuant to Articles 21, 23 and 34 of the Insurance Law in the amount of $7,000,000. Lockton Affinity shall pay the entire amount within ten days of executing this Consent Order. Lockton Affinity agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any U.S. federal, state, or local tax, directly or indirectly, for any portion of the civil monetary penalty paid pursuant to this Consent Order. Lockton further agrees that it will not claim, seek, or receive indemnification of the civil monetary penalty from any other person or entity. This provision is not intended, and shall not be construed, to prohibit Lockton affiliates from funding inter-company transfers to Lockton Affinity.

### Prohibition on NRA-Endorsed Insurance Programs

42.     Lockton agrees not to participate in the Carry Guard Program, any similar programs, or any other NRA-endorsed programs with regard to New York State, including,

12

without limitation, (a) by agreeing not to provide Carry Guard or other insurance policies specific to firearm usage that provides liability coverage for bodily injury or property damage from use of a firearm, whether they are written or issued in New York State or elsewhere; and (b) by agreeing not to provide liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in general liability policies that is not limited to those occasions where bodily injury results from the use of reasonable force to protect persons or property, whether they are written or issued in New York State or elsewhere; provided, however, that Lockton Affinity may provide runoff administration for any in-force policies not cancelled pursuant to Paragraph 46. Furthermore, Lockton agrees not to issue or deliver any Carry Guard or similar insurance policies in New York State, regardless of the residence of the insured. For the avoidance of doubt, Lockton shall not be prohibited from procuring homeowners, renters or general liability insurance in New York State or for New York residents that includes personal injury liability insurance or property damage liability insurance for loss, damage, or expense that results from the negligent use of a firearm.

43.     Lockton agrees that it shall not enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance to be issued or delivered in New York State or to anyone known to Lockton to be a New York resident; provided, however, that Lockton may assist the NRA in procuring insurance for the NRA's own corporate operations.

44.     Lockton confirms and represents to the Department that, between approximately April and November 2017, 680 Carry Guard insurance policies were issued to New York residents. Lockton confirms and hereby represents to the Department that no claims have been submitted under the New York Carry Guard insurance policies to date.

45.    Lockton confirms and represents to the Department that:

    a.  for the period January 2000 through March 25, 2018, 28,015 insurance policies were issued to New York residents under the Other NRA Programs;

    b.  Under written agreements between Lockton Affinity and the NRA, as of March 25, 2018, the NRA received royalties from the Carry Guard Program in New York in the amount of approximately $21,198;

    c.  Total revenue to the NRA from the Carry Guard Program and the Other NRA Programs in New York totaled approximately $1,872,737 for the period January 2000 through March 25, 2018;

    d.  Lockton Affinity collected premiums from the Carry Guard Program and the Other NRA Programs in New York amounting to approximately $12,056,627 for the period January 2000 through March 25, 2018;

    e.  Lockton Affinity collected approximately $785,460 in administrative fees from insureds under the Carry Guard Program and the Other NRA Programs in New York during the period January 2000 through March 25, 2018.

46.    Lockton agrees to fully cooperate with Chubb, Lloyd's and Alea (the "Underwriters") to effect any cancellation initiated by an Underwriter of Carry Guard insurance policies issued to New York residents, NRA Retired Law Enforcement Officer Self-Defense Insurance policies issued to New York residents, and any other NRA-related insurance policies issued to New York residents that provide coverage for intentional acts or legal services insurance that were procured by Lockton Affinity, such cancellation to be effective 90 days from the date of such notice. Lockton agrees to cooperate with the Underwriters in submitting any such draft notices to the Department for the Department's review and approval prior to the

mailing or delivery of such notices by the Underwriters. Lockton Affinity also agrees to fully cooperate in refunding the insurance premiums for the cancelled policies. Thereafter, Lockton Affinity shall promptly file a certification with the Department that sets forth its compliance with this Paragraph 46.

47.     Lockton Affinity agrees not to procure from an unauthorized insurer any insurance policy to be issued or delivered in New York State, or to anyone known to Lockton Affinity to be a New York resident, in the New York State excess line market that provides: (a) defense coverage in a criminal proceeding; (b)(i) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that is beyond the use of reasonable force to protect persons or property, or (ii) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in general liability policies that is not limited to those occasions where bodily injury results from the use of reasonable force to protect persons or property; and (c) coverage for expenses incurred by the insured for psychological counseling support. For the avoidance of doubt, Lockton shall not be prohibited from procuring homeowners, renters or general liability insurance in New York State or for New York residents that includes personal injury liability insurance or property damage liability insurance for loss, damage, or expense that results from the negligent use of a firearm.

**Full and Complete Cooperation of Lockton**

48.     Lockton commits and agrees to fully cooperate with the DFS Investigation and all terms of this Consent Order. Such cooperation shall include, without limitation:

a.  producing all non-privileged documents and other materials to the Department, as requested, wherever located in Lockton's possession, custody, or control;

b.  requiring employees or agents to appear for interviews, at such reasonable times and places, as requested by the Department;

c.  responding fully and truthfully in a prompt manner to all inquiries when requested to do so by the Department; and

d.  testifying at hearings, trials and other judicial, administrative or other proceedings, when requested to do so by the Department, in connection with its investigation of matters relating to any NRA-endorsed insurance program.

