# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| Plaintiff, | § § | CIVIL CASE NO.  18-CV-00566-LEK-CFH |
| v. | § § | |
| ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES, | § § § § § § § | |
| Defendants. | § § | |

## MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE FOR EXPEDITED DISCOVERY

William A. Brewer III (Bar No. 700217)
Stephanie L. Gase (Bar No. 700205)
Sarah B. Rogers (Bar No. 700207)
BREWER, ATTORNEYS & COUNSELORS
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone:  (212) 489-1400
Facsimile:  (212) 751-2849

Charles J. Cooper*
Michael W. Kirk*
J. Joel Alicea*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington D.C., 20036
Telephone: (202) 220-9660

*Appearing *pro hac vice*

ATTORNEYS FOR THE NATIONAL RIFLE ASSOCIATION OF AMERICA

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

I. PRELIMINARY STATEMENT ............................................................................ 1

II. STATEMENT OF FACTS .................................................................................. 3

    A.    The NRA Attempts To Make Affordable Insurance Available To Its Members. ............................................................................................... 3

    B.    Defendants' Attempt To Chill The NRA's Political Speech In Support Of Americans' Second Amendment Rights. ................................................. 5

    C.    Defendants' Actions Cause Companies To Terminate Their Relationships With The NRA. ............................................................................................ 8

    D.    The NRA Seeks Narrowly Tailored Discovery To Provide The Court With A Record Upon Which To Consider The NRA's Request For Preliminary Injunctive Relief .......................................................................................... 11

III. ARGUMENT AND AUTHORITIES ................................................................ 12

    A.    The NRA Is Entitled To Expedited Discovery Under The "Reasonableness And Good Cause" Standard. ................................................................... 14

    B.    The NRA Is Entitled To Expedited Discovery Even Under The *Notaro* Test. .................................................................................................... 16

          1.    Defendants' Violations Of The NRA's Constitutional Rights Constitute Irreparable Injury. ................................................................ 17

          2.    The NRA Has Established, At A Bare Minimum, Some Probability of Success On The Merits. ............................................................... 18

          3.    The Expedited Discovery Sought Will Help Avoid Further Harm To The NRA. .................................................................................... 22

          4.    The NRA Has A Greater Potential For Harm Than Any Harm Defendants Might Suffer From Responding To Discovery On An Expedited Basis ...................................................................... 23

IV. CONCLUSION ................................................................................................. 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AF Holdings LLC v. Does 1-1058,*
    752 F.3d 990 (D.C. Cir. 2014) ........................................................................13

*Albro v. Onondaga Cnty., N.Y.,*
    627 F. Supp. 1280 (N.D.N.Y. 1986) ...............................................................17

*Ayyash v. Bank Al-Madina,*
    233 F.R.D. 325 (S.D.N.Y. 2005) ...............................................................13, 16

*Backpage.com, LLC v. Dart,*
    807 F.3d 229 (7th Cir. 2015) ..........................................................................18

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963)................................................................................1, 18, 22

*Battle v. Mun. Hous. Auth. for City of Yonkers,*
    53 F.R.D. 423 (S.D.N.Y. 1971) .......................................................................17

*Brewer v. W. Irondequoit Cent. Sch. Dist.,*
    212 F.3d 738 (2d Cir. 2000)............................................................................17

*Brown v. Hartlage,*
    456 U.S. 45 (1982)..........................................................................................19

*Cine SK8, Inc. v. Town of Henrietta,*
    507 F.3d 778 (2d Cir. 2007)............................................................................20

*Cohen v. Coahoma Cnty., Miss.,*
    805 F. Supp. 398 (N.D. Miss. 1992) ...............................................................17

*Cuffley v. Mickes,*
    208 F.3d 702 (8th Cir. 2000) ..........................................................................20

*Deferio v. City of Syracuse,*
    193 F. Supp. 3d 119 (N.D.N.Y. 2016) .............................................................17

*Donohue v. Paterson,*
    715 F. Supp. 2d 306 (N.D.N.Y. 2010) .............................................................17

*Edudata Corp. v. Scientific Computers, Inc.,*
    599 F. Supp. 1084 (D. Minn. 1984), *aff'd in part, rev'd in part on other*
    *grounds,* 746 F.2d 429 (8th Cir. 1984) ..........................................................13

*Elrod v. Burns,*
    427 U.S. 347 (1976)........................................................................................17

*Fed. Express Corp. v. Fed. Espresso, Inc.,*
    No. Civ.A.97CV1219RSPGJD, 1997 WL 736530 (N.D.N.Y. Nov. 24, 1997)......................12

*Joint Anti-Fascist Refugee Comm. v. McGrath,*
    341 U.S. 123 (1951)........................................................................................21

*Kermani v. N.Y. State Bd. of Elections,*
    487 F. Supp. 2d 101 (N.D.N.Y. 2006).................................................................17

*Kone Corp. v. Thyssenkrupp USA, Inc.,*
    No. 11-465, 2011 WL 4478477 (D. Del. Sept. 26, 2011)........................................13

*LaTrieste Rest. and Cabaret, Inc. v. Vill. of Port Chester,*
    40 F.3d 587 (2d Cir. 1994)..............................................................................20

*Mitchell v. Cuomo,*
    748 F.2d 804 (2d Cir. 1984)............................................................................17

*Neiderhiser v. Borough of Berwick,*
    840 F.2d 213 (3d Cir. 1988)............................................................................22

*Notaro v. Koch,*
    95 F.R.D. 403 (S.D.N.Y. 1982) ...................................................................13, 16

*Okwedy v. Molinari,*
    333 F.3d 339 (2d Cir. 2003)............................................................................18

*OMG Fid., Inc. v Sirius Techs., Inc.,*
    239 F.R.D. 300 (N.D.N.Y. 2006).......................................................................23

*Paul v. Davis,*
    424 U.S. 693 (1976)........................................................................................21

*Rattner v. Netburn,*
    930 F.2d 204 (2d Cir. 1991)............................................................................18

*Scott v. Coughlin,*
    344 F.3d 282 (2d Cir. 2003)............................................................................19

*Stern v. Cosby,*
    246 F.R.D. 453 (S.D.N.Y. 2007) .....................................................................13

