UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

NATIONAL RIFLE ASSOCIATION OF AMERICA,

$\qquad$ *Plaintiff*,

-against-

ANDREW CUOMO, both individually and in his official
capacity; MARIA T. VULLO, both individually and in her
official capacity; and THE NEW YORK STATE
DEPARTMENT OF FINANCIAL SERVICES,

$\qquad$ *Defendants*.

1:18-CV-0566

LEK/CFH

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR EXPEDITED DISCOVERY**

BARBARA D. UNDERWOOD
Attorney General of the State of New York
*Attorney for Defendants Andrew M. Cuomo,
    Maria T. Vullo and New York State
    Department of Financial Services*
The Capitol
Albany, New York  12224
Telephone:  (518) 776-2608
Fax:  (518) 915-7738 (Not for service of papers)

Adrienne J. Kerwin
Assistant Attorney General, of Counsel
Bar Roll No. 105154

Michael G. McCartin
Assistant Attorney General, of Counsel

Dated: July 2, 2018

**Table of Contents**

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND……………………………………………………………...............3

A.  The DFS Superintendent's Role In The Insurance and Banking Industries In New York……………………………………….…………………………………………...3

B.  DFS's Investigations of the NRA, Lockton Companies LLC, Chubb Group Holdings, Inc………………………………………………………………………4

 1.  The NRA's Carry Guard Insurance Program violated multiple New York Insurance Laws………………………………………………………………..9

 2.  The Consent Orders…………………………………………………………11

 3.  DFS's Ongoing Investigation of the NRA……………………………………...11

C.  DFS's Press Releases………………………………………………………………12

D.  Governor Cuomo's Press Release and DFS's Guidance Letters..…………………………12

E.  NRA's Complaint………………………………………………………………...14

F.  Plaintiff's Expedited Discovery Requests…………………………………………………15

ARGUMENT…………………………………………………………………………16

Point I   EXPEDITED DISCOVERY IS NOT THE NORM AND THERE IS NO BASIS TO ORDER SUCH EXTRAORDINARY RELIEF WHERE, AS HERE, THE COMPLAINT FAILS AS A MATTER OF LAW TO STATE A CLAIM..………………………………………………………………16

Point II   PLAINTIFF CANNOT MEET THEIR BURDEN UNDER ANY TEST FOR THE EXTRAORDINARY AND DISFAVORED RECOURSE OF EXPEDITED DISCOVERY……………………………………………………………18

 A.  The Standards to be Applied – The *Notaro* Test and the Reasonableness and Good Cause Test…………………………………………………………...18

 B.  Plaintiff Fails the *Notaro* Test Because Its Complaint Fails as a Matter of Law, It Cannot Establish Irreparable Harm, and the Burden of Extraordinary Expedited Discovery on Defendants is Considerable………………………………………...20

 C.  Plaintiff Fails the Reasonableness and Good Cause Test Because Plaintiff Seeks Broad-Based Expedited Discovery on the Merits of Their Claim………………….. 25

i

Point III        SINCE DFS SUPERINTENDENT MARIA T. VULLO IS A
"HIGH-RANKING GOVERNMENT OFFICIAL", THE COURT
MUST NOT PERMIT PLAINTIFF TO TAKE HER DEPOSITION –
ESPECIALLY ON AN EXPEDITED BASIS…………………………………..29

CONCLUSION ……………………………………………………………………………33

## PRELIMINARY STATEMENT

New York State Governor Andrew M. Cuomo and the National Rifle Association ("NRA") have a well-known, longstanding history of strong disagreement related to gun control. The diametrically opposed views of the Governor and the NRA have been demonstrated by the frequent public expression of those views through the media, the political process, and other avenues. Such political discourse – on both sides – is precisely the type of speech and expression that is protected by the First Amendment.

The NRA's advocacy on gun-related issues, however, does not permit the NRA or any of its contractual counterparties to violate the New York Insurance Law. In October 2017, the New York State Department of Financial Services ("DFS") received a referral from the New York County District Attorney's Office regarding the NRA's marketing of illegal insurance policies in New York State. After receiving this referral, the DFS initiated an investigation of affiliates of Chubb Ltd., Lockton Cos., LLC, and Lloyds of London, as well as the NRA, for violations of the New York Insurance Law in connection with the sale in New York State of the NRA's "Carry Guard" program and other NRA-sponsored programs. In May 2018, the affiliates of Chubb and Lockton entered into consent orders with DFS to resolve their respective violation of the New York Insurance Law attributed to the NRA-sponsored policies. The affiliate of Lockton agreed to pay a civil penalty of $7,000,000 and the affiliate of Chubb agreed to pay a civil penalty of $1,300,000.

DFS's investigations of Lloyds of London and the NRA for violations of the New York Insurance Law continues to the present day.

By its Complaint in this case, and now through its request for expedited discovery, the NRA is seeking to thwart DFS's investigation of clear violations of the New York Insurance Law. Apparently believing that the best defense to its illegal conduct is a good offense, the NRA

1

has targeted the Governor and the Superintendent of DFS with a meritless lawsuit and a frivolous motion in retaliation for the Governor and DFS upholding the laws passed by the New York State Legislature and expressing their constitutionally-protected views that the NRA is out of the mainstream of social thought in its response to horrific tragedies such as the school shootings at Columbine High School, Sandy Hook Elementary School, and, most recently, at the Marjory Stoneman Douglas High School.  For the reasons set forth in the Defendants' motion to dismiss, filed simultaneously here, the NRA's claims should be dismissed by the Court.

More than that, though, the NRA's pending request to conduct full-blown discovery *on the merits* – in an expedited fashion – should be denied while the motion to dismiss is being considered by the Court.  In sum, the NRA's broad-based, merits-focused expedited discovery requests are patently improper under the legal standards set forth by the federal district courts to evaluate such requests.  Furthermore, the NRA's attempt to take the expedited depositions of DFS Superintendent Maria T. Vullo (and three other DFS officials) would unnecessarily disrupt a lawful investigation that DFS is presently conducting into the practices of the NRA.  As noted, this investigation has already led to insurance companies doing business with the NRA entering into consent orders with DFS in which those companies have admitted to violations of New York State law and have agreed to pay over $8 million dollars in fines.  Such an important investigation by DFS into the NRA's unlawful practices in New York should not be allowed to be disturbed by this meritless lawsuit or by the NRA's unfounded demands for expedited discovery.

## **BACKGROUND**

**A.     The DFS Superintendent's Role in the Insurance and Banking Industries in New York**

The Financial Services Law was enacted in 2011 and charges DFS with the responsibility "[t]o ensure the continued safety and soundness of New York's banking, insurance and financial services industries, as well as the prudent conduct of the providers of financial products and services, through responsible regulation and supervision." Fin. Servs. Law § 102(i). DFS was formed with the express goals of undertaking the "effective state regulation of the insurance industry," and stewarding the "elimination of fraud, criminal abuse and unethical conduct by and with respect to, banking, insurance and other financial service institutions." Fin. Servs. Law § 102(e), (k). In furtherance of its supervisory responsibilities, DFS is responsible for licensing all insurance carriers and producers that operate in this State. *See e.g.*, Ins. Law Arts. 11, 21. DFS conducts regular examinations of insurance carriers to ensure they operate in a safe and sound manner and are in compliance with all New York State laws. *See* Ins. Law § 309. The Superintendent also has broad regulatory and enforcement authority – indeed the responsibility – to ensure that policyholders in New York State are protected. Fin. Servs. Law § 301(c).

The Superintendent possesses broad authority to regulate nearly every aspect of insurance business in the State. DFS reviews insurance policy forms and rates for compliance with the Insurance Law and regulations promulgated thereunder. The Superintendent's supervision extends – as the Insurance Law provides – from the creation of an insurer, through its responsible operation, and to its ultimate conclusion. This supervision further extends to insurance producers, such as agents and brokers, who advertise, solicit and sell insurance policy in New York State. The Superintendent has the authority and responsibility to ensure the safety

and soundness of the market and to protect the rights and interests of policyholders, creditors, shareholders, and the public.  Ins. Law § 309; Fin. Serv. Law § 301(c).

