UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

NATIONAL RIFLE ASSOCIATION OF AMERICA,

*Plaintiff*,

-against-

18-CV-0566

TJM/CFH

ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,

*Defendants*.

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT PURSUANT TO FRCP 12(B)(6)**

BARBARA D. UNDERWOOD
Attorney General of the State of New York
Attorney for Defendants Andrew M. Cuomo,
    Maria T. Vullo and New York State
    Department of Financial Services
The Capitol
Albany, New York  12224
Telephone:  (518) 776-2608
Fax:  (518) 915-7738 (Not for service of papers)

Adrienne J. Kerwin
Assistant Attorney General, of Counsel
Bar Roll No. 105154

Helena O. Pederson
Assistant Attorney General, of Counsel

Kelly L. Munkwitz
Assistant Attorney General, of Counsel

Date: August 3, 2018

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iv

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND................................................................................................3

    A. The Superintendent's Role in the Insurance and Banking Industries in New York…..3

    B. DFS's Investigations of Lockton Companies LLC & Chubb Group Holdings, Inc…..5

    C. DFS's Press Releases………………………………………………………...11

    D. Governor Cuomo's Press Release and DFS's Guidance Letters……………………11

    E. The NRA's Complaint………………………………………………………...13

ARGUMENT……………………………………………………………………15

    POINT I……………………………………………………………………17

        THE COMPLAINT FAILS TO STATE A FIRST AMENDMENT CLAIM…..17

            A. The Consent Orders Punish Violations of the New York
                Insurance Law and, as a Matter of Law, Do Not Violate
                the NRA's First Amendment Rights………………………………...17

            B. The Press Releases and the Guidance Letters are Protected
                Government Speech that, as a Matter of Law, Do Not
                Violate the  NRA's Rights to Free Speech Rights…………………...19

            C. The Complaint Fails to Allege Any Particularized Instances
                of Protected Speech, Expression or Conduct Directly Infringed by
                Defendants……………………………………………….………...23

            D. If, *Arguendo*, the Complaint Alleges Protected Speech by
                the NRA, it is Commercial Speech…………………………………..30

            E. The Complaint Fails to Allege a Freedom of
                Association Claim…...…………………………………………..32

    POINT II……………………………………………………………………37

        THE NRA LACKS STANDING TO ALLEGE AN EQUAL PROTECTION
        CLAIM…………………………………………………………………..37

i

POINT III………………………………………………………………………………..40

    THE COMPLAINT FAILS TO ALLEGE A CONSPIRACY CLAIM……....…40

POINT IV……………………………………………………………………….......41

    THE COMPLAINT FAILS TO ALLEGE A DUE PROCESS CLAIM……......41

POINT V……………………………………………………………...…...45

    PLAINTIFF'S PENDANT TORTIOUS INTERFERENCE WITH
    PROSPECTIVE ECONOMIC ADVANTGAGE CLAIM SHOULD BE
    DISMISSED…………………………………………………………..…..45

CONCLUSION………………………………………………………………….....50

APPENDIX

    A:  May 2, 2018 DFS Press Release Regarding Lockton

    B:  May 7, 2018 DFS Press Release Regarding Chubb

    C:  Excerpts from the New York Insurance Law

        § 109……………………………………………………………..C-1
        § 308……………………………………………………………..C-2
        § 309……………………………………………………………..C-3
        § 310……………………………………………………………..C-4
        § 1101(a)………………………………………………………..C-5
        § 1102……………………………………………………………C-6
        § 1104…………………………………………………………...C-9
        § 1113…………………………………………………………..C-12
        § 1116…………………………………………………………..C-23
        § 2105(a)………………………………………………………..C-26
        § 2110…………………………………………………………..C-27
        § 2116…………………………………………………………..C-31
        § 2117…………………………………………………………..C-32
        § 2118…………………………………………………………..C-37
        § 2119…………………………………………………………..C-46
        § 2120…………………………………………………………..C-49
        § 2122…………………………………………………………..C-50
        § 2123…………………………………………………………..C-51
        § 2128…………………………………………………………..C-54
        § 2307…………………………………………………………..C-55
        § 2324(a)………………………………………………………..C-56
        § 3201…………………………………………………………..C-57

§ 3231(e)(1)(A)……………………………………………………………...C-64

§3420……………………………………………………………………...C-65

§ 4308(c)………………………………………………………………………C-74

## TABLE OF AUTHORITIES

CASES                                                                    Page(s)

*A.B.C. Home Furnishings v. Town of E. Hampton*,
    947 F. Supp. 635 (E.D.N.Y. 1996) .......................................................................43

*Adams v. Smith*,
    2015 U.S. Dist. LEXIS 88873 (N.D.N.Y. July 9, 2015).........................................42

*Al-Amin v. City of N.Y.*,
    979 F. Supp. 168 (E.D.N.Y. 1997) .........................................................................8

*Arcara v. Cloud Books, Inc.*,
    478 U.S. 697 (1986)............................................................................... 17-18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................15

*Bad Frog Brewery, Inc. v. New York State Liquor Auth.*,
    134 F. 3d 87 (2d Cir. 1998)..................................................................................30

*Balentine v. Tremblay*,
    554 Fed. Appx. 58 (2d Cir. 2014) .........................................................................44

*Bantam Books v. Sullivan*,
    372 U.S. 58 (1963)........................................................................................25, 28

*Beacon Syracuse Associates v. City of Syracuse*,
    560 F. Supp. 188 (N.D.N.Y. 1983)......................................................................43

*Bell Atl. Corp. v. Twombly*,
    50 U.S. 544 (2007).............................................................................................15

*Besicorp Ltd. V. Kahn*,
    290 A.D.2d 147 (3d ept. 2002) ...........................................................................47

*Board of Regents v. Southworth*,
    529 U.S. 217 (2000)............................................................................................19

*Boelter v. Hearst Communs., Inc.*,
    192 F. Supp. 3d 427 (S.D.N.Y. 2016)..................................................................27

*Brady v. Colchester*,
    863 F.2d 205 (2d Cir. 1988)........................................................................ 32-33

*British Int'l Ins. Co. v. Seguros La Republica, S.A.*,
    212 F.3d 138 (2d Cir. 2000)) ...............................................................................31

*Casciani v. Nesbitt,*
    659 F.Supp.2d 427 (W.D.N.Y. 2009) ....................................................................39

*CBF Industria DeGusa S/A v. AMCI Holdings, Inc.,*
    2018 U.S. Dist LEXIS 100781 (S.D.N.Y. June 15, 2018) ......................................15

*Center for Reprod. Law & Policy v. Bush,*
    2001 U.S. Dist. LEXIS 10903 (S.D.N.Y. July 31, 2001) .......................................38

*Central Hudson Gas & Elec. Corp. v. Pub. Service Comm'n,*
    447 U.S. 557 (1980) ................................................................................................30

*Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay,*
    868 F.3d 104 (2d Cir. 2017) ...................................................................................31

*Chrebet v. Co. of Nassau,*
    24 F. Supp. 3d 236 (E.D.N.Y. 2014) ...............................................................343-44

*Church of Am. Knights of the Ku Klux Klan v. Kerik,*
    356 F. 3d 197 (2d Cir. 2004) ..................................................................................24

*Ciambriello v. Cty. of Nassau,*
    292 F.3d 307 (2d Cir. 2002) ...................................................................................40

*Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993) ................................................................................................30

*Cine SK8, Inc. v. Town of Henrietta,*
    507 F. 3d 778 (2d Cir. 2007) ..................................................................................39

*College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,*
    527 U.S. 666 (1999) ................................................................................................43

*Concord Assocs., L.P. v. Entm't Props. Trust,*
    817 F.3d 46 (2d Cir. 2016) .....................................................................................15

*Congregation Rabbinical College of Tartikov, Inc. v. Vill. of Pomona,*
    138 F. Supp. 2d 352 (S.D.N.Y. Sept. 29, 2005) ...................................................17

*Corsini v. Brodsky,*
    2018 U.S. App. LEXIS 9209 (2d Cir. April 13, 2018) ..........................................40

*Crowley v. Courville,*
    76 F. 3d 47 (2d Cir. 1996) ......................................................................................43

*Dallas v. Stanglin,*
    490 U.S. 19 (1988) ..................................................................................................24

*Dawson v. Cty. Of Westchester,*
  351 F. Supp. 2d 176 (S.D.N.Y. 2004) ................................................................48

*DiFolco v. MSNBC, LLC,*
  622 F.3d 104 (2d Cir. 2010) ..............................................................................15

*Doyle v. N.Y.S. Div. of Hous. & Community Renewal,*
  1999 U.S. Dist. LEXIS 3960 (S.D.N.Y. March 29, 1999) ...................................36

*El v. City of New York,*
  2002 U.S. Dist. LEXIS 12431 (S.D.N.Y. 2002) ............................................. 17-18

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC,*
  194 F. Supp. 3d 263 (S.D.N.Y. 2016) .................................................................45

*Fighting Finest v. Bratton,*
  95 F.3d 224 (2d Cir. 1996) ........................................................................ 34-35, 37

*Fletcher v. Marino,*
  882 F.2d 605 (2d Cir. 1989) ...............................................................................34

*Gilmoe v. Bouboulis,*
  2016 U.S. Dist. LEXIS 115315 (N.D.N.Y. Aug. 29 2016) ...................................41

*Grzywna ex rel. Doe v. Schenectady Cent. Sch. Dist.,*
  489 F. Supp. 2d 139 (N.D.N.Y. 2006) .................................................................24

*Hall v. Marshal,*
  479 F. Supp. 2d 304 (E.D.N.Y. 2007) .................................................................44

*Hammerhead Enters. v. Brezenoff,*
  707 F.2d 33 (2d Cir. 1983) ........................................................................... 20-21

*Hotel Syracuse, Inc. v. Young,*
  805 F. Supp. 1073 (N.D.N.Y. 1992) ....................................................................46

*Hunt v. City of L.A.,*
  638 F.3d 703 (9th Cir. 2011) ..............................................................................29

*ISKCON of Potomac, Inc. v. Kennedy,*
  61 F. 3d 949 (D.C. Cir. 1995) .............................................................................29

*JA Apparel Corp. v. Abboud,*
  591 F. Supp. 2d 306 (S.D.N.Y. 2008) .................................................................19

*John R. Loftus v. White,*
  150 A.D.2d 857 (3d Dept. 1989) ........................................................................48

*Johnson v. Newburgh Enlarged Sch. Dist.*,
   239 F. 3d 246 (2d Cir. 2001)......................................................42

*Jones v. Schneiderman*,
   974 F. Supp. 2d 322 (S.D.N.Y. 2013)..........................................24

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
   2018 U.S. Dist LEXIS 87432  (S.D.N.Y. May 23, 2018)...................19

*LaFleur v. Whitman*,
   300 F3d 256 (2d Cir. 2002)........................................................38

*Laird v. Tatum*,
   408 U.S. 1 (1972).....................................................................38

*Latino Officers Ass'n v. City of New York*,
   1998 U.S. Dist. LEXIS 2018 (S.D.N.Y. Feb. 20, 1998)..................34

*Lennon v. Miller*,
   66 F.3d 416 (2d Cir. 1995).........................................................45

*Liberty Mut. Ins. Co. v. Fairbanks Co.*,
   170 F.Supp.3d 634 (S.D.N.Y. 2016).............................................32

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..................................................................38

*Martinez v. Sanders*,
   307 F. App'x 467 (2d Cir. 2008) .................................................17

*Massena v. Healthcare Underwriters Mut. Ins. Co.*,
   281 A.D.2d 107 (3d Dep't 2001) ...................................................9

*Mastrovincenzo v. City of N.Y.*,
   435 F.3d 78 (2d Cir. 2006).....................................................27-28

*Matal v. Tam*,
   137 S.Ct. 1744 (2017)...............................................................19

*Matson v. Bd. of Educ.*,
   631 F.3d 326 (2d Cir. 2011)........................................................16

*McLean v. City of N.Y*,
   12 N.Y.3d 194 (2009)................................................................48

*Morgan v. City of N.Y.*,
   166 F. Supp. 2d 817 (S.D.N.Y. 2001)..........................................38

*NAACP v. Alabama,*
  357 U.S. 449 (1958)..................................................................................32

*National Endowment for the Arts v. Finley,*
  524 U.S. 569 (1998)..................................................................................19

*New York State Rifle & Pistol Ass'n v.City of New York,*
  883 F.3d 45 (2d Cir. 2018)..................................................................... 32-33

*O'Connor v. Pierson,*
  476 F.3d 187 (2d Cir. 2005).....................................................................42

*Ohralik v. Ohio State Bar Assn.,*
  436 U.S. 447 (1978)............................................................................. 26-28

*Okwedy v. Molinari,*
  333 F.3d 339 (2d Cir. 2002)............................................................... passim

*Orr v. Miller Place Union Free Sch. Dist.,*
  2008 U.S. Dist. LEXIS 52803 (E.D.N.Y. July 9, 2008) .............................40

*Pangburn v. Culbertson,*
  200 F.3d 65 (2d Cir. 1999).......................................................................40

*Penthouse Intl., Ltd. v. Meese,*
  939 F.2d 1011 (D.C. Cir. 1991)................................................................22

*Pleasant Grove City v. Summum,*
  555 U.S. 460 (2009)........................................................................ 19, 21-22

*Podlach v. Vill. Of Southampton,*
  2017 U.S. Dist. LEXIS 73047 (E.D.N.Y. May 11, 2017) ...........................36

*Posner v. Lewis,*
  18 N.Y.3d 566 (2012) ...............................................................................47

*Public Serv. Mut. Ins. Co. v. Goldfarb,*
  53 N.Y.2d 392 (1981) .................................................................................8

*R.M. Bacon, LLC v. Saint-Gobain Performance Plastics Corp.,*
  2018 U.S. Dist. LEXIS 26299 (N.D.N.Y. Feb. 20, 2018) ..........................47

