# Appendix C

N.Y. Insurance Law

## § 109. Penalties; civil actions

(a) Every violation of any provision of this chapter shall, unless the same constitutes a felony, be a misdemeanor.

(b) Every penalty imposed by this section shall be in addition to any penalty or forfeiture otherwise provided by law.

(c)

> (1) If the superintendent finds after notice and hearing that any authorized insurer, representative of the insurer, licensed insurance agent, licensed insurance broker, licensed adjuster, or any other person or entity licensed, certified, registered, or authorized pursuant to this chapter, has wilfully violated the provisions of this chapter or any regulation promulgated thereunder, then the superintendent may order the person or entity to pay to the people of this state a penalty in a sum not exceeding one thousand dollars for each offense.

> (2) Failure to pay such penalty within thirty days after the order, unless it is suspended by an order of a court of competent jurisdiction, shall constitute a further violation of the provisions of this chapter.

> (3) No penalty shall be imposed pursuant to this subsection if a monetary penalty is otherwise provided in this chapter.

(d) The superintendent may maintain a civil action in the name of the people of the state to recover a judgment for a money penalty imposed by law for the violation of any provision of this chapter.

## § 308. Special reports

(a)

    (1) The superintendent may also address to any health maintenance organization, life settlement provider, life settlement intermediary or its officers, or any authorized insurer or rate service organization, or officers thereof, any inquiry in relation to its transactions or condition or any matter connected therewith. Every corporation or person so addressed shall reply in writing to such inquiry promptly and truthfully, and such reply shall be, if required by the superintendent, subscribed by such individual, or by such officer or officers of a corporation, as the superintendent shall designate, and affirmed by them as true under the penalties of perjury.

    (2) In the event any corporation or person does not provide a good faith response to an inquiry from the superintendent pursuant to this section relating to accident insurance, health insurance, accident and health insurance or health maintenance organization coverage or with respect to life settlements, within a time period specified by the superintendent of not less than fifteen business days, the superintendent is authorized to levy a civil penalty, after notice and hearing, against such corporation or person not to exceed five hundred dollars per day for each day beyond the date specified by the superintendent for response, but in no event shall such penalty exceed seven thousand five hundred dollars.

(b) In addition to the other reports required by this article, the superintendent may also require the filing of quarterly or other statements, which shall be in such form and shall contain such matters as the superintendent shall prescribe.

(c) The superintendent shall ensure that any contracts entered into, modified, extended or in any way made or continued with an organization or administrator to receive, distribute and otherwise administer funds for the pools specified in section eighteen of chapter two hundred twenty-six of the laws of nineteen hundred eighty-six and sections three thousand two hundred thirty-three, four thousand three hundred twenty-one-a and four thousand three hundred twenty-seven of this chapter, shall require such organization or pool administrator to submit the reports required pursuant to section two hundred six of the public health law at the time and in the format and manner specified in such section.

(d) [Repealed].

**§ 309. Examinations of insurers; when authorized or required**

(a) The superintendent may make an examination into the affairs of any insurance corporation or other insurer doing or authorized to do any insurance business in this state or, of any pension fund, retirement system or other organization which is required by law to make reports to, or is subject to examination by, the department as often as he deems it expedient for the protection of the interests of the people of this state, in addition to examinations authorized by other provisions of this chapter.

(b) The superintendent shall make an examination into the affairs:

> (1) of every authorized domestic fraternal benefit society and every domestic property/casualty insurance company, at least once in every three years; except that the superintendent may extend the three year interval to not more than five years with respect to a property/casualty insurance company, upon determining that the three year requirement is not necessary to safeguard the interests of the public or policyholders;

> (2) of every domestic life insurance company, at least once in every five years; and

> (3) of every other authorized domestic insurer and every rate service organization which makes or files rates, whether or not advisory, at least once in every five years.

(c)  As part of an examination, the superintendent shall review determinations of coverage for substance use disorder treatment and shall ensure that such determinations are issued in compliance with sections three thousand two hundred sixteen, three thousand two hundred twenty-one, four thousand three hundred three, and title one of article forty-nine of this chapter.

### § 310. Examinations; how conducted

(a)

    (1) Whenever pursuant to any provision of this chapter, the superintendent shall determine to examine the affairs of any insurer or other person, he shall make an order indicating the scope of the examination and may appoint as examiners one or more persons not employed by any insurer or interested in any insurer except as a policyholder. A copy of such order shall upon demand be exhibited to the insurer or person whose affairs are to be examined before the examination begins.

    (2) Any examiner authorized by the superintendent shall be given convenient access at all reasonable hours to the books, records, files, securities and other documents of such insurer or other person, including those of any affiliated or subsidiary companies thereof, which are relevant to the examination, and shall have power to administer oaths and to examine under oath any officer or agent of such insurer or other person, and any other person having custody or control of such documents, regarding any matter relevant to the examination.

    (3) The officers and agents of such insurer or other person shall facilitate such examination and aid such examiners in conducting the same so far as it is in their power to do so.

    (4) The refusal of any insurer to submit to examination shall be ground for revocation or refusal of a license or renewal license.

    (5) The examiner or examiners in charge of such examination shall make a true report of every examination made by them, verified under oath, which shall comprise only facts appearing upon the books, records, or other documents of such insurer or other person or as ascertained from the sworn testimony of its officers or agents or other persons examined concerning its affairs, and such conclusions and recommendations as may reasonably be warranted from such facts.

(b) In connection with any such examination the superintendent may appoint one or more competent persons as appraisers with authority to appraise the real property of such insurer or other person or any real property on which it holds security. The report of such appraisers shall be a supplement to the report of the examiner or examiners in charge, and shall be subject to notice and hearing as provided in section three hundred eleven of this article.

**§ 1101(a). Definitions; doing an insurance business**

(a) In this article:

> (1) "Insurance contract" means any agreement or other transaction whereby one party, the "insurer", is obligated to confer benefit of pecuniary value upon another party, the "insured" or "beneficiary", dependent upon the happening of a fortuitous event in which the insured or beneficiary has, or is expected to have at the time of such happening, a material interest which will be adversely affected by the happening of such event.

> (2) "Fortuitous event" means any occurrence or failure to occur which is, or is assumed by the parties to be, to a substantial extent beyond the control of either party.

> (3) "Contract of warranty, guaranty or suretyship" means an insurance contract only if made by a warrantor, guarantor or surety who or which, as such, is doing an insurance business.

## § 1102. Insurer's license required; issuance

(a) No person, firm, association, corporation or joint-stock company shall do an insurance business in this state unless authorized by a license in force pursuant to the provisions of this chapter, or exempted by the provisions of this chapter from such requirement. Any person, firm, association, corporation or joint-stock company which transacts any insurance business in this state while not authorized to do so by a license issued and in force pursuant to this chapter, or exempted by this chapter from the requirement of having such license, shall, in addition to any other penalty provided by law, forfeit to the people of this state the sum of one thousand dollars for the first violation and two thousand five hundred dollars for each subsequent violation.

(b) No corporation organized under any law of this state shall do an insurance business outside this state unless so authorized pursuant to the provisions of this chapter or exempted by the provisions of this chapter from such requirement.

(c) Every insurer organized prior to the first day of October, eighteen hundred ninety-two, as an insurer under any general or special law of this state which was doing an insurance business in this state immediately prior to the first day of January, nineteen hundred forty in compliance with the insurance law then in force and not as an organization exempted therefrom, shall be deemed licensed to do an insurance business in this state, subject to this chapter.

(d) Except as otherwise provided in subsection (h) hereof, the superintendent may issue a license to any insurer to do in this state the kinds of insurance business for which such insurer is qualified under the provisions of this chapter and under its charter. Every such license shall contain the name of the licensee, its home office address, the state or country under whose laws it was organized, the kinds of insurance business, as defined in this chapter, which it is authorized to do in this state, and the term of such license. The superintendent may refuse to issue or renew any such license if in his judgment such refusal will best promote the interests of the people of this state.

(e)

    (1) Before licensing any such corporation organized under section one thousand two hundred one of this chapter, to do any insurance business, the superintendent shall:

        (A) If such corporation be a stock corporation, cause an examination to be made into its affairs in accordance with the provisions of this chapter; and if it appears from the report upon such examination that the amount of capital and surplus required by law has been paid in and is possessed by the corporation in cash or in investments permitted by this chapter as minimum capital or minimum surplus to policyholder investments under section one thousand four hundred two of this chapter, the superintendent shall file such report in his office and notify the corporation thereof;

        (B) If such corporation be a mutual corporation, require proof (by statements of at least three incorporators subscribed and affirmed by such incorporators as true under the penalties of perjury, and by such investigation or examination of the

affairs of such corporation as he may deem it expedient to make pursuant to the provisions of this chapter) that:

> (i) the corporation has fully complied with the applicable provisions of this chapter,
> (ii) it has the required initial surplus in cash or investments as prescribed in this chapter,
> (iii) it has the required number and amount of bona fide applications for insurance as prescribed in this chapter,
> (iv) the membership list is genuine, and
> (v) every member has paid in cash the required premium on the insurance applied for and will take the policies as agreed within sixty days after a license has been issued to such corporation.

If the superintendent finds such proof of the foregoing facts to be sufficient, he shall file it in his office and notify the corporation thereof;

> (C) Upon payment of the appropriate fees by such corporation, cause a copy of its declaration and charter, certified by him, to be filed and recorded in the office of the clerk of the county in which such corporation has its principal office.

(2) The superintendent may refuse a license to any such corporation if he finds, after notice and hearing, that any proposed incorporator or director of a stock corporation, or any director of a mutual corporation, has been convicted of any crime involving fraud, dishonesty, or like moral turpitude, or is an untrustworthy person. As a part of such determination, the superintendent is authorized to fingerprint applicants for licensure. Such fingerprints shall be submitted to the division of criminal justice services for a state criminal history record check, as defined in subdivision one of section three thousand thirty-five of the education law, and may be submitted to the federal bureau of investigation for a national criminal history record check.

(3) The corporation, on receiving notice from the superintendent that it has complied with this subsection, shall thereupon deposit with the superintendent such monies or securities as may be required by law.

(4) Upon compliance with this section and any other lawful prerequisites for the issuance of an insurer's license, the superintendent may, pursuant to this section, issue a license to such corporation to do the kind or kinds of business specified in its charter; provided that this subsection shall not apply to co-operative fire insurance companies, fraternal benefit societies, or corporations organized under article forty-three of this chapter.

(f) Except as may be otherwise provided in this chapter, every license to do an insurance business shall be issued to a single licensee, who shall be either an individual or corporation.

(g)

(1) No license to do an insurance business, or to act as an insurance agent, agency or broker, shall be granted to any person, firm, association, corporation, or joint-stock company proposing to do business under a name identical with, or so similar to as to be likely to deceive or mislead the public, the name of any insurer then licensed or authorized to do any kind of insurance business within this state, or of any proposed domestic insurance corporation whose name has been approved pursuant to section one thousand two hundred one of this chapter within six months preceding the application for such license, or of any domestic corporation, organized but not yet licensed, which has not forfeited its charter because of non-use; provided, the superintendent may, in his discretion, upon satisfactory proof of an appropriate resolution of any insurance corporation's board of directors, grant a license to do any different kind of insurance business to another person, firm, association, joint-stock company, insurance agent, agency or broker, or insurance corporation, having a similar, but not identical, name. Notwithstanding any other provision of this article, the superintendent may refuse to grant a license to do an insurance business, or to act as an insurance agent, agency or broker, to any person, firm, association, corporation or joint-stock company proposing to do business under a name which is likely to deceive or mislead the public in this state.

(2) The provisions of this subsection shall not apply to a license renewal for a foreign or alien insurer, or to any corporation formed as part of a plan, approved by the superintendent and by the court, for rehabilitation of a domestic insurance corporation pursuant to article seventy-four of this chapter. A domestic corporation, formed by reincorporation, reorganization or consolidation of other corporations, or upon the sale of the property or franchises of another corporation, or a corporation acquiring or becoming possessed of all of the estate, property, rights, privileges and franchises of any other corporation or corporations by merger, may have a name identical with, or similar to, that of any corporation to whose franchises it has succeeded, if such other corporation was then licensed to do the business of insurance in this state.

(h) No license to transact any kind of insurance business in this state shall be issued or renewed to any foreign or alien insurer or issued or continued in effect to any domestic insurer which is controlled by another state of the United States or by a foreign government or by any political subdivision of either, or which is an agency of any such state, government or subdivision, unless:

(1) such insurer was so controlled or constituted, and was authorized to do business in this state, on or prior to January first, nineteen hundred fifty-six; or (2) such insurer is not authorized to transact the kinds of insurance specified in paragraph one, two or three of subsection (a) of section one thousand one hundred thirteen of this article and the superintendent determines that:

(A) such insurer does not receive a subsidy or other competitive advantage, as a result of such control or status, that would enable it to compete unfairly with similarly situated authorized insurers which are not so controlled or constituted;

(B) such insurer is not entitled to claim sovereign immunity as a result of such control or status, or has waived the sovereign immunity;

(C) the use of such insurer would not be detrimental to the interests of the people of this state; and

(D) such insurer otherwise satisfies all applicable requirements for the issuance or renewal of such license.

**§ 1104. Revocation or suspension of license; restriction of license authority or limitation on premiums written**

(a) The superintendent may revoke any license issued to any foreign or alien insurer to do an insurance business in this state if, after notice to and hearing, he finds that such insurer has failed to comply with any requirement imposed upon it by the provisions of this chapter and if in his judgment such revocation is reasonably necessary to protect the interests of the people of this state. The superintendent may in his discretion reinstate any such license if he finds that a ground for such revocation no longer exists.

(b) The superintendent shall revoke the certificate of authority of any corporation or agent convicted of violating section two thousand six hundred three of this chapter.

(c) The superintendent may suspend the license, restrict the license authority, or limit the amount of premiums written in this state of any accident and health insurance company, property/casualty insurance company, co-operative property/casualty insurance company, title insurance company, mortgage guaranty insurance company, reciprocal insurer, Lloyds underwriters or nonprofit property/casualty insurance company, except those insurers subject to the provisions of subsection (c) of section two thousand three hundred forty-three of this chapter, if after a hearing on a record, unless waived by the affected insurer, the superintendent determines that such insurer's surplus to policyholders is not adequate in relation to the insurer's outstanding liabilities or to its financial needs. All matters pertaining to a proceeding or determination pursuant to this subsection shall be confidential and not subject to subpoena or public inspection under article six of the public officers law or any other statute, except to the extent that the superintendent finds release of information necessary to protect the public. The hearing shall be initiated within twenty days after written notice to the insurer. Any determination pursuant to this subsection shall contain findings specifying the factors deemed significant in regard to the particular insurer, and shall set forth the reasons supporting the suspension, restriction or limitation ordered by the superintendent. The following factors shall be considered by the superintendent in making such determination:

> (1) the size of the insurer as measured by its admitted assets, capital and surplus to policyholders, reserves, premium writings, insurance in force and other appropriate criteria, with such surplus to policyholders for foreign insurers adjusted in accordance with section one thousand four hundred thirteen of this chapter;

> (2) the extent to which the insurer's business is diversified among the several kinds of insurance;

> (3) the number and size of risks insured in each kind of insurance and the insurer's loss experience in regard to such risks;

> (4) the extent of geographical dispersion of the insurer's risks;

> (5) the nature and extent of the insurer's reinsurance program;

> (6) the quality, diversification and liquidity of the insurer's investment portfolio;

(7) the recent past and projected future trends in regard to the insurer's loss experience and in the size of the insurer's surplus to policyholders;

(8) the surplus to policyholders maintained by other comparable insurers;

(9) the adequacy of the insurer's reserves; and

(10) the quality and liquidity of investments in subsidiaries made pursuant to this chapter.

(d) The superintendent shall identify and review those licensed property/casualty insurers needing immediate or targeted regulatory attention, and shall include the number of insurers so identified in the report required by section three hundred thirty-four of this chapter. Such report shall also include the name of each licensed property/casualty insurer placed in formal conservatorship, rehabilitation or liquidation during the preceding year. Nothing herein shall be construed to restrict or diminish any right or power of the superintendent under any other provision of this chapter.

**§ 1113. Kinds of insurance authorized**

(a) The kinds of insurance which may be authorized in this state, subject to other provisions of this chapter, and their scope, are set forth in the following paragraphs. The power to do any kind of insurance against loss of or damage to property shall include the power to insure all lawful interests in such property and to insure against loss of use and occupancy, rents and profits resulting therefrom. No kind of insurance shall include life insurance, title insurance or insurance against legal liability for personal injury or death unless specified in this section. In addition to any power specifically conferred by this chapter to engage in any other kind of business than an insurance business, any insurer authorized to do business in this state may engage in other kinds of business to the extent necessarily or properly incidental to the kinds of insurance business it is authorized to do in this state.

(1) "Life Insurance," means every insurance upon the lives of human beings, and every insurance appertaining thereto, including the granting of endowment benefits, additional benefits in the event of death by accident, additional benefits to safeguard the contract from lapse, accelerated payments of part or all of the death benefit or a special surrender value upon (A) diagnosis of terminal illness defined as a life expectancy of twelve months or less, (B) diagnosis of a medical condition requiring extraordinary medical care or treatment regardless of life expectancy, (C) certification by a licensed health care practitioner of any condition which requires continuous care for the remainder of the insured's life in an eligible facility or at home when the insured is chronically ill as defined by Section 7702(B) of the Internal Revenue Code and regulations thereunder, provided the accelerated payments qualify under Section 101(g)(3) of the Internal Revenue Code and all other applicable sections of federal law in order to maintain favorable tax treatment, (D) certification by a licensed health care practitioner that the insured is chronically ill as defined by Section 7702 (B) of the Internal Revenue Code and regulations thereunder, provided the accelerated payments qualify under Section 101(g)(3) of the Internal Revenue Code and all other applicable sections of federal law in order to maintain favorable tax treatment, (E) the insured's having been a resident of a nursing home, as defined in section twenty-eight hundred one of the public health law, for a period of three months or more, with an expectation that such insured will remain a resident of a nursing home until death, or (F) the insured's having been the recipient of end of life or palliative care, for a period of three months or more, at a residential health care facility as defined in subdivision three of section twenty-eight hundred one of the public health law, home care services as defined in subdivision one of section thirty-six hundred two of the public health law or hospice as defined in subdivision one of section four thousand two of the public health law, with the expectation that such insured will continue to require such services until death. "Life insurance" also includes a special surrender value upon total and permanent disability of the insured, optional modes of settlement of proceeds, and additional benefits to safeguard the contract against lapse in the event of unemployment of the insured or in the event the insured is a resident of a nursing home. Amounts paid the insurer for life insurance and proceeds applied under optional modes of settlement or under dividend options may be allocated by the insurer to one or more separate accounts pursuant to section four thousand two hundred forty of this chapter.

