# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NATIONAL RIFLE ASSOCIATION OF AMERICA,

                        *Plaintiff*,

        V.                                    18-CV-0566-TJM-CFH

ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,

                        *Defendants*.

**TEXAS PUBLIC POLICY FOUNDATION'S MEMORANDUM AS**
***AMICUS CURIAE* IN SUPPORT OF PLAINTIFF**

KEISHA RUSSELL
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075
Telephone:    (972) 941-4444
krussell@firstliberty.org

*Attorney for Texas Public Policy Foundation*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTEREST OF AMICUS ......................................................................................................1

INTRODUCTION ................................................................................................................1

ARGUMENT .......................................................................................................................3

I. The "guidance letters" were threats ..................................................................4

II. Threats of government penalties are not protected government speech .............6

III. The government may not punish businesses for associating with political organizations under the guise of regulating commercial speech .........................9

CONCLUSION ..................................................................................................................11

CERTIFICATE OF SERVICE ...........................................................................................13

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) ................................................................9

*Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015)..............................................................5, 7

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)...........................................................................4

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751 (2014)............................................................9

*Carey v. Brown*, 447 U.S. 455 (1980)...............................................................................................11

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ......................................................9

*Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788 (1985) ..................................3

*Garrison v. Louisiana*, 379 U.S. 64 (1964) .....................................................................................11

*Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir. 1983) ........................................4

*Johanns v. Livestock Marketing Assn.*, 544 U.S. 550 (2005) ...........................................................7

*Matal v. Tam*, 137 S.Ct. 1744 (2017) ...........................................................................................6, 11

*N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).......................................................8

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ...................................................................11

*Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003).........................................................................4, 5

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973).............10

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009)................................................................6, 7

*Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328 (1986) ..................9

*Reed v. Town of Gilbert, Ariz.*, 135 S.Ct. 2218 (2015)......................................................................3

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) .................................3

*Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011) ............................................................................10

*Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*,
    425 US. 748 (1976)...................................................................................................................9

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S.Ct. 2239 (2015)........................6

*West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943) ............................................................7

**INTEREST OF AMICUS**

The Texas Public Policy Foundation (the "Foundation") is a non-profit, non-partisan research organization dedicated to promoting liberty, personal responsibility, and free enterprise through academically-sound research and outreach.

Since its inception in 1989, the Foundation has emphasized the importance of limited government, free market competition, private property rights, and freedom from regulation. In accordance with its central mission, the Foundation has hosted policy discussions, authored research, presented legislative testimony, and drafted model ordinances to reduce the burden of government on Americans.

Through the Foundation's litigation center, the Center for the American Future, the Foundation currently represents individuals in state and federal courts across the country seeking to secure their constitutionally protected rights. As part of this work, the Foundation has filed briefs on behalf of itself and other organizations to protect First Amendment rights.

As an issue advocacy organization involved in many states, the Foundation has an acute interest in ensuring that states may not target organizations with whom they disagree politically for disparate treatment. It is with this background and experience that the Foundation files this Brief in support of Plaintiff.

The Foundation has paid all of the costs and fees incurred in the preparation of this brief.

**INTRODUCTION**

The State's Department of Financial Services, sent out "guidance letters" on state letterhead to insurers demanding that they "take prompt actions" to reconsider their affiliation with the National Rifle Association (NRA) "or similar gun promotion organizations."[1] The letters noted

---
[1] *See*, Plaintiff's Complaint, Exhibits B and C.

that affiliation with such groups could affect the insurers' reputation for risk[2]—a factor the State uses in determining whether insurance companies can continue to do business in the state.[3]

While the threat of regulatory action in the letter may not have been explicit, the NRA's insurance providers got the message—disassociate with the NRA and pro-Second Amendment groups or raise your potential for a negative risk assessment from the State. As a result of these actions, several insurers abruptly cancelled their dealings with the NRA.[4] One insurer indicated that it would no longer sell products to the NRA "at any price."[5]

The question before this Court is whether the State's threats in this case constitute impermissible viewpoint discrimination under the First Amendment. For the reasons laid out below and in the NRA's complaint, they do. The government may not bully its citizens into not doing business with organizations with whom it disagrees politically.

The Foundation writes separately, because two arguments raised by the State in its motion to dismiss, if accepted, would have profound impact on the ability of public interest advocacy organizations to operate in states where the local government does not share their beliefs. In particular, the State argues that, 1) the guidance letters were government speech and therefore immune from First Amendment scrutiny; and 2) even if the letters were implicit threats of retaliatory action by the State against the free speech rights of the insurers, New York asserts that First Amendment rights were not violated because the potential impacts apply solely to commercial relationships. The State's arguments are without merit because they are contrary to

---

[2] *Id.*
[3] *See*, Def's Motion to Dismiss, Appendix C, at p. 11 (§ 1104 (c) provides that "The superintendent may suspend the license, restrict the license authority, or limit the amount of premiums written in this state of any [insurance company]…" based on the company's "size of risks insured in each kind of insurance and the insurer's loss experience in regard to such risks.")
[4] Plaintiff's Complaint, 17-18.
[5] *Id.* at 18.

established precedent and would impermissibly expand the limited government and commercial speech exceptions to radically reshape the protections afforded to free speech under the First Amendment. Such a result should not be countenanced.

