**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| Plaintiff, | § § | CIVIL CASE NO.  18-CV-00566-TJM-CFH |
| v. | § § | |
| ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES, | § § § § § § § | |
| Defendants. | § | |

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

William A. Brewer III (Bar No. 700217)
Stephanie L. Gase (Bar No. 700205)
Sarah B. Rogers (Bar No. 700207)
BREWER, ATTORNEYS & COUNSELORS
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone:  (212) 489-1400
Facsimile:  (212) 751-2849

Charles J. Cooper*
Michael W. Kirk*
J. Joel Alicea*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington D.C., 20036
Telephone: (202) 220-9660
Facsimile: (202) 220-9601

*Appearing *pro hac vice*

ATTORNEYS FOR THE NATIONAL RIFLE
ASSOCIATION OF AMERICA

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ..................................................................................1

II. STATEMENT OF FACTS...................................................................................6

    A.    Defendants Are Engaged In A Multi-Pronged Campaign That Seeks To Chill The NRA's Political Speech. ..................................................................6

        1.    Defendants' Actions Go Well Beyond Carry Guard And Seek to Extinguish Financial Arrangements By The NRA Which Were Never Alleged To Be "Unlawful."...........................................................7

        2.    Taken Together, Defendants' Threatened And Actual Regulatory Reprisals Constitute A Cohesive Censorship-and-Retaliation Campaign. ...............................................................................................9

    B.    Defendants' Campaign Is Depriving The NRA Of Key Liberty And Property Interests—As Well As Its Right To Free Speech....................................10

    C.    Cuomo Publicly Admits The Basis Of The NRA's Claims................................12

III. ARGUMENT AND AUTHORITIES ........................................................................13

    A.    Legal Standard. ..............................................................................................13

    B.    The NRA States Multiple First Amendment Claims With Respect to Freedom of Speech. .......................................................................................13

        1.    Defendants' unconstitutional actions target lawful business relationships and conduct.......................................................................14

        2.    Defendants' threats constitute censorship and retaliation and cannot be characterized as "government speech."...................................................15

        3.    The NRA has amply pleaded that it engages in core political speech—which Defendants seek to punish and suppress. .........................19

        4.    The NRA does not need to give in to Defendants' threats in order to have a viable First Amendment claim. .....................................................21

        5.    Even if the NRA's speech constitutes commercial speech, which it does not, the Complaint sufficiently pleads claims with respect to commercial speech..............................................................................21

    C.    The NRA Has Standing To Allege An Equal Protection Claim.............................25

    D.    The NRA Alleges Multiple, Substantial Due Process Violations.........................28

        1.    Defendants have damaged the NRA's good name and reputation in violation of the Due Process Clause. ......................................................28

        2.    Defendants' coercive tactics deprived the NRA of essential services without affording the NRA any procedural protections. ..........................31

E.     The Complaint More Than Sufficiently Pleaded A Conspiracy Claim. ................35

F.     The NRA Adequately Alleges Tortious Interference With Prospective Economic Advantage. .........................................................................................36

    1.     Defendants acted for a wrongful purpose, with malicious intent, and used dishonest, unfair, and improper means when intentionally interfering with the NRA's business relationship with Lockton. ..............37

    2.     Cuomo and Vullo are not entitled to either qualified or absolute immunity. .........................................................................................................39

G.    The NRA More Than Sufficiently Pleads A Freedom-Of-Association Claim. .........................................................................................................43

    1.     The associational rights at issue are between the NRA and its members, not the NRA and financial institutions. ....................................43

    2.     Defendants' actions infringe upon the NRA's expressive association with its members. ...............................................................................44

H.    In The Alternative, The Court Should Grant The NRA Leave To Amend...........48

IV. CONCLUSION...................................................................................................48

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alex LL. v. Dep't of Soc. Servs. of Albany Cnty.*,
　872 N.Y.S.2d 569 (N.Y. App. Div. 2009) ............................................................41

*Am. Motor Club, Inc. v. Corcoran*,
　644 F. Supp. 862 (S.D.N.Y. 1986)..........................................................34, 35

*Arteaga v. State*,
　72 N.Y.2d 212 (N.Y. 1988) ....................................................................42

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)................................................................................13

*Backpage.com, LLC v. Dart*,
　807 F.3d 229 (7th Cir. 2015) ......................................................3, 21, 23

*Bantam Books, Inc. v. Sullivan*,
　372 U.S. 58 (1963)...............................................................................3, 34

*Barrett v. Harrington*,
　130 F.3d 246 (6th Cir. 1997) ...................................................................14

*Bart v. Telford*,
　677 F.2d 622 (7th Cir. 1982) ...................................................................14

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) ......................................28, 29

*Bd. of Trustees of State Univ. of N.Y. v. Fox*,
　492 U.S. 469 (1989)................................................................................22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................13

*Bernstein v. City of N.Y.*,
　No. 06 Civ. 895 (RMB), 2007 WL 1573910 (S.D.N.Y. May 24, 2007) ................................41

*Blankenship v. Manchin*, 471 F.3d 523 (4th Cir. 2006) ...............................14

*Blue Canary Corp. v. City of Milwaukee*,
　251 F.3d 1121 (7th Cir. 2001) .................................................................16

*Brady v. Town of Colchester*,
　863 F.2d 205 (2d Cir. 1988)....................................................................46

*Brandenburg v. Ohio*,
　395 U.S. 444 (1969)..........................................................................45, 46

*Branum v. Clark*,
    927 F.3d 698 (2d Cir. 1991) ..................................................................31

*Brown v. Hartlage*,
    456 U.S. 45 (1986) ..............................................................................20

*Casciani v. Nesbitt*,
    659 F. Supp. 2d 427 (W.D.N.Y. 2009) ....................................25, 26, 27

*Carvel Corp. v. Noonan*, 3 N.Y.3d 182 (2004) .........................................37

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,
    447 U.S. 557 ..................................................................................22, 24

*Ciambriello v. City of Nassau*,
    292 F.3d 307 (2d Cir. 2002) ................................................................35

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
    527 U.S. 666 (1999) ............................................................................32

*Comty. Fin'l Servs. Ass'n of Am., Ltd. v. Fed. Deposit Ins. Corp.*,
    132 F. Supp. 3d 98 (D.D.C. 2014) ........................................................30

*Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 530 (1980) ............................................................................47

*Corso v. Fischer*,
    983 F. Supp. 2d 320 (S.D.N.Y. 2013) ...................................................43

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ............................................................................32

*Dallas v. Stanglin*,
    490 U.S. 19 (1988) ..............................................................................20

*Dearth v. Holder*,
    641 F.3d 499 (D.C. Cir. 2011) .............................................................26

*Doe v. Bolton*,
    410 U.S. 179 (1973) ............................................................................26

*Dorsett v. Cty. of Nassau*,
    732 F.3d 157 (2d Cir. 2013) ................................................................22

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*,
    282 F.3d 83 (2d Cir. 2002) ..................................................................14

*Douglas v. N.Y. State Adirondack Park Agency*,
    895 F. Supp. 2d 321 (N.D.N.Y. 2012) ..................................................36

*Edenfield v. Fane*,
    507 U.S. 761 (1993)........................................................................47

*Blouin ex rel. Estate of Pouliot v. Spitzer*,
    356 F.3d 348 (2d Cir. 2004)......................................................40, 41

*Ezekwo v. N.Y.C. Health & Hospitals Corp.*,
    940 F.2d 775 (2d Cir. 1991)...............................................................31

*Fighting Finest, Inc. v. Bratton*,
    95 F.3d 224 (2d Cir. 1996)........................................................44, 46

*Foman v. Davis*,
    371 U.S. 178 (1962)........................................................................48

*Friedman v. Coldwater Creek, Inc.*,
    551 F. Supp. 2d 164 (S.D.N.Y. 2008)................................................38

*Garcia v. City of Trenton*,
    348 F.3d 726 (8th Cir. 2003) ...........................................................14

*Global Network Commc'ns, Inc. v. N.Y.C.*,
    458 F.3d 150 (2d Cir. 2006) ............................................................13

*Goel v. Bunge, Ltd.*,
    820 F.3d 554 (2d Cir. 2016)............................................................13

*Goldberg v. Kelly*,
    397 U.S. 254 (1970).........................................................................33

*Gomillion v. Lightfoot*,
    364 U.S. 339 (1960).........................................................................47

*Greenwood v. N.Y., Office of Mental Health*,
    163 F.3d 119 (2d Cir. 1998).............................................................30

*Guard-Life Corp. v. Parker Hardware Mfg. Corp.*,
    50 N.Y.2d 183 (1980) ......................................................................37

*H.L. v. Matheson*,
    450 U.S. 398 (1981)..........................................................................26

*Haddock v. City of New York*,
    75 N.Y.2d 478 (N.Y. 1990) ........................................................41, 42

*Hammerhead Enters., Inc. v. Brezenoff*,
    707 F.2d 33 (2d Cir. 1983)................................................................15

*Hayes v. City of Amsterdam,*
    770 N.Y.S.2d 138 (N.Y. App. Div. 2003) ............................................................40

*Healy v. James,*
    408 U.S. 169 (1972) ..............................................................................................47

*Holmes v. Grubman,*
    568 F.3d 329 (2d Cir. 2009) ..................................................................................13

*Imbler v. Pachtman,*
    424 U.S. 409 (1976) ..............................................................................................41

*Johnson v. Newburgh Enlarged School Dist.,*
    239 F.3d 246 (2d Cir. 2001) ..................................................................................32

*Jones v. Parmley,*
    465 F.3d 46 (2d Cir. 2006) ..............................................................................40, 41

*Jones v. Schneiderman,*
    974 F. Supp. 2d 322 (S.D.N.Y. 2013) ..................................................................20

*Kramer v. Time Warner Inc.,*
    937 F.2d 767 (2d Cir. 1991) ..................................................................................12

*Lacey v. Maricopa Cty.,*
    693 F.3d 896 (9th Cir. 2012) (en banc) ................................................................14

*Leonard F. v. Israel Discount Bank of N.Y.,*
    199 F.3d 99 (2d Cir. 1999) ....................................................................................12

*Lorely Fin. (Jersey) No. 3 Ltd., v. Wells Fargo Securities, LLC,*
    797 F.3d 160 (2d Cir. 2015) ..................................................................................48

*Lowrance v. Achtyl,*
    20 F.3d 529 (2d Cir. 1994) ....................................................................................31

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ..............................................................................................27

*Lynch v. United States,*
    292 U.S. 571 (1934) ..............................................................................................31

*Mangino v. Inc. Vill. of Patchogue,*
    808 F.3d 951 (2d Cir. 2015) ..................................................................................21

*Matal v. Tam,*
    —— U.S. ——, 137 S. Ct. 1744, 198 L. Ed. 2d 366 (2017) ..................................23

*Mathews v. Eldridge*,
424 U.S. 319 (1976)......................................................................................34

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007)......................................................................................26

*Mickens v. State*,
881 N.Y.S.2d 854 (N.Y. Ct. Cl. 2009)..........................................................41

*Munoz v. City of N.Y.*, No. 04 Civ. 1105(JGK),
2008 WL 464236 (S.D.N.Y. Feb. 20, 2008)..................................................40

*Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*,
357 U.S. 449 (1958).........................................................................43, 44, 45, 46

*Nat'l Council of Resistance of Iran v. Dep't of State*,
251 F.3d 192 (D.C. Cir. 2001)......................................................................30

*NRA v. ATF*,
700 F.3d 185 (5th Cir. 2012) ........................................................................26

*O'Connor v. Pierson*,
426 F.3d 187 (2d Cir. 2005)..............................................................31, 32, 34

*Okwedy v. Molinari*,
333 F.3d 339 (2d Cir. 2003)..........................................................................16

*Patterson v. City of Utica*,
370 F.3d 322 (2d Cir. 2004)....................................................................28, 29

*Paul v. Davis*,
424 U.S. 693 (1976)......................................................................................30

*Pena v. DePrisco*,
432 F.3d 98 .................................................................................................32

*Penthouse Int'l, Ltd. v. Meese*,
939 F.2d 1011 (D.C. Cir. 1991) ....................................................................19

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983).................................................................................1, 25

*Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*,
653 F.3d 290 (3d Cir. 2011)....................................................................1, 25

*Quinn v. Syracuse Model Neighborhood Corp.*,
613 F.2d 438 (2d Cir. 1980)..........................................................................29

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ..................................................................................1, 24, 25

*Rattner v. Netburn*,
  930 F.2d 204 (2d Cir. 1991) ....................................................................5, 16, 18

*Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*,
  49 F. Supp. 3d 385 (S.D.N.Y. 2014) ...............................................................37

*Reed v. Town of Gilbert, Ariz.*,
  -- U.S. --, 135 S. Ct 2218 (2015) ....................................................................23

*Richardson v. Pratcher*,
  48 F. Supp. 3d 651 (S.D.N.Y. 2014) ................................................................19

*Roberts v. United States Jaycees*,
  468 U.S. 609 (1984) ....................................................................................43, 46

*Royal Crown Day Care LLC v. Department of Health & Mental Hygiene of City
  of New York*, 746 F.3d 538 (2d Cir. 2014) ......................................................14

*Sadallah v. City of Utica*,
  383 F.3d 34 (2d Cir. 2004) ..............................................................................28

*Safelite Grp., Inc. v. Rothman*,
  229 F. Supp. 3d 859 (D. Minn. 2017) ..............................................................26

*Sassi v. Dutchess Cty.*,
  9:16-cv-1450, 2017 WL 4773320 (N.D.N.Y. Oct. 20, 2017) ...................13, 39, 48

