**EXHIBIT A**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

NATIONAL RIFLE ASSOCIATION OF
AMERICA,

          *Plaintiff*,

          v.

ANDREW CUOMO, both individually and in his
    official capacity; MARIA T. VULLO, both
    individually and in her official capacity; and
    THE NEW YORK STATE DEPARTMENT
    OF FINANCIAL SERVICES,

          *Defendants*.

No. 18-cv-0566-TJ-CFH

**BRIEF OF [PROPOSED] AMICUS CURIAE AMERICAN CIVIL LIBERTIES UNION
IN SUPPORT OF THE PLAINTIFF'S OPPOSITION TO THE DEFENDANTS'
MOTION TO DISMISS**

Dated: August 24, 2018

David Cole
Cecillia D. Wang
Ben Wizner
/s/Brian Hauss*
Brian Hauss
Jacob Hutt
American Civil Liberties Union
      Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
bhauss@aclu.org

*Admitted *Pro Hac Vice*

Attorneys for Proposed Amicus
Curiae American Civil Liberties
Union

**CORPORATE DISCLOSURE STATEMENT**

The American Civil Liberties Union Foundation has no parent corporations. It has no stock, so therefore no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................ i

TABLE OF AUTHORITIES ........................................................................... iii

INTEREST OF AMICUS CURIAE ................................................................. 1

INTRODUCTION .......................................................................................... 2

FACTUAL BACKGROUND ............................................................................ 4

ARGUMENT .................................................................................................. 6

    I.    The Court Must Consider All the Circumstances to Determine Whether Defendants
Threatened Adverse Action Against the NRA's Banks and Insurers. ...................... 6

    II.   The Motion to Dismiss Misstates the Requirements for a First Amendment Claim. ........ 14

CONCLUSION ............................................................................................... 19

CERTIFICATE OF COMPLIANCE .................................................................. 20

CERTIFICATE OF SERVICE .......................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Aebisher v. Ryan*, 622 F.2d 651 (2d Cir. 1980) ........................................................... 14

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)............................................. passim

*Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) ..................................................... 9

*Davis v. Vill. Park II Realty Co.*, 578 F.2d 461 (2d Cir. 1978) .................................... 18

*Dorsett v. Cty. of Nassau*, 732 F.3d 157 (2d Cir. 2013) ......................................... 14, 15

*Dye v. Office of the Racing Comm'n*, 702 F.3d 286 (6th Cir. 2012) ........................... 17

*Gravel v. United States*, 408 U.S. 606 (1972) ............................................................... 8

*Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir. 1983) ............... 8, 12

*Krause v. Buffalo & Erie Cty. Workforce Dev. Consortium, Inc.*, 425 F. Supp. 2d 352 (W.D.N.Y. 2006).......................................................................................................... 18

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184 (2d Cir. 2007) ............................ 2

*Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003).............................................. passim

*Planned Parenthood Association of Utah v. Herbert*, 828 F.3d 1245 (10th Cir. 2016).............. 17

*Rattner v. Netburn*, 930 F.2d 204 (2d Cir. 1991)......................................... 11, 12, 14

*Trotman v. Bd. of Trustees of Lincoln University*, 635 F.2d 216 (3d Cir. 1980)......................... 16

*Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392 (6th Cir. 2010)............................. 12

*X–Men Sec., Inc. v. Pataki*, 196 F.3d 56 (2d Cir. 1999) ............................................... 8

*Zieper v. Metzinger*, 392 F. Supp. 2d 516 (S.D.N.Y. 2005), *aff'd*, 474 F.3d 60 (2d. Cir. 2007).. 15

*Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007) ..................................................... 9, 14

## Statutes

Fin. Servs. Law § 102 .................................................................................................. 10

## Other Authorities

Federal Rule of Civil Procedure 12(b)(6) ...................................................................... 3

## INTEREST OF AMICUS CURIAE[1]

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan organization with over 1.5 million members dedicated to defending the principles embodied in the Constitution and our nation's civil rights laws. For nearly a century, the ACLU has been at the forefront of efforts nationwide to protect the full array of civil rights and civil liberties. Since its founding in 1920, the ACLU has frequently appeared before courts throughout the country in First Amendment cases, both as direct counsel and as amicus curiae. Many landmark civil rights decisions of the 1950s and 1960s arose out of free speech controversies, and involved the government's attempted use of its arrest powers to silence controversial ideas. *See, e.g.*, *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969). History demonstrates that governmental efforts to retaliate against particular viewpoints are often aimed at those who challenge and criticize the status quo. The preservation of the principle of viewpoint neutrality is therefore of immense concern to the ACLU, its clients, and its members and donors.

