UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

NATIONAL RIFLE ASSOCIATION OF AMERICA,

                              *Plaintiff*,

-against-                                    18-CV-0566

ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,         TJM/CFH

                              *Defendants*.

---

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT PURSUANT TO FRCP 12(B)(6)**

                                                       BARBARA D. UNDERWOOD
                                                       Attorney General of the State of New York
                                                        Attorney for Defendants Andrew M. Cuomo,
                                                            Maria T. Vullo and New York State
                                                            Department of Financial Services
                                                       The Capitol
                                                       Albany, New York  12224
                                                       Telephone:  (518) 776-2608
                                                       Fax:  (518) 915-7738 (Not for service of papers)

Adrienne J. Kerwin
Assistant Attorney General, of Counsel
Bar Roll No. 105154

Helena O. Pederson
Assistant Attorney General, of Counsel

Kelly L. Munkwitz
Assistant Attorney General, of Counsel                                             Date: August 30, 2018

i

# Table of Contents

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ............................................................................................................................. 3

    THE NRA'S AMENDED COMPLAINT DOES NOT RAISE ANY LEGALLY
    COGNIZABLE CLAIMS ................................................................................................. 3

        I.      Defendants' Government Speech is Fully Protected ............................................... 4

        II.     The DFS Consent Orders Punish Violations of the N.Y. Insurance Law –
             and Nothing Else – and Cannot be Challenged on First Amendment
             Grounds ..................................................................................................................... 4

        III.    The DFS Guidance Letters & the Press Statements Cannot Reasonably Be
             Interpreted as Threatening ...................................................................................... 6

CONCLUSION .......................................................................................................................... 10

# **TABLE OF AUTHORITIES**

**CASES**                                                                                                                          **Page(s)**

*Arcara v. Cloud Books, Inc.*,
    478 U.S. 697 (1986) ........................................................................................................... 4

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937 (2009) ............................................................................ 3, 5

*Connell v. Signoracci*,
    153 F.3d 74 (2d Cir. 1998) ................................................................................................ 4

*El v. City of New York*,
    2002 U.S. Dist. LEXIS 12431 (S.D.N.Y. June 18, 2002) ................................................ 5

*Krys v. Pigott*,
    749 F.3d 117 (2d Cir. 2014) .............................................................................................. 3

*Lehman XS Tr., Series 2006-GR2 v. Greenpoint Mortg. Funding Inc.*,
    2014 U.S. Dist. LEXIS 11179 (S.D.N.Y. Jan. 23, 2014) ................................................. 2

*Moy v. Perez*,
    712 F. App'x 38 (2d Cir. 2017) ........................................................................................ 3

*Okwedy v. City of N.Y.*,
    195 F. App'x 7 (2d Cir. 2006) .......................................................................................... 4

*Okwedy v. Molinari*,
    333 F.3d 339 (2d Cir. 2002) .............................................................................................. 7

*Penthouse Int'l, Ltd. v. Meese*,
    939 F.2d 1011 (D.C. Cir. 1991) ........................................................................................ 4

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) ........................................................................................................... 4

*Rattner v. Netburn*,
    930 F.2d 204 (2d Cir. 1991) .............................................................................................. 7

*Zieper v. Metzinger*,
    392 F.Supp. 2d 516 (S.D.N.Y. 2005) ............................................................................... 7

**STATUTES**

N.Y. Fin. Servs. L. 201(b)(2), (5)……………………………………………………………7

**RULES**

Rule 12(b)(6)..........................................................................................................................1

**PRELIMINARY STATEMENT**

The pending lawsuit is nothing more than an attempt by the NRA to insert politics into a regulatory insurance violation by certain insurers that unlawfully offered the Carry Guard Program in violation of New York law. The present lawsuit is manufactured, frivolous, and should be summarily dismissed with prejudice for the reasons set forth below and for those stated in Defendants' moving memorandum of law.

Since October 2017, several insurance producers and the NRA have been under a New York State Department of Financial Services (DFS) investigation for multiple violations of the N.Y. Insurance Law resulting from the sale of the Carry Guard Program and other NRA-sponsored affinity insurance programs in New York. In Consent Orders with an insurer and a broker, DFS's enforcement team fined these companies for these Insurance Law violations. Meanwhile, the NRA has not accounted for its unlicensed insurance activity and illegal receipt of a percentage of the premium paid by gun owners for insurance policies illegally sold in the state.

