1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF NEW YORK

3

4   NATIONAL RIFLE ASSOCIATION OF AMERICA, )
                                          )
5                                         )
                  Plaintiff,              ) CASE NO. 18-CV-566
6                                         )
       vs.                                )
7                                         )
    ANDREW CUOMO, et al.,                 )
8                                         )
                  Defendants.             )
9   _____)

10              **TRANSCRIPT OF PROCEEDINGS**
              **BEFORE THE HON. THOMAS J. MCAVOY**
11              **MONDAY, SEPTEMBER 10, 2018**
                   **ALBANY, NEW YORK**

12

13   **FOR THE PLAINTIFF:**
       BREWER ATTORNEYS & COUNSELORS
14     By:  WILLIAM A. BREWER, ESQ., SARAH ROGERS, ESQ., and
       STEPHANIE L. GASE, ESQ.
15     1717 Main Street, Suite 5900
       Dallas, Texas 75201
16
       COOPER & KIRK, PLLC
17     By:   CHARLES J. COOPER, ESQ. and JOSE JOEL ALICEA, ESQ.
       1523 New Hampshire Avenue, NW
18     Washington, DC 20036

19   **FOR THE DEFENDANTS:**
       OFFICE OF THE ATTORNEY GENERAL
20     By:  ADRIENNE J. KERWIN, ESQ. and HELENA O. PEDERSON, ESQ.
       The Capitol
21     Albany, New York 12224

22

23

24

25

**NRA of America v. Cuomo et al. - 18-CV-566**

1          (Open court, 10:00 a.m.)

2          THE COURT:  So why don't you call the NRA case and get

3   everybody up here.  I guess everybody is here.  Is there any

4   amici here?  No amici.  So that means we get a half hour from

5   the plaintiff and a half hour from the defendant?

6          MR. BREWER:  Yes, Your Honor.

7          THE COURT:  Is that right?

8          MS. KERWIN:  Yes, sir.

9          THE COURT:  Don't go over that.  I thought the briefs

10  submitted by the amici people were pretty good.  I enjoyed

11  reading them, and I'm sure you did too.

12          Well, this is defense motion to dismiss the second

13  complaint, the amended complaint on the ground that it fails to

14  state a cause of action upon which federal relief can be

15  granted.  So what does the defense have to say about that?

16          Why don't we call the case and get the appearances

17  first?

18          THE CLERK:  National Rifle Association of America

19  versus Andrew Cuomo et al., 18-CV-566.  May I have the

20  appearance on behalf of the plaintiff?

21          MR. BREWER:  Good morning, Your Honor.  My name is

22  Bill Brewer.  I'm here with my partners Stephanie Gase and Sarah

23  Rogers.  Also assisted today by Cooper & Kirk, Chuck Cooper and

24  Joel Alicea.

25          THE COURT:  Wow.  You guys really come in groups,

**NRA of America v. Cuomo et al. - 18-CV-566**

1    don't you?

2              MR. BREWER:  You know, for me, Your Honor, it was an

3    opportunity to be back in Albany, in the Hudson Valley where I

4    went to school, and glad to be in your court.

5              THE COURT:  That's good.  I enjoy Albany too.  It's a

6    great city.  I went to school here as well and never wanted to

7    leave, but circumstances took me back to Binghamton, New York,

8    and I've been hiding down there for a long time.

9              MR. BREWER:  That's where you're from.  I'm from Long

10   Island.  So I went back downstate.

11             THE COURT:  Long Island is a good place.  My best man

12   was from Point Lookout from the island.

13             Who do we have from the other side?

14             MS. KERWIN:  Good morning, Your Honor.  Adrienne

15   Kerwin for the Attorney General on behalf of Governor Cuomo,

16   Maria Vullo, and Department of Financial Services.  With me

17   today I have general counsel for DFS Nathaniel Dorfman and

18   Assistant Attorney General Helena Pederson.

19             THE COURT:  Welcome, folks.  We're glad you came, and

20   we'll hear your argument as soon as we listen to -- you guys are

21   defense.  So you're going first.

22             MS. KERWIN:  We're first.

23             THE COURT:  What are you going to tell me why this

24   matter should be dismissed?

25             MS. KERWIN:  Your Honor, the complaint in this case

**NRA of America v. Cuomo et al. - 18-CV-566**

1   does nothing more than describe three completely distinct legal

2   actions by the state.  First, it discusses government speech by

3   Superintendent Vullo through two guidance letters sent to all

4   insurers and financial institutions doing business in New York.

5   Second, it discusses lawful, reasonable, and prudent regulatory

6   action taken by DFS against Chubb and Lockton for violations of

7   New York law.  Third, it discusses protected government speech

8   by Governor Cuomo within press statements that express the

9   governor's political positions and beliefs in connection with

10   the NRA.

11          What the complaint does not do, however, is allege any

12   Constitutional violation by Governor Cuomo, Superintendent

13   Vullo, or DFS.  There are no allegations in the complaint

14   sufficient to remove the guidance letters and press releases

15   from the protections of the First Amendment or subject the

16   consent orders to the First Amendment at all.  Speech by the

17   government --

18          THE COURT:  You have to slow down because if you kill

19   my stenographer, we're going to have to adjourn this for another

20   week.

21          MS. KERWIN:  Got it.

22          Speech by the government only loses First Amendment

23   protections when it can reasonably be interpreted as

24   communicating that some form of punishment or adverse state

25   action will follow the failure to do as the government demands.

**NRA of America v. Cuomo et al. - 18-CV-566**

1  Government speech that attempts to convince a course of action,

2  and not coerce it, maintains First Amendment protection.

3       When the actual contents of the guidance letters and

4  press releases are read, they cannot be objectively interpreted

5  as threatening any kind of coercive criminal or regulatory

6  actions.  The type of language deemed objectively capable of

7  being seen as threatening or coercive is completely absent, and

8  as a result, no reading of the guidance letters or press

9  releases may reasonably be viewed as an implied threat and not

10  subjected itself to First Amendment protection.

11       In light of this clear conclusion, the NRA

12  mischaracterizes the guidance letters to the Court and suggests

13  that the Court must view the guidance letters as the NRA does.

14  However, the test is an objective one, and I think everyone in

15  this room would agree that the NRA does not view statements made

16  by or on behalf of Governor Cuomo about the NRA as objective.

17       Therefore, while the Court must accept all facts

18  alleged in the complaint as true on this motion, it is not

19  required to accept the NRA's mischaracterization of the actual

20  document-based facts or its empty, conclusory, unsupported

21  statements as true.  Instead, the Court must look at the actual

22  instances of speech at issue in this case objectively.

23       Additionally, Second Circuit has made clear in

24  Hammerhead, Zieper, and others that the government's motives are

25  irrelevant to whether speech can reasonably be interpreted by

**NRA of America v. Cuomo et al. - 18-CV-566**

1    the Court as threatening or coercive.  Therefore, it is the

2    government's speech itself and not the allegations about the

3    government's motivations in expressing that speech that is

4    relevant to the objectiveness inquiry that the Court must apply

5    on this motion to dismiss.

6          When read objectively, the guidance letters do not

7    demand any action from any company or threaten any penalty for

8    failing to comply with any government directive.  Although DFS

9    does have regulatory supervision over the approximately 3,200

10   insurers and financial institutions to whom the guidance letters

11   were sent, that factor is not determinative of whether the

12   guidance letters are protected government speech or

13   unconstitutional threats of coercive state action.  The words

14   themselves must be read within the context of the document.

15         When so read, the only objective conclusion that can

16   be drawn is that the guidance letters do not direct, much less

17   threaten, any company to do anything at all.  At most, the

18   guidance letters remind insurers and financial institutions of

19   their obligation to constantly evaluate reputational risks and

20   take any actions necessary to manage those risks consistent with

21   their corporate social responsibility obligations.

22         DFS has the right and in fact is obligated to warn

23   entities of potential reputational risks.  If it can't do so

24   through guidance letters like this which are generally

25   applicable industry wide, then how could it ever do so?

