**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NATIONAL RIFLE ASSOCIATION OF AMERICA,**

                                              **Plaintiff,**

    **-against-**                                      **1:18-CV-0566**

**ANDREW CUOMO, both individually and in his official**
**capacity;  MARIA T. VULLO, both individually and in**
**her official capacity;  and THE NEW YORK STATE**
**DEPARTMENT OF FINANCIAL SERVICES,**

                                              **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                          **DECISION & ORDER**

**I.    INTRODUCTION**

        Plaintiff the National Rifle Association of America ("Plaintiff" or "the NRA")

commenced this action against defendants New York Governor Andrew Cuomo, both

individually and in his official capacity ("Gov. Cuomo"); Superintendent of the New York

State Department of Financial Services Maria T. Vullo, both individually and in her official

capacity  ("Supt. Vullo"); and the New York State Department of Financial Services ("DFS")

(collectively, "Defendants").  In the Amended Complaint, Plaintiff asserts several federal and

New York state constitutional claims, and a New York common law tort claim. _See_ Am.

Compl., Dkt. No. 37, _passim_.  Presently before the Court is Defendants' motion pursuant to

Fed. R. Civ. P. 12(b)(6) to dismiss the Amended Complaint for failure to state claims upon

which relief can be granted.  Dkt. No. 40.  The Court has considered the parties' briefs, *see* Dkt. Nos. 40, 48, 51; the briefs of amici curiae the Texas Public Policy Foundation and the American Civil Liberties Union Foundation, *see* Dkt. Nos. 46, 49; and entertained oral argument from the parties related to claims asserting freedom of speech and due process violations. Oral Arg. Trans., Dkt. No. 52.  For the reasons that follow, Defendants' motion is granted in part and denied in part.

## II.   STANDARD OF REVIEW

On a Fed. R. Civ. P. 12(b)(6) motion, the Court must accept "all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (internal quotation marks omitted).  This tenet does not apply to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements ... are not entitled to the assumption of truth." *Id.; see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)(stating that a court is "not bound to accept as true a legal conclusion couched as a factual allegation").

In considering a Rule 12(b)(6) motion, the Court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at  678 (quoting *Twombly*, 550 U.S. at  570).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id*.   "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  "Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.  Plausibility is "a standard lower than probability." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012).  "[A] given set of actions may well be subject to diverging interpretations, each of which is plausible," and "[t]he choice between or among plausible inferences or scenarios is one for the factfinder." *Id.*  A court "may not properly dismiss a complaint that states a plausible version of the events merely because the court finds that a different version is more plausible." *Id.* at 185.  "The role of the court at this stage of the proceedings is . . . merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed." *Doe v. Columbia Univ.*, 831 F.3d 46, 59 (2d Cir. 2016).

III.    **BACKGROUND**

   a.  **DFS Investigation into the Carry Guard Insurance Program**

   In October 2017, DFS initiated an investigation of the NRA's affinity Carry Guard insurance program,[1] focusing on two insurance companies, Chubb Ltd. ("Chubb") and Lockton Affinity, LLC ("Lockton"), for underwriting and administering this program.  Dkt. Nos.

---

[1]Affinity insurance programs are insurance programs endorsed by a membership organization for use by its members.

37-4; 37-5.[2]  The Carry Guard program provided, among other policy coverages, (1) liability insurance to gun owners for acts of intentional wrongdoing, and (2) legal services insurance for any costs and expenses incurred in connection with a criminal proceeding resulting from acts of self-defense with a legally possessed firearm, in violation of New York Insurance Law.  Dkt. Nos. 37-4; 37-5.  The policies issued through the Carry Guard program were underwritten by Chubb and offered by Lockton through New York's excess line market. Dkt. Nos. 37-4 at p. 4; 37-5 at ¶ 13.  As part of its investigation, DFS learned that, although it did not have an insurance producer license from DFS, the NRA engaged in marketing of, and solicitation for, the Carry Guard program. Dkt. Nos. 37-4 at pp. 4-6; 37-5 at pp. 3-5.  DFS also found that Lockton and the NRA together offered at least eleven additional insurance programs (collectively "additional NRA programs")[3] to new and existing NRA members in New York and elsewhere.  Dkt. No. 37-4 at pp. 6-7.  Pursuant to written agreements with Lloyd's of London ("Lloyd's") and the NRA, Lockton served as the administrator for these additional NRA programs, carrying out such functions as marketing the insurance, binding the insurance, collecting and distributing premiums, and delivering policies to insureds.  *Id.* ¶ 16.  Lloyd's and Alea London Ltd. ("Alea") served as the underwriters for these additional NRA programs, which Lockton placed through New York's excess line market. *Id.* ¶ 17.

Following initiation of the DFS investigation, Lockton suspended the Carry Guard

---

[2]Dkt. Nos. 37-4 and 37-5 are the Lockton and Chubb Consent Orders entered with DFS on May 2, 2018 and May 7, 2018, respectively, which are appended to the Amended Complaint as Exhibits D and E.

[3]The additional NRA programs included: "Retired Law Enforcement Officer Self-Defense Insurance;" "ArmsCare Plus Firearms Insurance;" "No Cost ArmsCare Firearms Insurance;" "Firearms Instructor Plus Liability Insurance;" "Personal Firearms Protection Insurance;" "Gun Collector Insurance;" "Gun Club Insurance;" "Hunt Club Insurance;" "NRA Business Alliance Insurance;" "Gun Show Insurance;" and "Home-based Federal Firearms License Insurance." Dkt. No. 37-4 at pp. 5-6.

program on November 17, 2017 and is no longer making Carry Guard policies available to New York residents to purchase. *Id.* ¶ 32.  DFS's investigation revealed that Lockton and Chubb violated numerous provisions of the New York Insurance Law in connection with the Carry Guard program and the additional NRA programs. *See* Dkt. Nos. 37-4, ¶¶ 34-40; 37-5, ¶¶ 18-19 (discussed below).

The NRA alleges that throughout the investigation, DFS communicated "backchannel threats" to banks and insurers with ties to the NRA that they would face regulatory action if they failed to terminate their relationships with the NRA.  Am. Compl. ¶¶ 38, 45.   According to the NRA, the Chairman of Lockton called the NRA on February 25, 2018 and confided that Lockton would need to "drop" the NRA entirely for fear of losing its license to operate in New York, and the next day Lockton tweeted it would discontinue providing brokerage services for all NRA-endorsed insurance programs. *Id.* ¶¶ 42–43.  The NRA alleges that, days later, its corporate insurance carrier severed ties with it and said it would not renew coverage at any price. *Id.* ¶ 44. The NRA alleges that the corporate carrier severed its ties with the NRA "because it learned of Defendants' threats directed at Lockton, and feared it would be subject to similar reprisal."  *Id.*

### b. Cuomo Press Release

On April 19, 2018, Gov. Cuomo issued a press release indicating that he was directing DFS to communicate with insurance companies and financial institutions licensed or doing business in New York and urge them to review their relationships with the NRA and similar gun promotion organizations, and consider whether such relationships "harm their corporate reputations and jeopardize public safety."  Dkt. No. 37-1  ("Cuomo Press

5

Release").   Gov. Cuomo is quoted as stating:

> New York may have the strongest gun laws in the country, but we must push further
> to ensure that gun safety is a top priority for every individual, company, and
> organization that does business across the state. I am directing the Department of
> Financial Services to urge insurers and bankers statewide to determine whether any
> relationship they may have with the NRA or similar organizations sends the wrong
> message to their clients and their communities who often look to them for guidance
> and support. This is not just a matter of reputation, it is a matter of public safety, and
> working together, we can put an end to gun violence in New York once and for all.

*Id.*

The press release states that "DFS is encouraging regulated entities to consider

reputational risk and promote corporate responsibility in an effort to encourage strong

markets and protect consumers."  *Id.*  Then, following a statement that "[a] number of

businesses have ended relationships with the NRA following the Parkland, Florida school

shooting in order to realign their company's values," Supt. Vullo is quoted as stating:

> Corporations are demonstrating that business can lead the way and bring about the
> kind of positive social change needed to minimize the chance that we will witness
> more of these senseless tragedies. DFS urges all insurance companies and banks
> doing business in New York to join the companies that have already discontinued
> their arrangements with the NRA, and to take prompt actions to manage these risks
> and promote public health and safety.

*Id.*

### c. Guidance Letters

Also on April 19, 2018, Supt. Vullo issued "Guidance[s] on Risk Management

Relating to the NRA and Similar Gun Promotion Organizations" ("Guidance Letters"), which

encouraged financial institutions and insurance companies to consider their relationships

with the NRA. Dkt. Nos. 37-2 (Guidance Letter to all insurers doing business in New York);

37-3 (Guidance Letter to the chief executive officers of all New York state chartered or

licensed financial institutions). The Guidance Letter to all insurers doing business in New York is prefaced with reference to gun violence tragedies occurring at Marjory Stoneman Douglas High School, Columbine High School, Sandy Hook, Pulse night club, and the Las Vegas music festival, and indicates that there is a social backlash against the NRA and similar organizations "that promote guns that lead to senseless violence" and that "[o]ur insurers are, and have been, vital to the communities they serve for generations and are guided by their commitment to corporate social responsibility, including public safety and health." Dkt. No. 37-2, at 1.  This Guidance Letter further indicates:

> Insurers' engagement in communities they serve is closely tied to the business they do with their clients and customers and its impact on such communities. Often insurers report to their stakeholders that their performance is based on both their strategic business vision as well as on a commitment to society as a whole. There is a fair amount of precedent in the business world where firms have implemented measures in areas such as the environment, caring for the sick, and civil rights in fulfilling their corporate social responsibility. The recent actions of a number of financial institutions that severed their ties with the NRA after the AR-15 style rifle killed 17 people in the school in Parkland, Florida is an example of such a precedent.

> The tragic devastation caused by gun violence that we have regrettably been increasingly witnessing is a public safety and health issue that should no longer be tolerated by the public and there will undoubtedly be increasing public backlash against the NRA and like organizations.

> Our insurers are key players in maintaining and improving public health and safety in the communities they serve. They are also in the business of managing risks, including their own reputational risks, by making risk management decisions on a regular basis regarding if and how they will do business with certain sectors or entities. In light of the above, and subject to compliance with applicable laws, the Department encourages its insurers to continue evaluating and managing their risks, including reputational risks, that may arise from their dealings with the NRA or similar gun promotion organizations, if any, as well as continued assessment of compliance with their own codes of social responsibility. The Department encourages regulated institutions to review any relationships they have with the NRA or similar gun promotion organizations, and to take prompt actions to managing these risks and promote public health and safety.

7

*Id.,* at 1-2.  The Guidance Letter to the chief executive officers of all New York state chartered or licensed financial institutions contains nearly identical language. *See* Dkt. No. 37-3.

### d. Gov. Cuomo's Tweet

On April 20, 2018, Gov. Cuomo publicly tweeted: "The NRA is an extremist organization. I urge companies in New York State to revisit any ties they have to the NRA and consider their reputations, and responsibility to the public." Am. Compl. ¶ 51.

### e. Consent Orders

In early May 2018, DFS entered consent orders with Chubb and Lockton related to its investigation ("Consent Orders").  *See* Dkt. Nos. 37-4; 37-5.  In the Consent Orders, Lockton and Chubb admitted to various violations of the New York Insurance Law.  Dkt. No. 37-4, ¶¶ 34-40;[4] Dkt. No. 37-5, ¶¶ 18-19.[5]  Lockton agreed to, *inter alia*, pay a monetary fine

---

[4]Lockton admitted that it:

(1) compensated the NRA based on the actual premiums collected when the NRA was acting as an unlicensed insurance broker by selling and soliciting insurance in New York, in violation of New York insurance law § 2116;

(2) acted for and aided an unauthorized Chubb insurer, Illinois Union, in connection with Illinois Union's issuing or delivering policies in New York State, or otherwise issuing policies covering New York State residents, which provided insurance coverage that may not be offered in the New York State excess line market, specifically:

(a) defense coverage in a criminal proceeding that is not permitted by law;

(b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property; and

(c) coverage for expenses incurred by the insured for psychological counseling support, in violation of New York insurance law § 2117;

(3) gave, or offered to give, a free one-year NRA membership if a person purchased the Carry Guard Program insurance policy, when the NRA membership benefit was not specified in the policy and exceeded $25 in market value, in violation of New York Insurance Law § 2324(a);

(4) gave, or offered to give, the No Cost Arms Care Firearms Insurance at no cost to NRA members in good standing, in violation of New York Insurance Law § 2324(a);

(5) advertised the financial condition of a Chubb insurer by referring to the insurer's AM Best rating, in violation of New York insurance Law § 2122(a)(1);

(6) called attention to an unauthorized Chubb insurer by advertising Chubb's participation in the Carry Guard Program on the Carry Guard website, in violation of New York Insurance Law § 2122(a)(2); and

(continued...)

of $7,000,000; take specific actions to remedy ongoing violations of the New York Insurance Law; not participate in the future in any Carry Guard or similar programs that violate the New York Insurance Law; and not "enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance to be issued or delivered in New York State or to anyone known to Lockton to be a New York State resident."  Dkt. No. 37-4 at pp. 12-15.  The Lockton Consent Order expressly allowed Lockton to assist the NRA in procuring insurance for the NRA's own corporate operations. Dkt. No. 37-4 at p. 14, ¶ 43.

Plaintiff asserts that "DFS and Vullo have no legal basis to restrict Lockton's involvement with insurance programs that do not violate New York's Insurance Law; nor do they have authority to regulate insurance transactions outside of New York. Nevertheless, DFS mandated that Lockton never enter into any future agreements with the NRA for legitimate and fully Complaint insurance programs in New York."  Am. Compl. ¶ 56.  Plaintiff maintains that Lockton would violate the Lockton Consent Order "if it markets an ordinary property, casualty, or life insurance policy in the State of New York that was accompanied

---

[4](...continued)
(7) failed to properly secure declinations from authorized insurers for each insured, in violation of New York Insurance Law § 2118. Dkt. No. 37-4, ¶¶ 34-40.

