UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NATIONAL RIFLE ASSOCIATION OF AMERICA,

*Plaintiff*,

-against-

ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,.

18-cv-00566 (TJM/CFH)

*Defendants*.

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR A PROTECTIVE ORDER**

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

William A. Scott
Assistant Attorney General, of Counsel
Bar Roll No. 512434
Telephone: (518) 776-2255
Fax: (518) 915-7740 (Not for service of papers)

Date: February 4, 2019

## __Table of Contents__

Preliminary Statement ................................................................................................. 1

Argument ..................................................................................................................... 11

   I.  STANDARD FOR A MOTION FOR PROTECTIVE ORDER ......................................... 11

   II. DFS'S CARRY GUARD INVESTIGATION IS NOT A PROPER SUBJECT OF
DISCOVERY ................................................................................................................ 12

     A.  Documents Relating to the Investigation of the NRA Programs Are Not Legally
Relevant ..................................................................................................................... 12

     B.  All Documents Relating to the Investigation of the NRA Programs Are Protected by the
Law Enforcement Privilege ....................................................................................... 13

     C.  Additional Privileges Protect Many of the Documents Relating to the Investigation of
the NRA Programs ..................................................................................................... 15

   III. DISCOVERY AS TO DFS'S INVESTIGATIONS OF AFFINITY PROGRAMS
UNRELATED TO THE NRA IS IMPROPER ....................................................................... 17

   IV. PLAINTIFF IS NOT ENTITLED TO DISCOVERY REGARDING DEFENDANTS'
REFERRAL OF MATTERS TO OTHER GOVERNMENT AGENCIES ............................... 19

   V.  PLAINTIFF SHOULD NOT BE PERMITTED TO SEEK DISCOVERY OF CLEARLY
PRIVILEGED INTERNAL COMMUNICATIONS ................................................................ 20

     A. The NRA is Unequivocally Not Entitled to Information Exchanged Between Defendants
Relating to this Action ............................................................................................... 20

     B. Plaintiff's Demands Relating to the DFS Guidance Letters and Press Statements
Improperly Seek Clearly Privileged Documents ...................................................... 21

Conclusion .................................................................................................................. 24

# **Table of Authorities**

**Cases**

ACLU v. DOD, 2017 U.S. Dist. LEXIS 159108 (S.D.N.Y. Sep. 27, 2017)................................ 17

Children First Foundation v. Martinez, 2007 WL 4344915 (N.D.N.Y. 2007) ............................ 21

Dinler v. City of New York, 607 F.3d 923 (2d Cir. 2010)............................................................ 14

Grand Central Partnership, Inc. v. Cuomo, 166 F.3d 473 (2d Cir. 1999).................................... 22

Horn & Hardart Co. v. Pillsbury Co., 888 F.2d 8 (2d Cir. 1989) ................................................ 16

In re Dep't of Investigation, 856 F.2d 481 (2d Cir. 1988)............................................................ 14

In re Six Grand Jury Witnesses, 979 F.2d 939 (2d Cir. 1992)...................................................... 11

Kamholtz v. Yates County, No. 08-CV-6210, 2008 U.S. Dist. LEXIS 97985 (W.D.N.Y. Dec. 3, 2008) .......................................................................................................................................... 18

National Congress for Puerto Rican Rights v. City of New York, 194 F.R.D. 88 (S.D.N.Y. 2000) ........................................................................................................................................... 22

Ruggles v. WellPoint, 2010 WL 11570681 (N.D.N.Y. 2010) ..................................................... 11

Seattle Times Co. v. Rhinehart, 467 U.S. 20 (1984) ................................................................... 11

Strougo v. BEA Assocs., 199 F.R.D. 515 (S.D.N.Y. 2001) ........................................................ 16

Upjohn Co. v. United States, 449 U.S. 383 (1981)...................................................................... 16

Wood v. Capital One Services, 2011 WL 2154279 (N.D.N.Y. 2011)........................................... 20

Zieper v. Metzinger, 392 F.Supp. 2d 516 (S.D.N.Y. 2005)......................................................... 22

**Statutes**

N.Y. Fin. Servs. Laws § 102 .......................................................................................................... 2

N.Y. Fin. Servs. Laws § 403 .......................................................................................................... 2

N.Y. Fin. Servs. Laws §301 ........................................................................................................... 2

**Rules**

F.R.C.P. 26(c)(1).......................................................................................................................... 11

**Preliminary Statement**

Defendants Governor Andrew Cuomo, former Superintendent Maria Vullo, and the Department of Financial Services respectfully submit this memorandum in support of their motion for a protective order forbidding discovery by the Plaintiff NRA into four categories of documents.

The first category of materials subject to this motion are documents relating to the DFS investigation of Carry Guard and other NRA-endorsed programs.  These documents are not only irrelevant to any of the surviving claims in this action, but all of the documents are also protected by the law enforcement privilege as well as multiple other privileges.  The DFS investigation of the NRA is ongoing and DFS should not be required to provide any parts of its investigative files to the target of the investigation.

