UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

NATIONAL RIFLE ASSOCIATION OF AMERICA,

*Plaintiff*,

-against-

18-CV-0566

TJM/CFH

ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,

*Defendants*.

---

**DECLARATION OF MATTHEW L. LEVINE IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL AND IN SUPPORT OF DEFENDANTS' MOTION FOR A PROTECTIVE ORDER**

1. I am the Executive Deputy Superintendent for Enforcement of the New York State Department of Financial Services (the "Department"), and an attorney duly admitted to practice in the courts of the State of New York. I respectfully submit this Declaration in response to the Plaintiff's Motion to Compel filed January 22, 2019, and in support of Defendants' Motion for a Protective Order. I make this Declaration on personal knowledge, except where otherwise indicated.

2. The Department is the agency in New York responsible for enforcing the State's insurance banking, and financial services laws. See N.Y. Financial Services Law §§ 102, 301. The Department is a qualified law enforcement agency as defined in Executive Law § 835. See New York Financial Services Laws § 403.

3. In accordance with its statutory responsibilities, DFS routinely conducts examinations and investigations of insurance companies and insurance producers for violations of the New York Insurance Law and, as appropriate, imposes penalties, remediation requirements, and other consequences against those entities that violate the law.

4. Beginning in or about October 2017, the Department commenced an investigation of the sponsorship, marketing and sale of the National Riffle Association's (NRA's) "Carry Guard" insurance program in New York. The Department's investigation began after the Department received a referral concerning the Carry Guard insurance program from the New York County District Attorney's Office in September 2017.

5. On October 24, 2017, DFS served subpoenas on both the NRA and Lockton Affinity, LLC, a licensed insurance producer (and an affiliate of Lockton Cos., LLC). The Department also sent a Request for a Special Report pursuant to Insurance Law Section 308 to Chubb Ltd., an insurance company, and its subsidiary, Illinois Union. The Department's investigation

subsequently expanded to include certain underwriters of Lloyd's of London, an insurance syndicate, and also expanded to include insurance products other than the Carry Guard program ("other NRA-endorsed programs") that appeared to violate the Insurance Law.

6. At the outset of the investigation, there were three categories of entities that were the subject of the Department's investigation into the NRA's insurance programs: the insurers that issued the policies (Chubb and Lloyd's); the broker that sold the policies (Lockton), and the unlicensed entity that was illegally marketing a subset of the policies (the NRA).

7. From the beginning, there has been significant overlap concerning information provided by the entities that have been the subject of the Department's investigation. Certain information provided by Lockton was used by the Department in investigating Chubb, Lloyd's, and NRA. Certain information provided by Chubb was used by the Department in investigating Lockton and the NRA. And certain information provided by Lloyd's was used by the Department in investigating Lockton and the NRA.

8. The Department's investigation of Chubb in this matter concluded on May 7, 2018, with the execution of a Consent Order. See Exhibit A, attached.

9. The Department's investigation of Lloyd's in this matter concluded on December 20, 2018, with the execution of a Consent Order. See Exhibit B, attached.

10. The Department's investigation of Lockton in this matter resulted in its first resolution with Lockton on May 2, 2018, with the execution of a Consent Order. See Exhibit C, attached. Since May 2, 2018, Lockton remained under investigation by the Department for potentially illegal conduct in the sponsorship, marketing and sale of other affinity programs in New York State unrelated to the NRA. This additional investigation concluded on January 31, 2019, with the execution of a Supplemental Consent Order. See Exhibit D, attached.

11. The Department's investigation of the NRA is ongoing. I understand that outside counsel for the NRA in this litigation is also outside counsel for the NRA in the Department's ongoing investigation. To my knowledge, that outside counsel has never responded to the Department's invitation, made in November 2018, to discuss a possible resolution of the Department's investigation.

12. Though the Department's investigation of the NRA is not yet complete, the Department can provide the following summary of provisions of the New York Insurance Law that have been violated by the NRA in connection with the Carry Guard and other NRA-endorsed programs.

13. From approximately April 1, 2017 through November 17, 2017, the NRA offered an insurance program in New York and elsewhere called "Carry Guard." During that time, the NRA's website described the program as follows:

> NRA Carry Guard is a two-pronged program. It was created to provide dynamic, state-of-the-art insurance protection to those who legally defend themselves with a firearm, and to offer an elite, one-stop training option. The insurance provides a cutting-edge set of features that will help gun owners mitigate the potentially costly financial and legal consequences flowing from armed encounters, even if they did everything right.

