UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NATIONAL     RIFLE     ASSOCIATION     OF
AMERICA,

                                        *Plaintiff*,


                    -against-


ANDREW CUOMO, both individually and in his          18-cv-00566 (TJM/CFH)
official capacity; MARIA T. VULLO, both
individually and in her official capacity; and THE
NEW  YORK  STATE  DEPARTMENT  OF
FINANCIAL SERVICES,.

                                        *Defendants*.



**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO
COMPEL**

                              LETITIA JAMES
                              Attorney General of the State of New York
                              Attorney for Defendants
                              The Capitol
                              Albany, New York 12224-0341

William A. Scott
Assistant Attorney General, of Counsel
Bar Roll No. 512434
Telephone:  (518) 776-2255
Fax:  (518) 915-7740 (Not for service of papers)          Date: February 4, 2019

# Table of Contents

Preliminary Statement .................................................................................................... 1

Factual Background ........................................................................................................ 3

ARGUMENT ................................................................................................................ 11

**I.  Plaintiff's Discovery Demands Relating to the DFS's Carry Guard Investigation Exclusively Seek Legally Irrelevant AND Privileged Documents** ...................................... 11

    A.  Documents Relating to the Investigation of the NRA Programs Are Not Legally Relevant ............................................................................................................................. 11

    B.  All Documents Relating to the Investigation of the NRA Programs Are Protected by the Law Enforcement Privilege.............................................................................................. 13

    C.  Additional Privileges Protect Many of the Documents Relating to the Investigation of the NRA Programs.............................................................................................................. 14

    D.  A Privilege Log or Formal Assertion of a Privilege is Not Yet Required ...................... 16

**II. Plaintiff's Discovery Demands Relating to the DFS Guidance Letters and Press Statements Exclusively Seek Legally Irrelevant AND Privileged Documents** .................. 18

**III. Plaintiff's Discovery Demands Relating to Other Affinity Programs Seeks Legally Irrelevant Material** .......................................................................................................... 20

**IV.  Complete Responses Have Been Provided to the NRA's Requests Concerning Defendants' Communications with Financial Institutions or Insurers Related to their Business Relationships with the NRA or Other Gun Promotion Organizations** .............. 22

**V.  Complete Responses Have Been Provided to the NRA's Requests Concerning Adverse or Enforcement Actions Against Financial Institutions with Business Arrangements with the NRA and Other Gun Promotion Organizations**......................... 22

**VI.  The NRA is Unequivocally Not Entitled to Information Exchanged Between Defendants Relating to this Action**................................................................................... 23

**VII.  The NRA's Requests Concerning Defendants' Referral of Matters to Other Government Agencies** ..................................................................................................... 24

**VIII.  Plaintiff is Not Entitled to an Award of Attorneys' Fees** ......................................... 24

Conclusion ........................................................................................................................ 25

## **Table of Authorities**

Cases

ACLU v. DOD, 2017 U.S. Dist. LEXIS 159108 (S.D.N.Y. Sep. 27, 2017)................................ 16

Children First Foundation v. Martinez, 2007 WL 4344915 (N.D.N.Y. 2007) ............................ 23

Dinler v. City of New York, 607 F.3d 923 (2d Cir. 2010)............................................................ 13

Franco v. Yale University, 80 Fed. Appx. 707 (2d Cir. 2003)..................................................... 16

Grand Central Partnership, Inc. v. Cuomo, 166 F.3d 473 (2d Cir. 1999)................................... 19

Horn & Hardart Co. v. Pillsbury Co., 888 F.2d 8 (2d Cir. 1989) ................................................ 15

In re Dep't of Investigation, 856 F.2d 481 (2d Cir. 1988)........................................................... 13

Kamholtz v. Yates County, No. 08-CV-6210, 2008 U.S. Dist. LEXIS 97985 (W.D.N.Y. Dec. 3, 2008) ...................................................................................................................................... 21

Members Services, Inc. v. Security Mut. Life Ins., 2007 WL 2907520 (N.D.N.Y. 2007) ........... 11

National Congress for Puerto Rican Rights v. City of New York, 194 F.R.D. 88 (S.D.N.Y. 2000) .................................................................................................................................................. 19

Neogenix Oncology, Inc. v. Gordon, 2017 WL 1207558 (E.D.N.Y. 2017) ................................. 11

Securities and Exchange Commission v. McGinn, 2011 WL 13136028 (N.D.N.Y. 2011) ......... 17

Strougo v. BEA Assocs., 199 F.R.D. 515 (S.D.N.Y. 2001) ....................................................... 15

Upjohn Co. v. United States, 449 U.S. 383 (1981)..................................................................... 15

Zanowic v. Reno, 2000 WL 1376251 (S.D.N.Y. 2000) .............................................................. 11

Zieper v. Metzinger, 392 F.Supp. 2d 516 (S.D.N.Y. 2005)........................................................ 18

Statutes

N.Y. Fin. Servs. Laws § 102 ......................................................................................................... 3

N.Y. Fin. Servs. Laws § 403 ......................................................................................................... 3

N.Y. Fin. Servs. Laws §301 .......................................................................................................... 3

Rules

F.R.C.P. 26(b)(5)(A) ................................................................................................................... 17

F.R.C.P. 37(5)(A)(iii)................................................................................................................... 25

F.R.C.P. 37(5)(B)........................................................................................................................ 24

**Preliminary Statement**

For the past 15 months, the NRA has been the target of a DFS investigation relating to illegal insurance programs that they were sponsoring in New York State.  The other targets of the investigation – Lockton, Chubb, and Lloyds – have admitted to and resolved their misconduct before DFS.  The NRA has not.

