UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NATIONAL RIFLE ASSOCIATION OF AMERICA,

                       *Plaintiff*,

-against-

ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,

                       *Defendants*.

18-cv-00566 (TJM/CFH)

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO AMEND**

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

William A. Scott
Assistant Attorney General, of Counsel
Bar Roll No. 512434
Telephone: (518) 776-2255
Fax: (518) 915-7740 (Not for service of papers)

Date: January 27, 2020

# Table of Contents

Preliminary Statement ........................................................................................................... 1

Argument .............................................................................................................................. 6

   **I. The Plaintiff's References to DFS and Governor Cuomo** ................................. 6
      *A. Indirect References to Governor Cuomo* ........................................................ 6
      *B. Indirect and Direct References to DFS* .......................................................... 7
   **II. DFS Will be Prejudiced by This Late Amendment** ............................................ 8
   **III. Linda Lacewell Cannot be Substituted as a Party** ......................................... 10

Conclusion .......................................................................................................................... 11

# Table of Authorities

### Cases
*Block v. First Blood Associates*, 988 F.2d 344 (2d Cir. 1993) ....................................................... 8
*F5 Capital v. Pappas*, 856 F.3d 61 (2d Cir. 2017) ......................................................................... 6
*Foman v. Davis,* 371 U.S. 178 (1962)........................................................................................ 6, 8
*Monahan v. New York City Department of Corrections*, 214 F.3d 275 (2d Cir. 2000).................. 8
*Peregrine Myanamar v. Segal*, 89 F.3d 41 (2d Cir. 1996) ........................................................... 10
*Rowe v. New York State Division of Budget*, 2012 WL 4092856 (N.D.N.Y. 2012) ..................... 10
*Ruotolo v. City of New York*, 514 F.3d 184 (2d Cir.2008)............................................................. 8

### Rules
FRCP 16(a)(4)................................................................................................................................. 6

**Preliminary Statement**

The Plaintiff seeks to amend its complaint for the second time, without any factual basis for the allegations in the proposed pleading, and without a sufficient explanation for the delay in the request. At the last conference on this matter[1] Plaintiff's counsel represented to the Court and the parties that the proposed amended pleading would only seek to replead selective enforcement claims as to Defendant Maria Vullo. [Ex. A at pg. 4-5]. Despite this representation, the Plaintiff now seeks leave to amend the pleading to add new factual allegations as to DFS and Governor Cuomo, though the proposed cause of action itself only pertains to Ms. Vullo. It is submitted that this gross disparity between the Plaintiff's representations and the current motion should also weigh heavily in the Court's consideration of the Plaintiff's request for the Court to exercise its discretion and allow a delayed amendment of the pleadings.

The Plaintiff's proposed Second Amended Complaint contains seventeen direct and indirect references to alleged wrongdoing by Governor Cuomo and/or DFS. More particularly, the Plaintiff seeks to make the following relevant amendments[2]:

1) Moreover, Defendants knowingly targeted NRA-related insurance programs for violations not enforced against other similarly situated insurance programs. [Plaintiff's Proposed Second Amended Complaint[3] at pg. 2]

2) As a direct result of this coercion, multiple financial institutions have succumbed to Defendants' threats and determined not to do business with the NRA. Others, who were already doing business with the NRA yielded to Defendants' demands and agreed to terminate longstanding, beneficial business relationships with the NRA, both in New York and elsewhere. [Plaintiff's Proposed Second Amended Complaint at pg. 2]

3) Importantly, Defendants were fully aware by at least March 2018 (and likely earlier) that

---

[1] A copy of the transcript of said conference is annexed hereto as Exhibit A.
[2] For the sake of brevity, these proposed amendments will be referred to by these numerical designations (i.e. 1 – 17).
[3] A complete version of the proposed pleading is currently filed under seal, and the Court is respectfully referred thereto.