## Compliance Review

49.     Lockton agrees to fully and completely cooperate with the DFS Investigation by providing a truthful, accurate and complete report to the Department, within 60 days of the execution of this Consent Order (the "Compliance Review"), that reports on:

a.  any additional violations of the Insurance Law, or regulations promulgated thereunder, that Lockton has identified;

b.  any actions undertaken by Lockton to identify any violations of the Insurance Law, or the regulations promulgated thereunder; and

c.  a plan for remediation of any violation of the Insurance Law, or regulations promulgated thereunder, identified in connection with the Carry Guard Program, the Other NRA Programs, or any other insurance program or conduct that violates the Insurance Law, or regulations promulgated thereunder.

The Department may, in its sole regulatory discretion, accept, reject, or modify any plan of remediation submitted by Lockton.

**Breach of Consent Order**

50.    If the Department believes Lockton or Lockton Affinity to be in material breach of this Consent Order, the Department will provide written notice to Lockton and/or Lockton Affinity and Lockton and/or Lockton Affinity (as the case may be) must, within ten business days of receiving such notice, or on a later date if so determined in the Department's sole discretion, appear before the Department to demonstrate that no material breach has occurred or, to the extent pertinent, that the breach is not material or has been cured.

51.    The Parties understand and agree that Lockton's and/or Lockton Affinity's failure to make the required showing within the designated time period shall be presumptive evidence of such party's breach.  Upon a finding that Lockton and/or Lockton Affinity has breached this Consent Order, the Department has all the remedies available to it under the New York Insurance and Financial Services Laws and may use any evidence available to the Department in any ensuing hearings, notices, or orders.

**Waiver of Rights**

52.    The Parties understand and agree that no provision of this Consent Order is subject to review in any court or tribunal outside the Department.

**Parties Bound by the Consent Order**

53.    This Consent Order is binding on the Parties, as well as any successors and assigns.  This Consent Order does not bind any federal or other state agency or any law enforcement authority.

17

54.    No further action will be taken by the Department against Lockton in connection with the Carry Guard Program and the Other NRA Programs for the period January 1, 2000 through March 31, 2018, provided that Lockton complies fully with the terms of this Consent Order, including Paragraphs 48 and 49 above.

55.    Notwithstanding any other provision contained in this Consent Order, the Department may undertake action against Lockton for transactions or conduct that Lockton did not disclose to the Department in the written materials that Lockton submitted to the Department in connection with this matter, including, without limitation, any transactions or conduct that Lockton identifies to the Department pursuant to the Compliance Review that it will undertake as set forth in Paragraph 49 of this Consent Order.

**Notices**

56.    All notices or communications regarding this Consent Order shall be sent to:

For the Department:

> For the Department:
>
> Hadas Jacobi
> Assistant Deputy Superintendent
>   for Enforcement
> New York State Department of Financial Services
> One State Street
> New York, NY 10004
>
> Megan Prendergast
> Deputy Superintendent for Enforcement
> New York State Department of Financial Services
> One State Street
> New York, NY 10004
>
> Connor Mealey
> Excelsior Fellow
> New York State Department of Financial Services
> One State Street
> New York, NY 10004

For Lockton Companies, LLC:

William Humphrey
Secretary
Lockton Companies
444 West 47th Street
Kansas City, MO 64112

Scott A. Edelman
Milbank, Tweed, Hadley & McCloy
28 Liberty Street
New York, NY 10005

Andrew R. Holland
Sidley Austin
787 Seventh Avenue
New York, NY 10019

For Lockton Affinity, LLC:

William Humphrey
Secretary
Lockton Affinity
444 West 47th Street
Kansas City, MO 64112

Scott A. Edelman
Milbank, Tweed, Hadley & McCloy
28 Liberty Street
New York, NY 10005

Andrew R. Holland
Sidley Austin
787 Seventh Avenue
New York, NY 10019

19

**Miscellaneous**.

57.     Each provision of this Consent Order shall remain effective and enforceable until stayed, modified, suspended, or terminated by the Department.

58.     No promise, assurance, representation, or understanding other than those contained in this Consent Order has been made to induce any party to agree to the provisions of the Consent Order.

IN WITNESS WHEREOF, the parties have caused this Consent Order to be signed this 2nd day of May, 2018.

**LOCKTON COMPANIES, LLC, on**
behalf of each of its separate operating series,

By : _____
**WILLIAM HUMPHREY**
Secretary

**LOCKTON AFFINITY, LLC, on**
behalf of each of its separate operating series,

By: _____
**WILLIAM HUMPHREY**
Secretary

**NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES**

By: _____
**MARIA T. VULLO**
**Superintendent of Financial Services**

By: _____
**MATTHEW L. LEVINE**
**Executive Deputy Superintendent for Enforcement**

20