*Tunick v. Safir,*
    209 F.3d 67 (2d Cir. 2000)..............................................................................17

*Wandering Dago, Inc. v. Destito*,
  879 F.3d 20 (2d Cir. 2018)...................................................................................20

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ...............................................................................1

**Constitutional Provisions**

U.S. Const., amend. I ........................................................................... *passim*

U.S. Const., amend. II.............................................................................5, 7, 10, 11

U.S. Const., amend. IV ...................................................................................17

U.S. Const., amend. VIII.................................................................................17

U.S. Const., amend. XIV.....................................................................17, 18, 20, 21

N.Y. Const., art. 1, sect. 8................................................................................18, 19

N.Y. Const., art. 1, sect. 11..............................................................................18, 20

**Other Authorities**

FED. R. CIV. P. 26...........................................................................................1, 12, 13

FED. R. CIV. P. 30(b)(6)....................................................................................15

FED. R. CIV. P. 34............................................................................................3

FED. R. CIV. P. 45............................................................................................3

Pursuant to Rule 26 of the Federal Rules of Civil Procedure, Plaintiff the National Rifle Association of America (the "NRA") files this Memorandum of Law in Support of Its Order to Show Cause for Expedited Discovery (the "Motion") against defendants New York Governor Andrew Cuomo ("Cuomo"), in his official capacity; Maria T. Vullo ("Vullo"), in her official capacity; and the New York State Department of Financial Services ("DFS") (collectively, "Defendants").

## I.

## PRELIMINARY STATEMENT

Nearly two hundred years ago, Alexis de Tocqueville cautioned that unprincipled administration of laws by bureaucrats could destroy liberty in this country.[1]  To ensure that public officials (and the agencies they supervise) cannot punish disfavored viewpoints, courts are empowered by the United States Constitution to enjoin viewpoint-driven regulatory inquiries that chill, restrain, or punish protected First Amendment activity.[2]  Defendants' campaign against the NRA necessitates such relief.  In advance of its preliminary injunction motion, the NRA seeks expedited discovery.

Specifically, Defendants have misused the regulatory authority of DFS to exhort "all insurance companies and banks doing business in New York"[3] to blacklist so-called "gun

---

[1] Alexis de Tocqueville, Democracy in America: Historical-Critical Edition of De la démocratie en Amérique 416 (Eduardo Nolla ed., James T. Schleifer trans., A Bilingual French-English Edition 2010).

[2] *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963); *White v. Lee*, 227 F.3d 1214, 1228-29 (9th Cir. 2000).

[3] *See* Affidavit of John C. Frazer in Support of Order to Show Cause, dated June 14, 2018 ("Frazer Aff."), Ex. 3.

promotion organizations,"[4] including the NRA, under threat of expensive investigations and potential fines.  Defendants have supplemented their public threats with private ones, as well as an illustrative, well-publicized offensive against multiple insurance-industry firms that dared to do business with the NRA.  The DFS's ongoing insurance investigation (the "DFS Investigation") was promoted by anti-NRA activists, targets only NRA-related products, ignores identical non-NRA products, and is being pursued by state officials to accomplish an unlawful purpose—to silence the NRA.  To this point, the activities of Defendants has culminated in consent orders that prohibit lawful insurance transactions with the NRA. Moreover, Defendants continue to expand their efforts: just before this case was filed, another major insurer revealed that it had been contacted by the DFS regarding the NRA.  And on May 31, 2018, the DFS subpoenaed the NRA demanding the identities of virtually all persons and entities that have participated in insurance transactions with the NRA over the past eighteen years.

Predictably, Defendants' actions have caused numerous financial institutions to terminate mutually beneficial business arrangements with the NRA.  Additional, vital relationships with DFS-regulated insurers are now under threat, and anonymous media testimonials by bankers indicate that Defendants' campaign may soon impede the NRA's ability to obtain other financial services. The NRA will soon move for a preliminary injunction to halt Defendants' threats to financial institutions, and enjoin DFS's purported prohibition of concededly-lawful insurance transactions which involve the NRA and its members.  In advance of filing its preliminary injunction motion, the NRA seeks expedited discovery to identify all financial institutions targeted by Defendants' threats, channels used to deliver those threats, and key actors working in concert

---

[4] *See* Frazer Aff., Exs. 4 - 5.

with Defendants.  The NRA seeks to provide the Court with a sufficient record on which weigh its

request for injunctive relief.

Accordingly, the NRA requests this Court immediately allow it to serve document requests

on Defendants under Rule 34 of the Federal Rules of Civil Procedure, and on select non-parties

pursuant to Rule 45 subpoenas, and order that responses to such requests occur within fifteen (15)

days.  In addition, the NRA seeks the deposition of Defendant Vullo and up to three representatives

of DFS.  Such discovery will enable the Court to tailor this injunctive relief that stanches further

irreparable harm to the NRA from Defendants' ongoing violations of its constitutional rights, while

otherwise preserving the status quo pending a trial on the merits.

## II.

## STATEMENT OF FACTS

### A.   The NRA Attempts To Make Affordable Insurance Available To Its Members.

Like many affinity groups and organizations nationwide, the NRA seeks to make life,

health, and other insurance coverage available to its members on affordable, tailored terms.

Therefore, the NRA contracted with multiple insurance-industry firms to develop, broker, and

administer "affinity insurance" products that the NRA endorses to its members.[5]  Pursuant to these

arrangements, the NRA performs none of the functions of an insurer.  Rather, it lends its valuable

logo, marks, and endorsements to insurance policies brokered and administered by others.[6]  For

example, commencing in 2000, the NRA entered into a business relationship with Lockton

---

[5] *See* Frazer Aff. at ¶ 9.  Generally, an affinity program offers special benefits or customized products—here insurance products—to members or employees of a particular organization.

[6] *Id.* at ¶ 10.