With respect to the banking industry in New York State, the Superintendent has all of the powers and responsibilities that the former Superintendent of Banks held, including the right to conduct bank examinations of state chartered or licensed institutions, to require the production of any relevant books or papers, and to subpoena witnesses, compel their attendance, and to examine them under oath.  N.Y. Banking L. §§ 36, 38.  Here, as with the insurance industry, the Superintendent has the power and responsibility to guard the safety of the New York markets for banking services by ensuring that market participants operate in a safe and sound manner.

**B.     DFS's Investigations of the NRA, Lockton Companies LLC, Chubb Group Holdings, Inc**.

On September 13, 2017, representatives from the New York County District Attorney's Office ("DA's Office") attended a meeting at DFS and presented DFS with information provided to the DA's Office for possible investigation by the group Everytown for Gun Safety, a not-for-profit organization ("Everytown").  The matter related to the NRA's Carry Guard insurance program.  Declaration of Matthew L. Levine (hereafter, "Levine Decl."), ¶ 3.

The Carry Guard insurance program provided, among other coverages, (1) liability insurance to gun owners for acts of intentional wrongdoing, and (2) legal services insurance for any costs and expenses incurred in connection with a criminal proceeding resulting from acts of self-defense with a legally possessed firearm.  Dkt Nos. 1-5; 1-6.  The Carry Guard program also included coverage for bail money, attorney consultation fees and retainers, reasonable expenses incurred by the insured to assist the insurer in the investigation or defense of the criminal charges, including actual loss of earnings up to $250 per day because of time off from work, premiums on bonds to release attachments, and costs taxed against the insured or resident family

4

member in any such proceeding.  The Carry Guard policies also provided, with respect to an act

of self-defense, coverage for all reasonable expenses incurred by the insured for psychological

counseling support for the insured or resident family member.  *See* Def. Motion to Dismiss,

Appendix A & B.

      The Carry Guard program was underwritten by Illinois Union Insurance Company, a

subsidiary of Chubb, through Lockton Affinity, LLC, an affiliate of Lockton.  The NRA actively

marketed and solicited for the Carry Guard Program through a website, email, direct mail and

other avenues without having received a license from DFS to act as an insurance producer.

Levine Decl., ¶ 6.

      More specifically, Lockton offered Carry Guard through New York's excess line market.

Dkt. No. 1-5 at p. 5.  Excess line coverage offers policyholders an opportunity to obtain

insurance that could not be procured from an authorized insurer.  *Id*.  An "authorized insurer" is

an insurance company that has received a license from DFS to provide specified types of

insurance to customers in New York State.  *Id*.  Authorized insurers are fully regulated by DFS

in order to ensure solvency and adherence to consumer protection standards.  *Id*.  Excess line

insurers are not licensed or authorized by DFS, but are permitted to do business in New York

under very limited circumstances through an excess line broker.  *Id*.  Chubb is an excess line

insurer and Lockton is licensed by DFS to serve as an excess line insurance broker.  The NRA is

not licensed by DFS, *id*., and is thus clearly prohibited by law from acting as an insurer or

producer in New York State.

      Upon receipt of the materials from the DA's Office in September 2017, DFS undertook a

review to determine whether the Carry Guard program was in compliance with New York State

laws and regulations.  After additional review and preliminary investigation strongly suggested

5

that the marketing and offering of the Carry Guard program in New York State violated multiple provisions of New York law, DFS opened a formal investigation.  In or about October 2017, DFS informed the DA's Office that DFS had opened an investigation into the Carry Guard matter.

On or about October 24, 2017, DFS served a subpoena on the NRA pursuant to Financial Services Law § 306.  On the same day, DFS also served a subpoena on Lockton and sent a Request for Special Report pursuant to Insurance Law § 308 to Chubb and its subsidiary, Illinois Union.  These requests were comprised of nearly identical requests for certain types of documents from the NRA, Lockton, and Chubb principally relating to the Carry Guard program. Levine Decl., ¶ 9.  On or about November 6, 2017, DFS participated in a conference call with the NRA's outside counsel at the law firm Morgan Lewis to discuss the NRA's response to the DFS Subpoena.  Following that call, the NRA produced certain documents in response to the DFS Subpoena in a timely fashion.  *Id.*, ¶ 10.  Approximately one month after the requests were served, on or about November 17, 2018, Lockton informed DFS that it had suspended the offering of the Carry Guard program in New York for the duration that the DFS subpoenas are "at play," and that Lockton was evaluating the Carry Guard program in light of the DFS Subpoena.  *Id.*, ¶ 11.

Between approximately November 2017 and February 2018, Lockton and Chubb both produced voluminous documents to DFS.  DFS reviewed these productions and provided additional document and informational requests to Lockton.  By the end of February 2018, Lockton and Chubb had produced thousands of pages of documents responsive to nearly all the Subpoenas' requests.  *Id.*, ¶ 12.

Since October 2017, the DFS Investigation has identified that the NRA, through Lockton, had offered additional insurance policies to its members or potential members, which are underwritten by Lloyd's of London, that also violate multiple New York State laws. Accordingly, on or about April 11, 2018, DFS sent a Request for Special Report to Lloyds that sought the type of documents also sought from the NRA, Lockton, and Chubb relating to the Carry Guard and other affinity programs offered to NRA members and potential members.  *Id*., ¶ 13.  Additionally, DFS received several presentations from both Lockton and Chubb concerning the Carry Guard and other NRA-related affinity insurance programs.  In light of additional information that had come to light during the DFS Investigation, DFS served a second subpoena on the NRA on or about June 6, 2018.  DFS and the NRA are presently in discussions concerning the NRA's response to this second subpoena.  *Id*., ¶¶ 14-15.

Thus far, DFS's investigation has determined that the Carry Guard program improperly provided coverage in any criminal proceeding against the policyholder or the policyholder's family members, including coverage for bail money, premiums on bonds, attorney consultation fee and retainer expenses, expenses incurred for the investigation of or defense of criminal charges and costs assessed against the insured or the insured's resident family member in a criminal proceeding arising out of a shooting.  Def.'s Motion to Dismiss, App. A.  This coverage is illegal in New York State, because New York State law prohibits insurance coverage for defense costs arising out of a crime, including alcohol-related driving crimes and rape and sexual assault.  Ins. Law § 1116; 11 N.Y.C.R.R.  262 (Insurance Regulation 162).  Lockton issued 680 Carry Guard policies to New York residents between April and November 2017 and, as administrator of the Carry Guard program, carried out functions such as marketing and binding the insurance, collecting and distributing premiums and delivering policies to insureds.  Between

7

approximately January 2000 and March 2018, Lockton and the NRA offered at least eleven

additional insurance programs to new and existing NRA members in New York and elsewhere.

Def.'s Motion to Dismiss, App. A.

As part of its investigation, DFS learned that, although it did not have an insurer producer

license from DFS as required by law, the NRA engaged in aggressive marketing of, and

solicitation for, the Carry Guard Program.  Dkt. Nos. 1-5 at pp. 4-6; 1-6 at pp. 3-5.  The NRA

advertised the Carry Guard program on its website as "developed and supported by the National

Rifle Association" and "created by the NRA."  Dkt. No. 1-5 at pp. 3-4.  Other NRA promotional

materials referred to the program as the "NRA Carry Guard Insurance Program."  *Id*., at p. 4.

The NRA's marketing and solicitation also involved, among other things, the broadcasting of

NRA-produced promotional videos; email and direct mail marketing; heavy promotion at annual

meetings and on the NRA website; operating an online marketing website; and use of NRA

spokespersons in "pop-up" internet advertising.  These activities are clear violations of Insurance

Law § 2102 and are presently the subject of an active investigation by DFS.  Dkt. Nos. 1-5 at pp.

5-6; 1-6 at pp. 4-5.