*Rattner v. Netburn,*
  930 F.2d 204 (2d Cir. 1991).....................................................................25

*Richardson v. NYC Health & Hosps. Corp.,*
  2009 U.S. Dist. LEXIS 25247 (S.D.N.Y. March 25, 2009) .......................40

*Richardson v. Pratcher*,
   48 F.Supp. 3d 351 (S.D.N.Y. 2014).................................................................23

*Rinaldi v. City of New York*,
   2014 U.S. Dist. LEXIS 79011 (S.D.N.Y. June 10, 2014) ........................................42

*Sadallah v. City of Utica*,
   383 F. 3d 34 (2d Cir. 2004)...........................................................................44

*Sanitation & Recycling Ind., Inc. v. City of New York*,
   928 F. Supp. 407 (S.D.N.Y. 1996).................................................................43

*Selevan v. New York Thruway Auth.*,
   584 F.3d 82 (2d Cir. 2009)............................................................................37

*Sierra Club v. Morton*,
   405 U.S. 727 (1972).....................................................................................38

*Silver v. Kuehbeck*,
   217 F. App'x 18 (2d Cir. 2007) ......................................................................47

*Smith v. Arkansas State Highway Emplyees*,
   441 U.S. 463 (1979).....................................................................................33

*Snepp v. United States*,
   444 U.S. 507 (1980).....................................................................................19

*Sorrell v. IMS Health, Inc.*,
   564 U.S. 553 (2011)..................................................................................30-31

*Sorvillo v. St. Francis Prep. Sch.*,
   2014 U.S. Dist LEXIS 186923 (E.D.N.Y. Aug. 12, 2014)....................................45

*Spence v. Washington*,
   418 U.S. 405 (1974).....................................................................................24

*St. German of Alaska Eastern Orthodox Catholic Church v. United States*,
   653 F. Supp. 1342 (S.D.N.Y. 1987)................................................................37

Tango v. Tulevech,
   *61 N.Y.2d 34 (1983)*................................................................................48-49

*Temple of the Lost Sheep, Inc. v. Abrams*,
   930 F.2d 178 (2d Cir. 1991)..........................................................................46

*Texas v. Johnson*,
   491 U.S. 97 (1989).......................................................................................24

*Travelers Ins. Companies v. Stanton*,
   223 A.D. 104 (3d Dep't 1996) ....................................................................9

*Trudeau v. NYS Consumer Prot. Bd.*,
   2006 U.S. Dist. LEXIS 26308 ...................................................................23

*United States v. Hashmi*,
   2009 U.S. Dist. LEXIS 108321 (S.D.N.Y. Nov. 18, 2009) ............................ 18-19

*United States v. O'Brien,*
   391 U.S. 367 (1968) ................................................................................24

*United Public Works v. Mitchell*,
   330 U.S. 75 (1947) ..................................................................................38

*United Veterans Mem. & Patriotic Assn. v. City of New Rochelle*,
   72 F. Supp. 3d 468 (S.D.N.Y. 2014) ...........................................................19

*Valdez v. Town of Brookhaven*,
   2005 U.S. Dist. LEXIS 36713 (E.D.N.Y. Dec. 15, 2005) ...............................32

*Velez v. Levy*,
   401 F.3d 75 (2d Cir. 2005) .........................................................................44

*Vugo v. City of New York*,
   2018 U.S. Dist. LEXIS 28802 (S.D.N.Y. Feb. 22, 2018) ...............................30

*Waldron v. Rotzler*,
   862 F. Supp. 763 (N.D.N.Y 1994) ..............................................................46

*Wandering Dago, Inc. v. Destito*,
   879 F.3d 20 (2d Cir. 2018) .........................................................................39

*Warth v. Seldin*,
   422 U.S. 490 (1975) .................................................................................38

*Westchester Legal Services, Inc. v. County of Westchester*,
   607 F. Supp. 1379 (S.D.N.Y. 1985) ............................................................33

*Young v. NYS Trans. Auth.*,
   903 F.2d 146 (2d Cir. 1990) .................................................................. 27-28

*Zalewska v. County of Sullivan*,
   316 F.3d 314 (2d Cir. 2003) ................................................................. 23-24

*Zieper v. Metzinger*,
   392 F.Supp. 2d 516 (S.D.N.Y. 2005) ..................................................... 20, 22-23

x

## U.S. CONSTITUTION

First Amendment ............................................................................................ passim
Second Amendment ......................................................................................14, 30
Fourteenth Amendment ............................................................................ 16, 40-41

## NEW YORK STATE CONSTITUTION

Article 1, § 6 .......................................................................................................15
Article 1, § 8 ..................................................................................................14, 17
Article 1, § 11 .....................................................................................................14

## FEDERAL STATUTES

42 U.S.C.
    § 1983...........................................................................................................38, 40

## STATE STATUTES

Fin. Servs. Law
    § 102.......................................................................................................... 4
    § 201..............................................................................................................4
    § 202..............................................................................................................4
    § 301.........................................................................................................4, 5
    § 309.........................................................................................................4, 5
    § 408..............................................................................................................5

Ins. Law
    Article 11 ....................................................................................................4, 5
    Article 12 .......................................................................................................4
    Article 21 ....................................................................................................4, 5
    Article 74 .......................................................................................................4
    § 109..............................................................................................................5
    § 116..............................................................................................................7
    § 308..............................................................................................................4
    § 309..............................................................................................................4
    § 310..............................................................................................................4
    § 1101(a) ....................................................................................................8, 9
    § 1102............................................................................................................9
    § 1116............................................................................................................8
    § 1113........................................................................................................8, 9
    § 2105(a) ......................................................................................................9
    § 2110............................................................................................................5

§ 2116................................................................................................10, 46
§ 2117.................................................................................................9, 46
§ 2118................................................................................................10, 46
§ 2119......................................................................................................5
§ 2120......................................................................................................5
§ 2122.......................................................................................5, 10, 46
` § 2123....................................................................................................5
§ 2128......................................................................................................5
§ 2307...................................................................................................4, 5
§ 2324(a).............................................................................................9, 46
§ 3201...................................................................................................4, 5
§ 3231......................................................................................................4
§ 3420......................................................................................................9
§ 4308......................................................................................................4

Banking Law
§ 36........................................................................................................5
§ 38........................................................................................................5

**STATE REGULATIONS**

11 NYCRR 262.....................................................................................7, 8

**RULES**

FRCP 12(b)(6) ...................................................................................15, 44

**MISCELLANEOUS AUTHORITIES**

OGC Opinion No. 99-125 (Sept. 17, 1999).............................................9
OGC Opinion No. 99-155 (Dec. 13, 1999)..............................................9
OGC Opinion No. 02-05-25 (May 30, 2002) ..........................................9


https://www.governor.ny.gov/news/governor-cuomo-kicks-bus-tour-pass-red-
    flag-gun-protection-bill.......................................................................2

https://www.nraila.org/articles/20180612/new-york-red-flag-bill-would-allow-
    school-employees-to-initiate-gun-confiscations.................................2

Julie Creswell and Tiffany Hsu, *Connection To N.R.A. Can Be Bad For Business*,
    N.Y. Times, Feb. 24, 2018, *available at*
    https://www.nytimes.com/2018/02/23/business/nra-boycott.html .........................12

## PRELIMINARY STATEMENT

An investigation by the New York State Department of Financial Services ("DFS")—the agency responsible for enforcing the New York State Insurance Law[1] ("Insurance Law")—discovered in October 2017 that certain insurance policies being sold in New York and marketed by the National Rifle Association ("NRA") violated multiple provisions of the Insurance Law. Dkt. Nos. 37-4 at pp. 8-13; 37-5 at pp. 6-7.   In the regular course of its business, DFS took enforcement actions against the insurer and broker selling the policies, which resulted in the termination of several insurance programs offered to NRA members, for which the NRA was receiving financial compensation.   Dkt. Nos. 37 at ¶¶ 52-53; 37-4; 37-5.   DFS is also currently investigating the NRA for violations of the Insurance Law for the NRA's role in the marketing and sale of these illegal policies in New York.

To distract from its involvement in various violations of the law, the NRA brings this action attempting to characterize Defendants' lawful acts—including providing guidance to insurers and financial institutions to evaluate and manage risks that might arise from their dealings with gun promotion organizations—as unconstitutional simply because they indirectly affect the NRA. While the NRA's violations of the New York Insurance Law may have been stymied by Defendants' acts, the NRA's ability to continue its mission, and communicate its message, in opposition to the regulation of firearms has not.   It continues unimpeded by any of the government actions alleged in the First Amended Complaint ("Complaint").   Indeed, the Complaint, which focuses on actions taken by the State with respect to insurers and financial institutions, does not allege that Defendants' actions have directly inhibited the NRA from expressing its opposition to gun regulation.   Dkt. No. 37.   Instead, it presents a speculative and implausible "parade of

---

[1] Portions of the Insurance Law are appended hereto at Appendix C for the Court's convenience.

horribles," which starts with the lawful regulation of affinity insurance programs and ends with the inexplicable loss of general banking services and corporate insurance coverage, resulting in the ultimate demise of the NRA.  See id. at ¶¶ 28-29, 68, 98-99.

New York State Governor Andrew M. Cuomo and the NRA have a longstanding history of strong disagreement related to gun control.  The diametrically opposite views of the Governor and the NRA have been demonstrated by the frequent public expression of those views through the media, the political process and other avenues.  Such political discourse is precisely the type of speech and expression that is protected by the First Amendment, and coverage of the topic has intensified in the wake of the tragedies at Marjory Stoneman Douglas High School, Sandy Hook, the Las Vegas music festival, Pulse nightclub in Orlando, and many others.  While the NRA has continued to lobby against government regulation of firearms, New York State, through the Governor and its agencies, has continued its advocacy in favor of public safety and strengthened government regulation.  Indeed, on June 12, 2018, Governor Cuomo proposed legislation—the Red Flag Gun Protection Bill—that would keep firearms away from those deemed to be an extreme risk to themselves or others.[2]  The very next day, the NRA began disseminating its opposition to the proposal.[3]

The NRA's Complaint should be dismissed in its entirety.  First, Plaintiff's First Amendment claims fail because the Consent Orders punish violations of law that do not, as a matter of law, implicate the NRA's First Amendment Rights.  Second, the Press Releases and

---

[2]     https://www.governor.ny.gov/news/governor-cuomo-kicks-bus-tour-pass-red-flag-gun-protection-bill.

[3]     https://www.nraila.org/articles/20180612/new-york-red-flag-bill-would-allow-school-employees-to-initiate-gun-confiscations ("This bill is nothing more than anti-gun Gov. Andrew Cuomo pushing his extreme political agenda and continuing to wage war on law-abiding New York gun owners.  Please contact your state Senator today and respectfully request that this legislation be defeated.").

Guidance Letters are protected government speech that are not implied threats to employ coercive state power and, as a matter of law, do not violate the NRA's First Amendment Rights.  And finally, the NRA has failed to—because it cannot—allege any particularized instances of speech that have directly been stifled by Defendants' alleged conduct.  As such, Plaintiff's First Amendment claims should be dismissed.

Plaintiff's remaining constitutional claims likewise fail as a matter of law.  Plaintiff lacks standing to allege an Equal Protection claim as to the lawful enforcement against Chubb and Lockton—a claim which Chubb and Lockton have already waived.  Dkt. Nos. 37-4; 37-5.  And the Complaint fails to allege any deprivation that is protected by the Due Process clause.  Because all of Plaintiff's constitutional claims fail, so too must its conspiracy claim, as it has not—and cannot—show a deprivation of a constitutional right as that claim requires.

Finally, once Plaintiff's federal claims have been dismissed, the Court should decline the continued exercise of pendant jurisdiction and dismiss the remaining state law claim.  However, even if the court chooses to continue exercising jurisdiction over that claim, it too fails as a matter of law.  Plaintiff fails to allege sufficient facts to state a tortious interference with prospective economic advantage claim, but instead pursues a novel theory that a settlement following a law enforcement investigation could give rise to liability for tortious interference.  The Court should reject that theory.  Accordingly, Plaintiff's state tort claim should be dismissed.

## BACKGROUND

### A.   The Superintendent's Role in the Insurance and Banking Industries in New York

The Financial Services Law was enacted in 2011 and charges DFS with the responsibility "[t]o ensure the continued safety and soundness of New York's banking, insurance and financial services industries, as well as the prudent conduct of the providers of financial products and

services, through responsible regulation and supervision."  Fin. Servs. Law § 102(i).  DFS was formed with the express goals of undertaking the "effective state regulation of the insurance industry," and stewarding the "elimination of fraud, criminal abuse and unethical conduct by and with respect to, banking, insurance and other financial service institutions."  Fin. Servs. Law § 102(e), (k).

In furtherance of its supervisory responsibilities, DFS is responsible for licensing all insurance carriers and producers that operate in this State.  See, e.g., Ins. Law Arts. 11, 21.  DFS conducts regular examinations of insurance carriers to ensure they operate in a safe and sound manner and are in compliance with all New York laws.  See Ins. Law § 309.  The Superintendent also has broad regulatory and enforcement authority—indeed the responsibility—to ensure that policyholders in New York are protected.  Fin. Servs. Law § 301(c).

The Superintendent possesses broad authority to regulate nearly every aspect of insurance business in the State.  Id.  DFS reviews insurance policy forms and rates for compliance with the Insurance Law and regulations promulgated thereunder.  See, e.g., Ins. Law §§ 2307, 3201, 3231(e)(1)(A), 4308(c).  The Superintendent's supervision extends—as the Insurance Law provides—from the creation of an insurer, through its responsible operation, and to its ultimate conclusion.  See, e.g., id. at Arts. 11, 12, 74, §§ 308, 309, 310.  This supervision further extends to insurance producers, such as agents and brokers, who advertise, solicit and sell insurance policies in New York.  See id. at Art. 21.  The Superintendent has the authority and responsibility to ensure the safety and soundness of the market and to protect the rights and interests of policyholders, creditors, shareholders, and the public.  See, e.g., Fin. Servs. Law §§ 102, 201, 202, 301.