(2) "Annuities," means all agreements to make periodical payments for a period certain or where the making or continuance of all or some of a series of such payments, or the amount of any such payment, depends upon the continuance of human life, except payments made under the authority of paragraph one hereof. Amounts paid the insurer to provide annuities and proceeds applied under optional modes of settlement or under dividend options may be allocated by the insurer to one or more separate accounts pursuant to section four thousand two hundred forty of this chapter.

(3) "Accident and health insurance," means (i) insurance against death or personal injury by accident or by any specified kind or kinds of accident and insurance against sickness, ailment or bodily injury, including insurance providing disability and family leave benefits pursuant to article nine of the workers' compensation law, except as specified in item (ii) hereof; and (ii) non-cancellable disability insurance, meaning insurance against disability resulting from sickness, ailment or bodily injury (but excluding insurance solely against accidental injury) under any contract which does not give the insurer the option to cancel or otherwise terminate the contract at or after one year from its effective date or renewal date.

(4) "Fire insurance," means insurance against loss of or damage to any property resulting from fire, including loss or damage incident to the extinguishment of a fire or to the salvaging of property in connection therewith.

(5) "Miscellaneous property insurance," means loss of or damage to property resulting from:

> (A) lightning, smoke or smudge, windstorm, tornado, cyclone, earthquake, volcanic eruption, rain, hail, frost and freeze, weather or climatic conditions, excess or deficiency of moisture, flood, the rising of the waters of the ocean or its tributaries;

> (B) insects, or blights, or disease of such property except animals;

> (C) electrical disturbance causing or concomitant with a fire or an explosion in public service or public utility property;

> (D) bombardment, invasion, insurrection, riot, civil war or commotion, military or usurped power, any order of a civil authority made to prevent the spread of a conflagration, epidemic or catastrophe, vandalism or malicious mischief, strike or lockout, collapse from any cause, or explosion; but excluding any kind of insurance specified in paragraph nine hereof, except insurance against loss of or damage to property resulting from:

> > (i) explosion of pressure vessels (except steam boilers of more than fifteen pounds pressure) in buildings designed and used solely for residential purposes by not more than four families,

C-13

(ii) explosion of any kind originating outside of the insured building or outside of the building containing the property insured,

(iii) explosion of pressure vessels which do not contain steam or which are not operated with steam coils or steam jackets, or

(iv) electrical disturbance causing or concomitant with an explosion in public service or public utility property; or

(E) lateral or vertical subsidence of the earth caused by past or present mining operations.

(6) "Water damage insurance," means insurance against loss or damage by water or other fluid or substance to any property resulting from the breakage or leakage of sprinklers, pumps or other apparatus erected for extinguishing fires or of water pipes or other conduits or containers, or resulting from casual water entering through leaks or openings in buildings or by seepage through building walls, but excluding loss or damage resulting from flood or the rising of the waters of the ocean or its tributaries; and including insurance against accidental injury of such sprinklers, pumps, fire apparatus, conduits or containers.

(7) "Burglary and theft insurance," means:

(A) Insurance against loss of, or damage to, any property resulting from burglary, theft, larceny, robbery, forgery, fraud, vandalism, malicious mischief, confiscation, or wrongful conversion, disposal, or concealment by any person, or from any attempt thereof;

(B) Insurance against loss of, or damage to, moneys, coins, bullion, securities, notes, drafts, acceptances, or any other valuable papers or documents, resulting from any cause, except while in the custody or possession of, and being transported by, any carrier for hire or in the mail;

(C) Insurance of individuals by means of an all-risk type of policy commonly known as the "Personal Property Floater" against any kind and all kinds of loss of, or damage to, or loss of use of, any personal property other than merchandise;

(D) Insurance covering a ransom or reward payment incurred as the result of an abduction or the theft of property; travel and lodging expense and lost wages incurred as the result of an act or threatened act of violence; expense incurred to locate or identify a missing or abducted person; or other expenses to respond to a violent act or threatened act, or to prevent a reoccurrence thereof; and

(E) Insurance against losses and expenses resulting from a "stolen identity event," which shall include the theft, accidental release, or publication of, or misappropriation of information related to, an individual's personal identification,

social security number, or other method of identifying the individual, that has resulted in, or could reasonably result in, the wrongful use of the information.

(8) "Glass insurance," means insurance against loss of or damage to glass and its appurtenances resulting from any cause.

(9) "Boiler and machinery insurance," means insurance against loss of or damage to any property of the insured, resulting from explosion of or injury to:

(A) any boiler, heater or other fired pressure vessel;
(B) any unfired pressure vessel;
(C) pipes or containers connected with any such boilers or vessels;
(D) any engine, turbine, compressor, pump or wheel;
(E) any apparatus generating, transmitting or using electricity; or
(F) any other machinery or apparatus connected with or operated by any such boilers, vessels or machines; and including the incidental power to make inspections of, and issue certificates of inspection upon, any such boilers, apparatus, and machinery, whether insured or otherwise.

(10) "Elevator insurance," means insurance against loss of or damage to any property of the insured, resulting from ownership, maintenance or use of elevators, except loss or damage by fire.

(11) "Animal insurance," means insurance against loss of or damage to any domesticated or wild animal resulting from any cause.

(12) "Collision insurance," means insurance against loss of or damage to any property of the insured resulting from collision of any other object with such property, but excluding collision to or by elevators, or to or by vessels, craft, piers or other instrumentalities of ocean or inland navigation.

(13) "Personal injury liability insurance," means insurance against legal liability of the insured, and against loss, damage or expense incident to a claim of such liability (including the insurer's obligation to pay medical, hospital, surgical and disability benefits to injured persons, and funeral and death benefits to dependents, beneficiaries or personal representatives of persons who are killed, irrespective of legal liability of the insured), arising out of death or injury of any person, or arising out of injury to the economic interests of any person, as the result of negligence in rendering expert, fiduciary or professional service, but excluding any kind of insurance specified in paragraph fifteen except insurance to protect an insured against liability for indemnification or contribution to a third party held responsible for injury to the insured's employee arising out of and in the course of employment when such insurance is written pursuant to this paragraph and not written pursuant to paragraph fifteen of this subsection.

(14) "Property damage liability insurance," means insurance against legal liability of the insured, and against loss, damage or expense incident to a claim of such liability, arising

out of the loss or destruction of, or damage to, the property of any other person, but not including any kind of insurance specified in paragraph thirteen, fifteen or twenty-eight of this subsection.

(15) "Workers' compensation and employers' liability insurance," means insurance against the legal liability, under common law or statute or assumed by contract, of any employer for the death or disablement of, or injury to, his employee, including volunteer firefighters' benefit insurance provided pursuant to the volunteer firefighters' benefit law including volunteer ambulance workers' benefit insurance provided pursuant to the volunteer ambulance workers' benefit law and insurance for workers' compensation benefits for death and injuries arising out of crimes provided by the independent livery driver benefit fund pursuant to article six-G of the executive law.

(16) "Fidelity and surety insurance," means:

(A) Guaranteeing the fidelity of persons holding positions of public or private trust; and indemnifying banks, thrifts, brokers and other financial institutions against loss of money, securities, negotiable instruments, other specified valuable papers and tangible items of personal property caused by larceny, misplacement, destruction or other stated perils including loss while being transported in an armored motor vehicle or by messenger; and insurance for loss caused by the forgery of signatures on, or alteration of, specified documents and valuable papers;

(B) Insurance against losses that financial institutions become legally obligated to pay by reason of loss of customers' property from safe deposit boxes;

(C) Any contract bond; including a bid, payment or maintenance bond or a performance bond where the bond is guaranteeing the execution of any contract other than a contract of indebtedness or other monetary obligation;

(D) An indemnity bond for the benefit of a public body, railroad or charitable organization; a lost security or utility payment bond;

(E) Becoming surety on, or guaranteeing the performance of, any lawful contract, not specifically provided for in this paragraph, but does not include becoming surety on, or guaranteeing the performance of:

(i) any insurance contract except as authorized pursuant to section one thousand one hundred fourteen of this article; or
(ii) any contract, if becoming surety on, or guaranteeing the performance of that contract, would constitute:
a. mortgage guaranty insurance as defined in subsection (a) of section six thousand five hundred one of this chapter;
b. financial guaranty insurance as defined in subsection (a) of section six thousand nine hundred one of this chapter; or

C-16

c. service contract reimbursement insurance as defined in paragraph twenty-eight of this subsection;

(F) Becoming surety on, or guaranteeing the performance of, bonds and undertakings required or permitted in all judicial proceedings or otherwise by law allowed, including surety bonds accepted by states and municipal authorities in lieu of deposits as security for the performance of insurance contracts;

(G) Becoming surety on, or guaranteeing the performance of, any agreement for the lease or rental of non-residential real property or tangible personal property, provided that the obligation of the insurer shall not exceed a period of five years, and the bond is not issued directly or indirectly in connection with the sale of securities, a pooling of financial assets or a credit default swap as defined by article sixty-nine of this chapter;

(H) Becoming surety on, or guaranteeing the performance of, a contract of indebtedness or other monetary obligation where: (i) the aggregate gross principal, interest, and other amounts of indebtedness or other monetary obligations of any obligor whose obligations are guaranteed by the insurer under all bonds issued to that obligor pursuant to this subparagraph by the insurer does not exceed ten million dollars; and (ii) the bond is not issued directly or indirectly in connection with the sale of securities, a pooling of financial assets, or a credit default swap as defined by article sixty-nine of this chapter; and (iii) the bond by its terms terminates upon any sale or other transfer of the insured obligation in connection with the sale of securities, a pooling of financial assets, or a credit default swap as defined by article sixty-nine of this chapter;

(I) A depository bond that insures deposits in financial institutions to the extent of the excess over the amount insured by the Federal Deposit Insurance Corporation; and

(J) Becoming surety on, or guaranteeing the performance of, a bond, which shall not exceed a period greater than five years, that guarantees the payment of a premium, deductible, or self-insured retention to an insurer issuing a workers' compensation or liability policy.

In this chapter "fidelity" insurance shall have the meaning set forth in subparagraphs (A) and (B) of this paragraph.

(17) "Credit insurance," means:

(A) Indemnifying merchants or other persons extending credit against loss or damage resulting from non-payment of debts owed to them, for goods and services provided in the normal course of their business, including the incidental power to acquire and dispose of debts so insured, and to collect any debts owed to such insurer or to the insured, but no insurance may be written as credit insurance if it

falls within the definition of financial guaranty insurance as set forth in paragraph one of subsection (a) of section six thousand nine hundred one of this chapter;

(B) Indemnifying any person for expenses disbursed or to be disbursed under a contract in connection with the cancellation of a catered affair;

(C) Indemnifying any person for tuition and other educational expenses disbursed or to be disbursed under a contract in connection with his or her dismissal or withdrawal from an educational institution; or indemnifying elementary or secondary schools, whether public, private, profit or non-profit, providing education in consideration of a tuition charge or fee against loss or damage in the event of non-payment of the tuition charges or fees of a student or pupil dismissed, withdrawn or leaving before the end of the school year for which the insurance is written. An educational institution may not require any person responsible for the payment of a student's or pupil's tuition charge or fee to pay for tuition refund insurance;

(D) Indemnifying an adoptive parent for verifiable expenses not prohibited under the law paid to or on behalf of the birth mother when either one or both of the birth parents of the child withdraw or withhold their consent to adoption. Such expenses may include maternity-connected medical or hospital expenses of the birth mother, necessary living expenses of the birth mother preceding and during confinement, travel expenses of the birth mother to arrange for the adoption of the child, legal fees of the birth mother, and any other expenses which an adoptive parent may lawfully pay to or on behalf of the birth mother. For the purposes of this section "adoptive parent" means the parent or his or her spouse seeking to adopt a child, "birth mother" means the biological mother of the child, "birth parent" means the biological mother or biological father of the child; or

(E) Indemnifying professional sports participants (including any person who participates or expects to participate as a player, coach, manager, trainer, physician or other person directly associated with a player or a team) under contract or the teams with which the contract is made, entertainers under contract to perform or the entities with which the contract is made, or business executives under an employment contract or the entities with which the contract is made, where contracts between such persons and teams or entities cannot be fulfilled due to a sports participant's, entertainer's or business executive's death, personal injury by accident, sickness, ailment or bodily injury that causes disability, where such indemnification is for the amount of financial loss that is sustained by the insured party or parties due to the inability to fulfill the terms of the contract.

(F) Indemnifying any person for expenses disbursed or to be disbursed for a ticket to an event, including any fees, when the person cannot use the ticket and the event does not fully reimburse the person for the expenses or provide a ticket of equal value or a rain check.

(18) "Title insurance," means insuring owners of, and other persons lawfully interested in, real property and chattels real against loss by reason of defective titles and encumbrances and insuring the correctness of searches for all instruments, liens or charges affecting the title to such property, including power to procure and furnish information relative thereto, and such other incidental powers as are specifically granted in this chapter.

(19) "Motor vehicle and aircraft physical damage insurance," means insurance against loss of or damage to motor vehicles or aircraft and their equipment resulting from any cause; and insurance reimbursing a driver for costs including replacement car rental, commercial transportation and accommodations resulting from an automobile accident or mechanical breakdown occurring fifty miles or more from the driver's principal place of residence or garaging.

(20) "Marine and inland marine insurance," means insurance against any and all kinds of loss of or damage to:

(A) Vessels, hulls, craft, aircraft, cars, automobiles, trailers and vehicles of every kind, and all goods, freights, cargoes, merchandise, effects, disbursements, profits, moneys, bullion, precious stones, securities, choses in action, evidences of debt, valuable papers, bottomry and respondentia interests and all other kinds of property and interests therein, in respect to, appertaining to or in connection with any and all risks or perils of navigation, transit, or transportation, including war risks, on or under any seas or other waters, on land or in the air, or while being assembled, packed, crated, baled, compressed or similarly prepared for shipment or while awaiting the same or during any delays, storage, transshipment, or reshipment incident thereto, including marine builder's risks and all personal property floater risks;

(B) Person or property in connection with or appertaining to marine, inland marine, transit or transportation insurance, including liability for loss of or damage to either, arising out of or in connection with the construction, repair, operation, maintenance or use of the subject matter of such insurance (but not including life insurance or surety bonds nor insurance against loss by reason of bodily injury to the person arising out of ownership, maintenance or use of automobiles);

(C) Precious stones, jewels, jewelry, gold, silver and other precious metals, whether used in business or trade or otherwise and whether the same be in course of transportation or otherwise; and

(D) Bridges, tunnels and other instrumentalities of transportation and communication (excluding buildings, their improvements and betterments, furniture and furnishings, fixed contents and supplies held in storage), including auxiliary facilities and equipment attendant thereto; piers, wharves, docks and slips; other aids to navigation and transportation, including dry docks and marine railways.

In this chapter "inland marine" insurance shall not include insurance of vessels, crafts, their cargoes, marine builders' risks, or other similar risks, commonly insured only under ocean marine insurance policies.

(21) "Marine protection and indemnity insurance," means insurance against, or against legal liability of the insured for, loss, damage or expense arising out of, or incident to, the ownership, operation, chartering, maintenance, use, repair or construction of any vessel, craft or instrumentality in use in ocean or inland waterways, including liability of the insured for personal injury, illness or death or for loss of or damage to the property of another person.

(22) "Residual value insurance" means insurance issued in connection with a lease or contract which sets forth a specific termination value at the end of the term of the lease or contract for the property covered by such lease or contract, and which insures against loss of economic value of tangible personal property or real property or improvements thereto except loss due to physical damage to property, excluding any lease or contract that falls within the definition of financial guaranty insurance as set forth in paragraph one of subsection (a) of section six thousand nine hundred one of this chapter.

(23) "Mortgage guaranty insurance," means the kind of insurance specified in section six thousand five hundred one of this chapter.

(24) "Credit unemployment insurance" means insurance on a debtor in connection with a specified loan or other credit transaction within the state to provide payments to a creditor in the event of unemployment of the debtor for the installments or other periodic payments becoming due while a debtor is unemployed.

(25) "Financial guaranty insurance," means the kind of insurance defined in paragraph one of subsection (a) of section six thousand nine hundred one of this chapter.

(26) "Gap insurance" means insurance covering the gap amount which is payable upon the total loss of personal property, which is the subject of a lease or loan or other credit transaction occasioned by its theft or physical damage. The kinds of gap insurance are:

(A) "Motor vehicle lessor/creditor gap insurance" which insures the lessor, creditor, or the lessor's or creditor's assignee, under a motor vehicle lease or loan or other credit transaction pursuant to which the lessor, creditor, or, in the absence of a waiver by the lessor or creditor, the assignee has waived the obligation of the lessee or debtor for the gap amount;

(B) "Motor vehicle lessee/debtor gap insurance" which insures the lessee or debtor under a motor vehicle lease or loan or other credit transaction pursuant to which the lessor, creditor, or the lessor's or creditor's assignee has not waived the obligation of the lessee or debtor for the gap amount;

(C) "Non-motor vehicle lessor/creditor gap insurance" which insures the lessor, creditor, or the lessor's or creditor's assignee, under a lease or loan or other credit transaction covering personal property other than a motor vehicle pursuant to which the lessor, creditor, or, in the absence of a waiver by the lessor or creditor, the assignee, has waived the obligation of the lessee or debtor for the gap amount; and

(D) "Non-motor vehicle lessee/debtor gap insurance" which insures the lessee or debtor under a lease or loan or other credit transaction covering personal property other than a motor vehicle pursuant to which the lessor, creditor, or the lessor's or creditor's assignee has not waived the obligation of the lessee or debtor for the gap amount.