## ARGUMENT

The First Amendment guards against government action "targeted at specific subject matter," a form of speech suppression known as content based discrimination. *Reed v. Town of Gilbert, Ariz.*, 135 S.Ct. 2218, 2230 (2015). This category includes a subtype of laws that go further, aimed at the suppression of "particular views ... on a subject." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). A law found to discriminate based on viewpoint is an "egregious form of content discrimination," which is "presumptively unconstitutional." *Id.*, at 829–830.

At its most basic, the test for viewpoint discrimination is whether the government has singled out a subset of messages for disfavor based on the views expressed. *See Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 806 (1985) ("[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject"). This standard is met "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the [government action]." *Rosenberger*, 515 U.S. at 829.

In the present case, there is no question that the State has singled out the views of the NRA and other Second Amendment advocacy groups for disfavor. The guidance letters issued by the State demand that insurers provide additional scrutiny to their associations with "the NRA or

3

similar gun promotion organizations."[6] Failure to apply this additional scrutiny could result in a poor risk assessment from the State.[7]

As explained below, this violates the First Amendment, because: 1) the letters were a clear attempt to bully insurers into not doing business with the NRA on the basis of its "gun promotion" viewpoint, 2) threats of government retribution are not government speech, and 3) the fact that the injuries sustained by the NRA as a result of the State's actions were primarily commercial does not shield the State's viewpoint discrimination from constitutional review.

### I.  The "guidance letters" were threats

It is well established that a letter from the government asking that private actors engage in content based discrimination is sufficient to trigger First Amendment scrutiny. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66-69 (1963) (Book publishers had First Amendment injury when government sent letters to book distributers asking them not to distribute plaintiffs' books.) This is true, even if the letter never explicitly threatens government retribution for failure to comply. *Id.* at 66. (Censorship was real despite the fact that the government agency sending the letters power lacked the power "to apply formal legal sanctions" and the letters "simply exhorted booksellers and advised them of their legal rights.") At the motion to dismiss stage, the court must view the letter as a threat of government force if that reading is possible. *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003); *Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) ("Where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid [First Amendment] claim can be stated.")

---

[6]  Plaintiff's Complaint, Exhibits B and C.
[7]  *Id*.

In *Backpage.com, LLC v. Dart*, 807 F.3d 229, 234–35 (7th Cir. 2015), for example, the Seventh Circuit recently held that a local Sheriff had violated the First Amendment by sending letters to credit card companies encouraging them not to do business with Backpage.com due to that website's content. The Sheriff's letters did not explicitly threaten to prosecute the companies and the Sheriff, in fact, lacked any authority to prosecute the credit card companies even if he wanted to. *Id.* at 236. Nonetheless, the court found the letters were a deliberate attempt to use government force to bully the credit card companies into cutting ties with Backpage.com, because the letters were sent on official letter-head and mentioned various tangentially related legal duties financial institutions have to monitor the activities of their customers. *Id.* at 232. The implication of that vague reference, the court explained, was to hint that some future government action might be taken if the companies failed to comply. *Id.* Backpage.com therefore had a valid claim that their First Amendment rights had been violated. *Id.*

The facts of this case are on all fours with *Backpage.com*. Here the State issued official regulatory guidance to insurers encouraging them not to do business with the NRA due to its support for the Second Amendment.[8] As in *Backpage.com,* these letters were issued on official letter-head, and referenced potential impacts that continuing to associate with the NRA could have on the insurers' reputation for risk—a factor in determining eligibility for licensure.[9] Therefore, as in *Backpage.com*, the guidance letters could reasonably be read as an attempt to intimidating the NRA's business partners into discriminating against the NRA on the basis of viewpoint. At the motion to dismiss stage, this is sufficient to state a claim under the First Amendment. *Backpage.com,* 807 F.3d at 234–35; *Okwedy v. Molinari*, 333 F.3d at 344.

---

[8] Plaintiff's Complaint, Exhibits B and C.
[9] *Id*.

## II. Threats of government penalties are not protected government speech

The State argues that the letters were merely advocacy, which is protected under the government speech doctrine.[10] Such a position is contrary to law and would allow the narrow exception for government speech to swallow the entire First Amendment.