*Schittino v. State of N.Y.*,
  692 N.Y.S.2d 760 (N.Y. App. Div. 1999) .........................................................41

*Scutti Enterprises, LLC. v. Park Place Entertainment Corp.*,
  322 F. 3d 211 (2d Cir. 2003) ...........................................................................38

*Smith v. Arkansas State Highway Employees*,
  441 U.S. 463 (1979) .........................................................................................45

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) .........................................................................................24

*State Teachers Retirement Bd. v. Fluor*,
  654 F.2d 843 (2d Cir. 1981) .............................................................................48

*Tabbaa v. Chertoff*,
  509 F.3d 89 (2d Cir. 2007) .................................................................45, 46, 47

*In re Tam*,
  808 F.3d 1321 (Fed. Cir. 2015)....................................................................................24

*Telian v. Town of Delhi*,
  No. 3:14-cv-945, 2015 WL 2249975 (N.D.N.Y. May 13, 2015) ...........................................36

*Tessler v. Paterson*,
  768 F. Supp. 2d 661 (S.D.N.Y. 2011)..............................................................................40, 41

*TPP Acquisition, Inc. v CPI Corp.*,
  2012 N.Y. Misc. LEXIS 6458 (N.Y. Sup. Ct. Feb. 2, 2012).................................................37

*United States v. Stein*,
  495 F. Supp. 2d 390 (S.D.N.Y. 2007)..............................................................................32

*United States v. United Foods, Inc.*,
  533 U.S. 405 (2001) ....................................................................................................22

*Valmonte v. Bane*,
  18 F.3d 992 (2d Cir. 1994).............................................................................................29, 30

*Vega v. Lantz*,
  596 F.3d 77 (2d Cir. 2010)..............................................................................................28

*Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976)......................................................................................................26

*W. Union Telegraph Co. v. Foster*,
  247 U.S. 105 (1918) .....................................................................................................47

*Walker v. Mendoza*, No. 00 Civ. 93,
  2000 WL 915070 (E.D.N.Y. June 27, 2000) ......................................................................41

*Wandering Dago, Inc. v. Destito*,
  879 F.3d 20 (2d Cir. 2018)..............................................................................................23

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ........................................................................................3, 14

*Wisconsin v. Constantineau*,
  400 U.S. 433 (1971)......................................................................................................29, 30

*Zalewska v. Cty. of Sullivan, N.Y.*,
  316 F.3d 314 (2d Cir. 2003)............................................................................................20

*Zherka v. Amicone*,
  634 F.3d 642 (2d Cir. 2011)............................................................................................21

*Zieper v. Metzinger*,
    474 F.3d 60 (2d Cir. 2007)................................................................................ *passim*

**Statutes**

N.Y. Fin. Serv. Law §§ 301(c), 309, 408....................................................................39

N.Y. Ins. Law §§ 109(c)(1), 109(d), 1104(a), 2110(a)(1) ...........................................39

**Other Authorities**

Fed. R. Civ. P. 15(a) ...................................................................................................49

Fed. R. Evid. 201(c)(2)................................................................................................12

Plaintiff the National Rifle Association of America (the "NRA") submits this Memorandum of Law in Opposition to the Motion to Dismiss ("Motion") of defendants New York Governor Andrew Cuomo ("Cuomo"); Maria T. Vullo ("Vullo"); and the New York State Department of Financial Services ("DFS") (collectively, "Defendants"), as follows:

## I. PRELIMINARY STATEMENT

"Viewpoint discrimination is anathema to free expression," and state action that disfavors or punishes speakers based on their viewpoint is impermissible under the First Amendment.[1] Although Defendants do not (openly) dispute this bedrock constitutional principle, their actions, set forth in the Amended Complaint, have run well over the line and infringed the constitutional rights of the NRA. In furtherance of Governor Cuomo's crusade to "put the gun lobby out of business" in New York, Defendants leveraged the coercive power of the state with a singular goal: to bankrupt the NRA, and others who share its views, thereby extinguishing their advocacy.[2]

To achieve their aim, Defendants constructed a censorship-and-retaliation scheme based on backroom bullying, selective prosecution, and thinly veiled threats directed at banks and insurance companies who dared to do business with the NRA. Because public officials may not discriminate based on viewpoint, it is axiomatic that Defendants could not simply enact an explicit rule forcing financial institutions to blacklist gun-rights advocates. So instead, Defendants

---

[1] *Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, 653 F.3d 290, 296 (3d Cir. 2011); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

[2] *See* Andrew Cuomo, FACEBOOK (Aug. 4, 2018, 9:50 AM), https://www.facebook.com/andrewcuomo/posts/10155989594858401, attached as Exhibit A to the Declaration of Stephanie L. Gase in Support of Memorandum of Law In Opposition to Motion to Dismiss, dated August 24, 2018 (the "Gase Declaration").

"urge[d]" them to do so—via a pair of warning letters sent by New York's primary financial regulator, DFS, to chief executive officers of DFS-regulated entities.[3]

At the same time, Defendants reinforced their public exhortations with covert, backchannel threats.[4]  And Defendants delivered on their threats: shortly after it issued the warning letters, DFS announced a pair of punitive "consent" decrees imposed on two insurance companies that brokered and underwrote policies for NRA members, along with an "investigation" of a third company.[5]

Defendants' actions have successfully deterred banks[6] and insurers[7] from providing services to Second Amendment advocacy groups, like the NRA, who may incur "politically motivated . . . disfavor[] with the New York State DFS."[8]  One executive worried that his firm could not take the risk of losing its license should it fail to "drop" the NRA.[9]  And in the immediate wake of Defendants' actions, Lloyd's of London—which had no involvement with the insurance programs that purportedly triggered the DFS investigation—announced that it would "direct underwriters to terminate all insurance offered, marketed, endorsed, or otherwise made available through the National Rifle Association of America."[10]  Lloyd's explicitly cited DFS scrutiny as

---

[3] *See* Dkt. 37-1, 37-2, 37-3.

[4] *See* Compl. at ¶¶ 38, 75, 86.

[5] *See* Dkt. 37-4; Dkt. 37-5; Dkt. 37-6.

[6] *See* Compl. at ¶ 67; *see also id.* at ¶ 68, citing Neil Haggerty, *Gun issue is a lose-lose for banks (whatever their stance)*, AMERICAN BANKER (Apr. 26, 2018, 1:11 PM), https://www.americanbanker.com/news/gun-issue-is-a-loselose-for-banks-whatever-their-stance.

[7] *See* Compl. at ¶¶ 41, 44, 52.

[8] Neil Haggerty, *Gun issue is a lose-lose for banks (whatever their stance)*, AMERICAN BANKER (Apr. 26, 2018, 1:11 PM), https://www.americanbanker.com/news/gun-issue-is-a-loselose-for-banks-whatever-their-stance.

[9] *See* Compl. at ¶ 42.

[10] *See* Dkt. 37-6.

the reason for its decision.[11]   At the same time, a number of banks became newly reluctant to provide depository and related services to the NRA.[12]   Insurance for the NRA's corporate activities, including media broadcasts that constitute clear, core political speech, also became more difficult to find.[13]   Meanwhile, Cuomo publicly gloats about the success of Defendants' blacklisting campaign: boasting of "forcing the NRA into financial crisis" and vowing, "we won't stop until we shut them down."[14]

Just as the Constitution prohibits overt censorship, it also prohibits "[i]nformal measures" such as "coercion, persuasion, and intimidation"[15] that improperly target speech, including measures that "suffocate[]" a disfavored speaker  by "depriving [it] of . . . revenues" or "scaring off its payments-service providers."[16]  To identify implicit censorship regimes like this one, courts must "look through forms to the substance" of government conduct and determine, in light of surrounding context, whether state officials have leveraged their power in a way that offends the First Amendment.[17]

Because this totality-of-the-circumstances analysis dooms the present Motion, Defendants

---

[11] *See id.*

[12] *See* Compl. at ¶¶ 67-68.

[13] *See id.* at ¶¶ 65-66.

[14]    Andrew    Cuomo,    FACEBOOK    (Aug.    3,    2018,    12:16    PM), https://www.facebook.com/andrewcuomo/posts/10155987290088401, attached as Exhibit B to the Gase Declaration.

[15] *See White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)); *see also Zieper v. Metzinger*, 474 F.3d 60, 66 (2d Cir. 2007) (opining that "it is necessary to consider the entirety of the defendants' words and actions in determining whether they could reasonably be interpreted as an implied threat").

[16] *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015).

[17] *See Bantam Books, Inc.*, 372 U.S. at 67.

strain to present each element of their scheme as an isolated act, "entirely unrelated" to other, simultaneous acts by the same officials targeting the same political enemy.[18]  Sidestepping the warning letters that DFS issued to regulated entities just before it announced penalties against two of them, Defendants focus their Motion on the purported insurance infractions identified in the Lockton and Chubb Consent Orders, insisting that this is a case about "unlawful conduct," not speech.  But even viewed piecemeal, the Consent Orders reveal Defendants' true agenda: they target only NRA-related products, ignore identical marketing practices by the same insurance firms in connection with non-NRA products, and prohibit future lawful business relationships with the NRA.[19]

The DFS warning letters that accompanied the Consent Orders focus explicitly on speech. In the letters, DFS (which routinely imposes eight-figure fines on institutions with inadequate risk controls)[20] invokes the "risk management" obligations of New York financial institutions, and directs them to "take prompt actions" to manage vague "risks" that arise not only from dealings

---

[18] *See* Motion at 12.

[19] Indeed, the Consent Orders by themselves are unconstitutional, amounting to selective prosecution in violation of the Equal Protection Clause. *See* discussion *infra* at Section III.C.

[20] *See, e.g.*, Bonnie Sinnock, *New York fines Nationstar $5M for past compliance flaws*, NATIONAL MORTGAGE NEWS (Apr. 11, 2018, 2:18 PM), https://www.nationalmortgagenews.com/news/new-york-fines-nationstar-5m-for-past-compliance-flaws; *New York State Department of Financial Services Fines Goldman Sachs $54.75 Million For Unsafe And Unsound Conduct In Its Foreign Exchange Trading Business*, MONDO VISIONE (Jan. 5, 2018), http://www.mondovisione.com/media-and-resources/news/new-york-state-department-of-financial-services-fines-goldman-sachs-5475-mill/; Jenny Strasburg, *Deutsche Bank to Pay $205 Million Fine to End N.Y. Currency-Trading Probe*, THE WALL STREET JOURNAL (June 20, 2018, 1:57 PM), https://www.wsj.com/articles/deutsche-bank-to-pay-205-million-fine-to-end-n-y-currency-trading-probe-1529517428; Tony Adams, *Aflac fined $1.1 million by New York financial regulators*, LEDGER-ENQUIRER (July 10, 2018, 5:04 PM), https://www.ledger-enquirer.com/latest-news/article214637690.html.

with the NRA, but any "similar organization" engaged in so-called "gun promotion" advocacy.[21] In a press release that heralded the DFS letters, DFS Superintendent Vullo dispelled any ambiguity about the "prompt actions" Defendants sought: she commended several DFS-regulated entities who already agreed to "realign their company's values" and sever ties with the NRA, and directly "urge[d] all insurance companies and banks doing business in New York to join [them]."[22] Simultaneously, Defendants pursued blunt, backchannel communications with banks and insurers that reinforced their message: it's bad business in New York to do business with the NRA, or any other "gun promotion" organization.

Unable to pretend that these communications were viewpoint-neutral, Defendants now claim they were mere suggestions—not coercive directives. But where, as here, an official's communications urging adverse action against a disfavored speaker "may reasonably be viewed as an implicit threat,"[23] the line from permissible persuasion to unconstitutional coercion is crossed. As detailed in the Amended Complaint, banks and insurers not only could—but did—reasonably perceive Defendants' contemporaneous regulatory directives and enforcement actions for what they were: a sophisticated and coherent campaign to deter dealings with gun-rights groups. Financial institutions took Defendants' threats seriously—and acted upon them.

Defendants argue that unless this Court blesses their current conduct, all government actions "that could ever theoretically affect an organization whose 'major purpose' is political speech would violate the organization's First Amendment rights."[24] Not so. The NRA brings this

---

[21] *See* Dkt. 37-2, 37-3.

[22] *See* Dkt. 37-1.

[23] *See Rattner v. Netburn*, 930 F.2d 204, 210 (2d Cir. 1991).

[24] *See* Motion at 25.

action to redress an extraordinary, specific, and clear pattern of viewpoint-based coercion that seeks to silence Second Amendment advocates by depriving them of financial services in this State.[25]

The Court should deny the motion to dismiss.

## II. <u>STATEMENT OF FACTS</u>

**A.**  **Defendants Are Engaged In A Multi-Pronged Campaign That Seeks To Chill The NRA's Political Speech.**

The Motion emphasizes DFS's investigation of a particular NRA-endorsed insurance product known as Carry Guard and attempts to couch many of Defendants' actions as appropriate enforcement responses to "unlawful conduct" allegedly affecting Carry Guard.[26] However, as the Amended Complaint makes clear, Carry Guard was never Defendants' real focus. Long before the NRA commenced this lawsuit, DFS's investigation expanded to encompass life insurance, health insurance, and other insurance transactions that share no features whatsoever with Carry Guard. In fact, none of the Consent Order provisions challenged by this lawsuit concern Carry Guard, and DFS's exhortative "guidance" to banks and insurers had nothing to do with Carry Guard. Put simply, Defendants' focus on Carry Guard in their Motion to Dismiss is a red herring.