---

[1] Amicus confirm that no party or counsel for any party authored this brief in whole or in part and that no person other than amici or their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

1

## INTRODUCTION

Political advocacy organizations throughout the United States, including the American Civil Liberties Union, rely on access to a number of basic services in order to function. Many of these services are highly regulated, including insurance, banking, legal services, and accounting. In this case, Plaintiff National Rifle Association of America ("NRA") has alleged that the New York Department of Financial Services ("DFS"), the Department's Superintendent Maria Vullo, and Governor Andrew Cuomo have carried out a "campaign to chill the political speech of the NRA and other so-called 'gun promotion' organizations by leveraging state power to punish[] financial institutions which maintain business arrangements with the NRA." Amended Complaint, Dkt. No. 37 ("Compl.") ¶ 21. If true, those allegations represent a blatant violation of the First Amendment. Although public officials are free to express their opinions and may condemn viewpoints or groups they view as inimical to public welfare, they cannot abuse their regulatory authority to retaliate against disfavored advocacy organizations and to impose burdens on those organizations' ability to conduct lawful business.

On a motion to dismiss, the plaintiff's factual allegations must be accepted as true and all reasonable inferences must be drawn in the plaintiff's favor. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). Under that standard, the NRA has stated a First Amendment claim. It alleges that: core political speech is a major purpose of the organization; Defendants have threatened adverse actions against New York banks and insurers that maintain ties with the NRA or other gun promotion groups; Defendants took these actions based on hostility to the NRA's political advocacy; and Defendants' actions have caused millions of dollars in damages and jeopardized the NRA's access to essential corporate liability insurance and banking services. In particular, the NRA points to the April 2018 Guidance Letters issued by Superintendent Vullo, entitled "Guidance on Risk Management Relating to the NRA and Similar

2

Gun Promotion Groups." The NRA alleges that those letters—which have no connection to DFS's regulatory mission and which explicitly target the NRA and similar groups based on their constitutionally protected political advocacy—threatened adverse action against banks and insurers that associate with groups espousing a disfavored viewpoint. Under Federal Rule of Civil Procedure 12(b)(6) and well-established doctrine, those allegations are sufficient to survive Defendants' motion to dismiss.

Defendants make two kinds of arguments, neither of which avails. First, Defendants maintain that the NRA has failed to plausibly allege that Defendants threatened adverse action against New York banks and insurers associated with the NRA. Under Defendants' theory, the Court may look *only* to the allegedly threatening public statements—in this case, the Press Releases and Guidance Letters issued by Superintendent Vullo and Governor Cuomo—to determine whether the state directly threatened adverse action. But courts assessing retaliation claims must consider the whole context to determine whether adverse action was threatened. Here, the allegations of the Amended Complaint as a whole support the NRA's charge that Defendants implicitly threatened adverse action: Superintendent Vullo has regulatory authority over banks and insurers in New York; her Guidance Letters to banks and insurers instructing them to "take prompt" action to "manag[e] their risks, including reputational risks, that may arise from their dealings with the NRA or similar gun promotion organizations" could reasonably be construed as threatening, *id.*, Exhibit C; two weeks after the Guidance Letters were issued, DFS announced consent decrees with two insurers, imposing millions of dollars in fines and prohibiting them from carrying NRA-endorsed insurance programs; and the NRA has alleged that numerous banks and insurers have refused to provide even basic services to the NRA because of the perceived threat in the Guidance Letters and consent decrees.

Second, Defendants attempt to impose several new requirements that, they maintain, the NRA must satisfy in order to state a First Amendment retaliation claim. According to Defendants, plaintiffs alleging First Amendment retaliation must show that: their speech was subjectively chilled, regardless of whether they have suffered other kinds of harm; the government was motivated by hostility to a "particularized" instance of speech, instead of broad hostility to a speaker's politics or viewpoint; and the government attempted to directly suppress protected expression, rather than retaliating financially against a disfavored speaker. None of these requirements has any foundation in the caselaw; all would radically constrict the scope of First Amendment protection against government retaliation.