Rather than address and resolve its misconduct with DFS – as other participants in the same illegal insurance programs have done through DFS Consent Orders – the NRA chose instead to sue Governor Cuomo and DFS on manufactured claims of First Amendment violations. This otherwise inexplicable action apparently stems from the NRA's longstanding political fight with Governor Cuomo, and is being pursued for the sole purpose of evading the legal and regulatory requirements of its demonstrably unlawful Carry Guard Program. As shown in Defendants' motion to dismiss, the NRA's claims fail as a matter of law.

The NRA's opposition memorandum provides no legal basis for its contrived Amended Complaint. Indeed, when the overblown rhetoric and conclusory allegations are excised from the NRA's Amended Complaint and opposition memorandum – as required in a Rule 12(b)(6) motion

1

– all that remains are the DFS Consent Orders, the DFS Guidance Letters, and the Governor's and DFS Press Statements. DFS is statutorily authorized to enforce the Insurance Law and to protect the safety and soundness of its regulated institutions, and each of the documents and statements at issue furthered these responsibilities. As a matter of law, a violation of the NRA's First Amendment rights cannot be established by any one or combination of these documents.

This reply memorandum makes three principal points. First, the law is clear that government speech is protected. Second, illegal conduct is not protected speech under the First Amendment. The DFS Consent Orders – which exclusively relate to violations of N.Y. Insurance Law – cannot form the basis for a First Amendment claim. Third, contrary to the NRA's rhetoric, nothing in the DFS Guidance Letters, or the Governor's Press Statements, constitute an actionable threat of punishment against any company, or adverse regulatory action for a company's decision whether to do business with the NRA. No matter how the DFS Guidance Letters or Governor Press Statements are sliced, cut, or spun, there is no reasonable way to construe the plain language of these statements or documents as threatening any coercive action.

Each of the First Amendment claims in the Amended Complaint fail as a matter of law. As the NRA's other causes of action are each premised on the existence of some viable First Amendment violation, the Amended Complaint should be dismissed in its entirety.[1]

---

[1] While Defendants take no position on the amici applications, Defendants note that "[t]he usual rationale for amicus curiae submissions is that they are of aid to the court and offer insights not available from the parties." Lehman XS Tr., Series 2006-GP2 v. Greenpoint Mortg. Funding, Inc., 2014 U.S. Dist. LEXIS 11179, at *6-7 (S.D.N.Y. Jan. 23, 2014) (citations and quotation marks omitted) (denying leave because "the amicus brief would not serve the limited purposes for which an amicus curiae might be useful"). Here, the proposed amici briefs do not "serve the limited purposes" for which such briefs "might be useful" because they do not "offer insights not available from the parties."

2

# ARGUMENT

## THE NRA'S AMENDED COMPLAINT DOES NOT RAISE ANY LEGALLY COGNIZABLE CLAIMS

The Amended Complaint is rife with summary speculation and conclusory statements. Plaintiff's entire case rests on a contrived argument that the DFS Consent Orders, the DFS Guidance Letters, and the Press Statements somehow deprived the NRA of its constitutional rights. Instead of evaluating the plain language of the DFS Consent Orders, Guidance Letters, and the Press Statements, Dkt. No. 48 at pp. 14-15, the NRA's opposition memorandum directs the Court to consider these unrelated events "together" as supplemented by the NRA's blatant mischaracterizations of fact, which do not constitute factual allegations sufficient to state a claim. Even the NRA's claims of financial hardship are undermined by their own actions, having launched a seven-figure national and regional political advertising campaign.[2]

The federal standard on a motion to dismiss is clear. "[O]nly a complaint that states a *plausible* claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009) (emphasis added; citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Further, "'bald assertions and conclusions of law will not suffice' to avoid dismissal, nor will factual 'allegations that are wholly conclusory[.]'" Moy v. Perez, 712 F. App'x 38, 39 (2d Cir. 2017); Krys v. Pigott, 749 F.3d 117, 128 (2d Cir. 2014)). "[W]here the well-pleaded facts do not permit the court to infer *more than the mere possibility of misconduct*," the complaint must be dismissed. Iqbal, 556 U.S. at 679, 129 S. Ct. at 1950 (emphasis added). That is this case.

---

[2] See https://www.nraila.org/articles/20180807/nra-ila-launches-major-advertising-campaign-urging-confirmation-of-judge-brett-kavanaugh (last visited on August 29, 2018).