**NRA of America v. Cuomo et al. - 18-CV-566**

1          THE COURT:  Why is reputation important?  What

2     difference does it make what their reputation is as long as they

3     follow the law?

4          MS. KERWIN:  Reputational risk can go to a company's

5     bottom line.  If customers of that company disagree with a

6     business relationship that company may have with an

7     organization, it can pull its business and it can effectively

8     decrease their bottom line and lose business.  So it's necessary

9     to think about what customers of a company may relate that

10    company to, and if it's to a social issue that most of the

11    country, a good number of people in the country are against,

12    then that company will necessarily lose, could necessarily lose

13    business.  So it is a relevant inquiry that companies should

14    make.

15         THE COURT:  So it's like the Nike case, right?

16    Whether or not you put something like that and tie it to a

17    certain quarterback and half the country loves him and half the

18    country hates him.  So it's important that you look at how that

19    may affect the bottom line of a company that's doing business

20    with the NRA.

21         MS. KERWIN:  Right.  You have to look at the balance,

22    which way.  What is this campaign going to do to our business?

23    It's going to attract people.  Is it going to make people stop

24    buying Jordans?

25              For the cases in which government speech has been

NRA of America v. Cuomo et al. - 18-CV-566

1    reasonably interpreted as threatening state action involved

2    government speech being directed at one person or entity who is

3    known to the government to be involved with the dissemination of

4    the plaintiff's message.  In Bantam Books, the commission's

5    notice was sent to one publisher.  In Okwedy, the borough

6    president's letter was sent to one company.  In Rattner, the

7    government's letter was sent to one newspaper.

8              Here, the government -- the guidance letters were not

9    directed at any specific companies at all, much less companies

10   known to the state to be in business relationships with the NRA.

11   Instead, they were sent industry wide and contained generally

12   applicable guidance.  Therefore, it cannot be credibly argued

13   that the plain language of the guidance letters can objectively

14   be deemed as threatening regulatory action against the over

15   1,800 insurers and 1,400 banking institutions to whom the

16   guidance letters were sent.  Importantly --

17             THE COURT:  I hate judges that do this.  What do you

18   say about paragraph 38 of plaintiff's complaint?  I think there

19   is some specific threatening language as the Court read it in

20   that paragraph.  I'd like you to discuss that if it wouldn't

21   throw you off your presentation.

22             MS. KERWIN:  Paragraph 38, that paragraph, correct?

23             THE COURT:  Right.

24             MS. KERWIN:  States that throughout its purported

25   investigation of Carry Guard in late 2017 and early 2018, DFS

**NRA of America v. Cuomo et al. - 18-CV-566**

1   communicated to banks and insurers with known or suspected ties

2   to the NRA that they would face regulatory action if they failed

3   to terminate their relationship with the NRA.

4           THE COURT:  That's pretty strong wording, isn't it?

5           MS. KERWIN:  It's a pretty strong conclusory statement

6   with no facts to bolster it whatsoever.  I mean this is the kind

7   of statement that Iqbal warns against.  You can't just say there

8   were all these communications and people stopped --

9           THE COURT:  You've got to point to certain

10  communications and point to what they said, right?

11          MS. KERWIN:  Yes.  Who said it, what the words were,

12  right.

13          THE COURT:  Right.  That's what's important here, to

14  flesh that paragraph out.

15          MS. KERWIN:  Right.

16          THE COURT:  If they can do that, they've got a pretty

17  strong argument.  If they can't do it, they don't, right?

18          MS. KERWIN:  If they could do that, we'd by talking

19  about a different issue on a different motion, but the fact is

20  this is the second time they've alleged this complaint, and they

21  still haven't identified anything at all with respect to those

22  kind of allegations.

23          THE COURT:  Thank you.

24          MS. KERWIN:  As Your Honor just referred to the Nike

25  case, DFS's statements in this case follow the actions of a

**NRA of America v. Cuomo et al. - 18-CV-566**

1  large number of major companies that cut ties with the NRA in

2  the days and weeks following the February 14, 2018, massacre in

3  Parkland, Florida, and the NRA's public responses to it.

4  Companies nationwide were evaluating their reputational risks

5  and social responsibilities and making the choice that

6  continuing business relationships with the NRA could not coexist

7  with their corporate values.

8          By the time that the April guidance letters were

9  issued, the list of companies that determined that the

10  reputational risks of maintaining business relationships with

11  the NRA was too great to justify their continued relationship,

12  those companies were companies such as Bank of America,

13  Citicorp, First National Bank of Omaha, Enterprise Holdings,

14  Best Western, Wyndham Hotels, Dick's Sporting Goods, Walmart,

15  Kroger.  Other very large, influential companies in this county

16  had already done it by the time these guidance letters came out.

17  The guidance provided by DFS at Governor Cuomo's direction was

18  not new or novel.  It was consistent with this national shift

19  towards support for more rigorous gun regulation and an already

20  overwhelming corporate response.

21          For New York to continue to maintain secured insurance

22  and financial services markets, DFS had an obligation to ensure

23  that insurance and financial institutions continued to manage

24  risks that could affect the soundness of those institutions.

25  That companies may have been convinced to take action as a

**NRA of America v. Cuomo et al. - 18-CV-566**

1    result of the guidance letters does not make the guidance

2    letters coercive since, as recognized by the Second Circuit,

3    attempts by government to convince are themselves protected by

4    the First Amendment.

5            As a regulatory body, DFS routinely directs companies

6    under its supervision to take or refrain from actions that

7    violate the law and warns that regulatory sanctions will result

8    from a company's failure to comply with existing law.  Such

9    warnings are not made under a thin veil and don't contain any

10   ambiguity whatsoever.  Instead, DFS uses plain language that is

11   direct and straightforward.

12           For instance, as referenced in footnote 5 of our reply

13   brief, DFS issued guidance to insurers outlining what the law

14   requires in connection with providing coverage for contraceptive

15   drugs and devices, which concluded with the statements, "DFS

16   will continue to ensure full compliance with these consumer

17   health protections."  This statement on its face specifically

18   informed insurers DFS would be taking regulatory action to

19   ensure that insurers comply with the law as outlined in the

20   guidance.

21           Additionally, in connection with providing guidance to

22   lenders about ensuring nondiscrimination in the offering of

23   automobile loans, DFS informed companies that DFS "will continue

24   to conduct fair lending examinations to review indirect

25   automobile lending programs where appropriate and take any other

**NRA of America v. Cuomo et al. - 18-CV-566**

1    supervisory or enforcement actions necessary to ensure that

2    lending in New York State is fair and nondiscriminatory."  This

3    language told the people getting these guidance letters that DFS

4    would be watching and DFS would be making sure that these

5    companies were complying with what was in that guidance letter.

6         That's not the case here.  No such language is found

7    in the guidance letters.  Instead, DFS encouraged insurers and

8    financial institutions to continue evaluating and managing their

9    risks, continue assessing compliance with their own codes of

10   social responsibility, and encouraged companies to review their

11   relationships within the context of managing reputational risks

12   and corporate social responsibility.  This language cannot be

13   objectively read as coercive or threatening.

14         The Governor's April 2018 press release about the

15   guidance letters similarly contained no language that can

16   objectively, reasonably be viewed as a threat, implied or

17   otherwise.  It contains no threats of state action at all and

18   makes no suggestion that the government would be taking any role

19   in companies' own assessment of their own reputational risks.

20   The press release was not aimed at any particular insurer or

21   financial institution and did not direct any company to take any

22   action whatsoever.

23         Therefore, under the Second Circuit test in Okwedy

24   versus Molinari, the complaint fails to allege that the guidance

25   letters or the Governor's press release are anything other than

**NRA of America v. Cuomo et al. - 18-CV-566**

1   government speech that is protected by the First Amendment.  As

2   a matter of law, the exception of Okwedy does not apply here to

3   the facts as alleged in the complaint, and plaintiff's first and

4   second causes of actions should be dismissed.