[5]Chubb admitted that:
(1) through Illinois Union, it engaged in the business of insurance without a license by issuing or delivering policies in New York State, or otherwise issuing policies covering New York State residents, which provided insurance coverage that may not be offered in the New York State excess line market, specifically:
(a) defense coverage in a criminal proceeding that is not permitted by law;
(b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property; and
(c) coverage for expenses incurred by the insured for psychological counseling support, in violation of New York Insurance Law § 1102; and
(2) through Illinois Union, it issued liability insurance coverage to New York residents that failed to contain required liability insurance policy provisions, in violation of New York Insurance Law § 3420.  Dkt. No. 37-5, ¶¶ 18-19.

by an NRA logo or endorsement —notwithstanding that a comparable logo or endorsement referencing any other affinity or common-cause organization is permissible," and contends that "[t]his provision . . . is deliberate and intended to impair the NRA's ability to negotiate insurance benefits for its members, damage the NRA's goodwill among its membership, and unconstitutionally restrict the NRA's speech on the basis of political animus." *Id.* ¶ 57. The NRA further maintains that several of the violations assessed in the Lockton Consent Order "concern programs commonly engaged in by numerous additional affinity associations that do not publicly advocate for Second Amendment rights" but that were "not targets of Defendants' unconstitutional conduct." *Id.* ¶ 57; *see id.* ¶ 58 (citing similar actions by Lockton related to affinity programs by organizations that do not advocate Second Amendment rights). The NRA asserts that even if Lockton's conduct identified in the Consent Order "does violate insurance law, DFS's selective enforcement of such offenses as to NRA-endorsed policies—but not as to other policies marketed by Lockton in an identical fashion—constitutes impermissible viewpoint discrimination and a denial of equal protection under the law." *Id.* ¶ 60

Chubb agreed to, *inter alia*, pay a monetary fine of $1,300,000; not participate in the future in any Carry Guard, or similar programs that violate the New York Insurance Law; and not to "enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance." Dkt. No. 37-5, pp. 6-7. The Chubb Consent Order expressly allowed Chubb to issue insurance policies to the NRA for the NRA's own corporate operations. Dkt. No. 37-5 at ¶ 22.

The NRA maintains that "[a]lthough DFS restricts Lockton from participating in any

affinity-type insurance programs with the NRA in New York or with New York residents,

Defendants' restrictions in the Chubb Consent Order contain no geographic constraint

whatsoever. Instead, the Chubb Consent Order purports to limit Chubb's involvement with

the NRA anywhere, and everywhere, in the world."  Am. Compl. ¶ 63.  Plaintiff contends that

"DFS allows Chubb to continue to underwrite affinity-type insurance programs with other

affinity or common-cause organizations that do not publicly advocate for Americans' Second

Amendment rights, so long as Chubb undertakes 'reasonable due diligence to ensure that

any entity involved . . . is acting in compliance with the Insurance Law . . . .'  The only

plausible explanation for the DFS's complete exclusion of NRA-endorsed policies, even

those 'in compliance with the Insurance Law,' is that Defendants seek to misuse DFS's

power to deprive the NRA of insurance and financial services, on the sole ground that

Defendants disapprove of the NRA's viewpoint regarding gun control." *Id.* ¶ 64 (quoting Dkt.

No. 37-5 at ¶ 22).

### f.  May 2018 Press Releases

Also in May 2018, DFS issued two press releases detailing its investigation into the

Carry Guard program, the violations of the New York Insurance Law, and the Consent

Orders ("DFS Press Releases").  Def. App. at A & B.[6]  In its May 2, 2018 Press Release

announcing that Lockton had agreed to pay a $7 million fine, DFS states that the NRA Carry

Guard insurance program unlawfully provided liability insurance to gun owners for certain

acts of intentional wrongdoing and improperly provided insurance coverage for criminal

---

[6]Defendants' Appendixes A and B are the May 2, 2018 and May 7, 2018 DFS Press Releases
referenced in the Amended Complaint. Because they are not annexed as exhibits to the Amended Complaint,
Defendants appended them to their motion.

defense in a crime involving a firearm.  Def. App. at A.  The press release also indicates that the NRA, "which does not have a license from DFS to conduct insurance business in New York, actively marketed and solicited for the Carry Guard program . . . ."  *Id.*   It further indicates that "DFS will not tolerate conduct by any entity, licensed or otherwise, in contravention of New York Insurance Law, especially when that conduct is such an egregious violation of public policy designed to protect all citizens," and that the Consent Order with Lockton was part of DFS's continuing efforts to "uphold and preserve the integrity of New York law."  *Id.*

The May 7, 2018 Press Release announcing that Chubb had agreed to pay a $1.3 million fine contains language identical to that in the Stockton press release related to the illegality of the Carry Guard insurance program and the NRA's active marketing and solicitation for the Carry Guard program even though it is not licensed to conduct insurance business in New York.  Def. App. at B.  DFS describes the Consent Order with Chubb as "another step in addressing the unlicensed and improper activity connected with the NRA's unlawful Carry Guard program," and states that DFS will "continue its comprehensive investigation into [the] matter to ensure that the New York Insurance Law is enforced and that consumers are no longer conned into buying so-called 'self-defense' insurance coverage."  *Id.*  The press release also indicates that Chubb has agreed to refrain from, *inter alia*, "[e]ntering into any other agreement or arrangement, including any affinity type insurance program involving any line of insurance involving a contract of insurance involving the NRA, directly or indirectly."  *Id.*

   **g.  Response to Guidance Letters and Consent Orders**

Shortly after the Consent Orders were made public, Lloyd's announced that it would terminate all affinity insurance programs associated with the NRA, citing the DFS investigations.  Am. Compl. ¶ 65.  The NRA alleges that it also encountered "serious difficulties" replacing its corporate insurance carrier, and that "nearly every" potential replacement carrier "has indicated that it fears transacting with the NRA specifically in light of DFS's actions against Lockton and Chubb." Id. ¶ 66.  The NRA further alleges that following the Guidance Letters, "multiple  banks" withdrew their bids in the NRA's Request for Proposal ("RFP") process[7] "based on concerns that any involvement with the NRA . . . would expose them to regulatory reprisals." Id. ¶ 67.  Plaintiff contends: "Defendants' campaign is achieving its intended chilling effect on banks throughout DFS's jurisdiction. Speaking 'on the condition of anonymity,' one community banker from Upstate New York told American Banker magazine that in light of the apparent 'politically motivated' nature of the DFS guidance, '[i]t's hard to know what the rules are' or whom to do business with, because bankers must attempt to anticipate 'who is going to come into disfavor with the New York State DFS' or other regulators.  Other industry sources told American Banker that, 'such regulatory guidelines are frustratingly vague, and can effectively compel institutions to cease catering to legal businesses.'" Id. ¶ 68 (quoting Neil Haggerty, Gun issue is a lose-lose for banks (whatever their stance), AMERICAN BANKER (Apr. 26, 2018). The NRA asserts that it suffered tens of millions of dollars in damages as a result of Defendants' actions, which "includ[es], without limitation, damages due to reputational

---

[7]The NRA alleges that "during February 2018, the NRA issued a Request for Proposal ("RFP") to multiple banks, inviting them to submit bids to provide depository services, cash-management services, and other basic wholesale banking services necessary to the NRA's advocacy. The NRA received enthusiastic responses from several banks." Am. Compl. ¶ 40.

harm, increased development and marketing costs for any potential new NRA-endorsed insurance," *id.* ¶ 69, ¶ 111 (same), and "lost royalty amounts owed to the NRA." *Id.* ¶ 80. The NRA further asserts that without access to essential banking and insurance services, "it will be unable to exist as a not-for-profit or pursue its advocacy mission." *Id.* ¶ 70.

## IV.   DISCUSSION

### 1. Freedom of Speech

Count One alleges that "Defendants' actions—including but not limited to the issuance of the April 2018 [Guidance] Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon Chubb and Lockton, and the issuance of the Cuomo Press Release—established a 'system of informal censorship' designed to suppress the NRA's speech." Am. Compl.  ¶ 75 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71 (1963)).  Plaintiff asserts that Defendants took these actions "with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech." *Id.* ¶ 76.   Plaintiff contends that these actions "constitute a concerted effort to deprive the NRA of its freedom of speech by threatening with government prosecution services critical to the survival of the NRA and its ability to disseminate its message," and amount to "an 'implied threat[ ] to employ coercive state power' against entities doing business with the NRA.*" Id.* ¶ 77 (quoting *Okwedy v. Molinari*, 333 F.3d 339, 342 (2d Cir. 2003)).  Plaintiff maintains that Defendants' actions have caused "financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations." *id.* ¶ 78, and, in turn, "resulted in significant damages to the NRA, including but not limited to damages due to reputational harm, increased

development and marketing costs for any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA." *Id.* ¶ 80.

Count Two alleges that these same actions by Defendants "were in response to and substantially caused by the NRA's political speech regarding the right to keep and bear arms.  Defendants' actions were for the purpose of suppressing the NRA's pro-Second Amendment viewpoint.  Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech." *Id.* ¶ 86.  Like with Count One, Plaintiff alleges that Defendants' actions have "caused financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations," *id.* ¶ 87, and caused the same damages to the NRA as alleged in Count One.  *Id.* ¶ 90.

Because the alleged "censorship campaign" challenged in Count One, and the alleged illegal retaliation asserted in Count Two, are based upon the same conduct, caused the same response from regulated entities doing business with the NRA, and resulted in the same damages, and because the lion's share of the parties' First Amendment freedom-of-speech arguments are addressed to both causes of action, *see e.g.* Def. Mem. L. pp. 17-30; Pl. Mem. L. pp. 6-21; Pl. Mem. L. p. 9 ("Taken together, Defendants' threatened and actual regulatory reprisals constitute a cohesive censorship-and-retaliation campaign."), the Court addresses these counts together.

The First Amendment[8] guards against government action "targeted at specific

_____

[8]Because violations of Article 1, § 8 of the New York State Constitution are subject to the same analysis as claims bought pursuant to the First Amendment, *see, e.g., Martinez v. Sanders*, 307 F. App'x 467, 468 n.2 (2d Cir. 2008)(citing *Pico v. Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26*, 638 F.2d 404 (2d Cir. 1980), *aff'd*, 457 U.S. 853 (1982)); *Congregation Rabbinical College of Tartikov, Inc. v. Vill. of*

(continued...)

subject matter," a form of speech suppression known as content based discrimination. *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2230 (2015); *see Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829-30 (1995) (Government action aimed at the suppression of "particular views ... on a subject," and which discriminates based on viewpoint, is "presumptively unconstitutional."). The Guidance Letters and the Cuomo Press Release indisputably are directed at the NRA and similar groups based on their "gun promotion" advocacy. However controversial it may be, "gun promotion" advocacy is core political speech entitled to constitutional protection. The Guidance Letters and Cuomo Press Release's comments directed to this protected speech provides a sufficient basis to invoke the First Amendment on these claims.

Defendants argue that the Guidance Letters and Cuomo Press Release are merely government advocacy protected under the government-speech doctrine. The government-speech doctrine provides that the government does not need to be viewpoint-neutral when it chooses to express its own viewpoint on a topic of public interest. *Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017). But while "the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse." *Matal*, 137 S. Ct. at 1758. If read to allow not only government advocacy, but also government action, it could be used to "silence or muffle the expression of disfavored viewpoints." *Id.* For this reason, courts "must exercise great caution" in applying this doctrine. *Id.*

The Guidance Letters and Cuomo Press Release, read in isolation, clearly fit into the

---

[8](...continued)
*Pomona*, 138 F. Supp. 2d 352, 445 (S.D.N.Y. Sept. 29, 2005), the Court relies upon First Amendment freedom of speech jurisprudence in analyzing Counts One and Two.

government-speech doctrine as they address matters of public importance on which New York State has a significant interest. *See Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 115 (2d Cir. 2017) (public safety is a significant governmental interest); *British Int'l Ins. Co. v. Seguros La Republica, S.A.*, 212 F.3d 138, 143 (2d Cir. 2000) ("New York shares with its citizens a significant interest in ensuring that businesses in the heavily regulated insurance industry have sufficient funds within the state where they conduct business to fulfill each individual insurance claim."); *see also* Def. Mem. L., at 31 ("[T]he Guidance Letters were issued to advance the State's interest in ensuring that insurers and financial institutions doing business in New York consider whether business relationships with the NRA, and other similar groups, may jeopardize their corporate reputations and public safety. . . .  Management of corporate reputations and risks to New York State businesses, and promotion of public safety and corporate responsibility in an effort to encourage strong markets and protect consumers are certainly significant government interests." ); Oral Arg. Trans. at 33 ("[The NRA] agree[s] that risks that affect the soundness of financial institutions are the type that DFS is properly charged with regulating, and reputation risks can even do that in some situations.")  Yet Plaintiff does not cite the Guidance Letters and Cuomo Press Release in isolation, but rather contends that these documents, when read in the context in which they were issued, amount to "threats that deliberately invoked DFS's 'risk management' authority to warn of adverse action if institutions failed to support Defendants' efforts to stifle the NRA's speech and to retaliate against the NRA based on its viewpoint." Am. Compl. ¶ 48.  For the reasons that follow, the Court finds that Plaintiff has stated plausible First Amendment freedom of

speech claims.

"'First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech.'" *Zieper v. Metzinger*, 474 F.3d 60, 65 (2d Cir. 2007)(quoting *Aebisher v. Ryan*, 622 F.2d 651, 655 (2d Cir.1980)); *see also Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013)("To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury.")).  As applicable to the allegations in Counts One and Two, "the First Amendment prohibits government officials from encouraging the suppression of speech in a manner which 'can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request.'" *Zieper*, 474 F.3d at 65-66 (quoting *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir.1983)).  In determining whether government statements impede upon First Amendment rights, "what matters is the 'distinction between attempts to convince and attempts to coerce.'" *Id.*, at 66 (quoting *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) *(per curiam*).

The NRA's First Amendment freedom-of-speech claims turn on the allegations that Defendants issued threats to financial institutions and insurers "that DFS . . . will exercise its extensive regulatory power against those entities that fail to sever ties with the NRA." Am. Compl. at p. 2.  The First Amendment "require[s] courts to draw fine lines between permissible expressions of personal opinion [by public officials] and implied threats to employ coercive state power to stifle protected speech." *Hammerhead*, 707 F.2d at 39.  On

18

the one hand, public officials are free to promote their views about public welfare, including by using their bully pulpits to "cajole[] and exhort" others to repudiate positions or groups the officials view as pernicious. *Gravel v. United States*, 408 U.S. 606, 625 (1972); *see X–Men Sec., Inc. v. Pataki*, 196 F.3d 56, 70 (2d Cir. 1999) ("[W]e have noted that where a public official, without engaging in any threat, coercion, or intimidation, 'exhort[ed]' private entities not to distribute a board game whose ideas the official viewed as pernicious, the official's speech did not violate any constitutional right of the game's authors.") (quoting *Hammerhead*, 707 F.2d at 39 & n.6).  On the other hand, "oral or written statements made by public officials' could give rise to a valid First Amendment claim where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Okwedy*, 333 F.3d at 342 (internal quotation marks, brackets, and citation omitted). Thus, the critical question here is whether Defendants' statements, including the Guidance Letters and Cuomo Press Release, threatened adverse action against banks and insurers that did not disassociate with the NRA.