The second category of materials subject to this motion are documents relating to DFS's investigation of affinity insurance programs that have no relationship to the NRA or any of its claims.  DFS has not identified (and therefore could not have investigated): (1) any affinity group sponsors that engaged in the type or degree of illegal unlicensed insurance activity as the NRA did, or; (2) any affinity group insurance policies that provided illegal firearm use coverage.  As such, none of the DFS investigative files relating to any other affinity group policy are legally relevant to this case.

The third category of materials subject to this motion are documents regarding Defendants' referral of matters to other government agencies.  Although all documents referring matters relating to the NRA to other government agencies have been produced to the Plaintiff including follow-up communications between DFS and other states' insurance regulators, the

1

NRA's request for referral documents unrelated to the NRA is improper.  DFS's enforcement division routinely refers matters to the United States Department of Justice including various United States Attorneys' Offices in New York, the District Attorney for New York County, and various other district attorneys throughout the state.  None of the documents or communications related to the referral matters can satisfy the relevance standard in Rule 26.  The production of any communications or documents relating to these referrals is protected by the law enforcement privilege, the deliberative process privilege, the attorney-client privilege, and the work product doctrine and may also be precluded by grand jury secrecy rules.

The fourth category of materials subject to this motion are categories of documents that are clearly protected by a privilege.  The NRA's request for disclosure of all information exchanged between the Defendants relating to this action – information which is by definition privileged –  is not a good faith discovery request.  The NRA's request for draft documents shared only within a privileged group is similarly devoid of any merit.

**Factual Background**

1.     <u>DFS's Investigation of the NRA is Ongoing</u>

DFS is the agency in New York responsible for enforcing the State's insurance and banking laws.   <u>See</u> N.Y. Fin. Servs. Laws §§ 102, 301.  The Department is also a qualified law enforcement agency as defined in Executive Law section 835.  <u>See</u> N.Y. Fin. Servs. Laws § 403. In accordance with these statutory law enforcement responsibilities, DFS routinely conducts examinations and investigations of insurers and insurance producers for violations of the N.Y. Insurance Law and, as appropriate, imposes penalties against those entities that violate the law.

Beginning in October 2017, the Department commenced an investigation of the illegal

marketing and sale of the NRA's Carry Guard insurance program in New York. The

investigation began after the Department received a referral from the New York County District

Attorney's Office. On October 24, 2017, DFS issued subpoenas to both the NRA and Lockton

(an insurance producer) and issued a demand letter to Chubb (an insurer) pursuant to Section 308

of the Insurance Law. The investigation was subsequently expanded to include certain affiliates

of Lloyds (another insurer) and was further expanded to include insurance products other than the

Carry Guard program ("other NRA-endorsed programs") that were being illegally marketed and

sold in New York.

There were three categories of targets of the Department's investigation into the NRA's

insurance programs: the insurers that issued the policies (Chubb and Lloyds); the broker that sold

the policies (Lockton), and the unlicensed entity that was illegally marketing a subset of the

policies (the NRA). From the outset, there has been significant overlap across the targets of the

investigation. The Department used the information provided by Lockton in investigating

Chubb, Lloyds, and NRA. Similarly, the Department used the information provided by Chubb in

investigating Lockton and the NRA. Additionally, the information provided by Lloyds was used

by the Department in investigating the NRA. This overlap is not surprising given that the focal

point of the investigation – the NRA's Carry Guard program and other criminal defense policies

that included coverage for firearm uses – gave rise to the insurance law violations committed by

each of the targets.

The DFS's investigation of Chubb concluded on May 7, 2018, with the execution of a

Consent Order. See Levine Dec. Ex. A. The DFS investigation of Lloyds concluded on

December 20, 2018, with the execution of a Consent Order. See Levine Dec. Ex. B. 10. The

investigation of Lockton was partially concluded on May 2, 2018, with the execution of a

Consent Order. <u>See</u> Levine Dec. Ex. C.  Lockton remained under investigation by DFS for the

illegal marketing and sale of other affinity programs in New York that were unrelated to the

NRA.  This follow-on investigation concluded on January 31, 2019, with the execution of a

Supplemental Consent Order.  <u>See</u> Levine Dec. Ex. D.

DFS's investigation of the NRA is active and ongoing.  Unlike the investigations of

Chubb, Lockton, and Lloyds, the investigation of the NRA does not currently appear headed

toward resolution by consent order.  Counsel for the NRA in this case is also counsel for the

NRA in the pending DFS investigation, and has not responded to the Department's invitation to

discuss the resolution of the investigation by consent order.  Though the investigation is not

complete, DFS has provided a summary of the NRA's violation of multiple provisions of the

New York insurance law in connection with the Carry Guard and other NRA-endorsed programs,

through the accompanying declaration of Matthew Levine.