14. The NRA website further described the Carry Guard Program as "the only membership carry program developed and supported by the National Rifle Association, the most powerful civil rights organization in American history." The website further stated that Carry Guard was "created by the NRA."

15. Additional promotional materials disseminated by the NRA stated:

> Why do I need Carry Guard? Although millions of Americans are prepared to use a firearm in self-defense, very few families can withstand the financial consequences that may come next. The legal fees to clear your good name could be enormous. Likewise, the costs of defending and potentially losing a civil lawsuit could cripple your finances for the rest of your life. And many homeowners' policies have severe limitations or exclusions related to intentional acts such as self-defense.

These materials stated at the bottom of the page: "NRA CARRY GUARD™ Insurance Program Administered by Lockton Affinity, LLC • D/B/A/ Lockton Affinity Insurance Brokers, LLC."

16. Pursuant to written agreements with Chubb and the NRA, Lockton served as the administrator for the Carry Guard Program, carrying out such functions as marketing the insurance, binding the insurance, collecting and distributing premiums, and delivering policies to insureds.

17. Pursuant to written agreements with Lockton, Chubb served as the underwriter for the Carry Guard Program, providing insurance policies to individuals who purchased the Carry Guard insurance. According to the marketing and promotion website for the Carry Guard Program, www.nracarryguard.com, the Carry Guard Program "is backed by insurance leader Chubb" and is underwritten by a group within Chubb, "the world's largest publicly traded property and casualty insurance company."

18. The NRA directly managed the membership aspect of the Carry Guard Program. The NRA and Lockton placed these insurance policies through New York's excess line market.

19. An "authorized" insurer is an insurance company that has received a license from the Department to provide specified types of insurance to customers in New York. Authorized insurers are fully regulated by the Department in order to ensure solvency and adherence to consumer protection standards.

20. Excess line insurers are not licensed or authorized by the Department, but are permitted to do business in New York through an excess line broker. Unless another exemption applies, an insurance policy may be procured from an excess line insurer only after an excess line broker has obtained declinations of coverage from three authorized insurers.

21. The Carry Guard program as well as other NRA-endorsed programs violated numerous provision of the New York Insurance Law. First, and foremost, the Carry Guard insurance program, as underwritten by Chubb and administered, solicited and marketed by Lockton Affinity, provided insurance coverage that may not be offered in the New York State excess line market, specifically: (a) defense coverage in a criminal proceeding that is not permitted by law; (b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property; and (c) coverage for expenses incurred by the insured for psychological counseling support.

22. In addition to regulating the conduct of insurance companies, the New York Insurance Law also governs the conduct of insurance producers (known as "brokers").

23. For example, Section 2102(a)(1)(A) of the Insurance Law provides that no person, firm, association or corporation shall act as an insurance producer in this state without having authority to do so by virtue of a license issued and in force pursuant to the provisions of the Insurance Law.

24. Section 2102(a)(1)(B) of the Insurance Law provides that (except for circumstances inapplicable here), no person, firm, association or corporation shall act as an excess line broker in this state without having authority to do so by virtue of a license issued and in force pursuant to Section 2105 of the Insurance Law.

25. Section 2117 of the Insurance Law provides that no person shall in New York state act as agent for any insurer which is not licensed or authorized to do an insurance business in New York State, in the doing of any insurance business in New York State or in soliciting, negotiating or effectuating any insurance or shall in New York State act as insurance broker in soliciting,

negotiating or in any way effectuating any insurance, or in placing risks with, any such insurer, or shall in New York state in any way or manner aid any such insurer in effecting any insurance.

26. Section 2122(a)(1) of the Insurance Law provides that no insurance producer shall make or issue in New York state any advertisement, sign, pamphlet, circular, card or other public announcement purporting to make known the financial condition of any insurer, unless the same shall conform to the requirements of Section 1313 of the Insurance Law.

27. Section 2122(a)(2) of the Insurance Law provides that no insurance producer or other person, shall, by any advertisement or public announcement in this state, call attention to any unauthorized insurer or insurers.