Rather, the NRA seeks the compelled disclosure of DFS's investigatory files relating to the NRA's misconduct.  Even if the DFS's investigation were over, the NRA would not be entitled to the production of this information.  The compelled production of the investigation file **during** the actual investigation is an improper request that undermines the law enforcement privilege and does so without any legal justification.

The NRA's attempt to compel the production of investigatory files unrelated to the NRA is similarly abusive.  To date, DFS has not uncovered any evidence of any other insurance policy brokered by Lockton or issued by Lloyds or Chubb that provided coverage specific to firearm usage for bodily injury or property damage from use of a firearm, or for liability coverage for bodily injury or property damage expected or intended from the insured's standpoint to extend beyond those occasions where bodily injury results from the use of reasonable force to protect persons or property.  In other words, the Carry Guard program and other NRA criminal defense coverages specific to the use of a firearm are unique.

DFS still has not identified any other sponsor of an affinity-style insurance product brokered by Lockton that committed the type and degree of unauthorized insurance activity with respect to an insurance policy containing illegal criminal defense coverage that was committed by the NRA with respect to Carry Guard.  In other words, the NRA stands alone.  As a result,

1

there are no comparable insurance policies, affinity groups or affinity group sponsors that are even remotely comparable to the NRA and the NRA's Carry Guard program.  The NRA's attempt to obtain document discovery over investigative matters that cannot support any claim – especially one that is subject to a pending motion to dismiss – is improper.

As detailed in this memorandum, there are multiple additional deficiencies in the NRA's document discovery requests that make the requests improper.  This includes  the NRA's improper attempt to obtain documents that are  subject to a claim of privilege.   While the NRA characterizes its demands as "targeted discovery," even a cursory review of the demands reveals that they are, at a minimum, overbroad and not reasonably calculated to lead to the production of discoverable material, nor are they proportional to the discovery needs of this matter. [1]

As noted in the NRA's motion papers, the parties did confer in an effort to resolve this dispute.  It became apparent during those consultations, however, that the NRA not only had no intention of withdrawing its improper demands, but that the demands were intended to be even broader than phrased.  Despite the improper nature of the demands, the Defendants provided the Plaintiff with good faith responses and, notwithstanding their objections, produced non-privileged documents to NRA and advised the NRA if there were no documents responsive to a specific request.

This case survived the Defendants' motion to dismiss only because of the Plaintiff's baseless allegations that there were "backroom exhortations" communications between the DFS and "financial institutions" that related to the NRA.  DFS has responded to the NRA's discovery

---

[1] To the extent that the Plaintiff appears to challenge the form in which documents were produced, particularly as it relates to metadata, the parties are still in the process of finalizing an agreement regarding electronic discovery, which would, presumptively, resolve this issue.

requests on this issue and has advised the NRA that there were no such exhortations between DFS and any financial institution that related in any way to the NRA.  Other than the Guidance Letters and the enforcement actions against Chubb, Lockton, and Lloyds which resulted in publicly-available consent orders, DFS has not had any discussions with any financial institutions that related to the NRA.

The Defendants have responded to all proper discovery demands made by the Plaintiff. All responsive documents have been produced or the Defendants have advised the Plaintiffs that it has no responsive documents to produce.  Thus, for the reasons set forth in this memorandum, Defendants' responses to the Plaintiff's demands were proper and the Plaintiff's motion should be denied in its entirety.

## **Factual Background**

1.     <u>DFS's Investigation of the NRA is Ongoing</u>

DFS is the agency in New York responsible for enforcing the State's insurance and banking laws.  <u>See</u> N.Y. Fin. Servs. Laws §§ 102, 301.  DFS is also a qualified law enforcement agency as defined in Executive Law section 835.  <u>See</u> N.Y. Fin. Servs. Laws § 403.  In accordance with these statutory law enforcement responsibilities, DFS routinely conducts examinations and investigations of insurers and insurance producers for violations of the N.Y. Insurance Law and, as appropriate, imposes penalties against those entities that violate the law.

Beginning in October 2017, DFS commenced an investigation of the illegal marketing and sale of the NRA's Carry Guard insurance program in New York.  The investigation began after DFS received a referral from the New York County District Attorney's Office.  On October 24, 2017, DFS issued subpoenas to both the NRA and Lockton (an insurance producer) and

issued a demand letter to Chubb (an insurer) pursuant to Section 308 of the Insurance Law.  The

investigation was subsequently expanded to include certain affiliates of Lloyds (another insurer)

and was further expanded to include insurance products other than the Carry Guard program

("other NRA-endorsed programs") that were being illegally marketed and sold in New York.

There were three categories of targets of DFS's investigation into the NRA's insurance

programs: the insurers that issued the policies (Chubb and Lloyds); the broker that sold the

policies (Lockton), and the unlicensed entity that was illegally marketing a subset of the policies

(the NRA).  From the outset, there has been significant overlap across the targets of the

investigation.  DFS used the information provided by Lockton  in investigating Chubb, Lloyds,

and NRA.  Similarly, DFS used the information provided by Chubb in investigating Lockton and

the NRA.  Additionally, the information provided by Lloyds was used by DFS in investigating

the NRA.  This overlap is not surprising given that the focal point of the investigation – the

NRA's Carry Guard program and other criminal defense policies that included coverage for

firearm uses – gave rise to the Insurance Law violations committed by each of the targets.