1

    non-NRA insurance policies exhibiting the same features were being marketed on behalf of other affinity organizations. Defendants intentionally ignored such knowledge and did not undertake enforcement actions relating to these other similarly constructed programs because enforcing the Insurance Law was never their goal. Instead, as DFS explained to Lloyd's in closed-door meetings, the Cuomo administration sought to focus on "gun programmes" and gun advocacy groups generally. [Plaintiff's Proposed Second Amended Complaint at ¶22]

4) Ignoring Identical Features of Comparable Affinity-Insurance Programs, Defendants Impermissibly Targeted the NRA. [Plaintiff's Proposed Second Amended Complaint at pg. 27]

5) Beginning during the Fall of 2017, including through a subpoena issued to Lockton and research supplied by Everytown, Defendants became aware of pervasive, colorable regulatory infirmities affecting numerous affinity-insurance programs. For example, brokers such as Lockton frequently paid success-based royalties to their affinity clients, which DFS would later assert violated New York Insurance Law § 2116. Insurance coverage for the cost of psychological counseling had become increasingly pervasive outside a standard health-insurance context, yet DFS argues that providing such insurance violates New York Insurance Law § 2117. Similarly, DFS takes the position that the financial condition or "rating" of an out-of-state, excess-line insurer may not be advertised as a means to promote the policy—but this practice was common in the affinity-insurance marketplace in 2017. And although New York Insurance Law § 3420 sets forth various minimum requirements for liability insurance which protects persons and property, many policies failed to meet those requirements. It is clear that confusion existed among brokers regarding the mechanics of compliance with New York Insurance Law § 2118, which requires brokers to secure declinations from authorized insurers before placing surplus-line insurance. [Plaintiff's Proposed Second Amended Complaint at ¶65]

6) Confronted with a marketplace where they knew that brokerage, underwriting, and affinity-endorsement practices frequently departed from the regulators' preferred reading of certain statutes, Defendants could have issued informative guidance, or adopted an even-handed enforcement approach. Instead, Defendants selectively used these purported infractions to target the NRA, while disregarding other instances of the same conduct of which they were aware. (When Defendants did issue guidance letters to regulated institutions in April 2018, the letters reflected their enforcement approach: ignore excess-line declinations, out-of-state-carrier ratings, and other technical insurance-policy features while "urging" financial institutions to cut ties with gun groups). [Plaintiff's Proposed Second Amended Complaint at ¶66].

7) During her surreptitiously held meetings with Lloyd's executives that commenced in February 2018, Vullo acknowledged the widespread regulatory issues in the excess-line

marketplace. Vullo and DFS made clear that Lloyd's could avoid liability for infractions relating to other, similarly situated insurance policies, so long as it aided DFS's campaign against gun groups. Against the specter of this bold abuse of her position, Lloyd's agreed that it would instruct its syndicates to cease underwriting firearm-related policies and would scale back its NRA-related business; in exchange, DFS would focus its forthcoming affinity-insurance enforcement action solely on those syndicates which served the NRA, and ignore other syndicates writing similar policies. The first step of this choreographed process was a letter from DFS to Gunset, an LAI executive, sent on April 11, 2018. [Plaintiff's Proposed Second Amended Complaint at ¶69].

8) Pursuant to the conversations between Vullo and DFS with senior officials at Lloyd's and LAI described above, Lloyd's was not subjected to any enforcement action and/or penalties for any violation of the New York Insurance Law related to affinity-insurance programs, other than in connection with the NRA-related insurance programs. [Plaintiff's Proposed Second Amended Complaint at ¶75].

9) Importantly, Lloyd's was not the only entity with direct exposure to DFS's selective enforcement scheme. DFS also became specifically cognizant of non-NRA policies that exhibited the same purported defects as NRA policies—and chose to ignore those violations, targeting solely the NRA—in the context of its Lockton investigation. By March 2018, Lockton was fully aware that purported violations of New York Insurance Law § 2122(a)(1)-(2), concerning the advertisement of the financial rating of an excess-line carrier, affected many of its other clients. Indeed, under DFS supervision, Lockton began efforts to remediate the issue on websites for non-NRA programs. During this time, Lockton also began to negotiate its consent order with DFS. Unfortunately, the written record of those negotiations is sparse, because DFS instructed Lockton to confine its feedback to telephone calls, lest written comments impose an "administrative burden" (i.e., create a paper trail). However, Lockton specifically questioned the propriety of reciting, within the text of the consent order, the exact statutes that had been violated—notably, the same statutes and issues applied to non-NRA affinity programs. DFS verbally conveyed to Lockton that it was only interested in pursuing the NRA. Other programs exhibiting the same issues, DFS explained, could be quietly remediated by Lockton after consent order and penalty targeting NRA programs had been publicized. [Plaintiff's Proposed Second Amended Complaint at ¶76].