Companies, LLC and its affiliates (collectively with pertinent affiliates, "Lockton"),[7] which provide affinity-program brokerage and administration services.  Lockton marketed and administered various types of NRA-endorsed insurance products in New York State and across the nation without incident for the past seventeen years.[8]

Lockton also markets and administers similar programs for other membership organizations in New York and makes public claims about the qualifications of the insurance carriers backing those programs.  For example, Lockton administers an insurance program for the American Optometric Association through AOAExcel ("AOAExcel"), which it markets as having the "backing of a carrier that is rated A+ (Superior) by A.M. Best."[9]  It also administers affinity insurance plans for the Veterans of Foreign Wars ("VFW")[10] and Moose International Inc. ("Moose"), and claims that underwriters for both plans are "rated 'Excellent' or higher by A.M.

---

[7] In particular, the NRA contracted with Lockton Affinity Series of Lockton Affinity, LLC (f/k/a Lockton Risk Services, Inc.) ("Lockton Affinity") and Kansas City Series of Lockton Companies, LLC ("Lockton KC").

[8] *Id*. at ¶ 11.

[9] *See Questions? We have answers for you.*, AOAINSURANCEALLIANCE, http://aoainsurancealliance.com/faq/ (last visited May 7, 2018).  A.M. Best is a credit rating agency that focuses on the insurance industry, and provides ratings which assess the creditworthiness of insurers, issuers, and insurance-related financial obligations.  *See* A.M. Best Rating Services, *Understanding Best's Ratings*, http://www.ambest.com/ratings/index.html (accessed June 7, 2018).

[10] At least one of the insurance plans (for VFW) is marketed as being free for VFW members.

Best."[11]   Lockton also administers an affinity insurance program that is offered at no cost to members of the Professional Photographers of America ("PPA").[12]

## B.  Defendants' Attempt To Chill The NRA's Political Speech In Support Of Americans' Second Amendment Rights.

To suppress the political speech and associations he disfavors,[13] Governor Cuomo conspired with Superintendent Vullo and others to pursue an insidious collateral-attack strategy: prevent groups that advocate for the right to keep and bear arms from accessing banking or insurance services.  To achieve this, Defendants employed a combination of selective prosecution, backroom exhortations, and public threats.  Their primary cudgel has been the regulatory authority of DFS, a watchdog agency established after the 2008 credit crisis and vested with considerable power to ensure the "solvency, safety [and] soundness" of banks and insurance companies in New York.

---

[11] *See FVW Post Insurance Program, Program Information*, VFW INSURANCE, http://vfwinsurance.com/wp-content/uploads/sites/29/2017/12/VFW_Post_Insurance_Information_Packet.pdf    (last    visited May 7, 2018); MOOSE INSURANCE PROGRAM, http://mooseinsuranceprogram.com/ (last visited May 7, 2018).

[12] *See* INSURANCE FOR PPA, https://insuranceforppa.com/ (last visited May 7, 2018).

[13] Cuomo makes no secret of his longstanding political animus toward "conservatives and Second Amendment types," particularly the NRA.  He has vilified Second Amendment supporters as "the enemy," and bemoaned the effectiveness of grassroots and legislative advocacy by groups like the NRA.  *See e.g., Remarks by Secretary Andrew Cuomo Handgun Control, Inc, Washington, D.C. Tuesday, June 20, 2000*, U.S. Dep't of Hous. and Urban Dev. (Jan. 20, 2009), https://archives.hud.gov/remarks/cuomo/speeches/handguncontrl.cfm.  Not content to debate his political opponents (in the tradition of the First Amendment), Cuomo has vowed that conservative firearms advocates "have no place in the State of New York."  Heather Long, *Conservatives aren't welcome in New York, according to Governor Cuomo*, The Guardian (Jan. 14, 2014, 8:49 AM), https://www.theguardian.com/commentisfree/2014/jan/24/governor-cuomo-conservatives-not-welcome-new-york.

In October 2017, the *Wall Street Journal* reported that DFS launched an investigation nominally focused on an NRA-endorsed, Lockton-administered insurance product known as Carry Guard, which provides coverage for losses resulting from the lawful self-defense use of a firearm.[14] From the beginning, it was obvious that the DFS Investigation was politically motivated.[15]  The investigation was chronicled in the national media even before the DFS provided official notice of it to the NRA.  Moreover, a non-governmental activist organization known as Everytown for Gun Safety ("Everytown")—whose explicit mission is to oppose the NRA—made public statements suggesting that it prompted the DFS inquiry. [16]

Although the DFS Investigation purported to target Carry Guard, subsequent documents published by DFS make clear that the inquiry extended beyond Carry Guard to encompass policies having nothing to do with firearms.  Indeed, the DFS targeted NRA-related insurance policies that appear identical to policies brokered by Lockton in the State of New York on behalf of non-NRA clients.[17]  Tellingly, DFS never announced similar inquiries concerning any of these other membership organizations, even though their affinity programs involve most, if not all, of the practices and features that were the subject of DFS's investigations into the NRA's affinity programs.[18]  Instead, Defendants employed selective prosecution as a tool of censorship and retaliation, targeting the NRA because of its legislative and grassroots advocacy activities.

---

[14] *See* Frazer Aff., Ex. 1.

[15] *See* Frazer Aff. at ¶¶ 13 - 14.; Frazer Aff., Exs. 1-2.

[16] *See* Frazer Aff., Ex. 2.

[17] *See* Section II.A, *supra*.

[18] *Id.*

Subsequent events strongly suggest that Defendants also engaged in, or directed, back-channel communications urging regulated institutions to blacklist the NRA—or face costly consequences.   On April 19, 2018, Cuomo publicly announced that he directed DFS to  "urge insurers and bankers statewide to determine whether any relationship they may have with the NRA or similar organizations sends the wrong message to their clients and their communities."[19]  The same day of Cuomo's announcement, DFS issued a pair of ominous "guidance" letters (the "April 2018 Letters") directed at the chief executive officers, or equivalents, of all New York State chartered or licensed financial institutions and all insurers doing business in New York urging recipients to sever ties with the NRA and other similar "gun promotion organizations."[20]

Consistent with the overtly political nature of Cuomo's directive—which focused on the "message" that institutions might convey regarding gun-policy issues, via their choice to transact with the NRA or boycott it—the April 2018 Letters reflect clear viewpoint discrimination against the NRA's speech and political activities.  For example, the letters blame the NRA for "senseless violence," an allegation that can only be understood as a claim that the NRA's advocacy in favor of strong Second Amendment protections somehow promotes violent criminal activity.  Incredibly, the letters go further and invoke the formidable supervisory authority of DFS regarding the "risk management" function of financial institutions.  Reminding recipients that they must "mak[e] risk management decisions on a regular basis regarding if and how they will do business with certain sectors or entities," the letters direct all banks and insurance companies regulated by DFS to "take

---

[19] *See* Frazer Aff., Ex. 3.