DFS also found that Lockton and the NRA together offered at least eleven additional

insurance programs (collectively "additional NRA programs") to new and existing NRA

members in New York State and elsewhere.[1]  Dkt. No. 1-5 at pp. 6-7.  Lockton also offered these

policies through New York's excess line market and served as the administrator of these

---

[1] The additional NRA programs included: "Retired Law Enforcement Officer Self-Defense Insurance;" "ArmsCare Plus Firemarms Insurance;" "No Cost ArmsCare Firearms Insurance;" "Firearms Instructor Plus Liability Insurance;" "Personal Firearms Protection Insurance;" "Gun Collector Insurance;" "Gun Clun Insurance;" "Hunt Club Insurance;" "NRA Business Alliance Insurance;" "Gun Show Insurance;" and "Home-based Federal Firearms License Insurance."

programs, carrying out functions similar to that done on behalf of the Carry Guard program.  *Id.*,

at pp. 7-8.

 Following DFS's initiation of the investigation into these matters, Lockton suspended the

illegal Carry Guard program on or about November 17, 2017 and is longer making Carry Guard

policies available to New York State residents to purchase.  Dkt. No. 1-6 at p. 6.

### 1. The NRA's Carry Guard Insurance Program violated multiple New York Insurance Laws

 DFS's investigation revealed that Lockton and Chubb violated multiple provisions of the

New York State Insurance Law in connection with the Carry Guard program and additional

NRA-endorsed programs.  Levine Decl., ¶ 16.

 First, the Carry Guard program, as underwritten by Chubb and administered, solicited

and marketed by Lockton, provided insurance coverage that may not lawfully be offered in the

New York State excess line market, namely: (a) defense coverage in a criminal proceeding in

violation of Insurance Law § 1116 and 11 N.Y.C.R.R. 262 (Insurance Regulation 162); (b)

liability coverage for intentional use of firearms other than the use of reasonable force to protect

persons or property that may not be written as insurance pursuant to Insurance Law §§ 1101(a)

and 1113 and violates New York public policy, *see Public Serv. Mut. Ins. Co. v. Goldfarb*, 53

N.Y.2d 392, 399 (1981), *Massena v. Healthcare Underwriters Mut. Ins. Co*., 281 A.D.2d 107,

110 (3d Dep't 2001), mod. 98 N.Y.2d 435 (2002); *Travelers Ins. Companies v. Stanton*, 223

A.D. 104, 105-106 (3d Dep't 1996), lv denied 89 N.Y.2d 804; Office of General Counsel

("OGC") Opinion No. 02-05-25 (May 30, 2002), OGC Opinion No. 99-155 (NILS) (Dec. 13,

1999), and OGC Opinion No. 99-125 (NILS) (Sept. 17, 1999); and (c) coverage for expenses

incurred by the insured for psychological counseling support in violation of Insurance Law §

2105(a).[2]  Chubb's underwriting of such coverage violated Insurance Law § 1102 and Lockton

procuring such coverage from Chubb violated Insurance Law § 2117.  *Id.*, ¶ 17.

Second, the Carry Guard program failed to comply with Insurance Law § 3420, which

sets forth minimum requirements for liability insurance policies.  *Id.*, ¶ 18.

Third, Lockton violated Insurance Law § 2324(a) by giving or offering to give (a) the No

Cost ArmsCare Firearms Insurance for free to NRA members in good standing, and (b) free

NRA membership, which the insured could use him or herself, or transfer to a family member, if

a person purchased the Carry Guard insurance, when the free NRA membership was not

specified in the insurance policy, and exceeded $25 in market value.  *Id.*, ¶ 19.

Fourth, DFS's investigation revealed that Lockton violated Insurance Law § 2118 by

making inaccurate representations relating to its efforts to satisfy the requirements necessary to

offer excess coverage.  *Id.*, ¶ 20.

Fifth, by paying royalties to the NRA for the Carry Guard Program that were based on a

percentage of actual Carry Guard insurance premiums collected, with knowledge that the NRA

did not have an insurance broker license from DFS, Lockton violated Insurance Law § 2116.  *Id.*,

¶ 21.

Finally, Lockton advertised the financial condition of a Chub insurer by referring to the

insurer's AM Best rating, in violation of Insurance Law § 2122(a)(1), and called attention to an

---

[2] Similarly, the NRA Retired Enforcement Officer Self-Defense Insurance Program provided coverage
that also may not be offered in the New York excess line market including (a) defense coverage in a
criminal proceeding that is not permitted by law; (b) liability coverage for bodily injury or property
damage expected or intended from the insured's standpoint in an insurance policy limited to use of
firearms and that was beyond the use of reasonable force to protect persons or property.

unauthorized Chubb insurer by advertising Chubb's participation in the Carry Guard program on the Carry Guard website, in violation of Insurance Law § 2122(a)(2).  *Id.*, ¶ 22.

## 2.    **The Consent Orders**

In resolution of the DFS investigation, Lockton and Chubb entered into Consent Orders with DFS on May 2, 2018 and May 7, 2018, respectively.  In the consent orders, Lockton and Chubb admitted to the various violations of the Insurance Law, and agreed to, *inter alia*, pay monetary fines, take specific actions to remedy ongoing violations of the Insurance Law, not participate in any Carry Guard, or similar programs in the future that violates the Insurance Law, and not to "enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance to be issued or delivered in New York State or to anyone known to Lockton to be a New York State resident."  *Id.*, ¶ 23.

The Consent Order with Chubb, however, expressly allowed Chubb to issue insurance policies to the NRA for the NRA's own corporate operations.  Similarly, the Consent Order with Lockton expressly allowed Lockton to assist the NRA in procuring insurance for the NRA's own corporate operations.  *Id.*, ¶ 24.  Additionally, as part of its Consent Order, Lockton agreed to report to DFS within 60 days on other potential violations of New York State law arising out of other (non-NRA) affinity programs in which they participate.

## 3.    **DFS's Ongoing Investigation of the NRA**

The DFS investigation of the NRA is still ongoing.  Specifically, DFS is continuing to investigate whether the NRA acted as an unlicensed insurance broker by selling and soliciting the Carry Guard program and other NRA-sponsored insurance programs in New York State, in violation of Insurance Law § 2102.  DFS is also investigating whether the NRA aided an

unauthorized insurer in violation of Insurance Law § 2117, in connection with the sale of these insurance programs in New York. *Id.*, ¶¶ 25-26.

**C. DFS's Press Releases**

In May 2018, DFS issued two press releases detailing its investigation into the Carry Guard program, the violations of the Insurance Law, and the Consent Orders executed by Chubb and Lockton. *See* Def's Motion to Dismiss, App. A & B. In its May 2, 2018 press release relating to Lockton, DFS stated that it "'will not tolerate conduct by any entity, licensed or otherwise, in contravention of New York Insurance Law, especially when that conduct is such an egregious violation of public policy designed to protect all citizens,'" and that the Consent Order with Lockton was part of DFS's continuing efforts to "uphold and preserve the integrity of New York law." *Id.*, App. A.

Similarly, in its May 7, 2018 press release, DFS described the Consent Order with Chubb as "'another step in addressing the unlicensed and improper activity connected with the NRA's unlawful 'Carry Guard' program,'" and stated that DFS would "'continue its comprehensive investigation into [the] matter to ensure that the New York Insurance Law is enforced and that consumers are no longer conned into buying so-called 'self-defense' insurance coverage.'" *Id.*, App. B.

**D. Governor Cuomo's Press Release and DFS's Guidance Letters**

On April 19, 2018, Governor Cuomo issued a press release advising that he had directed DFS to communicate with insurance companies and financial institutions licensed or doing business in New York, and ask that they review any relationships that they have with the NRA or similar organizations, and consider whether such relationships expose them to corporate harm or risk and/or jeopardize public safety. Dkt. No. 1-2. The direction was given in response to the

increased incidents of mass shootings nationwide and emphasized to financial and insurance

entities doing business in New York State potential risks that may arise due to relationships with

organizations, like the NRA, that promote the use of guns.  *Id*.  The Governor's Press Release

recognized that a number of businesses – including MetLife, First National Bank of Omaha, and

Delta and United Airlines – had ended relationships with the NRA following the Parkland,

Florida school shooting in order realign their company's values.  *Id*.