4

Insurance is a highly regulated industry. Nearly every market participant is required to obtain a license from DFS and comply with the requirements for maintaining that license before they are granted the privilege of engaging in the business of insurance. See, e.g., Ins. Law Arts. 11, 21. Once licensed, a market participant is still subject to DFS supervision concerning the policies sought to be sold and the manner undertaken to market and sell them. See, e.g., id. at §§ 2119, 2120, 2122, 2123, 2128, 2307, 3201. And the Superintendent is empowered to take enforcement action against licensees who violate the law and can suspend or revoke a license— and thus prevent future participation in the business of insurance—if she determines doing so is necessary. See, e.g., id. at §§ 109, 1104, 2110; Fin Servs. Law §§ 301, 309, 408.

With respect to the banking industry in New York, the Superintendent has all of the powers and responsibilities that the former Superintendent of Banks held, including the right to conduct bank examinations of State chartered or licensed institutions, to require the production of any relevant books or papers, and to subpoena witnesses, compel their attendance, and to examine them under oath. N.Y. Banking Law §§ 36, 38. Here as with the insurance industry, the Superintendent has the power and responsibility to guard the safety of the New York markets for banking services by ensuring that market participants operate in a safe and sound manner.

**B.      DFS's Investigations of Lockton Companies LLC & Chubb Group Holdings, Inc**.

In October 2017, DFS commenced an investigation into the "Carry Guard" insurance program, which provided, among other policy coverages, (1) liability insurance to gun owners for acts of intentional wrongdoing, and (2) legal services insurance for any costs and expenses incurred in connection with a criminal proceeding resulting from acts of self-defense with a legally possessed firearm. Dkt. Nos. 37-4; 37-5. Appendix hereto ("App.") at A & B. The Carry Guard program also included coverage for bail money, attorney consultation fees and retainers,

reasonable expenses incurred by the insured to assist the insurer in the investigation or defense of the criminal charges, including actual loss of earnings up to $250 per day because of time off from work, premiums on bonds to release attachments, and costs taxed against the insured or resident family member in any such proceeding.  App. at A & B.  The policies issued through the Carry Guard program also provided, with respect to an act of self-defense, coverage for all reasonable expenses incurred by the insured for psychological counseling support for the insured or resident family member.  App. at B.

The policies issued through the Carry Guard program were underwritten by Illinois Union Insurance Company, a subsidiary of Chubb Ltd. ("Chubb") through Lockton Affinity, LLC, an affiliate of Lockton Cos., LLC ("Lockton").  Dkt. No. 37-5 at p. 13.  The NRA actively marketed and solicited for the Carry Guard program through a website, email, direct mail and other avenues. Id. at pp. 13-14.

Lockton offered Carry Guard through New York's excess line market.  Dkt. No. 37-4 at p. 5.  Excess line coverage offers policyholders an opportunity to obtain insurance that could not be procured from an authorized insurer.  Id.  An "authorized insurer" is an insurance company that has received a license from DFS to provide specified types of insurance to customers in New York. Id.  Authorized insurers are fully regulated by DFS in order to ensure solvency and adherence to consumer protection standards.  Id.  Excess line insurers are not licensed or authorized by DFS, but are permitted to do business in New York under very limited circumstances through an excess line broker.  Chubb is an excess line insurer and Lockton is licensed by DFS to serve as an excess line insurance broker.  The NRA is not licensed by DFS.  Id.

DFS's investigation determined that the Carry Guard program improperly provided coverage in any criminal proceeding against the policyholder or the policyholder's family

members, including coverage for bail money, premiums on bonds, attorney consultation fee and retainer expenses, expenses incurred for the investigation of or defense of criminal charges and costs assessed against the insured or the insured's resident family member in a criminal proceeding arising out of a shooting.  App. at A.  This coverage is illegal in New York State, because New York law prohibits insurance coverage for defense costs arising out of a crime, such as, for example, alcohol-related driving crimes and rape and sexual assault.  Ins. Law § 116; 11 NYCRR 262 (Insurance Regulation 162).  Lockton issued 680 Carry Guard policies to New York residents between April and November 2017 and, as administrator of the Carry Guard program, carried out functions such as marketing and binding the insurance, collecting and distributing premiums and delivering policies to insureds.  App. at A.

As part of its investigation, DFS learned that, although it did not have an insurance producer license from DFS, the NRA engaged in aggressive marketing of, and solicitation for, the Carry Guard program.  Dkt. Nos. 37-4 at pp. 4-6; 37-5 at pp. 3-5.  The NRA advertised the Carry Guard program on its website as "developed and supported by the National Rifle Association" and "created by the NRA."  Dkt. No. 37-4 at pp. 3-4.  Other NRA promotional materials referred to the program as the "NRA Carry Guard Insurance Program."  Id. at p. 4.  The NRA's marketing and solicitation also involved, among other things, the broadcasting of NRA-produced promotional videos; email and direct mail marketing; heavy promotion at annual meetings and on the NRA website; operating an online marketing website; and use of NRA spokespersons in "pop-up" internet advertising.  These activities are apparent violations of the Insurance Law and led DFS to open an investigation into the NRA's unlicensed and unlawful insurance activities, which remains ongoing.  Dkt. Nos. 37-4 at pp. 5-6; 37-5 at pp. 4-5.

DFS also found that Lockton and the NRA together offered at least eleven additional insurance programs (collectively "additional NRA programs") to new and existing NRA members in New York and elsewhere.[4]  Dkt. No. 37-4 at pp. 6-7.  Lockton also offered these policies through New York's excess line market and served as the administrator of these programs, carrying out functions similar to that done on behalf of the Carry Guard program.  Id. at pp. 7-8.

Following DFS's initiation of the investigation into these matters, Lockton suspended the illegal Carry Guard program on or about November 17, 2017 and is no longer making Carry Guard policies available to New York residents to purchase.  Dkt. No. 37-5 at p. 6.

1.   The NRA's Carry Guard Insurance Program violated multiple New York Insurance Laws

DFS's investigation revealed that Lockton and Chubb violated at least eight provisions of the Insurance Law in connection with the Carry Guard program and additional NRA-endorsed programs.

First, the policies issued as part of the Carry Guard program, as underwritten by Chubb and administered, solicited and marketed by Lockton, provided insurance coverage that may not lawfully be offered in the New York State excess line market, namely:  (a) defense coverage in a criminal proceeding in violation of Insurance Law § 1116 and Insurance Regulation 162; (b) liability coverage for intentional use of firearms other than the use of reasonable force to protect persons or property that may not be written as insurance pursuant to Insurance Law §§ 1101(a) and 1113 and violates New York public policy, see Public Serv. Mut. Ins. Co. v. Goldfarb, 53

---

[4] The additional NRA programs included: "Retired Law Enforcement Officer Self-Defense Insurance;" "ArmsCare Plus Firearms Insurance;" "No Cost ArmsCare Firearms Insurance;" "Firearms Instructor Plus Liability Insurance;" "Personal Firearms Protection Insurance;" "Gun Collector Insurance;" "Gun Clun Insurance;" "Hunt Club Insurance;" "NRA Business Alliance Insurance;" "Gun Show Insurance;" and "Home-based Federal Firearms License Insurance."  Dkt. No. 37-4 at pp. 6-7.

N.Y.2d 392, 399 (1981), Massena v. Healthcare Underwriters Mut. Ins. Co., 281 A.D.2d 107, 110

(3d Dept. 2001), mod., 98 N.Y.2d 435 (2002); Travelers Ins. Companies v. Stanton, 223 A.D. 104,

105-106 (3d Dept. 1996), lv denied, 89 N.Y.2d 804; Office of General Counsel ("OGC") Opinion

No. 02-05-25 (May 30, 2002), OGC Opinion No. 99-155 (NILS) (Dec. 13, 1999), and OGC

Opinion No. 99-125 (NILS) (Sept. 17, 1999); and (c) coverage for expenses incurred by the insured

for psychological counseling support in violation of Insurance Law § 2105(a).[5]  Dkt. No. 37-4 at

p. 8.   Chubb's  underwriting  of  such  coverage  violated  Insurance  Law  §  1102  and  Lockton

procuring such coverage from Chubb violated Insurance Law § 2117.  Dkt. Nos. 37-4 at p. 12; 37-

5 at p. 7.

     Second, the policies issued as part of the Carry Guard program failed to comply with §

3420 of the Insurance Law, which sets forth minimum requirements for liability insurance policies.

Dkt. No. 37-4 at p. 9.

     Third, Lockton violated § 2324(a) of the Insurance Law by giving or offering to give (a)

free No Cost ArmsCare Firearms Insurance to NRA members in good standing, and (b) free NRA

membership, which the insured could use him or herself or transfer to a family member, if a person

purchased the Carry Guard insurance, when the free NRA membership was not specified in the

insurance policy and exceeded $25 in market value.  Id. at pp. 12-13.

---

[5] Similarly, the NRA Retired Enforcement Officer Self-Defense Insurance Program provided
coverage that also may not be offered in the New York excess line market including (a) defense
coverage in a criminal proceeding that is not permitted by law; and (b) liability coverage for
intentional use of firearms other than the use of reasonable force to protect persons or property that
may not be written as insurance pursuant to Insurance Law §§ 1101(a) and 1113 and violates New
York public policy.  Dkt. No. 37-4 at p. 8.

Fourth, DFS's investigation revealed that Lockton violated Insurance Law § 2118 by making inaccurate representations relating to its efforts to satisfy the requirements necessary to offer excess coverage.  Id. at p. 10.

Fifth, by paying royalties to the NRA for the Carry Guard Program that were based on a percentage of actual Carry Guard insurance premiums collected, with knowledge that the NRA did not have an insurance broker license from DFS, Lockton violated Insurance Law § 2116.  Id. at p. 12.

Finally, Lockton advertised the financial condition of a Chubb insurer by referring to the insurer's AM Best rating, in violation of Insurance Law § 2122(a)(1), and called attention to an unauthorized Chubb insurer by advertising Chubb's participation in the Carry Guard program on the Carry Guard website, in violation of Insurance Law §2122(a)(2).  Id. at p. 13.

2.    The Consent Orders

In resolution of the DFS investigation, Lockton and Chubb entered into Consent Orders with DFS on May 2, 2018 and May 7, 2018, respectively.  Dkt. Nos. 37-4; 37-5.  In the Consent Orders, Lockton and Chubb admitted to the various violations of the Insurance Law, and agreed to, inter alia, pay monetary fines, take specific actions to remedy ongoing violations of the Insurance Law, not participate in the future in any Carry Guard, or similar programs that violate the Insurance Law, and not to "enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance to be issued or delivered in New York State or to anyone known to Lockton to be a New York State resident." Dkt. Nos. 37-4 at pp. 13-16; 37-5 at pp. 7-9.  Additionally, as part of its Consent Order, Lockton

agreed to report to DFS within 60 days on other potential violations of New York law arising out of other (non-NRA) affinity programs in which they participate.  Dkt. No. 37-4 at pp. 16, 18.

The Consent Order with Chubb, however, expressly allowed Chubb to issue insurance policies to the NRA for the NRA's own corporate operations.  Dkt. No. 37-5 at p. 8.  Similarly, the Consent Order with Lockton expressly allowed Lockton to assist the NRA in procuring insurance for the NRA's own corporate operations.  Dkt. No. 37-4 at p. 16.

## C.   DFS's Press Releases[6]

In May 2018, DFS issued two press releases detailing its investigation into the Carry Guard program, the violations of the Insurance Law, and the Consent Orders executed by Chubb and Lockton ("DFS Press Releases").  App. at A & B.  In its May 2, 2018 Press Release relating to Lockton, DFS stated that it "'will not tolerate conduct by any entity, licensed or otherwise, in contravention of New York Insurance Law, especially when that conduct is such an egregious violation of public policy designed to protect all citizens,'" and that the Consent Order with Lockton was part of DFS's continuing efforts to "uphold and preserve the integrity of New York law."  App. at A.

Similarly, in its May 7, 2018 Press Release relating to Chubb, DFS described the Consent Order with Chubb as "'another step in addressing the unlicensed and improper activity connected with the NRA's unlawful 'Carry Guard' program,'" and stated that DFS would "'continue its comprehensive investigation into [the] matter to ensure that the New York Insurance Law is

---

[6] The bases of Plaintiff's claims, the May 2, 2018 and May 7, 2018 DFS Press Releases are not annexed as exhibits to the Complaint.  For the convenience of the court, they are appended hereto at Appendices A and B, respectively.

enforced and that consumers are no longer conned into buying so-called 'self-defense' insurance coverage.'"   App. at B.

## D.   Governor Cuomo's Press Release and DFS's Guidance Letters

On April 19, 2018, Governor Cuomo issued a Press Release ("Governor's Press Release") advising that he had directed DFS to communicate with insurance companies and financial institutions licensed or doing business in New York, and ask that they review any relationships that they have with the NRA or similar organizations, and consider whether such relationships expose them to corporate harm or risk and/or jeopardize public safety.   Dkt. No. 37-1.   The direction was given in response to the increased incidents of mass shootings nationwide and emphasized to financial and insurance entities doing business in New York the potential risks that may arise due to relationships with organizations that promote the use of guns.   Id.   The Governor's Press Release recognized that a number of businesses—including MetLife, First National Bank of Omaha, and Delta and United Airlines—had ended relationships with the NRA following the Parkland, Florida school shooting in order to realign their companies' values.[7]   Id.