(27) "Prize indemnification insurance," means insurance against financial loss by reason of payment of any sum or item awarded to a participant in any lawful contest or sports related event.

(28) "Service contract reimbursement insurance" means insurance issued to a provider pursuant to article seventy-nine of this chapter whereby the insurer agrees, for the benefit of service contract holders, to discharge the obligations and liabilities of such provider under the terms of the service contracts issued by such provider, including the return of unearned provider fees upon any termination or cancellation of service contracts, in the event of non-performance of any such obligations or liabilities by such provider. Such insurance may also include insurance issued to a provider to indemnify the provider for losses sustained by reason of the performance of such provider's obligations under service contracts issued pursuant to article seventy-nine of this chapter.

(29) "Legal services insurance" means insurance providing legal services or reimbursement of the cost of legal services.

(30) "Involuntary unemployment insurance" means insurance against the loss of income due to the involuntary loss of full-time employment which is the result of an individual or mass layoff or employer termination, a temporary suspension or permanent cessation of employment or a business failure.

(31) "Salary protection insurance" means insurance against financial loss caused by the cessation of earned income due to disability from sickness, ailment or bodily injury, in an amount up to: (A) that portion of an individual's annual earned income which is in excess of the amount of in force disability insurance as defined in paragraph three of this subsection in an amount not to exceed seventy-five percent of the individual's annual earned income in total based upon the sum of the in force disability insurance and salary protection insurance when the benefits are payable to the individual or the individual's beneficiary; or (B) where such underlying disability insurance cannot be obtained by an individual from an authorized insurer, in an amount not to exceed seventy-five percent of the individual's annual earned income when the benefits are payable to the individual or the individual's beneficiary. Any insurer licensed to write disability insurance as defined in paragraph three of this subsection may also write salary protection insurance as defined in this paragraph.

C-21

(32) "Substantially similar kind of insurance," means such insurance which in the opinion of the superintendent is determined to be substantially similar to one of the foregoing kinds of insurance and thereupon for the purposes of this chapter shall be deemed to be included in that kind of insurance.

(b) Nothing herein contained shall require any insurer to insure every kind of risk which it is authorized to insure.

**§ 1116. Prepaid legal services plans and legal services insurance**

(a)

(1) An authorized insurer subject to the provisions of this chapter (except an insurer organized to write the kinds of insurance specified in paragraph eighteen, twenty-three or twenty-five of subsection (a) of section one thousand one hundred thirteen of this article or any corporation licensed or organized pursuant to article sixty-six of this chapter) may, if licensed to transact legal services insurance, as defined in paragraph twenty-nine of subsection (a) of section one thousand one hundred thirteen of this article, be authorized by the superintendent to issue contracts of legal services in connection with a prepaid legal services plan, if such plans satisfy the criteria set forth in subsection (b) of this section and the superintendent makes the determinations set forth in subsection (g) of this section. The provisions of this section shall be applicable to a corporation organized pursuant to article forty-three of this chapter only if the proposed plan and method of operations have been approved by a vote of at least two-thirds of the corporation's board of directors before the plan is submitted to the superintendent.

(2) A prepaid legal services plan may include legal services insurance as part of the plan, provided however, not more than an incidental amount of the premium with respect to such prepaid legal services plan shall be attributable to legal services for defense only coverages for commercial or other business related lawsuits or arbitration proceedings commenced against the business entity that purchased the policy.

(3) Legal services insurance may not be written except (i) in conjunction with prepaid legal services plans as authorized in this section, or (ii) pursuant to a regulation promulgated by the superintendent permitting legal services insurance to be written as part of a policy of liability insurance covering related risks, and provided further, that legal services for defense only coverages for commercial or other business related lawsuits or arbitration proceedings commenced against the business entity that purchased the policy is not more than an incidental part of such liability insurance.

(b) The superintendent may, in accordance with the provisions of article twenty-three of this chapter, authorize the issuance of contracts in connection with a prepaid legal services plan when such plan satisfies the following criteria:

(1) its provisions are not misleading, confusing or inconsistent with the needs of the public;

(2) it avoids interference with judicial supervision over the professional and public obligations of lawyers;

(3) it provides for prompt resolution of grievances concerning benefits;

(4) it does not restrict the beneficiary's choice of attorney, provided, however, that compensation by the plan for attorneys not participating in the plan shall be subject to the schedule of benefits and fee structure set forth in the applicable contract and, provided further, that nothing herein shall be construed as prohibiting an attorney who is not

participating in the plan from charging a fee for services provided in excess of the schedule of benefits or fee structure set forth in the applicable contract;

(5) it provides for a broad range of legal services, through personal and telephone consultations, such as wills, residential real estate matters and domestic relations matters, provided nothing herein shall require or prohibit the offering of a particular type of legal services by a prepaid legal services plan;

(6) it provides for written disclosure to contract holders, including a description of the schedule of benefits, fee structure, exclusions or other limitations on benefits, and an explanation of a covered person's financial responsibility for the payment of premiums, co-payments, deductibles or amounts charged in excess of the schedule of benefits or fee structure by attorneys not participating in a plan;

(7) unless it provides for a shorter period, as provided in [a]*Link to the text of the note paragraph two of subsection (d) of section three thousand four hundred twenty-six of this chapter, or for a longer period, the plan shall be issued or renewed for a one-year policy period;

(8) it may be cancelled by an insurer only if cancellation is based on one or more of the reasons set forth in paragraph one of subsection (c) of section three thousand four hundred twenty-six of this chapter upon no less than fifteen days written notice to a contract holder and shall include no less than a fifteen-day grace period in the event of a cancellation based on non-payment of premium, provided, however, in the event a contract is issued on a group basis, an individual group member may be canceled upon termination of his or her employment with or membership in the group contract holder;

(9) it may be nonrenewed by an insurer for any reason upon at least forty-five, but not more than sixty, days written notice to a contract holder; and

(10) it may be cancelled by a contract holder for any reason upon thirty days written notice to an insurer.

(c) The contracts may be issued on a group basis subject to regulations promulgated by the superintendent.

(d) Such contracts shall be subject to all other applicable provisions of this chapter and regulations thereunder.

(e) The superintendent may permit an authorized insurer subject to the provisions of this section to enter into contracts with any corporation or other organization, which provides or sponsors a prepaid legal services plan not subject to this chapter, to administer such plan if the plan satisfies the criteria set forth in subsection (b) of this section and provided the superintendent makes the determinations set forth in subsection (g) of this section. Such administration may include, but need not be limited to, marketing, actuarial, data processing, accounting, claims and other related

services. Such contracts shall provide for the payment of a reasonable fee for such administrative services.

(f) The superintendent may permit an authorized insurer subject to the provisions of this chapter to reinsure the risk of any prepaid legal services plan as if it were legal services insurance if the plan satisfies the criteria set forth in subsection (b) of this section, provided the superintendent makes the determinations set forth in subsection (g) of this section. Such reinsurance agreements shall provide for the payment of a reasonable premium.

(g) The superintendent may take the actions set forth in subsections (a), (e) and (f) of this section only if the superintendent determines, with respect to each such action, that:

> (1) the sponsors and other participants in the plan can reasonably be anticipated to be able to carry out their responsibilities under the plan, and

> (2) the plan attempts to address the problem that desired legal services are unavailable to some citizens of this state because some individuals and families who are not eligible for government subsidized programs cannot afford the cost of those services, and

> (3) the proposed activity by the authorized insurer will not cause or constitute an impairment of the insurer's ability to satisfy its existing and anticipated contracts and other obligations, including such standards as the superintendent prescribes concerning adequate capital and financial requirements.

(h) The superintendent shall promulgate such regulations that are necessary to implement the provisions of this section.

**§ 2105(a). Excess line brokers; licensing**

(a) The superintendent may issue an excess line broker's license to any person, firm, association or corporation who or which is licensed as an insurance broker under section two thousand one hundred four of this article, or who or which is licensed as an excess line broker in the licensee's home state, provided, however, that the applicant's home state grants non-resident licenses to residents of this state on the same basis, except that reciprocity is not required in regard to the placement of liability insurance on behalf of a purchasing group or any of its members; authorizing such person, firm, association or corporation to procure, subject to the restrictions herein provided, policies of insurance from insurers which are not authorized to transact business in this state of the kind or kinds of insurance specified in paragraphs four through fourteen, sixteen, seventeen, nineteen, twenty, twenty-two, twenty-seven, twenty-eight and thirty-one of subsection (a) of section one thousand one hundred thirteen of this chapter and in subsection (h) of this section, provided, however, that the provisions of this section and section two thousand one hundred eighteen of this article shall not apply to ocean marine insurance and other contracts of insurance enumerated in subsections (b) and (c) of section two thousand one hundred seventeen of this article. Such license may be suspended or revoked by the superintendent whenever in his or her judgment such suspension or revocation will best promote the interests of the people of this state.

**§ 2110. Revocation or suspension of license of insurance producer, insurance consultant, adjuster or life settlement broker**

(a) The superintendent may refuse to renew, revoke, or may suspend for a period the superintendent determines the license of any insurance producer, insurance consultant, adjuster or life settlement broker, if, after notice and hearing, the superintendent determines that the licensee or any sub-licensee has:

>(1) violated any insurance laws, or violated any regulation, subpoena or order of the superintendent or of another state's insurance commissioner, or has violated any law in the course of his or her dealings in such capacity;

>(2) provided materially incorrect, materially misleading, materially incomplete or materially untrue information in the license application;

>(3) obtained or attempted to obtain a license through misrepresentation or fraud;

>(4)
>(A) used fraudulent, coercive or dishonest practices;

>(B) demonstrated incompetence;

>(C) demonstrated untrustworthiness; or

>(D) demonstrated financial irresponsibility in the conduct of business in this state or elsewhere;

>(5) improperly withheld, misappropriated or converted any monies or properties received in the course of business in this state or elsewhere;

>(6) intentionally misrepresented the terms of an actual or proposed insurance contract, life settlement contract or application for insurance;

>(7) has been convicted of a felony;

>(8) admitted or been found to have committed any insurance unfair trade practice or fraud;

>(9) had an insurance producer license, a life settlement broker license, or its equivalent, denied, suspended or revoked in any other state, province, district or territory;

>(10) forged another's name to an application for insurance or life settlement contract or to any document related to an insurance or life settlement transaction;

>(11) improperly used notes or any other reference material to complete an examination for an insurance license or life settlement broker license;

(12) knowingly accepted insurance business from an individual who is not licensed;

(13) failed to comply with an administrative or court order imposing a child support obligation;

(14) failed to pay state income tax or comply with any administrative or court order directing payment of state income tax;

(15) while acting as a public adjuster, the licensee has failed to act on behalf and in the best interests of the insured when negotiating for or effecting the settlement of an insurance claim for such insured or otherwise acting as a public adjuster, or has failed to make the disclosures required by paragraph two of subsection (s) of section two thousand one hundred eight of this article;

(16) while acting as a life settlement broker, failed to protect the privacy of the insured or owner or other person for whom the life settlement broker was required to provide protection pursuant to article seventy-eight of this chapter; or

(17) ceased to meet the requirements for licensure under this chapter.

(b) Before revoking or suspending the license of any insurance producer, life settlement broker or other licensee pursuant to the provisions of this article, the superintendent shall, except when proceeding pursuant to subsection (f) of this section, give notice to the licensee and to every sub-licensee and shall hold, or cause to be held, a hearing not less than ten days after the giving of such notice.

(c) If an insurance producer's license or other licensee's license pursuant to the provisions of this article is revoked or suspended by the superintendent, he shall forthwith give notice to the licensee.

(d) The revocation or suspension of any insurance producer's license or other licensee's license pursuant to the provisions of this article shall terminate forthwith such producer's license or other licensee's license and the authority conferred thereby upon all sub-licensees.

(e)

(1) No individual, corporation, firm or association whose license as an insurance producer or other licensee subject to subsection (a) of this section has been revoked, and no firm or association of which such individual is a member, and no corporation of which such individual is an officer or director, shall be entitled to obtain any license under the provisions of this chapter for a period of one year after such revocation, or, if such revocation be judicially reviewed, for one year after the final determination thereof affirming the action of the superintendent in revoking such license.

(2) If any such license held by a firm, association or corporation be revoked, no member of such firm or association and no officer or director of such corporation shall be entitled to obtain any license, or to be named as a sub-licensee in any such license, for the same

period of time, unless the superintendent determines, after notice and hearing, that such member, officer or director was not personally at fault in the matter on account of which such license was revoked.

(f)

(1) As used in this subsection, "non-resident insurance producer's license or sub-license" means a license or sub-license in such capacity issued pursuant to paragraph five of subsection (g) of section two thousand one hundred three or subsection (e) of section two thousand one hundred four of this article.

(2) A non-resident insurance producer's license or sub-license may be summarily revoked in the event that the licensee's license as an agent, broker, adjuster or in any other capacity under the insurance law of the licensee's home state of domicile or such license of the firm or association of which the licensee is a member, employee or sub-licensee, or such license of the corporation of which the licensee is an officer, director, employee or sub-licensee has been suspended or revoked or renewal thereof denied in the licensee's home state of domicile by a procedure affording to the licensee or it a statutory right to a hearing, for action or conduct which, if it had been established upon a hearing before the superintendent, would have constituted grounds for revocation of a license under subsection (a) of this section.

(3) Before revoking the license of any non-resident insurance producer in accordance with this section, the superintendent shall give ten days' notice in writing to such producer of the action proposed to be taken, which notice shall be given in accordance with the applicable provisions of subsections (a) and (d) of section three hundred three of this chapter.

(4) Upon submission to the superintendent of satisfactory proof that a suspension or revocation of a license issued by a home state to act as an insurance agent, insurance broker, adjuster or in another licensed capacity under the insurance law of such other state or a denial of renewal thereof has been duly withdrawn, set aside, reversed or voided, the superintendent shall thereupon reinstate and restore any and all licenses revoked in accordance with the provisions of this subsection.

(g) If any licensed insurance producer or any person aggrieved shall file with the superintendent a verified complaint setting forth facts tending to show sufficient ground for the revocation or suspension of any insurance producer's license, or if any licensed adjuster or any person aggrieved files with the superintendent a verified complaint setting forth facts showing sufficient grounds for the suspension or revocation of any adjuster's license, the superintendent shall, after notice and a hearing, determine whether such license shall be suspended or revoked.

(h) The superintendent shall retain the authority to enforce the provisions of and impose any penalty or remedy authorized by this chapter against any person or entity who is under investigation for or charged with a violation of this chapter, even if the person's or entity's license or registration has been surrendered, or has expired or has lapsed by operation of law.

(i) A licensee subject to this article shall report to the superintendent any administrative action taken against the licensee in another jurisdiction or by another governmental agency in this state within thirty days of the final disposition of the matter. This report shall include a copy of the order, consent to order or other relevant legal documents.

(j) Within thirty days of the initial pretrial hearing date, a licensee subject to this article shall report to the superintendent any criminal prosecution of the licensee taken in any jurisdiction. The report shall include a copy of the initial complaint filed, the order resulting from the hearing and any other relevant legal documents.

**§ 2116. Insurance brokers; commissions**

[Until Sept 10, 2019] No insurer authorized to do business in this state, and no officer, agent or other representative thereof, shall pay any money or give any other thing of value to any person, firm, association or corporation for or because of his or its acting in this state as an insurance broker, unless such person, firm, association or corporation is authorized so to act by virtue of a license issued or renewed pursuant to the provisions of section two thousand one hundred four of this article. For the purposes of this section, "acting as insurance broker" shall not include the referral of a person to a licensed insurance agent or broker that does not include a discussion of specific insurance policy terms and conditions and where the compensation for referral is not based upon the purchase of insurance by such person.

[Eff Sept 10, 2019] No insurer authorized to do business in this state, and no officer, agent or other representative thereof, shall pay any money or give any other thing of value to any person, firm, association or corporation for or because of his or its acting in this state as an insurance broker, unless such person, firm, association or corporation is authorized so to act by virtue of a license issued or renewed pursuant to the provisions of section two thousand one hundred four of this article.

### § 2117. Acting for or aiding unlicensed or unauthorized insurers or health maintenance organizations

(a) No person, firm, association or corporation shall in this state act as agent for any insurer or health maintenance organization which is not licensed or authorized to do an insurance or health maintenance organization business in this state, in the doing of any insurance or health maintenance organization business in this state or in soliciting, negotiating or effectuating any insurance, health maintenance organization or annuity contract or shall in this state act as insurance broker in soliciting, negotiating or in any way effectuating any insurance, health maintenance organization or annuity contract of, or in placing risks with, any such insurer or health maintenance organization, or shall in this state in any way or manner aid any such insurer or health maintenance organization in effecting any insurance, health maintenance organization or annuity contract.

(b) Notwithstanding the provisions of subsection (a) hereof, any insurance broker licensed under subparagraph (B) of paragraph one of subsection (b) of section two thousand one hundred four of this article may negotiate a contract of insurance, or place insurance, in an insurer not authorized to do business in this state, as follows:

> (1) a contract of reinsurance on risks produced by such broker;

> (2) insurance against loss of or damage to property having a permanent situs outside of this state; and

> (3) marine insurance of the following kind or kinds, where it is reasonable so to do with due regard to the interests of all concerned and whether or not, at the time of such negotiation, the subject matter of such insurance is within or without this state:

>> (A) insurance against perils of navigation, transit or transportation upon hulls, freights or disbursements, or other shipowner interests, goods, wares, merchandise and all other personal property and interests therein, in course of exportation from or importation into any country, or transportation coastwise, including transportation by land or water from point of origin to final destination and including war risks and marine builders' risks; and

>> (B) insurance in connection with ocean going vessels against any of the risks specified in paragraph twenty-one of subsection (a) of section one thousand one hundred thirteen of this chapter.