The government speech doctrine provides that the government does not have to be viewpoint-neutral when it chooses to express its own viewpoint on a topic of public interest. *Matal v. Tam*, 137 S.Ct. 1744, 1758 (2017). For example, during the Second World War, the Federal Government produced and distributed millions of posters to promote the war effort. *Id.* There were posters urging enlistment, the purchase of war bonds, and the conservation of scarce resources. *Id.* "These posters expressed a viewpoint, but the First Amendment did not demand that the Government balance the message of these posters by producing and distributing posters encouraging Americans to refrain from engaging in these activities." *Id.*

But while "the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse." *Id.* If read to allow not only government advocacy, but also government action, it could be used to "silence or muffle the expression of disfavored viewpoints." *Id.* For this reason, the Court has held that we "must exercise great caution before extending our government-speech precedents." *Id.*

The government speech doctrine has only been recognized as appropriate in a handful of circumstances. In each of these cases, the government or one of its agents was merely expressing an opinion on an issue. *See, e.g., Walker v. Texas Div., Sons of Confederate Veterans, Inc.,* 135 S.Ct. 2239, 2249 (2015) (message on state manufactured license plate was government speech). *Pleasant Grove City v. Summum*, 555 U.S. 460, 470-71 (2009) (government erection of a

---

[10] Def's Motion to Dismiss, at p. 19.

permanent monument on government property was government speech.); *Johanns v. Livestock Marketing Assn.*, 544 U.S. 550, 561 (2005) (government produced advertisements "to advance the image and desirability of beef and beef products" were government speech.). None of these cases involved the government ordering private individuals to take action. Put another way, the State may give its opinion, but it cannot command, by threats or direct action, "what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943).

The State's actions in this case do not fit into the narrow exception carved out of the First Amendment for government speech. This lawsuit does not exist because Governor Cuomo issued public statements in favor of gun control or antithetical to gun rights. The State is not being sued because it erected an anti-gun statue, manufactured a pro-gun control license plate, or ran anti-second amendment advertisements. The State is being sued because a state agency issued official guidance ordering businesses to apply a different level of scrutiny to Second Amendment advocacy groups, and followed that official guidance up with backdoor meetings and threats. That is not government speech, it is government action. *Backpage.com*, 807 F.3d at 235 ("A government entity… is entitled to say what it wants to say—but only within limits. It is not permitted to employ threats to squelch the free speech of private citizens.")

Imagine, for a moment, that the State issued a regulatory guidance document demanding that businesses "take prompt action" to disassociate themselves with "progressive organizations that advocate for gun control." Is there any doubt that this action would trigger constitutional challenges?

Yet that is precisely what has occurred here. The state has demanded that businesses apply more scrutiny to associating with a political advocacy group—the NRA—based solely on that

group's alleged "gun promotion."[11] That should be sufficient to survive a motion to dismiss. At a minimum, the First Amendment ensures that we do not live in a country where the rules that govern commerce are different based on your political ideology.

The State counters that the guidance letters do not target the NRA for its political advocacy, but for the fact that it allegedly marketed insurance in the past that is contrary to the State's guidelines. But this is disproven by the text of the guidance letters themselves. The letters did not demand that companies disassociate with groups that have marketed prohibited insurance, it demanded that they disassociate with "NRA or similar gun promotion organizations."[12] Any alleged improper insurance contracts were never mentioned.

Even if the letters had mentioned the NRA's past insurance contracts, the State may not use unrelated violations as pretext to cover explicit viewpoint discrimination. *See*, *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 909 (1982) ("If the persons assembling have committed crimes elsewhere…they may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation …in a lawful public discussion as the basis for a criminal charge."). The right to political speech and association "does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." *Id.* at 908.

At the end of the day, the State has demanded that the NRA be treated differently on the basis of its viewpoint. The "purpose and effect" of the guidance letters was "to silence entities

---

11     Plaintiff's Complaint, Exhibits B and C.
12     Plaintiff's Complaint, Exhibits B and C.

whose voices the Government deems to be suspect." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010). That is a government action implicating the First Amendment. *Id.*

> III. **The government may not punish businesses for associating with political organizations under the guise of regulating commercial speech**

The State raises two additional defenses that amount to a claim that the First Amendment loses its force when the injuries inflicted by government action take the form of interference with a speaker's commercial relationships. In particular, the State argues that the freedom of association does not apply to commercial relationships[13], and that even if it did, the State is only regulating commercial speech in this case.[14] These arguments fail.

First, the Supreme Court has roundly rejected the notion that First Amendment freedoms do not apply to commercial relationships. *See*, *Burwell v. Hobby Lobby Stores*, *Inc.,* 134 S.Ct. 2751, 2770 (2014) ("a law that operates so as to make…beliefs more expensive in the context of business activities imposes a burden on [First Amendment Rights].") The State's first argument therefore fails.