In truth, the DFS enforcement actions that purportedly stem from its Carry Guard investigation are now known to be part of a multi-pronged attempt to disrupt any and all business arrangements between the NRA and New York financial institutions. This explains why DFS's actions have extended far beyond Carry Guard, and underscores why those actions—including the consent decrees coerced from Lockton and Chubb, the ongoing investigation of Lloyd's, and

---

[25] *See* Compl. at ¶¶ 17, 20.

[26] *See*, *e.g.*, Motion at 17-19.

Defendants' contemporaneous threats to other entities—are not, as the Motion insists, "entirely unrelated."[27]  The Amended Complaint alleges, and discovery will further prove, that Defendants' multiple, simultaneous actions targeting the NRA represent a conspiracy, not a coincidence.[28]

1. **Defendants' Actions Go Well Beyond Carry Guard And Seek to Extinguish Financial Arrangements By The NRA Which Were Never Alleged To Be "Unlawful."**

The first publicized step in what can now be seen as Defendants' campaign against the NRA occurred in October 2017, when DFS commenced an investigation that focused nominally on Carry Guard, an insurance product that covers expenses arising from the lawful use of a legally possessed firearm in self-defense.[29]  The Carry Guard investigation focused, initially, on Lockton, a major insurance broker that served as broker and administrator for the Carry Guard product. Although the regulatory violations alleged with respect to Carry Guard were relatively specific to firearms self-defense,[30] the majority of insurance policies administered by Lockton for the NRA consist of "life, health, property, and casualty insurance that resemble policies offered by Lockton to other affinity groups."[31]  Within weeks of commencing the Carry Guard investigation, Defendants began investigating *all* insurance programs administered by Lockton and endorsed by the NRA[32]—while ignoring identical business arrangements between Lockton and its non-NRA clients.[33]

---

[27] *See id.* at 12.

[28] *See* Compl. at ¶¶ 114-120.

[29] *See id.* at ¶ 32.

[30] *See id.* at ¶ 36.

[31] *See id.* at ¶ 32; Dkt. 37-4; Dkt. 37-5.

[32] *See* Compl. at ¶¶ 54-55.

[33] *See id.* at ¶¶ 58-59.

Indeed, the enforcement actions that publicly began with the Carry Guard inquiry rapidly expanded to target insurance programs which have nothing to do with firearms.[34]  Under the auspices of the same investigation, Defendants targeted other DFS-regulated entities apart from Lockton which did business with the NRA.  At first, Defendants served subpoenas (and later imposed penalties) on Chubb Group Holdings, Inc. and Illinois Union Insurance Company (together, "Chubb"), the insurance carrier that underwrote Carry Guard.[35]  Yet, as with Lockton, the DFS actions against Chubb encompassed all potential NRA-related business, irrespective of whether such transactions bore any similarity to Carry Guard.[36]

During May 2017, Defendants announced Consent Orders with Lockton and Chubb that barred all lawful insurance transactions with the NRA.[37]  The press release accompanying the Lockton Consent Order makes clear that DFS intends to prohibit any insurance "agreement or arrangement" that "involve[s] the NRA, directly or indirectly."[38]  Moreover, the Chubb Consent Order purports to forbid NRA-related transactions that occur outside New York—*i.e.*, it prohibits business arrangements that could not conceivably violate any regulation DFS enforces.[39]  During the same period, it was announced that DFS was "investigating" Lloyd's of London ("Lloyd's") for its business arrangements with the NRA.[40]  Importantly, Lloyd's has no involvement with

---

[34] *See id*. at ¶ 54.

[35] *See id*. at ¶ 62, 63, 117.

[36] *See id*. at ¶¶ 62-63.

[37] *See id*. at ¶¶ 54-55, 62-63.

[38] *See* Motion, Appendix A (Dkt. 40-2).

[39] *See* Compl. at ¶ 63.  Unlike with respect to Chubb, the Lockton Consent Order permits Lockton to continue administering NRA-endorsed insurance programs outside of New York.

[40] *See* Defendants' Memorandum of Law In Opposition To Plaintiff's Request For Expedited Discovery ("Defendants' Opposition"), at 7; Compl. at ¶ 65.

Carry Guard, and Defendants articulate no rational basis for their pursuit of Lloyd's insurance transactions with the NRA.

### 2.   Taken Together, Defendants' Threatened And Actual Regulatory Reprisals Constitute A Cohesive Censorship-and-Retaliation Campaign.

The DFS enforcement actions targeting NRA affinity-insurance arrangements are not occurring in a vacuum.[41]  Instead, they were calculated to coincide with other communications, public and nonpublic, to threaten regulatory reprisals against banks and insurers which fail to blacklist so-called "gun promotion" advocacy organizations.[42]

On April 19, 2018—just before the Lockton and Chubb Consent Orders and the Lloyd's investigation were announced—Cuomo publicly directed DFS to "urge insurers and bankers statewide to determine whether any relationship they may have with the NRA or similar organizations sends the wrong message to their clients and their communities."[43]  The same day, DFS issued a pair of ominous "guidance" letters (the "April 2018 Letters") that urged "all insurance companies and banks doing business in New York"[44] to "take prompt actions" to redress the "risks" which "may arise from their dealings with the NRA or similar gun promotion organizations."[45]  The April 2018 Letters constitute official regulatory guidance from DFS, signed by Superintendent Vullo and sent to thousands of institutions under DFS's regulatory purview.[46] The April 2018 Letters explicitly invoke the "risk management" authority of DFS, which allows

---

[41] *See* Compl. at ¶ 65.

[42] *See id*. at ¶¶ 38, 45-46, 54, 62.

[43] *See* Dkt. 37-1 (the "Cuomo Press Release"); Compl. at ¶ 45.

[44] *See* Dkt. 37-1.

[45] *See* Compl. at ¶ 46.

[46] *See id*.

it to levy heavy fines to redress misconduct which can jeopardize the "safety, soundness, and integrity" of New York's financial institutions.[47]

In addition to its actions against Lockton, Chubb, and Lloyd's, and its "guidance" letters to New York banks and insurers, DFS undertook additional communications which the Amended Complaint identifies and the Motion ignores.[48]  For example, within days of the issuance of the April 2018 Letters, Cuomo publicly tweeted: "The NRA is an extremist organization.  I urge companies in New York State to revisit any ties they have to the NRA and consider their reputations, and responsibility to the public."[49]  Defendants also issued backchannel threats to banks and insurers who maintained, or sought, business arrangements with the NRA.[50]

## B.   Defendants' Campaign Is Depriving The NRA Of Key Liberty And Property Interests—As Well As Its Right To Free Speech.

Although they did business with the NRA for decades, financial institutions have begun to heed the threats from New York's regulators.[51]  Lockton and Chubb consented to terminate all affinity-insurance transactions with the NRA, including transactions which comply with relevant laws and—in the case of Chubb—occur outside DFS's regulatory jurisdiction.  In addition, Lloyd's announced on May 9, 2018, that it would terminate all insurance "offered, marketed, endorsed, or otherwise made available" to the NRA and its members in light of scrutiny by DFS.[52]

---

[47] *See id.* at ¶ 26.

[48] *See id.* at ¶¶ 38, 45-48.

[49] *See id.* at ¶ 51.

[50] *See id.* at 2.

[51] *See id.* at ¶¶ 54, 62, 65.

[52] *See* Compl., Ex. E (Dkt. 37-6); *see also* Compl. at ¶ 52.

In the wake of Defendants' actions, other DFS-regulated financial institutions have balked at providing services to the NRA, including basic banking[53] and corporate insurance[54] services that bear no conceivable connection to Carry Guard and are essential to the NRA's advocacy mission.[55]  These institutions, such as the NRA's Corporate Carrier, are not reacting to purported compliance defects in any affinity insurance program, nor any other past conduct or omission by the NRA.[56]  Instead, they have repeatedly expressed reluctance to maintain relationships with the NRA or any organizations that propound political viewpoints disfavored by Defendants.[57]

As detailed in the Amended Complaint, the inability to access banking and insurance services will directly and substantially interfere with the NRA's core political speech and associational activities.[58]  Without insurance, the NRA will be unable to convene rallies, host events, or support original media content.[59]  Similarly, without banking services, the NRA cannot effectively collect or safeguard members' donations, maintain an employee payroll, engage key vendors and conduct business in the normal course.[60]  The Amended Complaint alleges substantial harm from Defendants' conduct to date, including the loss of key insurance coverage from the NRA's longtime Corporate Carrier[61] and the withdrawal of several banks from an NRA request-

---

[53] *See id.* at ¶¶ 67-68.

[54] *See id.* at ¶¶ 65-66.

[55] *See id.* at ¶¶ 29, 70.

[56] *See id.* at ¶¶ 41, 44, 66.

[57] *See id.*

[58] *See id.* at ¶¶ 28-29.

[59] *See id.* at ¶ 29.

[60] *See id.* at ¶ 28.

[61] *See id.* at ¶¶ 41, 44, 66.

for-proposal process.[62]  If Defendants' campaign continues unchecked, its effects on the NRA can reasonably be expected to escalate.

## C.  Cuomo Publicly Admits The Basis Of The NRA's Claims.[63]

Cuomo continues to boast of his unconstitutional campaign to silence the NRA by depriving it of financial resources.  For example, on August 3, 2018, Cuomo gloated that the actions of New York regulators "are working" because "[w]e're forcing the NRA into financial jeopardy.  We won't stop until we shut them down."[64]  The very next day, he reiterated that "New York is forcing the NRA into financial crisis."[65]  Using the hashtag "#BankruptTheNRA," Cuomo urged others to "put the gun lobby out of business."[66]  Cuomo also uploaded a video to YouTube that bragged: "New York has the NRA on the brink."[67]  Importantly, these statements do not directly reference purported insurance infractions by the NRA.  Instead, Cuomo is candid about the purpose of Defendants' campaign: the NRA represents "the gun lobby," *i.e.*, a force of political

---

[62] *See id*. at ¶¶ 67-68.

[63] The Court should take judicial notice, as ascertainable facts, of Defendants' statements cited herein pursuant to Rule 201 of the Federal Rules of Evidence because Defendants cannot reasonably dispute their accuracy. *See* Fed. R. Evid. 201(c)(2); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991); *Leonard F. v. Israel Discount Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999). To be clear, the NRA does not ask the Court to take judicial notice of Defendants' statements for the truth of the matter asserted, but merely to acknowledge that Defendants made the statements. *See*, *e.g.*, *Kramer*, 937 F.2d at 774 (explaining that "courts routinely take judicial notice of documents filed in other courts, . . . not for the truth of the matters asserted . . ., but rather to establish the fact of such litigation and related filings").

[64] Gase Declaration, Ex. B.

[65] Gase Declaration, Ex. A.

[66] Gase Declaration, Ex. A.

[67] YouTube, *Stand with us in the fight to end the NRA's stranglehold on Americans politics. VOTE SEPT. 13*, https://www.youtube.com/watch?v=59NDp7ATfhg (last visited Aug. 15, 2018), attached as Exhibit C to the Gase Declaration.

opposition, and therefore must be destroyed by the coercive regulatory power of the state.

### III. <u>ARGUMENT AND AUTHORITIES</u>

#### A.    <u>Legal Standard.</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[68]  All facts alleged must be taken as true, and every reasonable inference from those facts must be drawn in the non-moving party's favor.[69]  Because a motion to dismiss tests only the legal sufficiency of a plaintiff's claims, inquiry into their substantive merits—that is, whether the facts pleaded are actually true—is inappropriate.[70]  Thus, a claim may not be dismissed where the facts pleaded, taken as true and accompanied by every reasonable inference in plaintiff's favor, "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[71]

#### B.    **The NRA States Multiple First Amendment Claims With Respect to Freedom of Speech.**

The NRA alleges two distinct violations of the First Amendment right to free speech: (1) establishment of a censorship scheme to suppress the NRA's speech; and (2) retaliation against the NRA for its advocacy on gun-control issues.  None of Defendants' arguments warrant dismissal of these claims.[72]

---

[68] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[69] *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009).

[70] *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citing *Global Network Commc'ns, Inc. v. N.Y.C.*, 458 F.3d 150, 155 (2d Cir. 2006)).

[71] *Sassi v. Dutchess Cty.*, 9:16-cv-1450, 2017 WL 4773320, *3 (N.D.N.Y. Oct. 20, 2017) (D.J., McAvoy).

[72] Insofar as the Motion discusses any particular free speech claim, it focuses on the NRA's implicit-censorship claim.  The NRA's response below therefore pays particular attention to that claim.  However, it is important to understand that the NRA's retaliation claim is a separate-and-

1.    __Defendants' unconstitutional actions target lawful business relationships and conduct.__

Defendants argue that their actions target "unlawful conduct having nothing to do with . . . expressive activity," and thus, their campaign to deprive so-called "gun promotion organizations" access to financial services cannot, as a matter of law, violate the United States Constitution.[73]  Defendants' allegations of "unlawful conduct" with respect to a particular affinity insurance program are inapposite—because Defendants' actions indiscriminately seek to prohibit __all__ affinity-insurance business involving the NRA, irrespective of whether such arrangements violate New York Law.[74]  Importantly, the NRA's First Amendment claims do not challenge any Consent Order provisions that pertain to Carry Guard, or any other program for which "unlawful conduct" is alleged.  Instead, the NRA challenges enforcement of provisions that prohibit __lawful__ insurance transactions and business relationships with the NRA.[75]

Defendants' "unlawful conduct" arguments also ring hollow because the Amended Complaint alleges that DFS permits similar (and in some cases identical) conduct by other affinity

---

independent claim with its own legal test, *see Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002), and it is well-established that the kind of tactics Defendants have employed can constitute retaliatory conduct. Courts have held that government officials' statements to the press, *see Blankenship v. Manchin*, 471 F.3d 523, 530 (4th Cir. 2006); *Barrett v. Harrington*, 130 F.3d 246, 263 (6th Cir. 1997), harassing investigations, *see Lacey v. Maricopa Cty.*, 693 F.3d 896, 917 (9th Cir. 2012) (en banc); *White*, 227 F.3d at 1238, and regulatory action, *see Royal Crown Day Care LLC v. Department of Health & Mental Hygiene of City of New York*, 746 F.3d 538, 545 (2d Cir. 2014), can all be bases for retaliation claims. Indeed, the retaliatory conduct need not be nearly as serious as Defendants' actions in this case to be actionable.  *See Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003) (four $35 parking tickets); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982).