The NRA ultimately may not be able to prove their allegations, or Defendants may eventually succeed in refuting them. But at the motion-to-dismiss stage, the NRA's allegations are sufficient to make out a claim under the First Amendment. If the NRA's allegations were deemed insufficient to survive the motion to dismiss, it would set a dangerous precedent for advocacy groups across the political spectrum. Public officials would have a readymade playbook for abusing their regulatory power to harm disfavored advocacy groups without triggering judicial scrutiny. And it is extremely difficult, if not impossible, for any advocacy group to operate effectively without routine access to basic banking and insurance services. For these reasons, Defendants' motion to dismiss should be denied, and the NRA should be given an opportunity to investigate and substantiate its First Amendment claims.

## FACTUAL BACKGROUND

In October 2017, DFS initiated an investigation of the Carry Guard insurance program, focusing on two insurance companies, Chubb Ltd. ("Chubb") and Lockton Affinity, LLC ("Lockton"), for underwriting and administering NRA affinity insurance programs, which DFS

4

maintains violated New York insurance law.[2] The NRA alleges that throughout the investigation, DFS communicated "backchannel threats" to banks and insurers with ties to the NRA that they would face regulatory action if they failed to terminate their relationships with the NRA. Compl. ¶¶ 38, 45. According to the NRA, the Chairman of Lockton called the NRA on February 25, 2018 and confided that Lockton would need to "drop" the NRA entirely for fear of losing its license to operate in New York; the next day, Lockton tweeted it would discontinue providing brokerage services for all NRA-endorsed insurance programs. *Id.* ¶¶ 42–43. Days later, the NRA alleges, its corporate insurance carrier severed ties with it and said it would not provide the NRA insurance at any price. *Id.* ¶ 44. The NRA alleges that the corporate carrier learned about the state's threats against Lockton and feared it would be subject to similar reprisals. *Id.*

In April 2018, Governor Cuomo and Superintendent Vullo issued a Press Release and "Guidance[s] on Risk Management Relating to the NRA and Similar Gun Promotion Organizations," encouraging banks and insurance companies to reconsider their relationships with the NRA. Superintendent Vullo's Guidance Letter to insurance companies, for instance, states: "[T]he Department encourages its insurers to continue evaluating and managing their risks, including reputational risks, that may arise from their dealings with the NRA or similar gun promotion organizations, if any, as well as continued assessment of compliance with their own codes of social responsibility. The Department encourages regulated institutions to review any relationships they have with the NRA or similar gun promotion organizations, and to take prompt actions to managing these risks and promote public health and safety." *Id.*, Exhibit B.[3]

---

[2] Affinity insurance programs are insurance programs endorsed by a membership organization, such as the New York City Bar or the New York State Psychological Association, for use by its members.

[3] *See* Maria T. Vullo, *Guidance on Risk Management Relating to the NRA and Similar Gun Promotion Organizations*, N.Y. State Dep't of Fin. Servs. (2018),

Just a few weeks later, the Defendants announced consent orders with Chubb and Lockton, in which the insurers agreed to cease underwriting affinity insurance programs for the NRA in perpetuity, regardless of the programs' legality. *Id.* ¶¶ 55, 62.  Thus, the consent orders did not only cover the Carry Guard insurance policies that violated New York state law, but any affinity insurance programs at all. Shortly after the consent decrees were made public, Lloyd's of London announced that it would terminate all affinity insurance programs associated with the NRA, citing the DFS investigations. *Id.* ¶ 65.

The NRA alleges that it also encountered serious difficulty replacing its corporate insurance carrier, and that nearly every potential replacement carrier has indicated that it fears transacting with the NRA, specifically because of the DFS investigations. *Id.* ¶ 66. The NRA further alleges that numerous banks have withdrawn bids to provide basic depository services because the April guidance letters indicated to the banks that any association with the NRA could expose them to regulatory retaliation, citing a banker's anonymous comment to *American Banker* magazine. *Id.* ¶¶ 67, 68. The NRA alleges it has suffered tens of millions of dollars in damages as a result of Defendants' actions. *Id.* ¶ 69. The NRA alleges that, without access to essential banking and insurance services, "it will be unable to exist as a not-for-profit or pursue its advocacy mission." *Id.* ¶ 70.

## ARGUMENT

### I.     The Court Must Consider All the Circumstances to Determine Whether Defendants Threatened Adverse Action Against the NRA's Banks and Insurers.