3

**I.      Defendants' Government Speech is Fully Protected**

A government entity "is entitled to say what it wishes and to select the views that it wants to express." Pleasant Grove City v. Summum, 555 U.S. 460, 467-468 (2009) (internal citation omitted). "When the government speaks, it is not bound by principles of viewpoint neutrality and can make persuasive arguments for its own favored point of view." Okwedy v. City of N.Y., 195 F. App'x 7, 10 (2d Cir. 2006). See also Connell v. Signoracci, 153 F.3d 74 (2d Cir. 1998) ("[t]he Mayor is privileged, for example, to organize a rally against pornography, to call the topless bars a 'black eye on the community' and a 'slimy business,' and to call for a boycott of the establishments.") Id. at 82.

In Penthouse Int'l, Ltd. v. Meese, 939 F.2d 1011 (D.C. Cir. 1991), the United States Attorney General's Commission on Pornography sent letters to 23 distributors of Penthouse Magazine, stating that the Commission had received testimony that each recipient "is involved in the sale or distribution of pornography" and requested responses "prior to drafting its final report section on identified distributors." Id. at 1013. As a result, major distributors ceased selling Penthouse Magazine, and Penthouse sued based on this alleged economic harm. The Court held that the government's speech did not implicate the First Amendment even assuming "that the government's speech was designed, or intended, or motivated, to discourage the distribution of *Penthouse*[,]" Id. at 1017. The court held there, even if the Government's motive was to embarrass, no First Amendment violation occurs. Id.

**II.     The DFS Consent Orders Punish Violations of the N.Y. Insurance Law – and Nothing Else – and Cannot be Challenged on First Amendment Grounds**

The "First Amendment is not implicated by the enforcement of laws directed at unlawful conduct having nothing to do with…expressive activity." Arcara v. Cloud Books, Inc., 478 U.S. 697, 707 (1986). "Even when accompanied by speech, unlawful conduct is outside the bounds of

4

First Amendment protection." <u>El v. City of New York</u>, 2002 U.S. Dist. LEXIS 12431, *12 (S.D.N.Y. June 18, 2002).  The NRA's reliance on the DFS Consent Orders to support a First Amendment violation fails.

First and foremost, the DFS Consent Orders were agreed to by third parties Chubb and Lockton, and the NRA was not a party to the Consent Orders.  The two DFS Consent Orders require Lockton and Chubb to pay separate fines for multiple violations of the N.Y. Insurance Law that are specified in the agreements.  Although the NRA's Carry Guard program posed the greatest threat to public safety in New York, contrary to the NRA's argument in its opposition memorandum, the sale of the NRA's affinity programs violated multiple Insurance Laws and were the appropriate subject of sanction by DFS.  There is no First Amendment exception to a violation of law.  Chubb and Lockton agreed to these violations, instead of challenging them in a DFS administrative process and in a state court Article 78 proceeding.  The NRA has no standing to challenge the Consent Orders here.

Recognizing the futility of its challenge to the Consent Orders, the NRA seeks to defend its own violations of law by arguing that the investigations are politically motivated.  While the NRA's opposition is rife with hyperbole, out-of-context soundbites, and accusations of "backchannel threats," "blacklisting campaigns" and "backroom exhortations," the fact is – as Lockton and Chubb agreed – the Carry Guard product violates multiple provisions of New York's Insurance Law.  The NRA's bald allegations are insufficient to survive a motion to dismiss.  <u>See</u>, e.g., <u>Iqbal</u>, 556 U.S. at 679.

Similarly, the NRA's claim that the two DFS Consent Orders were "coerced" is also fanciful.  The Consent Orders were the negotiated outcome of an investigation into violations of the Insurance Law by two well-represented and sophisticated insurance businesses.  Lockton and Chubb *admitted* to various violations of the Insurance Law, and agreed to, *inter alia*, pay monetary

5

fines, take specific actions to remedy ongoing violations of the Insurance Law, cease all participation in any Carry Guard or similar programs that violate the Insurance Law, and refrain from "enter[ing] into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance to be issued or delivered in New York State or to anyone known to Lockton to be a New York State resident." See, e.g., Dkt. No. 37-4 at ¶ 43; Dkt. No. 37-5 at ¶ 22. The inclusion of an agreement by the violator not to engage in certain types of activities or business relationships with entities that participated in the illegal conduct under investigation is not improper or unreasonable, and certainly is not unconstitutional. Indeed, such agreement is a common provision in the resolution of criminal and civil law enforcement investigations.

The NRA's claim that the DFS actions will prevent the NRA from procuring corporate insurance is directly contrary to express provisions in the two agreements. The Lockton Consent Order specifically states that "Lockton may assist the NRA in procuring insurance for the NRA's own corporate operations." Dkt. No. 37-4 at ¶ 43. Similarly, the Chubb Consent Order specifically states that "the NRA may itself purchase insurance from Chubb for the sole purpose of obtaining insurance for the NRA's own corporate operations." Dkt. No. 37-5 at ¶ 22. These two clauses completely undermine the NRA's claim that DFS intended to coerce insurers and banks into not doing business with the NRA.