5          The complaint's allegations relating to consent orders

6   with Lockton and Chubb fail without any First Amendment analysis

7   needing to be applied at all.  On their face, the consent orders

8   resolve DFS's investigation into violations of the Insurance Law

9   by Lockton and Chubb.  The consent orders were voluntarily

10  entered into by two sophisticated players in the insurance

11  industry and include admissions of violations of the Insurance

12  Law by both Lockton and Chubb.

13         The First Amendment is not implicated by the

14  enforcement of laws directed at unlawful conduct because

15  unlawful conduct is outside the limits of the First Amendment

16  protections.  Recognizing that unlawful conduct is not protected

17  by the First Amendment, the NRA has attempted to distance itself

18  and its argument from the DFS's investigation of Carry Guard,

19  which provided illegal insurance for intentional unjustified

20  shootings, which is obviously contrary to the Insurance Law and

21  public policy.

22         Instead, in its brief, the NRA states that its First

23  Amendment claims do not challenge any consent order provisions

24  that pertain to Carry Guard or any program for which unlawful

25  conduct is alleged.  In making that argument, the NRA

**NRA of America v. Cuomo et al. - 18-CV-566**

1   specifically cites to two sentences out of its 142-paragraph

2   complaint, and those sentences are found in the complaint at

3   paragraph 54 and 62, and those sentences in the complaint

4   contain provisions in which -- allege that the consent orders

5   contain provisions in which Lockton and Chubb agree not to

6   participate in any affinity programs with the NRA, even if they

7   comply with the law, unlike Carry Guard.

8          However, even limited to these two sentences, the

9   NRA's First Amendment claims related to the consent orders fail

10  to state a claim for two reasons.  First, a party to an

11  agreement is free to agree to anything it wants, including an

12  agreement to limit otherwise Constitutionally-protected conduct.

13  Second, as the consent orders specifically state, the NRA

14  affinity programs administered by Lockton and those underwritten

15  by Chubb were illegally marketed and promoted by the NRA with

16  the full knowledge and involvement of Lockton and Chubb.

17         Additionally, as a result of its business contracts

18  with Lockton and Chubb, the NRA was involved in providing

19  unlawful benefits to owners of the affinity policy.  The

20  inclusion in an agreement that a violator of the law will not

21  engage in certain types of conduct or business relationships

22  with whom it previously engaged in illegal conduct is not only

23  not illegal or unconstitutional, it's a common provision in

24  resolutions of criminal and civil enforcement investigations and

25  is rationally based.

NRA of America v. Cuomo et al. - 18-CV-566

1          Additionally, the two DFS press releases attached to

2    the complaint as exhibits A and B relate only to the illegal

3    Carry Guard program and the false affidavits submitted by

4    Lockton in connection with the administration of the NRA's other

5    affinity programs.  Since the NRA now argues that it is not

6    challenging any state action related to unlawful conduct, it has

7    necessarily abandoned any claims related to the DFS press

8    statements attached to the complaint.

9          In a desperate effort to allege a cognizable First

10   Amendment claim, the NRA attempts to bootstrap instances of

11   legal government conduct and argue that the guidance letters,

12   press releases, and consent orders should be viewed in

13   connection with statements made by Governor Cuomo adverse to the

14   NRA.  In other words, the NRA is asking the Court to recognize a

15   cause of action that imposes liability on a Governor's political

16   speech.

17         Political speech is precisely the type of speech that

18   the First Amendment was intended to protect, not penalize.

19   Governor Cuomo has the absolute right to publicly challenge the

20   NRA and the position it advocates for.  In fact, the complaint

21   alleges that Governor Cuomo and the NRA have been engaged in

22   public political debate for decades, and it is the very business

23   of government to favor and disfavor different points of view and

24   attempt to garner agreement with its own viewpoints.

25         Despite this longstanding political disagreement, it

NRA of America v. Cuomo et al. - 18-CV-566

1   was not until DFS began investigating Carry Guard within six

2   months of its existence and discovered that it provided illegal

3   liability coverage for causing intentional unjustified death

4   that the NRA -- only then did the NRA allege that Governor Cuomo

5   violated its rights.

6          As the consent orders set forth, the NRA publicly

7   purported to have developed and created Carry Guard and

8   vigorously, aggressively marketed, solicited, and promoted Carry

9   Guard without being licensed to do so and was being paid to do

10  so.  It was only after illegal Carry Guard was shut down that

11  the NRA brought this lawsuit and tried to tie its business

12  losses to Governor Cuomo's opposition to the NRA and the First

13  Amendment.  However, the First Amendment does not recognize such

14  a claim.

15         Contrary to the unsupported analysis urged by the NRA,

16  a totality of the circumstances analysis does not apply here.

17  Such an argument requires the Court to evaluate separate,

18  distinct, unrelated lawful instances of Constitutionally-

19  protected conduct against a political backdrop and infer an

20  implied threat.  The First Amendment does not recognize such an

21  analysis and instead prohibits the imposition of liability for

22  the expression of a political viewpoint, the enforcement of the

23  law, or government speech.

24         The only case cited by the NRA in support of this

25  proposition is inapplicable.  That case was Bantam Books, and in

**NRA of America v. Cuomo et al. - 18-CV-566**

1   Bantam Books, the language involved there specifically thanked

2   the publisher in advance for cooperating with the government and

3   reminded the publisher that the commission had an obligation to

4   report or to refer prosecutions to the Attorney General and

5   informed the publisher that the list of that publisher's books

6   would be sent to the police.

7          That government speech on its face could reasonably be

8   interpreted as an implied threat since it warned of criminal

9   prosecution and police involvement.  Because of this objective

10  interpretation of the four corners of the speech at issue in

11  that case, the Court then as a factfinder considered other

12  circumstances outside of the actual speech to determine whether

13  the motivation behind the speech was intended to coerce.

14         Here, the guidance letters, press releases, and

15  consent orders on their face do not objectively direct any

16  company to do anything.  Accordingly, nothing the defendants did

17  violated the law, and since as a matter of law the guidance

18  letters, press releases, and consent orders cannot objectively

19  be reasonably interpreted as threatening any type of state-

20  inflicted punishment, consideration of any other factors is not

21  relevant, even if pled in the complaint.

22         Also fatal to the NRA's first and second causes of

23  action is the complete failure to allege any particularized

24  instance of speech that has been infringed by the guidance

25  letters or the consent orders, which is an essential element of

**NRA of America v. Cuomo et al. - 18-CV-566**

1    both claims.  Instead of alleging that the guidance letters or

2    press releases were issued or the consent orders entered into in

3    an effort to stifle or retaliate against any viewpoint of the

4    NRA, the complaint alleges in conclusory fashion that the

5    guidance letters, press releases, and consent orders were

6    carried out because of the Governor's disagreement with the

7    NRA's overall purpose.

8              This is contrary to the Supreme Court and Second

9    Circuit case law that demonstrates that First Amendment

10   protection is afforded only particularized instances of speech

11   or expressive conduct.  What cases like Okwedy, Rattner, and

12   Bantam Books have in common is that the government coerced or

13   threatened a third party to stop aiding the plaintiff in

14   expressing a specific viewpoint on a particular topic.  Here,

15   nothing that the defendants have done has prevented the NRA from

16   spreading its message, and the complaint does not even allege

17   that it has.

18             Applying Constitutional protection to an advocacy

19   group for its very existence strips the freedoms of speech and

20   expression protected by the First Amendment of their very

21   purpose, which is the freedom to speak or express a viewpoint.

22   Its intended purpose was not to exempt lobby groups from having

23   to allege and prove an element of a First Amendment claim as

24   required by longstanding doctrine.

25             Perhaps recognizing that it cannot allege any causal

NRA of America v. Cuomo et al. - 18-CV-566

1    link between any act of the defendants to any actual speech or

2    expression, the NRA alleges that the guidance letters, press

3    releases, and consent orders violate the NRA's freedom of

4    association.  The First Amendment prohibits the imposition of a

5    general prohibition against a certain type of advocacy or

6    penalizing the expression of a particular view and requires that

7    a plaintiff allege a direct and substantial or significant

8    interference with its ability to associate.