When a question exists whether government speech contains a threat of future enforcement action, the First Amendment requires the Court to "look through forms to the substance." *Bantam Books,* 372 U.S. at 67.  "While the precise language" of the Cuomo Press Release and Guidance Letters "is certainly important," the Second Circuit has "never held that it is the only relevant factor in determining whether a public official has crossed the line 'between attempts to convince and attempts to coerce.'" *Zieper*, 474 F.3d at 66 (quoting *Okwedy*, 333 F.3d at 344).  Rather, the First Amendment requires the Court to consider all

19

the circumstances, including "the entirety of the defendants' [alleged] words and actions," to

determine "whether they could reasonably be interpreted as an implied threat." *Id.*  In

making this determination, the Court examines a number of factors, including: (1) the

Defendants' regulatory or other decisionmaking authority over the targeted entities, *see*

*Okwedy*, 333 F.3d at 343  ("[T]he existence of regulatory or other direct decisionmaking

authority is certainly relevant to the question of whether a government official's comments

were unconstitutionally threatening or coercive...."); (2) whether the government actors

actually exercised regulatory authority over targeted entities, *see Bantam Books*, 372 U.S.

at 68–69 (the fact that the defendant's notices were "invariably followed up by police

visitations" as one factor that was relevant in determining that the notices "serve[d] as

instruments of regulation")*; Rattner v. Netburn*, 930 F.2d 204, 210 (2d Cir. 1991)

(suggesting that "unannounced visits by police personnel" might be relevant in determining

whether the defendants' actions could be reasonably viewed as an implicit threat), (3)

whether the language of the allegedly threatening statements could  reasonably be

perceived as a threat;  *Zieper*, 474 F.3d at 66 (citing *Rattner*, 930 F.2d at 210 (noting that "a

threat was perceived and its impact was demonstrable")); *Backpage.com, LLC v. Dart*, 807

F.3d 229, 233–35 (7th Cir. 2015); and (4) whether any of the targeted entities reacted in a

manner evincing the perception of an implicit threat. *See Bantam Books*, 372 U.S. at 68

("The Commission's notices, phrased virtually as orders, reasonably understood to be such

by the distributor, invariably followed up by police visitations, in fact stopped the circulation

of the listed publications *ex proprio vigore*.")*; Rattner*, 930 F.2d at 205–10 (holding that a

village trustee's letter to the village's chamber of commerce expressing concern about the

plaintiff's political advertisement in the chamber's newsletter and containing a list of businesses at which the trustee shopped, which the chamber's directors viewed as threatening boycott or other retaliatory action by the Village, could "reasonably be viewed as an implicit threat," largely because "a threat was perceived and its impact was demonstrable").  When Defendants' statements and alleged conduct is examined in its totality, there are sufficient allegations to state plausible freedom-of-speech claims.

Supt. Vullo and DFS clearly have regulatory authority over the targeted entities. Supt. Vullo is charged by the New York Financial Services Law with taking all actions that she "believes necessary to … ensure the continued solvency, safety, soundness and prudent conduct of the providers of financial products and services" in the State of New York to "encourage high standards of honesty, transparency, fair business practices and public responsibility." N.Y. Fin. Serv. L. §201(b)(2), (5).   "Reputational risk – the risk that negative publicity regarding an institution's business practices will lead to a loss of revenue or litigation – is just one of the threats to a bank or insurer's safety and soundness on which the Superintendent has previously issued guidance."  Def. Reply Mem. L., at 7 (citation omitted).  While it is within Supt. Vullo's province to issue the Guidance Letters, she also has the authority to initiate investigations and civil enforcement actions against regulated entities, as well as the power to refer matters to the attorney general for criminal enforcement. N.Y. Fin. Serv. L., Art. 3, § 301(b), (c)(4).  The authority to institute enforcement proceedings is one factor supporting a plausible contention that the Guidance Letters are part of an attempt to convey implied threats of coercive action against regulated entities doing business with the NRA.

Further, the government actor need not have direct power to take adverse action

21

over a targeted entity for comments to constitute a threat, provided the government actor has the power to direct or encourage others to take such action. *See Bantam Books*, 372 U.S. at 66–68 (observing that, although the Rhode Island Commission to Encourage Morality in Youth lacked the "power to apply formal legal sanctions," it had the authority to initiate investigations and recommend prosecutions, thereby imbuing the Commission's "advisory notices" with extra weight, since "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around"); *Okwedy*, 333 F.3d at 344 ("Even though Molinari lacked direct regulatory control over billboards, [PNE Media, LLC ("PNE"), a company that produces and displays billboards,] could reasonably have feared that Molinari would use whatever authority he does have, as Borough President, to interfere with the 'substantial economic benefits' PNE derived from its billboards in Staten Island."). Based on Gov. Cuomo's press release wherein he indicates he is directing DFS to issue the Guidance Letters, it is a reasonable inference that he has the power to direct DFS take other official action, including the commencement of enforcement investigations against regulated institutions. Thus, there is a reasonable basis to conclude that he has the power to effectuate regulatory action against entities doing business with the NRA.

DFS actually exercised regulatory authority over Chubb and Lockton, two regulated entities that fall within the same scope of DFS's authority as the entities addressed in the Guidance Letters and Cuomo Press Release. But this fact, by itself, does not help Plaintiff's claims because Chubb and Lockton admitted violations of New York insurance laws. There are also no allegations that DFS exercised regulatory authority over entities other than Chubb and Lockton. Nevertheless, the Amended Complaint asserts that, during

22

the course of the DFS investigations into Chubb and Lockton, "DFS communicated to banks and insurers . . . that they would face regulatory action if they failed to terminate their relationships with the NRA,  . . . indicating that any business relationship whatsoever with the NRA would invite adverse action." Am. Compl. ¶ 38.  This is a powerful factual allegation linking the recommendations in the Guidance Letters and Cuomo Press Release that regulated entities consider (and possibly end) their associations with the NRA, and the enforcement actions carried out by DFS against Chubb and Lockton.  At this stage of the litigation, the Court must accept this factual allegation as true.  Further, the NRA notes that the Chubb and Lockton Consent Orders, which imposed several million dollars in monetary penalties and permanently prohibited those entities from participating in any NRA-endorsed insurance program in New York State, were announced just two weeks after the Cuomo Press Release and Guidance Letters were issued. *Id.* ¶ 54.  Viewing the allegations in the light most favorable to the NRA, and drawing reasonable inferences in its favor, the temporal proximity between the Cuomo Press Release, the Guidance Letters, and the Consent Orders plausibly suggests that the timing was intended to reinforce the message that insurers and financial institutions that do not sever ties with the NRA will be subject to retaliatory action by the state. *See Wrobel v. Cnty. of Erie*, 692 F.3d 22, 32 (2d Cir. 2012)("A causal relationship can be demonstrated either indirectly by means of circumstantial evidence, including that the protected speech was followed by adverse treatment, or by direct evidence of animus."); *see also Catanzaro v. City of New York*, 486 Fed. Appx. 899, 902 (2d Cir.2012) ("Where a plaintiff has not alleged a specific connection between protected speech and an adverse action, 'causality can be shown through a close temporal proximity between the employer's awareness of protected conduct and the adverse

action.'")(quoting *Nagle v. Marron*, 663 F.3d 100, 110 (2d Cir. 2011));  *Housing Works, Inc. v. City of New York,*  72 F. Supp.2d 402, 424 (S.D.N.Y.1999) (concluding that the proximity in time between the plaintiff's protected speech and the defendants' conduct constituted indirect evidence of an improper motive).  The backroom exhortations combined with the timing of the publically announced Consent Orders provides strong support for Plaintiff's claims.

The Court must also assess whether the language of the Cuomo Press Release and the Guidance Letters could reasonably be perceived as a threat.  In the Cuomo Press Release, insurance companies and financial institutions are "urged" to "consider reputational risk that may arise from their dealings with the NRA or similar gun promotion organizations," "take prompt actions to manag[e] these risks," and "join the companies that have already discontinued their arrangements with the NRA."  The Guidance Letters contain similar language, "encourag[ing] regulated institutions to review any relationships they have with the NRA or similar gun promotion organizations, and to take prompt actions to managing these risks and promote public health and safety."  While neither the Guidance Letters nor the Cuomo Press Release specifically directs or even requests that insurance companies and financial institutions sever ties with the NRA, a plausible inference exists that a veiled threat is being conveyed.  Viewed in the light most favorable to the NRA, and given DFS's mandate—"effective state regulation of the insurance industry" and the "elimination of fraud, criminal abuse and unethical conduct by, and with respect to, banking, insurance and other financial services institutions," N.Y. Fin. Servs. Law § 102(e), (k) — , the Cuomo Press Release and the Guidance Letters, when read objectively and in the context of DFS's regulatory enforcement actions against Chubb and Lockton and the

backroom exhortations, could reasonably be interpreted as threats of retaliatory enforcement against regulated institutions that do not sever ties with the NRA. *See Okwedy*, 333 F.3d at 344 ("Because the district court was considering a motion to dismiss, it should have viewed the language of Molinari's letter in the light most favorable to plaintiffs."); *id.* at 342 (holding that a jury could find that the defendant's letter contained an implicit threat of retaliation where it invoked the defendant's position as the Borough President of Staten Island, pointed out that the targeted company "owns a number of billboards on Staten Island and derives economic substantial benefits from them," and directed the company to contact the defendant's legal counsel and chair of his anti-bias task force); *Rattner*, 930 F.2d at 206–10 (holding, on motion for summary judgment, that there were genuine issues of material fact about whether Defendant's letter—stating that Plaintiff's publication "raises significant questions and concerns about the objectivity and trust which we are looking for from our business friends"—was "threatening or coercive").

Finally, targeted entities' reactions to the perception of an implicit threat is a factor the Court should consider.  Defendants argue that no individual company was singled out or coerced as a result of Defendants' public statements, Def. Mem., L., at 22, but such specific targeting is not required in order to make out a First Amendment claim in these circumstances. *See Hammerhead*, 707 F.2d at 39 (noting that "not a single store was influenced by [defendant's allegedly threatening] correspondence").  The Amended Complaint includes numerous allegations regarding the perception of a threat by New York insurers and financial institutions, and its impact on the NRA's ability to procure insurance

and banking services from target entities. *See* Am. Compl. ¶¶ 42, 44, 65-68.[9]  These allegations sufficiently support the contention that New York insurers and financial institutions took specific actions in response to their perceptions of a threat.

The allegations in the Amended Complaint are sufficient to create a plausible inference that the Guidance Letters and Cuomo Press Release, when read together and in the context of the alleged backroom exhortations and the public announcements of the Consent Orders, constituted implicit threats of adverse action against financial institutions and insurers that did not disassociate from the NRA.

Contrary to Defendants' argument, actual chilled speech is not necessary to make out a plausible First Amendment claim.  "Chilled speech is not the *sine qua non* of a First Amendment claim.  A plaintiff has standing if he can show either that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm.  Various non-speech harms are sufficient to give a plaintiff standing." *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).  The NRA's allegations of

---

[9]The NRA alleges that: during DFS's investigation into Lockton, Lockton's chair "confided [to the NRA] that Lockton would need to 'drop' the NRA—entirely—for fear of 'losing [our] license' to do business in New York," Am. Compl. ¶ 42; a week after the Chubb and Lockton consent decrees were entered, Lloyd's of London "announced . . . that it would 'terminate all insurance offered, marketed, endorsed, or otherwise made available' through the NRA in light of the DFS Investigation," *id.* ¶ 65; the NRA's corporate insurance carrier "severed mutually beneficial business arrangements with the NRA because it learned of Defendants' threats directed at Lockton, and feared it would be subject to similar reprisals," *id.* ¶ 44; the "NRA has encountered serious difficulties obtaining [replacement] corporate insurance coverage" because "nearly every carrier has indicated that it fears transacting with the NRA specifically in light of DFS's actions against Lockton and Chubb," *id.* ¶ 66; "[m]ultiple banks withdrew their bids in the NRA's RFP process following the issuance of the April 2018 Letters, based on concerns that any involvement with the NRA—even providing the organization with basic depository services—would expose them to regulatory reprisals," *id.* ¶ 67; and "one community banker from Upstate New York told American Banker magazine that in light of the apparent 'politically motivated' nature of the DFS guidance, '[i]t's hard to know what the rules are' or whom to do business with, because bankers must attempt to anticipate 'who is going to come into disfavor with the New York State DFS' or other regulators," *id.* ¶ 68.

significant interference with its business relationships, *see* Am. Compl. ¶¶ 65-67, 69-70,[10]

and the damages caused by Defendants' actions, *id.* ¶¶ 80, 87, are sufficient to establish a

First Amendment injury. *See, e.g., Bantam Books*, 372 U.S. at 64 n.6 ("Appellants' standing

has not been, nor could it be, successfully questioned. The appellants have in fact suffered

a palpable injury as a result of the acts alleged to violate federal law, and at the same time

their injury has been a legal injury. The finding that the Commission's notices impaired sales

of the listed publications, which include two books published by appellants, establishes that

appellants suffered injury.")(citation omitted); *see also Burwell v. Hobby Lobby Stores, Inc.*,

134 S. Ct. 2751, 2770 (2014) ("[A] law that operates so as to make…beliefs more expensive

in the context of business activities imposes a burden on [First Amendment Rights].")*;*

*Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir. 2011) ("Allegations of loss of business or

some other tangible injury as a result of a defendant's [retaliatory] statements would suffice

to establish concrete harm."); *Davis v. Vill. Park II Realty Co.*, 578 F.2d 461, 463 (2d Cir.

1978) (reversing dismissal of a complaint by president of a tenants' association who

claimed that the owner of a federally funded housing project had threatened her with

eviction in retaliation for her advocacy of tenants' rights).

The fact that the alleged impact of Defendants' statements and actions was

commercial in nature does not remove the case from the First Amendment's protections, or

---

[10]The Amended Complaint alleges that Defendants' statements are causing "insurance, banking, and financial institutions doing business with the NRA . . . to rethink their mutually beneficial business relationships with the NRA for fear of monetary sanctions or expensive public investigations." Am. Compl. ¶ 65.  As a result, the NRA states that it is at risk of losing "access to basic banking services," that it "has encountered serious difficulties obtaining corporate insurance coverage to replace coverage withdrawn by the Corporate Carrier," and that "there is a substantial risk that NRATV will be forced to cease operating" if it cannot "obtain insurance in connection with media liability." *Id.* ¶¶ 66, 67.  The NRA claims it has incurred "tens of millions of dollars in damages based on Defendants' conduct," and that it "will be unable to exist as a not-for-profit or pursue its advocacy mission" if it is unable to obtain basic insurance and financial services. *Id.* ¶¶ 69, 70.

necessarily require a lesser level of scrutiny.  *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011) (Commercial activity is "no exception" to the principle that the First Amendment "requires heightened scrutiny whenever the government creates a regulation of speech because of disagreement with the message it conveys.")(internal quotation marks omitted). While commercial speech may generally be subject to intermediate scrutiny, "viewpoint discrimination is scrutinized closely whether or not it occurs in the commercial speech context." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 39 (2d Cir. 2018). The Amended Complaint contains sufficient allegations plausibly supporting the conclusion that Defendants' actions were taken in an effort to suppress the NRA's gun promotion advocacy. *See* Am. Compl. at ¶¶ 21, 76, 78, 86.   Moreover, the NRA's allegations that Defendants' enforcement actions against Lockton and Chubb impeded the NRA's ability to enter contracts for lawful affinity insurance plans, but did not take similar action against other membership organizations that did not engage in gun promotion advocacy, *see* Am. Compl. at ¶¶ 36-37, provides a plausible basis to conclude that Defendants sought to impose a content-based restriction on NRA-affiliated businesses based on viewpoint animus that serves no substantial government interest.