From approximately April 1, 2017 through November 17, 2017, the NRA offered an

insurance program in New York and elsewhere called "Carry Guard."  During that time, the

NRA's website described the program as follows:

> NRA Carry Guard is a two-pronged program.  It was created to provide dynamic, state-of-
> the-art insurance protection to those who legally defend themselves with a firearm, and to
> offer an elite, one-stop training option.  The insurance provides a cutting-edge set of
> features that will help gun owners mitigate the potentially costly financial and legal
> consequences flowing from armed encounters, even if they did everything right.

Pursuant to written agreements with Chubb and the NRA, Lockton served as the

administrator for the Carry Guard Program, carrying out such functions as marketing the

insurance, binding the insurance, collecting and distributing premiums, and delivering policies to insureds.  Pursuant to written agreements with Lockton, Chubb served as the underwriter for the Carry Guard Program, providing insurance policies to individuals who purchased the Carry Guard insurance.

The NRA directly managed the membership aspect of the Carry Guard Program.  The NRA and Lockton placed these insurance policies through New York's excess line market.  An "authorized" insurer is an insurance company that has received a license from the Department to provide specified types of insurance to customers in New York.  Authorized insurers are fully regulated by the Department in order to ensure solvency and adherence to consumer protection standards. Excess line insurers are not licensed or authorized by the Department, but are permitted to do business in New York through an excess line broker.   Unless another exemption applies, an insurance policy may be procured from an excess line insurer only after an excess line broker has obtained declinations of coverage from three authorized insurers.

The Carry Guard program as well as other NRA-endorsed programs violated numerous provision of the New York Insurance Law.  First, and foremost, the Carry Guard insurance program, as underwritten by Chubb and administered, solicited and marketed by Lockton Affinity, provided insurance coverage that may not be offered in the New York State excess line market, specifically: (a) defense coverage in a criminal proceeding that is not permitted by law; (b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property; and (c) coverage for expenses incurred by the insured for psychological counseling support.   A complete listing of the legal deficiencies in the

Carry Guard Program and the other NRA-endorsed programs is set forth in Exhibits A, B and C to the Levine Declaration.

In addition to regulating the conduct of insurers and insurance policies, the New York Insurance Law also closely regulates the conduct of insurance producers, as explained in the Levine Declaration. Although it did not possess an insurance producer license from the Department during the relevant period, the NRA nonetheless engaged in the marketing of and solicitation for the Carry Guard Program and violated various provisions of the Insurance Law governing conduct of insurance producers in New York as detailed in the Levine Declaration.

Additionally, evidence developed by DFS shows that the Carry Guard Program illegally tied the provision of insurance to NRA membership. When purchasing Carry Guard insurance, members would also receive one year of free NRA membership, which had a market value of at least $40. The NRA membership benefit was not specified in the insurance policy.

Between approximately April and November 2017, 680 Carry Guard insurance policies were issued to New York residents. And between approximately January 2010 and March 2018, 28,015 insurance policies were issued under the other NRA-endorsed programs to individuals and businesses whose home state is New York. Under written agreements between Lockton and the NRA, the NRA received royalties in the approximate amount of $21,198, an amount impermissibly based on a percentage of the actual premiums collected by Lockton under the Carry Guard program. Similarly, under written agreements between Lockton and the NRA, the NRA received approximately $1,872,737 in royalties, administrative fees and profit-sharing distributions under the other NRA-endorsed programs for the period January 2000 through March 2018, an amount that was impermissibly based, in part, on a percentage of actual

premiums collected by Lockton.

The NRA's conduct with respect to the Carry Guard program likely establishes that on multiple occasions during the time period April 1, 2017 through November 17, 2017: (1) the NRA acted as an unlicensed insurance producer with respect to the Carry Guard Program, in violation of Insurance Law § 2102;   (2)  the NRA aided an unauthorized insurer by marketing, soliciting, selling, administering, and facilitating the provision of impermissible excess line policies, thus aiding Chubb in underwriting unlawful insurance that provided coverage for, inter alia, criminal defense and intentional conduct, in violation of Insurance Law § 2117; (3) the NRA received compensation from Lockton based on a percentage of insurance premiums generated, in violation of Insurance Law § 2324(a); (4) the NRA provided free NRA membership when a member purchased Carry Guard insurance, therefore impermissibly tying insurance to NRA membership, in violation of Insurance Law § 2324(a); (5) the NRA advertised the financial condition of an unauthorized insurer by referring to the unauthorized insurer's A.M. Best rating, in violation of Insurance Law § 2122(a); (6) the NRA advertised the financial condition of an unauthorized insurer by calling attention to unauthorized insurers in advertisements and public announcements, in violation of Insurance Law § 2122(a).

In light of the NRA's failure to negotiate a resolution of its misconduct, it is likely that once the investigation is concluded, DFS will need to issue a Notice of Charges to the NRA and proceed to an administrative hearing to address the NRA's misconduct.  In the event that the NRA is the recipient of an adverse order after that hearing, it will have an opportunity to file an Article 78 proceeding in New York courts challenging the order.