28. Section 2324(a) of the Insurance Law provides that no authorized insurer, no licensed insurance agent, no licensed insurance broker, and no employee or other representative of any such insurer, agent or broker shall make, procure or negotiate any contract of insurance other than as plainly expressed in the policy or other written contract issued or to be issued as evidence thereof, or shall directly or indirectly, by giving or sharing a commission or in any manner whatsoever, pay or allow or offer to pay or allow to the insured or to any employee of the insured, either as an inducement to the making of insurance or after insurance has been effected, any rebate from the premium which is specified in the policy, or any special favor or advantage in the dividends or other benefit to accrue thereon, or shall give or offer to give any valuable consideration or inducement of any kind, directly or indirectly, which is not specified in such policy or contract, other than any valuable consideration, including but not limited to merchandise or periodical subscriptions, not exceeding twenty-five dollars in value, or shall give, sell or purchase, or offer to give, sell or purchase, as an inducement to the making of such insurance or in connection therewith, any stock, bond or other securities or any dividends or

profits accrued thereon, nor shall the insured, his agent or representative knowingly receive directly or indirectly, any such rebate or special favor or advantage, provided, however, a licensed insurance agent or a licensed insurance broker may retain the usual commission or underwriting fee on insurance placed on his own property or risks, if the aggregate of such commissions or underwriting fees will not exceed five percent of the total net commissions or underwriting fees received by such licensed insurance agent or insurance broker during the calendar year.

29. Although it did not possess an insurance producer license from the Department during the relevant period, the NRA nonetheless engaged in the marketing of and solicitation for the Carry Guard Program and violated each of these provisions. For example (and without limitation), the evidence developed in the Department's investigation demonstrates that:

a. The NRA broadcasted NRA-produced videos promoting the Carry Guard Program on YouTube;

b. The NRA solicited participation in the Carry Guard Program through mass e-mail marketing, direct mail, banner ads, and articles in NRA publications;

c. The NRA heavily promoted the Carry Guard Program at its 2017 "Carry Guard Expo" and its annual meetings;

d. The NRA operated the website "www.nracarryguard.com," which was a marketing portal for the Carry Guard Program and linked to a website operated by Lockton Affinity (www.lockton.nracarryguard.com), which provided additional information about the Carry Guard Program;

e. The NRA promoted Carry Guard insurance on its main website, www.nra.org, which, among other things, featured an NRA spokesperson making claims such

as, "We're proud to have developed the one carry membership program that stands above all others – NRA Carry Guard"; and "I will never carry a gun without carrying this."; and

f. "Pop-up" internet advertising for the Carry Guard Program featured one or more NRA spokespersons.

30. Additionally, evidence developed by the Department shows that the Carry Guard Program unlawfully tied the provision of insurance to NRA membership. When purchasing Carry Guard insurance, members would also receive one year of free NRA membership, which had a market value of at least $40. The NRA membership benefit was not specified in the insurance policy. In the event the purchaser was already an NRA member, the Carry Guard Program allowed the member to carry a credit for a one-year membership forward, or allowed a transfer of the credit to a family member for use in purchasing an NRA membership.

31. Between approximately April and November 2017, 680 Carry Guard insurance policies were issued to New York residents. And between approximately January 2010 and March 2018, 28,015 insurance policies were issued under the other NRA-endorsed programs to individuals and businesses whose home state is New York.

32. Under written agreements between Lockton and the NRA, the NRA received royalties in the approximate amount of $21,198 for the time period April through November 2017, an amount that was impermissibly based on a percentage of the actual premiums collected by Lockton under the Carry Guard program. Similarly, under written agreements between Lockton and the NRA, the NRA received approximately $1,872,737 in royalties, administrative fees and profit-sharing distributions under the other NRA-endorsed programs for the period January 2000

through March 2018, an amount that was impermissibly based, in part, on a percentage of actual premiums collected by Lockton.

33. Certain of the aforementioned conduct demonstrates that on multiple occasions during the time period April 1, 2017 through November 17, 2017, the NRA acted as an unlicensed insurance producer with respect to the Carry Guard Program, in violation of Insurance Law § 2102.

34. Certain of the aforementioned conduct demonstrates that on multiple occasions during the time period April 1, 2017 through November 17, 2017, the NRA aided an unauthorized insurer by marketing, soliciting, selling, administering, and facilitating the provision of impermissible excess line policies, thus aiding Chubb in underwriting unlawful insurance that provided coverage for, *inter alia,* criminal defense and intentional conduct, in violation of Insurance Law § 2117.

35. Certain of the aforementioned conduct demonstrates that on multiple occasions during the time period April 1, 2017 through November 17, 2017, the NRA received compensation from Lockton based on a percentage of insurance premiums generated, in violation of Insurance Law § 2324(a).

36. Certain of the aforementioned conduct demonstrates that on multiple occasions during the time period April 1, 2017 through November 17, 2017, the NRA provided free NRA membership when a member purchased Carry Guard insurance, therefore impermissibly tying insurance to NRA membership, in violation of Insurance Law § 2324(a).