The DFS's investigation of Chubb concluded on May 7, 2018, with the execution of a

Consent Order.  <u>See</u> Levine Dec. Ex. A.  The DFS investigation of Lloyds concluded on

December 20, 2018, with the execution of a Consent Order.  <u>See</u> Levine Dec. Ex. B.  10.  The

investigation of Lockton was partially concluded on May 2, 2018, with the execution of a

Consent Order.  <u>See</u> Levine Dec. Ex. C.  Lockton remained under investigation by DFS for the

illegal marketing and sale of other affinity programs in New York that were unrelated to the

NRA.  This follow-on investigation concluded on January 31, 2019, with the execution of a

Supplemental Consent Order.   <u>See</u> Levine Dec. Ex. D.

DFS's investigation of the NRA is active and ongoing.  Unlike the investigations of Chubb, Lockton, and Lloyds, the investigation of the NRA does not currently appear headed toward resolution by consent order.  Counsel for the NRA in this case is also counsel for the NRA in the pending DFS investigation, and has not responded to DFS's invitation to discuss the resolution of the investigation by consent order.  Though the investigation is not complete, DFS has provided a summary of the NRA's violation of multiple provisions of the New York Insurance Law in connection with the Carry Guard and other NRA-endorsed programs, through the accompanying declaration of Matthew Levine.

From approximately April 1, 2017 through November 17, 2017, the NRA offered an insurance program in New York and elsewhere called "Carry Guard."  During that time, the NRA's website described the program as follows:

> NRA Carry Guard is a two-pronged program.  It was created to provide dynamic, state-of-the-art insurance protection to those who legally defend themselves with a firearm, and to offer an elite, one-stop training option.  The insurance provides a cutting-edge set of features that will help gun owners mitigate the potentially costly financial and legal consequences flowing from armed encounters, even if they did everything right.

Pursuant to written agreements with Chubb and the NRA, Lockton served as the administrator for the Carry Guard Program, carrying out such functions as marketing the insurance, binding the insurance, collecting and distributing premiums, and delivering policies to insureds.  Pursuant to written agreements with Lockton, Chubb served as the underwriter for the Carry Guard Program, providing insurance policies to individuals who purchased the Carry Guard insurance.

The NRA directly managed the membership aspect of the Carry Guard Program.  The

NRA and Lockton placed these insurance policies through New York's excess line market.  An "authorized" insurer is an insurance company that has received a license from DFS to provide specified types of insurance to customers in New York.  Authorized insurers are fully regulated by DFS in order to ensure solvency and adherence to consumer protection standards. Excess line insurers are not licensed or authorized by DFS, but are permitted to do business in New York through an excess line broker.   Unless another exemption applies, an insurance policy may be procured from an excess line insurer only after an excess line broker has obtained declinations of coverage from three authorized insurers.

The Carry Guard program as well as other NRA-endorsed programs violated numerous provision of the New York Insurance Law.  First, and foremost, the Carry Guard insurance program, as underwritten by Chubb and administered, solicited and marketed by Lockton Affinity, provided insurance coverage that may not be offered in the New York State excess line market, specifically: (a) defense coverage in a criminal proceeding that is not permitted by law; (b) liability coverage for bodily injury or property damage expected or intended from the insured's standpoint in an insurance policy limited to use of firearms and that was beyond the use of reasonable force to protect persons or property; and (c) coverage for expenses incurred by the insured for psychological counseling support.   A complete listing of the legal deficiencies in the Carry Guard Program and the other NRA-endorsed programs is set forth in Exhibits A, B and C to the Levine Declaration.

In addition to regulating the conduct of insurers and insurance policies, the New York Insurance Law also closely regulates the conduct of insurance producers, as explained in the Levine Declaration.  Although it did not possess an insurance producer license from DFS during

6

the relevant period, the NRA nonetheless engaged in the marketing of and solicitation for the Carry Guard Program and violated various provisions of the Insurance Law governing conduct of insurance producers in New York as detailed in the Levine Declaration.

Additionally, evidence developed by DFS shows that the Carry Guard Program illegally tied the provision of insurance to NRA membership.  When purchasing Carry Guard insurance, members would also receive one year of free NRA membership, which had a market value of at least $40.  The NRA membership benefit was not specified in the insurance policy.

Between approximately April and November 2017, 680 Carry Guard insurance policies were issued to New York residents.  Between approximately January 2010 and March 2018, 28,015 insurance policies were issued under the other NRA-endorsed programs to individuals and businesses whose home state is New York.  Under written agreements between Lockton and the NRA, the NRA received royalties in the approximate amount of $21,198, an amount impermissibly based on a percentage of the actual premiums collected by Lockton under the Carry Guard program.  Similarly, under written agreements between Lockton and the NRA, the NRA received approximately $1,872,737 in royalties, administrative fees and profit-sharing distributions under the other NRA-endorsed programs for the period January 2000 through March 2018, an amount that was impermissibly based, in part, on a percentage of actual premiums collected by Lockton.