10) Consistent with this agreement, on July 2, 2018, Lockton provided a report to DFS regarding the status of its remediation efforts for non-NRA programs. The report confirms that many of the alleged regulatory infractions identified in the Lockton Consent Order were systemic and pervasive. For example, "a number" of other affinity clients received success-based royalty compensation, and Lockton's entire process for securing declinations pursuant to New York Insurance Law § 2118 needed to be reformed. Although DFS purported to target NRA policies based on, among other things, their allegedly improper psychological-counseling coverage, Lockton's remediation report

3

confirmed that such coverage was "prevalen[t]," and sought "dialogue with DFS on the best way forward" given the ample demand and need for such coverage. [Plaintiff's Proposed Second Amended Complaint at ¶77].

11) In sum, Lockton's report confirmed what DFS already knew: that the regulatory issues alleged with regard to NRA-related policies affected numerous non-NRA policies. In response, DFS took no action whatsoever against any of Lockton's non-NRA clients. On January 31, 2019, almost three months after this Court had sustained the NRA's selective-enforcement claims and permitted discovery regarding them, DFS entered into a Supplemental Consent Order with Lockton that purported to admonish violations of the same statutes by Lockton's non-NRA clients, yet did not identify the clients by name or require Lockton to cease doing business with them. [Plaintiff's Proposed Second Amended Complaint at ¶78]

12) DFS's selective enforcement continues to this day. While taking no action against any of Lockton's other affinity clients, or the underwriters involved in those policies, DFS recently subpoenaed an underwriter known as AGIA which backs health-insurance policies administered and brokered by Lockton for the NRA. These policies have nothing to do with firearms and are identical in all material respects to policies administered and brokered by Lockton on behalf of non-NRA clients. [Plaintiff's Proposed Second Amended Complaint at ¶79]

13) Alternatively, Vullo should have known of similarly situated individuals at the time DFS launched its investigation and any purported lack of knowledge was due to a "see-no-evil" policy of enforcement, which Vullo and DFS abandoned solely to further their vendetta against the NRA. The "see-no-evil" enforcement policy was confirmed by DFS's continued ignorance toward the violations of the similarly situated comparators. [Plaintiff's Proposed Second Amended Complaint at ¶111]

14) By virtue of the position held by Vullo at the time DFS launched its investigation, Vullo knew the actions taken by DFS against NRA affinity insurance programs were unprecedented. No other similarly situated programs have faced even close to the same treatment for analogous violations. However, Vullo and DFS failed to inquire about whether there were any other similarly situated affinity programs when the investigation was launched. [Plaintiff's Proposed Second Amended Complaint at ¶112].

15) There is an extremely high level of similarity between the NRA-related affinity-insurance programs and those of the comparator affinity-insurance programs, including AOAExcel, Moose, the VFW, and the PPA, such that no rational person would perceive the NRA related programs to be different enough to justify the differential treatment by Vullo and DFS. [Plaintiff's Proposed Second Amended Complaint at ¶113].

16) Vullo and DFS discriminated against the NRA and its business partners because of

>Vullo's personal animus toward the NRA and its Second Amendment advocacy. [Plaintiff's Proposed Second Amended Complaint at ¶114]

17) The similarity between the NRA-related programs and the comparators and the sharp differences in Vullo's and DFS's treatment of them are sufficient to exclude the possibility that Vullo and DFS acted on the basis of a mistake. [Plaintiff's Proposed Second Amended Complaint at ¶115].

Additionally, the Plaintiff seeks to substitute the current DFS Superintendent, Linda Lacewell, as a party in lieu of Ms. Vullo in her official capacity.

As set forth in greater detail below, the Plaintiff fails to establish that it should be granted leave to amend, and Plaintiff's motion must be denied.

**Argument**

### I. The Plaintiff's References to DFS and Governor Cuomo

A motion to amend should be denied if the moving party has: (1) caused undue delay or otherwise has acted in bad faith; (2) the opposing party will suffer unfair prejudice if leave is granted; or (3) the proposed amendment is futile. *Foman v. Davis,* 371 U.S. 178, 182 (1962). As relevant to the proposed additional allegations against Governor Cuomo and DFS, "'[a] proposed amendment to a complaint is futile when it could not withstand a motion to dismiss.'" *F5 Capital v. Pappas*, 856 F.3d 61, 89 (2d Cir. 2017) (quoting *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 164-65 [2d Cir. 2015]). Additionally, if a party seeks leave to amend after a Rule 16 conference has been held and a Pretrial Scheduling Order entered, they must demonstrate good cause for any delay. FRCP 16(a)(4); *see also Parker v. Columbia Pictures*, 204 F.3d 326, 340-41 (2d Cir. 2000).