[20] *See* Frazer Aff., Exs. 4-5.

prompt actions to manage" vague, unspecified "reputational risks" arising from "dealings with the NRA or similar gun promotion organizations."[21]

Although styled as "guidance," the April 2018 Letters contain no language clarifying that DFS will forebear from directly enforcing the letters' terms.  Nor do the April 2018 Letters provide regulated institutions any objective criteria for measuring the "reputational risks" allegedly imposed by dealings with entities that "promote guns that lead to senseless violence."  Moreover, a contemporaneous press release issued by Cuomo (and quoting Vullo) directly "urge[d] all insurance companies and banks doing business in New York to join the companies that have already discontinued their arrangements with the NRA."[22]  Likewise, on April 20, 2018, Cuomo publicly tweeted: "The NRA is an extremist organization. I urge companies in New York State to revisit any ties they have to the NRA and consider their reputations, and responsibility to the public."[23]

## C.    Defendants' Actions Cause Companies To Terminate Their Relationships With The NRA.

On May 2, 2018, two weeks after Vullo issued the April 2018 Letters, Lockton entered into a consent order under Articles 21, 23, and 34 of the Insurance Law (the "Lockton Consent Order") with DFS—signed by Vullo—which imposes a civil monetary penalty of $7 million.[24]  Although the Lockton Consent Order ostensibly addresses discrete violations by specific Lockton entities of New York's Insurance Law, it purports to restrict Lockton's participation in *any* NRA-endorsed insurance programs in New York State, irrespective of whether such programs comply with the

---

[21] *Id.*

[22] *See* Frazer Aff., Ex. 3.

[23] *See* Frazer Aff., Ex. 6.

[24] *See* Frazer Aff., Ex. 7.

Insurance Law.[25]  Furthermore, Lockton will violate the Lockton Consent Order if it markets an ordinary property, casualty, or life insurance policy in the State of New York that is accompanied by an NRA logo or endorsement—notwithstanding that a comparable logo or endorsement referencing any other affinity or common-cause organization is permissible.[26]

On May 7, 2018, Chubb Group Holdings, Inc. and Illinois Union Insurance Company ("Illinois Union" and, together, "Chubb") entered into a Consent Order Under Sections 1102 and 3420 of the Insurance Law (the "Chubb Consent Order") with DFS—signed by Vullo—which imposes a civil monetary penalty of $1.3 million.[27]  Similar to the Lockton Consent Order, in the Chubb Consent Order, DFS overextends its authority and purports to restrict Chubb's participation in *any* affinity-type insurance program with the NRA, irrespective of whether such programs comply with the Insurance Law.  Although DFS restricts Lockton from participating in any affinity-type insurance programs with the NRA in New York or with New York residents, Defendants' restrictions in the Chubb Consent Order contain no geographic constraint whatsoever.[28]  Instead, the Chubb Consent Order purports to limit Chubb's involvement with the NRA anywhere, and everywhere, in the world.  Nevertheless, DFS allows Chubb to continue to

---

[25] Specifically, the Lockton Consent Order requires that Lockton agree "not to participate in . . . any other NRA-endorsed programs with regard to New York State."  Nor may Lockton "enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance to be issued or delivered in New York State or to anyone known to Lockton to be a New York resident."  *See* Frazer Aff., Ex. 7 at ¶¶ 42-43.

[26] *See id.*

[27] *See* Frazer Aff., Ex. 8.

[28] *See e.g.*, Frazer Aff., Ex. 8 at ¶ 22 ("Chubb and Illinois Union agree that they shall not enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance").

underwrite affinity-type insurance programs with other affinity or common-cause organizations that do not publicly advocate for Americans' Second Amendment rights, so long as Chubb undertakes "reasonable due diligence to ensure that any entity involved . . . is acting in compliance with the Insurance Law."[29]

Defendants' concerted efforts to stifle the NRA's freedom of speech and to retaliate against the NRA based on its viewpoints are causing other insurance, banking, and financial institutions doing business with the NRA, such as Lloyd's of London ("Lloyd's"), to abandon their mutually beneficial business relationships with the NRA for fear of monetary sanctions or expensive public investigations.[30]   Indeed, Lloyd's announced on May 9, 2018, that it would terminate all insurance "offered, marketed, endorsed, or otherwise made available" through the NRA in light of the scrutiny by DFS.[31]

Other financial institutions, too, have spoken out about the chilling effect of DFS's actions. Speaking "on the condition of anonymity," one community banker from Upstate New York told *American Banker* magazine that in light of the apparent "politically motivated" nature of the DFS guidance, "[i]t's hard to know what the rules are" for whom to do business with, because bankers must attempt to anticipate "who is going to come into disfavor with the New York State DFS" or other regulators.[32]   Other industry sources likewise told *American Banker* that, "such regulatory

---

[29] *Id.*

[30] *See* Frazer Aff., Ex. 9.

[31] *Id.*

[32] Neil Haggerty, *Gun issue is a lose-lose for banks (whatever their stance)*, AMERICAN BANKER (Apr. 26, 2018, 1:11 PM), https://www.americanbanker.com/news/gun-issue-is-a-lose-lose-for-banks-whatever-their-stance.

guidelines are frustratingly vague, and can effectively compel institutions to cease catering to legal businesses."[33]

Other DFS-regulated institutions that maintain business relationships with the NRA have balked at renewing insurance coverage, including corporate coverage unrelated to any affinity program. Other institutions have been willing to insure the NRA, but have demanded higher premiums or have offered lower policy limits or other unfavorable terms. These insurers are not reacting to any purported compliance defect in the NRA's administration of its insurance policies, nor any other past conduct or omission by the NRA. Instead, expedited discovery will prove that the insurers are hesitant to maintain relationships with pro-Second Amendment organizations generally—*i.e.*, organizations that propound political viewpoints disfavored by Defendants.