     In accordance with the Governor's direction, DFS Superintendent Vullo issued

memoranda dated April 19, 2018 to the leaders of New York chartered or licensed financial

institutions and all insurers doing business in New York State entitled "Guidance on Risk

Management Related to the NRA and Similar Gun Promotion Organizations" ("Guidance

Letters").  Dkt. No. 1-3; 1-4.  The Guidance Letters were not addressed to any particular

company or business and simply encouraged financial institutions and insurers generally to

consider whether their association with the NRA and other similar groups exposed them to

reputational risk, and if such relationships promoted corporate responsibility:

> The Department encourages its insurers to continue evaluating and managing their
> risks, including reputational risks, that may arise from their dealings with the NRA
> or similar gun promotion organizations, if any, as well as continued assessment of
> compliance with their own codes of social responsibility.  The Department
> encourages regulated institutions to review any relationships they have with the
> NRA or similar gun promotion organizations, and to take prompt actions to
> managing these risks and promote public health and safety.

*Id*.

     Neither the Governor's Press Release or the two Guidance Letters included any implied

threats to employ coercive state power against any individual or entity.  Dkt. No. 1-2; 1-3; 1-4.

The Governor's Press Release and the two Guidance Letters did not order any company to do

anything at all – there  was no mention of concepts such as "demanding" or "compelling" or with

verbs such as "should" or "must" which are routinely used when exercising the regulatory power

of the state. *Id.* The Governor's Press Release and the two Guidance Letters did not include any

threats of state action of any kind, whether regulatory or criminal. *Id.* The Governor's Press

Release and the two Guidance Letters did not suggest or imply that companies with ties to the

NRA are somehow complicit in unlawful behavior that merits state regulatory attention. *Id.*

And the Governor's Press Release and the two Guidance Letters did not suggest that the

government would take any active role in the process of companies assessing their own

reputational risk. *Id.*

**E.     NRA's Complaint**

The Complaint alleges that the Defendants "have abused their authority in an effort to

stifle the NRA's political advocacy and to retaliate against the NRA for the effectiveness of that

advocacy," Dkt. No. 1, ¶ 19, through the use of "selective prosecution, backroom exhortations,

and public threats" aimed at depriving "the NRA and its constituents of their First Amendment

right to speak freely about gun-related issues and defend the Second Amendment." *Id.*, at pp. 1-

2. Specifically, the Complaint alleges that DFS, Governor Cuomo and Superintendent Vullo

have violated, and continue to violate, the NRA's federal and state constitutional rights by

issuing the Guidance Letters and Press Releases, entering into the Consent Orders with Lockton

and Chubb.

The Complaint includes five causes of action. As a matter of law, each count fails to

state a cause of action and both the Governor and DFS have filed a motion to dismiss the

Complaint in its entirety.

**F.       Plaintiff's Expedited Discovery Requests**

On June 18, 2018, Plaintiff took the extraordinary step, by means of an Order to Show

Cause, to seek the disfavored recourse of expedited discovery.  *See* Dkt. No. 22.  Despite there

being no basis for disrupting the normal flow of litigation, no pending motion for a preliminary

injunction, and with full knowledge that the Defendants' deadline to answer was fast

approaching, Plaintiff sought to disrupt the Defendants' ability to litigate this case – and the

Defendants' constitutional right to speak out on the issue of gun control as well as the ongoing

investigation by DFS of Plaintiff's violations of the Insurance Law – by  bringing this entirely

unfounded motion.  In particular, Plaintiff seeks to take open-ended depositions of four

individuals from DFS, including Superintendent Maria T. Vullo, as well as to serve the

Defendants with *broad-based, merits-focused* document demands.  An example of this discovery

is the First Document Demand submitted to Governor Cuomo, which seeks: "All documents and

communications exchanged between any Defendant, on the one hand, and any Financial

Institution, on the other hand, relating to such Financial Institution's actual or potential business

arrangements with the NRA."  Dkt. No. 21-3, p. 12.  Similarly, the Fifth Request for the

Production of Documents submitted to DFS is typical of the type of merit-based discovery that

Plaintiff seeks of DFS:

> "All documents and communications relating to the April 19 Press Release
> including, without limitation:
>
>       a) All documents and communications relating to the concern that
> Financial Institutions might "send[] the wrong message" by doing business with
> the NRA;
>
>       b) Any research, analyses, models, or estimates developed or compiled by
> Defendants to substantiate the expectation that the April 2018 Letters would
> "encourage strong markets;"

c) Documents sufficient to identify the risk(s) from which Defendants, by their issuance of the April 2018 Letters, seek to "protect consumers;" and

d) Any communications received by Defendants from Financial Institutions seeking guidance or clarification regarding the April 19 Press Release, or concerning the potential impact of the April 19 Press Release upon the business practices of such Financial Institutions."

*Id.*, pp. 25-26.  Because the Complaint is entirely meritless, Defendants are entitled to its dismissal.  Therefore, no discovery should be permitted – particularly on an expedited basis.  And further, these discovery demands clearly go to the merits of the Plaintiff's claim, not to Plaintiff's not yet made request for preliminary relief.  As such, for the reasons cited below, all of Plaintiff's requests for expedited discovery are improper.

## ARGUMENT

### Point I

**EXPEDITED DISCOVERY IS NOT THE NORM AND THERE IS NO BASIS TO ORDER SUCH EXTRAORDINARY RELIEF WHERE, AS HERE, THE COMPLAINT FAILS AS A MATTER OF LAW TO STATE A CLAIM**

Pursuant to Federal Rule of Civil Procedure 26(d)(1), "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except . . . when authorized by these rules, by stipulation, or by court order."  Notably, though, it is a fundamental point of law that "[e]xpedited discovery is not the norm, … and a party should not ordinarily seek expedited merits discovery under Rule 26(d)(1)."  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2018 Bankr. LEXIS 1648, at \*11-12 (Bankr. S.D.N.Y. June 5, 2018); accord *Merrill Lynch, Pierce, Fenner & Smith v. O'Connor*, 194 F.R.D. 618, 623 (N.D. Ill. 2000) ("Expedited discovery is not the norm.").  Thus, when courts have found expedited discovery requests to be "a thinly veiled attempt to circumvent the normal litigation process," they have not hesitated to deny those requests.  *In re Fannie Mae Derivative Litig*., 227 F.R.D.

16

142, 143 (D.D.C. 2005).  Additionally, district courts have noted that "expedited discovery is not automatically granted merely because a party seeks a preliminary injunction." *Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1066 (C.D. Cal. 2009).  Indeed, "courts have an obligation to protect defendants from unfairly expedited discovery." *Edgenet, Inc. v. Home Depot U.S.A.*, Inc., 259 F.R.D. 385, 388 (E.D. Wis. 2009).

And particularly relevant here, a case in which the Defendants have filed a motion to dismiss, "[b]ecause discovery typically occurs after the resolution of motions to dismiss, presenting a motion for expedited discovery prior to rulings on motions to dismiss is often disfavored." *Attkisson*, 113 F. Supp. 3d 156, 165 (D.D.C. 2015) (omits internal citation).  This is simply because "requiring defendants to comply with an order for expedited discovery when the case may later be dismissed for failure to state a claim could 'force[] [the defendants] to expend significant resources responding to discovery requests in a case where plaintiffs did not have a viable cause of action.'"  *Id*. (quoting *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 99 (D.D.C. 2014)).

For the reasons set forth in Defendants' memorandum in support of its motion to dismiss, the allegations raised by the NRA are entirely without merit.  First, Plaintiff's First Amendment claims fail because the Consent Orders punish violations of law that clearly do not implicate the NRA's First Amendment rights, as the First Amendment does not provide any protection for unlawful conduct and the NRA is not even a party to the Consent Orders, which were entered into by Lockton and Chubb for those entities' admitted violations of law.  Further, the Press Releases and Guidance Letters are protected government speech that are not implied threats to employ coercive state power and, as a matter of law, do not violate the NRA's First Amendment rights.  Instead, they represent the protected expression of the views of the Defendants.  And

17

finally, the NRA has failed to – because it cannot – allege any particularized instances of speech that have allegedly been stifled.  As such, Plaintiff's First Amendment claims are without merit and must be dismissed.  No discovery should be permitted concerning the NRA's meritless First Amendment claims.