In accordance with the Governor's direction, DFS Superintendent Vullo issued memoranda dated April 19, 2018 to the leaders of New York chartered or licensed financial institutions and all insurers doing business in New York entitled "Guidance on Risk Management Related to the NRA and Similar Gun Promotion Organizations" ("Guidance Letters").   Dkt. Nos. 37-2; 37-3.   The Guidance Letters were entirely unrelated to DFS's investigation of the illegal policies issued through the Carry Guard program, were not addressed to any particular company or business and simply encouraged financial institutions and insurers generally to consider whether their

---

[7]  Julie Creswell and Tiffany Hsu, *Connection To N.R.A. Can Be Bad For Business*, N.Y. Times, Feb. 24, 2018 at A12, *available at* https://www.nytimes.com/2018/02/23/business/nra-boycott.html (under updated title).

association with the NRA and other similar groups exposed them to reputational risk, and if such

relationships promoted corporate responsibility:

> The Department encourages its insurers to continue evaluating and managing their
> risks, including reputational risks, that may arise from their dealings with the NRA
> or similar gun promotion organizations, if any, as well as continued assessment of
> compliance with their own codes of social responsibility.   The Department
> encourages regulated institutions to review any relationships they have with the
> NRA or similar gun promotion organizations, and to take prompt actions to
> managing these risks and promote public health and safety.

Id.  Neither the Governor's Press Release nor the two Guidance Letters included any implied

threats to employ coercive State power against any individual or entity.  Dkt. Nos. 37-1; 37-2; 37-

3.  The Governor's Press Release and the two Guidance Letters did not order any company to do

anything at all—there was no mention of concepts such as "demanding" or "compelling" or with

verbs such as "should" or "must" which are routinely used when exercising the regulatory power

of the State.  Id.  The Governor's Press Release and the two Guidance Letters did not include or

imply any threats of State action of any kind, whether regulatory or criminal.  Id.  The Governor's

Press Release and the two Guidance Letters did not suggest or imply that companies with ties to

the NRA are somehow complicit in unlawful behavior that merits State regulatory attention.  Id.

And the Governor's Press Release and the two Guidance Letters did not suggest or imply that the

government would take any active role in the process of companies assessing their own

reputational risk.  Id.

## E.    The NRA's Complaint

The Complaint alleges that Defendants "have abused their authority in an effort to stifle

the NRA's political advocacy and to retaliate against the NRA for the effectiveness of that

advocacy," Dkt. No. 37 at ¶ 20, through the use of "selective prosecution, backroom exhortations,

and public threats" aimed at depriving "the NRA and its constituents of their First Amendment

right to speak freely about gun-related issues and defend the Second Amendment," id. at pp. 1-2. Specifically, the Complaint alleges that DFS, Governor Cuomo and Superintendent Vullo have violated, and continue to violate, the NRA's federal and state constitutional rights by issuing the Guidance Letters and Press Releases, entering into the Consent Orders with Lockton and Chubb, and privately communicating threats to banks and insurers in an effort to end the offering of insurance programs endorsed by the NRA affinity insurance plans and to deprive the NRA of "critical insurance and banking services." Id., generally.

The Complaint includes seven causes of action, six of which are based on alleged federal and state constitutional violations, and the last of which is a state tort claim. Count One alleges that Defendants issued the Guidance Letters and Press Releases, and entered into the Consent Orders, for the purpose of stifling the NRA's rights to free speech and expression in violation of the First Amendment and Article 1, § 8 of the New York State Constitution. Id. at ¶¶ 71-82. Count Two of the Complaint alleges that Defendants issued the Guidance Letters and Press Releases, and entered into the Consent Orders, in retaliation for the NRA generally expressing its views in favor of gun ownership in violation of the First Amendment and Article 1, § 8 of the New York State Constitution. Id. at ¶¶ 83-92.

Count Three of the Complaint alleges that the Guidance Letters, Press Releases and Consent Orders violate the NRA's right to freedom of association in violation of the First Amendment and Article 1, § 8 of the New York State Constitution. Id. at ¶¶ 93-106. Count Four of the Complaint alleges that Defendants have selectively enforced provisions of the Insurance Law against Lockton for its participation in NRA-endorsed insurance programs in violation of the Equal Protection Clause and Article 1, § 11 of the New York State Constitution. Id. at ¶¶ 107-113.

Count Five of the Complaint alleges that Governor Cuomo and Superintendent Vullo conspired to deprive the NRA of its rights under the federal and state constitutions by issuing the Guidance Letters and executing the Consent Orders.  Id. at ¶¶ 114-120.  Count Six of the Complaint alleges that the Guidance Letters, Press Releases and Consent Orders have deprived the NRA of its property interests in existing agreements with insurers and banking institutions, and have unconstitutionally stigmatized the NRA in violation of the Due Process clause and Article 1, § 6 of the New York State Constitution.  Id. at ¶¶ 121-132.

Finally, Count Seven of the Complaint alleges that the issuance of the Guidance Letters, Press Releases and Consent Orders interfered with the business relationship between the NRA and Lockton, causing the NRA to suffer the loss of prospective economic advantage.  Id. at ¶¶ 133-141.

## ARGUMENT

On a motion to dismiss pursuant to FRCP 12(b)(6), the court must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor." Concord Assocs., L.P. v. Entm't Props. Trust, 817 F.3d 46, 52 (2d Cir. 2016).  However, the court is not required to assume that legal conclusions within the complaint are true.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "In considering a motion to dismiss, a 'district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.'"  CBF Industria DeGusa S/A v. AMCI Holdings, Inc., No. 13 Civ. 2581 (RWS), 2018 U.S. Dist LEXIS 100781, *16 (S.D.N.Y.  June 15, 2018) (quoting DiFolco v. MSNBC LLC, 622 F.3d 104, 111 (2d Cir. 2010)).

To withstand a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 50 U.S. 544, 570 (2007).  A claim

is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  Matson v. Bd. of Educ., 631 F.3d 326, 329 (2d Cir. 2011).

When stripped of its rhetoric and repeated conclusory statements, the Complaint alleges only that Defendants' actions caused the NRA to lose existing, and prospective, business relationships with companies in the insurance industry.  More specifically, the Complaint alleges that agreements to provide the NRA affinity insurance plans have been terminated.  However, the federal and state constitutions do not protect against such a deprivation, especially where the underlying business interest is plainly unlawful.

As discussed fully below, the four corners of the Complaint, and its exhibits and documents incorporated therein by reference, fail to allege cognizable violations of the NRA's rights to free speech, free expression, free association, and to be free from retaliation under the First Amendment and New York State Constitution, or to due process and equal protection under the Fourteenth Amendment and New York State Constitution.  Additionally, the Complaint fails to allege facts sufficient to state a constitutional conspiracy claim.  Finally, the Complaint also fails to allege facts sufficient to state a tortious interference with prospective economic advantage claim under New York State law and, in any event, Governor Cuomo and Superintendent Vullo are immune from liability on this state tort claim.

POINT I

THE COMPLAINT FAILS TO STATE A FIRST AMENDMENT CLAIM[8]

**A. The Consent Orders Punish Violations of the New York Insurance Law and, as a Matter of Law, Do Not Violate the NRA's First Amendment Rights**

As discussed above, DFS commenced an investigation into Lockton and Chubb because they were unlawfully involved in the offering of Carry Guard, and other similar programs, to individuals in New York.  This investigation began long before the Press Releases or Guidance Letters were issued, and long before the Parkland, Florida school shooting and public backlash against gun promotion organizations, like the NRA, that prompted them.  Dkt. Nos. 37-4; 37-5. The investigation identified violations of at least eight provisions of the Insurance Law, and culminated in the execution of Consent Orders by Lockton and Chubb in which both companies admitted to violating the Insurance Law.  Id.

The "First Amendment is not implicated by the enforcement of" laws directed at unlawful conduct having nothing to do with…expressive activity."  Arcara v. Cloud Books, Inc., 478 U.S. 697, 707 (1986).  "Even when accompanied by speech, unlawful conduct is outside the bounds of First Amendment protection."  El v. City of New York, No. 00 Civ. 8979 (LMM), 2002 U.S. Dist. LEXIS 12431, *12 (S.D.N.Y. 2002).  Incidental and attenuated effects on First Amendment rights cannot be the basis of a First Amendment challenge.  Arcara, 478 U.S. at 701, 707.

---

[8] Claims alleging violations of Article 1, § 8 of the New York State Constitution are subject to the same analysis as claims bought pursuant to the First Amendment.  See, e.g., Martinez v. Sanders, 307 F. App'x 467, 468 n.2 (2d Cir. 2008) (citing Pico v. Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26, 638 F.2d 404 (2d Cir. 1980), aff'd, 457 U.S. 853 (1982)); Congregation Rabbinical College of Tartikov, Inc. v. Vill. of Pomona, 138 F. Supp. 2d 352, 445 (S.D.N.Y. Sept. 29, 2005).  Therefore, Plaintiff's state claims contained in Counts One, Two and Three of the Complaint should be dismissed for the same reasons as those discussed in connection with Plaintiff's First Amendment claims in those counts.

Arcara involved a challenge to an anti-prostitution ordinance by an adult bookstore slated for closure under the ordinance because it had been the site of illegal lewdness.  The New York State Court of Appeals held that the ordinance "triggered First Amendment scrutiny of the bookstore's ability to operate, and by extension to exercise its right of free expression" in selling books.  United States v. Hashmi, No. 06 Crim. 442 (LAP), 2009 U.S. Dist. LEXIS 108321, **28-29 (S.D.N.Y. Nov. 18, 2009) (describing the New York Court of Appeals decision in Arcara).  The Supreme Court rejected this premise, finding that because the ordinance was aimed at illegal conduct, it had nothing to do with protected speech or expression and, therefore, despite potential incidental effects on the plaintiff's First Amendment rights, the First Amendment was not implicated.  Arcara, 478 U.S. at 707.

Lockton and Chubb "did not merely express a view or take a position, [they] directly took part in illegal conduct," El at *12, and the Consent Orders were executed to address substantive violations of the Insurance Law.  Accordingly, the Consent Orders bore no relation to any speech or expression by the NRA, or the content of the Guidance Letters or Press Releases or any other government speech.

This is true even as to the specific provisions of the Consent Orders by which Lockton and Chubb agree not to participate in the Carry Guard program, or other similar NRA-endorsed programs.  These provisions directly relate to the enforcement of the Insurance Law by ensuring that Lockton and Chubb do not engage in the type of conduct that led to the violations articulated, and admitted to, in the Consent Orders.  Only the unlawful activities of Lockton and Chubb—not any protected speech or expression—formed the basis for the Consent Orders. Therefore, as a matter of law, there is no connection between the Consent Orders and any underlying instances of

speech or expression sufficient to state a First Amendment claim.[9]   Hashmi, at **28-29.

Accordingly, the Consent Orders cannot form the basis for a cognizable First Amendment claim

under Count One or Count Two of the Complaint.

### B. The Press Releases and the Guidance Letters Are Protected Government Speech that, as a Matter of Law, Do Not Violate the NRA's Rights to Free Speech Rights

The First Amendment does not restrict government speech[10] such as the Guidance Letters

and Press Releases.  Indeed, "[t]he Free Speech Clause restricts government regulation of private

speech; it does not regulate government speech."  Pleasant Grove City v. Summum, 555 U.S. 460,

467 (2009).  A government entity "is entitled to say what it wishes and to select the views that it

wants to express."  Id. at 467-468 (internal citation omitted).  Indeed, it "is the very business of

government to favor and disfavor points of view . . . ."  National Endowment for the Arts v. Finley,

524 U.S. 569, 598 (1998) (J. Scalia, concurring).  "It is inevitable that government will adopt and

pursue programs and policies within its constitutional powers but which nevertheless are contrary

to the profound beliefs and sincere convictions of some of its citizens."  Board of Regents v.

Southworth, 529 U.S. 217, 229 (2000).  The remedy for citizens who disagree with government

speech is to work to vote their representatives out of office.  See United Veterans Mem. & Patriotic

---

[9] Even if, *arguendo*, the Consent Orders related in some way to speech or expression by Lockton and Chubb, a party to an agreement may lawfully "contract away" its right to engage in what otherwise might be considered protected speech.  JA Apparel Corp. v. Abboud, 591 F. Supp. 2d 306, 331-32 (S.D.N.Y. 2008), vacated on other grounds, 568 F.3d 390 (2d Cir. 2009).  See also Snepp v. United States, 444 U.S. 507, 509 (1980) (holding that an employment agreement with the government may constitutionally limit the employee's right to protected speech).

[10] "In assessing whether speech constitutes government speech, the Supreme Court has considered at least three factors:  whether government has historically used the speech in question 'to convey state messages,' whether that speech is 'often closely identified in the public mind' with the government, and the extent to which government "maintain[s] direct control over the messages conveyed."  Knight First Amendment Inst. at Columbia Univ. v. Trump, No. 17 Civ. 5205 (NRB), 2018 U.S. Dist LEXIS 87432, **55-56 (S.D.N.Y. May 23, 2018) (quoting Matal v. Tam, 137 S.Ct. 1744, 1760 (2017)).

Assn. v. City of New Rochelle, 72 F. Supp. 3d 468, 473 (S.D.N.Y. 2014) (citing Summum, 555 U.S. at 468-69).

Under certain circumstances, government speech may "require courts to draw fine lines between permissible expressions of personal opinion and implied threats to employ coercive State power to stifle protected speech." Hammerhead Enters. v. Brezenoff, 707 F.2d 33, 39 (2d Cir. 1983). Specifically,

> oral and written statements made by public officials" could give rise to a valid First Amendment claim "where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request.

Okwedy v. Molinari, 333 F.3d 339, 342 (2d Cir. 2002) (internal quotations omitted) (quoting Hammerheard Enters., Inc. v. Brezenoff, 707 F.2d at 39).