(c) Notwithstanding the provisions of subsection (a) hereof, any insurance broker licensed under subparagraph (B) of paragraph one of subsection (b) of section two thousand one hundred four of this article may negotiate a contract of insurance or place insurance in an unauthorized insurer as follows:

> (1) insurance against legal liability arising out of the ownership, operation or maintenance of any motor vehicle or aircraft which is neither principally garaged nor principally used in this state, arising out of any activity carried on wholly outside of this state or arising out

of the ownership, operation or maintenance of any property having a permanent situs outside of this state, but in case such property or risk is located in any other state, then only in an insurer authorized to do such business in such state or in an insurer in which a licensed insurance broker of such state may lawfully place such insurance; and

(2) fidelity bonds guaranteeing the fidelity of persons holding or exercising positions of public or private trust wholly outside of this state, and surety bonds guaranteeing or assuming the performance of any contract or other obligation of the kind included under subparagraphs (B) and (C) of paragraph sixteen of subsection (a) of section one thousand one hundred thirteen of this chapter, to be performed wholly outside of this state; but if such positions are held or exercised in another state or if such contract or other obligation is to be performed wholly or partly in another state, then only if such insurance is placed in an insurer authorized to do such business in such state, or in which a licensed broker of such state may lawfully place such insurance.

(d) Notwithstanding the provisions of subsection (a) hereof, any licensed reinsurance intermediary may negotiate a contract of reinsurance, or place reinsurance, in an insurer not authorized to do business in this state.

(e) This section shall not authorize any person, firm, association or corporation to guarantee or otherwise validate or secure the performance or legality of any agreement, instrument or policy of insurance or annuity contract of any insurer not authorized to do business in this state, or to bind risks, validate, effect by countersignature, endorsement or otherwise, any binder, memorandum, cover note, slip, certificate, policy or other instrument of insurance of any insurer not authorized or licensed to do business in this state, or to make binding declarations of risks thereunder, or permit any unauthorized insurer to do any insurance business by its agent acting within this state; but licensed insurance brokers acting pursuant to subsections (b) and (c) hereof may issue to their clients, the insureds, confirmation of insurance so lawfully placed.

(f) This chapter shall not prohibit or prevent an attorney and counsellor at law from representing an unauthorized insurer in litigation or settlement of claims in this state.

(g) Any person, firm, association or corporation violating any provision of this section shall, in addition to any other penalty provided by law, forfeit to the people of the state the sum of five hundred dollars for each transaction.

(h)

(1) This section shall not prohibit any person, firm, association or corporation from acting within the scope of the authority conferred by section two thousand one hundred five of this article.

(2) Notwithstanding subsection (a) of this section, a licensed insurance broker may deliver to the insured an insurance policy or contract procured by any person, firm, association or corporation acting pursuant to the authority conferred by section two thousand one hundred five of this article.

(3) Notwithstanding subsection (a) of this section and any other provision of law to the contrary, any excess line broker licensed pursuant to section two thousand one hundred five of this article may exercise binding authority and execute an authority to bind coverage on behalf of an insurer not licensed or authorized to do business in this state pursuant to the provisions of subsection (f) of section two thousand one hundred eighteen of this article.

(i) Notwithstanding subsection (a) of this section, a licensed insurer may provide, from its office in the state, services to support the insurance business of an unauthorized insurer with which it is affiliated, provided that the unauthorized insurer has satisfied all applicable requirements for placements by excess line brokers as set forth in section two thousand one hundred eighteen of this article. Such services may include, but shall not be limited to, computer operations, clerical and staffing support, underwriting, negotiating contract terms, quoting premiums, binding coverage, drafting and issuing policies and claims handling, investigation and payment, among other incidental services. Services expressly prohibited under this section include the marketing, soliciting or advertising by the unauthorized insurer directly to policyholders. Notwithstanding paragraph two of subsection (a) of section two thousand one hundred twenty-two of this article, such unauthorized insurers shall be permitted to advertise to, and market and solicit through, excess line brokers licensed pursuant to section two thousand one hundred five of this article, from an office within the state. All obligations of such licensee under this article shall remain in full force and effect. Any document issued by an unauthorized insurer that indicates any location within this state in which it conducts its operations shall include a prominent notice that the insurer is not licensed by the state of New York, in no smaller than 10 point type, in accordance with regulations as may be promulgated by the superintendent.

(j) Nothing in this section shall prohibit a person who is not a resident of this state from selling, soliciting or negotiating a property/casualty insurance contract of an insurer not authorized to do business in this state, provided that: (1) the insured's home state is a state other than this state; and (2) the person is licensed to sell, solicit or negotiate excess line insurance in the insured's home state.

(k)

(1) Notwithstanding subsection (a) of this section, any insurance broker licensed under subparagraph (A) of paragraph one of subsection (b) of section two thousand one hundred four of this article with respect to life insurance or annuities, subparagraph (A) or (B) of paragraph one of subsection (b) of such section with respect to accident and health insurance, or subparagraph (B) of this paragraph with respect to property/casualty insurance may engage in the activities specified in paragraph two of this subsection with respect to an alien insurer not authorized to do an insurance business in this state, provided that:

(A) the activities relate to a policy or contract of group life, group annuity, group accident and health insurance, or property/casualty insurance where the policyholder or proposed policyholder is a multinational entity resident outside the United States, the policy or contract covers the multinational entity's liabilities, properties, employees and their dependents, and the liabilities arise, or the properties and employees reside outside of the United States, except that the policy

or contract may provide coverage to employees who are temporarily inside the United States;

(B) the policy or contract shall not be underwritten or negotiated in this state or issued or delivered in the United States;

(C) the alien insurer is authorized to transact the kinds of insurance business in the jurisdictions where the policies or contracts will be issued or delivered and the policies or contracts are issued in conformance with the laws of such jurisdictions;

(D) before engaging in any of the activities specified in paragraph two of this subsection, the licensed insurance broker provides written notice to the multinational entity that the alien insurer is not licensed in or authorized to do business in this state; the policy or contract is not protected by the New York state guaranty funds; the policy or contract has not been approved by the superintendent; and the policy or contract may not be subject to all of the laws of this state;

(E) the alien insurer shall not maintain any office in this state; and

(F) except as specifically provided in this section, the licensed insurance broker shall not call attention to the alien insurer by any advertisement or public announcement in this state.

(2) Subject to paragraph one of this subsection, the licensed insurance broker may engage in this state in only the following activities with respect to the alien insurer:

(A) provide information to the multinational entity with respect to a policy or contract of group life, group annuity, group accident and health insurance, or a property/casualty insurance policy issued or delivered or that will be issued or delivered by the alien insurer;

(B) meet and discuss insurance needs with the multinational entity, including providing information directly to the entity in person or otherwise about the policies or contracts offered by the alien insurer; and facilitating introductions with the multinational entity's human resources and benefits manager in each country in which the multinational entity has employee benefit needs;

(C) refer the multinational entity to the alien insurer and provide information to the multinational entity about the alien insurer;

(D) respond to requests for information by representatives of the multinational entity concerning quotes and any other specific terms and conditions of a group life, group annuity, group accident and health insurance, or property/casualty insurance policy or contract being negotiated in the jurisdiction where the policy or contract will be issued or delivered by the alien insurer;

(E) provide information concerning renewals of existing policies or contracts of group life, group annuity, group accident and health insurance, or a property/casualty insurance policy issued by the alien insurer; and

(F) manage the employee benefits program of the multinational entity, including aggregating and reporting employee benefits and financial information about the program.

(3) Any activity in which a licensed insurance broker engages with respect to an alien insurer pursuant to this subsection shall be deemed to be included within the meaning of "any other transaction of business" for the purposes of section one thousand two hundred thirteen of this article.

(4) For purposes of this subsection:

(A) "multinational entity" shall mean an institution that is a member of a multinational group of institutions operating globally where: (i) at least one institution in the group is formed under the laws of the United States or has significant operations in the United States; and (ii) at least one institution in the group has offices outside the United States; and

(B) "group of institutions" shall mean a parent corporation and its subsidiaries.

## § 2118. Excess line brokers; duties

(a)

(1) Every licensee licensed pursuant to section two thousand one hundred five of this article shall be required to use due care in selecting the unauthorized insurer from whom policies are procured under his license.

(2)

(A) No policy of insurance may be procured by a licensee from any foreign or alien insurer which is controlled, by a foreign government or by a political subdivision thereof, or which is an agency of any such government or subdivision if the superintendent determines that: (i) such insurer receives a subsidy or other competitive advantage, as a result of such control or status, that would enable it to compete unfairly with similarly situated insurers which are not so controlled or constituted; (ii) such insurer is entitled to claim sovereign immunity as a result of such control and the insurer has not waived the sovereign immunity; or (iii) the use of such insurer would be detrimental to the interests of the people of this state.

(B) No licensee shall be deemed to be in noncompliance with this subsection unless: (i) the superintendent has made a prior determination that the foreign or alien insurer from which the licensee procured a policy of insurance should not be used as an excess line insurer in this state in accordance with the provisions of this subsection; or (ii) the licensee knew or should have known that such insurer should not be used as an excess line insurer in accordance with the provisions of this subsection. The superintendent may promulgate regulations to provide guidance to the licensee.

(C) Every such insurer shall otherwise satisfy all applicable requirements for placement by an excess line broker.

(b) [Until July 1, 2019]

(1) Within forty-five days after a policy is procured, a licensee shall submit the declarations page or cover note of every policy procured under his or her license to the excess line association established pursuant to section two thousand one hundred thirty of this article for recording and stamping. In the event that no declarations page or cover note is available to the licensee, within forty-five days after the policy is procured, the licensee shall submit a binder to the excess line association in lieu of such declarations page or cover note. In the event that a binder is submitted to the excess line association, the licensee shall submit the declarations page or cover note to the excess line association promptly upon receipt. Every insurance document submitted to the excess line association pursuant to this subsection shall set forth:

(A) the name and address of the insured;
(B) the gross premium charged;
(C) the name of the unauthorized insurer; and

(D) the kind of insurance procured.

(2) Subsequent endorsements which do not affect the premium charged are exempted from stamping.

(3)

(A) Except as provided in subparagraph (F) of this paragraph, submission of insurance documents to the excess line association shall be accompanied by a statement subscribed to, and affirmed by, the licensee or sublicensee as true under the penalties of perjury that, after diligent effort, the full amount of insurance required could not be procured, from authorized insurers, each of which is authorized to write insurance of the kind requested and which the licensee has reason to believe might consider writing the type of coverage or class of insurance involved, and further showing that the amount of insurance procured from an unauthorized insurer is only the excess over the amount procurable from an authorized insurer. The licensee, however, shall be excused from affirming that a diligent effort, as defined above, was made to procure the coverage from authorized insurers if the licensee's affidavit is accompanied by the affidavit of another broker involved in the placement affirming as true under the penalties of perjury that, after diligent effort by the affirming broker, the required insurance could not be procured from an authorized insurer which the affirming broker had reason to believe might consider writing the type of coverage or class of insurance involved. The licensee and the affirming broker shall be excused from affirming that a diligent effort was made if the superintendent determines, pursuant to paragraph four of this subsection, that no declinations are required.

(B) A licensee or affirming broker shall be considered to have the reason to believe required by subparagraph (A) of this paragraph if the decision to offer the risk to the authorized insurer was based on any of the following:

(i) Recent acceptance by the authorized insurer of a type of coverage or class of insurance similar to that for which coverage is presently being sought;

(ii) Advertising by the authorized insurer or its agent indicating that the authorized insurer is willing to consider acceptance of this or a similar type of coverage or class of insurance;

(iii) Media communications (i.e., newspaper or magazine articles, trade publications, television and radio programming) indicating that the authorized insurer is writing, or is considering writing, this type of coverage or class of insurance;

(iv) Communications with other insurance professionals, risk managers, trade associations, the excess line association or the department of financial

services which indicates that the authorized insurer might consider writing this type of coverage or class of insurance; or

(v) Any other valid basis for making such decision.

(C) Every licensee, or affirming broker, in connection with the placement of each risk pursuant to this section, shall record on the affidavit required pursuant to subparagraph (A) of this paragraph the information relied upon that formed the basis of such licensee's or affirming broker's reason to believe that the authorized insurer might consider writing the type of coverage or class of insurance involved.

(D) Declinations obtained from authorized insurers which are affiliates of, or, as defined in article fifteen of this chapter, under common control with, each other or the unauthorized insurer shall not meet the requirements of this subsection unless such related insurers operate as distinct and autonomous entities, and for underwriting purposes, compete with each other for the same type of coverage or class of insurance.

(E) The superintendent, in a regulation, may determine whether there are circumstances where it may be appropriate, due to the unavailability from an authorized insurer of the leading type of coverage or the leading class of insurance required by the insured, to waive the requirement in subparagraph (A) of this paragraph that a licensee may procure from an unauthorized insurer only the amount of insurance which is excess over the amount procurable from an authorized insurer, and to instead permit the licensee to procure from an unauthorized insurer the full amount of insurance required by the insured.

(F) A licensee seeking to procure or place insurance in this state for an exempt commercial purchaser shall not be required to satisfy any requirement of this state to make a due diligence search to determine whether the full amount or type of insurance sought by the exempt commercial purchaser can be obtained from authorized insurers if:

(i) the licensee procuring or placing the excess line insurance has disclosed to the exempt commercial purchaser that the insurance may or may not be available from the authorized market that may provide greater protection with more regulatory oversight; and

(ii) the exempt commercial purchaser has subsequently requested in writing that the licensee procure or place the insurance from an unauthorized insurer.

(4) The number of declinations constituting diligent effort in regard to placement of coverage with authorized insurers for purposes of paragraph three of this subsection shall be three, unless the superintendent after a hearing, on a record, upon findings and conclusions, determines that another number of such declinations is appropriate in regard

to particular coverages. In making such determinations, the superintendent shall consider relevant market conditions, including unavailability of particular coverages from authorized insurers, and may conduct market surveys. Any such determination shall be reviewed at least annually by the superintendent.

(5) Before placing business with an unauthorized insurer, each licensee shall ascertain and verify the fact that such insurer is authorized in its domiciliary jurisdiction to write the insurance policy proposed to be procured from it by the licensee. No unauthorized insurer shall be deemed unacceptable for placement of business solely on the ground that it has been so authorized to write such business in its domiciliary jurisdiction for a period of less than three years preceding the placement of such risk by the licensee. In determining whether business may be placed with such unauthorized insurer, the superintendent shall consider such factors as: the interests of the public and policyholders, the length of time such insurer has been authorized in its domiciliary jurisdiction and elsewhere, its financial condition, and unavailability of particular coverages from authorized insurers.

(6) It shall be unlawful for a licensee as defined in section two thousand one hundred one of this article and pursuant to sections two thousand one hundred four and two thousand one hundred five of this article to deliver in this state any declarations page of an insurance policy or cover note evidencing insurance unless such insurance document is stamped by the excess line association or is exempt from such requirements; provided, however, that a licensee's failure to comply with the requirements of this subsection shall not affect the validity of the coverage.

(7) Compliance by a licensee with the requirements set forth in this section in connection with submitting for recording and stamping declarations pages, cover notes, binders, endorsements, affidavits, notices of excess line placement and other excess line insurance documents may be accomplished by means of electronic or other media transmission, provided the superintendent first approves such methods of submitting for recording and stamping.

(b) [Eff July 1, 2019]

(1) When any policy of insurance is procured under the authority of a license issued pursuant to section two thousand one hundred five of this article, there shall be submitted, both by the licensee or sub-licensee and by the insured, statements subscribed and affirmed by them as true under the penalties of perjury setting forth facts showing that such insured and such licensee were unable after diligent effort to procure, from authorized insurers, each authorized to write coverages of the kind requested, the full amount of insurance required to protect the interest of such insured, and further showing that the amount of insurance procured from an unauthorized insurer or insurers is only the excess over the amount so procurable from authorized insurers; provided, however, that the licensee shall be excused from affirming that a diligent effort was made to procure the coverage from such authorized insurers if the licensee's affidavit is accompanied by the affidavit of another broker involved in the placement affirming as true under the penalties of perjury that, after diligent effort by the affirming broker, the required insurance could not be procured from such authorized insurers.

(2) The number of declinations constituting diligent effort in regard to placement of coverage with authorized insurers for purposes of paragraph one of this subsection shall be three, unless the superintendent after a hearing, on a record, upon findings and conclusions, determines that another number of such declinations is appropriate in regard to particular coverages. In making such determinations, the superintendent shall consider relevant market conditions, including unavailability of particular coverages from authorized insurers, and may conduct market surveys. Any such determination shall be reviewed at least annually by the superintendent.

(3) Before placing business with an unauthorized insurer, each licensee shall ascertain and verify the fact that such insurer is authorized in its domiciliary jurisdiction to write the insurance policy proposed to be procured from it by the licensee. No unauthorized insurer shall be deemed unacceptable for placement of business solely on the ground that it has been so authorized to write such business in its domiciliary jurisdiction for a period of less than three years preceding the placement of such risk by the licensee. In determining whether business may be placed with an unauthorized insurer, the superintendent shall consider such factors as: the interests of the public and policyholders, the length of time such insurer has been authorized in its domiciliary jurisdiction and elsewhere, its financial condition, and unavailability of particular coverages from authorized insurers.

(4) The statements required pursuant to paragraph one of this subsection shall be filed by such licensee with the superintendent within thirty days after such policies have been procured.

(c) [Until July 1, 2019]

(1) The licensee shall keep a complete and separate record of all policies procured from unauthorized insurers under such license. The licensee shall also maintain files supporting declinations by authorized insurers. An authorized insurer need not maintain underwriting submissions or other records with respect to any declination, unless the superintendent, after a hearing on a record, finds substantial abuses of the provisions of this section and determines that recordkeeping or reporting requirements in regard to authorized insurers are necessary to redress or eliminate such abuses.

(2) Such records shall be open to examination by the excess line association as provided for in section two thousand one hundred thirty of this article and by the superintendent, as provided in section three hundred ten of this chapter, at all reasonable times and shall show:

(A) the exact amount of each kind of insurance permitted under this section which has been procured for each insured;

(B) the gross premiums charged by the insurers for each kind of insurance permitted under this section;

(C) the amount of each kind of premiums of insurance permitted by this section which were returned to each insured;

C-41

(D) the name of the insurer or insurers which issued each of said policies;

(E) the effective dates of such policies;

(F) the terms for which they were issued; and

(G) the cities and villages within this state in which the insured risks, respectively, are located.