Second, the State's actions in this case were not a regulation of commercial speech. The commercial speech doctrine is limited to "speech which does no more than propose a commercial transaction." *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 340 (1986) (quoting *Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)). Commercial advertising constitutes paradigmatic commercial speech under the Supreme Court's standard because its fundamental purpose is to propose an economic transaction. *See, e.g.*, 44 *Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 496–500 (1996).

---

[13] Def's Motion to Dismiss, at p. 32-35.
[14] *Id.* at 30.

To determine whether a state action is a regulation of commercial speech, the fact that money may have changed hands is not dispositive. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 384–85 (1973). Instead, the Court looks at whether the speech that triggered the regulation was an invitation to engage in commerce with the speaker. *Id.* If not, the commercial speech doctrine is not implicated, and full First Amendment protections apply. *Id.*

Here, the speech that triggered the disparate treatment by government is inherently political in nature. The guidance letters make clear that the state is targeting "gun promotion organizations."[15] In other words, it is the NRA's promotion of Second Amendment rights—not its commercial advertisements or economic activities—that triggered government action. The guidance letters therefore cannot be interpreted as a regulation on commercial speech.

The State, nonetheless, contends that because the real-world impact of its viewpoint discrimination will be increased difficulty for the NRA in procuring insurance contracts, that the First Amendment is not implicated. But that has never been the standard for the First Amendment. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011) (internal quotation marks omitted) (Commercial activity is "no exception" to the principle that the First Amendment "requires heightened scrutiny whenever the government creates a regulation of speech because of disagreement with the message it conveys.") If it were, then States could simply forbid groups whose politics they disagree with from doing any business in the state, and those groups would have no standing to challenge that disparate treatment. The First Amendment demands more protection than that.

---

[15] Plaintiff's Complaint, Exhibits B and C.

## CONCLUSION

The Supreme Court has recognized that "expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values." *Carey v. Brown*, 447 U.S. 455, 467 (1980). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). There is a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

The reality of life for public interest organizations is that engaging in the public debate in a state requires engaging in commercial transactions in that state as well. *Matal*, 137 S. Ct. at 1768 (Kennedy, Ginsburg, Sotomayor, and Kagan, concurring). "Nonprofit organizations… compete in a real economic sense for funding and other resources as they seek to persuade others to join their cause." *Id.* To be effective, the organization must purchase or rent office space, buy office supplies, pay employees, purchase insurance, and engage in a host of other commercial transactions. To "permit viewpoint discrimination in this context is to permit Government censorship." *Id.*

The arguments advanced by the State in this case would allow the government to make these necessary tasks more difficult by threatening any business that chooses to associate with public interest organizations with whom the State disagrees. That is censorship, and it is forbidden by the First Amendment. Accordingly, the State's motion to dismiss should be denied.

Dated: August 24, 2018                    Respectfully submitted,

              */s/ Keisha Russell*
            KEISHA RUSSELL
            State Bar No. 5594338
            2001 W. Plano Parkway, Suite 1600
            Plano, Texas 75075
            Telephone:     (972) 941-4444
            krussell@firstliberty.org

            *Attorney for Texas Public Policy Foundation*

# CERTIFICATE OF SERVICE

   I hereby certify that on August 24, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of New York by using the CM/ECF system, which will serve a copy of same on the counsel of record.

| | |
|---|---|
| Sarah Rogers<br>sbr@brewerattorneys.com<br>Brewer Attorneys & Counselors<br>750 Lexington Avenue, Floor 14<br>New York, NY 10022<br><br>Stephanie L. Gase<br>szg@brewerattorneys.com<br>William A. Brewer<br>wab@brewerattorneys.com<br>Brewer Attorneys & Counselors<br>1717 Main Street, Suite 5900<br>Dallas, Texas 75201<br><br>Charles J. Cooper<br>ccooper@cooperkirk.com<br>Harold S. Reeves<br>hreeves@cooperkirk.com<br>Jose Joel Alicea<br>jalicea@cooperkirk.com<br>Michael W. Kirk<br>mkirk@coooperkirk.com<br>Cooper & Kirk, PLLC<br>1523 New Hampshire Avenue, N.W.<br>Washington, DC 20036<br><br>*Attorneys for Plaintiff* | Adrienne J. Kerwin<br>adrienne.kerwin@ag.ny.gov<br>Helena O. Pederson<br>helena.pederson@ag.ny.gov<br>Michael G. McCartin<br>michael.mccartin@ag.ny.gov<br>Office of the Attorney General – Albany<br>The Capitol<br>Albany, NY 12224<br><br>*Attorneys for Defendants* |

             */s/ Keisha Russell*
             KEISHA RUSSELL