[73] *See* Motion at 17.

[74] *See* discussion *supra* at Section II.A.

[75] *See* Compl. at ¶¶ 54, 62.

organizations who endorse insurance in New York.[76]  Indeed, the Complaint identifies insurance-marketing communications for policies brokered by Lockton, and endorsed by organizations such as the New York City Bar, the Professional Photographers of America and the Veterans of Foreign Wars, which exhibit the same purported compliance issues as the NRA-endorsed policies.[77] Incredibly, although they purport to identify Insurance Law violations by Lockton and Chubb, the Lockton and Chubb Consent Orders *do not prospectively prohibit the same allegedly "violative" conduct with respect to other clients*—only the NRA.

Finally, Defendants' accusations of "unlawful conduct" cannot justify their ominous "guidance" and backroom threats concerning any or all "dealings with the NRA or similar gun promotion organizations."[78]  In sum, Defendants' attempt to characterize the NRA's claims as an assault on their ability to regulate unlawful conduct is baseless.

### 2. Defendants' threats constitute censorship and retaliation and cannot be characterized as "government speech."

A First Amendment claim exists where an official's actions "can reasonably be interpreted as intimating . . . some form of punishment or adverse regulatory action" when viewed in light of "the entirety of [the official's] words and actions."[79]  Although courts must occasionally "draw fine lines between permissible expressions of personal opinion and implied threats" by government officials,[80] Defendants' actions decisively cross such lines, and cannot be shielded as government

---

[76] *See id*. at ¶¶ 58-59.

[77] *See id*. at ¶ 59.

[78] *See* discussion *supra* at II.A.

[79] *Zieper*, 474 F.3d at 68 n.4.

[80] *See Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983).

speech—especially on a motion to dismiss.[81]  Where, as here, that speech "threaten[s] credit card companies or other suppliers" of financial services to a speaker, in an effort to "prevent the dissemination of ideas or opinions thought dangerous or offensive,"[82] courts routinely hold that communications like the April 2018 Letters amount to unconstitutional coercion.[83]

To avoid such an outcome, the Motion omits key language contained in Defendants' pronouncements,[84] and urges that each communication be evaluated in a vacuum without regard to Defendants' contemporaneous tweets, press releases, enforcement actions, and backchannel threats.[85]  However, in the Second Circuit, a court confronting claims of implicit censorship must examine the entirety of defendants' words and actions in determining whether they can reasonably be interpreted as an implied threat.[86]  In this case, the threat of regulatory reprisal against any institution that does business with the NRA is not merely a ***reasonable*** interpretation of

---

[81] *See Rattner*, 930 F.2d at 210 (holding that, even on a motion for summary judgment, it was error for the district court not to regard defendant-official's letter as implied threat).

[82] *Blue Canary Corp. v. City of Milwaukee*, 251 F.3d 1121, 1123 (7th Cir. 2001).

[83] *See Okwedy v. Molinari*, 333 F.3d 339, 340-41 (2d Cir. 2003) ("We write here only to make clear that a public-official . . . who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights even if the public-official . . . lacks direct regulatory or decisionmaking authority over the plaintiff . . . ."); *see also Rattner*, 930 F.2d at 209 (determining that "a reasonable factfinder could" interpret a government official's letter as "as intimating that some form of punishment or adverse regulatory action would follow" if plaintiff's advertisement continued to be published and thus violate the First Amendment).

[84] *See, e.g.*, Motion at 22 (claiming that the April 2018 Letters "merely encouraged [businesses] to 'consider' their ties to the NRA" and omitting the directive that they "take prompt actions" to redress the purported risks).

[85] *See id.* at 11-13.

[86] *See Zieper*, 474 F.3d at 66.  That analysis must be conducted "in the light most favorable to [plaintiff] as the nonmoving party."  *See, e.g.*, *Rattner*, 930 F.2d at 210 (holding that "[t]he district court's ruling that the language of the [defendant's] letter, either standing alone or in all the circumstances, is not a veiled threat of boycott or reprisal does not view that language in the light most favorable to [plaintiff] as the nonmoving party").

Defendants' actions and statements as a whole—it is the only *plausible* interpretation.

Defendants publicly exhorted banking and insurance institutions to cease doing business with the NRA, not for any purported compliance or regulatory reasons, but because the NRA is a "gun promotion organization[]" whose advocacy the Governor opposes.[87]   Indeed, the Motion *concedes* that, far from merely offering viewpoint-neutral regulatory guidance, the April 2018 Letters and the press release "express[ed] the government's position on the public gun control debate."[88]  In the press release issued by Defendant Cuomo's office, the Governor warns regulated entities that "any relationship they may have with the NRA" might "send[] the *wrong message* to their clients and their communities," and DFS extolled those entities that had "ended relationships with the NRA" and had "realign[ed] their company's values."[89]   Defendant Vullo expressly "urge[s] all insurance companies and banks doing business in New York to join the companies that have already discontinued their arrangements with the NRA,"[90] and the April 2018 Letters cite recent actions by "a number of financial institutions that severed their ties with the NRA" as "an example of" firms "fulfilling their corporate social responsibility" in the eyes of DFS.[91]

Of course, looming behind Defendants' pronouncements is the brute force of state power.[92] The April 2018 Letters, Consent Orders, and accompanying press releases are directed at entities subject to Defendants' regulatory authority.[93]  One press release pointedly advises the reader that

---

[87] *See* Dkt. 37-2, 37-3.

[88] Motion at 21; *see also id.* at 31–32, 44.

[89] *See* Dkt. 37-1 (emphasis added).

[90] *See* Dkt. 37-1.

[91] *See* Dkt. 37-2, 37-3.

[92] *See, e.g.*, Compl. at ¶¶ 21, 64, 77.

[93] *See id*. at 19; Dkt. 37-2; Dkt. 37-3.

MetLife, "a major insurer regulated by DFS," has severed ties with the NRA, and refers to Chubb as "another DFS-regulated insurer" expected to cosign Defendants' blacklist.[94]   Moreover, Defendants' communications repeatedly reference the regulatory "risk management" obligations of banks and insurers, which the DFS enforces through multimillion-dollar fines.

Defendants made clear that the guidance letters were not idle threats by announcing Consent Orders, which fined Lockton and Chubb millions of dollars for doing business with the NRA and prohibited lawful transactions with the NRA in the future (and in the case of Chubb, anywhere in the world).[95]   Regulated entities got the message: the day after the Chubb Consent Order was made public, Lloyd's—an insurance underwriter of NRA endorsed affinity insurance programs—"announced" that it was severing ties with the NRA because of the "inquiry by the New York Department of Financial Services."[96] Obviously, a threat was perceived and its impact became demonstrable.[97]

Against these factual allegations, Defendants curiously cite *Zieper v. Metzinger*, wherein the United States District Court for the Southern District of New York held that an FBI agent's statements failed to rise to the level of coercion because they did not explicitly mention "criminal statutes or legal consequences."[98]   However, although it affirmed the outcome in *Zieper* on other grounds, the Second Circuit firmly rejected and reversed the holding cited by Defendants.  Instead,

---

[94] *See* Dkt. 37-1.  Accordingly, the Motion is incorrect when it asserts that "the Press Releases and Guidance Letters" did not mention "any particular company."  Motion at 22.

[95] *See* Compl. at ¶ 63.

[96] *Lloyd's Underwriters Told to Stop Insurance Linked to NRA*, THE NEW YORK TIMES (May 9, 2018), https://www.nytimes.com/reuters/2018/05/09/business/09reuters-lloydsof-london-nra.html.

[97] *Rattner*, 930 F.2d at 210.

[98] *Zieper*, 474 F.3d at 66.

it held that a rational juror could infer coercion even if the government did not expressly invoke

potential penalties:

> we have never held that [the precise language and tone used] is the
> only relevant factor in determining whether a public official has
> crossed the line "between attempts to convince and attempts to
> coerce." . . . Instead, it is necessary to consider the entirety of the
> defendants' words and actions in determining whether they could
> reasonably be interpreted as an implied threat.[99]

Simply put, the NRA has more than adequately alleged that Defendants' actions, taken together

and viewed in light of surrounding circumstances, "could reasonably be interpreted as an implied

threat."[100]  Indeed, Defendants' actions **were** so-interpreted by institutions, including Lloyd's.[101]

### 3.  **The NRA has amply pleaded that it engages in core political speech—which Defendants seek to punish and suppress.**

The Motion asserts that the Complaint "fails to identify any specific, particularized instance

of protected speech or expressive conduct that has been directly infringed by Defendants."[102]  In

an effort to construct a heightened, particularized pleading standard for First Amendment claims,

---

[99] *Id*.  Defendants' reliance on *Penthouse Int'l, Ltd. v. Meese* is also misplaced.  939 F.2d 1011, 1015 (D.C. Cir. 1991).  Although the *Penthouse* court found a letter was governmental speech where there was no "threatened imposition of governmental power," the court distinguished between the threats of an advisory committee with no enforcement or prosecutorial power and threats from agents with the authority to sanction.  *Id*. at 1014.  Here, Defendants have broad regulatory and enforcement authority against the very entities to which their speech is directed and they imposed significant sanctions (over $8 million within three weeks) on companies doing business with the NRA—the very activity they were warning against.  This crucial difference renders *Penthouse* inapplicable to this case.

[100] *See e.g., Richardson v. Pratcher*, 48 F. Supp. 3d 651, 670 (S.D.N.Y. 2014) (finding that comments by a regulator about unprofessional behavior and questioning the integrity and judgment of an employee was sufficient to "be interpreted as intimating that some form of punishment or adverse regulatory action will follow" if the employer did not take action against the employee).

[101] *See id*.

[102] *See* Motion at 26.

the Motion cites an assortment of cases wherein litigants failed to establish that their conduct (wearing a skirt to work;[103] participating in illegal combat sports;[104] inviting minors to certain nightclub events[105]) was sufficiently "expressive" to invoke the First Amendment.[106]   However, no such particularized pleading is required to invoke the First Amendment's protection for actual speech (as opposed to conduct).

In any event, Defendants ignore the wealth of factual support in the Complaint describing the protected speech targeted and affected by Defendants' conduct.[107]   For example, the Complaint alleges that Defendants' conduct has put the NRA's involvement with NRATV at risk due to the inability to obtain media liability coverage for the NRA[108] and the April 2018 Letters indict the NRA specifically for its political "gun promotion" advocacy.[109]   Defendants' multi-pronged censorship and retaliation campaign against the NRA will, if left unchecked, put the entire organization at risk, along with the organization's ability to "pursue its advocacy mission" through letter-writing campaigns, peaceable public gatherings, and other grassroots 'lobbying' activities.[110] This activity is precisely the type of political speech which rests at the "core of the First Amendment."[111]

---

[103] *See Zalewska v. Cty. of Sullivan, N.Y.*, 316 F.3d 314, 319–20 (2d Cir. 2003).

[104] *See Jones v. Schneiderman*, 974 F. Supp. 2d 322, 333 (S.D.N.Y. 2013) (applying First Amendment law to conduct—mixed martial arts).

[105] *See Dallas v. Stanglin*, 490 U.S. 19, 25 (1988).

[106] Motion at 23–24.

[107] *See* Compl. at ¶¶ 38–53, 57, 65–66, 70, 75, 78.

[108] *See id.* at ¶ 66.

[109] *See id.* at ¶¶ 15–19.

[110] *See id.* at ¶ 14.

[111] *Brown v. Hartlage*, 456 U.S. 45, 52 (1986).

4.     __The NRA does not need to give in to Defendants' threats in order to have a viable First Amendment claim.__

Implicitly conceding that the NRA engages in protected, political speech, Defendants point out that the NRA has continued to engage in political speech, despite Defendants' efforts.[112] However, the NRA need not accede to Defendants' coercion in order to seek redress.  Any attempt at government censorship is actionable, even if a plaintiff continues to speak.[113]  As for the NRA's retaliation claim, the Second Circuit has held that "[c]hilled speech is not the *sine qua non* of a First Amendment claim," and that "[a] plaintiff has standing if he can show *either* that his speech has been adversely affected by the government retaliation *or* that he has suffered some other concrete harm."[114]  "Allegations of loss of business or some other tangible injury as a result of a defendant's [retaliatory] statements would suffice to establish concrete harm,"[115] and the NRA has made precisely these types of allegations.[116]

5.     __Even if the NRA's speech constitutes commercial speech, which it does not, the Complaint sufficiently pleads claims with respect to commercial speech.__

Defendants argue that because their campaign against the NRA targets the NRA's business relationships with Lockton, Chubb, and Lloyds, the speech at issue is only commercial speech that

---

[112] *See* Motion at 2 ("[T]he NRA has continued to lobby against government regulations of firearms[.]").