The NRA's First Amendment retaliation claim turns on its allegation that Defendants issued "threats to financial institutions that DFS . . . will exercise its extensive regulatory power

https://www.dfs.ny.gov/legal/dfs/DFS_Guidance_Risk_Management_NRA_Gun_Manufacturers
-Insurance.pdf.

against those entities that fail to sever ties with the NRA." *Id.* at 2. The Amended Complaint's key allegation states: "Read in the context of the preceding months' private communications—as well as disclosures that would soon follow concerning consequences imposed on firms doing business with the NRA—[Superintendent Vullo's] April 2018 [Guidance] Letters were threats that deliberately invoked DFS's 'risk management' authority to warn of adverse action if institutions failed to support Defendants' efforts to stifle the NRA's speech and to retaliate against the NRA based on its viewpoint." *Id.* ¶ 48. The April 2018 "Guidance[s] on Risk Management Relating to the NRA and Similar Gun Promotion Organizations," indisputably targeted the NRA and similar groups based on their "gun promotion" advocacy. It is important to note that, however controversial it may be, "gun promotion" is core political speech, entitled to the same constitutional protection as speech advocating for reproductive rights, marijuana legalization, or financial deregulation. The central questions, then, are whether the Guidance Letters threatened adverse action against banks and insurers that associate with the NRA or other "gun promotion" advocacy groups, and whether this threat was motivated by the government's hostility to a "gun promotion" viewpoint.

As Defendants acknowledge, Memorandum of Law in Support of Defendant's Motion to Dismiss, Dkt. No. 40-1 ("Memo. in Support of Motion to Dismiss") at 20, the First Amendment sometimes "require[s] courts to draw fine lines between permissible expressions of personal opinion [by public officials] and implied threats to employ coercive state power to stifle protected speech." *Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983). On the one hand, public officials are undoubtedly free to promote their views about public welfare, including by using their bully pulpits to "cajole[] and exhort" others to repudiate positions or groups the officials view as pernicious. *Gravel v. United States*, 408 U.S. 606, 625

(1972); *see also, X–Men Sec., Inc. v. Pataki*, 196 F.3d 56, 70 (2d Cir. 1999) ("[W]e have noted that where a public official, without engaging in any threat, coercion, or intimidation, 'exhort[ed]' private entities not to distribute a board game whose ideas the official viewed as pernicious, the official's speech did not violate any constitutional right of the game's authors." (quoting *Hammerhead*, 707 F.2d at 39 & n.6)). On the other hand, "'oral or written statements made by public officials' could give rise to a valid First Amendment claim '[w]here comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request.'" *Okwedy v. Molinari*, 333 F.3d 339, 342 (2d Cir. 2003) (internal citation omitted).

Defendants argue that the NRA failed to state a retaliation claim because "neither the Press Releases nor the Guidance Letters contain any threat or suggestion of State action, or imply that companies with ties to the NRA are somehow complicit in unlawful behavior that merits State regulatory attention." Memo. in Support of Motion to Dismiss at 22. But Defendants' analysis is too formalistic and narrow. It would allow the government to threaten retaliation through the use of subtle language and visible enforcement actions against the threatened group. To prevent such gamesmanship, the First Amendment requires the Court to "look through forms to the substance." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).

"While the precise language" of the Press Releases and Guidance Letters "is certainly important," the Second Circuit has "never held that it is the only relevant factor in determining whether a public official has crossed the line 'between attempts to convince and attempts to coerce.'" *Zieper v. Metzinger*, 474 F.3d 60, 66 (2d Cir. 2007) (quoting *Okwedy*, 333 F.3d at 344). Rather, the First Amendment requires the Court to consider all the circumstances, including "the entirety of the defendants' [alleged] words and actions," to determine "whether they could

reasonably be interpreted as an implied threat." *Id.*; *see also Bennett v. Hendrix*, 423 F.3d 1247, 1252 (11th Cir. 2005) (explaining that "adverse effect" in a retaliation claim "depends on context"). A number of factors bear on this inquiry, including: (1) the defendants' regulatory or other decisionmaking authority over the targeted entities; (2) the language of the allegedly threatening statements; (3) allegedly retaliatory exercises of regulatory authority over the targeted entities; and (4) the perception of a threat by the targeted entities and their response. *See Zieper*, 474 F.3d at 66. The Amended Complaint contains numerous allegations relevant to this analysis, all of which must be weighed by the Court to determine whether the NRA has plausibly alleged a First Amendment claim.