As standalone agreements – or when viewed with all of the government speech at issue in this case – the two DFS Consent Orders cannot form the basis for a valid First Amendment claim against either DFS or the Governor.

### III. The DFS Guidance Letters & the Press Statements Cannot Reasonably Be Interpreted as Threatening

The legal standard that applies to First Amendment claims of government coercion is clear: "oral and written statements made by public officials could give rise to a valid First Amendment

6

claim where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." Okwedy v. Molinari, 333 F.3d 339, 342 (2d Cir. 2002). This is an objective standard. Zieper v. Metzinger, 392 F.Supp. 2d 516, 525 (S.D.N.Y. 2005).

As a matter of law, not one of the DFS Guidance Letters nor the Press Statements at issue in this case can reasonably be interpreted as coercing any insurer or banking institution to take any specific action. Simply put, no objective reading of the Guidance Letters, Press Statements or any of the government speech at issue in this case "may reasonably be viewed as an implied threat." Rattner v. Netburn, 930 F.2d 204, 210 (2d Cir. 1991).

The Superintendent is charged by the N.Y. Financial Services Law with taking all actions that she "believes necessary to … ensure the continued solvency, safety, soundness and prudent conduct of the providers of financial products and services" in the State of New York to "encourage high standards of honesty, transparency, fair business practices and public responsibility." N.Y. Fin. Serv. L. §201(b)(2), (5). Accordingly, when the Superintendent identifies risks to the safety and soundness of New York institutions, she has not hesitated to act and has regularly issued industry-wide alerts and guidance to the entities that she is responsible for supervising. Reputational risk – the risk that negative publicity regarding an institution's business practices will lead to a loss of revenue or litigation – is just one of the threats to a bank or insurer's safety and soundness on which the Superintendent has previously issued guidance. See, e.g., DFS Guidance on Incentive Compensation Arrangements, Oct. 11, 2016, available at https://www.dfs.ny.gov/legal/industry/il161011.pdf.

Moreover, corporate America has a strong track record of cutting ties with entities that fail to carry out their social responsibilities. The widespread corporate withdrawal of business from

7

the State of North Carolina in response to that state's anti-LGBT "bathroom bill" is one example. Corporate concern with reputational risk has given rise to the determination that businesses (like individuals) bear a social responsibility that should be present in corporate governance.  As such, based on extensive regulatory guidance and examination manuals, federal and state regulators of financial institutions recognize both corporate social responsibility and reputational risk as impacting the safety and soundness of the institutions they regulate. See generally, Comptroller's Handbook EP-LBS, Office of the Comptroller of the Currency, Examination Process (EP): Large Bank Supervision 32-33 (June 2018); Comptroller's Handbook M-CRG, Office of the Comptroller of the Currency, Safety and Soundness: Corporate and Risk Governance (July 2016); FDIC Risk Management Manual of Examination Practices – Basic Examination Concepts and Guidelines.

The increased frequency of school shootings and the NRA's successful campaign to prevent the enactment of additional gun safety laws at the national level and in many states (not New York), have prompted businesses to re-evaluate the reputational risks of continuing their business relationships with the NRA.  Following the massacre at Marjorie Stoneman Douglas High School in Parkland, Florida, and the resulting NRA response, many large corporations cut ties with the NRA. The list of companies that concluded that the reputational risk – which includes customer input – of maintaining business relationships with the NRA was too great to justify their continued relationships is extensive:   First National Bank of Omaha, Delta Airlines, MetLife, Bank of America, Citicorp, Enterprise Holdings, Inc., Hertz Corp., Avis/Budget, TrueCar, Best Western, Wyndham Hotels, Starkey Hearing Technologies, Paramount RX, Symatec Corp., SIRVA, SimplisSafe, Dick's Sporting Goods, Walmart, and Kroger.[3]

---

[3] See, e.g., https://www.omaha.com/money/first-national-bank-of-omaha-ends-relationship-with-nra/article_c55d1003-5c88-59a1-83d5-3e7712863459.html (last visited on August 29, 2018); http://fortune.com/ 2018/02/23/metlife-nra/ (last visited on August 29, 2018);

Additionally, following the Parkland massacre, industry leaders, investor advocacy groups, and other national leaders – including the State of Rhode Island – encouraged "All Companies" to "end commercial relationships and promotional ties with the NRA."[4] With this important backdrop, and in its capacity as the regulator charged with ensuring the fiscal soundness of financial services market participants, DFS issued the Guidance Letters solely to encourage its regulated institutions to continue evaluating and managing the risks associated with continued business dealings with the NRA and similar organizations; the Guidance Letters do nothing more. Notably, the Guidance Letters do not state, directly or impliedly, that DFS will take any action whatsoever in the event its thousands of institutions act or fail to act in a particular way in response to the Guidance Letters.