9         The complaint here does not allege that any act of the

10   defendants penalizes or prohibits the NRA's expression of its

11   viewpoint.  Instead of alleging that an interference is direct

12   and substantial or significant, the complaint attempts to lead

13   the Court through an exercise of attenuated mental gymnastics to

14   come to a conclusion that the guidance letters, press releases,

15   and consent orders will cause the NRA to have to cease

16   operations and fade out of existence.

17        Specifically, NRA alleges that because of the guidance

18   letters, press releases, and consent orders, it may not be able

19   to get corporate insurance and banking services in the future.

20   However, importantly, the complaint does not allege the NRA

21   cannot currently secure insurance or banking services.  At most,

22   it alleges that its choices may be fewer because some banks are

23   agreeing with the nationwide reassessment of reputational risk

24   and corporate social responsibility commitments.

25        Not only are the allegations about securing insurance

NRA of America v. Cuomo et al. - 18-CV-566

1   and banking services entirely speculative and require attenuated

2   logic, but they are completed undermined by two factors.  First,

3   DFS only regulates state-chartered banks and insurance

4   companies, and as a nationwide organization based out of state,

5   it cannot be credibly alleged that it will be left without

6   insurance and banking services because of any act of Governor

7   Cuomo or DFS.

8          Second, the consent orders themselves specifically

9   provide that Lockton may assist the NRA in procuring insurance

10  for the NRA's own corporate operations and the NRA may purchase

11  insurance from Chubb for the sole purpose of obtaining insurance

12  for the NRA's own corporate operations.  These two clauses taken

13  directly from the consent orders completely undermine the NRA's

14  argument that the actions of the defendant will cause the NRA to

15  cease to associate with its members.

16          Finally, the complaint fails to allege facts

17  sufficient to support the NRA's sixth cause of action.  The NRA

18  attempts to allege claims of both procedural and substantive due

19  process, but fails to allege a property right protected by the

20  due process clause or facts sufficient to allege an injury of

21  its reputation that rises to an unconstitutional level.

22          First, there's no property right under the due process

23  clause to continue business on the same terms as it had in the

24  past or to any future business opportunities.  Since these are

25  the only alleged property interests in the complaint, the NRA's

**NRA of America v. Cuomo et al. - 18-CV-566**

1    substantive due process claims should be dismissed.

2              Second, to state a due process claim, a plaintiff must

3    allege governmental conduct that is so egregious and outrageous

4    that it can be said to shock the contemporary conscience.

5    Allegations that courts have found to shock the conscience

6    include actions done out of spite with no rational government

7    purpose.  None of the alleged conduct of the defendant alleged

8    in this case -- the regulatory guidance of DFS, the enforcement

9    of the law through consent orders, and the expression of

10   political opinion by the Governor -- can credibly be argued to

11   rise to this level, particularly since they were done consistent

12   with the law and with a clearly rational purpose.

13             Third, the stigma plus claim under the due process

14   clause requires a plaintiff to plead a statement sufficiently

15   derogatory to injure the plaintiff's reputation that is capable

16   of being proven false and a material state-imposed burden.  The

17   complaint fails to allege any statement by a defendant that's

18   capable of being proven false.  Again because the plain language

19   of the actual statements at issue here does not rise to a level

20   that implicates the Constitution, the NRA urges the Court to

21   look at the plain language with an unobjective lens and give it

22   a meaning other than its clear plain meaning.  However, when the

23   guidance letters, press releases, and consent orders are read,

24   the NRA cannot point to any statement that is capable of being

25   proven false.

NRA of America v. Cuomo et al. - 18-CV-566

1              Additionally, the complaint fails to allege that any

2    statement by the defendant resulted in any state-imposed burden

3    or change to plaintiff's status or rights.  It continues as it

4    has for decades spreading its message and lobbying in favor of

5    its viewpoint.

6              In conclusion, Governor Cuomo, Superintendent Vullo,

7    and DFS respectfully request that the Court dismiss the

8    complaint in its entirety with prejudice.  The government acts

9    relied upon by the NRA simply do not violate the NRA's rights.

10   Instead, the consent orders enforce the Insurance Law, a

11   government function that cannot implicate the First Amendment.

12   The guidance letters and press releases when viewed objectively

13   simply cannot reasonably be interpreted as threatening any

14   state-imposed penalty.  Instead, the guidance letters and press

15   releases are protected government speech.

16             While the NRA attempts in this lawsuit to stifle

17   Governor Cuomo's and Superintendent Vullo's First Amendment

18   rights to engage in government and political speech, the law

19   simply does not allow it.  The NRA's attempt to stop the

20   national momentum in favor of more vigorous gun control cannot

21   be accomplished by silencing masses of government and corporate

22   voices.  That it may lose business and money because fewer

23   people and companies want to be associated with the NRA's

24   message is not a violation of the Constitution.  It's a

25   political movement, which is what the First Amendment was

**NRA of America v. Cuomo et al. - 18-CV-566**

1    designed to protect, and accordingly, the complaint should be

2    dismissed.

3              THE COURT:  Thank you very much.

4              Let's hear the other viewpoint.  What's the plaintiff

5    have to say?

6              MS. ROGERS:  Good morning, Your Honor.  Sarah Rogers

7    for the NRA.

8              THE COURT:  Good morning.  Okay.

9              MS. ROGERS:  I'm going to begin my discussion, unless

10   Your Honor would like me to begin elsewhere, the same place the

11   government begins because this is a really pivotal issue and

12   comes down in our favor.

13             Now, the government argues that every action and every

14   statement by Governor Cuomo, Superintendent Vullo, and DFS over

15   the course of the relevant time period must be viewed as

16   completely distinct.  Those are the words they use in oral

17   argument.  In their brief, they say entirely unrelated and

18   compartmentalized, that the totality of the circumstances cannot

19   be considered.  That's simply not the law.  In fact, the law

20   instructs us otherwise.

21             Now, counsel already referenced Bantam Books, which

22   they claim is in opposite.  We claim it's not, but let's look at

23   cases within the Second Circuit.  So we have the Zieper v.

24   Metzinger case in which the Second Circuit overruled summary

25   judgment in favor of the defendants on a claim like this, and

**NRA of America v. Cuomo et al. - 18-CV-566**

1   there the Court expressly points out that even though there is

2   no explicit, verbatim threat of a government-imposed sanction or

3   penalty, the circumstances in which the communications occurred

4   have to be considered.  The fact that there are FBI agents

5   standing on plaintiff's doorstep could be conveyed to a

6   reasonable person that he's facing the threat of adverse

7   government action, and that's really the standard here.

8           If the government -- and I'm quoting Zieper as well as

9   other Second Circuit authorities.  If the government encourages,

10  not mandates, not directs, but encourages the suppression of

11  protected speech in a manner that could reasonably be perceived

12  as threatening, that is an objective test, then the First

13  Amendment is implicated and indeed is violated.

14          Let's just talk about a few others cases counsel

15  mentioned, and we love these cases.  All of these cases favor

16  the NRA.  The Hammerhead case is one of very few Second Circuit

17  cases that actually substantiates an adverse outcome against a

18  claim like this.  Even in the Hammerhead case where the letter

19  at issue, a letter that a municipal official sent to stores that

20  were stocking an offensive videogame, the letter was very mild.

21  It said, "Your cooperation will be a public service.  As a

22  member of the public, I don't like this game.  I implore you not

23  to stock it."

24          Even in Hammerhead based on that communication with no

25  stores responding and acceding to the threat, they still get

**NRA of America v. Cuomo et al. - 18-CV-566**

1   past a motion to dismiss.  Indeed, that case gets a summary

2   judgment, and the Second Circuit scrutinizes the summary

3   judgment that was granted in favor of the defendant because the

4   First Amendment mandates heightened scrutiny where the

5   government is encouraging the suppression of protected speech.