In the end, the allegations of direct and implied threats to insurers and financial institutions because of these entities' links with the NRA, and the allegations of resulting harm to the NRA's operations, are sufficient to make out plausible First Amendment freedom-of-speech claims.  While the NRA may not be able to establish the factual predicates for these claims, it has presented sufficient allegations to allow them to go forward.  Accordingly, those portions of Defendants' motion directed to Counts One and Two are denied.

### b. Freedom of Association

Count Three alleges a violation of the NRA's rights to freedom of association as protected by the First and Fourteenth Amendments to the United States Constitution, and by Article 1, Section 8 of the New York Constitution.  Am. Compl. ¶¶ 93-106.  In this regard, the NRA alleges that "Defendants' actions—including but not limited to the issuance of the April 2018 [Guidance] Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon Chubb and Lockton, and the issuance of the Cuomo Press Release—are, in effect, limiting the NRA's ability to continue to operate as an ongoing entity and engage in political advocacy." *Id.* ¶ 96.  Plaintiff contends that "financial institutions previously doing business with the NRA . . . are ending their business relationships, or exploring such action, due to fear of monetary sanctions or expensive public investigations." *Id.*, ¶ 97.  In this regard, the NRA contends that it "has spoken to numerous carriers in an effort to obtain replacement corporate insurance coverage; nearly every carrier has indicated that it fears transacting with the NRA specifically in light of DFS's actions against Lockton and Chubb.  Furthermore, multiple banks withdrew their bids following the issuance of the April 2018 Letters, based on concerns that any involvement with the NRA—even providing the organization with bank-depository services—would expose them to regulatory reprisals." *Id.*   The NRA maintains that without appropriate insurance and banking services, it will be unable to continue "its existence as a not-for-profit organization and fulfill its advocacy objectives."  *Id.* ¶ 98; *see id.* ¶ 99.  Plaintiff asserts that "Defendants' actions were taken to specifically target the NRA's and its members' right to associate and express their political beliefs in order to banish pro-Second Amendment views from New York.  Believing they could not directly bar the NRA from operating in New York, Defendants instead

engaged in a censorship scheme to directly, substantially, and significantly infringe the NRA's and its members' right to associate by depriving it of critical insurance and banking services." *Id.* ¶ 100.

The First Amendment[11] protects association "for the purpose of engaging in . . . activities protected by the First Amendment." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18, 104 S. Ct. 3244, 82 L. Ed.2d 462 (1984). The NRA associates with its members for the purpose of engaging in political advocacy advancing Second Amendment rights, including through letter-writing campaigns, peaceable public gatherings, and other grassroots "lobbying" activities. *See* Am. Compl. at ¶ 95. Association for purposes of Second Amendment advocacy is an activity protected by the First Amendment. *See Smith v. Arkansas State Highway Employees*, 441 U.S. 463, 464 (1979) (The First Amendment "protects the right of associations to engage in advocacy on behalf of their members."); *NAACP v. Alabama*, 357 U.S. 449, 462 (1958)(the First Amendment protects the right "to engage in association for the advancement of beliefs and ideas"); *Tabbaa v. Chertoff*, 509 F.3d 89, 101 (2d Cir. 2007)("Plaintiffs unquestionably had a protected right to express themselves through association at the [Reviving the Islamic Spirit] Conference."); *Brady v. Colchester*, 863 F.2d 205, 217 (2d Cir. 1988)("[t]he Supreme Court has recognized a freedom to associate with others to pursue goals independently protected by the first amendment—such as political advocacy...," )(internal quotation marks and citation omitted).

The "first question [the Court] must answer" in determining whether Plaintiff states viable freedom-of-association claims "is whether and to what extent [D]efendants' actions

---

[11]The New York State Constitution claims at issue here are subject to the same standards as the First Amendment claims. *See* fn. 8, *supra*.

burdened" Plaintiff's right to associate for the purpose of engaging in Second Amendment advocacy.  *Tabbaa*, 509 F.3d at 101.  "To be cognizable, the interference with [Plaintiff's] associational rights must be 'direct and substantial' or 'significant.'" *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996) (quoting *Lyng v. Int'l Union*, 485 U.S. 360, 366, 367 & n. 5, 108 S .Ct. 1184, 99 L. Ed.2d 380 (1988)).  "Mere incidental burdens on the rig ht to associate do not violate the First Amendment." *Tabbaa*, 509 F.3d at 101.

Plaintiff's allegations, accepted as true for purposes of this motion, indicate that "nearly" every insurance carrier, and "multiple" banks have expressed a fear of transacting with the NRA or withdrawn their bids for services to the NRA because of Defendants' actions as discussed above.  While the Court accepts, at it must, that many insurance carriers and banks have refused to offer services to the NRA, and that insurance coverage and banking services are necessary for the NRA to continue its advocacy activities, Plaintiff has not asserted that it is unable to obtain any insurance coverage or any banking services so it can continue its operations.  Moreover, even accepting the allegations that multiple insurers and banking institutions have expressed an unwillingness to offer services to the NRA due to Defendants' actions, there are no allegations plausibly supporting the conclusion that Defendants' actions directly and substantially, or significantly, interfered with the NRA's associational rights.  Rather, the Amended Complaint alleges that the Guidance Letters, Consent Orders, press releases, and "backchannel threats" af fect insurers and banking institutions' willingness to offer services to the NRA which, in turn, creates a "risk" that the NRA might not be able to offer associational activities such as (1) media coverage through NRATV, (2) circulation of publications and magazines, (3) meetings, rallies, conventions and assemblies, (4) educational programs, Am. Compl. ¶ 98, and (5) letter-

31

writing campaigns. *Id.* at ¶ 95.  But the Amended Complaint fails to sufficiently allege that Defendants' actions directly and significantly, or substantially, hampered the NRA's right to associate with its members.  While the NRA's ability to obtain insurance coverage and banking services from entities regulated in New York state may be impaired by Defendants' actions, this imposes only an incidental burden on the NRA's right to engage in expressive association. *Cf. Lyng*, 485 U.S. at 367, 108 S. Ct. 1184 (concluding that a burden is merely incidental when it is "exceedingly unlikely" that a defendant's actions would prevent someone from exercising his or her associational rights) (internal quotation marks omitted).

The cases of *Healy v. James*, 408 U.S. 169 (1972), and *Tabbaa*, *supra*, cited by Plaintiff in support of its freedom of association claims, are clearly distinguishable. In *Healy*, the Supreme Court held that a college's denial of official recognition to a student organization constituted a substantial burden on association.  408 U.S. at 183.  Here, Defendants took no action like the college in *Healy* that directly impacted the NRA's right to meet with its members for expressive association.  In *Tabbaa,* the Second Circuit held that the "plaintiffs suffered a significant penalty, or disability, solely by virtue of associating at the [Reviving the Islamic Spirit] Conference" because they were detained for lengthy periods of time, interrogated, fingerprinted, and photographed when others, who had not attended the conference, did not have to endure these measures. *Tabbaa*, 509 F.3d at 102.  Here, there are no allegations that Defendants imposed a penalty upon NRA members who participated in NRA advocacy events.  Similarly, there are no plausible allegations that the Defendants imposed a penalty upon the NRA for associating with its members for Second Amendment advocacy purposes.  While the NRA argues that the Consent Orders were the result of speech-motivated regulatory decisions, the Consent Orders indicate that Chubb and

Stockton agreed that their conduct related to NRA insurance programs violated New York insurance law. The fact that these insurance companies agreed that *their* conduct violated New York law does not support a plausible claim that the Defendants imposed a penalty upon the NRA for associating with its members.  *See e.g. Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986)(The "First Amendment is not implicated by the enforcement of laws directed at unlawful conduct having nothing to do with…expressive activity.").  Further, the Lockton Consent Order provides that "Lockton may assist the NRA in procuring insurance for the NRA's own corporate operations, " Dkt. No. 37-4 at ¶ 43, and the Chubb Consent Order provides that "the NRA may itself purchase insurance from Chubb for the sole purpose of obtaining insurance for the NRA's own corporate operations." Dkt. No. 37-5 at ¶ 22.  These two clauses undermine the NRA's claim that DFS intended to coerce insurers and banks into not doing business with the NRA and thereby penalized the NRA.

The allegations in the Amended Complaint are, at most, that the Defendants' actions "make it more difficult" for the NRA "to exercise [its] freedom of association" through NRA activities, but "did not prevent [the NRA] . . . from associating [with its members] nor burden in any significant manner [its] ability to do so." *Fighting Finest*, 95 F.3d at 228.  This fails to state plausible freedom-of-association claims.  Accordingly, Defendants' motion directed to Count Three is granted.  If Plaintiff seeks leave to amend this claim, it should be done through a formal Rule 15 motion.[12]

---

[12]At the end of the NRA's brief, it generically asks that if any claims are dismissed, it be given leave to amend. Pl. Mem. L., at 48.  But without providing proposed factual allegations that would support legally plausible freedom-of-association claims, the Court is unable to determine whether to grant such leave.  *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012)("In assessing whether the proposed complaint states a claim, we consider the proposed amendments along with the remainder of the complaint, accept as true all non-conclusory factual allegations therein, and draw all reasonable inferences in

(continued...)

### d.  Equal Protection

Count Four alleges that Defendants engaged in selective enforcement of the New York insurance laws in violation of the NRA's rights to equal protection of law as secured by the Fourteenth Amendment to the United States Constitution, and by Article 1, Section 11 of the New York Constitution.  Am. Compl. ¶¶ 108-113.  In this regard, the NRA alleges that Defendants "knowingly and willfully violated the NRA's equal protection rights by seeking to selectively enforce certain provisions of the Insurance Law against Lockton's affinity-insurance programs for the NRA.  Meanwhile, other affinity-insurance programs that were identically (or at least similarly) marketed by Lockton, but not endorsed by 'gun promotion' organizations, have not been targeted by DFS's investigation." *Id.* at ¶ 107.  Plaintiff further contends that "Defendants' selective enforcement of the Insurance Law against the NRA and its business partners is based on the NRA's political views and speech relating to the Second Amendment." *Id.* ¶ 110.  Plaintiff maintains that "Defendants' actions have resulted in significant damages to the NRA, including but not limited to damages due to reputational harm, increased development and marketing costs for any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA." *Id.* ¶ 111.  Plaintiff seeks (a) "an order preliminarily and permanently enjoining Cuomo and Vullo (in their official capacities) and DFS . . . from selectively enforcing the Insurance Law by requiring Lockton or Chubb, through their respective consent orders, to forbear from doing

---

[12](...continued)
plaintiff's favor to determine whether the allegations plausibly give rise to an entitlement to relief.")(interior quotation marks, alterations, and citations omitted); *Johnson v. City of New York*, No. 16-CV-6426 (KAM)(VMS), 2018 WL 5282874, at *4 (E.D.N.Y. Oct. 24, 2018)("A party seeking leave to amend under Rule 15 must establish that amendment is not futile, is not the product of undue delay or bad faith, and would not overly prejudice the non-movant.")(interior quotation marks and citations omitted).

business with the NRA which they could otherwise permissibly conduct with other affinity organizations," *id.* ¶ 113; (b) an injunction to enjoin Defendants "from further selective enforcement of the Insurance Laws to the NRA endorsed policies," *id.,* p. 44 ("Request for Relief"), ¶ a(3); and (c) monetary damages. *Id.* ¶ c.

Defendants argue that Plaintiff fails to allege facts supporting standing for selective enforcement equal protection claims because the Amended Complaint alleges that DFS "selectively" enforced the New York Insurance Law against Lockton and Chubb, but "does not allege that DFS has taken any enforcement action against the NRA at all." Def. Mem. L. at 39 (citing Am. Compl. at ¶¶ 54-64, 107-113).[13]  Defendants maintain that the Court should not allow the NRA "to attempt a collateral attack on the Consent Orders, to which they are not a party, and to which the parties voluntarily waived any objection or challenge." *Id.*  They argue that to do so would be improper "under the established law of standing," and "would hamper the current and future law enforcement efforts of DFS, by casting a shadow over the finality that regulated parties obtain when they enter into consent orders." *Id.* Plaintiff counters that it has standing to bring these claims because, "[b]y prohibiting Lockton and Chubb from engaging in lawful insurance business with the NRA, Defendants have selectively enforced the State's insurance laws against the NRA, not just against Lockton and Chubb." Pl. Mem. L. at 25.

### 1. Standing

---

[13]Defendants note in two footnotes, however, that the NRA is under investigation for unlicensed insurance activities. Def. Mem. L., at 38, n. 16 ("While the NRA is under investigation for its unlicensed insurance activities and other violations of the Insurance Law, that investigation is ongoing and has not, to date, resulted in any enforcement action against the NRA."); *id.* at 39, n. 17 ("It should be noted that, while the NRA's own violations of the Insurance Law are under investigation by DFS, no enforcement action has yet been taken against it.").

"A complaint must contain specific allegations that 'plausibly suggest [Plaintiff has] standing to sue.'" *Ctr. for Bio-Ethical Reform, Inc. v. Black*, 234 F. Supp. 3d 423, 431 (W.D.N.Y. 2017)(quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).  "And because standing is essential to a court's power to entertain suit, courts must refrain from drawing inferences to find standing." *Id.* (citing *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992)).  At the pleading stage, a plaintiff must "clearly allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robins*, ──── U.S. ────, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016).   "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 185 (2000); *see Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011)(Standing must be demonstrated "for each claim and form of relief sought.").

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" or "Controversies." U.S. Const. art. III, § 2.  "The purpose of Article III is to limit federal judicial power 'to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process.'" *Montesa v. Schwartz*, 836 F.3d 176, 195 (2d Cir. 2016)(quoting *Valley Forge Christian Coll. v. Ams. United For Separation of Church and State, Inc.*, 454 U.S. 464, 472(1982)).  Standing is a doctrine rooted in the traditional understanding of the case-or-controversy limitation on federal judicial power. *Burgin v. Brown*, No. 15-CV-201S, 2018 WL 1932598, at *4 (W.D.N.Y. Apr. 24, 2018)(citing *Spokeo*, 136 S. Ct. at 1547).  "As recently explained in *Spokeo*, constitutional standing developed 'to ensure that federal courts do not exceed their authority as it has been traditionally

understood' by limiting 'the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.'" *Id.* (quoting *Spokeo,* 136 S. Ct. at 1547).