2.    DFS's Investigation of Lockton

The consent order executed by DFS and Lockton on May 2, 2018, required Lockton to conduct a compliance review and take all remediation necessary to resolve any other violations of the New York Insurance law that related to its affinity-group and other excess lines business in New York.  Levine Dec. Ex. C at paras. 8 and 9.  Lockton has completed its obligations under this agreement and executed a Supplemental Consent Order with DFS on January 31, 2019.

Pursuant to the Supplemental Consent Order, Lockton admitted to multiple violations of the insurance law with respect to these other policies, agreed to pay a penalty of $400,000, and further agreed to continue the company's remediation obligations agreed to as part of its original consent order.

Unlike the May 2, 2018 Consent Order between the Department and Lockton which addressed the Carry Guard program, none of the policies covered by this Supplemental Consent Order were specific to firearm usage that provides liability coverage for bodily injury or property damage from use of a firearm, or for liability coverage for bodily injury or property damage expected or intended from the insured's standpoint to extend beyond those occasions where bodily injury results from the use of reasonable force to protect persons or property.  In other words, the NRA's Carry Guard program was the only firearm usage policy that Lockton was involved in.

Moreover, at the time the Supplemental Consent Order was executed and continuing to the present day, the Department has not identified any other sponsor of an affinity-style insurance product that committed the type and degree of unauthorized insurance activity with respect to a Lockton insurance policy containing illegal criminal defense coverage that was committed by the

8

NRA with respect to Carry Guard.  In other words, the NRA's illegal producer activity with respect to the Carry Guard program stands alone.

      3.    <u>The NRA's Discovery Demands</u>

The undersigned counsel conferred on multiple occasions with counsel for NRA regarding the discovery demands in dispute, and their inappropriate nature.  Defendants provided both initial and supplemental discovery responses addressing the NRA's concerns.  During these telephone calls, counsel for the NRA expanded the scope of the requests yet, without failure, have failed to address any of the concerns outline in the Defendants' January 11, 2019 letter to the Court, in this memorandum, or in the Defendants' accompanying cross-motion for a protective order.

The undersigned counsel conferred on multiple occasions with counsel for NRA regarding the discovery demands in dispute, and their inappropriate nature.  Defendants provided both initial and supplemental discovery responses addressing the NRA's concerns.  During these telephone calls, counsel for the NRA expanded the scope of the requests yet, without failure, have failed to address any of the concerns outline in the Defendants' January 11, 2019 letter to the Court, in this memorandum, or in the Defendants' accompanying opposition to the Plaintiff's motion to compel.

Plaintiff's refusal to remedy the latent defects in their discovery demands has necessitated this motion for a protective order.  This motion pertains to four categories of information none of which are the proper subject of discovery for the various reasons set forth in detail below.  These four categories are: 1) DFS's Carry Guard Investigation; 2) DFS's investigations of affinity programs unrelated to the NRA; 3) Defendants' referral of matters to other government agencies;

and 4) Privileged internal communications protected by the deliberative process privilege, the attorney-client privilege, and the work product doctrine.  Defendants seek a protective order from this court forbidding the discovery or disclosure of the documents demanded that fall within each category; forbidding inquiry into these four categories, and/or; limiting the scope of disclosure or discovery as it relates to the four categories.

## Argument

### I.  STANDARD FOR A MOTION FOR PROTECTIVE ORDER

A court may issue a protective order upon good cause "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  F.R.C.P. 26(c)(1).  Such an order may, as relevant to the current motion, contain terms including, "forbidding the discovery or disclosure," "forbidding inquiry into certain matters," and "limiting the scope of disclosure or discovery to certain matters." F.R.C.P. 26(c)(1)(A), (D).  Rule 26 provides a district court with "broad discretion and substantial latitude" in determining whether a protective order is appropriate and what the terms of such an order might be.  See Ruggles v. WellPoint, 2010 WL 11570681, *4 (N.D.N.Y. 2010) (citing Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 [1984]).

 The normally liberal discovery rules do not hinder a court's ability to restrict discovery in the face of improper demands.  See e.g., In re Six Grand Jury Witnesses, 979 F.2d 939, 943 (2d Cir. 1992). "All agree that the rules of discovery are to be applied broadly, but that according the discovery rules liberal treatment does not license opposing counsel to discovery anything and everything."  Id.  A court may issue a protective order to preclude the disclosure of information that is irrelevant and/or protected by a recognized privilege.  See id.

The Plaintiff's demands in this matter encompass material that is improper, irrelevant, and protected by the law enforcement, deliberative process and attorney client privileges.  As such, the Defendants move this court for a protective order covering four improper subjects of discovery that the Plaintiff has persisted in demanding discovery on, namely: 1) DFS's Carry Guard Investigation; 2) DFS's investigations of affinity programs unrelated to the NRA; 3) Defendants' referral of matters to other government agencies; and 4) Privileged internal

11

communications protected by the deliberative process privilege, the attorney-client privilege, and the work product doctrine.