37. Certain of the aforementioned conduct demonstrates that on multiple occasions during the time period April 1, 2017 through November 17, 2017, the NRA advertised the financial

condition of an unauthorized insurer by referring to the unauthorized insurer's A.M. Best rating, in violation of Insurance Law § 2122(a).

38. Certain of the aforementioned conduct demonstrates that on multiple occasions during the time period April 1, 2017 through November 17, 2017, the NRA advertised the financial condition of an unauthorized insurer by calling attention to unauthorized insurers in advertisements and public announcements, in violation of Insurance Law § 2122(a).

39. In general, documents responsive to the Plaintiff's document requests issued to DFS and Superintendent Vullo appear to include: (1) documents produced to the Department by Lockton, Chubb, the Lloyd's Underwriters and the NRA (of which I understand there are over 75,000 pages); (2) communications between the Department and Lockton, Chubb, the Lloyd's Underwriters and the NRA (of which I understand there are hundreds of documents); (3) internal memoranda and other documents of the Department, including, without limitation, drafts, that were prepared by members of the Department's investigative team (of which I understand there are dozens of documents); and (4) internal communications between the Department's employees on the investigation team, most of whom are attorneys (of which I understand there are hundreds of documents).

40. The penalty for each violation of the Insurance Law may equal (and some cases exceed) $500. In the event that the NRA is determined, after an administrative hearing, to be liable for the conduct outlined above, the aggregate penalty exposure for the NRA could well exceed $10 million– an amount that appears to well exceed by multiples the revenue that the NRA received from the Carry Guard and other endorsed insurance programs offered in New York.

41. As the NRA remains under active investigation by the Department for conduct that is clearly related to the acts and omissions giving rise to the Chubb Consent Order, the first

Lockton Consent Order, and the Lloyd's Consent Order, the NRA should not be permitted to have access to any of these documents. These documents were compiled for law enforcement purposes and their disclosure would reveal law enforcement techniques and procedures, might impact the confidentiality of sources, and would interfere with DFS's ongoing investigation of the NRA.

42. Second, based on my participation in this investigation, all of the internal DFS memoranda and other documents, including drafts, prepared by members of the Enforcement Division's investigation team, and the internal communications between DFS employees on the Enforcement Division's investigation team, most of whom are attorneys, (1) were prepared by or for the attorneys representing the Department in the course of that representation for the purpose of providing or obtaining legal advice; and/or (2) were prepared as part of an investigation and in anticipation of the both the prosecution of the administrative hearing relating to the investigation and in anticipation of defense of any Article 78 litigation challenging any order issued as part of the hearing; and/or (3) encompass work product reflecting advisory opinions, recommendations, and deliberations related to various governmental decisions and policies that were made prior to the resolution of the matter.

43. As noted in Paragraph 10 above, on January 31, 2019, the Department completed its investigation of Lockton for conduct unrelated to the NRA-endorsed programs. Pursuant to the Supplemental Consent Order between the Department and Lockton, Lockton admitted to multiple violations of the insurance law with respect to these other policies, agreed to pay a penalty of $400,000, and further agreed to continue Lockton's remediation obligations agreed to as part of its original consent order.

44. Unlike the May 2, 2018 Consent Order between the Department and Lockton which addressed the Carry Guard program, none of the policies covered by this Supplemental Consent Order, identified by Lockton to the Department, were specific to firearm usage that provides liability coverage for bodily injury or property damage from use of a firearm, or for liability coverage for bodily injury or property damage expected or intended from the insured's standpoint to extend beyond those occasions where bodily injury results from the use of reasonable force to protect persons or property.

45. At the time the Supplemental Consent Order was executed, the Department was not aware of any other sponsor, of an affinity-style insurance product brokered by Lockton, that committed the type and degree of unauthorized insurance activity with respect to an insurance policy containing illegal criminal defense coverage that was committed by the NRA with respect to Carry Guard. Nonetheless, the Supplemental Consent Order provides that if the Department makes a determination that any sponsor of an affinity group illegally marketed an affinity-type policy sold or underwritten by Lockton that includes illegal criminal defense coverage, then "Lockton will not enter into any agreement or program with the sponsor to sell, underwrite, or otherwise participate in any affinity-type insurance program involving any line of insurance to be issued or delivered in New York State." See Lockton Supplemental Consent Order (Exhibit D), at ¶ 12.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York this 4th day of February, 2019.

[signature]

Matthew L. Levine