The NRA's conduct with respect to the Carry Guard program likely establishes that on multiple occasions during the time period April 1, 2017 through November 17, 2017: (1)  the NRA acted as an unlicensed insurance producer with respect to the Carry Guard Program, in violation of Insurance Law § 2102;   (2)  the NRA aided an unauthorized insurer by marketing,

soliciting, selling, administering, and facilitating the provision of impermissible excess line policies, thus aiding Chubb in underwriting unlawful insurance that provided coverage for, inter alia, criminal defense and intentional conduct, in violation of Insurance Law § 2117; (3) the NRA received compensation from Lockton based on a percentage of insurance premiums generated, in violation of Insurance Law § 2324(a); (4) the NRA provided free NRA membership when a member purchased Carry Guard insurance, therefore impermissibly tying insurance to NRA membership, in violation of Insurance Law § 2324(a); (5) the NRA advertised the financial condition of an unauthorized insurer by referring to the unauthorized insurer's A.M. Best rating, in violation of Insurance Law § 2122(a); (6) the NRA advertised the financial condition of an unauthorized insurer by calling attention to unauthorized insurers in advertisements and public announcements, in violation of Insurance Law § 2122(a).

In light of the NRA's failure to negotiate a resolution of its misconduct, it is likely that once the investigation is concluded, DFS will need to issue a Notice of Charges to the NRA and proceed to an administrative hearing to address the NRA's misconduct.  In the event that the NRA is the recipient of an adverse order after that hearing, it will have an opportunity to file an Article 78 proceeding in New York courts challenging the order.

2.    DFS's Investigation of Lockton

The consent order executed by DFS and Lockton on May 2, 2018, required Lockton to conduct a compliance review and take all remediation necessary to resolve any other violations of the New York Insurance law that related to its affinity-group and other excess lines business in New York.  Levine Dec. Ex. C at paras. 8 and 9.  Lockton has completed its obligations under this agreement and executed a Supplemental Consent Order with DFS on January 31, 2019.

Pursuant to the Supplemental Consent Order, Lockton admitted to multiple violations of the Insurance Law with respect to these other policies, agreed to pay a penalty of $400,000, and further agreed to continue the company's remediation obligations agreed to as part of its original consent order.

Unlike the May 2, 2018 Consent Order between DFS and Lockton which addressed the Carry Guard program, none of the policies covered by this Supplemental Consent Order were specific to firearm usage that provides liability coverage for bodily injury or property damage from use of a firearm, or for liability coverage for bodily injury or property damage expected or intended from the insured's standpoint to extend beyond those occasions where bodily injury results from the use of reasonable force to protect persons or property.  In other words, the NRA's Carry Guard program was the only firearm usage policy that Lockton was involved in.

Moreover, at the time the Supplemental Consent Order was executed and continuing to the present day, DFS has not identified any other sponsor of an affinity-style insurance product that committed the type and degree of unauthorized insurance activity with respect to a Lockton insurance policy containing illegal criminal defense coverage that was committed by the NRA with respect to Carry Guard.  In other words, the NRA's illegal producer activity with respect to the Carry Guard program stands alone.

       3.     <u>The NRA's Discovery Demands</u>

The undersigned counsel conferred on multiple occasions with counsel for NRA regarding the discovery demands in dispute, and their inappropriate nature.  Defendants provided both initial and supplemental discovery responses addressing the NRA's concerns.  During these telephone calls, counsel for the NRA expanded the scope of the requests yet, without failure,

have failed to address any of the concerns outline in the Defendants' January 11, 2019 letter to the Court, in this memorandum, or in the Defendants' accompanying cross-motion for a protective order.

<u>**ARGUMENT**</u>

**I.  Plaintiff's Discovery Demands Relating to the DFS's Carry Guard Investigation Exclusively Seek Legally Irrelevant AND Privileged Documents[2]**

**A.  Documents Relating to the Investigation of the NRA Programs Are Not Legally Relevant**

A party seeking to compel discovery has the initial burden of establishing the relevancy of the documents sought.  <u>See e.g.</u>, <u>Zanowic v. Reno</u>, 2000 WL 1376251, *6 (S.D.N.Y. 2000).  In order to meet this burden, the moving party must "demonstrate at least the possibility of a nexus between the information sought and the claims or defenses of a party."  <u>Members Services, Inc. v. Security Mut. Life Ins.</u>, 2007 WL 2907520, *4 (N.D.N.Y. 2007). The party seeking discovery must establish that the documents sought are "both relevant and proportional in accordance with Rule 26's over-arching relevancy requirement."  <u>Neogenix Oncology, Inc. v. Gordon</u>, 2017 WL 1207558, *10 (E.D.N.Y. 2017).

There are several reasons why the NRA's requests concerning DFS's investigations of Carry Guard and the other NRA endorsed program cannot satisfy this standard.   First, the NRA cannot collaterally attack the consent orders entered into by Chubb, Lockton, or Lloyds or the substance of any of the components of those consent orders.  As Judge McAvoy explained in his November 6, 2018 Decision & Order, "These agreements were plainly entered to resolve enforcement actions directed at the admittedly unlawful insurance-related conduct by Lockton and Chubb. There is no plausible basis to conclude that Supt. Vullo signed the Consent Orders to

---

2 These requests include, RFPs 1-3, 5, 10, 11, 18-23, 28 and 31 to DFS; RFPs 1–3, 5, 10, and 17–22 to Ms. Vullo, and; RFPs 1–3, 5, 10, 11, 19–23 to the Governor (it should be noted that the Governor has responded that he is not

carry out a purported plan she and Gov. Cuomo had to violate the NRA's constitutional rights, as opposed to signing these documents in her role as DFS Superintendent."  Dkt. 56 at pg. 63-64. Further, Judge McAvoy explained that the exercise of regulatory authority in entering into the Consent Orders "does not help Plaintiff's claims because Chubb and Lockton [and now Lloyds] admitted violations of New York Insurance Laws."  Id. at 22.  Plaintiffs attempt to look behind the consent orders and obtain access to all of DFS's investigative material cannot conceivably advance any of the claims that survived Judge McAvoy's Decision & Order.