Allowing the Plaintiff to amend its pleading to include the seventeen additional allegations as to Governor Cuomo and DFS would be both futile and prejudicial to Defendants.4

#### *A. Indirect References to Governor Cuomo*

As defined in the Plaintiff's proposed pleading "Defendants" is intended to refer to Governor Cuomo, DFS and Ms. Vullo. Proposed Amendments 1 through 6 each make general allegations as to the "Defendants" role in the alleged selective enforcement. Such broad allegations are patently insufficient to meet the Plaintiff's pleading requirement as outlined not only the relevant law, but by Judge McAvoy in the current matter. The Plaintiff has presented no basis, either in its current submission or during the last conference on this issue, to allege that Governor Cuomo played any role in any alleged selective enforcement.

---

[4] The Plaintiff's request to amend as to Ms. Vullo is similarly improper, and the Court is respectfully referred to Ms.

Nor are these merely restatements of prior allegations that predate the Court's ruling on the Defendants' Motion to Dismiss and 12(c) motion, but new allegations that, on their face, apply to Governor Cuomo. Elsewhere in the proposed pleading the Plaintiff has corrected the document to remove dismissed claims and to change references from "Defendants" to "Vullo." [Plaintiff's Proposed Second Amended Complaint at ¶¶118-120]. As such, the references to "Defendants" in proposed amendments 1 through 6 can only be seen as intentional and without basis.

In the absence of any supported allegation that Governor Cuomo knew of and consciously declined to prosecute comparable violations of the Insurance Law, these vague proposed amendments as to Governor Cuomo would not survive a motion to dismiss. [Dkt. 112 at pg. 9-10]. As such, the proposed amendments as to Governor Cuomo are futile and the Plaintiff's request to amend should be denied or, in the alternative, denied absent further amendment to remove any implied reference to Governor Cuomo.

### B. Indirect and Direct References to DFS

The references to "Defendants," as defined above, in amendments 1 through 6 also improperly include DFS. Additionally, proposed amendments 7 through 17, contain specific selective enforcement allegations against DFS. Permitting the Plaintiff to amend the Complaint to include either explicit or implicit references to alleged wrongdoing by DFS would be improper as such claims are futile.

In their 12(c) motion to this Court, the Defendants argued that DFS was not subject to suit under §1983 as it is not a "person" amenable to suit. [Dkt. 112 at pg. 3]. The Plaintiff

---

Vullo's submissions in opposition to the current motion.

offered no opposition to this argument and the Court ordered that "all Section 1983 claims against DFS are dismissed as withdrawn." [Dkt. 112 at pg. 3]. The law on this issue has not changed since the Court's May 10, 2019 order, nor does the Plaintiff present any argument with its current submission that its dismissed §1983 claims against DFS can be reinstated. As DFS remains an improper party to any §1983 claims, the Plaintiff's proposed amendments could not survive a motion to dismiss, are futile, and the request to amend should be denied.

## II. DFS Will be Prejudiced by This Late Amendment

As noted above, a motion to amend should be denied when the moving party has caused undue delay or otherwise has acted in bad faith, or if the opposing party will suffer unfair prejudice if leave is granted. *Foman*, 371 U.S. at 182. In deciding whether the requisite level of prejudice exists, a Court must evaluate whether the proposed amendment would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Monahan v. New York City Department of Corrections*, 214 F.3d 275, 284 (2d Cir. 2000) (quoting *Block v. First Blood Associates*, 988 F.2d 344, 350 [2d Cir. 1993]). In assessing prejudice courts must consider the particular procedural posture of the case. *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir.2008).

If permitted to amend its complaint for a second time, the Plaintiff will undoubtably seek further discovery from DFS. Indeed, the Court need not speculate on that point as the Plaintiff already, improperly, served interrogatories to DFS seeking information associated with the Plaintiff's selective enforcement claim.[5] Even absent this more recent demand, a review of this Court's order

---

[5] A copy of the Plaintiff's Interrogatories is attached hereto as Exhibit B.

on the parties' various discovery motions demonstrates that an amendment at this stage would place a further discovery burden on DFS.

The Court cited the dismissal of the Plaintiff's selective enforcement claim as a reason to deny the Plaintiff's requests for: 1) Materials related to referrals to other government agencies of matters not related to the NRA [Dkt. 121 at pg. 27-29]; 2) Investigative files relating to non-NRA endorsed affinity insurance programs [Dkt. 121 at pg. 30, 43-45], and; 3) Communications between the Defendants and financial institutions/insurers about their business relationships with non-NRA gun promotion organizations [Dkt. 121 at pg. 47-48]. If the Plaintiff is allowed to revive its claim now, these demands would undoubtably be renewed by the Plaintiff. DFS would again be compelled to respond and object to these demands based on the privileges previously asserted, which would in turn require the Court to issue further rulings on these materials, and may require additional in camera review, which would undoubtedly require time and effort on the part of both DFS and the Court.