**D.    The NRA Seeks Narrowly Tailored Discovery To Provide The Court With A Record Upon Which To Consider The NRA's Request For Preliminary Injunctive Relief.**

The public statements and documents available to date make it clear that Defendants are actively violating the NRA's constitutional rights and that the NRA is, therefore, suffering ongoing, irreparable harm. The NRA intends to move promptly for a preliminary injunction. However, at this time, the NRA wishes to take narrowly tailored discovery to determine the scope of Defendants' wrongful conduct and, thus, the scope of the remedy required.

Accordingly, the NRA requests that: (1) Cuomo and DFS be required to respond to the document requests within fifteen days of service of such requests;[34] (2) Chubb, Lockton, and

---

[33] *Id.*

[34] The NRA's proposed document requests to Defendants are attached as Exhibit A and B to the Declaration of Sarah B. Rogers in Support of Order to Show Cause, dated June 14, 2018 (the "Rogers Declaration").

Lloyd's be required to respond to the subpoenas within fifteen days of service;[35] and (3) the Court allow the NRA to take depositions of Vullo and no more than three representatives of DFS (specific individuals to be determined after DFS produces responsive documents).

In substance, the NRA seeks discovery sought of the following categories of information:

1. Information sufficient to identify nonpublic communications by Defendants, or those under their control, with financial institutions that urge termination of current or potential business relationships with the NRA;

2. Information concerning the effect of the April 2018 letters, including any communications Defendants received from financial institutions in response thereto;

3. Information regarding the specific provisions of the Chubb and Lockton Consent Orders which purport to limit Chubb's and Lockton's ability to participate in programs with the NRA that comply with New York's Insurance Law; and

4. Information regarding communications between Defendants, or those under their control, and any regulated financial institution or insurer regarding their current or potential business relationships with the NRA.

## III.

## ARGUMENT AND AUTHORITIES

Good cause exists to allow the NRA to take reasonable expedited discovery of Defendants and non-parties (Lockton, Chubb, and Lloyd's) to support its forthcoming motion for preliminary injunction.  This Court has broad power to permit expedited discovery prior to a Rule 26(f) conference, and such discovery is routinely granted with respect to motions for preliminary injunction.[36]

---

[35] The NRA's proposed subpoenas to non-parties, Lloyd's, Chubb, and Lockton, are attached as Exhibits C–E to the Rogers Declaration.

[36] *See* FED. R. CIV. P. 26(d); FED. R. CIV. P. 26(d) advisory committee's note to 1993 Amendments ("Discovery can begin earlier if authorized . . . by local rule, order, or stipulation. This will be appropriate in some cases, such as those involving requests for a preliminary injunction . . . ."); *Briggs & Stratton Corp. v. Chongquing Rato Power Co., Ltd.*, 5:13-CV-0316 (LEK/ATB), 2013 WL 12134085, at *1 (N.D.N.Y. Apr. 25, 2013) (Kahn, D.J.); *Fed. Express*

Requests for expedited discovery are properly governed by a "flexible standard of reasonableness and good cause[,]" which weighs "the need for discovery at an early juncture in the litigation against the breadth of the discovery requests and the prejudice to the responding party" in light of factors such as: (1) the timing and context of the discovery requests, including whether a preliminary injunction hearing has been scheduled; (2) the scope and purpose of the requests; and (3) the nature of the burden to the respondent.[37]   As set forth below, all of the foregoing factors favor expedited discovery in this case.

Alternatively, some courts in the Second Circuit have applied a stricter, now-disfavored test articulated in *Notaro v. Koch*,[38] which resembles the standard for a preliminary injunction.[39] Even if the Court applies the *Notaro* test (and it should not), the ongoing irreparable harm to the

---

*Corp. v. Fed. Espresso, Inc.*, No. Civ.A.97CV1219RSPGJD, 1997 WL 736530, at *2 (N.D.N.Y. Nov. 24, 1997) (finding that "early discovery is appropriate here where plaintiff's requests are 'reasonably tailored to the time constraints' involved and to the 'specific issues' to be addressed at the preliminary injunction hearing") (quoting *Irish Lesbian and Gay Org. v. Giuliani*, 918 F. Supp. 728, 731 (S.D.N.Y. 1996)); *see also Edudata Corp. v. Scientific Computers, Inc.*, 599 F. Supp. 1084, 1088 (D. Minn. 1984), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 429 (8th Cir. 1984) (granting expedited discovery because "[f]urther development of the record before the preliminary injunction hearing will better enable the court to judge the parties' interests and respective chances for success on the merits.").

[37] *Briggs*, 2013 WL 12134085 at *2 (quoting *Digital Sin, Inc. v. Does 1-176*, 279 F.R.D. 239, 241 (S.D.N.Y. 2012); *Kone Corp. v. Thyssenkrupp USA, Inc.*, No. 11-465, 2011 WL 4478477, at *4 (D. Del. Sept. 26, 2011) (Kahn, D.J.); *Ayyash v. Bank Al-Madina,* 233 F.R.D. 325, 327 (S.D.N.Y. 2005); *Stern v. Cosby*, 246 F.R.D. 453, 457 (S.D.N.Y. 2007) (Chin, J.); *cf. AF Holdings LLC v. Does 1-1058*, 752 F.3d 990, 995 (D.C. Cir. 2014) (discovery under Rule 26(d)(1) governed by Rule 26(b)(1)'s "good cause" standard).

[38] 95 F.R.D. 403 (S.D.N.Y. 1982).

[39] *See Ayyash*, 233 F.R.D. at 327 (rejecting the *Notaro* test because the analysis required is similar to "the far more dramatic decision to grant a preliminary injunction," and it is senseless to employ a preliminary-injunction type analysis to ascertain whether the moving party is entitled to expedited discovery to prepare for a preliminary injunction hearing).

NRA from Defendants' overt infringement of its First Amendment rights amply justifies expedited discovery.