Plaintiff's remaining constitutional claims are likewise entirely without merit.  Plaintiff clearly lacks standing to allege an Equal Protection claim as to the lawful enforcement against Chubb and Lockton – a claim which Chubb and Lockton have already waived.  And the Complaint fails to allege any deprivation that is protected by the Due Process clause.  Because all of Plaintiff's constitutional claims fail, so too must their conspiracy claim, as the NRA has not – and cannot – show a deprivation of a constitutional right as that claim requires.  As such, none of these additional, meritless claims should be the subject of any discovery either.

Because the complaint fails to state a cause of action as a matter of law, Plaintiff's request is properly understood as one to obtain – on an expedited basis – discovery to which it will never be entitled.  In circumstances such as these, where the Plaintiff seeks discovery concerning claims that cannot survive a motion to dismiss, there is clearly no reason to expedite the normal litigation process.  On that basis alone, Plaintiff's request should be denied.

## POINT II

### PLAINTIFF CANNOT MEET THEIR BURDEN UNDER ANY TEST FOR THE EXTRAORDINARY AND DISFAVORED RECOURSE OF EXPEDITED DISCOVERY

#### A.  The Standards to be Applied – The *Notaro* Test and the Reasonableness and Good Cause Test

Although the Second Circuit has yet to articulate a definitive standard for determining whether to allow expedited discovery, courts within the Second Circuit have variously applied either the four-part test derived from *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982) – the

elements of which are similar to the standard for granting a preliminary injunction – or the more "flexible standard of reasonableness and good cause" from cases like *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005).

Under the *Notaro* test, *the moving party* must "demonstrate (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the [non-moving party] will suffer if the expedited relief is granted." *Notaro*, 95 F.R.D. at 405. *See Dentsply Sirona Inc. v. L I K Supply, Corp.*, No. 3:16-cv-00806 (MAD/DEP), 2016 U.S. Dist. LEXIS 91894, at *24 (N.D.N.Y. July 15, 2016) (applying the *Notaro* test alone); *ForceX, Inc. v. Tech. Fusion, LLC*, 2011 U.S. Dist. LEXIS 69454, at *13 (E.D. Va. June 27, 2011) (favoring the *Notaro* test over the reasonableness and good cause test).

The reasonableness and good cause test, on the other hand, requires that *the moving party* "prove that the requests are reasonable under the circumstances." *Pietsch v. Marcantonio*, 2016 U.S. Dist. LEXIS 34035, 2016 WL 1069656, at *4 (E.D.N.Y. Mar. 16, 2016) (quoting *N. Atl. Operating Co. v. Evergreen Distribs.*, LLC, 293 F.R.D. 363, 367 (E.D.N.Y. 2013)). "Under the reasonableness test, courts consider the reasonableness of the request in light of the entire record to date and all of the surrounding circumstances." *Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 234 F.R.D. 4, 6 (D.D.C. 2006). "Factors that courts consider under this test include the procedural posture of the case, whether the discovery requested is narrowly tailored, whether the party seeking the information would be irreparably harmed by waiting until after the parties conduct their Rule 26(f) conference, and whether the information sought would be unavailable or subject to destruction in the absence of expedited production."

*Merz N. Am., Inc. v. Viveve Med. Inc.*, 2017 U.S. Dist. LEXIS 69343, at *4 (E.D.N.C. May 5, 2017).

Recently, however, some courts have found that "[t]he prudent course … appears to be to blend the two tests, the *Notaro* four-factor test and the reasonableness and good cause standard." *N. Atl. Operating Co.*, 293 F.R.D. at 368. "In any event, under either test, a party must show a likelihood of irreparable harm without access to early discovery." *Merz N. Am.*, 2017 U.S. Dist. LEXIS 69343, at *4-5. Plaintiff's request for expedited discovery here satisfies neither standard, nor a blend of the two tests.

### B. Plaintiff Fails the *Notaro* Test Because Its Complaint Fails as a Matter of Law, It Cannot Establish Irreparable Harm, and the Burden of Extraordinary Expedited Discovery on Defendants is Considerable

Before addressing Plaintiff's failure to demonstrate irreparable harm in this case – which also dooms the Plaintiff's application – Defendants have shown that Plaintiff's Complaint fails as a matter of law.[3] As such, there can be no "probability of success on the merits" as required by the second inquiry under *Notaro*. Defendants are entitled to dismissal of the causes of action in the Complaint.

Plaintiff's First Amendment claims fail because the Consent Orders punish violations of the Insurance Law and the punishment of these unlawful activities does not as a matter of law implicate the NRA's First Amendment Rights. Further, the Press Releases and Guidance Letters are protected government speech that, as a matter of law, do not violate the NRA's First Amendment Rights. The NRA has failed to – because it cannot – allege any particularized instances of speech that have allegedly been stifled.

---

[3] Defendants hereby incorporate the arguments from Defendants' simultaneously-filed motion to dismiss here to show that there is no likelihood of Plaintiff succeeding on the merits.

Plaintiff's remaining constitutional claims likewise fail as a matter of law.  Plaintiff clearly lacks standing to allege an Equal Protection claim as to the lawful enforcement against Chubb and Lockton – a claim that Chubb and Lockton have already waived.  And the Complaint fails to allege any deprivation that is protected by the Due Process clause, so its claim thereunder also fails as a matter of law.

As to irreparable harm, Plaintiff has only asserted the idea that deprivation of constitutional rights are generally recognized as irreparable harms, but failed to point out that "[d]espite this general rule, … courts have held that the mere allegation of a constitutional infringement itself does not constitute irreparable harm." *Lore v. City of Syracuse*, 2001 U.S. Dist. LEXIS 26942, at *17-19 (N.D.N.Y. Feb. 21, 2001).  *See also KM Enterprises, Inc. v. McDonald*, 2012 U.S. Dist. LEXIS 20469, 2012 WL 540955, at *3 (E.D.N.Y. Feb. 16, 2012) ("the mere assertion of a constitutional injury is insufficient to automatically trigger a finding of irreparable harm"); *Meadows v. State Univ. of N.Y. at Oswego*, 832 F.Supp. 537 (N.D.N.Y. 1993) (denying preliminary injunction in case alleging violation of First Amendment because movant failed to establish irreparable harm).  Rather, it is only "where the constitutional deprivation is *convincingly shown and that violation carries noncompensable damages*" that "a finding of irreparable harm is warranted." *Smith v. Fredrico*, 2013 U.S. Dist. LEXIS 3681, at *17 (E.D.N.Y. Jan. 8, 2013) (emphasis added).  Thus, "courts have found irreparable injury by virtue of a constitutional deprivation alone have done so, with certain exceptions, where the protected right has been personal *and the violation non-compensable*." *Id.*, at 19 (emphasis added).  This means that "when 'personal' constitutional rights are violated and the harm that accompanies the violation is remediable or compensable, the damage is not irreparable." *E.E.O.C. v. Local 638*, 1995 U.S. Dist. LEXIS 7756, at *17 (S.D.N.Y. June 7, 1995).

21

As an initial point, because Defendants have demonstrated entitlement to dismissal of all of the Plaintiff's constitutional claims, it clearly cannot be said the Plaintiff has "convincingly shown" an irreparable injury as required under *Notaro*. *See Fredrico*, 2013 U.S. Dist. LEXIS 3681, at *17. In fact, Plaintiff devoted a mere three sentences to this portion of the test in its brief. Given this failure, and the deficiencies entitling Defendants to dismissal, Plaintiff has clearly failed to "convincingly show[]" irreparable injury. This alone provides a sufficient basis for denying the Plaintiff's request.

But further, in describing Plaintiff's supposed irreparable harm here, John C. Frazer, Plaintiff's General Counsel, merely states the following:

> The termination of the NRA's long-term business relationships with Lockton, Chubb, and Lloyd's has resulted and will continue to result in the loss of valuable insurance products for its members, loss of NRA members due to the cancelled policies, and loss of royalties lawfully owed. To date, several members have notified the NRA that they will not be renewing their membership because of the cancelled insurance policies.