The Okwedy standard is an objective one. Zieper v. Metzinger, 392 F.Supp. 2d 516, 525 (S.D.N.Y. 2005), aff'd, 474 F.3d 60 (2007). Where government speech "can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim can be stated." Hammerhead Enters., 707 F.2d at 39. "Only when a government official attempts to coerce, rather than convince, does a First Amendment violation occur[ ]." Zieper, 392 F. Supp. 2d at 525. The Complaint alleges that the Guidance Letters and Press Releases are unconstitutional government speech because they "impl[y] threats to employ coercive State power to stifle protected speech." Dkt. No. 37 at ¶ 77. However, the Complaint mischaracterizes the Guidance Letters and Press Releases, which, on their face, do not constitute unconstitutional threats as a matter of law. Dkt. Nos. 37-1; 37-2; 37-3. App. at A & B. Rather they constitute lawful government speech. That such government speech is at odds with the NRA's political message is of no moment here. "Having boldly entered the flames of public discussion the First Amendment specifically is designed to kindle, [plaintiff] now

20

seek[s] [the Court's] rescue from the sparks of controversy [it] ignited."  Hammerhead Enters.,
707 F.2d at 35 (alterations added).

In the wake of recent gun-related tragedies, the gun control debate continues to polarize.
See Dkt. No. 37 at ¶ 20.  Governor Cuomo, a long-time advocate for reasonable restrictions on
firearms, is on one side of the debate, while Plaintiff's primary purpose is to champion the other.
Dkt. No. 37 at ¶¶ 11-12, 14, 18.  After the Parkland, Florida school shooting, the latest of many
gun violence tragedies in the United States, Superintendent Vullo, at the direction of Governor
Cuomo, issued Guidance Letters to insurance and banking executives to encourage those entities
to evaluate their relationships with Plaintiff in light of the public backlash against Plaintiff and
other organizations that "promote guns that lead to senseless violence."  Dkt. Nos. 37-2; 37-3.

In the Guidance Letters, Superintendent Vullo expressly addressed the numerous gun
violence tragedies in the United States and highlighted the deaths of 17 students and staff at
Marjory Stoneman Douglas High School.  Id.  She explained that

> the intensity of the voices now speaking out, including the voices of the passionate,
> courageous, and articulate young people who have experienced this recent horror
> first hand, is a strong reminder that such voices can no longer be ignored and that
> society, as a whole, has a responsibility to act and is no longer willing to stand by
> and wait and witness more tragedies caused by gun violence, but instead is
> demanding change now.

Id.  The Guidance Letters encouraged insurers and financial institutions to evaluate and manage
risks that might arise from their dealings with gun promotion organizations in the face of the
polarized political debate.  Id.  Both the Guidance Letters and the Press Releases are classic
government speech—they are expressing the government's position in the public gun control
debate, which is entirely permissible.  See Summum, 555 U.S. at 467 (holding that the government
is entitled to "select the views that it wants to express").

21

Even if the Guidance Letters and Press Releases are not held to be government speech, they are nonetheless permissible under Okwedy.  On the same day, Governor Cuomo issued a Press Release expressing the same sentiments articulated by Superintendent Vullo.  Dkt. No. 37, n. 17.  He noted that "[a] number of businesses have ended relationships with the NRA following the Parkland, Florida school shooting in order to realign their company values."  Dkt. No. 37-1. In the same Press Release, Superintendent Vullo observed that corporations are leading the way to bring about positive social change.  Id.

Contrary to the allegations in the Complaint, neither the Guidance Letters nor the Press Releases "urged" businesses to "sever ties" with the NRA.  See Dkt. Nos. 37 at ¶ 46, n. 17; 37-2; 37-3.  App. at A & B.  The Press Releases and Guidance Letters did not order companies to take action, but merely encouraged them to "consider" their ties to the NRA and similar organizations in light of the polarizing public debate.  Id.  Notably, the Press Releases and Guidance Letters were not aimed at, nor do they mention, any particular company.  Id.  Thus no individual company was singled out or coerced as a result of the statements.  Of significance, and contrary to the allegations in the Complaint, neither the Press Releases nor the Guidance Letters contain any threat or suggestion of State action, or imply that companies with ties to the NRA are somehow complicit in unlawful behavior that merits State regulatory attention.[11]  Id.; see Zieper, 392 F. Supp. 2d at 528-29 (holding FBI agent's statements are not coercive, as a matter of law, where he did not reference "criminal statutes or legal consequences" should plaintiff fail to comply with his request); Penthouse Intl., Ltd. v. Meese, 939 F.2d 1011, 1015 (D.C. Cir. 1991) (holding speech is not coercive in the absence of "actual or threatened imposition of governmental power or

---

[11] In contrast to the Consent Orders, which expressly assert that both Lockton and Chubb violated New York Insurance Law, Dkt. Nos. 37-4; 37-5, the Press Releases and Guidance Letters do not allege any unlawful activity.  Dkt. Nos. 37-1; 37-2; 37-3.  App. at A & B.

sanction"); cf. Okwedy, 333 F.3d at 343 (holding letter could be found an implicit threat where it directed recipient to call "legal counsel and Chair of [] Anti-Bias Task Force); Trudeau v. NYS Consumer Prot. Bd., No. 1:05-CV-1019 (GLS/RFT), 2006 U.S. Dist. LEXIS 26308, **62-63, (finding that suggestion that communication could suggest complicity with spreading misleading information raised issue of fact).

The Press Releases and Guidance Letters are clear on their face and raise no issue of fact. Cf. Richardson v. Pratcher, 48 F. Supp. 3d 351, 670 (S.D.N.Y. 2014) (finding issue of fact where there was a dispute as to content and tone of conversations).  Nothing in the Guidance Letters or Press Releases "could reasonably be interpreted as intimating that some form of punishment would follow" any failure by companies in the banking and insurance industries to comply with any request in the Guidance Letters or Press Releases.  Zieper v. Metzinger, 474 F.3d 60, 66 (2d Cir. 2007).  They were plainly intended to convince companies to work towards "positive social change" without threat of regulatory action.  Dkt. No. 37, n.17.  Defendants' motion to dismiss should be granted.

### C.  The Complaint Fails to Allege Any Particularized Instances of Protected Speech, Expression or Conduct Directly Infringed by Defendants

The First Amendment protects "particularized" instances of speech or expressive conduct that directly attempt to convey a message or viewpoint.  See, e.g., Zalewska v. County of Sullivan, 316 F.3d 314, 319-20 (2d Cir. 2003) (affirming dismissal of First Amendment claim where plaintiff-appellant's action failed to convey a "specific, particularized message" and instead conveyed a "broad statement of cultural values," noting that "[a]ction attempting to communicate such a 'vague and unfocused' message is afforded minimal if any First Amendment protection").

"The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies, and that party must advance more than a mere 'plausible contention'

that its conduct is expressive." Jones v. Schneiderman, 974 F. Supp. 2d 322, 333 (S.D.N.Y. 2013)

(quoting Church of Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 205 (2d Cir. 2004)

(internal quotations omitted)). "While it is possible to find some kernel of expression in almost

every activity a person undertakes . . . such a kernel is not sufficient to bring the activity within

the protection of the First Amendment."); Dallas v. Stanglin, 490 U.S. 19, 25 (1988).

Thus, "[f]or purposes of the First Amendment, the Supreme Court has repeatedly rejected

the view that 'an apparently limitless variety of conduct can be labeled "speech" whenever the

person engaging in the conduct intends thereby to express an idea.'" Zalewska, 316 F.3d at 319

(quoting U.S. v. O'Brien, 391 U.S. 367, 376 (1968)). "[N]ot all conduct may be viewed as speech

simply because by her conduct the actor intends to express an idea." Id. (citing Spence v.

Washington, 418 U.S. 405, 409 (1974)). The "fact that something is in some way communicative

does not automatically afford it constitutional protection." Id. To be entitled to constitutional

protection, conduct must evince, "at the very least, an intent to convey a 'particularized message'

along with a great likelihood that the message will be understood by those viewing it." Id. (citing

Texas v. Johnson, 491 U.S. 397, 404 (1989)). Notably, "the actor's subjective intent is not

dispositive over whether her conduct is protected." Grzywna ex rel. Doe v. Schenectady Cent.

Sch. Dist., 489 F. Supp. 2d 139, 146 (N.D.N.Y. 2006). "Rather, there is an objective component

that requires consideration of whether, under the circumstances, the particular conduct is likely to

be understood or perceived as expressing a particular message." Id.

Here, the NRA has pled that as a "superlobby," "political speech is a major purpose" of its

organization, and "[f]irst among the 'Purposes and Objectives' contained in the NRA's bylaws is

'[t]o protect and defend the Constitution of the United States.'" Dkt. No. 37 at ¶¶ 11, 14. The

NRA alleges that the Guidance Letters, Press Releases and Consent Orders negatively affect the

NRA's ability to tell its message because the Guidance Letters, Press Releases and Consent Orders may impact the NRA's business relationships with non-party insurance companies and financial institutions. However, by this logic, all government speech that could ever theoretically affect an organization whose "major purpose" is political speech would violate that organization's First Amendment rights. No such sweeping weaponization of the First Amendment is recognized by the Supreme Court, the Second Circuit, or elsewhere.

As indicated above, the First Amendment does not protect such a broad and attenuated category of speech or expressive conduct. Indeed, relevant case law demonstrates that First Amendment protection is afforded only to "particularized" instances of speech or expressive conduct. For instance, in Okwedy, the plaintiff alleged that the government coerced a billboard company to take down and refrain from erecting billboards bearing discriminatory bible verses chosen by the plaintiff. Okwedy, 333 F.3d at 341-42. In Rattner v. Netburn, 930 F.2d 204 (2d Cir. 1991), the plaintiff alleged that the government threatened to boycott a newspaper if it did not refrain from printing the plaintiff's views on his disputes with the government. Id. at 205-07. In Bantam Books v. Sullivan, 372 U.S. 58 (1963), the plaintiff alleged that the government coerced a distributor of the plaintiff's publications to refrain from publishing certain publications that were deemed obscene by the government. Id. at 61-64. What all of these cases have in common is: the government coerced or threatened a third party to stop aiding the plaintiff in expressing a specific viewpoint on a particular topic. Okwedy, 333 F.3d at 341-42; Rattner, 930 F.2d at 205-07; Bantam Books, 372 U.S. at 61-64. Such is not the case in the instant matter, where, despite Plaintiff's vague and speculative allegations that it might lose general banking services and/or corporate insurance coverage at some point in the future, the only activity being stopped now is the proliferation of illegal insurance policies in New York. Nothing Defendants have done, or are

doing, has prevented the NRA from spreading its message—whether through rallies, conventions, publications, or NRATV—as shown by the NRA's continued public condemnation of Governor Cuomo and others who speak out in favor of common sense gun control.[12]  It strains credulity to suggest that any of the alleged actions has prevented a single person from hearing the NRA's message.[13]

Here, the NRA fails to identify any specific, particularized instance of protected speech or expressive conduct that has been directly infringed by Defendants.  According to the Complaint, the only specific conduct allegedly infringed upon by Defendants is the NRA's "lend[ing] [of] its valuable logos, marks, and endorsements to insurance policies brokered and serviced by others." Dkt. No. 37 at ¶ 30.  The NRA alleges that its ability to enter into such agreements has been infringed by the Guidance Letters, Press Releases and Consent Orders.  See Dkt. No. 37, generally. However, the actions of the NRA are violative of neutral laws of general applicability.  Indeed, the NRA, which has not obtained any license under the Insurance Law, is not entitled to enter this highly regulated industry and make money any way it chooses.  Thus, at best, the NRA alleges that it has lost and may continue to lose out on ordinary commercial transactions (i.e., transactions resulting in business and revenue generated by NRA-logo-bearing insurance policies) as a result of Defendants' actions.

However, ordinary commercial transactions, and communications related to such transactions, are not entitled to unbridled protection by the First Amendment.  See, e.g., Ohralik

---

[12] See, e.g., https://www.nratv.com/videos/new-york-governor-andrew-cuomo-off-the-map.

[13] Indeed, as of the date of this filing, the NRA remains prolific in its postings on Twitter, NRATV programs, and website publications.  See, e.g., https://twitter.com/NRA?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor; https://www.nratv.com/?utm_source=nraorg&utm_medium=header&utm_campaign=crosslink; http://www.nrapublications.org/.

v. Ohio State Bar Assn., 436 U.S. 447, 455-56 (1978) (recognizing that "expression concerning purely commercial transactions" is afforded "a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values"); Young v. NYS Trans. Auth., 903 F.2d 146 (2d Cir. 1990) (indicating that where the object of a transaction is the "transfer of money," "[s]peech simply is not inherent in the act; it is not the essence of the conduct"). Indeed, courts have recognized that there are "numerous examples [ ] of communications that are regulated without offending the First Amendment, such as the exchange of information about securities, [ ], corporate proxy statements, [ ], [and] the exchange of price and production information among competitors [ ]." Ohralik, 436 U.S. at 456 (citing cases). Similarly, items such as consumer and credit reports are entitled to only limited protection because they "concern[] no public issue," constitute speech "solely in the individual interest of the speaker and its specific business audience," and an "economic motive" drives their disclosure. See Boelter v. Hearst Communs., Inc., 192 F. Supp. 3d 427, 446 (S.D.N.Y. 2016).

Simply put, the sale of items classified as "mere commercial goods," even those containing "marginally expressive content," is not subject to First Amendment protection. See Mastrovincenzo v. City of N.Y., 435 F.3d 78, 95 (2d Cir. 2006). An item will be classified as a "mere commercial good" where its primary purpose is a non-expressive one. See id. That such item also possesses "expressive elements" does not automatically render it expressive if its non-expressive purpose dominates over such "expressive elements." See id.