(c) [Eff July 1, 2019]

(1) The licensee shall keep a complete and separate record of all policies procured from unauthorized insurers under such license. The licensee shall also maintain files supporting declinations by authorized insurers. An authorized insurer need not maintain underwriting submissions or other records with respect to any declination, unless the superintendent, after a hearing on a record, finds substantial abuses of the provisions of this section and determines that recordkeeping or reporting requirements in regard to authorized insurers are necessary to redress or eliminate such abuses. The superintendent shall review recordkeeping requirements applicable to this section and, by October first, nineteen hundred eighty-six, shall take measures in order to simplify forms and other aspects of compliance with such requirements.

(2) Such records shall be open to examination by the superintendent, as provided in section three hundred ten of this chapter, at all reasonable times and shall show:

(A) the exact amount of each kind of insurance permitted under this section which has been procured for each insured;

(B) the gross premiums charged by the insurers for each kind of insurance permitted under this section;

(C) the amount of each kind of premiums of insurance permitted by this section which were returned to each insured;

(D) the name of the insurer or insurers which issued each of said policies;

(E) the effective dates of such policies;

(F) the terms for which they were issued; and

(G) the cities and villages within this state in which the insured risks, respectively, are located.

(d)

(1) Where this state is the insured's home state, a person, firm, association or corporation licensed pursuant to the provisions of section two thousand one hundred five of this article shall pay to the superintendent a sum equal to three and six-tenths percent of the gross premiums charged the insureds by the insurers for insurance procured by such licensee pursuant to such license, less the amount of such premiums returned to such insureds.

(2) The amount of such payments which represents a sum equal to three percent of fire insurance premiums shall be distributed by the superintendent as prescribed in section nine thousand one hundred five of this chapter, and the balance thereof shall be paid over by the superintendent to the state treasurer.

(3) Such licensee shall be required to make such payments to the superintendent on the fifteenth day of March of each year for the taxes on all policies procured by such licensee, pursuant to such license, during the next preceding calendar year, and on such date such licensee shall also file with the superintendent a return in the form prescribed by the superintendent, showing such information as may be necessary for the proper distribution of such payments.

(e)

(1) Except as provided in paragraph two of this subsection, no licensee shall be required to obtain a declination from an association established pursuant to article fifty-four or fifty-five of this chapter, or to apply for insurance through a plan established pursuant to article fifty-three of this chapter, as a condition of procuring insurance pursuant to this section.

(2)

(A) Unless the licensee obtains a declination from the appropriate association, or from an insurer pursuant to an application for coverage through a plan, no diligent effort shall be considered to have been made if the insurance is available from the plan or association in connection with the placement of:

(i) a policy of non-commercial motor vehicle liability insurance;

(ii) medical malpractice insurance for a general hospital, as defined in subdivision ten of section two thousand eight hundred one of the public health law, a physician or dentist; or

(iii) insurance which by law must be provided by an authorized insurer.

(B) In connection with the placement of any other kind of insurance, a declination from the appropriate association, or from an insurer pursuant to an application for coverage through a plan, shall be required unless prior to the placement the insured has been advised of the availability of insurance from the plan or association.

(C) The affirming broker shall provide written notice to the insured that the placement was made with an unauthorized insurer. A copy of this notice shall be attached to the affirming broker's affidavit. The affidavits required by this section

to be completed by the affirming broker shall include a statement that the affirming broker advised the insured in writing:

(i) that the unauthorized insurer with which the coverage is being placed is not authorized to do an insurance business in this state and is not subject to supervision by this state;

(ii) that in the event of the insolvency of the unauthorized insurer, losses will not be covered by any New York state insolvency fund;

(iii) that the policy may not be subject to all of the regulations of the superintendent pertaining to policy forms; and

(iv) such other information as the superintendent may, by regulation, require.

(f)

(1) An excess line broker licensed pursuant to section two thousand one hundred five of this article may execute an authority to bind coverage and may exercise binding authority on behalf of an insurer not licensed or authorized to do business in this state pursuant to the provisions of this subsection.

(2) As used in this subsection:

(A) an "authority to bind coverage" means the written agreement between an excess line broker and an insurer not licensed or authorized to do business in this state and shall set forth the terms, conditions, and limitations governing the exercise of binding authority by the excess line broker;

(B) a "binder" means written evidence of a temporary insurance contract; and

(C) "binding authority" means the authority to issue and deliver binders, and to issue and deliver insurance policies on behalf of an insurer not licensed or authorized to do business in this state.

(3)

(A) Every excess line broker who exercises binding authority shall have filed an authority to bind coverage, the contents of which shall not be public, with the excess line association established pursuant to section two thousand one hundred thirty of this article.

(B) Such authority shall be valid until (i) terminated by the appointing insurer after termination in accordance with the contract between the broker and the insurer; (ii)

the excess line license is suspended or revoked by the superintendent; or (iii) the excess line license expires and is not renewed.

(4) Notwithstanding any other provision of law to the contrary, the execution or filing of an authority to bind coverage and the exercise of binding authority by an authorized excess line broker shall not constitute the doing of insurance business by an insurer not licensed or authorized to do business in this state.

(5) Any coverage so written must be in compliance with this section.

(6) Every binder shall contain a description and location of the subject of insurance, coverage, conditions and term of insurance, the premium, the name and address of the excess line broker, the name and address of the producing broker, the name of the insurer and the name and address of the insured.

(7) Any binding authority agreement made and filed pursuant to this section may authorize an excess line broker to bind coverage for risks located within or outside of the state of New York, notwithstanding any other provision of this chapter.

(8) Any binding authority agreement made and filed pursuant to this section may authorize an excess line broker to issue notice of cancellation of any insurance policy bound pursuant to such agreement (A) for non-payment of premium, (B) for a material increase in the hazard insured, or (C) upon discovery of a material misrepresentation in the application for insurance. The excess line broker shall not be deemed an agent of the insurer solely for issuing such notice of cancellation.

### § 2119. Insurance agents, brokers, consultants, life settlement brokers, and title insurance agents; written contract for compensation; excess charges prohibited

(a)

(1) No person licensed as an insurance agent, broker or consultant may receive any fee, commission or thing of value for examining, appraising, reviewing or evaluating any insurance policy, bond, annuity or pension or profit-sharing contract, plan or program or for making recommendations or giving advice with regard to any of the above, unless such compensation is based upon a written memorandum signed by the party to be charged and specifying or clearly defining the amount or extent of such compensation.

(2) A copy of every such memorandum or contract shall be retained by the licensee for not less than three years after such services have been fully performed.

(b)

(1) No person licensed as an insurance agent, broker or a consultant may receive any compensation, direct or indirect, as a result of the sale of insurance or annuities to, or the use of securities or trusts in connection with pensions for, any person to whom any such licensee has performed any related consulting service for which he has received a fee or contracted to receive a fee within the preceding twelve months unless such compensation is provided for in the memorandum or contract required pursuant to subsection (a) hereof.

(2) This chapter shall not prohibit the offset, in whole or in part, of compensation payable under subsection (a) hereof by compensation otherwise payable to such consultant as agent or broker as a result of such sale of insurance or annuities or the use of securities or trusts in connection with pensions, if any such offset is provided for in the written memorandum or contract required under subsection (a) hereof.

(c)

(1) No insurance broker may receive any compensation, other than commissions deductible from premiums on insurance policies or contracts, from any insured or prospective insured for or on account of the sale, solicitation or negotiation of, or other services in connection with, any contract of insurance made or negotiated in this state or for any other services on account of such insurance policies or contracts, including adjustment of claims arising therefrom, unless such compensation is based upon a written memorandum, signed by the party to be charged, and specifying or clearly defining the amount or extent of such compensation.

(2) A copy of every such memorandum shall be retained by the broker for not less than three years after such services have been fully performed.

(3) This subsection shall not affect the right of any such broker to recover from the insured the amount of any premium or premiums for insurance effectuated by or through such broker.

(4) This subsection shall not affect the requirements of subsection (a) or (b) hereof, subsection (g) of section two thousand one hundred one or section two thousand one hundred eight of this article.

(d) No insurance broker shall, in connection with the sale, solicitation or negotiation, issuance, delivery or renewal in this state of any contract of insurance made or negotiated in this state, directly or indirectly charge, or receive from, the insured or prospective insured therein any greater sum than the rate of premium fixed therefor by the insurer obligated as such therein, unless such broker has a right to compensation for services created in the manner specified in subsection (c) of this section.

(e)

(1) No person licensed as a life settlement broker may receive any compensation for examining, appraising, reviewing or evaluating any life settlement contract or for making recommendations or giving advice with regard to such contract; or receive any compensation from any owner or proposed owner for or on account of the solicitation or negotiation of, or other services in connection with, any life settlement contract subject to this chapter or for any other services on account of such contract; unless such compensation is based upon a written memorandum signed by the party to be charged and specifying or clearly defining the amount or extent of such compensation. A copy of every such memorandum shall be retained by the licensee for not less than three years after such services have been fully performed.

(2) No person licensed as a life settlement broker may receive any compensation, direct or indirect, for or on account of the solicitation or negotiation of, or other services in connection with a life settlement contract subject to this chapter from any person for whom any such licensee has performed any related consulting service for which the licensee has received a fee or contracted to receive a fee within the preceding twelve months unless such compensation is provided for in the written memorandum required pursuant to paragraph one of this subsection.

(3) No person licensed as a life settlement broker may receive any compensation, direct or indirect, from a life settlement provider or any other person with respect to any life settlement contract if the life settlement broker has already received or will receive compensation, direct or indirect from, or on behalf of, the owner with respect to that life settlement contract.

(f) No title insurance agent may receive any compensation or fee, direct or indirect, for or on account of services performed in connection with the issuance of a title insurance policy, unless such compensation is: (1) for ancillary services not encompassed in the rate of premium approved by the superintendent; and (2) based upon a written memorandum signed by the party to be

charged, and specifying or clearly defining the amount or extent of such compensation to be charged for each ancillary service as well as the total amount or extent of the compensation to be charged. A copy of every such memorandum shall be retained by the licensee for not less than three years after such services have been fully performed. For purposes of this subsection, legal services performed by a New York state licensed attorney who is also engaged as a title insurance agent shall not be considered ancillary services.

### § 2120. Fiduciary capacity of insurance agents, title insurance agents, insurance brokers and reinsurance intermediaries

(a) Every insurance agent, title insurance agent, and insurance broker acting as such in this state shall be responsible in a fiduciary capacity for all funds received or collected as insurance agent or insurance broker, and shall not, without the express consent of his, her or its principal, mingle any such funds with his, her or its own funds or with funds held by him, her or it in any other capacity.

(b) Every reinsurance intermediary acting as such in this state shall be responsible, in a fiduciary capacity for all funds received or collected in such capacity, and shall not, without the express consent of his or its principal or principals, mingle any such funds with his or its own funds or with funds held by him or it in any other capacity.

(c) This section shall not require any such insurance agent, title insurance agent, insurance broker or reinsurance intermediary to maintain a separate bank deposit for the funds of each such principal, if and as long as the funds so held for each such principal are reasonably ascertainable from the books of account and records of such agent, broker or reinsurance intermediary, as the case may be.

(d) A retail insurance producer who violates paragraph (a) of subdivision two of section five hundred seventy-seven-a of the banking law shall be liable for actual damages for the failure to notify, in writing, the premium finance agency of the information required pursuant to such paragraph (a).

### § 2122. Advertising by insurance producers

(a)

     (1) No insurance producer shall make or issue in this state any advertisement, sign, pamphlet, circular, card or other public announcement purporting to make known the financial condition of any insurer, unless the same shall conform to the requirements of section one thousand three hundred thirteen of this chapter.

     (2) No insurance producer or other person, shall, by any advertisement or public announcement in this state, call attention to any unauthorized insurer or insurers.

(b) Every agent of any insurer and every insurance broker shall, in all advertisements, public announcements, signs, pamphlets, circulars and cards, which refer to an insurer, set forth therein the name in full of the insurer referred to and the name of the city, town or village in which it has its principal office in the United States.

### § 2123. Misrepresentations, misleading statements and incomplete comparisons

(a)

(1) No agent or representative of any insurer or health maintenance organization authorized to transact life, accident or health insurance or health maintenance organization business in this state, insurance broker, person who has received a grant from and has been certified by the health benefit exchange established pursuant to section 1311 of the Affordable Care Act, 42 U.S.C. § 18031, to act as a navigator, including any person employed by a certified navigator, or other person, firm, association or corporation, shall issue or circulate or cause or permit to be issued or circulated, any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any policy or contract of life, accident or health insurance, any annuity contract or any health maintenance organization contract, delivered or issued for delivery or to be delivered or issued for delivery, in this state, or shall make any misleading estimate as to the dividends or share of surplus or additional amounts to be received in the future on such policy or contract, or shall make any false or misleading statement as to the dividends or share of surplus or additional amounts previously paid by any such insurer or health maintenance organization on similar policies or contracts, or shall make any misleading representation, or any misrepresentation, as to the financial condition of any such insurer or health maintenance organization, or as to the legal reserve system upon which such insurer or health maintenance organization operates.

(2) No such person, firm, association or corporation shall make to any person or persons any incomplete comparison of any such policies or contracts of any insurer, insurers, or health maintenance organization, for the purpose of inducing, or tending to induce, such person or persons to lapse, forfeit or surrender any insurance policy or health maintenance organization contract.

(3) Any replacement of individual life insurance policies or individual annuity contracts of an insurer by an agent, representative of the same or different insurer or broker shall conform to standards promulgated by regulation by the superintendent. Such regulation shall:

(A) specify what constitutes the replacement of a life insurance policy or annuity contract and the proper disclosure and notification procedures to replace a policy or contract;

(B) require notification of the proposed replacement to the insurer whose policies or contracts are intended to be replaced;

(C) require the timely exchange of illustrative and cost information required by section three thousand two hundred nine of this chapter and necessary for completion of a comparison of the proposed and replaced coverage; and

(D) provide for a sixty-day period following issuance of the replacement policies or contracts during which the policy or contract owner may return the policies or contracts and reinstate the replaced policies or contracts.

(b) Any comparison of the policies or contracts of any such insurer, insurers or health maintenance organization shall be deemed to be an incomplete comparison if it does not conform to all the requirements for comparisons established by regulation.

(c) In the determination, judicial or otherwise, of the incompleteness or misleading character of any such comparison, it shall not be presumed that the insured knew or knows of any of the provisions, terms or benefits contained in any insurance policy or health maintenance organization contract.

(d) Any agent or representative of an insurer or health maintenance organization, insurance broker, person who has received a grant from and has been certified by the health benefit exchange established pursuant to section 1311 of the affordable care act, 42 U.S.C. § 18031, to act as a navigator, including any person employed by a certified navigator, or any other person, firm, association or corporation who, or which, shall violate any of the provisions of this section and shall knowingly receive any compensation or commission for the solicitation, sale or negotiation of any insurance policy, health maintenance organization or annuity contract induced by a violation of this section shall also be liable for a civil penalty in the amount received by such violator as compensation or commission, which penalty may be sued for and recovered for his, her, or its own use and benefit by any person induced to purchase an insurance policy, health maintenance organization or annuity contract by such violation. In addition, such agent, representative, broker, person, firm, association or corporation violating this section shall be liable for a civil penalty in the amount of any compensation or commission lost by any agent, representative or broker as a result of a violation of this section or the making of such false or misleading statement, which penalty may be sued for and recovered for his, her, or its own use and benefit by such agent, representative or broker.

(e) [Expires and repealed Sept 10, 2019] Except with respect to a credit unemployment insurance policy, group credit life insurance policy, a group credit health, group credit accident or group credit health and accident policy, or similar group credit insurance covering the person of the insured, state chartered banking institutions, federally chartered banking institutions and any person soliciting the purchase of or selling insurance on the premises thereof, must disclose or cause to be disclosed in writing, where practicable, in clear and concise language, to their customers and prospective customers who are solicited therefor, that any insurance offered or sold:

(1) is not a deposit;

(2) is not insured by the federal deposit insurance corporation or the national credit union share insurance fund, as applicable; and

(3) is not guaranteed by the state chartered banking institution or the federally chartered banking institution.

C-52

(f) [Expires and repealed Sept 10, 2014 (see 1997 note below)] For the purposes of this section, the terms "state chartered banking institutions" and "federally chartered banking institutions" shall have the same meanings as set forth in subdivision one of section twelve-a of the banking law.

**§ 2128. Commission and fee sharing prohibited**

(a) Notwithstanding the provisions of sections two thousand three hundred twenty-four and four thousand two hundred twenty-four of this chapter, no licensee subject to this article shall receive any commissions or fees or shares thereof in connection with insurance coverages placed for or insurance services rendered to the state, its agencies and departments, public benefit corporations, municipalities and other governmental subdivisions in this state, unless such licensee actually placed insurance coverages on behalf of or rendered insurance services to the state, its agencies and departments, public benefit corporations, municipalities and other governmental subdivisions in this state.

(b) The superintendent shall, by regulation, require licensees subject to this article to file disclosure statements with the department of financial services and the most senior official of the governmental unit involved, with respect to any insurance coverages placed for or insurance services rendered to the state, its agencies and departments, public benefit corporations, municipalities and other governmental subdivisions in this state, except that neither a title insurance corporation nor a title insurance agent shall be required to file a disclosure statement if an industrial development agency, state of New York mortgage agency or its successor, or any similar type of entity, is the named insured under the policy and is a mortgagee with respect to the property insured.

### § 2307. Rating classifications or territories; policy forms

(a) No insurer or rate service organization shall use a rating classification or territory unless it has been filed with the superintendent and either he has approved it, or ninety days have elapsed and he has not disapproved it as unfairly discriminatory or violative of public policy.

(b) Except as otherwise provided herein, no policy form shall be delivered or issued for delivery unless it has been filed with the superintendent and either he has approved it, or thirty days have elapsed and he has not disapproved it as misleading or violative of public policy. After notice and hearing to the insurer or rate service organization which submitted a policy form for approval, the superintendent may withdraw approval of such form on finding that the use of such form is contrary to the legal requirements applicable at the time of withdrawal. The effective date of the withdrawal of approval shall be prescribed by the superintendent but shall be not less than ninety days after notice of withdrawal. With regard to residual value insurance, policy forms and any amendments thereto shall be filed with the superintendent within thirty days of their use by the insurer. For purposes of this subsection, "residual value insurance" shall have the same meaning as set forth in paragraph twenty-two of subsection (a) of section one thousand one hundred thirteen of this chapter, provided however, for the purposes of this subsection such insurance shall only be utilized for commercial purposes, and shall not include personal lines of insurance as defined in paragraph two of subsection (a) of section three thousand four hundred twenty-five of this chapter or any commercial auto insurance, and, provided further that applicants for such insurance shall sign a statement that the applicant has an appropriate level of knowledge and understanding of the use of residual value insurance.