[113] *See, e.g.*, *Zieper*, 474 F.3d at 66 (holding that a reasonable juror could have found a First Amendment violation even though plaintiff failed to accede to defendants' threats); *Backpage.com, LLC*, 807 F.3d at 231 ("Notice that such a threat [by a public official to employ coercive state power] is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent.").

[114] *Mangino v. Inc. Vill. of Patchogue*, 808 F.3d 951, 955–56 (2d Cir. 2015) (emphases in original); *see also Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

[115] *Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir. 2011).

[116] *See supra* Section II.B.

should receive, at most, the same level of constitutional scrutiny afforded to regulations of "the exchange of information about securities, [ ], corporate proxy statements, [ ], [and] the exchange of price and production information among competitors."[117]  This argument lacks merit.

a. **The NRA's central allegations relate to core political speech, not commercial speech.**

Defendants blanket assertion that the "basis of the NRA's claims . . . is not that the NRA is being hampered, in any way, from engaging in political speech advocating in favor of the Second Amendment," but is instead commercial speech, is a willful misreading of the Amended Complaint.[118]  Commercial speech is limited to expression that does no more than propose a commercial transaction.[119]  Conversely, the gravamen of this lawsuit concerns efforts to suppress the NRA's so-called "gun promotion" advocacy—*i.e.*, Governor Cuomo's crusade to extinguish disfavored political speech by "put[ting] the gun lobby out of business" in New York.[120]

---

[117] *See* Motion at 27.

[118] *See* Compl. at ¶¶ 76, 86, 122.

[119] *See, e.g.*, *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001) (commercial speech "usually defined as speech that does *no more than* propose a commercial transaction") (emphasis added); *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473-74 (1989) (describing this as "the test"); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 561 (1980) (commercial speech defined as "expression related *solely* to the economic interests of the speaker and its audience") (emphasis added).

[120] *See, e.g.*, Compl. at ¶ 21 ("Together with DFS Superintendent Vullo, [Cuomo's] longtime lieutenant, Cuomo has embarked on a campaign to chill the political speech of the NRA . . . by leveraging state power to punish[] financial institutions which maintain business arrangements with the NRA[;] [t]o achieve this, Defendants draw upon the formidable regulatory powers of DFS[.]") (internal quotation marks and footnote omitted), ¶ 76 ("Defendants' actions were for the purpose of suppressing the NRA's pro-Second Amendment viewpoint" and were "undert[aken] . . . with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech."), ¶ 78 ("Defendants' concerted efforts to stifle the NRA's freedom of speech caused financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations."), ¶ 86 ("Defendants' actions—including but not limited to the issuance of the April 2018 Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon Chubb and Lockton, and the

It is immaterial that the means employed by Defendants to silence their political opponents involve targeting commercial relationships and resources. Where the government seeks to "suffocate" a disfavored speaker by "depriving [it] of . . . revenues" or "scaring off its payments-service providers," the constitutional effect is the same as if any other censorship mechanism were employed.[121]   Here, the NRA alleges that Defendants aim to suppress and punish political advocacy that Cuomo believes should have "no place in the State of New York" by choking off financial services that are "necessary to the survival of the NRA as a charitable organization."[122]

### b.   Even with respect to commercial speech, viewpoint-based restrictions trigger heightened scrutiny.

To the extent that Defendants' actions also target the NRA's commercial speech, the NRA still sufficiently pleaded a violation of its First Amendment rights.  Defendants' restrictions on only the NRA's ability to enter lawful contracts for insurance and banking services, and not any other affinity or common-cause organization,[123] is a clear content-based restriction based on political animus and serves no substantial government interest.[124]  While commercial speech may generally be subject to intermediate scrutiny, "viewpoint discrimination is scrutinized closely whether or not it occurs in the commercial speech context."[125]  For example, although the

---

issuance of the Cuomo Press Release—were in response to and substantially caused by the NRA's political speech regarding the right to keep and bear arms.").

[121] *See Backpage.com, LLC*, 807 F.3d at 231.

[122] *See* Compl. at ¶¶ 18, 52.

[123] Defendants did not restrict Lockton's ability to enter into similar affinity insurance contracts with other organizations, such as the New York State Bar Association, the New York City Bar, the New York Association of Professional Land Surveyors, and the New York State Psychological Association.  *See id*. at ¶ 36-37.

[124] *See id*. at ¶ 57.

[125] *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 39 (2d Cir. 2018); *see also Matal v. Tam*, ⸺ U.S. ⸺, 137 S. Ct. 1744, 198 L. Ed. 2d 366 (2017); *Reed v. Town of Gilbert, Ariz.*, -- U.S. --, 135

government may limit commercial advertising to prevent fraud, the government "may not prohibit only that commercial advertising that depicts men in a demeaning fashion" because such a prohibition would discriminate on the basis of viewpoint.[126]  "Commercial speech is no exception" to the rule that "[t]he First Amendment requires heightened scrutiny whenever the government creates a regulation of speech because of disagreement with the message it conveys."[127]  Here, Defendants' blatant viewpoint-based discrimination cannot withstand the most basic scrutiny—let alone the heightened scrutiny afforded under the First Amendment.

Moreover, even if Defendants' discriminatory conduct was not based on the NRA's viewpoint, lawful and non-misleading commercial speech cannot be regulated unless the regulation directly advances a substantial government interest and is not more extensive than necessary to serve that interest.[128]  Here, Defendants cannot hope to articulate a substantial government interest in punishing and extinguishing financial transactions that involve the NRA, while permitting identical transactions by entities other than "gun promotion" advocacy groups. Certainly, the vague "reputational risks" invoked in the April 2018 Letters cannot suffice—if they did, the government would have an identical interest in excluding, from its financial markets, any

---

S. Ct 2218 (2015); *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) (opining that a heightened standard applies to content-based restrictions on commercial speech such that government must show that the restriction "directly advances a substantial governmental interest and that the measure is drawn to achieve that interest"); *In re Tam*, 808 F.3d 1321, 1338-39 (Fed. Cir. 2015) ("Commercial speech is no exception to the need for heightened scrutiny of content-based impositions seeking to curtail the communication of particular information or messages.") (internal citation and punctuation omitted).

[126] *R.A.V.*, 505 U.S. at 389.

[127] *Sorrell*, 564 U.S. at 566 (internal quotation marks omitted) (observing that "it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory . . . . whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied").

[128] *Central Hudson Gas & Elec. Corp.*, 447 U.S. at 566.

person or entity holding unpopular views.  Such discrimination is "anathema to free expression,"[129] and impermissible under the United States Constitution.

## C.     The NRA Has Standing To Allege An Equal Protection Claim.

Defendants do not seriously contest the NRA's Equal Protection claim on the merits;[130] instead, Defendants' erroneously contend that the NRA lacks standing to bring an equal protection claim because it is only asserting a violation on behalf of Chubb and Lockton and no formal enforcement action has been taken against the NRA.[131]  This is a blatant misinterpretation of the NRA's claim, a clear misstatement of the law, and contradicts the very case Defendants rely on in their Motion.[132]   The Complaint is replete with allegations that Defendants are selectively enforcing the Insurance Law "against *the NRA* and its business partners,"[133] which is causing *direct* personal injuries to the NRA.[134]   By prohibiting Lockton and Chubb from engaging in lawful insurance business with the NRA, Defendants have selectively enforced the State's insurance laws against the NRA, not just against Lockton and Chubb.

The fact that the NRA was not a party to the Consent Orders is of no moment; the NRA's

---

[129] *Pittsburgh League of Young Voters Educ. Fund*, 653 F.3d at 296; *R.A.V.*, 505 U.S. at 382; *Perry Educ. Ass'n*, 460 U.S. at 46.

[130] Indeed, contesting the NRA's claim on the merits is virtually impossible given the substantial evidence that Defendants selectively enforced certain provisions of the Insurance Law to target transactions involving the NRA—while permitting the same transactions by affinity organizations whom Cuomo has not labelled "the enemy."

[131] *See* Motion at 39.

[132] *See Casciani v. Nesbitt*, 659 F. Supp. 2d 427, 449-450 (W.D.N.Y. 2009) (holding that "a claim of selective enforcement requires actual, or at ***least threatened***, enforcement, or some sort of selective "treatment" of the plaintiff") (emphasis added).

[133] *See* Compl. at ¶¶ 42–44, 109–110.

[134] *See id*. at ¶¶ 35, 57, 60, 69, 80, 108, 111.

equal-protection injury remains the same.  It is well-established, for instance, that a woman challenging an abortion regulation on equal-protection grounds has standing to pursue that claim even though the regulation would only be enforced against her physician.[135]  Other cases similarly recognize that a plaintiff has standing to challenge laws enforced against another party where the plaintiff is injured by such enforcement.[136]  And in the particular context of this case, standing can exist for non-parties to a consent order that are affected by the provisions in the consent order.[137]  Defendants' contrary view—that only Lockton and Chubb can bring an equal-protection claim— would have dangerous implications.  By this logic, the state could enact onerous building regulations, then make it known that such regulations will be enforced *only* against landlords that rent space to the NAACP or Black Lives Matter.  Or, the state could begin charging a sales tax for internet purchases, but only enforce the tax against merchants who stock books by a dissident author.[138]  The Court should not indulge this end-run around equal protection.

Furthermore, with respect to a selective enforcement equal protection claim, no formal enforcement action against a plaintiff is required; instead, the NRA need only plead "some sort of selective 'treatment,'" or the mere threat of enforcement.[139]  Defendants readily admit that the

---

[135] *See Doe v. Bolton*, 410 U.S. 179, 187–89 (1973).

[136] *See, e.g.*, *H.L. v. Matheson*, 450 U.S. 398, 400–01, 405–07 (1981); *Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 753, 757 (1976); *see also NRA v. ATF*, 700 F.3d 185, 191–92 (5th Cir. 2012); *Dearth v. Holder*, 641 F.3d 499, 502 (D.C. Cir. 2011).

[137] *See Safelite Grp., Inc. v. Rothman*, 229 F. Supp. 3d 859, 875 (D. Minn. 2017) (rejecting defendants' standing argument where defendants entered into consent orders with plaintiff's insurer-clients, but not plaintiff, that required the insurer to drop plaintiff as its claim administrator; defendants "efforts to avoid 'the elephant in the room' by going after [plaintiff's] insurer-clients 'one by one' do not deprive [plaintiff] of standing").

[138] Of course, the foregoing examples would also raise First Amendment and Due Process issues— just like Defendants' conduct here.

[139] *See Casciani*, 659 F. Supp. 2d at 449-450; *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–129 (2007) ("[W]here threatened action by *government* is concerned, we do not

NRA itself is under investigation, for transactions in respect of which the DFS has already imposed nearly ten million dollars in fines.[140]   Even relying on the authority cited by Defendants, the investigation is a sufficient threat of selective enforcement of the Insurance Law to meet the standing requirements for Equal Protection.[141]

To establish standing, the NRA must demonstrate:  (1) a concrete and particularized "injury in fact," (2) which is fairly traceable to Defendants' conduct and (3) likely to "be redressed by a favorable decision"[142]   The Complaint alleges facts sufficient to demonstrate each of these elements:  (1) the NRA suffered a concrete injury by, among other things, losing royalty amounts owed to it under its contract with Lockton and experiencing increased costs associated with the potential development of new NRA-endorsed insurance programs not through Lockton, Chubb, or Lloyd's;[143] (2) the NRA's injury would not have occurred but for Defendants' selective enforcement of certain Insurance Laws against the NRA's affinity insurance program and, through the Lockton Consent Order, termination of those programs and the NRA's business relationship with Lockton;[144] (3) the relief requested by the NRA—to enjoin Defendants from requiring that Lockton or Chubb forbear from doing business with the NRA that is permissible with other affinity

---

require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat.").

[140] *See* Motion at 38, n.16 ("While the NRA is under investigation for its unlicensed insurance activities and other violations of the Insurance Law, that investigation is ongoing and has not, to date, resulted in any enforcement action against the NRA.").

[141] *See* Motion at 39 (citing to *Casciani*, 659 F. Supp. 2d at 449-450).

[142] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks, alterations, and citations omitted).

[143] *See* Compl. at ¶ 111.

[144] *See* Compl. at ¶¶ 108-111.

organizations—would redress the NRA's equal-protection injuries by allowing it to continue its programs with Lockton and Chubb.[145]   Accordingly, the NRA has standing to assert an equal-protection claim.

**D.      The NRA Alleges Multiple, Substantial Due Process Violations.**

The NRA adequately pleads two distinct claims under the Due Process Clause of the Fourteenth Amendment.  First, Defendants violated the Due Process Clause by stigmatizing the NRA in the course of instructing financial institutions to cease doing business with the NRA. Second, Defendants violated the NRA's due process rights when they coerced Lockton and Chubb to end their relationships with the NRA without affording the NRA any procedural protections. The public statements made by Defendants regarding the NRA and the Consent Orders leave no serious doubt that the NRA will prevail on both of these challenges.

**1.      Defendants have damaged the NRA's good name and reputation in violation of the Due Process Clause.**

A loss of reputation gives rise to a constitutional claim "if that loss is coupled with the deprivation of a more tangible interest."[146]   To prevail on such a "stigma-plus" claim, a plaintiff must show "(1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights."[147]   "[S]uch governmental action cannot be undertaken unless the individual is afforded an opportunity to be

---

[145] *See* Compl. at ¶ 113.

[146] *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004) (holding that proof of a "loss of [] reputation . . . coupled with the deprivation of a more tangible interest" establishes a "liberty interest" protected by the Due Process Clause) (citing *Bd. of Regents v. Roth*, 408 U.S. 564 (1972)).