First, "the existence of regulatory or other direct decisionmaking authority is certainly relevant to the question of whether a government official's comments were unconstitutionally threatening or coercive . . . ." *Okwedy*, 333 F.3d at 343. In *Bantam Books*, for instance, the Supreme Court observed that, although the Rhode Island Commission to Encourage Morality in Youth lacked the "power to apply formal legal sanctions," it had the authority to initiate investigations and recommend prosecutions. 372 U.S. at 66–67. This power imbued the Commission's "advisory notices" with extra weight, since "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." *Id.* at 68; *see also Okwedy*, 333 F.3d at 344 ("Even though Molinari lacked direct regulatory control over billboards, PNE could reasonably have feared that Molinari would use whatever authority he does have, as Borough President, to interfere with the 'substantial economic benefits' PNE derived from its billboards in Staten Island."). Here, the Defendants exercise even more direct regulatory authority over the allegedly threatened financial institutions. Superintendent Vullo has the authority to initiate investigations and civil enforcement actions

against regulated financial services firms operating in New York, as well as "the power to refer matters to the attorney general for criminal enforcement." Compl. ¶¶ 2, 24, 25.

Second, given Superintendent Vullo's direct regulatory authority over the allegedly threatened financial institutions, the Court should closely scrutinize the language of her Guidance Letters. The Guidance Letters state in relevant part that regulated banks and insurers should "continue evaluating and managing their risks, including [but perhaps not limited to] reputational risks, that may arise from their dealings with the NRA or similar gun promotion organizations," and that they should "take prompt actions to manag[e] these risks." *Id.*, Exhibits B and C. DFS's mandate—"effective state regulation of the insurance industry" and the "elimination of fraud, criminal abuse and unethical conduct by, and with respect to, banking, insurance and other financial services institutions," Fin. Servs. Law § 102(e), (k)—does not extend to "gun promotion," and it is not apparent why regulated entities would require guidance from DFS regarding the "risks" of associating with the NRA or other gun promotion groups.

Viewed in the light most favorable to the NRA, as required at this stage of the proceedings, the Guidance Letters could reasonably be interpreted as a threat of retaliatory enforcement against firms that do not sever ties with gun promotion groups. *See Okwedy*, 333 F.3d at 344 ("Because the district court was considering a motion to dismiss, it should have viewed the language of Molinari's letter in the light most favorable to plaintiffs."); *id.* at 342 (holding that a jury could find that the defendant's letter contained an implicit threat of retaliation where it invoked the defendant's position as the Borough President of Staten Island, pointed out that the targeted company "owns a number of billboards on Staten Island and derives economic substantial benefits from them," and directed the company to contact the defendant's legal counsel and chair of his anti-bias task force); *Rattner v. Netburn*, 930 F.2d 204, 206–10 (2d

Cir. 1991) (holding, on motion for summary judgment, that there were genuine issues of material fact about whether Defendant's letter—stating that Plaintiff's publication "raises significant questions and concerns about the objectivity and trust which we are looking for from our business friends"—was "threatening or coercive").

Third, the Court should consider the history of enforcement actions against the threatened entities. *See Rattner*, 930 F.2d at 210 (observing that "the Chamber member who had been 'in charge of' the *Gazette* testified that following receipt of the Netburn letter, he had actually lost business and had been harassed by the Village"); *see also Bantam Books*, 372 U.S. at 63 (noting that "[a] local police officer usually visited Silverstein shortly after Silverstein's receipt of a [Commission] notice to learn what action he had taken"). Here, the Amended Complaint asserts that Defendants linked the threats in the Guidance Letters to the enforcement actions carried out by DFS against Chubb and Lockton. For example, the NRA alleges that, during the course of the DFS investigations into Chubb and Lockton in late 2017 and early 2018, "DFS communicated to banks and insurers . . . that they would face regulatory action if they failed to terminate their relationships with the NRA. . . . indicating that any business relationship whatsoever with the NRA would invite adverse action." Compl. ¶ 38. The NRA also notes that the Chubb and Lockton consent decrees, which imposed several million dollars in monetary penalties and permanently prohibited those entities from participating in any NRA-endorsed insurance program in New York State, were announced just two weeks after the Guidance Letters were issued. *Id.* ¶ 54.  The timing could be purely coincidental, or it could have been intended to reinforce the message that insurers and financial institutions associated with the NRA will be subject to further retaliatory action by the state. *See Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) ("In analyzing the facts in temporal proximity cases, we have

always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn.").