In its opposition Memorandum, the NRA routinely misquotes and mischaracterizes the DFS Guidance Letters. The best rebuttal to the NRA's inaccurate rhetoric is the actual language of the DFS Guidance Letters:

> Our insurers are key players in maintaining and improving public health and safety in the communities they serve. They are also in the business of managing risks, including their own reputational risks, by making risk management decisions on a regular basis regarding if and how they will do business with certain sectors or entities. In light of the above, and subject to compliance with applicable laws, the Department encourages its insurers to continue evaluating and managing their risks, including reputational risks, that may arise from their dealings with the NRA or similar gun promotion organizations, if any, as well as continued assessment of compliance with their own codes of social responsibility. The Department encourages regulated institutions to review any relationships they have with

---

https://abcnews.go.com/US/companies-cutting-ties-nra-grows-include-hertz-metlife/story?id=53322436 (last visited on August 29, 2018) ; https://www.marketwatch.com/story/ americans-appear-divided-over-companies-breaking-ties-with-nra-2018-03-01(last visited on August 29, 2018) ; http://www.chicago tribune.com/business/ct-biz-kroger-fred-meyer-guns-20180301-story.html (last visited on August 29, 2018).

[4] Interfaith Center on Corporate Responsibility, "Investor Statement on Guidance Violence," available at https://www.iccr.org/investor-statement-gun-violence (last visited on August 29, 2018), signed by, *inter alia*, the State of Rhode Island.

9

    the NRA or similar gun promotion organizations, and to take prompt actions to managing these risks and promote public health and safety.

Dkt. No. 37-2 at 2; see also Dkt. No. 37-3 at 2.  There are no actual or implied threats of coercion, nor any warnings, in the DFS Guidance Letters.  The only reasonable conclusion that may be drawn from an objective reading of the Guidance Letters is that they further the legitimate DFS objective of ensuring that insurers and financial institutions providing services to New York State residents on an ongoing basis, consider matters that may affect a company's corporate reputation and, in turn, its financial health.

  DFS knows how to warn its regulated entities when they will be subject to sanction if they do not comply with the law.[5]  However, none of that warning language – or anything even remotely comparable – appears in the DFS Guidance Letters at issue here.  Because no such threat has been made or implied – nor is there any factual allegation that such a threat was made – the NRA's First Amendment claims fail as a matter of law and should be dismissed.

## CONCLUSION

  For the reasons discussed above, together with the reasons discussed in Defendants' moving memorandum of law, Dkt. No. 40-1, Defendants' motion to dismiss should be granted in its entirety, with prejudice.

---

[5] See, e.g,. DFS Banking Industry Letter, "Indirect Automobile Lending and Compliance with New York's Fair Lending Statute" (Aug. 23, 2018)("The Department will continue to conduct fair lending examinations to review indirect automobile lending programs where appropriate and to take any other supervisory or enforcement actions necessary to ensure that lending in New York State is fair and nondiscriminatory.");  DFS Supplement No. 1 to Insurance Circular Letter No. 1(2003), "Health Insurance Coverage for Contraceptive Services" (Jan. 21, 2017) ("In New York, an issuer must provide coverage for all contraceptive drugs and devices. . . . DFS will continue to ensure full compliance with these important consumer health protections.").

Dated: Albany, New York
       August 30, 2018

                              BARBARA D. UNDERWOOD
                              Attorney General of the State of New York
                              Attorney for Defendants Andrew M. Cuomo,
                                      Maria T. Vullo and Department of
                                      Financial Services
                              The Capitol
                              Albany, New York  12224
                              By: *s/ Adrienne J. Kerwin*
                              Adrienne J. Kerwin
                              Assistant Attorney General, of Counsel
                              Bar Roll No. 105154
                              Telephone:  (518) 776-2608
                              Fax:  (518) 915-7738 (Not for service of papers)
                              Email: Adrienne.Kerwin@ag.ny.gov

TO:    VIA ECF
          J. Joel Alicea, Esq.
          Charles J. Cooper, Esq.
          Michael W. Kirk, Esq

          VIA ECF
          William A. Brewer, Esq.
          Stephanie L. Gase, Esq.
          Sarah Rogers, Esq.