6        The Okwedy v. Molinari case, that's Second Circuit

7   2003.  There, likewise the totality of the circumstances was

8   extremely relevant to the Court's analysis.  In the Okwedy case,

9   as Your Honor may recall, a religious group had sponsored a

10  billboard that contained Biblical messages against

11  homosexuality.  And the municipal official wrote a letter to the

12  company that was hosting the billboard, said, you know, "This

13  type of intolerance is not welcome on Staten Island, and by the

14  way, we note that you have other billboards and other commercial

15  interests on Staten Island."

16       So the focus of the Court's analysis and the Second

17  Circuit emphasized is that isn't just that one particularized

18  instance of speech, and isn't just -- in fact, there was no

19  direct regulatory authority over that single billboard, but the

20  totality of the circumstances matter.  The fact that this

21  municipal authority could impose adverse consequences on the

22  recipient of that threat by applying sovereign power in other

23  ways factors into that analysis and compelled the reversal of

24  the dismissal of a claim like ours.

25       So with that, I think it's pretty clear, and if Your

**NRA of America v. Cuomo et al. - 18-CV-566**

1    Honor isn't with me on this at all, I'd like to talk about it

2    more.  It's pretty clear that the totality of the circumstances

3    matter and these communications have to be viewed in context.

4    They also have to be viewed in the light most favorable to the

5    NRA with all inferences drawn in favor of the NRA on a 12(b)(6).

6            Now, that doesn't mean as counsel suggests that you

7    have to read the communications as the NRA would.  In fact, I

8    would say that the objective standard as espoused in Okwedy,

9    Hammerhead, Zieper, Bantam Books, and all these other cases

10   actually suggests that Your Honor read the DFS communications

11   and the surrounding circumstances the way that financial

12   institutions would, and in fact, the way financial institutions

13   did because this is a very persuasive fact that crops up

14   repeatedly in these cases.  It's not quite dispositive, but it

15   almost is.

16           THE COURT:  We don't how that is.  I mean I understand

17   your point.  It makes some sense to me.  If you want to label

18   something as coercive or suggestive of government about to

19   exercise or can exercise certain power against these third-party

20   individuals, we have to have information from them, don't we,

21   saying, "Okay.  We saw these things, and this is why we decided

22   not to do any further business with the NRA."  Now you're into

23   discovery, I take it.

24           MS. ROGERS:  Yes, Your Honor.  That's one of the

25   issues we intend to explore in discovery and we would contend

**NRA of America v. Cuomo et al. - 18-CV-566**

1   that we're entitled to discovery to flesh out.  But even before

2   discovery, we have some evidence alleged in the complaint,

3   certainly evidence that would support an inference on 12(b)(6),

4   that these institutions did view these communications and

5   surrounding conduct as coercive and reacted accordingly.

6           For example, we have a banker speaking on the

7   condition of anonymity to American Banker Magazine saying that

8   he viewed these communications as politically motivated.  He

9   doesn't know with who he can do business now because he doesn't

10  want to incur the politically motivated disfavor of DFS.  We

11  cite that in our complaint.

12          We also have a midnight phone call from a Lockton

13  executive to an NRA executive.  Remember at this stage, February

14  2018, this investigation was ostensibly focused on Carry Guard,

15  the one product for which the government can cognizably allege

16  some regulatory infraction and which we'll get to later.

17          But that midnight phone call in February isn't about

18  Carry Guard.  The executive does not say to the NRA, "I feel

19  pressure to drop Carry Guard."  He says, "If I don't drop the

20  NRA, I want to keep doing business with you, but if I don't drop

21  you, I'm going to lose my license.  I'm going to lose my

22  license."

23          So some communication has occurred, I think we can

24  reasonably infer, that Lockton believed endangered its license

25  if it does not sever ties with the NRA, and Lockton isn't the

1    only financial institution whose behavior indicates that it's

2    been the recipient of that sort of message.

3              So Lloyd's of London, a major insurance underwriter --

4    and by the way, this argument that DFS only regulates

5    state-chartered institutions, so it could not possibly incur its

6    coercive effect that would impair the NRA as a broader

7    organization, that argument is a red herring because DFS

8    addresses its guidance to all insurance companies and banks

9    doing business in New York.  Well, as Your Honor knows, an

10   incredible percentage of insurance companies and banks do

11   business in New York.  In fact, it reaches all the way to

12   London.  We have Lloyd's of London who has no involvement with

13   Carry Guard whatsoever, undisputed fact that in the immediate

14   wake of the Chubb and Lockton consent orders announces that it

15   is severing key ties with the NRA in response to DFS scrutiny.

16   Lloyd's says that publicly.

17             So we have these institutions coming out and saying

18   that this is why they're doing what they're doing.  We have

19   other institutions that don't quite say why they're doing what

20   they do, but inferences can be drawn that substantiate the NRA's

21   claims.

22             For example, we set forth allegations regarding a

23   corporate insurance carrier.  Again nothing to do with Carry

24   Guard.  That corporate insurance carrier had stuck with the NRA

25   through thick and thin.  After the Sandy Hook tragedy, after the

**NRA of America v. Cuomo et al. - 18-CV-566**

1    Parkland tragedy, ready to renew coverage to the exact same

2    terms, but within days of that midnight Lockton phone call,

3    suddenly our corporate carrier tells us, "I'll give you a

4    Band-Aid.  I'll extend your coverage for 90 days, but I will not

5    renew at any price," which is pretty significant.

6            That's an anomalous behavior for an insurance company,

7    which is something that fact discovery, expert discovery will

8    show, and it happens right around the same time that Lockton

9    suddenly panics.  It happens around the same time that we begin

10   to hear that Chubb might drop us, that Met Life drops us,

11   another DFS-regulated entity.

12           And drawing all the inferences in favor of the

13   plaintiff as required on a motion to dismiss, I think Your Honor

14   has to give some deference to the well-pleaded allegations in

15   the complaint which set forth simply that this is not a series

16   of coincidences.  Rather, this reflects a concerted, cohesive

17   campaign to drive the NRA out of New York, to do indeed what

18   Governor Cuomo states on Facebook, on Twitter, and on the

19   Statehouse steps that he wants to do.

20           THE COURT:  So are you saying that we not only have to

21   focus on the language of the speech itself that were in these

22   three types of documents, but we also have to focus on what

23   third parties did in response to that speech?

24           MS. ROGERS:  Absolutely, Your Honor.

25           THE COURT:  Is that what you're labelling the totality

**NRA of America v. Cuomo et al. - 18-CV-566**

1     of the circumstances?

2          MS. ROGERS:  Absolutely, Your Honor.  I think the

3     cases support that.  I think they really emphasize the fact that

4     a threat was perceived and acted upon.  That language comes from

5     Hammerhead.  It appears in some other cases as well.  There's

6     the Backpage case in the Seventh Circuit.  Although it's outside

7     the circuit, Posner models his opinion substantially on Second

8     Circuit law.  He cites Okwedy v. Molinari quite a few times.

9          In Backpage, it's very important to Posner that Visa

10    and MasterCard, even though they had been the target of private

11    sector boycott efforts before, that Backpage had a shoddy

12    reputation.  People knew it was a prostitution website.  There

13    had been grassroots boycott campaigns that these companies had

14    not acceded to.  It was very significant that after the sheriff

15    sends that letter, Visa and MasterCard drop Backpage.  That's a

16    significant fact.  Likewise, a significant fact in Okwedy v.

17    Molinari.

18          THE COURT:  In that case, the sheriff had no authority

19    to do anything to Backpage.  This is different.

20          MS. ROGERS:  Absolutely, Your Honor.  And some of

21    these cases say that it's not dispositive whether the regulator

22    who sends the letter has authority, but it's certainly

23    persuasive.  It certainly matters, and DFS has direct and

24    substantial authority over all of these financial institutions.

25    It can revoke their license.  It can -- the insurance companies

**NRA of America v. Cuomo et al. - 18-CV-566**

1   have to apply to renew the rates they're charging.  It can give

2   them unfavorable treatment at that juncture.  Incurring the

3   favor or disfavor of DFS is going to be very important to any

4   banker or insurance company doing business in New York.

5          THE COURT:  So you're saying that the more power that

6   an entity has such as a state actor, the more cautious they have

7   to be in inferring that they might exercise that authority in

8   some fashion.