The "irreducible constitutional minimum" of standing requires Plaintiff to show three elements: 1) that it suffered an "injury in fact;" 2) a causal connection between the injury and the conduct of which Plaintiff complains; and 3) that it is likely rather than speculative that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To be sufficient for purposes of standing, an injury must be "an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical[.]" *Lujan*, 504 U.S. at 560 (internal quotations, citations, and footnote omitted); *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 ("The plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision.")(citing *Lujan*, 504 U.S. at 560). A "concrete" injury is one that is "'de facto'[,] that is, it must actually exist ... [it is] 'real' and not 'abstract,'" although an injury need not be tangible to be concrete. *Spokeo*, 136 S. Ct. at 1548. To be "particularized," an injury "must affect the plaintiff in a personal and individual way." *Id.* at n.1.

To have standing to seek injunctive relief, a plaintiff must establish a real or immediate threat of injury that is caused by the challenged conduct. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983); *see Cacchillo*, 638 F.3d at 404 (A plaintiff seeking injunctive relief "must show the three familiar elements of standing: injury in fact, causation, and redressability." )(citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)); *Greene v. Gerber Prod. Co.*, 262 F. Supp. 3d 38, 54 (E.D.N.Y. 2017)("'[T]o meet the

37

constitutional minimum of standing' for injunctive relief, a plaintiff 'must carry the burden of establishing that [it] has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'")(quoting *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a real or immediate threat of injury.")(interior quotation marks and citations omitted).  Thus, to obtain an injunction, Plaintiff "must show, *inter alia*, 'a sufficient likelihood that [it] will again be wronged" in a way similar to the way it has already been wronged. *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012)(quoting *Lyons*, 461 U.S. at 111).  The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)(quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990))(emphasis added in *Clapper*); *see Pungitore v. Barbera*, 506 Fed. Appx. 40, 41 (2d Cir. 2012) ("[W]hen seeking prospective injunctive relief, the plaintiff must prove the likelihood of future or continuing harm."); *Burgin*, 2018 WL 1932598, at *5 ("For prospective relief, 'a plaintiff must show a likelihood that he will be injured in the future,' and that the future injury is 'certainly impending, and real and immediate.'")(quoting *Carver v. City of N.Y.*, 621 F.3d 221, 228 (2d Cir. 2010) and *Lee v. Bd. of Governors of the Fed. Reserve Sys.*, 118 F.3d 905, 912 (2d Cir. 1997)).   While past injuries may be relevant to the issue of whether future injury is impending, and may support a claim for monetary damages, "such evidence 'does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.'" *Pungitore*, 506 Fed. Appx. at 42 (quoting *Lyons*, 461 U.S. at 102)); *see*

*Casey v. Odwalla, Inc.*, No. 17-CV-2148 (NSR), 2018 WL 4500877, at *9 (S.D.N.Y. Sept. 19, 2018) ("Although 'past injuries' can support a claim for 'money damages,' a party cannot rely on past injury alone to provide a basis for standing to seek injunctive relief.")(citing *Nicosia*, 834 F.3d at 239; *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004); *Deshawn E. ex rel. Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)).  Rather, to establish a certainly impending future injury, a plaintiff must show "'how [it] will be injured prospectively and that the injury would be prevented by the equitable relief sought.'" *Greene v. Gerber Prod. Co.*, 262 F. Supp. 3d 38, 54–55 (E.D.N.Y. 2017)(quoting *Marcavage*, 689 F.3d at 103 (collecting cases)).

In addition to constitutional standing, there is a prudential branch of standing "which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.'" *Montesa*, 836 F.3d at 195 (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) *abrogated on other grounds by Lexmark*, 134 S. Ct. at 1387).  Prudential standing acts as a limitation on constitutional standing and consists of "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Lexmark Int'l*,  572 U.S. at 126 (internal quotation marks and citations omitted).

To satisfy prudential standing, a "plaintiff generally must assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the rights or interests of third parties." *Warth*, 422 U.S. at  499.  "Though this limitation is not dictated by the Article III case or controversy requirement, the third-party standing doctrine has been considered a valuable prudential limitation, self-imposed by the federal courts."  *Kane v. Johns-Manville Corp.*, 843

F.2d 636, 643 (2d Cir. 1988).  The Supreme Court articulated two important policies

justifying this limitation: "first, the courts should not adjudicate [third-party] rights

unnecessarily, and it may be that in fact the holders of those rights either do not wish to

assert them, or will be able to enjoy them regardless of whether the in-court litigant is

successful or not.  Second, third parties themselves usually will be the best proponents of

their own rights." *Singleton v. Wulff*, 428 U.S. 106, 113–14 (1976)(citations omitted).

 "Although the Supreme Court has 'adhered to the rule that a party generally must

assert his own legal rights and interests, and cannot rest his claim to relief on the legal

rights or interests of third parties,' this rule is not absolute, and 'there may be circumstances

where it is necessary to grant a third party standing to assert the rights of another.'" *Greene*,

262 F. Supp. 3d at 55 (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004) (internal

quotation marks and citation omitted)).  "These circumstances are 'well-recognized,

prudential exceptions to the injury-in-fact requirement' that 'permit third-party standing

where the plaintiff can demonstrate (1) a close relationship to the injured party and (2) a

barrier to the injured party's ability to assert its own interests.'" *Id.* (quoting *W.R. Huff Asset*

*Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 109–10 (2d Cir. 2008)); *see also*

*Powers v. Ohio*, 499 U.S. 400, 410-11 (1991)(A plaintiff can assert claims on behalf of a

third party if three criteria are met: "[1] the litigant must have suffered an 'injury in fact,' thus

giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; [2]

the litigant must have a close relation to the third party; and [3] there must exist some

hindrance to the third party's ability to protect his or her own interests." )(citation omitted);

*Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 174 (2d

Cir. 2005) ("[A] plaintiff seeking third-party standing in federal court must ... demonstrat[e] a

close relation to the injured third party and a hindrance to that party's ability to protect its own interests." (internal quotation marks omitted)).

### 2. Sought-After Injunction, Am. Compl. ¶ 113.

The NRA lacks standing for the injunction sought in paragraph 113. *See* Am. Compl. ¶ 113.[14] Plaintiff fails to allege facts clearly demonstrating a sufficient likelihood that it will again be wronged in a manner similar to the way it was harmed by entry of the Lockton and Chubb Consent Orders.  The Consent Orders were entered following a DFS investigation yielding admissions from Lockton and Chubb that they were involved in numerous illegal insurance activities related to NRA programs. The NRA has not alleged that these activities were legal under New York law, or that the applicable New York insurance laws are unconstitutional or were improperly applied.  Thus, there are insufficient allegations supporting a plausible contention that all of the NRA's past damages will be, or could be, repeated.  To the extent the NRA alleges that it was harmed by provisions of the Consent Orders that prohibit Lockton and Chubb from participating with the NRA to offer legal affinity insurance programs, Plaintiff fails to allege facts plausibly indicating that, if the injunction was granted, either Lockton or Chubb would agree to participate in these programs in the future.  Further, nothing in the Lockton or Chubb Consent Orders prohibits other insurance companies from participating in these services, yet Plaintiff has not alleged that another insurance company is planning to participate in NRA-endorsed affinity insurance programs.  Thus, the  "threatened injury" occasioned by the Consent Orders is not "*certainly*

---

[14](Seeking "an order preliminarily and permanently enjoining Cuomo and Vullo (in their official capacities) and DFS . . . from selectively enforcing the Insurance Law by requiring Lockton or Chubb, through their respective consent orders, to forbear from doing business with the NRA which they could otherwise permissibly conduct with other affinity organizations.").

*impending*," but rather is, at most*, "a possible* future injury." *Clapper*, 568 U.S. at 409.  This is insufficient to confer constitutional standing for the injunction sough in paragraph 113.

Further, Plaintiff fails to satisfy prudential standing for this relief, which seeks to enjoin Defendants from enforcing the Lockton and Chubb Consent Orders.  This requested injunctive relief is, essentially, a third-party challenge to the stipulated settlements contained in those Consent Orders.  It relies upon the rights and interests of Lockton and Chubb to resolve claims against those parties.  Lockton and Chubb may not desire to vacate their consent agreements and/or do business with the NRA related to affinity insurance programs, and even if they wanted to do both, those are matters that should be advocated by Stockton and Chubb - not the NRA.  Moreover, Plaintiff has not alleged facts plausibly indicting that either Lockton or Chubb are hindered in some manner in asserting their rights affected by the Consent Orders.

The cases cited by Plaintiff for the proposition that "a plaintiff has standing to challenge laws enforced against another party where the plaintiff is injured by such enforcement," Pl. Mem. L. at 26,[15] are misplaced.  While these cases stand for the cited proposition, they do reach the issue raised by the injunction sought in paragraph 113 – that is, whether a plaintiff can vacate an agreement reached by a third party following enforcement of a challenged law.  Here, prudential considerations limit Plaintiff's ability to challenge third-party agreements having only a consequential affect on Plaintiff. *See e.g. Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n*, 747 F.3d 44, 48–49 (2d

---

[15](citing *Doe v. Bolton*, 410 U.S. 179, 187–89 (1973); *H.L. v. Matheson*, 450 U.S. 398, 400–01, 405–07 (1981); *Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 753, 757 (1976); *NRA v. ATF*, 700 F.3d 185, 191–92 (5th Cir. 2012); *Dearth v. Holder*, 641 F.3d 499, 502 (D.C. Cir. 2011)).

Cir. 2014)("We conclude that Hillside does not have prudential standing in this case because it cannot enforce the terms of the PAA, as to which it is neither a party nor a third-party beneficiary, but the enforcement of which is a necessary component of its claim."); *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (holding that a non-party to a contract lacks standing in a contract proceeding to enforce the agreement unless unequivocal terms clearly evidence an intent to permit such standing); *In re Motors Liquidation Co.*, 580 B.R. 319, 340 (Bankr. S.D.N.Y. 2018)("In the context of a contract dispute, only parties to the contract and intended third-party beneficiaries of the contract have prudential standing to appear and enforce agreements."); *Tamir v. Bank of N.Y. Mellon*, 2013 WL 4522926, at *3 (E.D.N.Y. Aug. 27, 2013) (stating that "a non-party to a contract lacks standing to challenge an agreement in the absence of terms demonstrating that it is a third-party beneficiary").

Furthermore, the case of *Safelite Group, Inc. v. Rothman*, 229 F. Supp.3d 859 (D. Minn. 2017), cited by Plaintiff for the proposition that a party can challenge a consent order to which it was not a party, is distinguishable.  In *Safelite*, the District of Minnesota found that the plaintiff had standing to challenge the enforcement of a consent order entered between Auto Club Group, Inc. ("AAA"), a third-party insurer for whom Safelite served as claims administrator, and the Commissioner of the Minnesota Department of Commerce (DOC).   Safelite challenged on First Amendment grounds the DOC's enforcement of a Minnesota statute that prohibits insurers from making statements that could pressure, coerce, or induce an insured to choose a particular glass vendor.  *Safelite*, 229 F. Supp. 3d at 866 (citing Minn. Stat. § 72A.201, subd. 6(14)(the Mandatory Advisory) and 6(16) (the Anti–Coercion Provision).  The facts of the case indicate that "Safelite, in conjunction with

the insurers for whom it provides claims administration services, develop[ed] scripts to use when insureds call to report an auto-glass claim." *Id.* The Consent Order was based on DOC's investigation finding that: (a) "[AAA's] glass administrator and its affiliated entities (collectively, "Safelite"), while administrating automobile glass claims, failed to provide the required advisory to insureds before recommending the use of [AAA's] network of preferred glass vendors;" and (b) "[AAA's] glass administrator Safelite, while administering automobile glass claims, advised that insureds may be balance billed[16] by non-preferred glass vendors," in violation of Minn. Stat. § 72A.201, subd. 6(14) and 6(16). *Safelite*, 229 F. Supp. 3d at 870. "In exchange for the DOC not pursuing an enforcement action against it, AAA agreed to drop Safelite as its claims administrator in Minnesota and 'cease and desist from informing insureds they ... may be balance-billed by non-preferred glass vendors, unless [AAA] [has] specific information proving the assertion(s) to be true for a certain vendor.'" *Id.* (quoting the Consent Order). Although the Consent Order "specifically address[ed] Safelite's suggestions that insureds 'may' be balance billed, . . . [t]he DOC never involved Safelite in its negotiations regarding the Consent Order . . . [and] Safelite did not learn about the Consent Order until weeks after it was executed." *Id.*

In finding that Safelite had standing to challenge the Consent Order, the District Court wrote:

> The Consent Order required that AAA drop Safelite as its claims administrator, undoubtedly causing economic "injury in fact" to Safelite. Moreover, the practical effect of the Consent Order is that Safelite must cease using any "may be balance billed" language if it wants to act as a claims administrator in Minnesota. The imminent threat of future prosecution and the self-censorship—or chilling effect—such a threat creates provides standing for

---

[16]"Balance billed" means the insured is billed for the difference between the amount paid by the insurer and total fee charged by the glass installer.

> as-applied First Amendment challenges. Safelite's commercial speech rights
> have thus been impaired by the Consent Order, giving it standing.
>
> Furthermore, as the DOC itself acknowledges, Safelite is the agent of AAA
> and the Consent Order had a "negative impact" on Safelite because of that
> relationship. Injury incurred indirectly, such as through an agency relationship,
> may still impart standing. The DOC's efforts to avoid "the elephant in the
> room" by going after Safelite's insurer-clients "one by one" do not deprive
> Safelite of standing to bring its First Amendment claim.

*Id*., at  875 (citations omitted).

Here, by contrast, the NRA has not challenged the New York insurance laws that

Stockton and Chubb agreed they violated.  There is also no plausible basis to conclude that

enforcement of the New York insurance laws identified in the Chubb and Lockton Consent

Orders would prevent another insurer from offering NRA lawful affinity insurance programs.

Thus, unlike the Consent Order in *Safelite*, the Consent Orders here do not prevent the

NRA from offering lawful affinity insurance programs to its members.   While Defendants

indicate that the NRA is under investigation for its unlicensed insurance activities, Def.

Mem. L., at 38, n. 16; *id.* at 39, n. 17, the Amended Complaint fails to provide allegations

plausibly suggesting that either Lockton or Chubb were in an agency relationship with the

NRA such that the Consent Orders inhibit the NRA's ability to engage in lawful insurance

activities.  Simply stated, the Consent Orders address Lockton and Chubb's activities, and

do not directly inhibit the NRA from engaging in lawful activities.