## II. DFS'S CARRY GUARD INVESTIGATION IS NOT A PROPER SUBJECT OF DISCOVERY[1]

### A.  Documents Relating to the Investigation of the NRA Programs Are Not Legally Relevant

There are several reasons why the NRA's requests concerning DFS's investigations of Carry Guard and the other NRA endorsed program are not relevant to the instant case.  First, the NRA cannot collaterally attack the Consent Orders entered into by Chubb, Lockton, or Lloyds or the substance of any of the components of those Consent Orders.  As Judge McAvoy explained in his November 6, 2018 Decision & Order, "These agreements were plainly entered to resolve enforcement actions directed at the admittedly unlawful insurance-related conduct by Lockton and Chubb [and now Lloyds]. There is no plausible basis to conclude that Supt. Vullo signed the Consent Orders to carry out a purported plan she and Gov. Cuomo had to violate the NRA's constitutional rights, as opposed to signing these documents in her role as DFS Superintendent."  Dkt. 56 at pg. 63-64.  Further, Judge McAvoy explained that the exercise of regulatory authority in entering into the Consent Orders "does not help Plaintiff's claims because Chubb and Lockton [and now Lloyds] admitted violations of New York insurance laws."  Id. at 22.  Plaintiff's attempt to look behind the Consent Orders and obtain access to all of DFS's investigative material cannot conceivably advance any of the claims that survived Judge McAvoy's Decision & Order.

---

1 These requests include, RFPs 1-3, 5, 10, 11, 18-23, 28 and 31 to DFS; RFPs 1–3, 5, 10, and 17–22 to Ms. Vullo, and; RFPs 1–3, 5, 10, 11, 19–23 to the Governor (it should be noted that the Governor has responded that he is not in possession of documentation responsive to this demand aside from the April Press Release).

Second, the only aspect of DFS's investigation into Carry Guard and the other NRA-endorsed programs that is even remotely relevant to either the First Amendment or Selective Enforcement Claims (the only claims that survived Judge McAvoy's Decision & Order) are the actual Consent Orders executed by DFS and Lloyds, Lockton, and Chubb.  It was the issuance of these Consent Orders that – according to the NRA's First Amendment claim – somehow transformed the plain language of the Guidance Letters and press statements into threats of coercive action.  It was the issuance of these Consent Orders that the NRA argues was selective enforcement of the Insurance Law.  The Consent Orders speak for themselves as to both the substance of the orders and their effective dates..  Nothing else relating to DFS's investigations is relevant to the surviving claims in this case.

Moreover, production of the investigation files would  not satisfy the proportionality standard in Rule 26.  DFS's investigation of the NRA-endorsed affinity programs including Carry Guard began over six months before the issuance of the Guidance Letters or the Press Releases – which the Court has found to be the "critical" issue here.  This timeline precludes Plaintiff from establishing the proportionality requirement for its request for many thousands of documents.

**B.  All Documents Relating to the Investigation of the NRA Programs Are Protected by the Law Enforcement Privilege**

Additionally, all of the information in DFS's possession that relates to its investigation of the NRA endorsed programs including Carry Guard is by the law enforcement privilege.  These documents remain protected by the law enforcement privilege because they were compiled for law enforcement purposes and their disclosure would reveal law enforcement techniques and

procedures, impact the confidentiality of sources, and interfere with DFS's ongoing investigation

of the NRA.  See In re Dep't of Investigation, 856 F.2d 481, 484 (2d Cir. 1988).

> The purpose of this privilege is to prevent disclosure of law
> enforcement techniques and procedures, to preserve the
> confidentiality of sources, to protect witness and law enforcement
> personnel, to safeguard the privacy of individuals involved in an
> investigation, and otherwise to prevent interference with an
> investigation. . . . For those reasons, state and federal freedom of
> information acts protect information compiled for law enforcement
> purposes . . . and we believe the non-statutory privilege is similarly
> broad.

Id.; see also Dinler v. City of New York, 607 F.3d 923, 944 (2d Cir. 2010).

It cannot be overstated that the NRA is currently subject to the same investigation by DFS

for which they seek discovery of DFS's investigatory files.  In other words, the NRA is seeking

through its discovery demands in this lawsuit to access the entire investigatory file that relates to

the ongoing investigation of the NRA's conduct.   As noted in the Factual Background of this

memorandum, and the accompanying declaration of Matthew Levine, there is compelling

evidence that the NRA regularly violated multiple provisions of the New York Insurance Law.

These violations carry a potential penalty of either $500 or $1000 per violation, and could

subject the NRA to an aggregate penalty liability of many tens of millions of dollars.  This

aggregate exposure under the New York Insurance Law far exceeds the total revenue that the

NRA received over an eight-year period under all of its affinity group insurance policies.  The

NRA knows this as its counsel in this case is also representing the NRA in connection with the

enforcement matter pending at DFS.

Providing an investigative file to its target – mid-investigation – is a completely

inappropriate proposition that would clearly undermine the investigation.  There is no legal

support for such disclosure – and for good reason.  If the target of an investigation could obtain premature access to its investigative file by merely filing a lawsuit, litigation would flourish and the law enforcement privilege would be too easily circumnavigated.