Second, the only aspect of DFS's investigation into Carry Guard and the other NRA-endorsed programs that is even remotely relevant to either the First Amendment or Selective Enforcement Claims (the only claims that survived Judge McAvoy's Decision & Order) are the actual Consent Orders executed by DFS and Lloyds, Lockton, and Chubb.  It was the issuance of these Consent Orders that – according to the NRA's First Amendment claim – somehow transformed the plain language of the Guidance Letters and press statements into threats of coercive action.  It was the issuance of these Consent Orders that the NRA argues was selective enforcement of the Insurance Law.  The Consent Orders speak for themselves as to both the substance of the orders and their effective dates..  Nothing else relating to DFS's investigations is relevant to the surviving claims in this case.

Moreover, production of the investigation files would  not satisfy the proportionality standard in Rule 26.  DFS's investigation of the NRA-endorsed affinity programs including Carry Guard began over six months before the issuance of the Guidance Letters or the Press Releases – which the Court has found to be the "critical" issue here.  This timeline precludes

---

in possession of documentation responsive to this demand aside from the April Press Release).

Plaintiff from establishing the proportionality requirement for its request for many thousands of documents.

## B.  All Documents Relating to the Investigation of the NRA Programs Are Protected by the Law Enforcement Privilege

Additionally, all of the information in DFS's possession that relates to its investigation of the NRA endorsed programs including Carry Guard is by the law enforcement privilege.  These documents remain protected by the law enforcement privilege because they were compiled for law enforcement purposes and their disclosure would reveal law enforcement techniques and procedures, impact the confidentiality of sources, and interfere with DFS's ongoing investigation of the NRA.  See In re Dep't of Investigation, 856 F.2d 481, 484 (2d Cir. 1988).

> The purpose of this privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation. . . . For those reasons, state and federal freedom of information acts protect information compiled for law enforcement purposes . . . and we believe the non-statutory privilege is similarly broad.

Id.; see also Dinler v. City of New York, 607 F.3d 923, 944 (2d Cir. 2010).

It cannot be overstated that the NRA is currently subject to the same investigation by DFS for which they seek discovery of DFS's investigatory files.  In other words, the NRA is seeking through its discovery demands in this lawsuit to access the entire investigatory file that relates to the ongoing investigation of the NRA's own conduct.  As noted in the Factual Background of this memorandum, and the accompanying declaration of Matthew Levine, there is compelling evidence that the NRA regularly violated multiple provisions of the New York Insurance Law.

These violations carry a potential penalty of either $500 or $1000 per violation, and could subject the NRA to an aggregate penalty liability of many tens of millions of dollars.  This aggregate exposure under the New York Insurance Law far exceeds the total revenue that the NRA received over an eight-year period under all of its affinity group insurance policies.  The NRA knows this as its counsel in this case is also representing the NRA in connection with the enforcement matter pending at DFS.   Providing an investigative file to its target – mid-investigation – is a completely improper proposition that would clearly undermine the investigation.  There is no legal support for such disclosure – and for good reason.  If the target of an investigation could obtain premature access to its investigative file by merely filing a lawsuit, litigation would flourish and the law enforcement privilege would be too easily circumnavigated.

The NRA chose to file its lawsuit when it did, and it continues to choose not to resolve its enforcement matter before DFS.  As a result of the NRA's decisions, its requests for production of DFS's investigative file either in this lawsuit or any other process remains subject to the law enforcement privilege and should be denied in their entirety.  The requests should be denied in their entirety.

## C.  Additional Privileges Protect Many of the Documents Relating to the Investigation of the NRA Programs

Many of the documents relating to the DFS investigations of the NRA, Chubb, Lockton and Lloyds are protected by multiple additional privileges.  In general, and as set forth in the declaration of Nathaniel Dorfman, the documents responsive to these requests include: (1) documents produced to DFS by the targets of the investigation (over 75,000 pages); (2) communications between DFS and the investigation targets (hundreds of documents); (3) internal

14

DFS memoranda and other documents, including drafts, prepared by members of the investigation team (dozens of documents); (4) internal communications between DFS employees on the investigation team, most of whom are attorneys (hundreds of documents).  As discussed above, items in categories 1 and 2 are protected by the law enforcement privilege.

The items in categories in 3 and 4, in addition to being protected by the law enforcement privilege, are protected by the attorney client privilege because they were prepared by or for the attorneys representing DFS in the course of that representation for the purpose of providing or obtaining legal advice.  See Upjohn Co. v. United States, 449 U.S. 383, 390, 101 S. Ct. 677, 683 (1981) ("the [attorney-client] privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice.")