This additional discovery burden must be viewed not only in light of the substantial briefing on this issue, which the Court is fully familiar with, but also in light of the Plaintiff's continued unexplained delay in seeking leave to amend. The Plaintiff claims that its delay was caused by attempts to obtain documents from Lloyd's, which it has now submitted to the Court, and which the Plaintiff claims form the basis for the proposed amended pleading. During the most recent conference in this matter the Plaintiff also indicated that it had obtained information "from a consulting individual," who's identity the Plaintiff has refused to disclose, relating to a supposed meeting between Ms. Vullo and Lloyd's. [Ex. A at pg. 5-6].

However, none of the documents submitted by the Plaintiff in support of its request make any

9

mention of a meeting between Ms. Vullo and Lloyd's.  Additionally, the Plaintiff's response to discovery demands from Ms. Vullo indicate that this "consulting individual" does not themselves possess any factual information, but they were instead retained by the Plaintiff to interpret the Lloyd's documents.  It is nearly inconceivable that a "consulting individual" can be relied upon to claim that a meeting or meetings took place based upon documents that contain no such reference, and it is clear that Plaintiff has proffered no reasonable excuse for waiting to seek leave to amend until months after not only Judge McAvoy's decision and order on the Defendant's 12(c) motion, but also this Court's decision on the various discovery motions.

This lack of a reasonable excuse for the delay in bringing the pending motion coupled with the unreasonable burden that will be placed on DFS in having restart portions of the discovery process after substantial briefing, and complex and detailed work compiling documents for in camera review, weigh against granting the Plaintiff's current motion.

### III. Linda Lacewell Cannot be Substituted as a Party

A plaintiff is not entitled to an "obey the law" injunction, since such injunctions are "vague, do not require the defendants to do anything more than that already imposed by law, subject the defendants to contempt rather than statutorily prescribed sanctions, and are not readily capable of enforcement." *Rowe v. New York State Division of Budget*, 2012 WL 4092856, at *7 (N.D.N.Y. 2012); *see also Peregrine Myanamar v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) (holding that "an injunction must be more specific than a simple command that the defendant obey the law").

The Plaintiff makes a passing reference to attempting to substitute DFS' current superintendent as a party for the purposes of securing injunctive relief.  Though the Plaintiff

correctly notes that in matters where a government official is named in their official capacity, and where injunctive relief is sought, the individual actually holding the relevant position can be substituted as a party. However, in this matter, substituting Ms. Lacewell as a party would be futile as the Plaintiff is not entitled to any injunctive relief that Ms. Lacewell would be required to effectuate.

The Plaintiff's First Amendment claim against Ms. Vullo is the only claim remaining against Ms. Vullo in her official capacity. The Plaintiff's request for injunctive relief as to this claim is, at best, an improper request for an "obey the law" injunction.[6] [Plaintiff's Proposed Second Amended Complaint at pg. 53-54]. The Plaintiff is simply not entitled to an injunction allowing it to "exercise the rights afford to it under the First and Second Amendment . . ." and any request for such relief is futile and cannot survive motion practice. [Plaintiff's Proposed Second Amended Complaint at pg. 53]. As such the Plaintiff's request for leave to amend to add Ms. Lacewell as a party must be denied.

## Conclusion

For the reasons set forth above the Plaintiff's motion to amend should be denied, together with such other and further relief as the Court deems proper and necessary.

---

[6] Though Plaintiff's "Request for Relief" includes a prayer for injunctive relief, the proposed amended complaint deletes the portion of the complaint that previously sought an injunction against Ms. Vullo in her official capacity. [Plaintiff's Proposed Second Amended Complaint at ¶113].

Dated: Albany, New York
January 27, 2020

          LETITIA JAMES
          Attorney General of the State of New York
          Attorney for Defendants
          The Capitol
          Albany, New York  12224-0341
          By: s/ *William A. Scott*
          William A. Scott
          Assistant Attorney General, of Counsel
          Bar Roll No. 512434
          Telephone:  (518) 776-2255
          Email: William.Scott@ag.ny.gov

TO:    All Counsel of Record via ECF