A.     **The NRA Is Entitled To Expedited Discovery Under The "Reasonableness And Good Cause" Standard.**

There is good cause for granting the NRA's request for expedited discovery. Expedited discovery will enable the NRA to develop a more complete evidentiary record on the extent of Defendants' selective enforcement and retaliation campaign against the NRA, which is central to the NRA's motion for a preliminary injunction.

Currently, the NRA has limited knowledge of Defendants' censorship and retaliation campaign against the NRA. To be sure, that limited knowledge suffices to prove that Defendants have violated the NRA's First Amendment rights, but the further evidence sought is directly relevant to showing a likelihood of success on the merits of the NRA's equal protection claim and to determining the scope of preliminary injunctive relief. Given the likely significant communications taking place behind the scenes, the NRA reasonably believes that the evidence of misconduct by Defendants it has uncovered thus far is the mere tip of the iceberg. The NRA brings this motion amid accelerating revelations regarding the extent and impact of Defendants' campaign. In the span of a few weeks, the DFS issued "guidance" letters that publicly threatened the NRA's business partners and announced consent orders prohibiting lawful NRA-related business in New York and elsewhere. Another financial institution, Lloyd's, also announced that it would discontinue its dealings with the NRA under pressure from DFS.

Expedited discovery will provide visibility regarding Defendants' discriminatory treatment of NRA-affiliated insurers and financial institutions even as they fail to pursue regulatory action against non-NRA entities involved with similar affinity products. Discovery will also reveal which financial institutions have been the focus of Defendants' campaign, the lines of communication

employed by Defendants, and other matters vital to fashioning prompt, effective, and complete injunctive relief.   Accordingly, the first factor impacting the Court's "reasonableness and good cause" analysis—the timing and context of the discovery requests—favors discovery here.

Similarly, the narrow scope and discrete purpose of the NRA's discovery requests favors granting the requested relief.  When discovery commences later this year, the NRA will seek broader categories of information affecting the merits of its case, including actions or conspiracies which may have formed prior to the DFS's current enforcement actions.  For now, however, the NRA seeks only to know the parameters and methods of Defendants' campaign during the past eight months, including the means by which Defendants caused two institutions to accede to specific, unlawful consent-order provisions just prior to this lawsuit.

Furthermore, the NRA's request for expedited discovery is narrowly tailored to limit any undue burden on Defendants, Chubb, Lockton, and Lloyds.  The requests for discovery are directly tied to the substance and extent of the actions by Defendants to violate the NRA's constitutional rights, including by identifying all actors a preliminary injunction may need to restrain.  And because the discovery requests target a discrete, recent span of mere months, responsive records will be easy to retrieve.  For example, the April 2018 Letters, the Lockton Consent Order, and the Chub Consent Order, which are major focal points of the requested discovery, were all publicized within the past two months.  Likewise, the NRA requests to depose Vullo in an individual fact-witness capacity, not a Rule 30(b)(6) capacity, which should limit the burden of any required preparation.  In light of the grave constitutional rights violations at issue in this case and the low

burden imposed by the NRA's requested discovery, the NRA has satisfied its burden to show "good cause" and that its requests are reasonable "in light of all the surrounding circumstances."[40]

**B.**   **The NRA Is Entitled To Expedited Discovery Even Under The *Notaro* Test.**

The NRA is still entitled to expedited discovery even if the Court uses the more stringent, four-part test outlined in *Notaro* and disfavored by recent case law.  As prevailing authorities have pointed out, the *Notaro* standard for granting expedited discovery "employ[s] a preliminary-injunction type of analysis to determine entitlement to expedited discovery" which "makes little sense" where the purpose of such discovery is to prepare for a preliminary injunction.[41] Nonetheless, even under *Notaro*, the NRA's right to expedited discovery is clear.  Pursuant to *Notaro*, expedited discovery requires:

> (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.[42]

Here, all of the *Notaro* elements are present.  The irreparable harm to free speech rights of the NRA and its members is enormous—Defendants' actions threaten to deprive the NRA of services critical to its survival and ability to disseminate its message—and will continue every day absent relief from the Court.  Furthermore, the NRA's likelihood of success is apparent—Defendants' actions constitute unconstitutional viewpoint discriminatory censorship of, and retaliation for, core political speech, unconstitutional selective enforcement of the Insurance Law, and a denial of the NRA's right to due process.

---

[40] *Ayyash*, 233 F.R.D. at 327.

[41] *See Ayyash* at 326.

[42] *Notaro*, 95 F.R.D. at 405.

1. **Defendants' Violations Of The NRA's Constitutional Rights Constitute Irreparable Injury.**

Defendants' violations of the NRA's First and Fourteenth Amendment rights inherently cause it irreparable harm.[43] Courts have routinely held that deprivation of *any* constitutional right constitutes irreparable harm.[44] This standard is inclusive of First Amendment rights,[45] due process rights,[46] and the right to equal protection under the law.[47]

---

[43] *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("'When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'") (quoting 11C WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE, § 2948, at 440 (1973)); *see also Cohen v. Coahoma Cnty., Miss.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992) (concluding that "[i]t has repeatedly been recognized by the federal courts at all levels that [a] violation of constitutional rights constitutes irreparable harm *as a matter of law*") (emphasis added).

[44] *See Albro v. Onondaga Cnty., N.Y.*, 627 F. Supp. 1280, 1287 (N.D.N.Y. 1986) ("[D]eprivation of a constitutional rights constitutes irreparable harm per se.") (citing *Mitchell*, 748 F.2d at 806); *Deferio v. City of Syracuse*, 193 F. Supp. 3d 119, 130 (N.D.N.Y. 2016) (presuming irreparable harm for a First Amendment violation) (Kahn, D.J.); *Kermani v. N.Y. State Bd. of Elections*, 487 F. Supp. 2d 101, 107 (N.D.N.Y. 2006) (presuming irreparable harm for deprivation of rights secured by the First and Fourteenth Amendments) (Kahn, D.J.); *Donohue v. Paterson*, 715 F. Supp. 2d 306, 315-16 (N.D.N.Y. 2010) (Kahn, D.J.).

[45] *Elrod*, 427 U.S. at 373 ("[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *see Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir. 2000) (opining that "violations of First Amendment rights are presumed irreparable").