Dkt. No. 21-2, ¶ 28. Because the harm that Plaintiff alleges here is at root a *financial harm*, one that can be financially compensated if Plaintiff were to prevail on the merits, there is no irreparable injury even if Plaintiff asserts a constitutional violation. *See Brooks v. Roberts*, 251 F. Supp. 3d 401, 433 (N.D.N.Y. 2017) ("when 'personal' constitutional rights are violated yet the harm that follows from the violation is compensable, the damage is not irreparable"); *Qwest Communs. Int'l, Inc. v. Worldquest Networks, Inc.*, 213 F.R.D. 418, 421 (D. Colo. 2003) ("While there is no bright-line standard for what constitutes irreparable injury, the essence of the concept requires a substantial threat of harm to the movant that cannot be compensated by money.").

For this reason, Plaintiff also fails to meet it burden to prove the third element of that test, that there is "some connection between the expedited discovery and the avoidance of [an] *irreparable injury*." *Notaro*, 95 F.R.D. at 405. As is shown above, because the alleged harm

that follows from the supposed constitutional violation is entirely compensable, there can be no irreparable injury here.  *See, e.g., KWG Partners, LLC v. Sigel*, 2011 U.S. Dist. LEXIS 75900, at *5 (E.D.N.Y. July 14, 2011) (holding that the plaintiff failed "to demonstrate that it will suffer irreparable injury if discovery is not expedited" because the Second Circuit "defines irreparable harm as 'certain and imminent harm for which a monetary award does not adequately compensate'") (quoting *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd*., 339 F.3d 101, 113-14 (2d Cir. 2003)).  So, logically, because Plaintiff cannot establish the first element of the *Notaro* test, Plaintiff also cannot establish the third element of that same test, which requires that an irreparable injury exists in the first instance.  *See Special Situations Cayman Fund, L.P. v. Dot Com Entm't Grp., Inc.*, 2003 U.S. Dist. LEXIS 25083, at *6 (W.D.N.Y. Dec. 5, 2003) ("this Court finds no irreparable injury, and thus no good cause exists for expedited discovery in preparation for a preliminary injunction hearing").

Since Plaintiff has clearly failed to establish the two irreparable injury elements of the *Notaro* test, there is no need for this Court to examine the other two elements of that test, and the Plaintiff's request should be denied.  *See KWG Partners, LLC*, 2011 U.S. Dist. LEXIS 75900, at *5-6 ("because plaintiff fails to demonstrate irreparable harm, [the court] need not discuss the three remaining elements"); *Momenta Pharm., Inc. v. Teva Pharm. Indus*., 765 F. Supp. 2d 87, 89 (D. Mass. 2011) ("Without a risk of irreparable harm, expedited discovery is unwarranted.").

Nonetheless, if the Court chose to examine the final element, Plaintiff also cannot satisfy the fourth prong of the *Notaro* test.  The fourth element of the *Notaro* test – that being that the injury that will result to Plaintiff without expedited discovery looms greater than the injury that the Defendants will suffer if the expedited relief is granted – is also not met here.  On this point, the Court should bear in mind that the focus of the factual allegations of the Complaint are: (1)

the April 2018 guidance letters; (2) the May 2018 consent orders with Chubb and Lockton; and (3) the DFS press releases issued in May 2018.  All of these items, though, are already publicly available to the Plaintiff and they speak for themselves.

Further, it is clear that the NRA is attempting to use discovery as a means of frustrating Defendants' ligation of this action, the Governor's protected speech regarding his longstanding and oft-publicized views on gun control, and the current investigation by DFS of the NRA's apparent violations of the Insurance Law.  The context, timing, and nature of the extraordinary requests made by the NRA demonstrate this purpose.  Permitting expedited discovery here would implicate the First Amendment rights of the Defendants, who undoubtedly have the right to express their views on matters of public policy – even if those views are in direct conflict with the NRA's views – and to be free of the retaliatory acts of Plaintiff when they express those views.  *See Board of Regents v. Southworth*, 529 U.S. 217, 229 (2000); *National Endowment for the Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J. concurring).  Further, an extraordinary grant of expedited discovery in this case would jeopardize a pending law enforcement investigation, require that substantial resources of both the Governor's Office and DFS be allocated to reviewing potential disclosures, and impede the business of governance for claims that have been demonstrated to lack any merit as a matter of law.  To require further unnecessary discovery on an expedited basis, including multiple depositions of DFS officials, would cause a significant harm to the Defendants, especially in the context of this case where a motion to dismiss is pending, which if granted, as it should be, would obviate the need for *any* discovery.  *See Attkisson*, 113 F. Supp. 3d at 165 ("expedited discovery prior to rulings on motions to dismiss is often disfavored").

For all of these reasons, Plaintiff clearly fails to satisfy the *Notaro* test.

### C. Plaintiff Fails the Reasonableness and Good Cause Test Because Plaintiff Seeks Broad-Based Expedited Discovery on the Merits of Their Claim

We now turn to the reasonableness and good cause test set forth in cases like *Ayyash*. In that case, the district court found adequate cause for expedited discovery concerning *only* the financial assets of the defendants – not discovery that went to the merits of the claim – because those defendants were "foreign individuals and corporations who ha[d] both incentive and capacity to hide their assets", and because there was "considerable urgency to plaintiff's need to seek information about the location of defendants' possible assets within the United States." *Ayyash*, 233 F.R.D. at 327. Thus, the court was particularly concerned with "the urgency of the need for discovery" because, as it noted, the defendants in that case were "now aware of the action (and thus have an incentive to conceal assets)", and also because "all but one of the defendants have failed to respond to the complaint (indicating disinclination to defend the matter on the merits, and making it appear futile to anticipate a prompt Rule 26(f) conference)." *Id*. Clearly, no such circumstances exist here. Indeed, it is absurd to even think that the public-official Defendants in the present case would conceal the evidence Plaintiff seeks, or that they would ever fail to respond to the Complaint in this action. Thus, there is no good cause to allow for expedited discovery under the test set forth in *Ayyash*.

Furthermore, in cases like *Guttenberg v. Emery*, 26 F. Supp. 3d 88, the district court found that the reasonableness and good cause standard was not met because the plaintiffs sought "relatively broad discovery *on issues going to the merits of their case*," that is, "their discovery requests [were] not narrowly tailored to reveal information related to the preliminary injunction as opposed to the case as a whole." *Id*., at 98 (emphasis added). That is clearly true here, too. Unlike in *Ayyash* where the plaintiffs sought very limited discovery related to the diminishing financial assets of the foreign defendants in order to perverse the status quo, here Plaintiff has

25

proposed discovery that is very broad in nature, as Plaintiff essentially seeks discovery to establish the *merits* of their claim.

For example, as noted above, Plaintiff's First Request for Production of Documents for Governor Cuomo is very broad and it goes to the heart of the *merits* of their claim, as it seeks: "All documents and communications exchanged between any Defendant, on the one hand, and any Financial Institution, on the other hand, relating to such Financial Institution's actual or potential business arrangements with the NRA." Dkt. No. 21-3, p. 12. Similarly, Plaintiff's Third Request for Production of Documents of Governor Cuomo is equally broad and it too goes to the *merits* by seeking: "All documents and communications relating to any actual or potential Adverse Action by any Defendant against any Financial Institution known or suspected by any Defendant to maintain or seek business arrangements with the NRA." *Id.* Likewise, Plaintiff's Sixth Request for Production of Documents of Governor Cuomo is *merit-based discovery*, as it demands: "All documents and communications relating to the NRA Insurance Investigation, the Lockton Consent Order, or the Chubb Consent Order." *Id.*, p. 13. These demands certainly are not narrowly tailored to reveal information related to a request for a preliminary injunction.