Thus, the affinity insurance policies at issue here, whereby the NRA seeks to provide "life, health, and other insurance coverage" to NRA members, are closer to corporate proxy statements and credit reports than they are to billboards bearing bible verses because they concern no public issue, are directed to the NRA's members (its "specific business audience"), and are purportedly

offered for the purpose of generating revenue for the NRA.  See Dkt. No. 37 at ¶¶ 80, 90, 103, 111, 120, 131 (claiming "marketing costs," "lost royalty amounts," "costs associated with finding replacement" services and "loss of insurance program revenues" as damages).  Were they legal, the insurance policies could easily be sold without reference to any ideological content.  Moreover, to the extent the NRA's "logos, marks and endorsements" are deemed "expressive elements," such elements are dominated by the primary purpose of the policies, i.e., providing insurance coverage and generating revenue.

In addition, the NRA does not allege that the insurance policies it offers to its members are themselves social or political messages protected by the First Amendment, such as the bible verses in Okwedy, the plaintiff's views in Rattner, or the books in Bantam Books.  The NRA also does not allege that such policies are, themselves, conduits for relaying social or political messages protected by the First Amendment, such as the billboards in Okwedy, the newspaper in Rattner, or the distribution company in Bantam Books.  Indeed, the NRA *cannot* make such allegations because the insurance policies at issue here are "mere commercial goods" and, as indicated above, the transactions involving such goods are not entitled to protection under the First Amendment. See Ohralik, 436 U.S. at 456-57; Mastrovincenzo, 435 F.3d at 95; Young, 903 F.2d at 153-154. Further, these policies are illegal and cannot be lawfully offered in New York and are thus not entitled to First Amendment protection.  See supra, Point I(A).  Moreover, the NRA's "logos, marks and endorsements" on the subject insurance policies constitute only "marginally expressive content," which is not enough to bring such products, or the NRA's offering of same, into the realm of full First Amendment protection.  See id.

Finally, where the sale of a product "'does not add anything to [the actor's] ability to communicate its ideas,'" that sale "is not entitled to First Amendment protection."  See Al-Amin

v. City of N.Y., 979 F. Supp. 168, 173 (E.D.N.Y. 1997) (quoting ISKCON of Potomac, Inc. v. Kennedy, 61 F.3d 949, 961 (D.C. Cir. 1995) (Ginsburg, J., concurring in part and dissenting in part)); see also Hunt v. City of L.A., 638 F.3d 703, 716-17 (9th Cir. 2011) (indicating that if an item "could easily [be sold] without reference to any religious, philosophical, and/or ideological element" and "the focus of [the actor's] speech is to sell [ ] products as opposed to communicate a particular message to the public," the sale of such item constitutes a commercial transaction not entitled to First Amendment protection).

According to the Complaint, the offer of the subject insurance policies does not add anything to the NRA's ability to communicate its message to the public.  There is no reason to believe, and there are no allegations to suggest, that the insurance companies could not, themselves, offer the same insurance policies without the NRA's "logos, marks and endorsements"—and other elements which violate the Insurance Law—or that such policies would be substantively different without such elements.  Likewise, there is no reason to believe, and there are no plausible allegations to suggest, that the NRA could not carry out its mission or convey its message to the public without offering insurance policies which violate the Insurance Law to its own members.  In other words, "[n]othing in the nature of [the insurance policies] requires their sales to be combined with a noncommercial message" and "nothing prevents [the NRA] from espousing [its] beliefs without selling these products."  Hunt v. City of L.A., 638 F.3d at 716.  In sum, the illegal insurance policies, and the NRA's ability to offer such policies, are not entitled to First Amendment protection.

Notwithstanding the foregoing, even if, *arguendo*, the court finds that the NRA has sufficiently alleged instances of speech, expression or conduct that are entitled to the protections

of the First Amendment, such speech, expression or conduct is commercial in nature and may be subject to valid government restriction, as discussed at Point I(D), infra.

**D. If, *Arguendo*, the Complaint Alleges Protected Speech by the NRA, it is Commercial Speech**

Even if, *arguendo*, the court finds that the NRA has pled speech or expressive conduct sufficient to state a First Amendment claim, it is nothing more than commercial speech entitled to only intermediate scrutiny.  Commercial speech "proposes a commercial transaction" or relates to "the economic interests of the speaker and its audience."  Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 422 (1993).  As discussed above, the actual basis of the NRA's claims in this case is alleged interference with the NRA's ability to contract for insurance and banking services; it is not that the NRA is being hampered, in any way, from engaging in political speech advocating in favor of the Second Amendment.  While that may be the NRA's purpose, that is not what is at issue here.

Since the Complaint alleges that Defendants' actions caused the termination of the NRA's business relationships with Lockton, Chubb and Lloyds, the speech being allegedly targeted, if it is speech at all, is commercial speech.  The government may restrict commercial speech that is not misleading or related to unlawful activity if the limitation (1) directly furthers a substantial government interest, and (2) is "not more extensive than necessary to serve that interest."  Central Hudson Gas & Elec. Corp. v. Pub. Service Comm'n, 447 U.S. 557, 564 (1980). "There must be a 'fit' between the [State's interests] and the means chosen to accomplish" those interests, Sorrell v. IMS Health, Inc., 564 U.S. 553, 572 (2011), but the "'the fit need not satisfy a least-restrictive-means standard.'"  Vugo v. City of New York, No. 16-CV-7443 (MWF/ASX), 2018 U.S. Dist. LEXIS 28802, *18 (S.D.N.Y. Feb. 22, 2018) (quoting Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth., 134 F.3d 87, 98 (2d Cir. 1998)).  Here the Insurance Law provides restrictions on what

insurance may be sold, who may sell it, and the manner in which insurance business must be conducted in New York.  Such regulation of insurance in New York is longstanding.

As demonstrated by the Governor's Press Release, and the Guidance Letters themselves, the Guidance Letters were issued to advance the State's interest in ensuring that insurers and financial institutions doing business in New York consider whether business relationships with the NRA, and other similar groups, may jeopardize their corporate reputations and public safety.  Dkt. Nos. 37-1; 37-2; 37-3.  Management of corporate reputations and risks to New York State businesses, and promotion of public safety and corporate responsibility "in an effort to encourage strong markets and protect consumers" are certainly significant government interests.  Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 115 (2d Cir. 2017) (public safety is a significant governmental interest); British Int'l Ins. Co. v. Seguros La Republica, S.A., 212 F.3d 138 (2d Cir. 2000) ("New York shares with its citizens a significant interest in ensuring that businesses in the heavily regulated insurance industry have sufficient funds within the state where they conduct business to fulfill each individual insurance claim").

Since, as discussed at Point I(B) above, neither the Press Releases, nor the Guidance Letters, direct or require any action by insurers and financial institutions, they cannot be deemed "more extensive than necessary" to further these significant State interests.  This is not a situation where the government's action has presented a "contrived choice," cf. Sorrell, 564 U.S. at 574 ("Either consent, which will allow your…information to be disseminated and used without restraint; or, withhold consent, which will allow your information to be used by those speakers whose message the State supports.") or, in fact, prohibited anything at all.  Cf. Centro De La Comunidad Hispana De Locust Valley, 868 F.3d at 115 (ordinance prohibited speech).  Instead, the Press Releases and Guidance Letters recite the State's political position on the issue of gun

31

control and encourage insurers and financial institutions to evaluate any risks that may be associated with doing business with the NRA or similar organizations.  Dkt. Nos. 37-1; 37-2; 37-3. App. at A & B.  There is no less burdensome way to convey this important State message.

Similarly, as demonstrated by the DFS Press Release, the Consent Orders were executed to advance the State's significant interests in ensuring compliance with the Insurance Law to protect the interests of New York's insureds.  Valdez v. Town of Brookhaven, No. 05-CV-4323 (JS/ARL), 2005 U.S. Dist. LEXIS 36713, *44 (E.D.N.Y. Dec. 15, 2005) (government has a significant interest in enforcing its laws); Liberty Mut. Ins. Co. v. Fairbanks Co., 170 F.Supp.3d 634, 647 (S.D.N.Y. 2016) ("New York has a significant interest in regulating the conduct of insurance companies doing business in New York).  They reach no further than necessary to ensure Lockton's and Chubb's compliance with the Insurance Law.  Accordingly, on the face of the Complaint and the documents incorporated therein—namely the Guidance Letters, Press Releases and Consent Orders—the NRA fails to allege that Defendants have unconstitutionally limited the NRA's commercial speech.

**E.  The Complaint Fails to Allege a Freedom of Association Claim**

The First Amendment[14] protects the right "to engage in association for the advancement of beliefs and ideas,"  NAACP v. Alabama, 357 U.S. 449, 462 (1958), and "[t]he Supreme Court has recognized a freedom to associate with others 'to pursue goals independently protected by the first amendment—such as political advocacy....'"  Brady v. Colchester, 863 F.2d 205, 217 (2d Cir. 1988).  However, "[t]he Constitution does not recognize a generalized right of social association. The right generally will not apply, for example, to business relationships…."  New York State

---

[14] As indicated above, the New York State Constitution claims at issue here are subject to the same standards as the First Amendment claims.  See supra, at n.8.

Rifle & Pistol Ass'n v. City of New York, 883 F.3d 45, 67 (2d Cir. 2018).  For instance, in Brady, plaintiff claimed that his right to association was violated because the Republican-controlled town denied him a building permit, a zoning permit and a certificate of occupancy for the purpose of precluding plaintiff from renting to the Democratic-controlled borough.  Brady, 863 F.2d at 209. The Second Circuit held that plaintiff's desire to rent to the Democrat-controlled borough was for "purely commercial reasons" and not to "pursue political or other goals independently protected by the first amendment."  Id. at 217.

The Complaint alleges that businesses such as Lockton, Chubb, Lloyds and the "Corporate Carrier" have terminated their business relationships with the NRA because of the Guidance Letters, Consent Orders and/or Press Releases.  Dkt. No. 37 at ¶ 41-44, 87, 97, 126, 139.  However, business relationships are not afforded First Amendment protection.  New York Rifle & Pistol Ass'n., 883 F.3d at 67.  Since the NRA has no constitutional right to associate with these, or any, companies for business purposes, any claims that the NRA's freedom to associate with insurers or financial institutions has been violated should be dismissed.

To the extent that the NRA claims that Defendants have violated its right to engage in advocacy for its members, see Dkt. No. 37 at ¶¶ 96, 98-99, such a claim should also be dismissed. "The First Amendment 'protects the right of associations to engage in advocacy on behalf of their members.'"  Westchester Legal Services, Inc. v. County of Westchester, 607 F. Supp. 1379, 1382 (S.D.N.Y. 1985) (quoting Smith v. Arkansas State Highway Employees, 441 U.S. 463, 464 (1979)).  The government unconstitutionally infringes on that right only when it imposes (1) a "general prohibition against certain forms of advocacy" or (2) "sanctions for the expression of particular views it opposes."  Smith, 441 U.S. at 464.

Here, the Plaintiff has not alleged a viable cause of action under either of the Smith theories. With respect to the first theory, Plaintiff simply has not alleged a "general prohibition" of the type of advocacy in which it engages. With respect to the second theory, the only "sanction[s]" which the Plaintiff can identify at all are the Consent Orders entered into not against the Plaintiff, but against Lockton and Chubb for violations of the Insurance Law. As detailed above, these two Consent Orders do not implicate First Amendment rights. Far from punishing "the expression of a particular view[]," id., the Consent Orders were designed for the sole purpose of remedying *admitted* violations of the Insurance Law and preventing further violations. "The effects of the [enforcement of the Insurance Law] of which plaintiffs complain are no more than 'the indirect consequence of laws necessary' to the state's responsibility to ensure that" insurance markets are operated in a safe and sound manner for the protection of those markets and the consumers of insurance products. Fletcher v. Marino, 882 F.2d 605, 614 (2d Cir. 1989) (quoting Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214 (1989)). "As such, they are not improper burdens on plaintiffs' First Amendment [freedom of association] rights." Id.

Even if the Plaintiff had alleged a "general prohibition" or any "sanctions for the expression of particular views[,]" Plaintiff further fails to state a First Amendment freedom of association claim, because such a claim requires that "the interference with associational rights must be 'direct and substantial' or 'significant.'" Fighting Finest v. Bratton, 95 F.3d 224, 228 (2d Cir. 1996). A plaintiff alleging the violation of its associational rights must allege that the actions of the defendant "caused its members to suspend or…curtail their associational activities." Latino Officers Ass'n v. City of New York, No. 97 Civ. 1384 (KMW), 1998 U.S. Dist. LEXIS 2018, *14 (S.D.N.Y. Feb. 20, 1998) (explaining the holding in Fighting Finest). Cf. Fighting Finest, 95 F.3d

34

at 228 (when act of defendant does not prevent members of an organization from associating together, it does not violate the First Amendment).

No such interference is alleged here.  The allegedly affected associational activities identified in the Complaint are (1) letter-writing campaigns, Dkt. No. 37 at ¶ 95, (2) media coverage through NRATV, (3) circulation of publications and magazines, (4) meetings, rallies, conventions and assemblies and (5) educational programs.  Id. at ¶ 98.

There are no allegations in the Complaint that these activities of the NRA have been at all hampered by the Guidance Letters, Consent Orders or Press Releases.  Fighting Finest, 95 F.3d at 228.  Indeed, the Complaint alleges no "general prohibition" or "sanction" concerning any of those alleged associational activities, because no such sanction has been levied. Instead, the Complaint alleges that *some* insurers and financial institutions have decided not to business with the NRA and, without corporate insurance, media liability insurance and banking services, it cannot engage in the identified associational activities.  It is clear that this decision by *some* insurers and financial institutions does not constitute a "general prohibition" or a governmental "sanction" under the Smith framework. This alone is sufficient reason to dismiss this cause of action.  However, this cause of action fails for several other reasons as well.