(c) [For expiration date, see § 2342] With respect to kinds of insurance or insurance activities the rates for which, pursuant to subsection (a) of section two thousand three hundred five of this article, are not subject to prior approval, any requirement in subsections (a) and (b) of this section of filing with or prior approval by the superintendent may be waived by regulation adopted by the superintendent after a public hearing.

(d) All policy forms and rating classifications and territories filed with the superintendent shall be available for public inspection at the department.

(e) Policy forms for inland marine risks where the rates for such risks by general custom of the business are not written according to manual rates or rating plans shall not be filed pursuant to subsection (b) of this section, unless the superintendent directs that they be filed.

### § 2324(a). Rebating and discrimination

(a) No authorized insurer, no licensed insurance agent, no licensed insurance broker, and no employee or other representative of any such insurer, agent or broker shall make, procure or negotiate any contract of insurance other than as plainly expressed in the policy or other written contract issued or to be issued as evidence thereof, or shall directly or indirectly, by giving or sharing a commission or in any manner whatsoever, pay or allow or offer to pay or allow to the insured or to any employee of the insured, either as an inducement to the making of insurance or after insurance has been effected, any rebate from the premium which is specified in the policy, or any special favor or advantage in the dividends or other benefit to accrue thereon, or shall give or offer to give any valuable consideration or inducement of any kind, directly or indirectly, which is not specified in such policy or contract, other than any valuable consideration, including but not limited to merchandise or periodical subscriptions, not exceeding twenty-five dollars in value, or shall give, sell or purchase, or offer to give, sell or purchase, as an inducement to the making of such insurance or in connection therewith, any stock, bond or other securities or any dividends or profits accrued thereon, nor shall the insured, his agent or representative knowingly receive directly or indirectly, any such rebate or special favor or advantage, provided, however, a licensed insurance agent or a licensed insurance broker may retain the usual commission or underwriting fee on insurance placed on his own property or risks, if the aggregate of such commissions or underwriting fees will not exceed five percent of the total net commissions or underwriting fees received by such licensed insurance agent or insurance broker during the calendar year.

**§ 3201. Approval of life, accident and health, credit unemployment, and annuity policy forms**

(a) In this article, "policy form" means any policy, contract, certificate, or evidence of insurance and any application therefor, or rider or endorsement thereto, affording benefits of the kinds of insurance specified in paragraph one, two, three or twenty-four of subsection (a) of section one thousand one hundred thirteen of this chapter, a group annuity certificate to which subsection (a) of section three thousand two hundred nineteen of this article applies, and a funding agreement authorized by section three thousand two hundred twenty-two of this article. The term "policy form" shall not include an agreement, special rider, or endorsement relating only to the manner of distribution of benefits or to the reservation of rights and benefits used at the request of the individual policyholder, contract holder or certificate holder.

(b)

(1) No policy form shall be delivered or issued for delivery in this state unless it has been filed with and approved by the superintendent as conforming to the requirements of this chapter and not inconsistent with law. A group life, group accident, group health, group accident and health or blanket accident and health insurance certificate evidencing insurance coverage on a resident of this state shall be deemed to have been delivered in this state, regardless of the place of actual delivery, unless the insured group is of the type described in: (A) section four thousand two hundred sixteen, except paragraph four where the group policy is issued to a trustee or trustees of a fund established or participated in by two or more employers not in the same industry with respect to an employer principally located within the state, paragraph twelve, thirteen or fourteen of subsection (b) thereof; (B) section four thousand two hundred thirty-five except subparagraph (D) where the group policy is issued to a trustee or trustees of a fund established or participated in by two or more employers not in the same industry with respect to an employer principally located within the state, subparagraph (K), (L) or (M) of paragraph one of subsection (c) thereof; or (C) section four thousand two hundred thirty-seven (except subparagraph (F) of paragraph three of subsection (a) thereof; of this chapter; and where the master policies or contracts were lawfully issued without this state in a jurisdiction where the insurer was authorized to do an insurance business. With regard to any certificate deemed to have been delivered in this state by virtue of this paragraph, the superintendent shall (i) require that the premiums charged be reasonable in relation to the benefits provided, except in cases where the policyholder pays the entire premium; (ii) have power to issue regulations prescribing the required, optional and prohibited provisions in such certificates; (iii) establish an accelerated certificate form approval procedure available to an insurer which includes a statement in its policy form submission letter that it is the company's opinion that the certificate form or forms comply with applicable New York law and regulations. The superintendent, upon receipt of such a filing letter, shall grant conditional approval of such certificate form or forms in reliance on the aforementioned statement by the company upon the condition that the company will retroactively modify such certificate form or forms, to the extent necessary, if it is found by the superintendent that the certificate form fails to comply with applicable New York laws and regulations. The superintendent may, with regard to the approval of any certificate deemed to have been delivered in this state by virtue of this paragraph, approve such certificate if the superintendent finds that the

certificate affords insureds protections substantially similar to those which have been provided by certificates delivered in this state. Any regulations issued by the superintendent pursuant to this paragraph may not impose stricter requirements than those applicable to similar policies and certificates actually delivered in this state.

(2) No unallocated group annuity contract or funding agreement, or policy form for accident and health insurance or any other policy form specified by the superintendent pursuant to regulation shall be issued by a domestic insurer or fraternal benefit society for delivery outside this state unless it has been filed with the superintendent.

(3) In exercising the authority granted by this subsection and by subsection (c) hereof, with respect to a policy or certificate form under which additional amounts may be credited pursuant to subsection (b) of section four thousand two hundred thirty-two or section four thousand five hundred eighteen of this chapter, the superintendent shall take into account the tax aspects of the policy form as they relate to all parties concerned.

(4)

    (A) No credit insurance or credit unemployment insurance policy form shall be issued unless it and its premium rates have been filed with and approved by the superintendent. In this section "credit insurance" and "credit unemployment insurance" mean insurance on a debtor, including an intended borrower, pursuant to a program as defined in paragraph three of subsection (b) of section four thousand two hundred sixteen of this chapter for defraying the costs of attendance of a student at a college or university, in connection with a specified loan or other credit transaction to provide payment to the creditor in the event of the death of the debtor or indemnity to the creditor for the installment payments on the indebtedness becoming due while the debtor is disabled as defined in the policy, or payment to the creditor for the installment payments on the indebtedness becoming due while the debtor is unemployed as set forth in section three thousand four hundred thirty-six of this chapter.

    (B) The superintendent shall from time to time prescribe regulations which, among other things, shall require that, in the event of the termination of the insurance prior to the scheduled maturity date of the indebtedness or the last maturing instalment thereof, there shall be an appropriate refund by the insurer to the policyholder of any amount collected from or charged to the policyholder for such terminated insurance, and an appropriate refund or credit by the policyholder or creditor to the debtor of an amount collected from or charged to the debtor for such terminated insurance, if such refund amounts to one dollar or more.

(5) Notwithstanding the other provisions of this section, on and after June first, nineteen hundred eighty no policy form of industrial life insurance, industrial accident insurance or industrial health insurance shall be approved by the superintendent for delivery or issuance for delivery in this state.

(6)

(A) As an alternative procedure to the policy form filing requirements of paragraph (1) of this subsection, an insurer has the option to file an expedited policy form approval application with the superintendent pursuant to this paragraph. If this option is elected, the filing shall include the proposed policy form, including rates as required, and all necessary supporting material requested by the superintendent pursuant to rule, and a certification signed by an officer of the insurer, who is knowledgeable with respect to the law and regulation applicable to the type of policy form, that such form is in compliance with the applicable law and regulations to the best of his or her knowledge and belief.

Within ninety days of receipt of a filing, the superintendent shall, in writing, either approve, submit a detailed list to the insurer requesting all additional information necessary to make a determination on the filing, or deny such filing, otherwise, such filing shall be deemed approved. Any denial issued by the superintendent shall state the reasons for such disapproval. If an insurer does not provide the additional information requested by the superintendent, or respond to the superintendent's objections within forty-five days of receipt of such request or denial, then such filing shall be deemed denied and such filing may not be resubmitted for a period not to exceed ninety days from the date that such information or response was due. The forty-five day limit for providing such additional information or response may be extended at the option of the superintendent.

In the event that an insurer properly submits the additional information or response, then such filing shall be deemed approved forty-five days after receipt of such information or response by the superintendent, unless the insurer is notified in writing prior to such date that the filing has been denied. Such denial shall state the reasons for such disapproval and cannot be based on any objection not specified in the superintendent's initial review of the filing, unless the objection arises from a modification of the policy forms made by the insurer in addressing the objections or new material submitted by the insurer. Notwithstanding anything to the contrary contained in this section, the superintendent may, at any time, before the filing is either deemed approved, affirmatively approved, or denied, raise objections to the policy form that is based on the explicit requirements of this chapter and any applicable regulations.

The superintendent shall, as soon as practicable, but no later than sixty days after receipt of the filing, notify the insurer if its filing is incomplete or fails to comply with applicable statutory or regulatory requirements. Such notice shall indicate that the filing is being returned with no action by the superintendent and that the period for the superintendent's substantive review has not commenced.

(B) Nothing contained in this paragraph shall prohibit the superintendent from requiring an insurer to retroactively modify or withdraw a form approved pursuant to the expedited filing procedure if such form is found to fail to conform with the

requirements of this chapter, provided that the order to withdraw or modify such form is issued in accordance with the provisions of section three thousand one hundred ten or section three thousand two hundred two of this chapter.

(C) In addition to any penalties for violations contained in this chapter, any insurer which receives approval under this subsection for a form which is found to fail to comply with the provisions of this chapter shall be ineligible to apply for an expedited review under this subsection for a period not to exceed one year.

(7) Notwithstanding any other provision of this section, an approved policy form that has been revised may continue to be delivered or issued for delivery in this state without further approval from the superintendent, provided that the policy form is revised solely to reflect:

(A) a change in the investment options of a separate account offered under the policy form, in accordance with an amended statement as to the methods of operation of the separate account approved by the superintendent pursuant to subsection (e) of section four thousand two hundred forty of this chapter, and further provided that an informational filing, in a form acceptable to the superintendent, identifying the policy forms that have been revised and the investment options offered in each policy form, is submitted to the superintendent no later than sixty days after the amended statement as to the methods of operation of the separate account has been approved; or

(B) any other type of change to a class or classes of policy forms for which the superintendent waives or otherwise modifies the filing and approval requirements of this section provided, however, that such determination to waive or otherwise modify shall be published in written guidance issued by the superintendent after such determination has been made.

(c)

(1) The superintendent may disapprove any policy form for delivery or issuance for delivery in this state if he finds that the same contains any provision or has any title, heading, backing or other indication of the contents of any or all of its provisions, which is likely to mislead the policyholder, contract holder or certificate holder.

(2) The superintendent may disapprove any life insurance policy form, or any form of annuity contract or group annuity certificate, or any form of funding agreement for delivery or issuance for delivery in this state, if its issuance would be prejudicial to the interests of policyholders or members or it contains provisions which are unjust, unfair or inequitable.

(3) The superintendent may disapprove any accident and health insurance policy form for delivery or issuance for delivery in this state if the benefits provided therein are unreasonable in relation to the premium charged or any such form contains provisions which encourage misrepresentation or are unjust, unfair, inequitable, misleading, deceptive, or contrary to law or to the public policy of this state.

C-60

(4) The superintendent shall not approve any life insurance policy form containing any war or travel exclusion or restriction, for delivery or issuance for delivery in this state, unless such policy form shall have printed or stamped across its face in red and in capital letters not smaller than twelve point type, or in an equally prominent manner established at the discretion of the superintendent and promulgated through regulations, the following:

"Read your policy (certificate) carefully.

"Certain (war, travel) risks are not assumed.


(state which or both)

In case of any doubt write your company (society) for further explanation."

(5) The superintendent shall not approve any annuity or life insurance policy form which is subject to the provisions of section four thousand two hundred twenty, four thousand two hundred twenty-one or four thousand five hundred eleven of this chapter, unless a detailed statement of the method used by the insurer in calculating any cash surrender value and any paid-up nonforfeiture benefit in the policy form is stated therein or, in lieu thereof, a statement that such method of computation has been filed with the insurance supervisory official of the state in which the policy form is delivered, and unless a statement of the method to be used in calculating the cash surrender value and paid-up nonforfeiture benefit available on any anniversary beyond the last anniversary for which such value and benefits are consecutively shown in the policy form is included therein, and, with respect to policy forms under which additional amounts may be credited pursuant to subsection (b) of section four thousand two hundred thirty-two or section four thousand five hundred eighteen of this chapter, the insurer shall also furnish such further information to the superintendent as the superintendent may require.

(6)

(a) The superintendent may disapprove any policy form specified in paragraph two of subsection (b) of this section issued by a domestic life insurer or fraternal benefit society for delivery outside the state if its issuance would be prejudicial to the interests of its policyholders or members.

(b) Except for the policy forms specified in paragraph two of subsection (b) of this section, every domestic life insurer and fraternal benefit society shall file annually with the superintendent a list identifying and describing the policy forms issued by the insurer or fraternal benefit society for delivery outside the state in a form prescribed by the superintendent. If the superintendent determines that the issuance of a policy form has been or may be prejudicial to the interests of policyholders or members, the superintendent may take any action he or she deems appropriate,

including issuing an order, after a hearing, to cease and desist issuing the policy form.

(7) If any policy of individual accident and health insurance is issued by an insurer domiciled in this state for delivery to a person residing in another state, and if the official having responsibility for the administration of the insurance laws of such other state shall have advised the superintendent that any such policy form is not subject to approval or disapproval by such official, the superintendent may by ruling require that such policy form meet the standards set forth in subsections (c) and (d) of section three thousand two hundred sixteen of this article.

(8) Without limitation on his other powers and duties under this section, the superintendent shall not approve any credit insurance or credit unemployment insurance policy forms or premium rates if the premium rates are unreasonable in relation to the benefits provided.

(9) Each insurer shall file with the superintendent of financial services any change in the premium rates for policies authorized under subparagraph (J) of paragraph one of subsection (c) of section four thousand two hundred thirty-five of this chapter, and the same shall be subject to his approval.

(10) The superintendent shall not approve any form of life insurance policy that is subject to the provisions of section four thousand two hundred twenty-one of this chapter or any form of annuity contract that is subject to the provisions of section four thousand two hundred twenty-three of this chapter if such form of policy or contract provides for the adjustment of any cash surrender benefit or policy loan value in accordance with a market-value adjustment formula, unless there shall have been filed with the superintendent a memorandum, in form and substance satisfactory to the superintendent, describing the market-value adjustment formula and stating that, in the opinion of the insurer, the formula provides reasonable equity to terminating and continuing policy and contract holders and to the insurer and complies with the nonforfeiture provisions of this chapter.

(11)

> (A) The superintendent shall not approve a life insurance policy which provides for accelerated payment of death benefits or special surrender values pursuant to subparagraph (B), (C), (D), (E) or (F) of paragraph one of subsection (a) of section one thousand one hundred thirteen of this chapter unless it also provides for such accelerated payments or special surrender values pursuant to subparagraph (A) of paragraph one of subsection (a) of such section.

> (B) The superintendent shall promulgate a regulation establishing rules for advertising, disclosure, benefit levels, benefit eligibility, payment of long term care benefits, nonforfeiture, and reserves for accelerated payment of death benefits or special surrender values provided under a life insurance policy. The regulation shall establish reasonable disclosure requirements concerning the percentage of the death benefit payable when accelerated payment of the death benefit or special surrender

value occurs, the impact of accelerated payment of the death benefit or special surrender value on eligibility for public assistance (as determined by the commissioner of social services), the prohibition that no health care facility as defined in section twenty of the public health law can require any person to accelerate payment of a death benefit or obtain a special surrender value as a condition of admission, providing or continuing care, and notice of possible tax obligations.

(12) The superintendent shall promulgate a regulation relating to waiver of premium for unemployment as authorized by paragraph one of subsection (a) of section one thousand one hundred thirteen of this chapter establishing minimum standards for benefit levels, benefits eligibility and exclusions. The premium charged shall be reasonable in relation to the benefit provided.

(d) The superintendent shall, within a reasonable time after the filing of any policy form requiring approval, notify the insurer filing the form of his approval or disapproval of it.

## § 3231(e)(1)(A). [Added by L 1992, ch 501] Rating of individual and small group health insurance policies; approval of superintendent

(e)

    (1)

        (A) An insurer desiring to increase or decrease premiums for any policy form subject to this section shall submit a rate filing or application to the superintendent.

        An insurer shall send written notice of the proposed rate adjustment, including the specific change requested, to each policy holder and certificate holder affected by the adjustment on or before the date the rate filing or application is submitted to the superintendent. The notice shall prominently include mailing and website addresses for both the department of financial services and the insurer through which a person may, within thirty days from the date the rate filing or application is submitted to the superintendent, contact the department of financial services or insurer to receive additional information or to submit written comments to the department of financial services on the rate filing or application. The superintendent shall establish a process to post on the department's website, in a timely manner, all relevant written comments received pertaining to rate filings or applications. The insurer shall provide a copy of the notice to the superintendent with the rate filing or application. The superintendent shall immediately cause the notice to be posted on the department of financial services' website. The superintendent shall determine whether the filing or application shall become effective as filed, shall become effective as modified, or shall be disapproved. The superintendent may modify or disapprove the rate filing or application if the superintendent finds that the premiums are unreasonable, excessive, inadequate, or unfairly discriminatory, and may consider the financial condition of the insurer when approving, modifying or disapproving any premium adjustment. The determination of the superintendent shall be supported by sound actuarial assumptions and methods, and shall be rendered in writing between thirty and sixty days from the date the rate filing or application is submitted to the superintendent. Should the superintendent require additional information from the insurer in order to make a determination, the superintendent shall require the insurer to furnish such information, and in such event, the sixty days shall be tolled and shall resume as of the date the insurer furnishes the information to the superintendent. If the superintendent requests additional information less than ten days from the expiration of the sixty days (exclusive of tolling), the superintendent may extend the sixty day period an additional twenty days to make a determination. The application or rate filing will be deemed approved if a determination is not rendered within the time allotted under this section. An insurer shall not implement a rate adjustment unless the insurer provides at least sixty days advance written notice of the premium rate adjustment approved by the superintendent to each policy holder and certificate holder affected by the rate adjustment.