[147] *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (internal punctuation omitted); *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004).

heard and to clear his name."[148]

A statement is sufficiently derogatory, and thus satisfies the first prong of the stigma-plus inquiry, where it impugns "a person's good name, reputation, honor or integrity."[149]   Here, Defendants publicly branded the NRA a "reputational risk" to the safety and soundness of financial institutions, warned those financial institutions that having the NRA as a customer may send the "wrong message to their clients and their communities," insinuated that having "ties" to the NRA "jeopardize[s] public safety," stated that the NRA has "caused carnage in this nation," and urged them to drop the NRA in order to "promote public health and safety."[150]   These public pronouncements have "call[ed] into question" the NRA's "'good name, reputation, honor, or integrity.'"[151]   They are, moreover, both false and capable of being shown to be false.[152]

Over the course of decades, sophisticated financial institutions weighed available information (including their awareness of the longstanding, sometimes-polarized debate over gun control), and decided for themselves that no "reputation risk," let alone any safety or health risk,

---

[148] *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 446 (2d Cir. 1980) (internal quotations and citations omitted).

[149] *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971).

[150] *See* Dkt. 37-1; Compl. at ¶ 45; *TRANSCRIPT: GOVERNOR CUOMO ADDRESSES NRA LAWSUIT AND CONDEMNS THE ORGANIZATION'S ILLEGAL BUSINESS PRACTICES WHILE GUEST ON CNN*, N.Y. STATE GOVERNOR ANDREW M. CUOMO (Aug. 6, 2018), https://www.governor.ny.gov/news/transcript-governor-cuomo-addresses-nra-lawsuit-and-condemns-organizations-illegal-business-0, attached as Exhibit D to the Gase Declaration.

[151] *Valmonte v. Bane*, 18 F.3d 992, 1000 (2d Cir. 1994) (quoting *Roth*, 408 U.S. at 573) (quoting *Constantineau*, 400 U.S. at 437)); *see also Patterson*, 370 F.3d at 330 (noting that statements which sully a plaintiff's "good name, reputation, honor, or integrity" satisfy the first element of the stigma-plus inquiry); *Quinn*, 615 F.2d at n.4 (holding that an allegation of illegal conduct could give rise to a Due Process claim).

[152] For example, Defendants' statements indicating that the NRA is causing the deaths from public shootings is demonstrably false.

precluded business relationships with gun-rights advocates.  This did not change—not in the aftermath of tragedies such as Sandy Hook, nor in the face of related private-sector boycott efforts—until Defendants commenced their coercive campaign. This is more than sufficient to satisfy the "stigma" prong of the stigma-plus doctrine.

The second, "plus" prong of the stigma-plus doctrine, *i.e.* a "material state-imposed burden or state-imposed alteration of the plaintiff's status or rights," requires that the stigmatized plaintiff be "deprived . . . of a right previously held under state law"[153] or imposes additional burdens on those who might contract with the stigmatized plaintiff.[154]  Here, too, the NRA has adequately plead its claim.  It is well-settled that, for example, the deprivation of access to banking services satisfies stigma-plus,[155] and contrary to Defendants' assertions, several financial institutions have refused to do business with the NRA in light of Defendants' actions.[156]  Likewise, other attempts by state actors to impose "badge[s] of infamy" hindering otherwise-lawful transactions—even with the clear goal of advancing public health and safety—have been invalidated by the Supreme Court under the stigma-plus doctrine.[157]  Furthermore, Defendants' defamatory statements were accompanied by a series of material changes in the NRA's status and rights with respect to the

---

[153] *Paul v. Davis*, 424 U.S. 693, 708 (1976); *Greenwood v. N.Y., Office of Mental Health*, 163 F.3d 119, 124 (2d Cir. 1998).

[154] *Valmonte*, 18 F.3d at 1001 (finding a plus element where a plaintiff's inclusion on a registry would require potential employers to incur additional burdens in order to hire her).

[155] *See Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204 (D.C. Cir. 2001); *see also Comty. Fin'l Servs. Ass'n of Am., Ltd. v. Fed. Deposit Ins. Corp.*, 132 F. Supp. 3d 98, 124 (D.D.C. 2014) ("The loss of a bank account as a result of stigma is sufficient to implicate a right to due process.").

[156] *See* Compl. at ¶¶ 67-68.

[157] *See, e.g.*, *Constantineau*, 400 U.S. at 437 (striking down statute that enabled cities to post lists of individuals known to be excessive drinkers, which prevented the individuals from purchasing alcohol).

benefits of its contractually bargained-for rights, which is foreclosing its participation in a substantial portion of the New York insurance market (and elsewhere).  Accordingly, Defendants have imposed a material change in the NRA's status sufficient to satisfy the second element of the stigma-plus analysis.

### 2.  Defendants' coercive tactics deprived the NRA of essential services without affording the NRA any procedural protections.

Defendants violated the NRA's due process rights by coercing financial institutions into withholding essential services for reasons that are arbitrary and capricious,[158] and without affording any process to the NRA.[159]

First, Defendants' argument that the NRA failed to identify any tangible right protected by the Due Process Clause should be rejected because the NRA alleged that it has a "property interest in its agreements with these financial institutions, as well as a liberty interest in its good name, reputation, honor, integrity, and its ability to endorse insurance products to its membership."[160] Both valid current contracts and goodwill are the exact type of property interests that courts routinely recognize qualify for protection under the Due Process Clause.[161]

---

[158] In order to allege a violation of its substantive due process rights, the NRA must allege:  (1) a constitutionally-protected interest in liberty or in property; and (2) that defendant's conduct deprived it of that interest in a manner that was "arbitrary in the constitutional sense."  *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994).

[159] In order to state a claim for relief under the procedural protections of the Due Process Clause, the NRA must demonstrate that it has been deprived of a property or liberty interest and that it suffered that deprivation without adequate opportunity to be heard.  *See O'Connor v. Pierson*, 426 F.3d 187, 197 (2d Cir. 2005).

[160] *See* Compl. at ¶ 125.

[161] *See Lynch v. United States*, 292 U.S. 571, 579 (1934) (holding that valid contracts, and the rights they guarantee, "are property, whether the obligor be a private individual, a municipality, a state, or the United States"); *Branum v. Clark*, 927 F.3d 698, 705 (2d Cir. 1991) (recognizing that an implied covenant of good faith "provides the basis for a property interest that would be entitled to constitutional protection"); *Ezekwo v. N.Y.C. Health & Hospitals Corp.*, 940 F.2d 775, 783 (2d

---

Second, the NRA adequately alleges that Defendants' actions "shock[] the conscience."[162] Whether actions shock the conscience "depends on [Defendants'] state of mind and the context in which [their] actions [were] taken."[163]  However, a lesser showing of scienter is permitted where the circumstances giving rise to government action permit reflection and deliberation.[164]  For example, where government actors have "time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations,"[165] deliberate[166] "indifference [to the liberties and rights of a plaintiff] is truly shocking" and thus gives rise to a constitutional violation.[167]

---

Cir. 1991) (recognizing a resident's expectation, based on a verbal promise, that she would be made chief resident as a property interest cognizable under the Due Process Clause); *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999).

[162] *O'Connor*, 426 F.3d at 203.

[163] *O'Connor*, 426 F.3d at 203.  Contrary to Defendants' argument, neither the Second Circuit nor the Supreme Court have ever limited conscience-shocking conduct solely to that which is "malicious and sadistic . . . [and that is] intended to oppress or cause injury and designed for no legitimate government interest."  Motion at 35.  While such conduct "unquestionably" violates the Fourteenth Amendment, the Second Circuit has recognized that a defendant's conduct may shock the conscience even where it does not have the purpose of depriving a plaintiff of a protected interest.  *Johnson v. Newburgh Enlarged School Dist.*, 239 F.3d 246, 252 (2d Cir. 2001).

[164] *See County of Sacramento v. Lewis*, 523 U.S. 833, 849-851 (1998) ("recogniz[ing] that some official acts" demonstrating less than intentional conduct may still shock the conscience, the Court explained that the level of culpability required depends, in part, upon whether the circumstances in which the conduct occurred permitted "actual deliberation").

[165] *County of Sacramento*, 523 U.S. at 853.

[166] *United States v. Stein*, 495 F. Supp. 2d 390, 414 (S.D.N.Y. 2007) (quoting *County of Sacramento*); *see also Pena v. DePrisco*, 432 F.3d 98, 113 (holding that an allegation of "deliberate indifference" could overcome a motion to dismiss where defendants had "ample opportunity" to "decide what to do").  Even under the most defendant-friendly standard, a showing that a government actor acted out of spite or with an intent to do harm is sufficient to trigger a violation of the Due Process Clause. *O'Connor*, 426 F.3d at 203.

[167] *County of Sacramento*, 523 U.S. at 853.

Here, Defendants had ample opportunity to devise methods of achieving their aims that were less restrictive of the NRA's rights; thus, the requisite scienter is "deliberate indifference" to the rights of the plaintiff.  The NRA has pleaded facts sufficient to establish deliberate indifference (as well as a deliberate and intentional deprivation of the NRA's rights), including that Defendants made a series of statements that were explicit in demonstrating their contempt for the NRA, their desire to compromise the NRA's political advocacy, and their willingness to pressure all businesses in the State of New York to cease doing business with the NRA.[168]  Defendants' knowledge of the NRA's interests, coupled with their clear intent to deprive the NRA of those interests, meets even the highest standards of scienter.  Accordingly, Defendants' misuse of their supervisory authority over financial institutions to punish political advocacy by NRA—the institutions' customer—is not only arbitrary and irrational, but also plainly unlawful, such that it shocks the conscience.

Finally, the Due Process Clause protects against the government's use of its power to coerce regulated institutions into injuring disfavored customers by requiring that due process be afforded to such customers before the State destroys those business relationships.  Where a state actor forces or induces a person's business associates to cut ties with a plaintiff, the Due Process Clause requires her to be afford an opportunity to be heard.[169]  Having repeatedly reaffirmed "that some form of hearing is required before an individual is finally deprived of a property interest," the Supreme Court has emphasized that the right to be heard must be meaningful in both time and

---

[168] *See* Compl. at ¶¶ 38, 46-51.

[169] *Goldberg v. Kelly*, 397 U.S. 254, 265 (1970) ("The fundamental requisite of due process of law is the opportunity to be heard.") (internal quotations omitted).

manner.[170]   Any "deprivation of life, liberty, or property [must] be preceded by notice and

opportunity" to be heard; otherwise, that deprivation occurs "without due process of law."[171]  That

is especially so where, as here, Defendants have not opted to pursue only "the procedures dictated

by state law," but instead opted to pursue a campaign of extralegal intimidation designed to cause

New York businesses to sever ties with the NRA.[172]

      Indeed, a similar scheme by Defendants' predecessors was enjoined on this basis over three

decades ago.  The court held that New York's Department of Insurance, the predecessor to DFS,

violated the due process rights of a business by blocking insurance "brokers from selling [its]

memberships through intimidation and harassment rather than the procedures dictated by state

law."[173]  The court reasoned that coercing insurance companies to stop selling memberships in

plaintiff's business violated plaintiff's due process rights to challenge that decision:

> A threat by the Department to revoke brokers' licenses, either for failure to stop
> selling AMC memberships or for failure to settle claims under AMC memberships,
> constitutes a "restraint" on brokers' sales of AMC memberships and grounds for
> granting a preliminary injunction. The threat of punishment if a broker continues to
> sell memberships is analogous to the order to cease selling memberships in
> American Automobile. The threat of revocation of a license, without which an
> insurance broker cannot do business, is a powerful restraint on the sale of
> memberships.[174]

The court issued a preliminary injunction prohibiting the Department from interfering with brokers

who sold memberships in plaintiff's program, before a state court proceeding decided the legality

---

[170] *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

[171] *O'Connor*, 426, F.3d at 197.

[172] *Am. Motor Club, Inc. v. Corcoran*, 644 F. Supp. 862, 866 (S.D.N.Y. 1986).

[173] *Am. Motor Club, Inc.*, 644 F. Supp. at 866.

[174] *Id.* (citing *Bantam Books, Inc.*, 372 U.S. at 67).

of that relationship.[175]   As in *Am. Motor Clubs*, so too here: Defendants have sought to regulate the New York insurance market through coercion, rather than through a legal process in which the NRA may participate.  By restraining Lockton and Chubb from selling NRA affinity products, and by coercing all other banks and insurers subject to their regulatory dictates to cease doing business with the NRA, Defendants have violated the NRA's due process rights.

## E.   The Complaint More Than Sufficiently Pleaded A Conspiracy Claim.

The NRA's Complaint pleads facts well beyond what is required to state a Section 1983 conspiracy claim.[176]   The Complaint sets forth numerous factual allegations—supported by evidence—which demonstrate that Cuomo and Vullo reached an agreement to deprive the NRA of its rights under the Constitution and took overt acts to achieve that goal.[177]   Defendants' reliance on *Ciambriello v. City of Nassau* is misplaced because the NRA's factual allegations provide a stark contrast to the conclusory allegations in *Ciambriello* that did not provide any details of time and place or specify "the factual basis necessary to enable defendants intelligently to prepare their defense."[178]   Here, the NRA's Amended Complaint extensively details the "who," "what," "where," and "how" comprising Defendants' conspiracy.[179]   For example, the Complaint alleges that "Cuomo directed Vullo to issue statements . . . to cause [financial institutions] to sever existing

---

[175] *Id.* at 867.