Finally, the perception of a threat by the targeted entities is probative as to whether an implicit threat was made. In *Rattner*, for instance, a village trustee sent a letter to the village's chamber of commerce expressing concern about the plaintiff's political advertisement in the chamber's newsletter. 930 F.2d at 205–06. Although the trustee's letter did not suggest that the publication was unlawful or directly threaten adverse action, the "Chamber directors testified that they regarded the letter, and [the trustee's] statement that he had made a list [of businesses at which he shopped], as clearly threatening boycott or other retaliatory action by the Village, including discriminatorily strict enforcement of parking and zoning regulations." *Id.* at 206. As a result, the chamber prevented the plaintiff from publishing further advertisements in its newsletter. *Id.* at 206–07. The Second Circuit held that the trustee's letter to the chamber "may reasonably be viewed as an implicit threat," largely because "a threat was perceived and its impact was demonstrable." *Id.* at 210. *See also Bantam Books*, 372 U.S. at 68 ("The Commission's notices, phrased virtually as orders, *reasonably understood to be such by the distributor*, invariably followed up by police visitations, in fact stopped the circulation of the listed publications ex proprio vigore." (emphasis added)); *Hammerhead*, 707 F.2d at 39 (noting that "not a single store was influenced by [defendant's allegedly threatening] correspondence").

Defendants argue that "no individual company was singled out or coerced as a result of the statements," Memo. in Support of Motion to Dismiss at 22, but such specific targeting is not required in order to make out a First Amendment claim in these circumstances. Moreover, the Amended Complaint includes numerous allegations regarding the perception of a threat by New York insurers and financial institutions, and its impact on the NRA's ability to procure insurance

and banking services. The NRA alleges that: during DFS's investigation into Lockton, Lockton's chair "confided [to the NRA] that Lockton would need to 'drop' the NRA—entirely—for fear of 'losing [our] license' to do business in New York," Compl. ¶ 42; a week after the Chubb and Lockton consent decrees were entered, Lloyd's of London "announced . . . that it would 'terminate all insurance offered, marketed, endorsed, or otherwise made available' through the NRA in light of the DFS Investigation," *id.* ¶ 65; the NRA's corporate insurance carrier "severed mutually beneficial business arrangements with the NRA because it learned of Defendants' threats directed at Lockton, and feared it would be subject to similar reprisals," *id.* ¶ 44; the NRA has encountered serious difficulties obtaining [replacement] corporate insurance coverage" because "nearly every carrier has indicated that it fears transacting with the NRA specifically in light of DFS's actions against Lockton and Chubb," *id.* ¶ 66; "[m]ultiple banks withdrew their bids in the NRA's RFP process following the issuance of the April 2018 Letters, based on concerns that any involvement with the NRA—even providing the organization with basic depository services—would expose them to regulatory reprisals," *id.* ¶ 67; and "one community banker from Upstate New York told *American Banker* magazine that in light of the apparent 'politically motivated' nature of the DFS guidance, '[i]t's hard to know what the rules are' or whom to do business with, because bankers must attempt to anticipate 'who is going to come into disfavor with the New York State DFS' or other regulators," *id.* ¶ 68.

Taken together, these allegations are sufficient to draw a reasonable inference that Defendants threatened adverse action against banks and insurers that associate with the NRA, and that this threat was motivated by the government's hostility to the NRA's "gun promotion" viewpoint.

## II.   The Motion to Dismiss Misstates the Requirements for a First Amendment Claim.

Defendants further argue that, even if they coercively threatened banks and insurers to sever ties with the NRA, the Amended Complaint fails to state a First Amendment claim. It is black-letter law that the government may violate the First Amendment through "action that falls short of a direct prohibition against speech," including by retaliation or threats of retaliation against speakers. *Zieper*, 474 F.3d at 65 (internal quotation marks omitted) (quoting *Aebisher v. Ryan*, 622 F.2d 651, 655 (2d Cir. 1980)). It is equally well-established that the government may violate a speaker's First Amendment rights by pressuring third parties to carry out its unconstitutional designs. *See, e.g.*, *Okwedy*, 333 F.3d at 344; *Rattner*, 930 F.2d at 209–10. "To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). The Amended Complaint plainly meets this test. The Complaint alleges that: "political speech is a major purpose of the NRA," and "[t]he NRA engages in extensive legislative advocacy to promote its purposes," Compl. ¶ 11; Defendants are engaged in a "campaign to chill the political speech of the NRA and other so-called 'gun promotion' organizations by leveraging state power to punish[] financial institutions which maintain business arrangements with the NRA," *id.* ¶ 21; and, as a result of Defendants' actions, the NRA has incurred tens of millions of dollars in damages and risks losing access to essential insurance and banking services in New York, *id.* ¶¶ 66–70.