9          MS. ROGERS:  I think that's a fair reading.  I

10  certainly think that the degree and directness of power that the

11  government exercises over the target of the purported threat is

12  one fact in the mosaic that the Court has to consider when

13  confronted with this type of claim.

14         THE COURT:  Okay.

15         MS. ROGERS:  So with that, I think it's absolutely

16  true that these communications do need to be read in light of

17  the totality of the circumstances, as the analogous

18  communications of other cases are.  They have to be viewed in

19  the light most favorable to the NRA as 12(b)(6) requires.

20         And let's look at the actual text of these

21  communications and the accompanying press releases because

22  within the four corners, these communications are much more

23  coercive than the state suggests.  So the state claims that the

24  DFS guidance letters, that all they do is remind institutions of

25  their legal obligations to manage risk.  Okay.  Well, that's a

NRA of America v. Cuomo et al. - 18-CV-566

1    legal obligation, and counsel reads from or paraphrases several

2    of the concluding sentences of those guidance letters during her

3    oral argument, that DFS encourages institutions to continue to

4    manage risks and asses risks, but counsel omits one of the very

5    last sentences.  DFS also encourages these institutions to take

6    prompt action in response to that.

7           In case there's any ambiguity about what prompt action

8    the regulator wants to see, the accompanying press release

9    states that Maria Vullo on behalf of DFS urges all insurance

10   companies and banks doing business in New York to join the

11   companies that have discontinued their business arrangements

12   with the NRA.

13          Let's look at that.  It's not -- in a lot of these

14   cases, you have a sheriff or you have a political trustee

15   writing a letter saying, "As a father and a government official,

16   I urge you to get this pornography off our streets."  That's not

17   this.  She's writing on behalf of the agency.  The agency urges

18   you to join the other institutions that have dropped the NRA.

19          By the way, what other institutions are there?  It's

20   not Delta Air Lines that I'll get to in a minute.  The press

21   release lists other DFS-regulated entities and calls them

22   DFS-regulated entities.  It notes, "Chubb and Met Life, which

23   are regulated by us, have discontinued business arrangements

24   with the NRA.  We're pleased by this.  We urge you to take

25   prompt action to join them."

**NRA of America v. Cuomo et al. - 18-CV-566**

1    And then within weeks of those guidance letters,

2    illustrative, hefty fines are imposed upon two institutions that

3    did business with the NRA, and we have an inquiry that surfaces

4    against Lloyd's of London, which had nothing to do with Carry

5    Guard, suddenly announces, suddenly comes to light they are

6    facing an expensive investigation from DFS, and unsurprisingly

7    institutions respond.  Unsurprisingly, that anonymous banker

8    speaks out in American Banker Magazine, says he feels chilled as

9    he'd reasonably be expected to, which is the standard.

10    Your Honor asked a question earlier.  Why does

11    reputational risk matter?  Why should DFS care if New York banks

12    are perceived to be allies of the NRA?  DFS and the state

13    responds that, well, reputation risk can impact the bottom line,

14    and counsel also says reputation risk can affect the soundness

15    of financial institutions.  We agree that risks that affect the

16    soundness of financial institutions are the type that DFS is

17    properly charged with regulating, and reputation risks can even

18    do that in some situations.  One example in their reply brief

19    for the first time, the state sites prior guidance they issued

20    with respect to reputation risk in connection with incentive

21    compensation arrangements for executives.

22    But if you look at that guidance, it's very different

23    from the guidance at issue in this case because there, the state

24    does what you would expect it to do when it's dealing with an

25    actual risk to the bottom line of an institution.  It points

**NRA of America v. Cuomo et al. - 18-CV-566**

1    out, for example, incentive compensation if improperly

2    calibrated can lead to misaligned incentives and the performance

3    of the company can suffer.  It lists specific criteria for

4    evaluating incentive compensation arrangements.

5         That's not what these guidance letters do.  These

6    guidance letters make perfectly plain what the state's real

7    concern is.  They don't want banks to send the wrong message by

8    doing business with gun promotional organizations because they

9    believe that gun promotion advocacy leads to violence.  Again

10   that's the only interpretation of their language, gun promotion.

11   It's not commercial gun promotion.  The NRA is not selling guns.

12   The NRA is promoting a political environment where individuals

13   can own guns to defend themselves.  They don't like that, and

14   they think that tacitly condoning it by allowing the NRA to have

15   a bank account or insurance sends the wrong message.  There's no

16   effort made to quantify this reputation risk, no effort made to

17   establish guidelines on how institutions can manage it.

18        Another place reputation risk sometimes crops up in

19   financial regulation is with respect to mortgage underwriting

20   after the 2008 financial crisis.  There were certain mortgage

21   underwriters that were reputationally unsound.  Countrywide I

22   believe was one.  There was actually a contagion effect where if

23   a bunch of Countrywide subprime mortgages default, then other

24   derivatives are affected too and that's the type of thing that a

25   financial regulator is rightly concerned with.

**NRA of America v. Cuomo et al. - 18-CV-566**

1       There's no evidence of that here.  These sophisticated

2   financial institutions had weighed over the course of decades

3   all of the risks and benefits of doing business with the NRA,

4   and they decided that doing business with the NRA worked out in

5   their favor, and that did not change until the government

6   stepped in, wielded its sovereign power, and strongly suggested

7   that they cease doing business with their political enemy.

8       I want to address briefly this notion that there's no

9   First Amendment claim under Bantam Books and progeny unless the

10  coercive communication is directed at only one entity.  I think

11  I'm getting that argument right.  Well, that's just simply not

12  true.  In the Playboy and Penthouse v. Meese cases from the

13  1990s, which the state cites, but I think actually favor us if

14  you really look at them.  Those communications were directed

15  broadly at anyone who carried these magazines.

16      And extending the state's logic, the Governor could

17  simply put out a mandate banning the NRA from the State of New

18  York or banning it from holding a bank account, and because of

19  the broad application of that mandate, I believe the state

20  argues that no First Amendment analysis applies, but that's

21  simply not what the Constitution countenances.

22      In fact, the breadth of this mandate actually makes

23  the breach of the First Amendment more egregious because the

24  state cannot pretend, as it does with respect to Lockton and

25  Chubb, that this is a tailored interaction with one institution

**NRA of America v. Cuomo et al. - 18-CV-566**

1    that is engaging in risky conduct.  Rather, it is a broad

2    pronouncement that gun rights groups should not enjoy financial

3    services in the State of New York.

4         We also allege additional communications apart from

5    these guidance letters, which the state has no real response to

6    except to suggest they don't need the Iqbal plausibility

7    standard, but they do.  So these are the back room exhortations,

8    and I think the reason that we are entitled to favorable

9    inferences that would allow us to flesh these out in discovery

10   that we've seen facts that are highly suggestive of these

11   communications occurring.

12        We see a late night phone call from Lockton.  We see

13   the sudden reversal in position from the corporate insurance

14   carrier.  We see banks that had been participating with the NRA

15   to provide basic depository services, participating even after

16   the Parkland tragedy and the grassroots boycott efforts that

17   followed, suddenly start dropping us and they won't say why, but

18   we have reason to believe based on all of these, the draft of

19   other facts that it is likely that they had some interaction

20   with regulators.

21        Here's another fact I'll note.  In connection with a

22   brief on the motion for expedited discovery, the state submitted

23   a declaration where it admitted or addressed some of the facts

24   in our complaint.  So for example, the state admits in that

25   declaration that the Carry Guard inquiry was orchestrated or

**NRA of America v. Cuomo et al. - 18-CV-566**

1   prompted by Everytown for Gun Safety, which is an anti-NRA

2   organization.  They say Everytown brought a dossier to Cy Vance,

3   who showed it to DFS, who acted.  But the state doesn't deny --

4                    (Reporter clarification.)

5           MS. ROGERS:  They may deny at depositions.  They may

6   produce documents that contradict it.  We expect the opposite,

7   but we think that allegation at least survives 12(b)(6) scrutiny

8   and it deserves discovery.