For the reasons discussed above, the Court finds that Plaintiff lacks standing for the

injunctive relief requested in paragraph 113.  Therefore, Defendants' motion to dismiss the

equal protection selective enforcement claims is granted to the extent Plaintiff seeks an

order enjoining Gov. Cuomo, Supt.  Vullo, and DFS from requiring Lockton and Chubb to

abide by their respective Consent Orders.  Because this standing deficiency is substantive

and would not be cured by better pleading, *see Cusamano v. Sobek*, 604 F. Supp. 2d 416, 462 (N.D.N.Y. 2009)("Of course, an opportunity to amend is not required where the problem with plaintiff's causes of action is substantive such that better pleading will not cure it.")(*Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) and *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991))(interior quotation marks and brackets omitted), Plaintiff is denied leave to amend to challenge the Consent Orders on equal protection grounds.

### 3.  Sought-After Injunction, Am. Compl. p. 44, ¶ a(3).

Plaintiff also seeks to enjoin Defendants "from further selective enforcement of the Insurance Laws to the NRA endorsed policies." Am. Compl. p. 44, ¶ a(3).[17]  Like with the injunction sought in paragraph 113, Plaintiff fails to allege facts clearly demonstrating a sufficient likelihood that it will be injured in the future by selective enforcement of the New York insurance laws to lawful NRA-affinity insurance programs, or that such future injury is certainly impending, real, and immediate.  Therefore, Defendants' motion to dismiss the equal protection selective enforcement claims is granted to the extent Plaintiff seeks an order enjoining Defendants from selectively enforcing the New York insurance laws against the NRA.  Because it is possible that Plaintiff could allege facts demonstrating future selective enforcement of the New York insurance laws to the NRA, or to lawful NRA-endorsed affinity programs, dismissal in this regard is without prejudice.

### 4.  Monetary Damages, Am. Compl. p. 44, ¶ c

Plaintiff also seeks monetary recovery for Defendants' alleged selective enforcement.

---

[17]The Court notes that Plaintiff also seeks injunctive relief in relation to Counts 1, 2, 3, and 6. Because Defendants have not specifically challenged standing for injunctive relief related to these counts, the Court offers no opinion on the subject.

Defendants' challenge to the selective enforcement claims is addressed only to standing. Thus, the Court examines only whether Plaintiff has pled sufficient allegations to confer standing to seek monetary recovery. *See Burgin*, 2018 WL 1932598, at *5 ("When assessing constitutional standing, courts do not examine the merits of the claims, but rather, determine 'whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.'") (quoting *Warth*, 422 U.S. at 498-99); *see also Montesa*, 836 F.3d at 195 (In determining whether a party has standing, the focus is on "'the party seeking to invoke federal jurisdiction, rather than the justiciability of the issue at stake in the litigation.'")(quoting *Fulani v. Bentsen*, 35 F.3d 49, 51 (2d Cir.1994)). The Court finds that it has.

First, the Amended Complaint alleges that the NRA suffered concrete and particularized injury by, among other things, losing royalty amounts owed to it under its contract with Lockton and experiencing increased costs associated with the potential development of new NRA-endorsed insurance programs not through Lockton, Chubb, or Lloyd's. *See* Am. Compl. at ¶ 111. It can also be presumed that Plaintiff suffered a sufficient injury-in-fact due to the alleged equal protection violations. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262–63 (1977) (finding injury-in-fact based on alleged equal protection violations); *Doe v. Sch. Bd. of Ouachita Parish*, 274 F.3d 289, 292 (5th Cir. 2001) ("Impairments to constitutional rights are generally deemed adequate to support a finding of 'injury' for purposes of standing." ); *accord Council of Ins. Agents & Brokers v. Molasky–Arman*, 522 F.3d 925, 931 (9th Cir. 2008)(same). Second, the Amended Complaint plausibly alleges that the NRA's injury would not have occurred but

47

for Defendants' selective enforcement of certain New York insurance laws against the NRA's affinity insurance program and, through the Lockton Consent Order, termination of all affinity insurance programs and the NRA's business relationship with Lockton.  *See id.* at ¶¶ 108-111.  This satisfies the second *Lujan* element.  Third, the alleged past harm provides a sufficient basis for monetary damages. *See Casey*, 2018 WL 4500877, at *9.

### 5. Conclusion - Selective Enforcement Claims

Accordingly, Defendants' motion to dismiss the equal protection selective enforcement claims is granted to the extent Plaintiff seeks an order enjoining Defendants from requiring Lockton and Chubb to abide by their respective Consent Orders, and enjoining Defendants from future New York Insurance Law enforcement actions.  The motion is denied to the extent Plaintiff seeks to recover monetary damages for alleged past selective enforcement actions.

### e. Due Process

Count Six alleges that Defendants violated the NRA's rights to due process as guaranteed by the Fourteenth Amendment of the United States Constitution and Article 1, Section 6 of the New York Constitution.  Am. Compl. ¶¶ 121-132.   Plaintiff argues that it has adequately pled two distinct due process claims - deprivation of its liberty interest "in its good name, reputation, honor, integrity, and its ability to endorse insurance products to its membership," *id.* ¶ 125*,* and deprivation of its property interest in its agreements with financial institutions and insurance companies to provide the NRA with banking services and insurance coverage. *Id.* ¶¶ 125-126; *see also* Pl. Mem. L., at 28;[18]  Trans. of Oral Arg.,

---

[18]("The NRA adequately pleads two distinct claims under the Due Process Clause of the Fourteenth Amendment. First, Defendants violated the Due Process Clause by stigmatizing the NRA in the course of

(continued...)

at p. 44.[19]  For the reasons that follow, these claims are dismissed.

### 1. Stigma-Plus Claim

The Fourteenth Amendment's Due Process Clause[20] prohibits a state actor from depriving a citizen of her life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1.  "A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause to create a cause of action under § 1983." *Patterson v. City of Utica*, 370 F.3d 322, 329–30 (2d Cir. 2004) (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)).  "Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest." *Id.* at 330 (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572–73 (1972)). Referred to as a "stigma-plus" claim, it involves "'injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process.'" *LoPorto v. County of Rensselaer*, 115CV0866LEKDJS, 2018 WL 4565768, at *15 (N.D.N.Y. Sept. 24, 2018)(quoting *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003)).  To prevail on such a claim, Plaintiff must show  "'(1) [stigma—] the utterance of a statement sufficiently derogatory to injure [plaintiff's] reputation, that is

---

[18](...continued)
instructing financial institutions to cease doing business with the NRA. Second, Defendants violated the NRA's due process rights when they coerced Lockton and Chubb to end their relationships with the NRA without affording the NRA any procedural protections.")

[19]("I would like to address now the due process claim. So the NRA alleges two separate due process claims, stigma plus and the deprivation of contract rights without due process of law.")

[20]Due process claims under the New York State Constitution similar to those alleged here are subject to the same analysis as federal due process claims. *Gilmoe v. Bouboulis*, No. 3:15-CV-0686 (GTS/DEP), 2016 U.S. Dist. LEXIS 115315, **35-36, n. 7 (N.D.N.Y. Aug. 29 2016).

capable of being proved false, and that he or she claims is false, and (2) [a plus—] a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.'" *Paterno v. City of New York*, No. 17 CIV. 8278 (LGS), 2018 WL 3632526, at *3 (S.D.N.Y. July 31, 2018)(quoting *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (internal punctuation omitted)).

"In order to survive a motion to dismiss on a 'stigma-plus' claim, the complaint must plead the particulars of a 'statement sufficiently derogatory to injure' the plaintiff's reputation; not merely general characterizations or summaries of those statements." *Id.*, at *4  (quoting *Vega*, 596 F.3d at 81).  Courts look to state substantive law of defamation in analyzing the "stigma" component of a "stigma-plus" claim. *Id.*  (citing *Sharpe v. City of New York*, No. 11 Civ. 5494, 2013 WL 2356063, at *6 n. 10 (E.D.N.Y. May 29, 2013), *aff'd*, 560 Fed. Appx. 78 (2d Cir. 2014) ("federal courts in New York often look to New York defamation law when analyzing a "stigma-plus" claim.").  "The gravamen of 'stigma' as part of a due process violation is the making under color of law of a reputation-tarnishing statement that is false." *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47–48 (2d Cir. 2001)*, rev'd on other grounds Conn. Dep't of Public Safety v. Doe*, 538 U.S. 1 (2003).

The Amended Complaint asserts that "Defendants, in their April 2018 Letters and in other public pronouncements, have made stigmatizing statements, including that the NRA represents a potential reputation risk to insurance companies and financial institutions, that the NRA is responsible for 'senseless violence,' and that the NRA is a threat to the public health and safety, that call into question the NRA's good name, reputation, honor, and integrity.  These stigmatizing statements are false and capable of being proved false." Am. Compl. ¶ 127.  In support of these claims, Plaintiff argues that "Defendants publicly

branded the NRA a 'reputational risk' to the safety and soundness of financial institutions, warned those financial institutions that having the NRA as a customer may send the 'wrong message to their clients and their communities,' insinuated that having 'ties' to the NRA 'jeopardize[s] public safety,' stated that the NRA has 'caused carnage in this nation,' and urged them to drop the NRA in order to 'promote public health and safety.'" Pl. Mem. L. at 29 (citing Dkt. 37-1 (Cuomo Press Release); Am. Compl. at ¶ 45 (referencing the Guidance Letters); Gase Decl., Ex. D).  These statements fail to satisfy the "stigma" component of the stigma-plus claims.

The statements in the Cuomo Press Release and the Guidance Letters are purely government speech relaying New York's opinions about public safety, gun regulation, and the role that insurance companies and financial institutions play in shaping public opinion in this public debate.  Whether the NRA represents a potential reputational risk to insurance companies and financial institutions is clearly a matter of opinion.  Further, the Guidance Letters do not state that the NRA is responsible for senseless violence.  Rather, they state that there is a "social backlash against [the NRA] and similar organizations that promote guns that lead to senseless violence," and then go on to state that "the nature and the intensity of the voices now speaking out . . . is a strong reminder that such voices can no longer be ignored and that society, as a whole, has a responsibility to act and is no longer willing to stand by and wait and witness more tragedies caused by gun violence, but instead is demanding change now." Dkt. # 37-2; *see* Dkt. # 37-3 (same).  These statements express New York's opinion of societal views related to the availability of guns, of organizations that promote access to guns, and whether the availability of guns leads to senseless violence. No statement is made that the NRA directly causes violence, and any inference that the

Guidance Letters imply that the NRA's gun promotion advocacy leads to violence is based on opinions articulated in the documents. Similarly, the Guidance Letters do not state that the NRA is a threat to public health and safety. Rather, they reference public health and safety in the context of the perceived role that insurance companies and financial institutions play in shaping public opinion, *see* Dkt. # 37-2;[21] Dkt. # 37-3,[22] and encourage these entities "to continue evaluating and managing their risks, including reputational risks, that may arise from their dealings with the NRA or similar gun promotion organizations, if any, as well as continued assessment of compliance with their own codes of social responsibility." Dkt. # 37-2; Dkt. # 37-3. While the Guidance Letters encourage insurance companies and financial institutions "to review any relationships they have with the NRA or similar gun promotion organizations, and to take prompt actions to managing [their reputational risks] and promote public health and safety," Dkt. # 37-2; Dkt. # 37-3, they do not state that the NRA is a threat to the public health and safety. Any inference that the Guidance Letters imply that the NRA's gun promotion advocacy is contrary the public health and safety is based on the opinions expressed in these two documents.

Likewise, the Cuomo Press Release is government speech relaying opinions about public safety, gun regulation, and the role that insurance companies and financial

---

[21]("Our insurers are, and have been, vital to the communities they serve for generations and are guided by their commitment to corporate social responsibility, including public safety and health. Insurers' engagement in communities they serve is closely tied to the business they do with their clients and customers and its impact on such communities. . . . Our insurers are key players in maintaining and improving public health and safety in the communities they serve.")

[22]("Our financial institutions, whether depository or non-depository, are, and have been, the cornerstone of the communities they serve for generations and are guided by their commitment to corporate social responsibility, including public safety and health. . . . Our financial institutions can play a significant role in promoting public health and safety in the communities they serve, thereby fulfilling their corporate social responsibility to those communities.")

institutions play in shaping public opinion in this public debate.  While the press release

encourages insurers and bankers "to consider whether [their ties to the NRA or other similar

organizations] harm their corporate reputations and jeopardize public safety," Dkt. # 37-1, it

does not state that the NRA is responsible for  violence, or that it jeopardizes public health

and safety.  Again, the statements are made in the context of a statement about gun

violence in general, and asks the targeted entities to examine their connections to the NRA

and other gun promotion organizations to determine for themselves whether continued

association with gun promotion organizations harms their reputations and benefits the

communities they serve.  Any inference that the press release implies that the NRA

promotes gun violence or is harmful to public safety is based only on the opinions

expressed in the press release.

    Thus, the statements in the Guidance Letters and Cuomo Press Release are not

actionable on the stigma-plus claims because, as opinions, they are not "capable of being

proved false." *Vega*, 596 F.3d at 81; *see, e.g.*, *Paterno*, 2018 WL 3632526, at *5 ("The first

two statements—referencing 'a terrible chapter' and 'fundamental principles'—are not

actionable because they are opinions, which are not 'capable of being proved false.'")(citing

*Vega*, 596 F.3d at 81; *Sharpe*, 2013 WL 2356063, at *6 ("a statement of opinion, rather

than fact ... is not actionable as a stigmatizing remark."); *Wiese v. Kelley*, No. 08 Civ. 6348,

2009 WL 2902513, at *6 (S.D.N.Y. Sept. 10, 2009) ("The Attorney General's description of

the conduct resulting in the loss of data as 'extremely troubling' is a statement of opinion,

rather than fact, and as such is not actionable as a stigmatizing remark.")); *cf. Enigma

Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 281 (S.D.N.Y.

2016) ("'New York law absolutely protects statements of pure opinion, such that they can

never be defamatory.'"); *Sorvillo v. St. Francis Prep. Sch.*, No. 13-CV-3357 (SJ/MDG), 2014 U.S. Dist LEXIS 186923, **12-13 (E.D.N.Y. Aug. 12, 2014) (granting motion to dismiss because alleged statements were opinions); *Apionishev v. Columbia Univ. in City of New York*, No. 09 Civ. 6471, 2012 WL 208998, at *10 (S.D.N.Y. Jan. 23, 2012) (dismissing a libel claim, because "[e]xpressions of opinion are not actionable").

Plaintiff does not specifically point to Gov. Cuomo's April 20, 2018 tweet in support of the stigma-plus claim. Nonetheless, Gov. Cuomo's statement that the "[t]he NRA is an extremist organization" is clearly an expression of his opinion and, therefore, is insufficient to support the first element of the stigma-plus claim.