The NRA chose to file its lawsuit when it did, and it continues to choose not to resolve its enforcement matter before DFS.  As a result of the NRA's decisions, its request for production of DFS's investigative file either in this lawsuit or any other process remains subject to the law enforcement privilege and is the proper subject for a protective order in this case.  As such, a protective order should be issued relative to these documents.

### C.  Additional Privileges Protect Many of the Documents Relating to the Investigation of the NRA Programs

Many of the documents relating to the DFS investigations of the NRA, Chubb, Lockton and Lloyds are protected by multiple additional privileges.  In general, and as set forth in the declaration of Nathaniel Dorfman, the documents responsive to these requests include: (1) documents produced to DFS by the targets of the investigation (over 75,000 pages); (2) communications between DFS and the investigation targets (hundreds of documents); (3) internal DFS memoranda and other documents, including drafts, prepared by members of the investigation team (dozens of documents); (4) internal communications between DFS employees on the investigation team, most of whom are attorneys (hundreds of documents).   ).  As discussed above, items in categories 1 and 2 are protected by the law enforcement privilege.

The items in categories in 3 and 4 are, in addition to being protected by the law enforcement privilege, protected by the attorney client privilege because they were prepared by or for the attorneys representing DFS in the course of that representation for the purpose of

providing or obtaining legal advice.  See Upjohn Co. v. United States, 449 U.S. 383, 390, 101 S.

Ct. 677, 683 (1981) ("the [attorney-client] privilege exists to protect not only the giving of

professional advice to those who can act on it but also the giving of information to the lawyer to

enable him to give sound and informed advice.").

 The items in categories in 3 and 4 are also protected by the work product doctrine because

DFS must prepare for the possibility that every investigation, if not resolved by agreement in

consent orders or otherwise or terminated by DFS, may give rise to an administrative hearing that

is subject to challenge in a proceeding under Article 78 of the New York Civil Practice Law and

Rules.   Thus, all these documents prepared by DFS are prepared in anticipation of the both the

prosecution of the administrative hearing, and in anticipation of defense of the Article 78

litigation.  See e.g., Strougo v. BEA Assocs., 199 F.R.D. 515, 521 (S.D.N.Y. 2001) ("Materials

need not be prepared solely for a litigation purpose in order to merit protection under the work-

product privilege. . . . An attorney must show merely that the documents were prepared 'with an

eye toward litigation.'") (Citation omitted); see also Horn & Hardart Co. v. Pillsbury Co., 888

F.2d 8, 12 (2d Cir. 1989) ("The work product doctrine protects an attorney's mental impressions,

opinions or legal theories concerning specific litigation from disclosure.  The district court's

denial of discovery, based on a finding that Stringer's notes contained mental impressions and

were made with an eye toward litigation, was not an abuse of discretion.") (Internal quotations

omitted).

 The items in categories in 3 and 4 are also intra-agency and inter-agency communications

protected by the deliberative process privilege because they encompass work product reflecting

advisory opinions, recommendations, and deliberations related to various governmental decisions

16

and policies that were made prior to the resolution of the matter. See e.g., ACLU v. DOD, 2017 U.S. Dist. LEXIS 159108, at *13 (S.D.N.Y. Sep. 27, 2017) ("The deliberative process privilege is a sub-species of work-product privilege that covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." Internal quotation omitted).

For all of the above reasons, a protective order should be issued as to these documents as well.

### III. DISCOVERY AS TO DFS'S INVESTIGATIONS OF AFFINITY PROGRAMS UNRELATED TO THE NRA IS IMPROPER[2]

The next subject for which the NRA has continued to improperly demand discovery is DFS's investigations of affinity programs that have absolutely no relationship to the NRA or any of its claims.  The NRA's request for documents relating to DFS investigations of affinity programs sponsored by unrelated entities is an improper request in that the NRA is seeking DFS's investigative files of entities that are not parties to this action and for conduct that has no nexus to the NRA.  In light of the improper nature of the request, the trade secret and privacy issues raised by the production of the non-privileged, responsive records, a protective order is appropriate.

The only investigation of affinity groups other than the NRA conducted by DFS since 2017 was a spin-off of the investigation of the NRA-endorsed programs including the Carry Guard program.  This spin-off investigation began after Lockton self-disclosed other violations of the Insurance Law relating to its excess lines business including affinity group insurance

---

2 These requests include, RFPs 12-14 to DFS; RFPs 11-13 and 27 to Ms. Vullo, and; RFPs 12-15 to the Governor.

17

unrelated to the NRA.  DFS completed this spin-off investigation on January 31, 2019, with the

execution of a Supplemental Consent Order with Lockton.

The only documents that DFS should be required to produce with respect to other affinity

programs are this Supplemental Consent Order—which is attached to the Levine Declaration as

Exhibit D—and any other documents that identify affinity groups policies or affinity group

sponsors that are sufficiently comparable to Carry Guard and the NRA under established

selective enforcement case law. Kamholtz v. Yates County, No. 08-CV-6210, 2008 U.S. Dist.