The items in categories in 3 and 4 are also protected by the work product doctrine because DFS must prepare for the possibility that every investigation, if not resolved by agreement in consent orders or otherwise or terminated by DFS, may give rise to an administrative hearing that is subject to challenge in a proceeding under Article 78 of the New York Civil Practice Law and Rules.  Thus, all these documents prepared by DFS are prepared in anticipation of the both the prosecution of the administrative hearing, and in anticipation of defense of the Article 78 litigation.  See e.g., Strougo v. BEA Assocs., 199 F.R.D. 515, 521 (S.D.N.Y. 2001) ("Materials need not be prepared solely for a litigation purpose in order to merit protection under the work-product privilege. . . . An attorney must show merely that the documents were prepared 'with an eye toward litigation.'") (Citation omitted.); see also Horn & Hardart Co. v. Pillsbury Co., 888 F.2d 8, 12 (2d Cir. 1989) ("The work product doctrine protects an attorney's mental impressions,

opinions or legal theories concerning specific litigation from disclosure.  The district court's denial of discovery, based on a finding that Stringer's notes contained mental impressions and were made with an eye toward litigation, was not an abuse of discretion.")(Internal quotations omitted).

The items in categories in 3 and 4 are also intra-agency and inter-agency communications protected by the deliberative process privilege doctrine because they encompass work product reflecting advisory opinions, recommendations, and deliberations related to various governmental decisions and policies that were made prior to the resolution of the matter. See e.g., ACLU v. DOD, 2017 U.S. Dist. LEXIS 159108, at *13 (S.D.N.Y. Sep. 27, 2017) ("The deliberative process privilege is a sub-species of work-product privilege that covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.") (Internal quotation omitted).

For all of the above reasons, the Plaintiff's motion must be denied as to these documents as well.

### D.  A Privilege Log or Formal Assertion of a Privilege is Not Yet Required

Federal practice does not require a party to produce a privilege log for documents subject to an improper discovery request.  See Franco v. Yale University, 80 Fed. Appx. 707, 710 (2d Cir. 2003).  As described in the relevant advisory committee note:

> The obligation to provide pertinent information concerning
> withheld privileged materials applies only to items "otherwise
> discoverable." If a broad discovery request is made—for example,
> for all documents of a particular type during a twenty year period—
> and the responding party believes in good faith that production of
> documents for more than the past three years would be unduly
> burdensome, it should make its objection to the breadth of the

16

> request and, with respect to the documents generated in that three
> year period, produce the unprivileged documents and describe
> those withheld under the claim of privilege. If the court later rules
> that documents for a seven year period are properly discoverable,
> the documents for the additional four years should then be either
> produced (if not privileged) or described (if claimed to be
> privileged).

F.R.C.P. 26(b)(5)(A) advisory committee's note to 1993 amendment.

Although DFS has produced documents and/or advised the NRA where no responsive documents exist in response to many of the NRA's requests, the Defendants are not required to produce any privilege logs over requests for which the Defendants do not believe any response is required because of patent defects in the request.

The NRA's claim that a formal assertion of privileges should have been made in the Defendants' objections is also without merit.  Apart from the fact that such a requirement is found nowhere in either the Federal Rules or in the Northern District's Local Rules, given the Plaintiffs clearly improper demands, the Rules do not yet require Defendant to particularize their assertions of privilege.  Moreover, none of the cases cited by the Plaintiff require that formalities be observed in an initial discovery response, particularly where the discovery demands are plainly improper.  Further, if required, the accompanying declaration of Mathew Levine, Executive Deputy Superintendent for Enforcement of DFS, more than satisfies any particularity requirements.  See Securities and Exchange Commission v. McGinn, 2011 WL 13136028, *6 (N.D.N.Y. 2011) (accepting declarations submitted in opposition to motions to compel as sufficiently formal assertions of privilege).  In any event, no privilege log is required in response to the Plaintiff's patently improper demands.

17

**II. Plaintiff's Discovery Demands Relating to the DFS Guidance Letters and Press Statements Exclusively Seek Legally Irrelevant AND Privileged Documents**[3]

There is no credible claim that either the two DFS Guidance Letters or the various press statements at issue in this case constitute an enforcement action.  As a result, the Guidance Letters and press statements can only be relevant to the NRA's First Amendment claims – its claim that DFS threatened coercive action against financial institutions that continued to do business with the NRA.

The primary deficit with the NRA's discovery requests for documents that relate to these Guidance Letters and press statements is that no document other than the final versions of the guidance letters or press statements were ever publicly released.  Documents that were not publicly released could not possibly have been perceived as a threat by any financial institution.  Although the NRA argues that the drafts of the Guidance Letters and press statements and other related documents may somehow reveal the author's intent, the NRA's First Amendment claim is subject to an objective legal standard that does not require an assessment of the author's subjective intent.  Zieper v. Metzinger, 392 F.Supp. 2d 516, 525 (S.D.N.Y. 2005), aff'd, 474 F.3d 60 (2007) ("The test is objective: whether the official's comments 'can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request' to cease engaging in protected speech.") (Citation omitted.).  As a result, the intent of the authors of the Guidance Letters and press statements – and every document other than the actual Guidance Letter and Press Statements – are legally irrelevant.

Moreover, to the extent that Plaintiff seeks communications between DFS personnel or between DFS personnel and personnel in the Governor's office that relate to the development

---

3 These requests include, RFPs 29-30 to DFS, and; RFPs 25-26 to the Governor

and drafting of the Guidance Letters or the Press Release, such communications are protected by

the deliberative process privilege and also) the attorney-client privilege and the attorney work

product doctrine.  The deliberative process privilege protects "recommendations, draft

documents, proposals, suggestions, and other subjective documents which reflect the personal

opinions of the writer rather than the policy of the agency."  Grand Central Partnership, Inc. v.