[46] *See Battle v. Mun. Hous. Auth. for City of Yonkers*, 53 F.R.D. 423, 427 (S.D.N.Y. 1971) (determining that a preliminary injunction should issue because plaintiffs showed that their "rights to due process and equal protection of the law have been denied").

[47] *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744-45 (2d Cir. 2000) (finding irreparable harm where defendants' actions violated plaintiffs' equal protection rights). "[W]hile it may be true that the majority of cases in which we have based an irreparable harm finding on the alleged deprivation of a constitutional right have arisen in the First Amendment context, we have also found irreparable harm in the allegation of Fourth Amendment violations and Eighth Amendment violations." *Id.* at 744 (citing *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996)).

2.      **The NRA Has Established, At A Bare Minimum, Some Probability of Success On The Merits.**

The NRA has established some probability of success that Defendants' viewpoint-based discrimination campaign violates the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment, as well as Article 1, Sections 8 and 11 of the New York Constitution.

a.      **The NRA Has Established Some Probability Of Success On Its Claim For Violation Of The NRA's First Amendment Rights Through The Establishment Of An Informal Censorship Regime.**

Defendants' implicit censorship regime violates the NRA's freedom of speech.[48] Defendants' actions—including, but not limited to, the issuance of the April 2018 Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon Chubb and Lockton, and the issuance of the press release dated April 19, 2018—established a "system of informal censorship" designed to suppress the NRA's speech.[49]  Courts have found actions like the ones here to be coercive and unconstitutional.[50]

---

[48] *See Bantam Books*, 372 U.S. at 72.

[49] *See id.* at 71.

[50] *See Okwedy v. Molinari*, 333 F.3d 339, 341-42, 344 (2d Cir. 2003) (finding an official's letter seeking "dialogue" could be interpreted as a threat when he invoked his authority as "Borough President of Staten Island" to complain about an offensive billboard and pointed out that he was aware that the billboard company "owns a number of billboards on Staten Island and derives substantial economic benefits from them"); *Rattner v. Netburn*, 930 F.2d 204, 210 (2d Cir. 1991) (holding that a letter from a village trustee questioning a chamber of commerce publication and hinting at a boycott "may reasonably be viewed as an implicit threat"); *see also Backpage.com, LLC v. Dart*, 807 F.3d 229, 236-38 (7th Cir. 2015) (explaining that a threat constituting an informal censorship regime does not become lawful simply because it comes "clothed in what in the absence of any threatening language would have been a permissible attempt at mere persuasion").

**b.**    **The NRA Has Established Some Probability Of Success On Its Claim For Violation Of The NRA's First Amendment Rights For Retaliation Against The NRA Based On Its Speech.**

In violation of the First Amendment and Article 1, Section 8 of the New York Constitution, Defendants retaliated against the NRA for its political speech.[51] Defendants have pursued a public campaign targeting the NRA and its members because of the NRA's extensive legislative advocacy, peaceable public gatherings, and other grassroots activities, which constitute precisely the type of political speech which rests "[a]t the core of the First Amendment."[52] This is demonstrated by, among other things, the April 2018 Letters, which were packaged in a sharply worded media advisory meant to generate headlines—and apply maximum public pressure on the NRA and those with whom it associates. Furthermore, at Cuomo's behest, Vullo and DFS threatened, and continue to threaten, regulated institutions with costly investigations and penalties should they fail to "discontinue[] . . . their arrangements with the NRA." And Defendants have already carried out some of these threats. Within a single week, DFS levied multi-million dollar fines against two insurance-industry firms that dared to do business with the NRA.

Defendants' selective enforcement, public exhortations, and multi-million dollar fines have been singularly motived by the NRA's protected expression and political activities, and Defendants cannot prove that they would have taken the same action in the absence of the protected activity—especially where Defendants failed to take action for the same alleged "wrongdoing" committed by other affinity-type insurance programs.

---

[51] *See Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003). In order to establish this claim, the NRA must demonstrate that its speech is protected by the First Amendment, that Defendants "took adverse action against" it, and a "causal connection between the protected speech and the adverse action." *Id.*

[52] *See, e.g., Brown v. Hartlage*, 456 U.S. 45, 52 (1982).

c.   **The NRA Has Established Some Probability Of Success On Its Claim For Violation Of Its Right To Equal Protection.**

Defendants' selective enforcement of the insurance law is denying the NRA its right to equal protection under the Fourteenth Amendment and Article 1, Section 11 of the New York Constitution.  Selective enforcement violates equal protection when a party has been treated differently from similarly situated individuals, because of, *inter alia*, the exercise of constitutional rights.[53]  The NRA's claim meets this standard because the NRA-endorsed insurance policies are similarly situated to many other affinity-type insurance policies, but were the only policies singled out for differential treatment (e.g., monetary penalties and orders to cease the programs) explicitly on account of the NRA's political viewpoint on gun-related issues.[54]

Lockton Affinity, the administrator of the NRA-endorsed insurance policies, acts as administrator to dozens of other affinity-type insurance programs for membership organizations like the NRA.[55]  These other membership organization affinity programs are similarly situated to the NRA-endorsed policies and were set up by Lockton Affinity to operate in the same manner as the NRA-endorsed policies.  Not only did Lockton Affinity run all of its membership organization affinity programs in the same manner, but Lockton Affinity also marketed the programs in the same manner.  Nevertheless, Defendants treat Lockton's NRA affinity programs in a manner that

---

[53] *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 40 (2d Cir. 2018); *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007); *LaTrieste Rest. and Cabaret, Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994).

[54] *See Cuffley v. Mickes*, 208 F.3d 702, 707 (8th Cir. 2000) (finding a violation of the Equal Protection Clause when the state prevented an organization from participating in the state's Adopt-A-Highway program based upon that organization's views because the government may not "deny a benefit to a person because of his constitutionally protected speech or associations") (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)).