And even just one of the proposed document demands for DFS shows how broad those demands are and how clear it is that they too go to the *merits* of the Plaintiff's claim. As noted above, the Fifth Request for the Production of Documents submitted to DFS seeks:

> "All documents and communications relating to the April 19 Press Release including, without limitation:
>
> a) All documents and communications relating to the concern that Financial Institutions might "send[] the wrong message" by doing business with the NRA;
>
> b) Any research, analyses, models, or estimates developed or compiled by Defendants to substantiate the expectation that the April 2018 Letters would "encourage strong markets;"

c) Documents sufficient to identify the risk(s) from which Defendants, by their issuance of the April 2018 Letters, seek to "protect consumers;" and

d) Any communications received by Defendants from Financial Institutions seeking guidance or clarification regarding the April 19 Press Release, or concerning the potential impact of the April 19 Press Release upon the business practices of such Financial Institutions."

*Id.*, pp. 25-26.

It is the normal discovery process that is used for all of this kind of merit-based discovery; it is not the purpose of expedited discovery. *See, e.g., United States ex rel. Brown v. Celgene Corp.*, 2014 U.S. Dist. LEXIS 194470, at *5 (C.D. Cal. Mar. 21, 2014) ("[Plaintiff] wants to … delve into the merits of the underlying dispute between the parties. … These are not proper bases for expedited discovery."). Indeed, "when a plaintiff's discovery requests would go to the heart of the case, such that they become discovery that seeks to prove an element of the plaintiff's case, a request for expedited discovery is inappropriate." *Attkisson*, 113 F. Supp. 3d at 163 (internal quotation marks, alterations and citation omitted). Stated differently, "the proposed discovery requests must be targeted or otherwise tailored to obtaining injunctive relief, and not simply be addressed to the ultimate merits of plaintiff's claims." *Merz N. Am., Inc. v. Viveve Med. Inc.*, 2017 U.S. Dist. LEXIS 69343, at *6 (E.D.N.C. May 5, 2017); accord *Storz Mgmt. Co. v. Carey*, 2018 U.S. Dist. LEXIS 21934, at *3 (E.D. Cal. Feb. 8, 2018) ("Expedited discovery may be denied where the expedited discovery goes to the merits of the plaintiff's claim.").

Again, here Plaintiff's discovery requests are plainly aimed at establishing the merits of its claim, not at simply preserving the status quo in relation to a motion for preliminary injunction. Thus, what the district court noted in *Disability Rights Council of Greater Wash.* applies equally here:

> Surely, plaintiffs are not seeking expedited discovery to gain evidence to get the court to preserve the status quo.  They want to gather all the evidence they would need to radically transform the status quo, on an expedited basis.  But, that is not the purpose of a preliminary injunction, nor of the limited discovery that the courts traditionally permit a plaintiff to have to secure it.

*Id.*, 234 F.R.D. at 7.  *See also Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1068 (C.D. Cal. 2009) ("plaintiff has not limited its discovery requests to information to preserve the status quo, as it must") (omits internal quotations).  The *broad-based, merits-focused* nature of the Plaintiff's request for expedited discovery requires that the Court deny the Plaintiff's requests.

Finally, to the extent that Plaintiff may argue that expedited discovery is needed with respect to the "likelihood of success on the merits" prong on the preliminary injunction inquiry, Plaintiff has already asserted that the "limited knowledge" that it currently possesses "*suffices to prove* that Defendants have violated the NRA's First Amendment rights …" Dkt. No. 21-1, p. 19 (emphasis added).  But because, by making this admission, "Plaintiff admits that it does not need the expedited discovery for its preliminary injunction motion, this factor weighs against expedited discovery."  *Profil Institut Fur Stoffwechselforschung Gbmh v. Profil Inst. for Clinical Research*, 2016 U.S. Dist. LEXIS 175238, at *10-11 (S.D. Cal. Dec. 16, 2016).  Again, the April 2018 guidance letters, the May 2018 consent orders with Chubb and Lockton, and the DFS press releases issued in May 2018 are all publicly available to the Plaintiff and they speak for themselves.  Plaintiff asserts that these documents *supposedly* prove its case on the merits, so expedited discovery is clearly not needed.  *See Fuhu, Inc. v. Toys "R" Us, Inc.*, 2012 U.S. Dist. LEXIS 192302, 2012 WL 12870313, at *1, 3-4 (S.D. Cal. Oct. 4, 2012) (finding no good cause for expedited discovery where plaintiffs admitted that they possessed the information needed for the upcoming TRO hearing; also observing that "[w]ith Plaintiffs' concessions that they

28

currently have all of the information that they need for the upcoming TRO hearing, the Court is at a loss to understand why expedited discovery is necessary").[4]

In sum, based upon the above case law and analysis, it is clear that the Plaintiff's request for expedited discovery is unwarranted. Because Plaintiff fails to meet either the *Notaro* test or the reasonableness and good cause test, Plaintiff's request for expedited discovery must be denied by the Court.

## Point III

### SINCE DFS SUPERINTENDENT MARIA T. VULLO IS A "HIGH-RANKING GOVERNMENT OFFICIAL", THE COURT MUST NOT PERMIT PLAINTIFF TO TAKE HER DEPOSITION – ESPECIALLY ON AN EXPEDITED BASIS.

Plaintiff also asks the Court to allow for the taking of the expedited deposition of DFS Superintendent Maria T. Vullo. To begin with, for the reasons asserted above, *no* deposition should be permitted of *any* DFS official. But this is particularly true of Superintendent Vullo since, as a general proposition, "high ranking government officials" like her "are not subject to depositions" – much less on an *expedited* basis. *Marisol A. by Forbes v. Giuliani*, 1998 U.S. Dist. LEXIS 3719, at *7 (S.D.N.Y. Mar. 23, 1998) (citing *National Nutritional Foods Ass'n v. F.D.A.*, 491 F.2d 1141, 1144-46 (2d Cir.), cert. denied, 419 U.S. 874, 42 L. Ed. 2d 113, 95 S. Ct. 135 (1974)). *See also Lederman v. N.Y.C. Dep't of Parks & Rec.*, 731 F.3d 199, 203 (2d Cir.

---

[4] Also relevant here, in *Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385 (S.D.N.Y. 2011), the district court found that the plaintiff's request for expedited discovery did not satisfy the reasonableness and good cause test because "plaintiff has offered no concrete basis whatsoever to justify expedited discovery" as the defendants had "represented to the Court that they have undertaken appropriate steps to preserve all potentially relevant materials, electronic or otherwise." *Id. See also Dimension Data N. Am., Inc. v. NetStar-1, Inc.*, 226 F.R.D. 528, 532 (E.D.N.C. 2005) (denying an expedited discovery motion because "plaintiff has not alleged that the discovery sought will be unavailable in the future or is subject to pending destruction if it is not taken now" thus "plaintiff will not be irreparably harmed by engaging in standard discovery procedures as set out in the Federal Rules of Civil Procedure"). Of course, the same is certainly true here. Defendants have taken all appropriate and necessary steps to preserve discovery material, if it is needed in the future.

2013) ("a high-ranking government official should not – absent exceptional circumstances – be
deposed or called to testify regarding the reasons for taking official action, including … his [or
her] consultation with subordinates") (omits internal quotation); *Gonzalez v. Cty. of Suffolk*, 2011
U.S. Dist. LEXIS 130390, at *3 (E.D.N.Y. Nov. 10, 2011) ("In general, depositions of high-
ranking government officials are not permitted.").

As one district court in New York has noted, "[t]he policy surrounding this privilege is to
allow the function and flow of government to proceed unabated." *Ebbert v. Nassau Cty.*, 2007
U.S. Dist. LEXIS 15159, at *12 (E.D.N.Y. Mar. 2, 2007). Indeed, "[i]f the head of a government
agency were subject to having his [or her] deposition taken concerning any litigation affecting
his [or her] agency or any litigation between private parties which may indirectly involve some
activity of the agency, we would find that the heads of government departments … would be
spending their time giving depositions and would have no opportunity to perform their
functions." *Capitol Vending Co. v. Baker*, 36 F.R.D. 45, 46 (D.D.C. 1964). Further, as another
district court in New York has held, "[t]he purpose of this rule is not only to leave officials free
to conduct government business, … but also to protect the mental processes of executive and
administrative officers in order promote open channels of communication within government."
*L.D. Leasing Corp. v. Crimaldi*, 1992 U.S. Dist. LEXIS 18683, at *3 (E.D.N.Y. Dec. 1, 1992)
(citing *Ernest and Mary Hayward Weir Foundation v. United States*, 508 F.2d 894, 895 n.2 (2d
Cir. 1974) (per curiam). Thus, "top executive department officials should not, absent
extraordinary circumstances, be called to testify regarding their reasons for taking official
actions." *In re Office of Inspector General*, 933 F.2d 276, 278 (5th Cir. 1991) (per curiam)
(quoting *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 586, 247 U.S. App.
D.C. 85 (D.C. Cir. 1985)).