First, the Complaint does not allege that the NRA cannot secure insurance or banking services.  Instead, it alleges that some—but not all—insurers and financial institutions have decided not to do business with the NRA and, as a result, the NRA's options are fewer.  Dkt. No. 37 at ¶ 66 ("**nearly** every carrier has indicated that it fears transacting with the NRA…(emphasis added)); id. at ¶ 67 ("**multiple** banks withdrew their bids in the NRA's RFP process…" (emphasis added)).  Since the Complaint fails to allege that there are **no** insurers or banks willing to do

business with the NRA, it fails to state a claim that the NRA is unable to continue with its advocacy activities.

Second, the NRA's arguments that they may somehow be deprived of "the ability to process and retain cash, check, wire-transfer, and other donations from members and events throughout the country, as well as transmit and apply these funds to operational needs" by the Guidance Letters, Consent Orders and Press Releases is hyperbolic and highly speculative, since DFS only regulates New York State-chartered banks and insurance companies doing business in New York.  National Banks, regulated by the federal Office of the Comptroller of the Currency under the National Bank Act, and banks chartered in any of the other 49 states—which are the large majority of commercial banking options available to the public—are not under DFS supervision.  Nor are the hundreds of insurance companies doing business in one or more of the 49 other states that are not licensed by New York State.   It is clear that DFS has not—and indeed could not, for institutions outside of its jurisdiction—imposed a "general prohibition" or levied any "sanctions" on the Plaintiff, or any banking institutions for that matter.

Third, the potential problems that the NRA alleges it may face if, someday, all insurers and financial institutions refuse to do business with the NRA are entirely speculative.  To state a First Amendment claim, a plaintiff must allege an injury that is "'actual' and 'non-speculative.'" Podlach v. Vill. of Southampton, No. 14-CV-6954 (SJF/SIL), 2017 U.S. Dist. LEXIS 73047, *30 (E.D.N.Y. May 11, 2017) (quoting Williams v. Town of Greenburgh, 535 F.3d 71, 78 (2d Cir. 2008));  see also Doyle v. N.Y.S. Div. of Hous. & Community Renewal, No. 98 Civ. 2161 (JGK), 1999 U.S. Dist. LEXIS 3960, *25 (S.D.N.Y. March 29, 1999) (allegations of possible future harm is "purely speculative and insufficient to substantiate a substantial infringement on the right of association.").  Instead of alleging any non-speculative injuries, the Complaint only alleges guesses

36

about what could potentially happen if a number of similarly-speculative events occur.  Since the Complaint fails to allege any non-speculative injury to the NRA, the freedom of association claim should be dismissed.  See also St. German of Alaska Eastern Orthodox Catholic Church v. United States, 653 F. Supp. 1342, 1347 (S.D.N.Y. 1987) (such an "exaggerated" connection between defendants' actions and possible future impacts on the plaintiff church insufficient to state a freedom of association claim).

Finally, the Guidance Letters, Consent Orders and Press Releases do not prohibit, or penalize, the expression of any viewpoint by the NRA.  Instead, as discussed above, the Guidance Letters and Press Releases are classic examples of government speech and the Consent Orders are enforcement mechanisms to halt unlawful conduct.  They do not limit, in any way, the NRA from continuing to advance its political agenda on behalf of its members.  Nor do the Consent Orders prevent Chubb or Lockton from issuing insurance policies to the NRA that relate to the NRA's corporate operations.   Therefore, the Complaint fails to allege that the Guidance Letters, Consent Orders or Press Releases constitute a direct or substantial or significant "interference with associational rights."  Fighting Finest, 95 F.3d 224 at 228.  Accordingly, Count Three of the Complaint should be dismissed.

POINT II

THE NRA LACKS STANDING TO ALLEGE AN EQUAL PROTECTION CLAIM[15]

The fourth cause of action in the Complaint alleges that Defendants selectively enforced the Insurance Law against Lockton's affinity-insurance programs for the NRA.  Dkt. No. 37 at ¶¶ 107-

---

[15] Equal protection claims under the New York State Constitution are analyzed using the same framework as claims under the federal Equal Protection clause.  Selevan v. New York Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009).  Therefore, the Plaintiff's state claim contained in Count Four of the Complaint should be dismissed for the same reasons as its federal Equal Protection claim.

113.  However, this argument ignores that the Insurance Law has not been enforced against the NRA,[16] which is the only plaintiff here.

"[O]nly the person toward whom the state action was directed, and not those incidentally affected, may maintain a §1983 claim."  Morgan v. City of N.Y., 166 F. Supp. 2d 817, 819 (S.D.N.Y. 2001) (citations and internal quotation marks omitted).  To establish constitutional standing a plaintiff must show three elements: 1) that the plaintiff has suffered an "injury in fact" which is "concrete and particularized;" 2) a causal connection between the injury and the conduct of which plaintiff complains; and 3) that it is likely rather than speculative that the injury will be "'redressed by a favorable decision.'"  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

The Supreme Court has held that "standing to sue must be predicated on a direct injury to the plaintiff, not an indirect, abstract or conjectural injury."  Center for Reprod. Law & Policy v. Bush, No. 01 Civ. 4986 (LAP), 2001 U.S. Dist. LEXIS 10903, *24 (S.D.N.Y. July 31, 2001) (citing Sierra Club v. Morton, 405 U.S. 727, 734-39 (1972)).  And, with respect to First Amendment claims, "[a]llegations of a 'subjective chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm …."  Laird v. Tatum, 408 U.S. 1, 13-14 (1972) (quoting United Public Workers v. Mitchell, 330 U.S. 75, 89 (1947)).

In addition to constitutional requirements, there are also prudential considerations of standing.  To satisfy prudential standing, a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the rights or interests of third parties."  Warth v. Seldin, 422 U.S. 490, 499 (1975); LaFleur v. Whitman, 300 F3d 256, 269, n.2 (2d Cir. 2002).

---

[16] While the NRA is under investigation for its unlicensed insurance activities and other violations of the Insurance Law, that investigation is ongoing and has not, to date, resulted in any enforcement action against the NRA.

Here, the Complaint alleges that Lockton and Chubb have been singled out for investigation and penalty because of their business ties with the NRA. Dkt. No. 37 at ¶¶ 107-113. This is simply not an argument that NRA may make as a plaintiff. To have standing to maintain a selective enforcement equal protection claim, it is necessary that the *plaintiff* has had a law or rule enforced against it. Casciani v. Nesbitt, 659 F.Supp.2d 427, 449-50 (W.D.N.Y. 2009) (collecting cases). The Complaint alleges that DFS has "selectively" enforced the Insurance Law against Lockton and Chubb. Dkt. No. 37 at ¶¶ 54-64, 107-113. It does not allege that DFS has taken any enforcement action against the NRA at all. Id. Indeed, the Court should not allow the NRA to attempt a collateral attack on the Consent Orders, to which they are not a party, and to which the parties voluntarily waived any objection or challenge. Doing so—apart from being improper under the established law of standing—would hamper the current and future law enforcement efforts of DFS, by casting a shadow over the finality that regulated parties obtain when they enter into consent orders. Accordingly, Count Four of the Complaint should be dismissed for lack of standing.[17]

---

[17] Since the Complaint fails to contain facts that the NRA has standing to bring a selective enforcement claim, it also fails to allege facts sufficient to state a claim. A plaintiff alleging a selective-enforcement claim under the Equal Protection Clause must show that (1) "'[it] was treated differently from other similarly situated businesses'" and (2) "'such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" Wandering Dago, Inc. v. Destito, 879 F.3d 20, 40 (2d Cir. 2018) (quoting Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 790 (2d Cir. 2007)). It should be noted that, while the NRA's own violations of the Insurance law are under investigation by DFS, no enforcement action has yet been taken against it. Since the Complaint fails to allege that the Insurance Law was enforced against it at all, it also, necessarily, fails to allege that it was treated differently under the Insurance Law than others similarly situated.

POINT III

THE COMPLAINT FAILS TO ALLEGE A CONSPIRACY CLAIM

The fifth cause of action in the Complaint alleges that Governor Cuomo and Superintendent Vullo intentionally conspired to deprive the NRA of its First and Fourteenth Amendment rights. Dkt. No. 37 at ¶¶ 114-120.  To allege a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must first show that it was actually deprived of a constitutional right.  Richardson v. NYC Health & Hosps. Corp., No. 05 Civ. 6278 (RJS), 2009 U.S. Dist. LEXIS 25247 (S.D.N.Y. March 25, 2009). As discussed in detail herein, the Complaint fails to allege a cognizable constitutional violation and, therefore, as a matter of law, cannot state a conspiracy claim.

However, even if, *arguendo*, the court finds that the Complaint does state a constitutional claim, the NRA's conspiracy claim should still be dismissed.  In addition to alleging the violation of a constitutional right, a plaintiff alleging a conspiracy claim must also allege (1) the existence of an agreement between two state actors (or a state actor and a private person) to jointly act to deprive the plaintiff of a constitutional right, and (2) "an overt act done in furtherance of that goal." Orr v. Miller Place Union Free Sch. Dist., No. 07-CV-787 (DRH/AKT), 2008 U.S. Dist. LEXIS 52803, **7-8 (E.D.N.Y. July 9, 2008).  See also Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999).

A motion to dismiss a conspiracy claim must be granted when a complaint fails to allege specific incidents of conduct sufficient to satisfy the elements of a conspiracy claim.  Ciambriello v. Cty. of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002).  "[C]onclusory, vague, or general allegations" are insufficient to allege a cognizable constitutional claim.  Id.  See also Corsini v. Brodsky, No. 17-CV-1461, No. 17-1461-CV, 2018 U.S. App. LEXIS 9209 (2d Cir. April 13, 2018) (applying the pleading requirements of Ciambriello).

Count Five of the Complaint alleges that Governor and Superintendent Vullo "agreed with each other, and with others known and unknown, to deprive the NRA" of its constitutional rights. Dkt. No. 37 at ¶ 115.  However, instead of including any factual allegations about any purported "agreement," the Complaint, instead, alleges that the Governor "directed" Superintendent Vullo to issue the Guidance Letters, and Superintendent Vullo complied.  Id. at ¶ 116.  While elsewhere in the Complaint, it is alleged that Defendants acted "together," id. at ¶ 21, and used "concerted efforts," id. at ¶ 78, nowhere is it alleged that anyone "agreed" to do any actual substantive act jointly.  See id. at ¶ 22 (alleging that Superintendent Vullo and DFS acted at the Governor's "behest").  Therefore, the Complaint fails to allege an essential element of a conspiracy claim. Accordingly, Count Five of the Complaint should be dismissed.

POINT IV

THE COMPLAINT FAILS TO ALLEGE A DUE PROCESS CLAIM[18]

The sixth cause of action in the Complaint alleges that Defendants' actions have deprived the NRA of property and liberty interests in violation of the Due Process Clause by making "stigmatizing statements" about the NRA that caused insurance and financial institutions to terminate certain business relationships with the NRA.  Dkt. No. 37 at ¶¶ 121-123, 126-131. However, the Complaint fails to allege that the NRA has suffered any deprivation that is protected by the Due Process clause of the Fourteenth Amendment.

---

[18] Due Process claims under the New York State Constitution similar to those alleged here are subject to the same analysis as federal Due Process claims.  Gilmoe v. Bouboulis, No. 3:15-CV-0686 (GTS/DEP), 2016 U.S. Dist. LEXIS 115315, **35-36, n. 7 (N.D.N.Y. Aug. 29 2016). Therefore, Plaintiff's state claims in Count Six of the Complaint should be dismissed for the same reasons as those requiring dismissal of Plaintiff's federal Due Process claim.

The Complaint alleges that the NRA has been deprived of "its constitutionally protected interests in engaging in core political advocacy and pursuing revenue opportunities…." Dkt. No. 37 at ¶ 122. Specifically, the Complaint alleges that the NRA has (1) a property interest in its agreements with financial institutions[19] to provide the NRA with banking services and corporate insurance coverage; and (2) a liberty interest "in its good name, reputation, honor, integrity, and its ability to endorse insurance products to its membership." Id. at ¶¶ 124-125.

To allege a substantive due process claim, a plaintiff must allege that "'(1) the complained-of state action compromised a constitutionally-protected liberty or property right, and (2) the state action that deprived [it] of that interest was oppressive or arbitrary.'" Adams v. Smith, No. 8:07-CV-0452 (LEK/RFT), 2015 U.S. Dist. LEXIS 88873, **26-27 (N.D.N.Y. July 9, 2015). "Conduct is arbitrary when it is not merely incorrect, but 'shocks the conscience.'" Id. at *27 (citing O'Connor v. Pierson, 426 F.3d 187, 203 (2d Cir. 2005)). The Second Circuit has articulated that to "shock the conscience," the government must engage in "'malicious and sadistic abuses of power…intended to oppress or cause injury and designed for no legitimate government interest.'" Rinaldi v. City of New York, No. 13 Civ. 4881 (LAK/JLC), 2014 U.S. Dist. LEXIS 79011, *21 (S.D.N.Y. June 10, 2014) (quoting Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 252 (2d Cir. 2001)) (internal quotations omitted). The Complaint fails to allege any interest that is within the protection of the Due Process clause.

---

[19] The Complaint does not allege a property interest in any agreements with insurers. Dkt. No. 37 at ¶125. However, even if, *arguendo*, the Complaint was read as containing such a claim, there clearly can be no protected interest in continuing unlawful activities—such as the admitted violations of the Insurance Law committed by Chubb and Lockton in the marketing and sale of policies offered as part of the Carry Guard program, or the violations of the Insurance Law for which the NRA are currently under investigation by DFS—regardless of the "superlobby" status of the actor. Therefore, the allegations in the Complaint that the NRA has expended significant time, money and effort into existing and past affinity programs with the insurance industry fails to allege an interest protected by the Due Process clause.