**§ 3420. Liability insurance; standard provisions; right of injured person**

(a) No policy or contract insuring against liability for injury to person, except as provided in subsection (g) of this section, or against liability for injury to, or destruction of, property shall be issued or delivered in this state, unless it contains in substance the following provisions or provisions that are equally or more favorable to the insured and to judgment creditors so far as such provisions relate to judgment creditors:

(1) A provision that the insolvency or bankruptcy of the person insured, or the insolvency of the insured's estate, shall not release the insurer from the payment of damages for injury sustained or loss occasioned during the life of and within the coverage of such policy or contract.

(2) A provision that in case judgment against the insured or the insured's personal representative in an action brought to recover damages for injury sustained or loss or damage occasioned during the life of the policy or contract shall remain unsatisfied at the expiration of thirty days from the serving of notice of entry of judgment upon the attorney for the insured, or upon the insured, and upon the insurer, then an action may, except during a stay or limited stay of execution against the insured on such judgment, be maintained against the insurer under the terms of the policy or contract for the amount of such judgment not exceeding the amount of the applicable limit of coverage under such policy or contract.

(3) A provision that notice given by or on behalf of the insured, or written notice by or on behalf of the injured person or any other claimant, to any licensed agent of the insurer in this state, with particulars sufficient to identify the insured, shall be deemed notice to the insurer.

(4) A provision that failure to give any notice required to be given by such policy within the time prescribed therein shall not invalidate any claim made by the insured, an injured person or any other claimant if it shall be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible thereafter.

(5) A provision that failure to give any notice required to be given by such policy within the time prescribed therein shall not invalidate any claim made by the insured, injured person or any other claimant, unless the failure to provide timely notice has prejudiced the insurer, except as provided in paragraph four of this subsection. With respect to a claims-made policy, however, the policy may provide that the claim shall be made during the policy period, any renewal thereof, or any extended reporting period, except as provided in paragraph four of this subsection. As used in this paragraph, the terms "claims-made policy" and "extended reporting period" shall have their respective meanings as provided in a regulation promulgated by the superintendent.

(6) A provision that, with respect to a claim arising out of death or personal injury of any person, if the insurer disclaims liability or denies coverage based upon the failure to provide timely notice, then the injured person or other claimant may maintain an action directly

against such insurer, in which the sole question is the insurer's disclaimer or denial based on the failure to provide timely notice, unless within sixty days following such disclaimer or denial, the insured or the insurer: (A) initiates an action to declare the rights of the parties under the insurance policy; and (B) names the injured person or other claimant as a party to the action.

(b) Subject to the limitations and conditions of paragraph two of subsection (a) of this section, an action may be maintained by the following persons against the insurer upon any policy or contract of liability insurance that is governed by such paragraph, to recover the amount of a judgment against the insured or his personal representative:

(1) any person who, or the personal representative of any person who, has obtained a judgment against the insured or the insured's personal representative, for damages for injury sustained or loss or damage occasioned during the life of the policy or contract;

(2) any person who, or the personal representative of any person who, has obtained a judgment against the insured or the insured's personal representative to enforce a right of contribution or indemnity, or any person subrogated to the judgment creditor's rights under such judgment; and

(3) any assignee of a judgment obtained as specified in paragraph one or paragraph two of this subsection, subject further to the limitation contained in section 13-103 of the general obligations law.

(c)

(1) If an action is maintained against an insurer under the provisions of paragraph two of subsection (a) of this section and the insurer alleges in defense that the insured failed or refused to cooperate with the insurer in violation of any provision in the policy or contract requiring such cooperation, then the burden shall be upon the insurer to prove such alleged failure or refusal to cooperate.

(2)

(A) In any action in which an insurer alleges that it was prejudiced as a result of a failure to provide timely notice, the burden of proof shall be on: (i) the insurer to prove that it has been prejudiced, if the notice was provided within two years of the time required under the policy; or (ii) the insured, injured person or other claimant to prove that the insurer has not been prejudiced, if the notice was provided more than two years after the time required under the policy.

(B) Notwithstanding subparagraph (A) of this paragraph, an irrebuttable presumption of prejudice shall apply if, prior to notice, the insured's liability has been determined by a court of competent jurisdiction or by binding arbitration; or if the insured has resolved the claim or suit by settlement or other compromise.

(C) The insurer's rights shall not be deemed prejudiced unless the failure to timely provide notice materially impairs the ability of the insurer to investigate or defend the claim.

(d)

    (1)

        (A) This paragraph applies with respect to a liability policy that provides coverage with respect to a claim arising out of the death or bodily injury of any person, where the policy is: (i) subject to section three thousand four hundred twenty-five of this article, other than an excess liability or umbrella policy; or (ii) used to satisfy a financial responsibility requirement imposed by law or regulation.

        (B) Upon an insurer's receipt of a written request by an injured person who has filed a claim or by another claimant, an insurer shall, within sixty days of receipt of the written request: (i) confirm to the injured person or other claimant in writing whether the insured had a liability insurance policy of the type specified in subparagraph (A) of this paragraph in effect with the insurer on the date of the alleged occurrence; and (ii) specify the liability insurance limits of the coverage provided under the policy.

        (C) If the injured person or other claimant fails to provide sufficient identifying information to allow the insurer, in the exercise of reasonable diligence, to identify a liability insurance policy that may be relevant to the claim, the insurer shall within forty-five days of receipt of the written request, so advise the injured person or other claimant in writing and identify for the injured person or other claimant the additional information needed. Within forty-five days of receipt of the additional information, the insurer shall provide the information required under subparagraph (B) of this paragraph.

    (2) If under a liability policy issued or delivered in this state, an insurer shall disclaim liability or deny coverage for death or bodily injury arising out of a motor vehicle accident or any other type of accident occurring within this state, it shall give written notice as soon as is reasonably possible of such disclaimer of liability or denial of coverage to the insured and the injured person or any other claimant.

(e) No policy or contract of personal injury liability insurance or of property damage liability insurance, covering liability arising from the ownership, maintenance or operation of any motor vehicle or of any vehicle as defined in section three hundred eighty-eight of the vehicle and traffic law, or an aircraft, or any vessel as defined in section forty-eight of the navigation law, shall be issued or delivered in this state to the owner thereof, or shall be issued or delivered by any authorized insurer upon any such vehicle or aircraft or vessel then principally garaged or principally used in this state, unless it contains a provision insuring the named insured against liability for death or injury sustained, or loss or damage occasioned within the coverage of the policy or contract, as a result of negligence in the operation or use of such vehicle, aircraft or vessel, as the case may be, by any person operating or using the same with the permission, express or implied, of the named insured.

(f)

    (1) No policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any natural person arising out of the ownership, maintenance and use

of a motor vehicle by the insured shall be issued or delivered by any authorized insurer upon any motor vehicle then principally garaged or principally used in this state unless it contains a provision whereby the insurer agrees that it will pay to the insured, as defined in such provision, subject to the terms and conditions set forth therein to be prescribed by the board of directors of the Motor Vehicle Accident Indemnification Corporation and approved by the superintendent, all sums, not exceeding a maximum amount or limit of twenty-five thousand dollars exclusive of interest and costs, on account of injury to and all sums, not exceeding a maximum amount or limit of fifty thousand dollars exclusive of interest and costs, on account of death of one person, in any one accident, and the maximum amount or limit, subject to such limit for any one person so injured of fifty thousand dollars or so killed of one hundred thousand dollars, exclusive of interest and costs, on account of injury to, or death of, more than one person in any one accident, which the insured or his legal representative shall be entitled to recover as damages from an owner or operator of an uninsured motor vehicle, unidentified motor vehicle which leaves the scene of an accident, a motor vehicle registered in this state as to which at the time of the accident there was not in effect a policy of liability insurance, a stolen vehicle, a motor vehicle operated without permission of the owner, an insured motor vehicle where the insurer disclaims liability or denies coverage or an unregistered vehicle because of bodily injury, sickness or disease, including death resulting therefrom, sustained by the insured, caused by accident occurring in this state and arising out of the ownership, maintenance or use of such motor vehicle. No payment for non-economic loss shall be made under such policy provision to a covered person unless such person has incurred a serious injury, as such terms are defined in section five thousand two hundred two of this chapter. Such policy shall not duplicate any element of basic economic loss provided for under article fifty-one of this chapter. No payments of first party benefits for basic economic loss made pursuant to such article shall diminish the obligations of the insurer under this policy provision for the payment of non-economic loss and economic loss in excess of basic economic loss. Notwithstanding any inconsistent provisions of section three thousand four hundred twenty-five of this article, any such policy which does not contain the aforesaid provisions shall be construed as if such provisions were embodied therein.

(2)

    (A) Any such policy shall, at the option of the insured, also provide supplementary uninsured/underinsured motorists insurance for bodily injury, in an amount up to the bodily injury liability insurance limits of coverage provided under such policy, subject to a maximum of two hundred fifty thousand dollars because of bodily injury to or death of one person in any one accident and, subject to such limit for one person, up to five hundred thousand dollars because of bodily injury to or death of two or more persons in any one accident, or a combined single limit policy of five hundred thousand dollars because of bodily injury to or death of one or more persons in any one accident. Provided however, an insurer issuing such policy, in lieu of offering to the insured the coverages stated above, may provide supplementary uninsured/underinsured motorists insurance for bodily injury, in an amount up to the bodily injury liability insurance limits of coverage provided under such policy, subject to a maximum of one hundred thousand dollars because of bodily injury to or death of one person in any one accident and, subject to such limit

for one person, up to three hundred thousand dollars because of bodily injury to or death of two or more persons in any one accident, or a combined single limit policy of three hundred thousand dollars because of bodily injury to or death of one or more persons in any one accident, if such insurer also makes available a personal umbrella policy with liability coverage limits up to at least five hundred thousand dollars which also provides coverage for supplementary uninsured/underinsured motorists claims. Supplementary uninsured/underinsured motorists insurance shall provide coverage, in any state or Canadian province, if the limits of liability under all bodily injury liability bonds and insurance policies of another motor vehicle liable for damages are in a lesser amount than the bodily injury liability insurance limits of coverage provided by such policy. Upon written request by any insured covered by supplemental uninsured/underinsured motorists insurance or his duly authorized representative and upon disclosure by the insured of the insured's bodily injury and supplemental uninsured/underinsured motorists insurance coverage limits, the insurer of any other owner or operator of another motor vehicle against which a claim has been made for damages to the insured shall disclose, within forty-five days of the request, the bodily injury liability insurance limits of its coverage provided under the policy or all bodily injury liability bonds. The time of the insured to make any supplementary uninsured/underinsured motorist claim, shall be tolled during the period the insurer of any other owner or operator of another motor vehicle that may be liable for damages to the insured, fails to so disclose its coverage. As a condition precedent to the obligation of the insurer to pay under the supplementary uninsured/underinsured motorists insurance coverage, the limits of liability of all bodily injury liability bonds or insurance policies applicable at the time of the accident shall be exhausted by payment of judgments or settlements.

(B) In addition to the notice provided, upon issuance of a policy of motor vehicle liability insurance pursuant to regulations promulgated by the superintendent, insurers shall notify insureds, in writing, of the availability of supplementary uninsured/underinsured motorists coverage. Such notification shall contain an explanation of supplementary uninsured/underinsured motorists coverage and the amounts in which it can be purchased. Subsequently, a notification of availability shall be provided at least once a year and may be simplified pursuant to regulations promulgated by the superintendent, but must include a concise statement that supplementary uninsured/underinsured motorists coverage is available, an explanation of such coverage, and the coverage limits that can be purchased from the insurer.

(2-a)

(A) Notwithstanding paragraph two of this subsection, this paragraph shall apply to any new insurance policy or contract subject to this subsection entered into after the effective date of this paragraph. This paragraph shall not be deemed to apply to any policies originally entered into prior to the effective date of this paragraph, but renewed after the effective date of this paragraph, or to any policy of commercial risk insurance. Any new insurance policy or contract entered into after the effective date of this paragraph shall, at the option of the first named insured, also provide

supplementary uninsured/underinsured motorists insurance for bodily injury, in an amount equal to the bodily injury liability insurance limits of coverage provided under such motor vehicle liability insurance policy; provided, however, that a first named insured may exercise the choice to decline such supplementary uninsured/underinsured motorists insurance or select a lower amount of coverage through a written waiver signed, or electronically signed, by such insured, subject to the requirements of subparagraph (B) of this paragraph. Supplementary uninsured/underinsured motorists insurance shall provide coverage, in any state or Canadian province, if the limits of liability under all bodily injury liability bonds and insurance policies of any other motor vehicle liable for damages are in a lesser amount than the bodily injury liability insurance limits of coverage provided by such policy. Upon written request by any insured covered by supplemental uninsured/underinsured motorists insurance or a duly authorized representative and upon disclosure by the insured of the insured's bodily injury and supplemental uninsured/underinsured motorists insurance coverage limits, the insurer of any other owner or operator of another motor vehicle against which a claim has been made for damages to the insured shall disclose, within forty-five days of the request, the bodily injury liability insurance limits of its coverage provided under the policy or all bodily injury liability bonds. The time of the insured to make any supplementary uninsured/underinsured motorist claim, shall be tolled during the period the insurer of any other owner or operator of another motor vehicle that may be liable for damages to the insured, fails to so disclose its coverage. As a condition precedent to the obligation of the insurer to pay under the supplementary uninsured/underinsured motorists insurance coverage, the limits of liability of all bodily injury liability bonds or insurance policies applicable at the time of the accident shall be exhausted by payment of judgments or settlements.

(B) In addition to the notice provided, upon issuance of a policy of motor vehicle liability insurance pursuant to regulations promulgated by the superintendent, insurers shall notify insureds, in writing, of the availability of supplementary uninsured/underinsured motorists coverage. Such notification shall contain an explanation of supplementary uninsured/underinsured motorists coverage and the amounts in which it can be purchased. Subsequently, a notification of availability shall be provided at least once a year and may be simplified pursuant to regulations promulgated by the superintendent, but must include a concise statement that supplementary uninsured/underinsured motorists coverage is available, an explanation of such coverage, and the coverage limits that can be purchased from the insurer. If an insured elects to reject supplementary uninsured/underinsured motorist coverage or select a lower amount of supplementary uninsured/underinsured motorist coverage than the bodily injury liability insurance limits of coverage provided under the insured's motor vehicle liability insurance policy, the selection of lower supplementary uninsured/underinsured motorists coverage or rejection of such coverage must be made on a written or electronic form provided to the first named insured. Such form shall also advise that such coverage is equal to the insured's bodily injury liability limits under the motor vehicle

liability insurance policy unless lower limits are requested or the coverage is rejected.

(i) The form shall also advise that supplementary uninsured/underinsured motorists coverage (sum coverage) provides insurance protection for any person included as insured under your policy if he or she is injured in an accident involving another motor vehicle whose owner or operator was negligent but who has either no bodily injury or liability insurance, or less than the insurance you carry. Sum coverage shall be equal to the level of the bodily injury liability coverage of your motor vehicle liability insurance policy unless you sign a waiver requesting lower coverage or declining the coverage. You are urged to carefully consider this decision.

(ii) An insured's written waiver shall apply to all subsequent renewals of coverage and to all policies or endorsements which extend, change, supersede, or replace an existing policy issued to the named insured, unless changed in writing by any named insured.

(iii) The selection of lower supplementary uninsured/underinsured motorists coverage or the rejection of such coverage by any first named insured shall be binding upon all insureds under such policy.

(C) Notwithstanding the provisions of subparagraph (A) of this paragraph, at the insurer's option, the insured's supplementary uninsured/underinsured motorists coverage limit may be required to equal the insured's bodily injury liability insurance limit under the motor vehicle liability insurance policy.

(D) An insurer may provide the coverage described in this paragraph available in an umbrella or excess liability policy if the umbrella or excess liability policy expressly provides such coverage.

(3) The protection provided by this subsection shall not apply to any cause of action by an insured person arising out of a motor vehicle accident occurring in this state against a person whose identity is unascertainable, unless the bodily injury to the insured person arose out of physical contact of the motor vehicle causing the injury with the insured person or with a motor vehicle which the insured person was occupying (meaning in or upon or entering into or alighting from) at the time of the accident.

(4) An insurer shall give notice to the commissioner of motor vehicles of the entry of any judgment upon which a claim is made against such insurer under this subsection and of the payment or settlement of any claim by the insurer.

(5) This paragraph shall apply to a policy that provides supplementary uninsured/underinsured motorist insurance coverage for bodily injury and is a policy: (A) issued or delivered in this state that insures against liability arising out of the ownership, maintenance, and use of a fire vehicle, as defined in section one hundred fifteen-a of the

vehicle and traffic law, where the fire vehicle is principally garaged or used in this state; or (B) as specified in paragraph one of this subsection. Every such policy that insures a fire department, fire company, as defined in section one hundred of the general municipal law, an ambulance service, or a voluntary ambulance service, as defined in section three thousand one of the public health law, shall provide such supplementary uninsured/underinsured motorist insurance coverage to an individual employed by or who is a member of the fire department, fire company, ambulance service, or voluntary ambulance service and who is injured by an uninsured or underinsured motor vehicle while acting in the scope of the individual's duties for the fire department, fire company, ambulance service, or voluntary ambulance service covered under the policy, except with respect to the use or operation by such an individual of a motor vehicle not covered under the policy.

(g) No policy or contract shall be deemed to insure against any liability of an insured because of death of or injuries to his or her spouse or because of injury to, or destruction of property of his or her spouse unless express provision relating specifically thereto is included in the policy as provided in paragraphs one and two of this subsection. This exclusion shall apply only where the injured spouse, to be entitled to recover, must prove the culpable conduct of the insured spouse.