[176] As discussed *supra*, Defendants violated the NRA's constitutional rights, and therefore their first argument that a constitutional deprivation did not occur should be rejected.

[177] *See*, *e.g.*, Compl. at ¶¶ 34-35, 46, 50-51, 54, 62.

[178] *Ciambriello v. City of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (internal quotation marks and brackets omitted).

[179] *See* Compl. at ¶¶ 34-35, 46, 50-51, 54, 62.

relationships with the NRA. Vullo agreed and subsequently released the April 2018 Letters."[180] The Complaint further alleges that Vullo, in order to "carry out her agreement with Cuomo," signed the Lockton and Chubb Consent Orders several weeks after releasing the April 2018 Letters.[181]

Where, as here, a plaintiff has alleged both the existence of an agreement between two actors and an overt act in furtherance of depriving plaintiff of a constitutional right, the Court must deny a motion to dismiss a conspiracy claim.[182]  The NRA has sufficiently alleged both elements and, therefore, the Court must deny Defendants' Motion.

**F.    The NRA Adequately Alleges Tortious Interference With Prospective Economic Advantage.**

Defendants' arguments supporting dismissal of the NRA's tortious interference with prospective economic advantage claim lack merit and should be rejected.[183]  To sustain a claim for tortious interference with prospective economic advantage, the NRA must prove that:  "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper

---

[180] Compl. at ¶ 116.

[181] *See* Compl. at ¶ 117.

[182] *See Douglas v. N.Y. State Adirondack Park Agency*, 895 F. Supp. 2d 321, 371 (N.D.N.Y. 2012); *Telian v. Town of Delhi*, No. 3:14-cv-945, 2015 WL 2249975, at *7 (N.D.N.Y. May 13, 2015) (D.J., McAvoy).

[183] Defendants' first argument assumes that none of the NRA's other well-pleaded claims withstand dismissal.  In particular, Defendants contend that the Court should decline to exercise supplemental jurisdiction, disallowing the NRA to pursue its lone claim under state law in this cause.  However, as discussed *supra*, the NRA more than sufficiently pleaded constitutional violations and conspiracy under Section 1983; therefore, this argument need not be addressed by the Court.

means;[184] and (4) the defendant's acts injured the relationship."[185]  Defendants do not (nor can they) contest that the NRA had business relations with Lockton, Defendants intentionally interfered with those relations, and the NRA sustained injuries.  Instead, Defendants only challenge the third element of the NRA's claim—asserting that although they intentionally interfered with the NRA's business relationship, they did not employ "wrongful means."  Their arguments lack merit and should be rejected, especially at the motion-to-dismiss stage.

      1.    **Defendants acted for a wrongful purpose, with malicious intent, and used dishonest, unfair, and improper means when intentionally interfering with the NRA's business relationship with Lockton.**

The NRA alleges that Cuomo and Vullo acted with a wrongful purpose or using dishonest, unfair, or improper means when they coerced Lockton to terminate its business relationship with the NRA.[186]  In response, the Motion essentially insists that any adverse action taken by a law enforcement official in the presence of "admitted violations of law" (here, admissions coerced from Lockton as part of its Consent Order) is *per se* proper, thus inactionable as tortious interference.[187]  Defendants provide no support for this premise, nor any reason for the Court to foreclose factual inquiry into the propriety of Defendants' motives at this preliminary stage.

First, the "wrongful purpose" or "improper means" standard for tortious interference is not

---

[184] Courts have held that "wrongful means" may include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure." *TPP Acquisition, Inc. v CPI Corp.*, 2012 N.Y. Misc. LEXIS 6458, at *11-12 (N.Y. Sup. Ct. Feb. 2, 2012) (*quoting Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 191 (2004), *quoting Guard-Life Corp. v. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980), *citing* Restatement (Second) of Torts § 768, Comment e; § 767, Comment c)).

[185] *Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 427 (S.D.N.Y. 2014) (internal quotation marks omitted).

[186] *See* Compl. at ¶ 136 (emphasis added).

[187] *See* Motion at 47-48.

an objective standard, but instead explores a defendant's subjective intentions and goals.[188]   In other words, even if Defendants' actions, on their face, could conceivably have been supported by proper motives, the correct question for the Court is whether Defendants actually acted with bad faith.[189]  Here, the NRA alleges—and Cuomo's public boasts in response to this lawsuit confirm— that Defendants have not sought in earnest to redress violations of insurance laws, but rather to "put the gun lobby out of business" in New York.[190]  The allegations must be taken as true and every reasonable inference drawn in the NRA's favor.[191]  Accordingly, the Court should deny Defendants' argument that their true purpose for requiring Lockton to no longer participate in lawful insurance programs with the NRA was to "correct admitted violations of law."

Second, no legitimate law enforcement purpose could have motivated Defendants' ban on participating in *any* affinity-type insurance program with the NRA involving *all* lines of insurance, including life, health, property, pet, and travel insurance.[192]  In focusing their argument on Lockton's purportedly illegal conduct, Defendants sidestep the real issue: in their desire to remove

---

[188] *See Scutti Enterprises, LLC. v. Park Place Entertainment Corp.*, 322 F. 3d 211, 216-217 (2d Cir. 2003) (denying motion to dismiss and examining defendant's objective and purpose behind actions).

[189] *See*, *e.g.*, *Friedman v. Coldwater Creek, Inc.*, 551 F. Supp. 2d 164, 171 (S.D.N.Y. 2008) (examining the "legitimacy of [Defendant's] stated motive" to determine whether she acted with wrongful means).

[190] *See* Gase Declaration, Ex. A; *see also* Gase Declaration, Ex. D; *GOVERNOR CUOMO EXPOSES NRA'S HYPOCRISY*, N.Y. STATE GOVERNOR ANDREW M. CUOMO (Aug. 9, 2018), https://www.governor.ny.gov/news/governor-cuomo-exposes-nras-hypocrisy, attached as Exhibit E to the Gase Declaration.

[191] *Sassi*, 2017 WL 4773320, at *3.

[192] *See* Compl. at ¶ 32 ("The NRA-endorsed affinity insurance administered by Lockton consist primarily of life, health, property, and casualty policies.").

the NRA from New York, they overstepped their authority.[193]

Defendants' true motive is even more clear when examining their reaction to Lockton engaging in the *very same conduct* with other membership organizations.  As the Complaint details, the very same allegedly "unlawful" conduct described in the Lockton Consent Order continues unabated where the NRA is not involved,[194] yet the NRA is the only organization singled out in the Consent Order and the only organization subject to a lifetime ban on conducting affinity business with Lockton in New York.[195]  Defendants' unprincipled pattern of enforcement is no accident; rather, it is the product of a malicious purpose, of an antipathy towards the NRA so powerful that no means are too arbitrary, nor any argument too illogical, for Defendants.[196]

Furthermore, preventing lawful business activity in no way comports with an effort to remedy unlawful conduct—Defendants would always have the authority to enforce the Insurance Law if it is violated by Lockton in the future.[197]  The Court must not allow Defendants to hide behind their professed law enforcement purpose when their conduct, which denies the NRA the ability to conduct lawful business, bears no relation to that purpose and is designed specifically to harm the NRA.

## 2.   <u>Cuomo and Vullo are not entitled to either qualified or absolute immunity.</u>

Failing to meaningfully argue tortious interference on the merits, Defendants mistakenly claim that Cuomo and Vullo are immune from liability.  However, Defendants enjoy neither

---

[193]  *See* Gase Declaration, Ex. A; *see also* Gase Declaration, Exs. D and E.

[194]  *See* Compl. at ¶¶ 58–59.

[195]  *See* Compl. at ¶¶ 58–59.

[196]  *See* Compl. at ¶¶ 54–64.

[197]  *See*, *e.g.*, N.Y. Ins. Law §§ 109(c)(1), 109(d), 1104(a), 2110(a)(1); N.Y. Fin. Serv. Law §§ 301(c), 309, 408.

qualified nor absolute immunity for the conduct alleged in the Complaint.

### a. Cuomo's and Vullo's actions preclude them from taking advantage of qualified immunity.

Defendants contention that Cuomo and Vullo are entitled to qualified immunity is without merit for at least two reasons:  (1) the application of qualified immunity in these circumstances is a highly factual inquiry inappropriate at the motion to dismiss stage;[198] and (2) where, as here, the NRA claims that Cuomo and Vullo violated clearly established law, their conduct was undertaken in bad faith and without a reasonable basis.[199]

First, qualified immunity rarely supports a motion to dismiss pursuant to Rule 12(b)(6) and should not do so here.[200]  Given the secretive nature of Defendants' attacks on the NRA, dismissal on grounds of qualified immunity would be particularly inappropriate.  Understanding the nature of Defendants' decision-making, and the circumstances and motivation giving rise to it, requires detailed factual analysis that cannot be definitively ascertained at this stage.[201]  The Supreme Court

---

[198] See Jones v. Parmley, 465 F.3d 46, 63-64 (2d Cir. 2006) (finding that, even at the summary judgment stage, factual issues precluded a determination on qualified immunity under New York state law); see also Hayes v. City of Amsterdam, 770 N.Y.S.2d 138, 140-41 (N.Y. App. Div. 2003) (reversing summary judgment dismissal of plaintiff's negligence action on the basis of qualified immunity "[i]n light of [a] factual dispute").

[199] See Tessler v. Paterson, 768 F. Supp. 2d 661, 672 (S.D.N.Y. 2011) ("'New York law . . . grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis.'") (quoting Parmley, 465 F.3d at 63 (alterations in original)); Blouin ex rel. Estate of Pouliot v. Spitzer, 356 F.3d 348, 364 (2d Cir. 2004).

[200] See Parmley, 465 F.3d at 63-64 (refusing to grant summary judgment on qualified immunity grounds because of factual disputes); Hayes, 770 N.Y.S.2d at 140-41 (same); Munoz v. City of N.Y., No. 04 Civ. 1105(JGK), 2008 WL 464236, at *7 n.6 (S.D.N.Y. Feb. 20, 2008) (same).

[201] See Munoz, 2008 WL 464236, at *7 n.6 ("Clearly, without a factual resolution of the sharply conflicting versions of these events, it is not possible to determine whether defendants are qualifiedly immune.") (internal quotation marks omitted).

has cautioned that "[t]he fate of an official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence *at trial*."[202]  It would be error for the Court to dismiss the NRA's tortious interference claim on the grounds of qualified immunity because such a claim is highly fact specific.[203]

Second, under New York law, a defendant may not use qualified immunity as a defense when it acts in bad faith or without a reasonable basis.[204]  Accordingly, Cuomo and Vullo can be held liable for tortious interference if they "lacked a reasonable basis for their decision . . . or violated constitutional or statutory rights of which reasonable persons would be aware."[205]  As discussed above, Defendants' decision to prohibit Lockton's participation in lawful affinity programs with the NRA has no reasonable basis and violates both the United States and New York Constitutions.[206]  Accordingly, Defendants acted in bad faith and without a reasonable basis,[207]

---

[202] *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13 (1976) (emphasis added).

[203] *See Bernstein v. City of N.Y.*, No. 06 Civ. 895 (RMB), 2007 WL 1573910, at *9 (S.D.N.Y. May 24, 2007) ("Because the qualified immunity defense necessarily involves a fact-specific inquiry, '[i]t is generally premature to address the defense of qualified immunity in a motion to dismiss pursuant to [Rule] 12(b)(6).'") (quoting *Walker v. Mendoza*, No. 00 Civ. 93, 2000 WL 915070, at *7 (E.D.N.Y. June 27, 2000) (alterations in original)).

[204] *See Tessler*, 768 F. Supp. 2d at 672; *Parmley*, 465 F.3d at 63; *Blouin ex rel. Estate of Pouliot*, 356 F.3d at 364 ("The New York courts recognize the defense of qualified immunity to shield the government official from liability unless that action is taken in bad faith or without a reasonable basis.").

[205] *See Mickens v. State*, 881 N.Y.S.2d 854, 864 (N.Y. Ct. Cl. 2009) (citing *Haddock v. City of N.Y.*, 75 N.Y.2d 478 (N.Y. 1990); *Alex LL. v. Dep't of Soc. Servs. of Albany Cnty.*, 872 N.Y.S.2d 569 (N.Y. App. Div. 2009); *Schittino v. State of N.Y.*, 692 N.Y.S.2d 760 (N.Y. App. Div. 1999)).

[206] *See supra* section III.B.1.  Defendants acknowledge that any violation of the United States Constitutional also qualifies as a violation of the New York Constitution.  *See* Motion at 17 n.8, 32 n.14, 37 n.15, 41 n.18.

[207] *See* Compl. at ¶¶ 109 (pleading that Defendants actions were "undertaken in bad faith and without a rational basis"), 136 (alleging that Defendants "used dishonest, wrongful, and improper means when intentionally interfering with the NRA's business relationship with Lockton").

and qualified immunity is not grounds for dismissal.

### b. Absolute immunity cannot shield Vullo and Cuomo from their tortious conduct.

It is inappropriate to extend absolute immunity to cover Cuomo's and Vullo's actions that went beyond their statutory or discretionary authority.  New York courts, recognizing that the immunity doctrine is a natural outgrowth of the "functions and duties of the particular government official . . . whose conduct is at issue," grant immunity according to the "scope of . . . discretion" delegated to the public actor and the nature of the challenged conduct. [208]  The purpose of absolute immunity is not to shield government defendants from suits challenging patently unlawful conduct; rather, its purpose is founded on the need to keep "officials free to exercise their discretion unhampered by the fear of retaliatory lawsuits."[209]

That concern is wholly inapplicable here, as the conduct challenged—the Lockton Consent Order's prohibiting Lockton from participating in lawful affinity insurance programs with the NRA—does not fall within any statutory or other grant of discretion.  No provision of New York law, including DFS's enabling statute, authorizes the conduct at issue.  Defendants implicitly acknowledge this fact, as neither the Consent Orders nor their Motion identifies any relevant authority for their conduct.[210]  DFS's mandate, broad as it is, can only be interpreted to include powers explicitly given to it by statute and powers to regulate unlawful conduct for the banking

---

[208] *Arteaga v. State*, 72 N.Y.2d 212, 216 (N.Y. 1988).