To avoid this straightforward analysis, Defendants have grafted several nonexistent requirements onto the test. According to Defendants, a plaintiff claiming First Amendment retaliation under these circumstances must allege that: (1) the plaintiff was *actually* chilled in the

14

exercise of its First Amendment rights; (2) the government retaliated against the plaintiff because of specific hostility to a particular communication, rather than broad hostility to the plaintiff's advocacy; and (3) the government interfered directly with the publication or dissemination of the plaintiff's speech, rather than imposed financial or other harms on the plaintiff. If upheld, Defendants' proposed requirements would radically narrow the scope of constitutional protection against government retaliation. Fortunately, Defendants' arguments are misplaced.

First, Defendants contend that the NRA has failed to state a retaliation injury because its expression has not been completely suppressed or chilled. Memo. in Support of Motion to Dismiss at 25–26 ("Nothing Defendants have done, or are doing, has prevented the NRA from spreading its message—whether through rallies, conventions, publications, or NRATV—as shown by the NRA's continued public condemnation of Governor Cuomo and others who speak out in favor of common sense gun control."). However, "[c]hilled speech is not the *sine qua non* of a First Amendment claim. A plaintiff has standing if he can show *either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm. Various non-speech harms are sufficient to give a plaintiff standing." *Dorsett*, 732 F.3d at 160; *see also Zieper v. Metzinger*, 392 F. Supp. 2d 516, 527 (S.D.N.Y. 2005) ("It would indeed be ironic were we to hold that persons who are persevering and resolute, who overcome their inhibitions and fears to proceed on a course they believe constitutionally protected, would thereby lose the very protection which they rely on in asserting their rights." (internal quotation marks omitted) (citing *Trotman v. Bd. of Trustees of Lincoln University*, 635 F.2d 216, 227–28 (3d Cir. 1980))), *aff'd*, 474 F.3d 60 (2d Cir. 2007).

The NRA's allegations of significant interference with its business relationships are sufficient to establish a First Amendment retaliation injury. *See Bantam Books*, 372 U.S. at 64

n.6. The Amended Complaint alleges that Defendants' retaliatory threats are causing "insurance, banking, and financial institutions doing business with the NRA . . . to rethink their mutually beneficial business relationships with the NRA for fear of monetary sanctions or expensive public investigations." Compl. ¶ 65. As a result, the NRA states that it is at risk of losing "access to basic banking services," that it "has encountered serious difficulties obtaining corporate insurance coverage to replace coverage withdrawn by the Corporate Carrier," and that "there is a substantial risk that NRATV will be forced to cease operating" if it cannot "obtain insurance in connection with media liability." *Id.* ¶¶ 66, 67. The NRA claims it has incurred "tens of millions of dollars in damages based on Defendants' conduct," and that it "will be unable to exist as a not-for-profit or pursue its advocacy mission" if it is unable to obtain basic insurance and financial services. *Id.* ¶¶ 69, 70. If these alleged injuries fail to suffice, it is hard to imagine what could.

Second, Defendants maintain that "First Amendment protection is afforded only to 'particularized' instances of speech or expressive conduct." Memo. in Support of Motion to Dismiss at 25. Although the NRA has alleged that Defendants' actions undermine its ability to engage in political advocacy, Defendants assert that "the First Amendment does not protect such a broad and attenuated category of speech." *Id.* "[B]y this logic," Defendants argue, "all government speech that could ever theoretically affect an organization whose 'major purpose' is political speech would violate that organization's First Amendment rights. No such sweeping weaponization of the First Amendment is recognized by the Supreme Court, the Second Circuit, or elsewhere." *Id.* Accordingly, Defendants maintain that the NRA's complaint should be dismissed because it "fails to identify any specific, particularized instance of protected speech or expressive conduct that has been directly infringed by Defendants." *Id.* at 26.