9           The state mentions that companies nationwide, Bank of

10  America, Delta, Enterprise also severed some ties with the NRA

11  in the aftermath of Parkland.  Discovery will help us flesh out

12  too the distinctions between these entities and the banks and

13  insurers at issue.  These are very different types of corporate

14  relationships.

15          So Delta, for example, and we didn't say this in our

16  brief because I didn't see it until the reply, but I believe it

17  was publicized that Delta Air Lines had about 12 people who took

18  advantage of that discount.  It was a very small corporate

19  relationship, not the same thing at all as a major insurance

20  relationship or a bank depository type of relationship.

21          So the state mentions that there's been a national

22  shift politically in favor of increased gun control and

23  shouldn't public officials be allowed to exercise their First

24  Amendment right to participate in that.  The answer is

25  certainly.  The NRA has not sued Governor Cuomo for criticizing

**NRA of America v. Cuomo et al. - 18-CV-566**

1    it.  As the complaint recounts, he's done so for decades.  He's

2    done so vociferously, and that's the tradition of vigorous

3    public debate that the NRA supports and participates in.

4    Governor Cuomo can criticize the NRA on Facebook, on Twitter,

5    from the Statehouse steps, in appeals to his constituents.  He

6    can pursue the legislative process to enact whatever

7    Constitutional gun control he wants.

8            What he can't do and what he can't enlist a banking

9    regulator to do is issue official regulatory directives to

10   financial institutions accompanied by penalties that are

11   choreographed to coincide and convey the message that even if

12   you want to do lawful business with the NRA, that's going to

13   result in regulatory disfavor and regulatory reprisals.

14           So with that, I'd like to address the consent orders

15   and this argument that the whole insurance investigation is

16   about unlawful conduct, and I think I'm going to quote the state

17   again here, that therefore because there's unlawful conduct and

18   because they're policing insurance markets, there's no First

19   Amendment analysis at all.  Again that's simply not the law

20   because even when the state is conducting a regulatory policing

21   function, even when there is unlawful conduct, the state can't

22   conduct that enforcement function in viewpoint-discriminatory

23   manner.

24           One of the biggest cases on this is the Supreme

25   Court's decision in R.A.V. v. St. Paul, 1992.  There you had a

**NRA of America v. Cuomo et al. - 18-CV-566**

1   statute that explicitly targeted conduct outside the scope of

2   the First Amendment.  It targeted fighting words, the types of

3   communications that courts have repeatedly held have no First

4   Amendment protection.  I believe the conduct at issue in R.A.V.

5   v. St. Paul was somebody burned a cross on somebody's lawn.  You

6   can regulate that, the Supreme Court says, but what you can't do

7   is regulate it based on the viewpoint of the person engaging in

8   it.  So you can't regulate only racist fighting words.  It has

9   to be all fighting words.

10          Here, the state can certainly regulate the manner in

11   which insurance is brokered and endorsed and the manner in which

12   insurance premiums are structured.  What it can't do is what

13   it's done here.  It can't go after only the NRA.  Take two

14   identical insurance policies, one has NRA's logo on the top, one

15   that says Sierra Club, and decide that this one is unlawful and

16   this one, the regulators aren't going to touch.

17          That's our selective enforcement claim, which

18   defendants don't even challenge the merits of.  They just

19   challenge standing there, and that's not within the scope of

20   this argument.  But it's telling because the state claims that

21   they engaged in just a good faith exercise of its lawful police

22   function, and that's not what it's engaged in.

23          I think discovery will tell us more about this

24   insurance investigation, but here's what we know about it now.

25   We know, number one, it was orchestrated and prompted by

**NRA of America v. Cuomo et al. - 18-CV-566**

1    Everytown.  Everytown is not an insurance NGO.  Everytown is an

2    anti-NRA organization.  That fact may not be dispositive, but

3    within the constellation of facts that tell us whether this was

4    a good faith exercise of police power or whether it is a

5    coercive partisan pursuit by a political enemy, that fact

6    matters.

7           Number two, we know that that inquiry very quickly

8    expanded beyond its purported focus, Carry Guard.  We know that

9    now DFS is looking at Lloyd's, which had nothing to do with

10   Carry Guard.  DFS concedes in its motion papers that it is now

11   looking at pretty much all the NRA's insurance relationships,

12   and the response to this is cursory.  They basically say, "Well,

13   there could have been violations that apply to programs other

14   than Carry Guard.  For example, the way the insurance is

15   marketed."

16          I'll put some flesh on the bones of that allegation.

17   So in the consent orders, there are certain provisions that

18   address the way some of the insurance was marketed that don't

19   pertain specifically to Carry Guard.  For example, consent

20   orders, one of the Lockton consent orders states that it failed

21   to secure three declinations from out-of-state insurers before

22   placing an excess line policy.  What's interesting is if you

23   look at the prospective conduct provisions of those consent

24   orders, Lockton isn't prohibited from doing that stuff with

25   respect to anybody other than the NRA.

**NRA of America v. Cuomo et al. - 18-CV-566**

1          So Lockton, for example, admits that it violated the

2     law by offering no-cost insurance to NRA members in good

3     standing, but we know that Lockton offers no-cost insurance to

4     members in good standing of other organizations.  We quote their

5     website in our complaint exactly verbatim the same language as

6     the NRA.  No action on that, and Lockton isn't forbidden from

7     doing that in the future.

8          The state is basically creating a regime where you can

9     offer no-cost insurance to your members if you're an affinity

10    group except if you're the NRA or we suspect other gun promotion

11    organizations, as the guidance letters suggest.  So we contend

12    that the consent orders do warrant First Amendment analysis and

13    that that First Amendment analysis favors rejecting this motion

14    and sustaining our claims.

15         With respect to the consent orders, the state also

16    argues the Lockton, Chubb, and others are free to agree to

17    whatever they want.  They're free to agree to give up their

18    business relationship.  Well, it may be true that Lockton,

19    having entered into a consent order, does not have a claim, but

20    the NRA has a claim.  We did not receive due process in

21    connection with that consent order, and we have a claim in

22    connection with it.

23         We would also suggest that it is strains credulity to

24    argue that this was a completely free volitional decision by

25    Lockton and Chubb.  We're analyzing whether the state's conduct

**NRA of America v. Cuomo et al. - 18-CV-566**

1   is coercive and whether you're seeing response as coercion.

2   Obviously a settlement with a regulator where you pay almost a

3   million dollar fine is a situation that bears some indicia of

4   coercion.

5           Let's see.  Here's another item I want to address.  So

6   the state then in its creative maneuver argues that since we've

7   argued that this a case about speech and not unlawful conduct,

8   that the NRA has an abandoned its allegations relating to the

9   press releases that announce the consent orders, but that's not

10  true.

11          And here's a key excerpt that I just want to read to

12  you from the press release attached as exhibit D because this

13  too bears on what the government's real objective is here.  So

14  the government points to some carve-out language in both the

15  Lockton and Chubb consent orders that prohibit certain corporate

16  insurance policies and they say, "Look.  This shows that we're

17  not trying to choke off financial services to the NRA.  We're

18  just dealing with specific, surgical types of affinity

19  insurance."

20          But that's not the message the government wanted the

21  public to receive, and we know that because in the May 7, 2018,

22  press release that announced the Chubb consent order, the

23  government states that Chubb agrees to refrain from entering

24  into any agreement or arrangement, any other agreement or

25  arrangement including affinity-type insurance program, but not

**NRA of America v. Cuomo et al. - 18-CV-566**

1    limited to it, including involving any line of insurance

2    involving a contract of insurance involving the NRA directly or

3    indirectly.

4           So the government's communications are far from clear

5    on this point, and as the complaint alleges, other institutions

6    such as our corporate carrier appeared to have gotten the

7    message set forth in this press release.  We allege that's not a

8    coincidence.  It's a campaign, and we would like discovery to

9    prove that out.

10          Finally, there's this notion that the NRA failed to

11   allege that it engages in particularized instances of speech.  I

12   think the kindest thing that I could say about that argument is

13   that the state has the First Amendment freedom to make it, but

14   as the ACLU puts forth eloquently in its brief, that's not an

15   element of a First Amendment claim.