Plaintiff's reference to a statement that the NRA has "caused carnage in this nation" is from a transcript of Gov. Cuomo's August 6, 2018 guest appearance on CNN's *New Day with Allisyn Camerota and John Berman*. Gase Decl., Ex. D. Because the transcript is not attached to the Amended Complaint or referenced therein, and because the matter is before the Court on a Rule 12(b)(6) motion, Gov. Cuomo's statements while on CNN cannot properly be considered in determining whether Plaintiff states a plausible stigma-plus claim. Nevertheless, because Plaintiff requests leave to amend if a claim is dismissed, the Court reviews the transcript to determine whether adding the "caused carnage" statement would provide an actionable stigmatizing statement. In the transcript, Gov. Cuomo is quoted as stating:

> [The NRA is] making a different point, which is, I have been a longtime opponent of the NRA, I plead guilty. I believe the NRA represents an extremist group. I believe they've been counterproductive for gun owners in this country. I believe their politics seeks them [*sic*] to stop any common sense gun reform because then, John, they would be out of business. Most gun owners support some type of reasonable gun control. 90 percent of Americans support background checks. The NRA has always been against any progress whatsoever. They're oblivious to the facts. They've

> caused carnage in this nation.  They've done gun owners a disservice because there
> is a common sense compromise if the NRA wasn't always threatening politicians who
> went anywhere near reasonableness.  If you remember President Trump after the
> Parkland shooting, spoke in the White House conference room and asked
> reasonable questions.  He seemed reasonable. "Why can't we raise the purchase
> age?  Why can't we raise the age for assault weapons?"  He met with the NRA and
> did a total 180 the next day and was absolutely against any reform, and this nation
> still has done nothing on guns.

Gase Decl., Ex. D, p. 3.

Read in context, Gov. Cuomo's "caused carnage" statement is clearly an expression of his, or New York's, opinion as to the connection between the NRA's political positions and the numerous incidents of mass shootings in the Country.  For the reasons just discussed, such an opinion does not support a plausible stigma-plus claim.  Therefore, leave to amend to add this statement is denied.

Plaintiff also does not point to the alleged "backroom exhortations [made] during the DFS Investigation" to support its stigma-plus claim.  *See* Am. Compl. ¶ 127 ("Defendants, in their April 2018 Letters *and in other public pronouncements*, have made stigmatizing statements . . . .")(emphasis added); *see also id.* ¶ 126 (referencing these backroom statements in support of the property deprivation claim).  Even if it did, however, Plaintiff has not pled the particulars of these statements such to allow a determination whether the statements are "sufficiently derogatory to injure the plaintiff's reputation" and capable of being proved false.  *See Vega*, 596 F.3d at 81; *Paterno*, 2018 WL 3632526, at *4.  Thus, this conclusory allegation provides an insufficient basis to avoid dismissal of the stigma-plus claims. *See*, *e.g.*, *Filteau v. Prudenti*, 161 F. Supp.3d 284, 293 (S.D.N.Y. 2016)(dismissing a "stigma-plus" complaint where the allegations of "stigma" were "conclusory and speculative"); *Miley v. Hous. Auth. of City of, Bridgeport*, 926 F. Supp.2d 420, 432 (D. Conn.

2013) (dismissing a complaint where the "allegations are devoid of specific factual content to state a claim to relief for a stigma-plus violation that is plausible on its face"); *see also Moy v. Perez*, 712 F. App'x 38, 39 (2d Cir. 2017)("[B]ald assertions and conclusions of law will not suffice to avoid dismissal, nor will factual allegations that are wholly conclusory[.]")(internal quotation marks and citations omitted).

Inasmuch as Plaintiff fails to point to statements plausibly supporting the first element of its stigma-plus due process claims, these claims are dismissed without prejudice.

### 2. Deprivation of Property Interest in Business Relationships

The Amended Complaint also alleges that "Defendants' actions have deprived the NRA of its constitutionally protected interests in engaging in core political advocacy and pursuing revenue opportunities free from unreasonable government interference by coercing financial institutions to cease providing essential services to the NRA and other 'gun promotion' organizations." Am. Compl. ¶ 122.  Specifically, Plaintiff alleges that the NRA has a property interest in its agreements with financial institutions to provide the NRA with banking services and corporate insurance coverage, *id.* at ¶¶ 124-125, and that:

> Defendants' April 2018 Letters, backroom exhortations during the DFS Investigation, and public statements caused, at a minimum, Lockton Affinity, Lockton Companies, and Chubb to discontinue their NRA-endorsed insurance options in New York or (in Chubb's case) nationwide and to never again participate in such programs, thus depriving the NRA of its property interest without due process of law. Furthermore, Defendants' actions have interfered with and deprived the NRA of its tangible property interests in accessing banking and insurance products on equal terms with other citizens.

*Id.* ¶ 126.  Plaintiff contends that Defendants' actions violate the NRA's substantive and procedural due process rights. Pl. Mem. L. at 31.

"In order to demonstrate a violation of either substantive or procedural due process

rights, the plaintiff must first demonstrate the possession of a federally protected property right to the relief sought." *Donohue v. Cuomo*, No. 111CV1530MADCFH, 2018 WL 4565765, at *17 (N.D.N.Y. Sept. 24, 2018)(citations omitted).  Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577 (1972).  "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)(citing *Roth*, 408 U.S. at 577).  However, "[t]he mere identification of a state law right does not necessarily require a finding that the right identified is protected by the Constitution." *Barnes v. Pilgrim Psychiatric Ctr.*, 860 F. Supp. 2d 194, 201 (E.D.N.Y. 2012). Rather, in order to have a protected property interest in a benefit, "a person clearly must have more than an abstract need for it.  He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at  577; *see Sindermann*, 408 U.S. at 603 (A mere subjective expectancy of receiving a benefit is not enough);  *Local 342, Long Island Pub. Serv. Emp., UMD, ILA, AFL-CIO v. Town Bd. of the Town of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994)("In order for a person to have a property interest in a benefit such as the right to payment under a contract, [h]e must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.")(citations omitted).  "When determining whether a plaintiff has a claim of entitlement, we focus on the applicable statute, contract or regulation that purports to establish the benefit." *Martz v. Vill. of Valley Stream*, 22 F.3d 26, 30 (2d Cir.1994).

Plaintiff asserts that it was deprived of its agreements with financial institutions and insurers to provide the NRA with banking services and corporate insurance coverage, and argues that "valid current contracts and goodwill are the exact type of property interests that courts routinely recognize qualify for protection under the Due Process Clause." Pl. Mem. L., p. 31. However, the instant case is distinguishable from the cases Plaintiff cites to support this argument. *See id.,* at  n. 161.  In these cases, rules or mutually explicit understandings supported the plaintiffs' claims of entitlement to the benefits they were denied. *See Lynch v. United States*, 292 U.S. 571, 578-81 (1934)(Addressing plaintiffs' entitlement to enforce War Risk Insurance policies, through which the United States insured the lives of veterans, finding that "the due process clause prohibits the United States from annulling [the policies], unless . . . the action taken falls within the federal police power or some other paramount power.");  *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991)(Finding that a dematriculated graduate student had a procedural due process right to an unbiased hearing because New York law recognizes "an implied contract between [a college or university] and its students," requiring the "academic institution [to] act in good faith in its dealing with its students.")(interior quotation marks and citations omitted); *Ezekwo v. N.Y.C. Health & Hospitals Corp.*, 940 F.2d 775, 783 (2d Cir. 1991)(finding that a physician had a reasonable expectation of being appointed as the position of Chief Resident at a public hospital because the hospital had an established policy and practice, highlighted in its informational documents, of awarding the position of Chief Resident to all third year residents on a rotating basis, and because the plaintiff was verbally advised that she would be Chief Resident during a specific period of time and, in that position, would receive a salary differential).  Here, by contrast, Plaintiff fails to allege facts plausibly demonstrating

that rules or mutually explicit understandings support its claim of entitlement to the benefit

of doing business with various financial institutions or insurance companies.

"[W]hile the Supreme Court has recognized that '[t]he assets of a business (including

its good will) unquestionably are property, and any state taking of those assets is

unquestionably a 'deprivation' under the Fourteenth Amendment ... business in the sense of

the activity of doing business, or the activity of making a profit is not property in the ordinary

sense.'" *Chrebet v. Cty. of Nassau*, 24 F. Supp. 3d 236, 245 (E.D.N.Y. 2014) (quoting

*College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666,

675 (1999)), *aff'd sub nom. Chrebet v. Nassau Cty.*, 606 F. App'x 15 (2d Cir. 2015).

Moreover,

> [d]ecisions by and within the Second Circuit indicate . . . that "the loss of a
> future business opportunity is not a protect[able] property interest." *Evac, LLC
> v. Pataki*, 89 F. Supp.2d 250, 258 (N.D.N.Y.2000) (citing *Asbestec Const.
> Servs., Inc. v. U.S. Envtl. Prot. Agency*, 849 F.2d 765, 770 (2d Cir.1988)
> ("Mere opportunity to obtain a federal contract is not a property right under the
> due process clause.")); *cf. Sanitation & Recycling Ind., Inc. v. City of New
> York*, 928 F. Supp. 407, 420–21 (S.D.N.Y.1996), *aff'd*, 107 F.3d 985 (2d
> Cir.1997) (right to continue business on same terms as in the past is not a
> protectable property interest under the Due Process Clause). Furthermore,
> decisions within this Circuit indicate that allegations of harm to a plaintiff's
> "business operations" may not form the basis of a due process claim.
> *Murtaugh v. New York*, 810 F. Supp.2d 446, 480 (N.D.N.Y. 2011) (finding that
> plaintiff's claim that defendants' actions effectively harmed plaintiff's business
> operations did not implicate a property interest for the purposes of a due
> process claim); *Tuchman v. Conn.*, 185 F. Supp.2d 169, 174 (D. Conn. 2002)
> (finding that harm to "ability to conduct business" was not a deprivation of due
> process).

*Id.*, at 245–46.

Plaintiff's allegations establish, at most, that it has "an abstract need for" and "a

unilateral expectation" of receiving the business services from the institutions that have

severed ties, or refused to associate, with the NRA. This includes Lockton and Chubb, who

agreed to refrain from offering insurance services to Plaintiff, including programs that violated New York insurance law.  Because Plaintiff does not present facts plausibly demonstrating that it has an entitlement to enter agreements with, or received services from, the financial institutions and insurance companies that have denied it services, it does not have a constitutionally protected property interest in its agreements with these entities. *See e.g., id.* at 246 ("In keeping with Second Circuit precedent, the Court will not recognize a protectable property interest in plaintiff's right to conduct his business and earn future profits from that business."). Therefore, the property deprivation due process claims are dismissed.  Because the deficiency with these claims is substantive and cannot be cure with better pleading, leave to amend the property deprivations due process claims is denied.

### f.  Conspiracy

Count Five alleges claims against Gov. Cuomo and Supt. Vullo in their individual capacities, brought pursuant to 42 U.S.C. § 1983, asserting that they "agreed with each other, and with others known and unknown, to deprive the NRA of rights secured and guaranteed by the First and Fourteenth Amendments to the United States Constitution and Sections Eight and Eleven of the New York Constitution."  Am. Compl. ¶ 115; *see id.* ¶¶ 114-120.  Defendants contend the claims must be dismissed because the Amended Complaint contains only conclusory allegations of a conspiracy.  Def. Mem. L., pp. 40-41. The Court agrees.

A § 1983 conspiracy claim requires "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Ciambriello v.*

*Cty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002) (same); *Galgano v.  County of Putnam, N.Y.*, No. 16-CV-3572 (KMK), 2018 WL 4757968, at *32 (S.D.N.Y. Sept. 28, 2018)(same).   "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn*, 200 F.3d at 72 (internal quotation marks omitted).  However, to state a viable conspiracy claim, Plaintiff "'must provide some factual basis supporting a meeting of the minds'" of the alleged conspirators to carry out the unlawful plan. *Galgano*, 2018 WL 4757968, at *32 (quoting *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (internal quotation marks omitted)).  "Thus, Plaintiff must 'make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end.'" *Id.* (quoting *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999)(citations and internal quotation marks omitted)).  To avoid dismissal, Plaintiff must allege "'facts upon which it may be plausibly inferred that [Gov. Cuomo and Supt. Vullo] came to an agreement to violate [Plaintiff's] constitutional rights.'" *LoPorto*, 2018 WL 4565768, at *13  (quoting *Green v. McLaughlin*, 480 F. App'x 44, 46 (2d Cir. 2012) (citation omitted)); *see Phillips v. County of Orange*, 894 F. Supp. 2d 345, 383–84 (S.D.N.Y. 2012) ("Allegations of conspiracy must allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the alleged conspiracy.")(internal quotation marks and citation omitted).  "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of [its] constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello*, 292 F.3d at

325  (internal quotation marks omitted).

The allegations in Count Five are that Gov. Cuomo directed Supt. Vullo to issue the Guidance Letters "implicitly threatening DFS-regulated entities with potential prosecutorial action should they fail to sever ties with the NRA," Am. Compl. ¶ 116, and that Supt. Vullo "agreed to issue" the Guidance Letters "in an apparent effort to silence, intimidate, and deter those possessing a particular viewpoint from participating in the debate with respect to gun control." *Id.* ¶ 118.  Plaintiff also alleges that Supt. Vullo signed the Consent Orders "to carry out her agreement with Cuomo to stifle the NRA's political speech." *Id.* ¶ 117.  These allegations are insufficient to support plausible Section 1983 conspiracy claims.

The Guidance Letters, by themselves, constitute purely political speech.  While these letters, when viewed in the context of Defendants' other actions, may provide some inference supporting First Amendment freedom of speech and Fourteenth Amendment equal protection claims, Plaintiff provides insufficient factual allegations supporting the conclusion that Gov. Cuomo and Supt. Vullo reached an agreement to violate the NRA's constitutional rights, or had a meeting of minds to issue these letters to carry out such a plan. *See Hutchins v. Solomon*, No. 16-CV-10029 (KMK), 2018 WL 4757970, at *26 (S.D.N.Y. Sept. 29, 2018) ("Plaintiff neither properly alleges the required existence of an agreement, nor the required meeting of the minds, between [Defendants]."); *see also Baines v. City of New York*, No. 10-CV-9545, 2015 WL 3555758, at *12 (S.D.N.Y. June 8, 2015) ("Although [the] [p]laintiff repeatedly asserts that [the] [d]efendants entered an agreement to violate his civil rights ..., the [complaint] is devoid of facts that would render that allegation plausible as opposed to merely conceivable." (citation omitted)).   The fact that Supt. Vullo issued the Guidance Letters at Gov. Cuomo's direction is insufficient to

plausibly establish that the two agreed to violate the NRA's constitutional rights and attempted to carry out the plan by issuing the Guidance Letters. *See Morales v. City of New York*, 752 F.3d 234, 237 (2d Cir. 2014) (finding claims that defendants worked together insufficient to suggest an improper motive); *Beechwood Restorative Care Center v. Leeds*, 436 F.3d 147, 154 (2d Cir. 2006) (finding that the fact that government employees from various federal and state agencies cooperated does not, without more, prove they conspired to violate plaintiff's rights); *Scotto v. Almenas*, 143 F.3d 105, 114–15 (2d Cir. 1998) (concluding that "several telephone calls and other communications" were not sufficient to show conspiracy); *Hutchins*, 2018 WL 4757970, at \*26 ("The facts Plaintiff points to fail to do more than describe a group of police officers working on the same case and passing information on to a prosecutor. Plaintiff does not allege when or how any of the Defendants agreed to violate Plaintiff's rights, what the scope of the agreement was, or any other detail regarding the alleged agreement. Plaintiff thus fails to allege a factual basis supporting the existence of an agreement."); *Zahrey v. City of New York*, No. 98-CV-4546, 2009 WL 1024261, at \*11 (S.D.N.Y. Apr. 15, 2009) (dismissing conspiracy claim on summary judgment where the plaintiff "provide[d] no evidence, absent the fact that the [i]ndividual [d]efendants worked together, that ... an agreement existed").