LEXIS 97985, *16 (W.D.N.Y. Dec. 3, 2008), aff'd, 350 F. App'x 589 (2d Cir. 2009)(holding that

the level of similarity between a plaintiff and any comparators "must be extremely high.").

There are no such affinity groups, and affinity group policies and sponsors that are not

sufficiently comparable are simply not relevant to the action.

The Supplemental Consent Order establishes that unlike the Carry Guard program and

other NRA-endorsed programs, none of the policies brokered by Lockton were specific to

firearm usage that provides liability coverage for bodily injury or property damage from use of a

firearm, or for liability coverage for bodily injury or property damage expected or intended from

the insured's standpoint to extend beyond those occasions where bodily injury results from the

use of reasonable force to protect persons or property.  Similarly, the Supplemental Consent

Orders establishes that unlike the NRA's conduct, DFS did not identify any other sponsor of an

affinity-style insurance product that committed the type and degree of unauthorized insurance

activity with respect to a Lockton insurance policy containing illegal criminal defense coverage

that was committed by the NRA with respect to Carry Guard.

In other words, DFS's investigation of Lockton concluded without identifying any other

illegal firearm coverages and without identifying any other affinity group sponsor that engaged in illegal producer activity for policies that contained any criminal defenses coverages.  Discovery should not be permitted with respect to affinity group policies or sponsors that are not comparable to the NRA and the Carry Guard program.

In addition to the aforementioned issues, a significant subset of the documents responsive to these discovery requests are protected by one or more privileges including the attorney client privilege, the attorney work product doctrine, and the deliberative process privilege.  Thus, information relating to affinity programs unrelated to, and not sufficiently comparable to, the NRA is not a proper subject of discovery in this action and the Court should issue a protective order barring Plaintiff's continued insistence on discovery related thereto.

## IV. PLAINTIFF IS NOT ENTITLED TO DISCOVERY REGARDING DEFENDANTS' REFERRAL OF MATTERS TO OTHER GOVERNMENT AGENCIES[3]

The NRA's continued insistence on discovery concerning the referral of matters to other government agencies, including (1) referrals relating to the NRA and (2) all other referrals involving any other entities, is patently improper.

First, all documents referring matters relating to the NRA to other government agencies have been produced to the Plaintiff including follow-up communications between DFS and other states' insurance regulators.

Second, the NRA's request for referral documents unrelated to the NRA is improper. DFS's enforcement division routinely refers matters to the United States Department of Justice including various United States Attorneys' Offices in New York, the District Attorney for New

_____

3 These requests include, RFPs 24, 24 (the second so numbered) and 25 to DFS; RFPs 23, 24 and 25 to Ms. Vullo,

York County, and various other district attorneys throughout the state.  None of the documents or communications related to the referral of unrelated matters can satisfy the relevance standard in Rule 26.  Furthermore, the production of any communications or documents relating to these referrals is protected by the law enforcement privilege, the deliberative process privilege, the attorney-client privilege, and the work product doctrine and may also be precluded by grand jury secrecy rules.

The Plaintiff makes a similarly improper demand of the Governor and seeks every communication between the Governor's Office and any government agency about any topic *not* related to either the NRA or any other Gun Promotion Organization.  Such information has no relevance to any of the issues raised in this case, nor is such a request proportional to the needs of this case.  "The rule of proportionality serves to protect a party against having to produce voluminous documents of questionable relevance."  Wood v. Capital One Services, 2011 WL 2154279, *3 (N.D.N.Y. 2011).  The number of topics that the Governor could have discussed with any of the State's executive agencies, or with other government, is almost infinite.

As such, the Plaintiff's insistence on demanding further discovery on this subject is inappropriate and the Court should issue a protective order on this subject.

## V.  PLAINTIFF SHOULD NOT BE PERMITTED TO SEEK DISCOVERY OF CLEARLY PRIVILEGED INTERNAL COMMUNICATIONS[4]

### A. The NRA is Unequivocally Not Entitled to Information Exchanged Between Defendants Relating to this Action

This Court has previously recognized that communications between the Governor's

---

and; RFPs 23(the second so numbered), 24 and 25 to the Governor.
4 This includes request 26 to DFS, Ms. Vullo, the Governor.

Office, as the chief executive, and subordinate executive agencies, such as DFS, are protected by the attorney-client privilege.  See e.g., Children First Foundation v. Martinez, 2007 WL 4344915, *14-15 (N.D.N.Y. 2007).  So long as the two agencies are involved in "a cooperative and common enterprise towards an identical legal strategy," the privilege will attach.  Id. at 14. When such a relationship exists any communications between staff and legal counsel at the two agencies, as it relates to the ongoing litigation, is protected.  Id. at 14-15.  This Court has specifically held that:

> [t]he Executive Chamber and state agencies are inextricably interlocked, with a few exceptions, and the nexus, whether policy or legally driven, is utterly obvious . . . The Executive Chamber and the state agencies will generally fall within the common interest doctrine and, in this respect, communications between Governor's Counsel and staff and DMV's Counsel and legal staff are absolutely and unmistakenly encompassed by this doctrine insofar as they have an inseparable and abiding common interest in ensuring that policies are both legal and constitutional.