Cuomo, 166 F.3d 473 (2d Cir. 1999) (internal quotation marks and citation omitted); see also

National Congress for Puerto Rican Rights v. City of New York, 194 F.R.D. 88, 92 (S.D.N.Y.

2000).  A document is pre-decisional if it correlates to a particular agency decision, was prepared

by the author to assist the agency in reaching its decision and precedes the decision to which it

relates.  See National Congress for Puerto Rican Rights, 194 F.R.D. at 92.

The NRA fails to overcome the Deliberative Process privilege applicable to these

documents.  The declarations of Nathaniel Dorfman and Tanisha Edwards, clearly establish that

the request documents are pre-decisional in nature.  Indeed, the request on its face seeks material

that can only be pre-decisional.  Although courts have sometimes held that the Deliberative

Process privilege does not apply when an agency's deliberations are the primary issue in

litigation, the objective standard that applies to the NRA's First Amendment claims is an

absolute bar to the NRA's reliance on this exception to the privilege.

The First Amendment issue in this case is not how the Guidance Letters or Press Release

were created, but whether they contain any threats of adverse government action.  As the Court

held, "[t]he NRA's First Amendment freedom-of-speech claims turn on the allegations that

Defendants issued threats to financial institutions and insurers[.]"  Dkt. 56 at pg. 18.  Thus, even

if the Plaintiff's assertion that by simply putting a government decision at issue the deliberative

process privilege somehow vanishes was correct, nothing in the deliberative process of drafting the Guidance Letters or the Press Releases would inform whether any threats were made by the publication of the final forms of those documents.  As such, the deliberative process privilege is properly asserted here.

### III. Plaintiff's Discovery Demands Relating to Other Affinity Programs Seeks Legally Irrelevant Material[4]

The NRA's request for documents relating to DFS investigations of affinity programs sponsored by unrelated entities is an improper request in that the NRA is seeking DFS's investigative files of entities that are not parties to this action and for conduct that has no nexus to the NRA.  In light of the extraordinary nature of the request, the trade secret and privacy issues raised by the production of the non-privileged, responsive records, and the fact that Defendants' Rule 12(c) motion to dismiss the selective enforcement claims (the only to which these records could be relevant to) is *sub judicie*, Defendants respectfully request that the Court delay its decision on these discovery requests until after the Rule 12(c) motion is decided.

If the Court declines to delay its decision, or if the Rule 12(c) motion is denied, Plaintiffs' request to compel the production of these records should nonetheless be denied.  The only investigation of affinity groups other than the NRA conducted since 2017 was a spin-off of the investigation of the NRA-endorsed programs including the Carry Guard program.  This spin-off investigation began after Lockton self-disclosed other violations of the Insurance Law relating to its excess lines business including affinity group insurance unrelated to the NRA.  DFS completed this spin-off investigation on January 31, 2019, with the execution of a Supplemental Consent Order with Lockton.

The only documents that DFS should be required to produce with respect to other affinity programs are this Supplemental Consent Order and any other documents that identify affinity group policies or affinity group sponsors that are sufficiently comparable to Carry Guard and the NRA under established selective enforcement case law.  Kamholtz v. Yates County, No. 08-CV-6210, 2008 U.S. Dist. LEXIS 97985, *16 (W.D.N.Y. Dec. 3, 2008), aff'd, 350 F. App'x 589 (2d Cir. 2009)(holding that the level of similarity between a plaintiff and any comparators "must be extremely high.")   Affinity group policies and sponsors that are not sufficiently comparable are simply not relevant to the action.

The Supplemental Consent Order establishes that unlike the Carry Guard program and other NRA-endorsed programs, none of the policies brokered by Lockton were specific to firearm usage that provides liability coverage for bodily injury or property damage from use of a firearm, or for liability coverage for bodily injury or property damage expected or intended from the insured's standpoint to extend beyond those occasions where bodily injury results from the use of reasonable force to protect persons or property.  Similarly, the Supplemental Consent Orders establishes that unlike the NRA's conduct, DFS did not identify any other sponsor of an affinity-style insurance product that committed the type and degree of unauthorized insurance activity with respect to a Lockton insurance policy containing illegal criminal defense coverage that was committed by the NRA with respect to Carry Guard.

In other words, DFS's investigation of Lockton concluded without identifying any other illegal firearm coverages and without identifying any other affinity group sponsor that engaged in illegal producer activity for policies that contained any criminal defenses coverages.  Discovery

4 These requests include, RFPs 12-14 to DFS; RFPs 11-13 and 27 to Ms. Vullo, and; RFPs 12-15 to the Governor.

should not be permitted with respect to affinity group policies or sponsors that are not comparable to the NRA and the Carry Guard program.

In addition to the aforementioned issues, a significant subset of the documents responsive to these discovery requests are protected by one or more privileges including the attorney client privilege, the attorney work product doctrine, and the deliberative process privilege, as discussed above.  DFS continues to assert these privileges over that relevant subset, and Plaintiff's motion to compel discovery of other affinity programs should be denied.

**IV.  Complete Responses Have Been Provided to the NRA's Requests Concerning Defendants' Communications with Financial Institutions or Insurers Related to their Business Relationships with the NRA or Other Gun Promotion Organizations[5]**

With the exception of the documents that relate to DFS's investigation of Chubb, Lockton, and Lloyds, which gave rise to the Consent Orders addressed above, all documents responsive to these requests including the two DFS Guidance Letters have been produced to the NRA.  All earlier drafts of these guidance letters as well as the investigative files relating to Chubb, Lockton, and Lloyds are legally irrelevant and protected by multiple privileges (as discussed in Headings I-A, I-B, and I-C above).