[55] *See* Section II.A, *supra*.  For example, Lockton Affinity administers affinity-type insurance programs for AOAExcel, VFW, Moose, and the PPA.

is inconsistent with how other affinity programs are viewed and regulated.  The publicly available evidence strongly suggests that Lockton was not barred from doing business in New York with any other affinity partner besides the NRA.  The NRA believes that the requested discovery will confirm that Defendants are selectively enforcing certain provisions of the Insurance Law only to the NRA-endorsed policies.[56]

### d.    The NRA Has Established Some Probability Of Success On Its Claim For Violation Its Due Process Rights.

Defendants' actions violate the NRA's due process rights under the Fourteenth Amendment.  Defendants' branding of the NRA as a "reputational risk" that might affect the "safety and soundness" of financial institutions doing business with it in New York and as the cause of "gun violence in New York"[57] stigmatizes the NRA without any judicial determination, notice, or opportunity to be heard, and because the stigma deprives the NRA of its property interest in being able to hold bank accounts and conduct affinity insurance business on equal terms with other citizens, it is unconstitutional.[58]  Moreover, because Defendants' arbitrary and capricious

---

[56] In particular, DFS and Vullo claim Lockton Affinity, with respect to the NRA-endorsed policies only, violated:  (1) Insurance Law § 2122(a)(1) by referring to the insurer's AM Best rating; (2) Insurance Law § 2324(a) by giving or offering to give no cost insurance to NRA members in good standing; and (3) Insurance Law § 2116 by compensating the NRA based on actual premiums collected.  However, Lockton's other membership affinity-type programs acted and continue to act in the exact same manner Defendants describe as violating these provisions of the Insurance Law.

[57] *See* Frazer Aff., Ex. 3.

[58] *See, e.g., Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 139 (1951) (determining that the Attorney General's designation of certain organizations as communist without notice or hearing violated due process because the designations "cripple the functioning and damage the reputation of those organizations in their respective communities and in the nation"); *Paul v. Davis*, 424 U.S. 693, 708 (1976).

MEMORANDUM OF LAW IN SUPPORT OF ORDER
TO SHOW CAUSE FOR EXPEDITED DISCOVERY                                      Page 21

actions coerced the NRA's affinity insurance partners to sever their relationships with the NRA, they violate the due process rule against irrational government action.[59]

The denial of due process has special significance when a government official tries to impose a censorship regime by informal means, as *Bantam Books* and many other cases have held. When a censorship regime is imposed using informal pressure, as it was here, there is no way due process requirements can be met, because the censor completely evades due process.  Thus, the Supreme Court found in *Bantam Books* that actions such as Defendants' have a far greater "capacity for suppression" than formal measures because there is "no provision whatever for judicial superintendence before notices issue or even for judicial review."[60]  Here, by design, Defendants set out to avoid due process protections.  Contrary to the Supreme Court's requirements, Defendants set about to change the status quo—i.e., financial institutions would discontinue their lawful business relationships with the NRA.

Given the above, the NRA has established that it has *some*, if not significantly more than some, probability of success on the merits, warranting its request for expedited discovery.

### 3.      The Expedited Discovery Sought Will Help Avoid Further Harm To The NRA.

The NRA's discovery requests will help avoid further harm to the NRA.  Although the NRA intends to move promptly for a preliminary injunction, it requires targeted discovery to better understand the scope of Defendants' wrongful acts.  For example, the NRA requires discovery to identify the actors involved who are working in conjunction with Defendants and to identify the companies, other than Lockton, Chubb, and Lloyd's, who have succumbed to Defendants'

---

[59] *See Neiderhiser v. Borough of Berwick*, 840 F.2d 213, 217-18 (3d Cir. 1988) (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986); *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)).

[60] *Bantam Books*, 372 U.S. at 71.

censorship regime.  This discovery will assist the NRA and the Court to determine the scope of the remedy required with a preliminary injunction to prevent further irreparable harm pending a trial on the merits.

4.      **The NRA Has A Greater Potential For Harm Than Any Harm Defendants Might Suffer From Responding To Discovery On An Expedited Basis.**

The harm the NRA will suffer without the expedited discovery is far greater than any harm Defendants will suffer.  When measured against the NRA's needs, and the public interest in protecting constitutional rights, Defendants cannot claim any significant injury from being required to respond to discovery in an expedited manner.  The NRA seeks discovery related to only a few categories of information, all of which relate directly to exposing the full extent of Defendants' viewpoint discrimination campaign against the NRA.  The requested discovery is essential to further establish the NRA's irreparable harm for its contemplated preliminary injunction motion.

Furthermore, there is a very low burden on Defendants to respond to the discovery as it only covers a very limited length of time and Defendants will need to provide the requested discovery eventually in this litigation.  Any prejudice from being required to do so at an early stage is minimal.[61]  Therefore, the NRA has established that the injury to it is greater than any injury Defendants could possibly suffer should expedited relief be granted.

_____

[61] *OMG Fid., Inc. v Sirius Techs., Inc.*, 239 F.R.D. 300, 305 (N.D.N.Y. 2006) (rejecting defendant's concerns where the requested discovery was "pointed" and where plaintiff assured that it would not later make duplicative demands).

# IV.

## CONCLUSION

For the foregoing reasons, the NRA respectfully requests that this Court grant the NRA's request for expedited discovery and establish a discovery and briefing schedule for the NRA's forthcoming motion for preliminary injunction.


Dated:  June 14, 2018                    Respectfully submitted,


By:   ___/s/ William A. Brewer III_____
      William A. Brewer III (Bar No. 700217)
      wab@brewerattorneys.com
      Stephanie L. Gase (Bar No. 700205)
      sgase@brewerattorneys.com
      Sarah B. Rogers (Bar No. 700207)
      sbr@brewerattorneys.com
      BREWER, ATTORNEYS & COUNSELORS
      750 Lexington Avenue, 14th Floor
      New York, New York 10022
      Telephone:  (212) 489-1400
      Facsimile:  (212) 751-2849

      Charles J. Cooper*
      ccooper@cooperkirk.com
      Michael W. Kirk*
      mkirk@cooperkirk.com
      J. Joel Alicea*
      jalicea@cooperkirk.com
      COOPER & KIRK, PLLC
      1523 New Hampshire Ave., NW
      Washington D.C., 20036
      Telephone: (202) 220-9660

      *appearing *pro hac vice*

      **ATTORNEYS FOR THE NATIONAL RIFLE ASSOCIATION OF AMERICA**