Depositions of high level government officials are therefore only permitted in "exceptional circumstances" upon a showing that "(1) the deposition is necessary in order to obtain relevant information that cannot be obtained from any other source and (2) the deposition would not significantly interfere with the ability of the official to perform his [or her] governmental duties." *Marisol A. by Forbes*, at *7.  Courts have consistently held that the first prong of this standard is "strictly imposed" and that the party seeking a deposition of a high-ranking government official must establish that the official has "*unique* personal knowledge" that cannot be obtained elsewhere by other means.  *Id.* at *8 (emphasis added).  Stated another way, "a party may only obtain the deposition of a high level official by showing that official has particularized first-hand knowledge that cannot be obtained from any other source."  *New York v. Oneida Indian Nation of N.Y.*, No. 95-CV-0554 (LEK/RFT), 2001 U.S. Dist. LEXIS 21616, at *9 (N.D.N.Y. Nov. 9, 2001) (omits internal quotations).

It is absolutely clear that Defendant Governor Cuomo would not be subject to a deposition in this case.  *Id*. ("Obviously, [the Governor of New York] is consumed daily with matters of statewide and even national relevance.").[5]  But the term "high-ranking official", in this context, also applies to other officials below the level of a chief executive of a state, including to mayors, commissioners, and agency department heads like Superintendent Vullo.  *See, e.g., Universal Calvary Church v. City of New York*, 1999 U.S. Dist. LEXIS 8095, 96 CIV. 4606, 1999 WL 350852, at *1 (S.D.N.Y June 1999) (the plaintiff was denied depositions of the Mayor

---

[5] In preventing the depositions of governors, other federal district courts throughout the Nation have held similarly.  *See, e.g., EMW Women's Surgical Ctr., P.S.C. v. Glisson*, 2017 U.S. Dist. LEXIS 139725, at *8 (W.D. Ky. Aug. 30, 2017) (holding that the Governor of Kentucky "is undeniably a high-ranking official not normally subject to the burden of depositions" and that only under "extraordinary circumstances" would he be subject to such a deposition); *Coleman v. Schwarzenegger*, 2008 U.S. Dist. LEXIS 70224, at *26 (holding that "the Governor of California" is a "high-ranking official[] who deserve[s] protection from the burden of depositions"); *Hernandez v. Tex. Dep't of Aging & Disability Servs*., 2011 U.S. Dist. LEXIS 145308, at *9 (W.D. Tex. Dec. 16, 2011) (same for the Governor of Texas).

and the former and current police commissioner); *Marisol A. by Forbes*, 1998 U.S. Dist. LEXIS 3719, at \*11 ("Common sense suggests that member of the Cabinet and the administrative head of a large executive department should not be called upon to . . . give testimony by deposition …"); *RI, Inc. v. Gardner*, 2011 U.S. Dist. LEXIS 89308 (E.D.N.Y. Aug. 11, 2011) (holding that the former New York State Commissioner of Labor was a high-ranking official that was not subject to a deposition); *Kyle Eng'g Co. v. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979) ("Heads of government agencies are not normally subject to deposition.").

Furthermore, in *L.D. Leasing Corp., Inc. v. Crimaldi*, 1992 U.S. Dist. LEXIS 18683 (E.D.N.Y. Dec. 1, 1992), the district court granted a protective order prohibiting the deposition of then-Mayor David Dinkins.  It is noteworthy that in quashing that notice of deposition, the court found that the mayor did not have exclusive first-hand knowledge of the information being sought, several key individuals had already been deposed without a showing that the mayor's testimony was needed, and the examination was exactly the type of mental probing of an official's decision-making that is prohibited.  *Id*., \*3-4.  Those same factors are dispositive here with regard to the sought-after expedited deposition of Superintendent Vullo.

Indeed, to meet their burden on this point, Plaintiff merely states the following: "[T]he NRA requests to depose Vullo in an individual fact witness capacity, not a Rule 30(b)(6) capacity, which should limit the burden of any required preparation."  Dkt. No. 21-1, p. 20. Plaintiff has nothing further to say on this subject, and this is plainly insufficient.

As the Second Circuit held in *Lederman*, Plaintiff "did not demonstrate exceptional circumstances" because Plaintiff "did not identify with particularity the information they needed," nor did Plaintiff contend that Superintendent Vullo had "unique first-hand knowledge related to the litigated claims or that the necessary information cannot be obtained through other,

less burdensome or intrusive means." *Id.*, 731 F.3d at 203.  So this Court clearly must not permit the deposition of Superintendent Vullo – *at all* – but especially on an expedited basis.  *See Am. LegalNet, Inc.*, 673 F. Supp. 2d at 1069 ("[P]laintiff has made no effort to limit the topics on which it seeks to depose [the defendant] to those topics pertinent to its motion for a preliminary injunction; in fact, plaintiff does not even identify the topics on which it seeks to examine [the defendant].").

It bears noting again that this request is nothing more than a thinly veiled attempt by the NRA to go on a fishing expedition, seeking to get information on the pending investigation of NRA's apparent violations of the Insurance Law.  By regularly, and over the course of years, marketing insurance for sale, collecting money for insurance, and otherwise acting as an insurance producer without obtaining a license, it appears the NRA is in violation of the Insurance Law.  *See* Ins. Law 2102.  The Superintendent is the official tasked by law to investigate and enforce the provisions that the NRA appears to have violated regularly.  *See e.g.*, Fin. Servs. Law §§ 306, 404, 408, 409; Ins. Law §§ 109, 2102.  And dutifully, the Superintendent is investigating those violations of law.   Public policy demands that the NRA not be permitted to use expedited discovery – related to claims that fail as a matter of law – as a sword to attempt to frustrate the entirely legitimate law enforcement investigation that DFS is currently undertaking.  Indeed, the NRA will never be entitled to discovery of DFS's investigatory efforts, as such information is plainly protected by – among other privileges – the law enforcement privilege and the bank examiner privilege.

## **CONCLUSION**

For the foregoing reasons, this Court should deny the Plaintiff's request for expedited discovery.  Plaintiff fails, as a matter of law, to state a claim upon which relief can be granted

and thus dismissal not discovery, expedited or otherwise, is warranted. Plaintiff fails to meet the legal standards necessary to obtain the extraordinary recourse of expedited discovery under either the *Notaro* test or the reasonableness and good cause test, nor a blend of the two tests. Furthermore, Plaintiff must not be allowed to take the deposition of DFS Superintendent Maria T. Vullo, a high-ranking government official.

Dated: Albany, New York
        July 2, 2018

                                        BARBARA D. UNDERWOOD
                                        Attorney General of the State of New York
                                        *Attorney for Defendants Andrew M. Cuomo,*
                                             *Maria T. Vullo and Department of*
                                             *Financial Services*
                                        The Capitol
                                        Albany, New York  12224

                                        By: s/ Adrienne J. Kerwin
                                        Adrienne J. Kerwin
                                        Assistant Attorney General, of Counsel
                                        Bar Roll No. 105154
                                        Telephone:  (518) 776-2608
                                        Fax:  (518) 915-7738 (Not for service of papers)
                                        Email: Adrienne.Kerwin@ag.ny.gov

TO:     VIA ECF
        J. Joel Alicea, Esq.
        Charles J. Cooper, Esq.
        Michael W. Kirk, Esq
        Cooper & Kirk, PLLC
        1523 New Hampshire Ave., NW
        Washington, DC  20036

        VIA ECF
        William A. Brewer, Esq.
        Stephanie L. Gase, Esq.
        Sarah Rogers, Esq.
        Brewer Attorneys & Counselors
        750 Lexington Avenue, 14th Flr.
        New York, NY  10022