First, to allege a "property interest sufficient to support a substantive due process claim" a complaint must allege that the plaintiff has a "legitimate claim of entitlement to the benefit in question."  A.B.C. Home Furnishings v. Town of E. Hampton, 947 F. Supp. 635, 644 (E.D.N.Y. 1996) (quoting Crowley v. Courville, 76 F.3d 47, 52 (2d Cir. 1996)) (internal quotations omitted). Investment of time, money and effort into business agreements or relationships is not a property right protected by the Due Process Clause.  A.B.C. Home Furnishings, 947 F. Supp. at 644 (expenditure of money and effort alone is not a protectable property interest).  See also Beacon Syracuse Associates v. City of Syracuse, 560 F. Supp. 188, 197 (N.D.N.Y. 1983) (finding no protected property interest in "investment-backed expectations").  There is no property right under the Due Process clause to (1) continue business on the same terms as in the past, Sanitation & Recycling Ind., Inc. v. City of New York, 928 F. Supp. 407, 420-21 (S.D.N.Y. 1996), or (2) future business opportunities.  Chrebet v. Co. of Nassau, 24 F. Supp. 3d 236, 245 (E.D.N.Y. 2014).  See also College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675 (1999) ("business in the sense of the activity of doing business, or the activity of making a profit is not property in the ordinary sense") (emphasis omitted).

The Complaint alleges that the NRA currently has existing agreements with financial institutions to provide it with banking services.  Dkt. No. 37 at ¶ 124.  However, the pleading then states in conclusory fashion that the Guidance Letters, Press Releases and Consent Orders "have interfered with and deprived the NRA of its tangible property interests in accessing banking…products on equal terms with other citizens."  Id. at ¶ 126.  Other than this conclusory statement, there are no allegations in the Complaint that any financial institution has severed ties with the NRA.

Second, as stated above, "[f]or a substantive due process claim to survive a Rule 12(b)(6) dismissal motion, it must allege governmental conduct that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  Velez v. Levy, 401 F.3d 75, 93 (2d Cir. 2005).  An ability to "endorse insurance products to its membership" cannot be deemed a right of "'constitutional dimension,'" Hall v. Marshal, 479 F. Supp. 2d 304, 313-14 (E.D.N.Y. 2007) (allegations of an alleged interest that is not of "constitutional dimension" fail to support a cognizable due process claim), which is supported by defense counsel's inability to find any case to support such an argument.

Finally, the Complaint alleges violation of its "good name, reputation, honor, and integrity…"  Dkt. No. 37 at ¶ 125.  However, such a claim cannot withstand a motion to dismiss as a matter of law.  "Loss of one's reputation can…invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest."  Chrebet, 24 F. Supp. 3d at 247.  To state such a claim, a plaintiff must allege facts establishing the following two elements: (1) "'the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,'" and (2) "'a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.'"  Balentine v. Tremblay, 554 Fed. Appx. 58, 60 (2d Cir. 2014) (quoting Sadallah v. City of Utica, 383 F.3d 34, 38 (2d Cir. 2004)).

While the Complaint alleges, in conclusory fashion, that that Defendants' conduct is "false and capable of being proven false," Dkt. No. 37 at ¶ 127, it does not identify any specific statement by Defendants that is false.  As discussed at Point I(B), supra, the statements contained in the Press Releases, Guidance Letters and Consent Orders are purely government speech relaying New York's opinions about public safety and gun regulation.  As a result, they are not cable of being

44

proven false. Enigma Software Grp. USA, LLC v. Bleeping Computer LLC, 194 F. Supp. 3d 263, 281 (S.D.N.Y. 2016) ("'New York law absolutely protects statements of pure opinion, such that they can never be defamatory.'"); Sorvillo v. St. Francis Prep. Sch., No. 13-CV-3357 (SJ/MDG), 2014 U.S. Dist LEXIS 186923, **12-13 (E.D.N.Y. Aug. 12, 2014) (granting motion to dismiss because alleged statements were opinions).

Additionally, as also discussed above, the Press Releases, Guidance Letters and Consent Orders do not impose a burden on the NRA, or otherwise alter its status or rights. Instead, they express the State's position in the public gun control debate. Therefore, the Complaint fails to allege facts sufficient to state a Due Process claim. Count Six of the Complaint should be dismissed.

## POINT V

### PLAINTIFF'S PENDENT TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE CLAIM SHOULD BE DISMISSED

The seventh cause of action in the Complaint alleges that Governor Cuomo and Superintendent Vullo tortiously interfered with Plaintiff's prospective business relationship with Lockton by entering into a Consent Order with Lockton. Dkt. No. 37 at ¶¶ 133-141. This claim must be dismissed.

First, as all of Plaintiff's claims grounded in federal law should be dismissed for the reasons set forth above, this remaining state law claim should likewise be dismissed as "it is generally accepted that state claims must be dismissed if the federal claim is dismissed before trial." Lennon v. Miller, 66 F.3d 416, 426 (2d Cir. 1995) (citing United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); Town of Hartford v. Operation Rescue, 915 F.2d 92, 104 (2d Cir. 1990); Maybee v. Town of Newfield, 789 F. Supp. 86, 92 (N.D.N.Y. 1992)). It is settled law and practice that federal district courts "decline to exercise supplemental jurisdiction over a [state] claim if the district court

45

has dismissed all claims over which it has original jurisdiction." <u>Hotel Syracuse, Inc. v. Young</u>, 805 F. Supp. 1073, 1086 (N.D.N.Y. 1992) (citing 28 U.S.C. § 1367(c)(3)); <u>see also</u>, <u>Temple of the Lost Sheep, Inc. v. Abrams</u>, 930 F.2d 178, 185 (2d Cir.1991) ("Given the absence of federal claims left to adjudicate, the district court properly dismissed the pendant state-law claims."); <u>Waldron v. Rotzler, 862 F. Supp. 763, 773 (N.D.N.Y. 1994)</u> ("Because there are no federal law claims left standing after this motion, the court finds it appropriate to dismiss the state law claim … as well.").

Second, should the Court nonetheless exercise jurisdiction over Plaintiff's tortious interference claim, such claim must be dismissed because the Complaint fails to allege any set of facts sufficient to state such a claim. Count Seven of the Complaint relies only on the NRA's "ongoing business relationship with Lockton." Dkt. No. 37 at ¶ 139. Indeed, the only "interference" NRA claims is, in reality, the entry into the Consent Order, which the Complaint quotes. <u>Id</u>. at ¶ 136. The Lockton Consent Order provides great detail on the violations which it sought to remedy, violations which Lockton admitted and to which Lockton voluntarily waived any challenge. <u>See</u> Dkt. No. 37-4. These violations include violations of sections 2116, 2117, 2118, 2122(a)(1), 2122(a)(2), and 2324(a) of the Insurance Law. Dkt. No. 37-4 at ¶¶ 34-40. The illegal conduct engaged in by Lockton —which the Consent Order remedied—related directly to Lockton's business with the NRA, including: "compensate[ing] the NRA based on actual premiums collected when the NRA was acting as an unlicensed insurance broker by selling and soliciting insurance in New York, in violation of Insurance Law § 2116," <u>id</u>. at ¶ 34; giving "a free one-year NRA membership" for purchasing insurance "in violation of Insurance Law § 2324(a)," <u>id</u>. at ¶ 36; giving insurance "at no cost to NRA members in good standing in violation of Insurance Law § 2122(a)(1)," <u>id</u>. at ¶ 37; and violations of law related to the marketing and sale of the NRA-branded, illegal Carry Guard policies, <u>id</u>. at ¶¶ 35, 38-40.

Based on the relationship between the NRA and Lockton's many violations of the Insurance Law set forth in the Consent Order, it was determined and agreed by both DFS and Lockton that Lockton would no longer engage in the type of affinity-policy business with the NRA as part of its settlement with DFS.  Under the circumstances giving rise to the Lockton Consent Order, as set forth therein, the prohibition regarding the affinity-policy business was entirely proper.

To state a claim for tortious interference a plaintiff must show "that the defendant either employed wrongful means or acted 'for the sole purpose of inflicting intentional harm on plaintiff[.]'"  Posner v. Lewis, 18 N.Y.3d 566, 570, 965 N.E.2d 949, 952, 942 N.Y.S.2d 447, 450 FN 2 (2012) (quoting Carvel Corp. v Noonan, 3 N.Y.3d 182, 190, 818 N.E.2d 1100, 785 N.Y.S.2d 359 (2004)).  Where, as here, a law enforcement official, at the conclusion of an investigation into illegal conduct, enters into a Consent Order to correct admitted violations of law, such actions cannot give rise to such a claim.  Given the NRA's connection to the unlawful conduct and the law enforcement purpose of remedying that unlawful conduct, it cannot be said that the Defendants employed "wrongful means" or that their "sole purpose" was harm to Plaintiffs in entering into the Consent Order.  See, e.g., Silver v. Kuehbeck, 217 F. App'x 18, 21 (2d Cir. 2007) (affirming dismissal where the complaint "failed to allege that defendants interfered with plaintiff's business relationship *solely* to harm him or that he used wrongful means in doing so") (citation omitted) (emphasis in original); R.M. Bacon, LLC v. Saint-Gobain Performance Plastics Corp., No. 1:17-CV-0441 (LEK/DJS), 2018 U.S. Dist. LEXIS 26299, at **15-16 (N.D.N.Y. Feb. 20, 2018) (concluding that plaintiff's tortious interference claims failed because the amended complaint did not allege that defendants "acted with the sole purpose of harming" the plaintiff) (citations omitted); Besicorp Ltd. v. Kahn, 290 A.D.2d 147, 150 (3d Dept. 2002) (affirming dismissal

because "[r]ather than alleging that defendants' conduct was motivated solely by malice or a desire to inflict injury by unlawful or wrongful means as required," plaintiff alleged that defendants were motivated by their financial self-interest) (citations omitted); John R. Loftus v. White, 150 A.D.2d 857, 860 (3d Dept. 1989) (noting that "the motive for the interference must be solely malicious") (citations omitted).

Plaintiff's novel argument that the agreed conditions in a consent order, where a party admits to wrongful conduct, could give rise to liability for tortious interference, threatens to shake the foundation of settlements between regulated parties and their regulators, not just in this case but in all regulated industries. Here, as with Plaintiff's Equal Protection claim, supra Point II, the Court should reject the NRA's attempted collateral attack on the Consent Orders—to which they are not a party, and to which the parties voluntarily waived any objection or challenge. The NRA has no basis in law to support that such agreements can give rise to liability for tortious interference, and the court should decline its invitation to extend such liability.

Finally, Governor Cuomo and Superintendent Vullo are immune from liability because "New York affords government officials and employees immunity for discretionary conduct." Dawson v. Cty. of Westchester, 351 F. Supp. 2d 176, 199 (S.D.N.Y. 2004) (citations omitted). Though such immunity "is not always absolute, individual public officials enjoy at least qualified immunity from liability for 'official action that involve the exercise of discretion or expert judgment in policy matters.'" Id. at 200 (citations and internal quotation marks omitted). See also McLean v. City of N.Y., 12 N.Y.3d 194, 203 (2009) ("Government action, if discretionary, may not be a basis for liability…."); Tango v. Tulevech, 61 N.Y.2d 34, 40 (1983) ("when official action involves the exercise of discretion, the officer is not liable for the injurious consequences of that action even if resulting from negligence or malice). A discretionary decision or act involves "the

exercise of reasoned judgment which could typically produce different acceptable results …." <u>Id</u>. at 41.

Here, the decision to enter into the Lockton Consent Order was discretionary because it involved "the exercise of reasoned judgment which could typically produce different acceptable results," one such "different acceptable result" being the initiation of enforcement proceedings against Lockton.  In exercising her "reasoned judgment," Superintendent Vullo entered into the Consent Order instead of initiating enforcement proceedings.  Likewise, to the extent that the NRA alleges that the Guidance Letters and Press Releases also interfered with the NRA's prospective economic advantage, they also were discretionary actions because they constitute "official action that involve[s] the exercise of discretion or expert judgment in policy matters."  As noted <u>supra</u>, pp. 11-12, the Guidance Letters and the Governor's Press Release merely suggest that companies aligned with the NRA and similar organizations should consider the risk of such relationships being harmful to their businesses, which is consistent with the Superintendent's "formidable authority to, among other things, 'ensure the continued solvency, safety [and] soundness' of banks and insurance companies, <u>see</u> Dkt. No. 37 at ¶ 26.  Moreover, even if the Complaint is construed as sufficiently alleging bad faith or malice, such bad faith or malice do not negate Defendants' immunity.  <u>Tango v. Tulevech</u>, 61 N.Y.2d at 40.  Accordingly, Governor Cuomo and Superintendent Vullo are immune from liability with respect to this tort claim.

Given the foregoing, Plaintiff's seventh cause of action for tortious interference with prospective economic advantage must be dismissed.

## CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss should be granted in its

entirety, with prejudice.

Dated: Albany, New York
       August 3, 2018

                                   BARBARA D. UNDERWOOD
                                   Attorney General of the State of New York
                                   Attorney for Defendants Andrew M. Cuomo,
                                        Maria T. Vullo and Department of
                                          Financial Services
                                   The Capitol
                                   Albany, New York  12224

                                   By: *s/ Adrienne J. Kerwin*
                                   Adrienne J. Kerwin
                                   Assistant Attorney General, of Counsel
                                   Bar Roll No. 105154
                                   Telephone:  (518) 776-2608
                                   Fax:  (518) 915-7738 (Not for service of papers)
                                   Email: Adrienne.Kerwin@ag.ny.gov

TO:    VIA ECF
        J. Joel Alicea, Esq.
        Charles J. Cooper, Esq.
        Michael W. Kirk, Esq

        VIA ECF
        William A. Brewer, Esq.
        Stephanie L. Gase, Esq.
        Sarah Rogers, Esq.