(1) Upon written request of an insured, and upon payment of a reasonable premium established in accordance with article twenty-three of this chapter, an insurer issuing or delivering any policy that satisfies the requirements of article six of the vehicle and traffic law shall provide coverage against liability of an insured because of death of or injuries to his or her spouse up to the liability insurance limits provided under such policy even where the injured spouse, to be entitled to recover, must prove the culpable conduct of the insured spouse. Such insurance coverage shall be known as "supplemental spousal liability insurance".

(2) Upon issuance of a motor vehicle liability policy that satisfies the requirements of article six of the vehicle and traffic law and that becomes effective on or after January first, two thousand three, pursuant to regulations promulgated by the superintendent, the insurer shall notify the insured, in writing, of the availability of supplemental spousal liability insurance. Such notification shall be contained on the front of the premium notice in boldface type and include a concise statement that supplementary spousal coverage is available, an explanation of such coverage, and the insurer's premium for such coverage. Subsequently, a notification of the availability of supplementary spousal liability coverage shall be provided at least once a year in motor vehicle liability policies issued pursuant to article six of the vehicle and traffic law, including those originally issued prior to January first, two thousand three. Such notice must include a concise statement that supplementary spousal coverage is available, an explanation of such coverage, and the insurer's premium for such coverage.

(h) In this section, the term "insurance upon any property or risk located in this state" includes insurance against legal liability arising out of the ownership, operation or maintenance of any vehicle which is principally garaged or principally used in this state, or arising out of the

ownership, operation, use or maintenance of any property which is principally kept or principally used in this state, or arising out of any other activity which is principally carried on in this state.

(i) Except as provided in subsection (j) of this section, the provisions of this section shall not apply to any policy or contract of insurance in so far as it covers the liability of an employer for workers' compensation, if such contract is governed by the provisions of section fifty-four of the workers' compensation law, or by any similar law of another state, province or country, nor to the kinds of insurances set forth in paragraph three of subsection (b) of section two thousand one hundred seventeen of this chapter.

(j)

    (1) Notwithstanding any other provision of this chapter or any other law to the contrary, every policy providing comprehensive personal liability insurance on a one, two, three or four family owner-occupied dwelling, issued or delivered in this state on and after the first of March, nineteen eighty-four, shall provide for coverage against liability for the payment of any obligation, which the policyholder may incur pursuant to the provisions of the workers' compensation law, to an employee arising out of and in the course of employment of less than forty hours per week, in and about such residences of the policyholder in this state. Such coverage shall provide for the benefits in the standard workers' compensation policy issued in this state. No one who purchases a policy providing comprehensive personal liability insurance shall be deemed to have elected to cover under the workers' compensation law any employee who is not required, under the provisions of such law, to be covered.

    (2) The term "policyholder" as used in this subsection shall be limited to an individual or individuals as defined by the terms of the policy, but shall not include corporate or other business entities or an individual who has or individuals who have in effect a workers' compensation policy which covers employees working in and about his or their residence.

    (3) Every insurer who is licensed by the superintendent to issue homeowners or other policies providing comprehensive personal liability insurance in this state shall also be deemed to be licensed to transact workers' compensation insurance for the purpose of covering those persons specified in this subsection.

C-73

**§ 4308(c). Supervision of superintendent**

(a) No corporation subject to the provisions of this article shall enter into any contract unless and until it shall have filed with the superintendent a copy of the contract or certificate and of all applications, riders and endorsements for use in connection with the issuance or renewal thereof, to be formally approved by him as conforming to the applicable provisions of this article and not inconsistent with any other provision of law applicable thereto. The superintendent shall, within a reasonable time after the filing of any such form, notify the corporation filing the same either of his approval or of his disapproval of such form.

(b) No corporation subject to the provisions of this article shall enter into any contract unless and until it shall have filed with the superintendent a schedule of the premiums or, if appropriate, rating formula from which premiums are determined, to be paid under the contracts and shall have obtained the superintendent's approval thereof. The superintendent may refuse such approval if he finds that such premiums, or the premiums derived from the rating formula, are excessive, inadequate or unfairly discriminatory, provided, however, the superintendent may also consider the financial condition of such corporation in approving or disapproving any premium or rating formula. Any adjustments to an approved schedule of premiums or to the approved rating formula for non-community rated contracts shall also be subject to the approval of the superintendent provided, however, such adjustments shall not be subject to the requirements of subsection (c) of this section. Any premium or formula approved by the superintendent shall make provision for such increase as may be necessary to meet the requirements of a plan approved by the superintendent in the manner prescribed in section four thousand three hundred ten of this article for restoration of the statutory reserve fund required by such section. Notwithstanding any other provision of law, the superintendent, as part of the rate increase approval process, may defer, reduce or reject a rate increase if, in the judgment of the superintendent, the salary increases for senior level management executives employed at corporations subject to the provisions of this article are excessive or unwarranted given the financial condition or overall performance of such corporation. The superintendent is authorized to promulgate rules and regulations which the superintendent deems necessary to carry out such deferral, reduction or rejection.

(c)

(1) An increase or decrease in premiums with respect to community rated contracts shall not be approved by the superintendent unless it is in compliance with the provisions of this subsection as well as other applicable provisions of law.

(2) A corporation desiring to increase or decrease premiums for any contract subject to this subsection shall submit a rate filing or application to the superintendent. A corporation shall send written notice of the proposed rate adjustment, including the specific change requested, to each contract holder and subscriber affected by the adjustment on or before the date the rate filing or application is submitted to the superintendent. The notice shall prominently include mailing and website addresses for both the department of financial services and the corporation through which a person may, within thirty days from the date the rate filing or application is submitted to the superintendent, contact the department of financial services or corporation to receive additional information or to submit written

comments to the department of financial services on the rate filing or application. The superintendent shall establish a process to post on the department's website, in a timely manner, all relevant written comments received pertaining to rate filings or applications. The corporation shall provide a copy of the notice to the superintendent with the rate filing or application. The superintendent shall immediately cause the notice to be posted on the department of financial services' website. The superintendent shall determine whether the filing or application shall become effective as filed, shall become effective as modified, or shall be disapproved. The superintendent may modify or disapprove the rate filing or application if the superintendent finds that the premiums are unreasonable, excessive, inadequate, or unfairly discriminatory, and may consider the financial condition of the corporation in approving, modifying or disapproving any premium adjustment. The determination of the superintendent shall be supported by sound actuarial assumptions and methods, and shall be rendered in writing between thirty and sixty days from the date the rate filing or application is submitted to the superintendent. Should the superintendent require additional information from the corporation in order to make a determination, the superintendent shall require the corporation to furnish such information, and in such event, the sixty days shall be tolled and shall resume as of the date the corporation furnishes the information to the superintendent. If the superintendent requests additional information less than ten days from the expiration of the sixty days (exclusive of tolling), the superintendent may extend the sixty day period an additional twenty days, to make a determination. The application or rate filing will be deemed approved if a determination is not rendered within the time allotted under this section. A corporation shall not implement a rate adjustment unless the corporation provides at least sixty days advance written notice of the premium rate adjustment approved by the superintendent to each contract holder and subscriber affected by the rate adjustment.

(3)

    (A) The expected minimum loss ratio for a contract form subject to this subsection for which a rate filing or application is made pursuant to this paragraph, other than a medicare supplemental insurance contract, or, with the approval of the superintendent, an aggregation of contract forms that are combined into one community rating experience pool and rated consistent with community rating requirements, shall not be less than eighty-two percent. In reviewing a rate filing or application, the superintendent may modify the eighty-two percent expected minimum loss ratio requirement if the superintendent determines the modification to be in the interests of the people of this state or if the superintendent determines that a modification is necessary to maintain insurer solvency. No later than July thirty-first of each year, every corporation subject to this subparagraph shall annually report the actual loss ratio for the previous calendar year in a format acceptable to the superintendent. If an expected loss ratio is not met, the superintendent may direct the corporation to take corrective action, which may include the submission of a rate filing to reduce future premiums, or to issue dividends, premium refunds or credits, or any combination of these.

    (B) The expected minimum loss ratio for a medicare supplemental insurance contract form shall not be less than eighty percent. No later than May first of each

year, every corporation subject to this subparagraph shall annually report the actual loss ratio for each contract form subject to this section for the previous calendar year in a format acceptable to the superintendent. In each case where the loss ratio for the contract form fails to comply with the eighty percent loss ratio requirement, the corporation shall submit a corrective action plan to the superintendent for assuring compliance with the applicable minimum loss ratio standard. The corrective action plan shall be submitted to the superintendent within sixty days of the corporation's submission of the annual report required by this subparagraph. The corporation's plan may utilize premium refunds or credits, subject to the approval of the superintendent.

(4) In case of conflict between this subsection and any other provision of law, this subsection shall prevail.

(d) The superintendent shall order an independent management and financial audit of corporations subject to the provisions of this article with a combined premium volume exceeding two billion dollars annually in order to develop a detailed understanding of such corporation's financial status and to determine the viability of such corporation's products. Such audit shall be performed by an organization upon submission of a program plan in response to a request for proposal approved by the superintendent in consultation with the commissioner of health and the state comptroller. Such audit shall not be performed by any organization that has in any way performed or furnished services of any kind to the corporation within the past five years, unless it is adequately demonstrated that such services would not compromise that organization's performance and objectivity. The audit shall be completed and a report submitted by May first, nineteen hundred ninety-three to the superintendent, the commissioner of health, and the chairs of the senate and assembly committees on health and insurance. The scope of the audit shall include, but not be limited to, financial and competitive position, corporate structure and governance, organization and management, strategic direction, rate adequacy, and the regulatory and competitive environment in the state of New York. Specifically, the audit shall include, but not be limited to:

(i) determining the corporation's financial and market position, including its reserves, trends in membership, market share, and profitability by market segment;

(ii) evaluating the corporation's product offerings with respect to market requirements and trends, the corporation's responses to the New York health care market, and its management of medical claims costs;

(iii) assessing the effectiveness of the organizational and management structure and performance, including, but not limited to, possible improvement in the size, structure, composition and operation of the board of directors, productivity improvement, information systems, management development, personnel practices, mix and level of skills, personnel turnover, investment practices and rate of return upon investment activities;

(iv) analyzing the corporation's strategic directions, its adequacy to meet competitive, market, and existing regulatory trends, including an evaluation of the use of brokers in

marketing products, and the impact of those strategies on the corporation's future financial performance and on the health care system of New York;

(v) evaluating the adequacy of rates for existing products, particularly (but not limited to) small group, medicare supplemental, and direct payment to identify areas that may need immediate remedial attention;

(vi) identifying any changes to the regulatory and legislative environment that may need to be made to ensure that the corporation can continue to be financially viable and competitive;

(vii) identifying and assessing specific transactions such as the procurement of reinsurance, sale of real property and the sale of future investment income to improve the financial condition of the corporation; and

(viii) evaluating and identifying possible improvements in the corporation's managed care strategies, operations and claims handling.

(e) Notwithstanding any other provision of law, the superintendent shall have the power to require independent management and financial audits of corporations subject to the provisions of this article whenever in the judgment of the superintendent, losses sustained by a corporation jeopardize its ability to provide meaningful coverage at affordable rates or when such audit would be necessary to protect the interests of subscribers. The audit shall include, but not be limited to, an investigation of the corporation's provision of benefits to senior citizens, individual and family, and small group and small business subscribers in relation to the needs of those subscribers. The audit shall also include an evaluation of the efficiency of the corporation's management, particularly with respect to lines of business which are experiencing losses. In every case in which the superintendent chooses to require an audit provided for in this subsection, the superintendent shall have the authority to select the auditor. Any costs incurred as a result of the operation of this subsection shall be assessed on all domestic insurers in the same manner as provided for in section three hundred thirty-two of this chapter.

(f) The results of any audit conducted pursuant to subsections (d) and (e) of this section shall be provided to the corporation and each member of its board of directors. The superintendent shall have the authority to direct the corporation in writing to implement any recommendations resulting from the audit that the superintendent finds to be necessary and reasonable; provided, however, that the superintendent shall first consider any written response submitted by the corporation or the board of directors prior to making such finding. Upon any application for a rate adjustment by the corporation, the superintendent shall review the corporation's compliance with the directions and recommendations made previously by the superintendent, as a result of the most recently completed management or financial audit and shall include such findings in any written decision concerning such application.

(g)

(1) Until September thirtieth, two thousand ten, as an alternate procedure to the requirements of subsection (c) of this section, a corporation subject to the provisions of this article desiring to increase or decrease premiums for any contract subject to this section may instead submit a rate filing or application to the superintendent and such application or filing shall be deemed approved, provided that (A) the anticipated incurred loss ratio for a contract form shall not be less than eighty-two percent for individual direct payment contracts or eighty-two percent for small group and small group remittance contracts, nor, except in the case of individual direct payment contracts with a loss ratio of greater than one hundred five percent during nineteen hundred ninety-four, shall the loss ratio for any direct payment, group or group remittance contract be more than one hundred five percent of the anticipated earned premium, and (B) the corporation submits, as part of such filing, a certification by a member of the American Academy of Actuaries or other individual acceptable to the superintendent that that corporation is in compliance with the provisions of this subsection, based upon that person's examination, including a review of the appropriate records and of the actuarial assumptions and methods used by the corporation in establishing premium rates for contracts subject to this section. A corporation shall not utilize the alternate procedure pursuant to this subsection to implement a change in rates to be effective on or after October first, two thousand ten. For purposes of this section, a small group is any group whose contract is subject to the requirements of section forty-three hundred seventeen of this article.

(2) Prior to January first, two thousand, no rate increase or decrease may be deemed approved under this subsection if that increase or decrease, together with any other rate increases or decreases imposed on the same contract form, would cause the aggregate rate increase or decrease for that contract form to exceed ten percent during any continuous twelve month period. No rate increase may be imposed pursuant to this subsection unless at least thirty days advance written notice of such increase has been provided to each contract holder and subscriber.

(h)

(1) Each calendar year, a corporation subject to the provisions of this article shall return, in the form of aggregate benefits incurred for each contract form filed pursuant to the alternate procedure set forth in subsection (g) of this section, at least eighty-two percent for individual direct payment contracts or eighty-two percent for small group and small group remittance contracts, but, except in the case of individual direct payment contracts with a loss ratio of greater than one hundred five percent in nineteen hundred ninety-four, for any direct payment, group or group remittance contract, not in excess of one hundred five percent of the aggregate premiums earned for the contract form during that calendar year. Corporations subject to the provisions of this article shall annually report, no later than June thirtieth of each year, the loss ratio calculated pursuant to this subsection for each such contract form for the previous calendar year.

(2) In each case where the loss ratio for a contract form fails to comply with the eighty-two percent minimum loss ratio requirement for individual direct payment contracts, or the eighty-two percent minimum loss ratio requirement for small group and small group

remittance contracts, as set forth in paragraph one of this subsection, the corporation shall issue a dividend or credit against future premiums for all contract holders with that contract form in an amount sufficient to assure that the aggregate benefits incurred in the previous calendar year plus the amount of the dividends and credits shall equal no less than eighty-two percent for individual direct payment contracts, or eighty-two percent for small group and small group remittance contracts, of the aggregate premiums earned for the contract form in the previous calendar year. The dividend or credit shall be issued to each contract holder or subscriber who had a contract that was in effect at any time during the applicable year. The dividend or credit shall be prorated based on the direct premiums earned for the applicable year among all contract holders or subscribers eligible to receive such dividend or credit. A corporation shall make a reasonable effort to identify the current address of, and issue dividends or credits to, former contract holders or subscribers entitled to the dividend or credit. A corporation shall, with respect to dividends or credits to which former contract holders that the corporation is unable to identify after a reasonable effort would otherwise be entitled, have the option, as deemed acceptable by the superintendent, of prospectively adjusting premium rates by the amount of such dividends or credits, issuing the amount of such dividends or credits to existing contract holders, depositing the amount of such dividends or credits in the fund established pursuant to section four thousand three hundred twenty-two-a of this article, or utilizing any other method which offsets the amount of such dividends or credits. All dividends and credits must be distributed by September thirtieth of the year following the calendar year in which the loss ratio requirements were not satisfied. The annual report required by paragraph one of this subsection shall include a corporation's calculation of the dividends and credits, as well as an explanation of the corporation's plan to issue dividends or credits. The instructions and format for calculating and reporting loss ratios and issuing dividends or credits shall be specified by the superintendent by regulation. Such regulations shall include provisions for the distribution of a dividend or credit in the event of cancellation or termination by a contract holder or subscriber.

(3) In each case where the loss ratio for a contract form fails to comply with the one hundred five percent maximum loss ratio requirement of paragraph one of this subsection, the corporation shall institute a premium rate increase in an amount sufficient to assure that the aggregate benefits incurred in the previous calendar year shall equal no more than one hundred five percent of the sum of the aggregate premiums earned for the contract form in the previous calendar year and the aggregate premium rate increase. The rate increase shall be applied to each contract that was in effect as of December thirty-first of the applicable year and remains in effect as of the date the rate increase is imposed. All rate increases must be imposed by September thirtieth of the year following the calendar year in which the loss ratio requirements were not satisfied. The annual report required by paragraph one of this subsection shall include a corporation's calculation of the premium rate increase, as well as an explanation of the corporation's plan to implement the rate increase. The instructions and format for calculating and reporting loss ratios and implementing rate increases shall be specified by the superintendent by regulation.

(i) The alternate procedure described in subsections (g) and (h) of this section shall apply to individual direct payment contracts issued pursuant to sections four thousand three hundred

twenty-one and four thousand three hundred twenty-two of this article on and after January first, nineteen hundred ninety-seven. Such alternate procedure shall not be utilized to implement a change in rates to be effective on or after October first, two thousand ten.

(j) All community rated contracts, other than medicare supplemental insurance contracts, issued or in effect during calendar year two thousand ten shall be subject to a minimum loss ratio requirement of eighty-two percent. Corporations may use the alternate procedure set forth in subsection (g) of this section to adjust premium rates in order to meet the required minimum loss ratio for calendar year two thousand ten. The rate filing or application shall be submitted no later than September thirtieth, two thousand ten.