[209] *Id.*; *see Haddock*, 75 N.Y.2d at 484–85 (holding that the application of immunity is grounded in the interest in having official "exercise their judgment and *discretion*" without fear of suit) (emphasis added).

[210] The Motion cites various provisions of the Financial Services Law; however, these provisions do not grant Cuomo or Vullo the right to wholesale prohibit private parties from engaging in insurance programs that fully comply with the Insurance Law merely because they dislike the parties' political positions.

and insurance industries.  In asserting that absolute immunity protects them from accountability for their *ultra vires* conduct, Defendants ask this Court to adopt a position that has never been endorsed by any court:  that government officials, acting without any statutory or otherwise applicable authority, are entitled to an absolute and unwavering immunity.  That result would render government actors wholly unaccountable in the courts of law, a result which the Court cannot condone.

Accordingly, Defendants' arguments for dismissing the NRA's tortious interference claim lack merit and the Court should deny Defendants' Motion.

**G.**  **The NRA More Than Sufficiently Pleads A Freedom-Of-Association Claim.**

"[I]mplicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."[211]  Here, Defendants' actions are directly and substantially interfering with the NRA's, and its members', clear constitutional "'right to associate for the purpose of engaging in those activities protected by the First Amendment.'"[212]

**1.**  **The associational rights at issue are between the NRA and its members, not the NRA and financial institutions.**

Defendants mistook the bases upon which the NRA alleges that its right to associate is infringed.  The NRA does not contend, as Defendants argue, that its First Amendment rights were violated merely because it cannot associate with other businesses.  On the contrary, the Complaint

---

[211] *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984).

[212] *Corso v. Fischer*, 983 F. Supp. 2d 320, 330 (S.D.N.Y. 2013) (quoting *Roberts*, 468 U.S. at 618).  Furthermore, it is well settled that "abridgement of [First Amendment] rights . . . may inevitably follow from varied forms of government action" even if that action is indirect and merely discourages the exercise of said rights.  *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 461 (1958).

sets forth specific allegations that Defendants' actions curtailed and continue to inhibit the NRA's ability to secure critical banking and insurance services that are required to function as an organization, in turn preventing *the NRA and its members* from exercising their associational rights with each other under the First Amendment.  Absent these essential business services, the NRA and its members will be precluded from associating to espouse their pro-Second Amendment beliefs—a political activity that the First Amendment protects.[213]

2. **Defendants' actions infringe upon the NRA's expressive association with its members.**

Defendants' censorship campaign threatening basic banking and insurance services for the NRA,[214] knowing full well that the NRA's and its members' ability to express their message depends upon these services, unlawfully stifles the NRA's and its members' freedom to associate under the First Amendment.  Courts recognize that the First Amendment is implicated even where government action does not directly forbid protected speech.  Just as the forced disclosure of a membership list in *Patterson* "entail[ed] a likelihood of a substantial restraint upon the exercise . . . of [the] right to freedom of association,"[215] Defendants' conduct has the same effect upon the NRA's associational rights.

In an effort to avoid the effect of the straightforward allegations in the Complaint, Defendants misstate the requirements for pleading the NRA's freedom of association claim and

---

[213] *See Patterson*, 357 U.S. at 460–61; *see also Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 227 (2d Cir. 1996) (noting that lobbying is the "kind[] of activit[y] . . . traditionally associated with the First Amendment).

[214] Defendants' claim that they cannot place restrictions on financial institutions outside of New York is disingenuous at best; especially considering the Chubb Consent Order includes restrictions on business relationships with the NRA outside of New York.  *See* Dkt. 37-5, at ¶ 22.

[215] *See Patterson*, 357 U.S. at 462.

improperly seeks to hold the NRA to an incorrect standard clearly not required for *expressive* association.[216]  To sustain a claim for a violation of its right to expressive association, the NRA need only show that:  (1) it engaged in expressive association protected by the First Amendment; (2) Defendants' actions cognizably burdened the NRA's right to expressive association; and (3) Defendants' actions do not serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.[217] The Complaint pleads each of these requirements.

### a.   The NRA is engaged in expressive association protected by the First Amendment.

The NRA and its members associate for the purpose of engaging in political advocacy advancing the Second Amendment rights of all Americans, including through letter-writing campaigns, peaceable public gatherings, and other grassroots "lobbying" activities.[218]  There can be no real dispute that this is the exact activity of expressive association that is protected by the First Amendment.[219]

---

[216] Defendants incorrectly maintain that the NRA's claim must fail because it does not meet the standard articulated in *Smith v. Arkansas State Highway Employees*, 441 U.S. 463 (1979).  The First Amendment analysis in *Smith*, however, is in the context of an individual's right to petition the government for a redress of grievances and is inapposite to the NRA's freedom of association claim.  *See id.* at 465.  Unlike plaintiffs in *Smith*, the NRA's freedom of association claim is rooted in Defendants' infringement of the NRA's and its members' right to *expressive association*.  *See* Compl. at ¶¶ 94–95, 100.  Defendants argument, therefore, that the right to associate is violated only when the government generally prohibits certain forms of advocacy or imposes sanctions for the expression of particular views it opposes is misplaced.  *See e.g., Patterson*, 357 U.S. at 462 (opining that the government's "[c]ompelled disclosure of membership in an organization engaged in advocacy of particular beliefs . . . may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs").

[217] *Tabbaa v. Chertoff*, 509 F.3d 89, 101–02 (2d Cir. 2007).

[218] *See* Compl. at ¶ 95.

[219] Defendants acknowledge that the First Amendment protects the right of associations such as the NRA to advocate on behalf of their members.  *See* Motion at 33; *see also Brandenburg v. Ohio*,

b.   **Defendants' actions cognizably burdened the NRA's right to expressive association.**

Defendants' actions, including through issuing the Consent Orders, the Cuomo Press Release, and April 2018 Letters, have burdened the NRA's right to expressive association. In order for actions to "cognizably burden" a plaintiff's associational right, the actions or interference must be "direct and substantial" or "significant."[220] Defendants' interference has caused the NRA to encounter serious difficulties in obtaining corporate insurance coverage, medical liability coverage, and basic banking services, all of which are critical to the NRA's ability to continue to operate as an ongoing entity and engage in political advocacy.[221] The fact that the NRA will be rendered unable to engage in several forms of core speech—from holding rallies to publishing media content—if the extinguishment of its insurance and banking relationships continues[222] is

_____

395 U.S. 444, 456 (1969) ("One's beliefs [regarding political parties] have long been thought to be sanctuaries which government could not invade."); *Patterson*, 357 U.S. at 460 ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association."); *Fighting Finest, Inc.*, 95 F.3d at 227 (quoting *Roberts*, 468 U.S. at 622 ("[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic . . . and cultural ends.")); *Brady v. Town of Colchester*, 863 F.2d 205, 217 (2d Cir. 1988) (noting that any violation of the freedom to associate in pursuit of political advocacy is cognizable under the law).

[220] *See Tabbaa*, 509 F.3d at 101.

[221] *See* Compl. at ¶¶ 96-99. Without citing any authority in, Defendants incorrectly contend that the NRA must allege that *no* insurers or banks are willing to do business with the NRA. *See* Motion at 35. However, merely because there might be some theoretical bank or insurer that would do business with the NRA, it does not change that fact that Defendants actions are causing a direct, substantial, and significant burden on the NRA. *See e.g.*, Compl. at ¶ ("nearly every carrier has indicated that it fears transacting with the NRA specifically in light of DFS's actions").

[222] Defendants complain that the NRA's allegations regarding its harm are speculative and, therefore, insufficient to withstand a motion to dismiss. *See* Motion at 36. However, harm that will occur in the future can form the basis of a freedom of association claim. *See Patterson*, 357 U.S. at 462 (finding a violation of plaintiffs' freedom of association even though the discrimination alleged would only occur in the future). Furthermore, Defendants misunderstand the standard for a motion to dismiss, which requires the Court to take the NRA's allegations with respect to its

sufficient evidence of the direct, substantial, and significant nature of the burden Defendants have placed on the NRA's right to expressive association.[223]

### c.   Defendants' actions do not serve compelling state interests.

While Defendants' actions with respect to the enforcement of the Insurance Laws against Chubb and Lockton may arguably serve a compelling state interest, their actions restricting lawful business relationships with the NRA does not serve any compelling state interest.[224]  The existence of a compelling state interest for one activity—enforcing certain provisions of the Insurance Law—does not give Defendants carte blanche to commit constitutional violations.[225]  Furthermore, even if the Court determined that Defendants' threats to financial institutions and explicit restrictions on business relationships both served a compelling state interest, Defendants can serve this interest through means significantly less restrictive of associational freedoms.  For example,

---

difficulties in finding insurance and banking services as true and accompany it with every reasonable inference in the NRA's favor.  *See Sassi*, 2017 WL 4773320, *3.

[223] *See Tabbaa*, 509 F.3d at 101 ("Government action can constitute a direct and substantial interference with associational rights even if there is no prior restraint and no clear chilling of future expressive activity.  For example, when government action substantially penalizes members of a group for exercising their First Amendment rights, that penalty in itself can constitute a substantial burden, even if the government did no prevent the group from associating and regardless of any future chilling effect."); *see also Healy v. James*, 408 U.S. 169, 183 (1972) (explaining that "the Constitution's protection is not limited to direct interference with fundamental rights" and plaintiffs suffered a substantial burden due to the "disabilities imposed" by defendant's actions even though plaintiffs did not demonstrate a chilling effect on their desire or ability to associate in the future).

[224] *See*, *e.g.*, *Edenfield v. Fane*, 507 U.S. 761, 770-771 (1993) (finding that a blanket prohibition on solicitation did not directly advance the substantial state interests, including to prevent fraud); *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 543 (1980) ("Mere speculation of harm does not constitute a compelling state interest.").

[225] *See Gomillion v. Lightfoot*, 364 U.S. 339, 347–48 (1960) ("'Acts generally lawful may become unlawful when done to accomplish an unlawful end, and a constitutional power cannot be used by way of condition to attain an unconstitutional result.'") (quoting *W. Union Telegraph Co. v. Foster*, 247 U.S. 105, 114 (1918) (internal citation omitted)).

Defendants could have entered the Consent Orders without singling out the NRA and precluding it from conducting lawful business activities with Lockton and Chubb.

The NRA, therefore, more than sufficiently pleaded a freedom of association claim.[226]

**H.      In The Alternative, The Court Should Grant The NRA Leave To Amend.**

The allegations of the Complaint are sufficient to state claims for relief.  If the Court disagrees, however, the NRA should be granted leave to amend.  Under the Federal Rules of Civil Procedure, leave to amend should be freely granted.[227]   Here, cause will exist to grant leave to amend because this action has been pending for only a few months, no trial date has been set, discovery has not yet started, and Defendants will not suffer any prejudice.[228]

## IV. CONCLUSION

For the foregoing reasons, the NRA respectfully requests that this Court deny Defendants' Motion to Dismiss in its entirety or, alternatively, grant the NRA leave to amend the Complaint.

---

[226] As discussed *supra*, Defendants' government speech argument is without merit and cannot serve as grounds for dismissing any of the NRA's First Amendment claims, including freedom of association. *See* Motion at 37.

[227] *See* Fed. R. Civ. P. 15(a).

[228] *See Foman v. Davis*, 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith, or dilatory motive on part of the movement, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely granted.'"); *State Teachers Retirement Bd. v. Fluor*, 654 F.2d 843, 856 (2d Cir. 1981) (denying leave to amend was an abuse of discretion where a trial date had not been set and where new claims would not require "a great deal of additional discovery" or otherwise cause defendant to suffer prejudice); *Lorely Fin. (Jersey) No. 3 Ltd., v. Wells Fargo Securities, LLC*, 797 F.3d 160, 190 (2d Cir. 2015)  (noting that leave to amend should be granted according to a "liberal standard," the court explained that the grounds for denying leave to amend are "undue delay, bad faith, dilatory motive, and futility").

Dated: August 24, 2018

Respectfully submitted,

By:  ___/s/ William A. Brewer III_____

    William A. Brewer III (Bar No. 700217)
    wab@brewerattorneys.com
    Stephanie L. Gase (Bar No. 700205)
    sgase@brewerattorneys.com
    Sarah B. Rogers (Bar No. 700207)
    sbr@brewerattorneys.com
    BREWER, ATTORNEYS & COUNSELORS
    750 Lexington Avenue, 14th Floor
    New York, New York 10022
    Telephone:  (212) 489-1400

    Charles J. Cooper*
    ccooper@cooperkirk.com
    Michael W. Kirk*
    mkirk@cooperkirk.com
    J. Joel Alicea*
    jalicea@cooperkirk.com
    COOPER & KIRK, PLLC
    1523 New Hampshire Ave., NW
    Washington D.C., 20036
    Telephone: (202) 220-9660
    Facsimile: (202) 220-9601

    *appearing *pro hac vice*

    **ATTORNEYS FOR THE NATIONAL RIFLE ASSOCIATION OF AMERICA**