To the contrary, the NRA has squarely alleged that Defendants are retaliating against it based on hostility to its "gun promotion" advocacy, Compl. ¶¶ 15–21, 47–48, 51, 53, 76, and the Guidance Letters' reference to the NRA "and similar gun promotion organizations" bears out Defendants' animus to the NRA's viewpoint, *id.*, Exhibits B and C. Courts have readily acknowledged that government retaliation against a person based on broad hostility to that person's politics or viewpoint violates the First Amendment, even if the plaintiff has not identified a "particularized" instance of speech that the government seeks to suppress. For example, in *Planned Parenthood Association of Utah v. Herbert*, the Tenth Circuit held that the Planned Parenthood Association of Utah (PPAU) was likely to succeed on its First and Fourteenth Amendment claims by showing that the Government of Utah denied the PPAU government funding in order to "weaken the organization and hamper its ability to provide *and advocate for* abortion services." 828 F.3d 1245, 1262 (10th Cir. 2016) (emphasis added); *see also Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 295–302 (6th Cir. 2012) (holding that the plaintiffs could go to trial on the claim that their government employer retaliated against them based on their perceived political affiliation, even though the court rejected their claim that the employer retaliated against them based on particular instances of protected speech). To be sure, unbiased application of facially neutral laws does not violate the First Amendment simply because those laws may affect expressive associations. But the NRA has alleged that Defendants are explicitly targeting the NRA based on its hostility to the NRA's viewpoint and its constitutionally protected political advocacy. Under those circumstances, it should not make any difference whether Defendants are attempting to suppress a "particularized" instance of speech or "gun promotion" writ large.

Third, Defendants argue that the NRA must allege that the government attempted to directly suppress the NRA's expression in order to state a First Amendment retaliation claim, and that interference with the NRA's non-expressive business relationships does not qualify. *See* Memo. in Support of Motion to Dismiss at 30 ("[T]he actual basis of the NRA's claims in this case is alleged interference with the NRA's ability to contract for insurance and banking services; it is not that the NRA is being hampered, in any way, from engaging in political speech advocating in favor of the Second Amendment.").

Courts have never required plaintiffs to demonstrate that the government directly attempted to suppress their protected expression in order to establish First Amendment retaliation, and they have often upheld First Amendment retaliation claims involving adverse economic action designed to chill speech indirectly. *See, e.g.*, *Davis v. Vill. Park II Realty Co.*, 578 F.2d 461, 463 (2d Cir. 1978) (reversing dismissal of a complaint by president of a tenants' association who claimed that the owner of a federally funded housing project had threatened her with eviction in retaliation for her advocacy of tenants' rights); *Krause v. Buffalo & Erie Cty. Workforce Dev. Consortium, Inc.*, 425 F. Supp. 2d 352, 379 (W.D.N.Y. 2006) (failure to hire the plaintiff based on alleged hostility to her political beliefs satisfied injury prong of First Amendment retaliation claim). Were it otherwise, the First Amendment would prohibit the government from pressuring a newspaper to remove a speaker's advertisement, but it would allow the government to bankrupt the speaker by pressuring its business partners to terminate their contracts. That absurd result has no foundation in the law. *See Okwedy*, 333 F.3d at 344 ("A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment

comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, *or in some less-direct form*." (emphasis added)).

## CONCLUSION

Because the NRA has plausibly alleged that Defendants threatened adverse action against banks and insurers associated with the NRA, and that Defendants' actions were motivated by hostility to the NRA's political advocacy, the Motion to Dismiss should be denied.

**CERTIFICATE OF COMPLIANCE**

Pursuant to Second Department Rule § 670.10.3(f), I certify that the Brief of Amicus Curiae

American Civil Liberties Union in Opposition to Defendants' Motion to Dismiss was prepared

on a computer, using Times New Roman (proportionally spaced) typeface, 12-point type,

double-spaced, with 12-point single-spaced footnotes and 12-point single-spaced block

quotations. The word count, as generated by Microsoft Word, is 5,426.

Dated: August 24, 2018
       New York, NY

    _/s/ Brian Hauss_____
    Brian Hauss

20

**CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2018, I electronically filed the foregoing with the Clerk of the

Court of the United States District Court for the Northern District of New York by using the

CM/ECF system. All participants are registered CM/ECF users, and will be served by the

CM/ECF system.


    */s/ Brian Hauss*   
Brian Hauss