16          We know that because if we look at the cases, even the

17   cases that the states cites which we've gone through already.

18   Okwedy, there's talk about other billboards, not just this one.

19   In Rattner, the state finds -- the Court finds persuasive that

20   the chamber of commerce was persuaded not just to censor that

21   one letter, but to entirely divorce its newsletter from the

22   chamber of commerce.  It doesn't even want to be in the

23   newsletter business anymore because the notion that it can

24   engage in politically tinged communication has been endangered

25   by this coercion.  It's been broadly chilled.  Bantam Books,

**NRA of America v. Cuomo et al. - 18-CV-566**

1    likewise.

2            So this particularized speech thing is not an element,

3    and contrary to what the state suggests, we are not advocating

4    the slippery slope where you can't do anything adverse to an

5    advocacy group without giving rise to a First Amendment claim.

6    To the contrary, I think if we're talking of drawing lines and

7    inviting slippery slopes, then we have to look at the line the

8    state has drawn because if the state gets its wish, the Court

9    closes the doors to the NRA on these facts alleged here drawing

10   all favorable inferences to the NRA, it is difficult to envision

11   a fact pattern that would give rise to a First Amendment claim

12   on behalf of an advocacy group that was pursued or persecuted by

13   the state.  I mean you would literally need I guess an explicit

14   statute banning the NRA from New York or the like.

15           What we have here is we have regulatory documents that

16   explicitly single out the NRA on the basis of its viewpoint.

17   That's what the guidance letters do.  They say gun promotional

18   organizations.  They don't say organizations that sell murder

19   insurance or organizations that participate in affinity

20   insurance.  They say organizations that promote gun rights, and

21   we have a constellation of surrounding facts and government

22   actions that really drive home the threat that is communicated

23   in a slightly veiled fashion in those letters.

24           There are no attenuated mental gymnastics required in

25   order to connect the dots between the DFS exhorting banks to

**NRA of America v. Cuomo et al. - 18-CV-566**

1    drop the NRA and banks dropping the NRA.  The dots on this time

2    line connect themselves, Your Honor, we believe, and we think

3    discovery will substantiate those connections even further.

4         The notion that the NRA's freedom of association has

5    not been harmed because it hasn't lost access to every single

6    bank, it just has fewer banks that are willing to do business

7    with it now, also bears scrutiny.  That is not the law.

8         What the state is essentially asking here and it

9    invites the same kind of consequence that makes the argument our

10   speech hasn't been chilled yet is that we have to wait for the

11   government to go around and put a gun to the head of every bank

12   one by one until we have no checking accounts, no way to pay

13   lawyers, which is very important.  Then when our work is done,

14   then you can vindicate our First Amendment rights in court.

15   That can't be the law.  The Constitution can't countenance that,

16   and it doesn't.

17        We've already addressed the notion that DFS, because

18   it only regulates banks and insurers who do business in New

19   York, couldn't possibly affect the NRA more broadly.  I think

20   that we refuted that.  We've addressed this carve-out for

21   corporate insurance.

22        I would like to address now the due process claim.  So

23   the NRA alleges two separate due process claims, stigma plus and

24   the deprivation of contract rights without due process of law.

25   So here are the elements of stigma plus because I think the

**NRA of America v. Cuomo et al. - 18-CV-566**

1  state misstates them a bit.  So you have to have the utterance

2  of a statement that is derogatory enough to injure the

3  reputation that is capable of being proven false.

4        I think the statement made in the guidance letters

5  which the state reiterates here that the NRA is such a

6  reputational risk, it promotes violence to such an extent that

7  it poses a risk to the soundness of a bank or insurer who does

8  business with it, that is capable of being proven false.

9  Discovery will prove it false, and it's certainly a statement

10 injurious to the NRA's reputation.  Now, the next element is you

11 have to have actually the plus.  You have to have concrete harm.

12 Here we've pleaded ample concrete harms.

13       There are a few cases we cite that parallel this case.

14 One in particular, let me see.  National Council of Resistance

15 of Iran versus the Department of State.  There, it's a very

16 similar situation.  You have the state labeling this

17 organization as a terrorist organization.  So it's not supposed

18 to receive banking services, and that is a deprivation of a due

19 process right.  That's a deprivation of a property right.

20       Here the only difference is there's no allegation that

21 the NRA is funding terrorism.  The allegation is that the NRA

22 promotes Second Amendment rights, and that is sufficient in the

23 eyes of the state to treat the NRA the way the federal

24 government during the Iraq war era treated certain radical

25 Muslim organizations.

**NRA of America v. Cuomo et al. - 18-CV-566**

1              So then we've got our second due process claim, which

2      is that we've been deprived of the property interest without due

3      process of law.  Here we have multiple contracts with Lockton,

4      Lloyd's, et al. have indicated that they will cancel or decline

5      to renew.  We have Lockton in particular that is now refusing to

6      perform key elements of its existing contract that's exclusively

7      because of state coercion.  We have Lloyd's of London telling

8      the New York Times it's severing ties with the NRA explicitly

9      because of state coercion.

10             That is a property right of which we've been deprived.

11     We had no opportunity to contest it, and it was arbitrarily

12     done.  We were singled out and deprived of valuable business

13     relationships.  So that implicates the due process clause of the

14     United States Constitution.

15             One thing I haven't explicitly addressed is the

16     association of rights.  So the genesis of the free association

17     right in the First Amendment is first articulated in the NAACP

18     cases that started in 1958.  And there, the standard is that if

19     the government directly and substantially or significantly

20     burdens the ability of a group to associate for expressive

21     purposes, that a free association claim under the First

22     Amendment arises.

23             And that case, when it's first articulated with

24     respect to NAACP, it governed the state wanted to force the

25     NAACP to disclose all its members so they could be basically

**NRA of America v. Cuomo et al. - 18-CV-566**

1    intimidated out of supporting the NAACP.  The Court says no.

2    That right has been extended to cover the privacy of donors as

3    well because expressive association incorporates the ability to

4    receive donations and fund our activities.

5         Our argument on free association is simply this:  That

6    if the disclosure of members or donors interferes with free

7    association right, then so too does a government campaign

8    designed to deprive us of the ability to collect donations in a

9    bank account or hold insurance that would allow us to have

10   physical premises or meetings in a meeting hall.  Those are core

11   elements of expressive association, and the government conduct

12   implicates them in a way that is Constitutionally troubling.

13        And with that, unless Your Honor has any questions,

14   I'd like to reserve the balance of my time.

15        THE COURT:  I'm afraid to ask a question after all

16   that.  The presentations were good.  They're well done.  They

17   followed the briefs you submitted.  They actually fleshed out

18   some points the Court hadn't considered before in the way they

19   were presented, which may affect the outcome of the decision.

20        So what the Court is going to do now is excuse

21   everybody.  I have a sentencing at 11:30.  I have to see

22   probation.  I will issue a written opinion quite quickly.  So

23   thank you very much for participating.  It really was

24   interesting.  Each side did a really good job.  I want to thank

25   you for the effort that you put into it.  So we'll see what

**NRA of America v. Cuomo et al. - 18-CV-566**

1    comes out.  Court stands adjourned.

2                         (The matter adjourned at 11:01 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**NRA of America v. Cuomo et al. - 18-CV-566**

1                    CERTIFICATION OF OFFICIAL REPORTER

2

3

4           I, JACQUELINE STROFFOLINO, RPR, Official Court Reporter,

5    in and for the United States District Court for the Northern

6    District of New York, do hereby certify that pursuant to Section

7    753, Title 28, United States Code, that the foregoing is a true

8    and correct transcript of the stenographically reported

9    proceedings held in the above-entitled matter and that the

10   transcript page format is in conformance with the regulations of

11   the Judicial Conference of the United States.

12

13              Dated this 17th day of September, 2018.

14

15           **/s/ JACQUELINE STROFFOLINO**

16              JACQUELINE STROFFOLINO, RPR

17              FEDERAL OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25