Further, there is a complete dearth of plausible factual allegations supporting the conclusion that Supt. Vullo signed the Consent Orders as a way to carry out a purported agreement she had with Gov. Cuomo to violate the NRA's constitutional rights. The Consent Orders were entered based on Lockton and Chubb's agreements that they violated New York insurance laws and were willing to pay substantial monetary penalties for their actions. These agreements were plainly entered to resolve enforcement actions directed at

the admittedly unlawful insurance-related conduct by Lockton and Chubb.  There is no plausible basis to conclude that Supt. Vullo signed the Consent Orders to carry out a purported plan she and Gov. Cuomo had to violate the NRA's constitutional rights, as opposed to signing these documents in her role as DFS Superintendent.  *See Thomas v. Demeo*, No. 15-CV-9559, 2017 WL 3726759, at *12 (S.D.N.Y. Aug. 28, 2017) (dismissing § 1983 conspiracy claim because the complaint did not "provide even circumstantial allegations that the alleged conspiracy existed, much less any details as to the extent of the alleged agreement or how [the] [d]efendants collectively carried it out");  *Tavares v. New York City Health & Hosps. Corp.*, No. 13-CV-3148, 2015 WL 158863, at *7–8 (S.D.N.Y. Jan. 13, 2015) (dismissing a conspiracy claim where plaintiff failed to "put forward any facts supporting the inference that the ... [d]efendants acted in concert").

Equally unavailing are Plaintiff's contentions that the Amended Complaint "sets forth numerous factual allegations—supported by evidence—which demonstrate that Cuomo and Vullo reached an agreement to deprive the NRA of its rights under the Constitution and took overt acts to achieve that goal," and that it "extensively details the 'who,' 'what,' 'where,' and 'how' comprising Defendants' conspiracy."  Pl. Mem. L. at 35 (citing Am. Compl.  34-35;[23]

---

[23](alleging that DFS launched an investigation into the Carry Guard program because the Everytown for Gun Safety ("Everytown") activist organization contacted the New York County District Attorney's Office ("DA's Office") about the Carry Guard program, the DA's office contacted DFS, and Everytown took credit for instigating the investigation)

46;[24] 50-51;[25] 54;[26] 62.[27]   None of these allegations plausibly demonstrates an agreement

between Gov. Cuomo and Supt. Vullo, or between either of these two and anyone else, to

violate the NRA's constitutional rights.   Accordingly, the conspiracy claims alleged in Count

Five are dismissed without prejudice.

### g. Tortious Interference With Prospective Economic Advantage

Count Seven asserts state law claims of tortious interference with prospective

economic advantage against Gov. Cuomo and Supt. Vullo in their individual capacities.

Am. Compl. ¶¶ 133-141.  Plaintiff contends that Gov. Cuomo and Supt. Vullo interfered with

the NRA's business relationship with Lockton by "convinc[ing] and induc[ing]" Lockton to

enter a Consent Order, *id.* ¶ 138, that included provisions that Lockton would not participate

in "any other NRA-endorsed programs with regard to New York State" and would not "enter

into any agreement or program with the NRA to underwrite or participate in any affinity-type

insurance program involving any line of insurance to be issued or delivered in New York

State or to anyone known to Lockton to be a New York resident." *Id.* at ¶ 136 (quoting

Lockton Consent Order, at ¶¶ 42-43).

"Under New York law, to state a claim for tortious interference with prospective

economic advantage, the plaintiff must allege that '(1) it had a business relationship with a

third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3)

---

[24](alleging that Supt. Vullo issued the Guidance Letters)

[25](alleging that Gov. Cuomo and Supt. Vullo issued the Cuomo Press Release, and that Gov. Cuomo issued his April 20, 2018 tweet)

[26](alleging that Lockton entered its Consent Order, which restricts Lockton's participation in any NRA-endorsed insurance programs in New York State)

[27](alleging that Chubb entered its Consent Order, which restricts Chubb's participation in any affinity-type insurance program with the NRA)

the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.'" *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006)(quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003), *certified question answered*, 3 N.Y.3d 182, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (N.Y. 2004)); *see Posner v. Lewis*, 18 N.Y.3d 566, 570, n. 2 (N.Y. 2012)(In New York, "[t]o state a cause of action for tortious interference with prospective contractual relations, a plaintiff must plead that the defendant directly interfered with a third party and that the defendant either employed wrongful means or acted 'for the sole purpose of inflicting intentional harm on plaintiff[.]")(quoting *Carvel Corp.*, 3 N.Y.3d at 190)).  Defendants challenge the claims on the third element.

The third element requires proof that Defendants interfered with the NRA's prospective business relationship with Stockton solely out of malice or a desire to inflict harm upon the Plaintiff, or used improper or illegal means to interfere with this prospective business relationship. *See Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)(stating the third element requires that "the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means");[28] *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.,* No. 15-CV-4244 (JGK), 2018 WL 4489278, at *11 (S.D.N.Y. Sept. 19, 2018) ("To establish the third element of tortious interference, the plaintiffs must demonstrate that the defendants acted solely out of malice or used improper or illegal

---

[28]Although *Catskill Dev.* states that the third element is satisfied where the defendant acted for a wrongful purpose, the case discusses the element as requiring that the defendant employed wrongful means to disrupt the subject business relationship. *See Catskill Dev.*, 547F.3d at 132 (citing *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (N.Y. 1980) (describing the interference with business relations tort as "interference with prospective contractual relations," and describing element three as "wrongful means")).  Plaintiff cites cases addressing the "wrongful means" requirement. *See* Pl. Mem. L., at 37, fn. 184.

means that amounted to a crime or independent tort."); *see also Rockland Exposition, Inc. v. Alliance of Automotive Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 333 (S.D.N.Y. 2012)(plaintiff must demonstrate that the defendant committed a'crime or an independent tort' or applied economic pressure 'for the sole purpose of inflicting intentional harm on the plaintiff)(citation omitted). The allegations in the Amended Complaint fail to plausibly support either of these requirements.

Here, even accepting Plaintiff's allegations as true, Plaintiff fails to assert facts plausibly indicating that Defendants entered the Lockton Consent Order solely out of malice or for the sole purpose of inflicting harm on Plaintiff. *See  R.M. Bacon, LLC v. Saint-Gobain Performance Plastics Corp.*, No. 1:17-CV-0441 (LEK/DJS), 2018 WL 1010210, at *6 (N.D.N.Y. Feb. 20, 2018) ("[I]t is not enough simply to allege intentional interference. Interference must be the defendant's sole objective.")(citations omitted). The Stockton Consent Order, voluntarily entered by DFS and Lockton after a DFS investigation, provides details of the numerous New York Insurance Law violations that Stockton admitted.  The face of the Lockton Consent Order plainly indicates that it was entered, at least in part, for the purpose of remedying Lockton's New York Insurance Law violations discovered during the DFS investigation.  While the Amended Complaint asserts that Gov. Cuomo and Supt. Vullo's "sole purpose for requiring Lockton to no longer participate in lawful insurance programs with the NRA was to harm the NRA and drive it . . . out of New York state," Am. Compl., ¶ 137, it is implausible to conclude that simply because Lockton could no longer offer NRA affinity-type insurance programs that the NRA would be put out of business in

New York.[29]  Indeed, the Lockton Consent Order specifically allows Lockton to offer the NRA corporate insurance thereby signifying that the NRA could go about its other legitimate business activities, and nothing in the Lockton Consent Order prohibits or prevents other insurance companies from offering lawful affinity-type insurance programs to the NRA.

The Amended Complaint also fails to allege facts plausibly indicating that Defendants employed wrongful means in arriving at the Lockton Consent Order.  To satisfy the wrongful means requirement, Plaintiff must demonstrate that Defendants interfered with the NRA's prospective business relations with Stockton by conduct amounting to a crime or an independent tort.  *See* Carvel Corp., 3 N.Y.3d at 190.[30]  The wrongful means requirement "makes alleging and proving a tortious interference claim with business relations more demanding than proving a tortious interference with contract claim." *Catskill Dev.,* 547 F.3d at 132 (interior quotation marks and citation omitted).

Although the Amended Complaint alleges that Defendants "used dishonest, wrongful, and improper means when intentionally interfering with the NRA's business relationship with Lockton," and "took intentional steps to violate the NRA's rights afforded by the United States and New York Constitutions and committed independent tortious conduct," Am.

---

[29]Further, the Lockton Consent Order plainly indicates a legitimate basis for including provisions prohibiting Lockton from engaging with the NRA to offer affinity-type insurance programs in New York.  Many of Lockton's admitted violations arose from its interactions with the NRA, and no inference of improper motivation arises from provisions that guard against similar future violations.

[30]As the New York Court of Appeals explained:

[W]here a suit is based on interference with a nonbinding relationship, the plaintiff must show that defendant's conduct was not "lawful" but "more culpable." The implication is that, as a general rule, the defendant's conduct must amount to a crime or an independent tort. Conduct that is not criminal or tortious will generally be "lawful" and thus insufficiently "culpable" to create liability for interference with prospective contracts or other nonbinding economic relations.

*Carvel Corp.,*  3 N.Y.3d at 190.

Compl. ¶ 37, these conclusory allegations are insufficient.  The Lockton Consent Order was entered following a DFS investigation, and is based upon Lockton's admission of numerous insurance law violations. *See generally*,  Dkt. No. 37-4.  Plaintiff fails to identify how it was that Defendants engaged in dishonest, wrongful, and improper means to get Lockton to enter its Consent Order.

Further, Plaintiff fails to allege facts plausibly indicating that Defendants engaged in tortious conduct to convince or induce Lockton to enter this Consent Order.  As indicated, the Lockton Consent Order was arrived at following a DFS investigation.  There are no allegations that Defendants engaged in threats, fraud, or misrepresentations during the investigation, or to support the conclusion that the DFS investigation amounted to meritless litigation.  *See Carvel Corp.,* 3 N.Y.3d at 192 ("Carvel did not drive the franchisees' customers away by physical violence, or lure them by fraud or misrepresentation, or harass them with meritless litigation.")(citation omitted).  As stated, Lockton admitted numerous violations of New York Insurance Law and agreed to pay a hefty penalty.   Whether the entry of the Lockton Consent Order amount to, or was a part of, a constitutional tort against the NRA is of no moment.  The pertinent inquiry is whether Defendants employed wrongful means to disrupt Plaintiff's potential business with Lockton, *see R.M. Bacon*, 2018 WL 1010210, at *5 ("To state a claim for interference with prospective relations, a plaintiff must also allege that the defendant employed 'wrongful means' to disrupt the plaintiff's potential business.")(quoting *Ullmannglass v. Oneida, Ltd.*, 927 N.Y.S.2d 702, 705–06 (3d Dept. 2011)), which Plaintiff asserts was accomplished by the Lockton Consent Order.  There are insufficient allegations that Defendants engaged in tortious conduct as a means to compel Lockton to enter its Consent Order.

69

In the end, Plaintiff's tortious interference with prospective economic advantage claims must be dismissed because the NRA fails to allege facts plausibly demonstrating that Defendants acted solely out of malice, or used improper means to harm the NRA by the entry of the Lockton Consent Order. *See, e.g.*, *Silver v. Kuehbeck*, 217 F. App'x 18, 21 (2d Cir. 2007) (affirming dismissal where the complaint "failed to allege that defendants interfered with plaintiff's business relationship *solely* to harm him or that he used wrongful means in doing so") (citation omitted) (emphasis in original); *R.M. Bacon,* 2018 WL 1010210, at *6 (concluding that plaintiff's tortious interference claims failed because the amended complaint did not allege that defendants "acted with the sole purpose of harming" the plaintiff) (citations omitted); *MVB Collision, Inc. v. Progressive Ins. Co.*, 13 N.Y.S.3d 139, 140 (2nd Dept. 2015) (affirming dismissal of a tortious interference claim where the defendant's "conduct was, at least in part, to advance its own interests, not solely for the purpose of harming the plaintiff"); *Besicorp Ltd. v. Kahn*, 736 N.Y.S.2d 708, 711–12 (3rd Dept. 2002) (affirming dismissal of a prospective business claim because "[r]ather than alleging that defendants' conduct was motivated solely by malice or a desire to inflict injury by unlawful or wrongful means as required, plaintiff alleges that defendants were motivated by their desire to maximize their financial gain")(emphasis omitted).  Because the deficiency in Plaintiff's tortious interference with prospective economic advantage claims cannot be cured by better pleading, leave to amend these claims is denied.

**V.      CONCLUSION**

For the reasons set forth above, Defendants' motion to dismiss the Amended Complaint [Dkt. No. 40] is **GRANTED in part and DENIED in part**.  In this regard,

-Defendants' motion to dismiss Counts One and Two is denied;

-Defendants' motion to dismiss Count Three is granted, and the freedom-of-association claims asserted in Count Three are dismissed without prejudice;

-Defendants' motion to dismiss Count Four is granted in part and denied in part. The motion is granted to the extent Plaintiff seeks an order enjoining Gov. Cuomo, Supt. Vullo, and DFS from requiring Lockton and Chubb to abide by their respective Consent Orders, and that much of Count Four seeking the injunctive relief requested in paragraph 113 is dismissed with prejudice. The motion is also granted to the extent that Plaintiff seeks an order enjoining Defendants from selectively enforcing the New York insurance laws against the NRA, and that much of Count Four seeking the injunctive relief requested in the Amended Complaint, "Request for Relief," ¶ a(3), is dismissed without prejudice. The motion is denied to the extent Plaintiff seeks monetary damages for Defendants' past acts of selective enforcement;

-Defendants' motion to dismiss Count Five is granted, and the conspiracy claims against Gov. Cuomo and Supt. Vullo are dismissed without prejudice;

-Defendants' motion to dismiss Count Six is granted, and the stigma-plus due process claims are dismissed without prejudice, and the property deprivation due process claims are dismissed with prejudice; and

-Defendants' motion to dismiss Count Seven is granted, and the tortious interference with prospective economic advantage claims against Gov. Cuomo and Supt. Vullo are dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: November 6, 2018

Thomas J. McAvoy
Senior, U.S. District Judge