Id. at 15 (internal citations omitted).

All of the communications and documents exchanged between the defendants in this case (and drafts thereof) that relate to the pending litigation are protected by the attorney client privilege, the work product doctrine, and the deliberative process privilege.  Plaintiff's attempt to obtain production of these materials is not a good faith discovery request, and a protective order should issue to prevent the continued attempts to seeks such discovery.

**B. Plaintiff's Demands Relating to the DFS Guidance Letters and Press Statements Improperly Seek Clearly Privileged Documents[5]**

Despite the irrelevance of the intent of the drafters of the Guidance Letters and Press

_____

5 These requests include, RFPs 29-30 to DFS, and; RFPs 25-26 to the Governor

21

Statements to its First Amendment claim, Zieper v. Metzinger, 392 F.Supp. 2d 516, 525

(S.D.N.Y. 2005), aff'd, 474 F.3d 60 (2007) ("The test is objective: whether the official's

comments 'can reasonably be interpreted as intimating that some form of punishment or adverse

regulatory action will follow the failure to accede to the official's request' to cease engaging in

protected speech.") (Citation omitted), the Plaintiff has persisted in making demands related to

pre-decisional materials that are clearly subject to the deliberative process privilege.  Plaintiff has

persisted in seeking communications between DFS personnel or between DFS personnel and

personnel in the Governor's office that relate to the development and drafting of the Guidance

Letters or the Press Release, such communications, in addition to being protected by the

deliberative process privilege, are also protected  by the attorney-client privilege and the attorney

work product doctrine.

The deliberative process privilege protects "recommendations, draft documents,

proposals, suggestions, and other subjective documents which reflect the personal opinions of the

writer rather than the policy of the agency."  Grand Central Partnership, Inc. v. Cuomo, 166 F.3d

473 (2d Cir. 1999) (internal quotation marks and citation omitted); see also National Congress

for Puerto Rican Rights v. City of New York, 194 F.R.D. 88, 92 (S.D.N.Y. 2000).  A document

is pre-decisional if it correlates to a particular agency decision, was prepared by the author to

assist the agency in reaching its decision and precedes the decision to which it relates.  See

National Congress for Puerto Rican Rights, 194 F.R.D. at 92.

The NRA fails to overcome the Deliberative Process privilege applicable to these

documents.  The declarations of Nathaniel Dorfman and Tanisha Edwards, clearly establish that

the requested documents are pre-decisional in nature.  Indeed, the request on its face seeks

material that can only be pre-decisional.  Although courts have sometimes held that the Deliberative Process privilege does not apply when an agency's deliberations are the primary issue in litigation, the objective standard that applies to the NRA's First Amendment claims is an absolute bar to the NRA's reliance on this exception to the privilege.

The First Amendment issue in this case is not how the Guidance Letters or Press Release were created, but whether they contain any threats of adverse government action.  As the Court held, "[t]he NRA's First Amendment freedom-of-speech claims turn on the allegations that Defendants issued threats to financial institutions and insurers[.]"Dkt. 56 at pg. 18.  Thus, even if the Plaintiff's assertion that by simply putting a government decision at issue the deliberative process privilege somehow vanishes was correct, nothing in the deliberative process of drafting the Guidance Letters or the Press Releases would inform whether any threats were made—they were not—by the publication of the final forms of those documents.  As such, the deliberative process privilege is properly asserted here.

Despite the clearly improper nature of the Plaintiff's demands related to these matters, the Plaintiff has persisted in demanding discovery thereon.  This persistence has made this motion necessary and the court should issue a protective order concerning these materials to prevent continued improper demands.

DFS and Executive Chamber have also asserted multiple privileges (attorney-client, work product, and deliberative process) over documents responsive to Plaintiff's other discovery requests as noted in their respective responses and supplemental responses.  Nothing herein waives any of the other-asserted privileges, which will clearly be informed by the Court's rulings on this motion and the pending motion to compel.

## Conclusion

For the reasons set forth above the Protective Order sought herein should be issued by the

Court, together with such other and further relief as the Court deems proper and necessary.

Dated: Albany, New York
February 4, 2019

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants
The Capitol
Albany, New York  12224-0341
By: s/ *William A. Scott*
William A. Scott
Assistant Attorney General, of Counsel
Bar Roll No. 512434
Telephone:  (518) 776-2255
Email: William.Scott@ag.ny.gov

TO:     Sarah Rogers, Esq.
Stephanie L. Gase, Esq.
William A. Brewer, Esq.
Brewer Attorneys & Counselors
750 Lexington Avenue, 14th Flr.
New York, NY  10022

Charles J. Cooper, Esq.
J. Joel Alicea, Esq.
Michael W. Kirk, Esq.
Cooper & Kirk, PLLC
1523 New Hampshire Ave., NW
Washington, DC  20036