**V.  Complete Responses Have Been Provided to the NRA's Requests Concerning Adverse or Enforcement Actions Against Financial Institutions with Business Arrangements with the NRA and Other Gun Promotion Organizations[6]**

With the exception of the documents that relate to DFS's investigation of Chubb, Lockton, and Lloyds, which gave rise to the Consent Orders addressed above, all documents responsive to these requests have been produced to the NRA.  The investigative files relating to Chubb, Lockton, and Lloyds are legally irrelevant and protected by multiple privileges (as

---

5 These requests include, RFPs 4, 6 and 7 to DFS, Ms. Vullo, and the Governor.

discussed in Heading I-A, I-B, and I-C above).

### VI. The NRA is Unequivocally Not Entitled to Information Exchanged Between Defendants Relating to this Action[7]

This Court has previously recognized that communications between the Governor's Office, as the chief executive, and subordinate executive agencies, such as DFS, are protected by the attorney-client privilege.  See e.g., Children First Foundation v. Martinez, 2007 WL 4344915, *14-15 (N.D.N.Y. 2007).  So long as the two agencies are involved in "a cooperative and common enterprise towards an identical legal strategy," the privilege will attach.  Id. at 14. When such a relationship exists any communications between staff and legal counsel at the two agencies, as it relates to the ongoing litigation, is protected.  Id. at 14-15.  This Court has specifically held that:

> [t]he Executive Chamber and state agencies are inextricably interlocked, with a few exceptions, and the nexus, whether policy or legally driven, is utterly obvious . . . The Executive Chamber and the state agencies will generally fall within the common interest doctrine and, in this respect, communications between Governor's Counsel and staff and DMV's Counsel and legal staff are absolutely and unmistakenly encompassed by this doctrine insofar as they have an inseparable and abiding common interest in ensuring that policies are both legal and constitutional.

Id. at 15 (internal citations omitted).

All of the communications and documents exchanged between the defendants in this case (and drafts thereof) that relate to the pending litigation are protected by the attorney client privilege, the work product doctrine, and the deliberative process privilege.  Plaintiff's attempt to obtain production of these materials is not a good faith discovery request.

---

6 These requests include, RFPs 8-9 to DFS and Ms. Vullo.
7 This includes request 26 to DFS, Ms. Vullo, the Governor.

**VII.  The NRA's Requests Concerning Defendants' Referral of Matters to Other Government Agencies[8]**

The NRA's requests concerning the referral of matters to other government agencies includes (1) referrals relating to the NRA and (2) all other referrals involving any other entities.

All documents referring matters relating to the NRA to other government agencies have been produced to the Plaintiffs including follow-up communications between DFS and other states' insurance regulators.

The NRA's request for referral documents unrelated to the NRA is improper.  DFS's enforcement division routinely refers matters to the United States Department of Justice including various United States Attorneys' Offices in New York, the District Attorney for New York County, and various other district attorneys throughout the state.  None of the documents or communications related to the referral of unrelated matters can satisfy the relevance standard in Rule 26.  Furthermore, the production of any communications or documents relating to these referrals is protected by the law enforcement privilege, the deliberative process privilege, the attorney-client privilege, and the work product doctrine and may also be precluded by grand jury secrecy rules.

**VIII.  Plaintiff is Not Entitled to an Award of Attorneys' Fees**

The Plaintiff is not entitled to an award of attorney's fees in this matter.  As explained above, the Plaintiff's demands are improper and their current motion should be denied.  F.R.C.P. 37(5)(B).  To the extent that the Court orders the production of any further material, the Defendants' responses to the Plaintiff's demands were reasonable and made in good faith,

---

8 These requests include, RFPs 24, 24 (the second so numbered) and 25 to DFS; RFPs 23, 24 and 25 to Ms. Vullo, and; RFPs 23(the second so numbered), 24 and 25 to the Governor.

particularly in light of the improper nature of the demands.  The Federal Rules prohibit an award of attorneys' fees on a motion to compel when "other circumstances make an award of expenses unjust."  F.R.C.P. 37(5)(A)(iii).  It is submitted that the Defendants' responses to the Plaintiff's improper demands were reasonable, particularly considering the narrow issues remaining in this case, and no award of attorneys' fees to the Plaintiff is warranted.

<u>**Conclusion**</u>

For the reasons set forth above the Plaintiff's motion to compel must be denied, together with such other and further relief as the Court deems proper and necessary.

Dated:  Albany, New York
       February 4, 2019

                                            LETITIA JAMES
                                            Attorney General of the State of New York
                                            Attorney for Defendants
                                            The Capitol
                                            Albany, New York  12224-0341
                                            By: <u>s</u> / *William A. Scott*
                                            William A. Scott
                                            Assistant Attorney General, of Counsel
                                            Bar Roll No. 512434
                                            Telephone:  (518) 776-2255
                                            Email: William.Scott@ag.ny.gov

TO:    Sarah Rogers, Esq.

25

Stephanie L. Gase, Esq.
William A. Brewer, Esq.
Brewer Attorneys & Counselors
750 Lexington Avenue, 14th Flr.
New York, NY  10022

Charles J. Cooper, Esq.
J. Joel Alicea, Esq.
Michael W. Kirk, Esq.
Cooper & Kirk, PLLC
1523 New Hampshire Ave., NW
Washington, DC  20036