# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL CASE NO.  18-CV-0566 |
| ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES, | § § § § § § § § | TJM/CFH |
| Defendants. | § § | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff the National Rifle Association of America (the "NRA"), by their undersigned counsel of record, hereby submit this memorandum of law, in addition to the declarations of Sarah B. Rogers, John R. Cashin, Arthur R. Miller, and all prior papers and proceedings, in support of its motion, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a preliminary injunction restraining The New York State Department of Financial Services ("DFS" or the "Department") from initiating enforcement proceedings against the NRA.

## I.
## PRELIMINARY STATEMENT

The core allegation in this case is that DFS, a banking and insurance regulator charged with preserving the solvency and soundness of financial markets, selectively wielded its powers at the behest of Governor Cuomo to damage the NRA for its political speech.  The NRA's claims arise from an investigation commenced by DFS in 2017, based on information provided by an anti-NRA activist group,[1] regarding certain insurance products offered to NRA members.  The DFS investigation continued during the pendency of this case, as the NRA never asked the Court to enjoin its progress  But now, having learned that the NRA possesses facts and documents which will expose the full extent of its unconstitutional activities, DFS has rushed to commence an administrative proceeding which would usurp the adjudication of key factual issues before this Court—diverting them to a DFS-controlled tribunal rather than an Article III forum and a New York jury.   The NRA seeks a preliminary injunction to preserve its day in court.

---

[1] *See* Am. Compl. ¶¶ 34-37; *see also* ECF No. 154, Notice of Mot. for Leave to File Second Am. Compl. Ex. 1, Proposed Second Am. Compl. ¶¶ 34-37; Declaration of Sarah B. Rogers ("Rogers Decl.") Ex. C, compilation of email communications among DFS and Everytown For Gun Safety ("Everytown"), produced by Defendants in the above-captioned matter (taking credit for instigating DFS's investigation of an NRA-related insurance product, Carry Guard).

This case asserts critical constitutional claims which this Article III Court is uniquely situated to adjudicate.  Yet, by design, DFS's enforcement proceeding would raise factual issues overlapping with ones before this Court, and purport to resolve them in a nonpublic forum lacking rigorous procedural or evidentiary safeguards and presided-over by a DFS employee.  As Professor Arthur Miller notes in his expert declaration, DFS's conduct implicates the same concerns as conventional forum shopping,[2] and should be met with the same skepticism by this Court.  Fortunately, courts in this Circuit recognize a remedy for such gamesmanship.  Where, as here, the substance of an imminent or incipient administrative proceeding would "overlap with factual issues" raised by an already-pending federal lawsuit (thereby creating a risk of inconsistent findings), a federal injunction halting the administrative proceeding is warranted.[3]  Such is the relief the NRA seeks.

## II.
## FACTUAL BACKGROUND

### A.   Like Other Affinity Groups, NRA Sought To Make Affordable Insurance Available To Its Members

Like many affinity groups and organizations nationwide, the NRA seeks to make life, health, and other insurance coverage available to its members on affordable, tailored terms. To this end, the NRA contracted with multiple insurance-industry firms to develop, market, and underwrite insurance programs for NRA members. In connection with these arrangements, the NRA performs none of the functions of an insurer. It does lend its valuable logos, marks, and endorsements to insurance programs brokered and serviced by others. Such "affinity" insurance

---

[2] *See* Declaration of Arthur R. Miller ("Miller Decl.") ¶¶ 13-15.

[3] *Schoolcraft v. City of New York*, 955 F. Supp. 2d 192, 198 (S.D.N.Y. 2013).

programs are common, and believed by many to be a suitable alternative to employer-based coverage.[4]

From 2000 onward, the NRA contracted with affiliates of the world's largest privately held insurance broker, Lockton Companies, LLC (collectively with pertinent affiliates, "Lockton"),[5] for affinity-program brokerage and administration services. Lockton provided services in the affinity-insurance market for decades and caters to a wide array of industries and numerous clients including franchises, professional and trade organizations, fraternal organizations, and common-cause groups such as the NRA. For roughly seventeen years, Lockton entities administered and marketed NRA-related insurance in New York State and throughout the nation without incident. In addition to its affinity-insurance transactions with the NRA, Lockton has also served for decades as the NRA's trusted insurance broker for various corporate coverage—such as general liability, umbrella and director and officer insurance.

The NRA affinity insurance administered by Lockton consists primarily of property and casualty policies that mirror policies offered by Lockton to other affinity groups. In addition, Lockton administered certain products, including a product known as "Carry Guard," that provided coverage for an array of gun-related expenses, including expenses arising out of the lawful self-defense use of a legally possessed firearm. Illinois Union Insurance Company ("Illinois Union"), a subsidiary of Chubb Ltd., underwrote Carry Guard while doing business under the name

---

[4] *See, e.g.*, Rachel Louise Ensign, *Affinity-Group Plans*, THE WALL STREET JOURNAL (Sept. 11, 2011), http://online.wsj.com/article/SB100014240531119048 3610457656334168 6006336.html, attached to Rogers Decl. as Ex. J.

[5] In particular, the NRA contracted with Lockton Affinity Series of Lockton Affinity, LLC (f/k/a Lockton Risk Services, Inc.) ("Lockton Affinity") and Kansas City Series of Lockton Companies, LLC ("Lockton KC").

"Chubb."   Another insurance broker and administrator, AGIA,[6] contracted with the NRA to provide similar services with respect to life and health insurance. The vast majority of NRA affinity-insurance policies were administered by Lockton and underwritten by Lloyd's.

Lockton and AGIA were (and are) entirely responsible for marketing relevant insurance— drafting website copy, formulating and disseminating direct-mail brochures, staffing call centers, and preparing commercial email content disseminated to members of NRA mailing lists.[7] Consistent with the parties' contracts, Lockton and AGIA marketers availed themselves of NRA logos and trademarks.   Such arrangements were, and remain, prevalent throughout the affinity-insurance marketplace, including in New York.   For example, similar insurance offerings are made available through the websites of the American Psychological Association,[8] the Fraternal Order of

---

[6] Association Group Insurance Administrators, Inc. ("AGIA").

[7] *See* Am. Compl. ¶¶ 30-31.

[8] Rogers Decl. Ex. F, Excerpts from the American Psychological Association ("APA") Website (The APA logo is featured prominently alongside the partnering insurance program and gives discounts to APA members.).

Police,[9] the New York State Bar Association,[10] the Sierra Club,[11] the National Education Association,[12] and the Seniors Coalition.[13]

The NRA has been the target of activist boycott efforts in the past, including campaigns that urged Lockton and other insurance-industry firms to cease doing business with the NRA. However, because these campaigns were carried out by non-governmental activist groups who lack the government's power to punish those who refused to join the boycott, their methods have centered on persuasion—not coercion. Unaided by the brute force of state power, activists were not successful in persuading the NRA's banking or insurance partners to sever ties with the NRA. This changed in 2017, when one activist organization successfully enlisted Defendants in a joint offensive against the NRA and the Second Amendment.

---

[9] Rogers Decl. Ex. G, Excerpts from the Fraternal Order of Police ("FOP") Website (FOP logo is featured on insurance forms, FOP lists insurance discounts as a benefit of membership, and has its own FOP titled insurance plan.).

[10] Rogers Decl. Ex. H, Excerpts from the New York State Bar Association ("NYSBA") Website (NYSBA lists insurance discounts as a premiere benefit of membership and advertises its affinity insurance program.).

[11] Rogers Decl. Ex. I, Excerpts from the Sierra Club Website (Sierra Club advertises affinity programs for travel and tour insurance offered as a benefit to its members.).

[12] Rogers Decl. Ex. Q, Excerpts from the National Education Association Website (online marketplace of "NEA Member Benefits", including multiple NEA-branded insurance policies such as "NEA Group Term Life Insurance," which are described as "carefully vetted, best-in-class programs;" the site also urges NEA members to purchase specific policies, making statements such as, "Your pets are a part of the family.  Help them lead long and healthy lives by having insurance coverage that helps with the high cost of veterinary care.").

[13] Rogers Decl. Ex. R, Excerpts from the Seniors Coalition Website (The Seniors Coalition advertises a "Special Offer on Auto and Home Insurance" exclusive to members of TSC through Liberty Mutual Insurance. On their website, TSC praises Liberty Mutual as being "trusted countrywide for quality coverage and exceptional service." A link is provided instructing those interested to "click for a free quote".).

**B.**     **Defendants Intentionally Wield DFS's Regulatory Powers To Advance A Political Vendetta Against the NRA**

During or about September 2017, a non-governmental activist organization known as Everytown for Gun Safety ("Everytown") contacted the New York County District Attorney's Office (the "DA's Office"), as well as state and municipal authorities in other jurisdictions, in an effort to prompt sympathetic government officials to target alleged compliance infirmities in Carry Guard. Notably, Everytown is not an organization dedicated to insurance compliance; instead, its explicit political mission is to oppose the NRA.[14] On September 13, 2017, representatives from the DA's Office met with DFS to effectuate Everytown's agenda.[15]

As a result, in October 2017, DFS launched an investigation that focused ostensibly on Carry Guard and was directed in the first instance at Lockton. On its website, Everytown took credit for instigating the inquiry[16]—but even if it had not, the political underpinnings and selective focus of the investigation were clear. In fact, the investigation was chronicled in the national media even before the NRA received official notice of it, and it targeted none of the available self-defense insurance products except Carry Guard, which was marketed to members of the NRA.

Of course, Defendants' true objective was to damage the NRA, not redress purported, technical regulatory infirmities in Carry Guard.  Therefore, the scope of the DFS investigation

---

[14] Aaron Blake, *Bloomberg launches new $50 million gun control effort*, THE WASHINGTON POST (Apr. 16, 2014), https://www.washingtonpost.com/news/post-politics/wp/2014/04/16/bloomberg-aims-to-spend-50-million-on-gun-control/?noredirect=on&utm_term=.703fe67ee197 (explaining that Everytown "will attempt to combat the vast influence of the National Rifle Association"), attached to Rogers Decl. as Ex. K.

[15]  Decl. of Matthew L. Levin, Dk. 28-1, at 2 (July 2, 2018).

[16] Everytown, Moms Demand Action Statements Responding to Report That New York Department of Financial Services is Investigating NRA Carry Guard Insurance, EVERYTOWN FOR GUN SAFETY (Oct. 25, 2017), https://everytown.org/press/everytown-moms-demand-action-statements-responding-to-report-that-new-york-department-of-financial-services-is-investigating-nra-carry-guard-insurance/, attached to Rogers Decl. as Ex. L.

rapidly expanded to encompass programs substantively identical to others in the marketplace, which had nothing to do with firearms or self defense. Importantly, at all relevant times, DFS allegedly knew that it was targeting the NRA for conduct which similarly situated entities engaged in pervasively. As detailed in the NRA's proposed Second Amended Complaint, the NRA believes that the prevalence of these practices throughout the affinity-insurance marketplace played into DFS's threats to Lloyd's and others: if insurance companies failed to blacklist the NRA, DFS could respond by investigating and penalizing other, similar affinity programs just as harshly, generating significant penalties.[17]  Against the backdrop of escalating backchannel interactions with Lockton, Lloyd's, and others which are detailed in the NRA's proposed Second Amended Complaint, Defendants during April and May 2018 delivered their intended *coup de grâce*.  In a pair of menacing "guidance letters," DFS informed all financial institutions under its jurisdiction that it was bad business in New York to do business with the NRA.  Those letters were followed closely by high-profile, multi-million-dollar consent decrees coerced from Lockton and Chubb which underscored Defendants' threat to all DFS-regulated institutions.

Even after ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████—*i.e.*, that comparator programs were functionally identical to NRA programs—DFS kept its investigation focused exclusively on the NRA.  It was only after this Court sustained selective-enforcement claims by the NRA on November 6, 2018,[18] that DFS grudgingly entered into a second consent order with Lockton that purported to address violations in programs administered for Lockton's

---

[17] *See* ECF No. 154, Notice of Mot. for Leave to File Second Am. Compl. Ex. 1, Proposed Second Am. Compl. ¶¶ 49-52.

[18] *See* ECF No. 56 at 71-72.

non-NRA clients. Tellingly (and more consistent with historic DFS practice),[19] that second consent decree declined to identify Lockton's non-NRA clients by name, and assessed comparatively minor penalties.[20]

**C.     DFS's Imminent Enforcement Proceeding Will Overlap With The Subject Matter Of This Case**

On May 9, 2019, this Court granted dismissal of the NRA's selective-enforcement claims without prejudice to re-pleading, explaining that although the NRA had adequately alleged unequal treatment of its insurance programs vis-à-vis comparable programs, the NRA must also explicitly plead that Defendants "were aware of such violations by the comparators yet consciously declined" to treat those violations as harshly as NRA-related violations.[21] Thereafter, the NRA sought discovery that would enable it to re-plead its claims robustly, while DFS continued its investigation of the NRA.[22] On December 4, 2019, DFS learned during a court conference that the NRA's discovery efforts had borne fruit, and the NRA would shortly re-plead its selective-enforcement claims.[23] Defendants immediately sprang into action—demanding the identities of anyone who had spoken with the NRA's counsel about the facts newly alleged.[24] Then, on February 5, 2020, DFS formally noticed its administrative proceeding against the NRA via a Statement of Charges and Notice of Hearing.[25] Concerned by the risk of inconsistent adjudications an enforcement

---

[19] *See* Cashin Decl. ¶¶ 33-36; *see also see also* Rogers Decl. Ex. B, Expert Witness Report of James W. Schacht at 34-36.

[20] *See* Rogers Decl. Ex. B, Expert Witness Report of James W. Schacht at 34-36; *see also* Rogers Decl. Ex. A, Expert Witness Report of John R. Cashin § IV.

[21] *See* ECF No. 112 at 11.

[22] Rogers Decl. ¶ 22.

[23] Rogers Decl. Ex. E, Hr'g Tr. 13:21-14:11.

[24] Rogers Decl. Ex. E, Hr'g Tr. 15:6-15; *see* Rogers Decl. Ex. D, Defendant Maria T. Vullo's First Set of Interrogatories at 4.

[25] Rogers Decl. ¶ 23.

proceeding would pose, the NRA sought to adjourn the proceeding administratively by letter dated February 10, 2020.[26]  DFS denied the NRA's request.[27]

DFS's charges present a risk of inconsistent adjudications that would complicate this federal case. In particular, the charges include violations of N.Y. Ins. Law §§ 2102 (dealing with unlicensed solicitation of insurance), 2117 (acting as an agent for an unauthorized insurer), 2122 (advertising for unauthorized insurers), and a "determined violation" under 2402(c) with respect to alleged unfair or deceptive acts or practices.[28]  N.Y. Ins. Law §§ 2102 and 2117 impose sliding-scale monetary penalties "up to" $500 per "transaction," with the amount of the penalty determined by the hearing officer.[29]  Elements invariably considered at such hearings include the alleged violator's level of culpability—for example, whether the NRA formulated marketing communications itself, or simply relied on templates prepared by Lockton—and whether comparator entities engaged in the same or similar conduct.[30]  The administrative tribunal considering those issues would be required to accord deference to DFS,[31] and not required to abide

---

[26] Rogers Decl. ¶ 25; *id*. Ex. T, Enjoinment Letter dated February 10, 2020.

[27] Rogers Decl. ¶ 26; *id.* Ex. U, Letter Denying NRA's Request dated February 19, 2020.

[28] Rogers Decl. ¶ 23; *id*. Ex. S.

[29] N.Y. Fin. Serv. Law § 301, *et seq.*

[30] *See* Cashin Decl. ¶¶ 19, 22-25.

[31] *See, e.g., Int'l Union of Painters & Allied Trades v. New York State Dep't of Labor*, 32 N.Y.3d 198, 209 (2018) (granting deference to agency's interpretation of statutory language at issue); *see also* Cashin Decl. ¶¶ 20, 22-24.

by any particular procedural or evidentiary rules.[32]   Factual determinations made in New York

State administrative proceedings could  have preclusive effects in federal court.[33]

The likelihood of complications arising from DFS's enforcement hearing, including

inconsistent adjudications and potential preclusion of the Court's ability to decide the case before

it, is high given the overlap in the claims and factual issues between the intended DFS enforcement

proceeding and the case pending before this Court.   Indeed, Defendants have, time and again,

intentionally and explicitly put into issue—in this case—the NRA's alleged "violations of New

York Insurance Law"[34] and "illegal conduct."[35]   Having raised those issues here,  Defendants

should try them here, not commence an overlapping parallel proceeding in a forum they prefer and

control.

Clearly, DFS's urgent drive to commence an administrative proceeding at this juncture is

no coincidence.  Facing the revival of the NRA's selective-enforcement claims, the Department

wishes to secure a favorable forum for adjudicating key elements of those claims and avoid a

---

[32] N.Y. Fin. Serv. Law § 305(e) (stating that there is no requirement for the Department of Financial Services to observe any formal rules of pleading or evidence during administrative hearings).

[33] *Schoolcraft v. City of New York*, 955 F. Supp. 2d 192, 199 (S.D.N.Y. 2013) (granting a preliminary injunction on the grounds that an administrative adjudication of issues that overlap with those already pending before the federal district court could generate preclusive effects and interfere with the district court's ability to fully adjudicate the issues).

[34] Defs.' Mem. of Law in Supp. of Defs.' Mot. to Dismiss the First Am. Compl. Pursuant to FRCP 12(B)(6), Dk. 40-1, at 1 (Aug. 3, 2018) (accusing the NRA of "distract[ing] from its involvement in various violations of the law" by bringing its First Amendment claims); *see also id*. at 7 ("[t]he NRA's marketing and solicitation . . . are apparent violations of Insurance Law and led DFS to open an investigation into the NRA's unlicensed and unlawful insurance activities, which remains ongoing").

[35] Defs.' Mem. of Law in Opp'n to Pl.'s Req. for Expedited Disc., Dkt. 28, at 1 (July 2, 2018) (accusing the NRA of initiating its First Amendment lawsuit against Defendants as "seeking to thwart DFS's investigation of clear violations of the New York Insurance Law" and "believing that the best defense to its illegal conduct is a good offense . . .").

public trial on the merits.  But the constitutional rights at stake in this case, for the NRA and other controversial advocacy groups, are too important to abdicate to a bureaucratic process. Accordingly, the NRA seeks an injunction staying any state enforcement proceeding until its Fourteenth Amendment selective-enforcement and First Amendment retaliation claims are adjudicated.

## III.
## LEGAL STANDARD

A preliminary injunction is warranted if the movant shows: "(1) a likelihood of irreparable harm; (2) either a likelihood of success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in their favor; (3) that the balance of hardships tips in their favor regardless of the likelihood of success; and (4) that an injunction is in the public interest."[36]  The NRA easily meets this standard.

## IV.
## ARGUMENT

### A.    The NRA Will Suffer Irreparable Harm Absent An Injunction.

The Second Circuit has found that a violation of constitutional rights constitutes irreparable harm in a variety of contexts.[37] The rationale for the rule is straightforward: "improper conduct for which monetary remedies cannot provide adequate compensation suffices to establish irreparable

---

[36] *Chobani, LLC v. Dannon, Co*., 157 F. Supp. 3d 190, 199 (N.D.N.Y. 2016); *see also Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) ("A party seeking a preliminary injunction must generally show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest.").

[37] *See, e.g.*, *Conn. Dep't of Env't. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) (sovereign immunity); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) (right to privacy); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (Eighth Amendment); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (religious freedom).

harm,"[38] and the violation of a constitutional right is "difficult to compensate monetarily."[39]  For

that reason, the Second Circuit has applied the presumption of irreparable harm to alleged

violations of the Free Speech and Equal Protection Clauses.[40] Here, the NRA alleges violations of

both clauses, and elements of both its First Amendment and its Equal Protection claims overlap

with issues sought to be adjudicated administratively: both in a selective-enforcement and a First

Amendment retaliation context, the government's treatment of comparator entities is squarely at

issue.[41]

Importantly, courts have also found that irreparable harm arises where, as here, allowing

the state to commence administrative proceedings would subject the NRA to "additional testimony

on the very topics at issue in this pending litigation, but outside the bounds of the judicial process

and on defendant's terms."[42]  Such harm is particularly acute if the state administrative agency

---

[38] *Paulsen v. Cty. of Nassau*, 925 F.2d 65, 68 (2d Cir. 1991).

[39] *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744 (2d Cir. 2000).

[40] *See id.* at 744-45 (equal protection); *Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir. 2000) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)) (free speech); *Beal v. Stern*, 184 F.3d 117, 123–24 (2d Cir. 1999) (same); *Bery v. City of New York*, 97 F.3d 689, 693-94 (2d Cir. 1996) (same).

[41] With respect to First Amendment retaliation claims, *see, e.g.*, *Franzon v. Massena Memorial Hosp.*, 32 F. Supp. 3d 528, (N.D.N.Y. 1998) (reversing magistrate's denial of discovery concerning potential disparate treatment of peers in First Amendment retaliation case because admissible evidence in such cases "may well include evidence demonstrating that [the plaintiff] was treated differently" than others similarly situated); *cf.* Am. Compl. at 30-32; *see* ECF No. 154, Notice of Mot. for Leave to File Second Am. Compl. Ex. 1, Proposed Second Am. Compl. at 37-39.

[42] *Schoolcraft v. City of New York*, 955 F. Supp. 2d 192, 199 (S.D.N.Y. 2013) (internal quotations and citations omitted); *see also Mullins v. City of New York*, 554 F. Supp. 2d 483, 486 (S.D.N.Y. 2008) (Failure to enjoin "would allow defendants to compel additional testimony on the very topics at issue in this pending litigation.") (granting preliminary injunction against government action that "threaten[ed] the right to petition the Government via the courts for redress of grievances guaranteed by the First Amendment" (internal quotations and citations omitted)); *Karmel v. City of New York*, 200 F. Supp. 2d 361, 366 (S.D.N.Y. 2002) (plaintiff's participation

conducting the hearing "[is] a party to the instant action [and] . . . stands to sustain significant damage if Plaintiff succeeds in proving his claims, all of which are premised upon the alleged existence of rampant [state government] corruption."[43]  Both criteria are satisfied here: the NRA alleges that DFS abused its substantial regulatory powers, designed to ensure the solvency and soundness of financial institutions, in order to suppress and punish political speech.  Relegating fact-finding on these issues to a DFS-controlled tribunal would unquestionably constitute irreparable harm.

Moreover, the NRA's only outlet for appealing an adverse determination in an administrative hearing would be a proceeding under Article 78 of the New York Civil Practice Law and Rules—over which federal courts in this Circuit are reluctant to exercise supplemental jurisdiction.[44]  The court presiding over the Article 78 appeal would, moreover, be required to accord significant deference to DFS's determinations.[45] Absent an injunction, vital constitutional claims that the NRA pleaded nearly two years ago would be waylaid indefinitely, and could be irreparably compromised, subject to the whims of the exact state agency the NRA has sued.  If pivotal factual issues germane to the NRA's constitutional claims were diverted to an administrative tribunal rather than an Article III court, the NRA would also lose access to plenary appellate review—another noncompensable harm.

---

in government hearing "without the safeguards of the Federal Rules of Civil Procedure" would "risk . . . prejudicing her action against Defendants" (internal citations omitted)).

[43] *Id*.

[44] *See, e.g.*, *Donley v. Vill. of Yorkville*, No. 614CV1324MADATB, 2019 WL 3817054, at *10 (N.D.N.Y. Aug. 13, 2019).

[45] *See, e.g.*, *Bartolacci v. Vill. of Tarrytown Zoning Bd. of Appeals*, 144 A.D.3d 903 (N.Y. App. Div. 2016) (holding that in an Article 78 proceeding, agency determinations are entitled to judicial deference; judicial review is limited to ascertaining whether the action was illegal, arbitrary and capricious, or an abuse of discretion).

Accordingly, the Court should issue an injunction preserving the status quo until the NRA's claims are adjudicated in the forum where the NRA commenced them, and the one best suited to resolve them: this Court.

**B.      The NRA is Likely to Succeed on the Merits of Its Claims.**

As is described above, Defendants' actions target the NRA because of its views on the right to keep and bear arms. Accordingly, they strike at the heart of the First Amendment in at least two ways: (1) by establishing a regime of implicit censorship in order to suppress the NRA's speech; and (2) by retaliating against the NRA for its advocacy on gun-control issues.  Moreover, Defendants' pursuit of the NRA based on its political viewpoint violates the Fourteenth Amendment's guarantee of equal protection of the law, which prohibits targeting entities for enforcement action based on their "exercise of protected statutory and constitutional rights."[46]

Although the NRA is likely to succeed on the merits of all of its claims, the following analysis focuses on the two claims for which the existence of similarly-situated-comparator "violations"—and the government's treatment of the same—are most relevant: First Amendment retaliation, and selective enforcement.

1.      The NRA Is Likely to Succeed On The Merits Of Its First Amendment Retaliation Claim

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."[47]  To establish a retaliation claim, a plaintiff must show that:  "(1) his conduct was protected by the First Amendment, and (2) such conduct prompted or substantially caused

---

[46] *Wayte v. United States*, 470 U.S. 598, 608 (1985).

[47] *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

defendant's action."[48]  A plaintiff alleging retaliation must also demonstrate "either that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm."[49]

Defendants' actions plainly manifest all of these elements. There is no doubt that the NRA's advocacy regarding gun-control policy is protected speech.[50]  Moreover, Defendants openly targeted the NRA because of its viewpoint on an issue of public concern.[51]  Although Defendants may claim that they are only enforcing the insurance laws, that explanation is utterly implausible in light of their express statements emphasizing that Defendants seek to limit banking and insurance activity by "gun promotion organizations"—not organizations party to specific types of affinity-insurance arrangements.[52]  Likewise telling are the sanctions imposed in the Lockton, Chubb, and Lloyd's Consent Orders, certain provisions of which prohibit lawful insurance programs endorsed by the NRA yet permit unlawful programs endorsed by non-NRA entities— contrasted with the strikingly lighter sanctions imposed in the second Lockton consent order, with respect to similar conduct involving non-NRA clients.[53]  No legitimate enforcement action

---

[48] *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) (citations omitted).

[49] *Dorsett v. Cty of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

[50] *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).

[51] *See supra* at 6-8.

[52] *See id.*

[53] For example, the Lockton Consent Order asserts that Lockton violated New York Insurance Law by "advertis[ing] the financial condition of a Chubb insurer by referring to the insurer's AM Best rating" in connection with Carry Guard yet assesses no violations with respect to Lockton's apparently identical conduct vis-à-vis other Lockton-brokered policies. *See* ECF No. 37 Am. Compl. Ex. D, Lockton Consent Order ¶ 12. Nor do the Consent Order's prospective-conduct provisions clarify or limit the range of marketing practices Lockton might permissibly pursue on behalf of non-NRA entities.  Meanwhile, the Consent Order prohibits Lockton from "enter[ing] into any agreement or program with the NRA to underwrite and participate in an

targeting alleged insurance-law violations by Lockton, Chubb, and Lloyd's would focus solely on their relationships with the NRA, nor would it result in a prohibition ***solely*** of doing business ***only*** with the NRA, nor would it yield strikingly disparate treatment of identical violations by programs Lockton ██████████████████████████████████████████████████████. This transparent attempt to silence the NRA is the essence of retaliation.[54]

Nor can there be any serious question that NRA has suffered concrete harm from Defendants' actions: the NRA lost important business relationships when Defendants demanded that Chubb and Lockton sever ties with the NRA, and Lloyd's terminated key business arrangements  with the NRA shortly thereafter, specifically citing Defendants' actions as the reason for its decision.  "Allegations of loss of business or some other tangible injury as a result of a defendant's [retaliatory] statements . . . suffice to establish concrete harm," and that kind of loss is present here.[55]

It is well-established that tactics like Defendants' may constitute retaliatory conduct. Courts have held that government officials' statements to the press,[56] harassing investigations,[57] and regulatory action,[58] can all be bases for retaliation claims.  Indeed, the retaliatory conduct need

---

affinity-type insurance program," irrespective of whether such programs violate New York law. *Id.* ¶ 43.

[54] *See Blankenship v. Manchin*, 471 F.3d 523, 529–30 (4th Cir. 2006) (rejecting official's innocent explanation for his retaliatory actions as "unreasonable").

[55] *Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir. 2011).

[56] *See Blankenship*, 471 F.3d at 530; *Barrett v. Harrington*, 130 F.3d 246, 263 (6th Cir. 1997).

[57] *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 917 (9th Cir. 2012) (en banc); *White v. Lee*, 227 F.3d 1214, 1238 (9th Cir. 2000).

[58] *See Royal Crown Day Care LLC v. Dep't. of Health & Mental Hygiene of New York*, 746 F.3d 538, 545 (2d Cir. 2014).

not be nearly as serious as Defendants' actions in this case to be actionable.[59]  If vague allusions to "additional scrutiny" and alleged regulatory violations are reasonably seen as retaliation as in *Blankenship*,[60] then Defendants' far more explicit threats—to say nothing of the concrete harms already inflicted upon the NRA's business relationships—certainly meet the same standard.

> 2.      The NRA Is Likely To Succeed On The Merits Of Its Selective-Enforcement Claims

Where, as here, "(1) [a] person, compared with others similarly situated, was selectively treated; and (2) [] such selective treatment was based on impermissible considerations such as race, religion, ***intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person***," the Fourteenth Amendment requires relief.[61]

As discovery has already begun to show, Defendants commenced an enforcement action at the behest of an anti-NRA advocacy group which targeted solely NRA-related insurance arrangements.  The DFS-regulated institutions that first felt the brunt of Defendants' efforts knew what they were witnessing: an anonymous banker worried that continuing to serve politically polarizing clients would incur DFS's disfavor,[62] and Lloyd's leadership ███████████████

███████████████████████████████████████████████████████████████

---

[59] *See Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003) (finding that four $35 parking tickets evidenced retaliatory conduct); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982).

[60] *See Blankenship*, 471 F.3d at 530 (where the governor publicly insisted that additional scrutiny of the plaintiff's business was justified, and that the plaintiff had engaged in regulatory violations which "hopefully they've been able to correct," the plaintiff reasonably feared imminent adverse regulatory action).

[61] *See LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980) (emphasis added).

[62] Neil Haggerty, *Gun issue is a lose-lose for banks (whatever their stance)*, AMERICAN BANKER (Apr. 26, 2018, 1:11 PM), https://www.americanbanker.com/news/gun-issue-is-a-lose-lose-for-banks-whatever-their-stance, attached to Rogers Decl. as Ex. M.

███████████████████████████████████████████████.[63] Now, DFS continues to single out the NRA for punishment, without proceeding against any other Lockton client—or any other affinity group—known to have engaged in the same pervasive market conduct. Indeed, a side-by-side comparison of the two consent orders executed between DFS and Lockton should, standing alone, compel a finding of selective enforcement: having discovered that Lockton ███████████████████████████████████████████████ to a wide variety of affinity clients, DFS singled out the NRA for blacklisting and further investigation, leaving Lockton's other clients untouched.[64] If DFS felt that widespread market conduct engaged-in uniformly by the NRA and other affinity groups violated insurance regulations, DFS could have issued clarifying guidance. Instead, DFS warned financial institutions to cut ties with "gun promotion" organizations, on the ground that their political speech "leads to senseless violence."[65] Because differential treatment based on the exercise of First Amendment rights violates the Equal Protection Clause, the NRA is likely to succeed on its equal protection claim.[66]

## C.   The Balance of the Hardships Favors the NRA.

DFS commenced its investigation of certain affinity insurance programs nearly three years ago, and swiftly exacted penalties from insurance brokers and underwriters (all business partners

---

[63] *See* ECF No. 154, Notice of Mot. for Leave to File Second Am. Compl. at Ex. G.

[64] *See* Cashin Decl. ¶¶ 32-35 ("Consistent with my experience as an insurance regulator, I find no evidence of proceedings by DFS against any other affinity client."); *see also* Rogers Decl. Ex. B, Expert Witness Report of James W. Schacht at 34-36 ("Moreover, although the Lockton Consent Order and the Supplemental Consent Order address many of these same types of alleged insurance violations, only the Lockton Consent Order names a consumer—the NRA. In other words, it is reasonable to infer that the NRA was singled out by Defendants.").

[65] *See* ECF No. 37, Am. Compl. at Ex. C (Letter from DFS to Financial Institutions dated April 19, 2019, "RE: Guidance on Risk Management Relating to the NRA and Similar Gun Promotion Organizations").

[66] *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 40 (2d Cir. 2018); *LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d 587, 592 (2d Cir. 1994).

of the NRA) that participated in them.  However, DFS did not take the unprecedented, unusual step of proceeding directly against an affinity **client** until now—facing the specter of re-pleaded selective-enforcement claims, and public discovery and adjudication of its extraordinary conduct vis-à-vis the NRA.  During the time since DFS began its investigation, the NRA lodged serious constitutional claims that have drawn support from senior former insurance regulators, the American Civil Liberties Union, and other academics and commentators.[67] Some of the most important discovery in this case, which the NRA seeks through the Hague regarding DFS's interactions with Lloyd's, remains pending.[68]

    If DFS is permitted to proceed with an administrative hearing adjudicating the same issues raised in this case[69] (issues which will be illuminated further by pending discovery), the NRA's ability to prosecute its claims could be gravely compromised, including due to potential collateral-estoppel effects.[70]  By contrast, having been permitted to complete the fact-finding portion of its investigation without interference from this Court, DFS will suffer no hardship or prejudice if an enforcement hearing is forestalled pending adjudication of overlapping factual issues already before this Court. Indeed, an injunction would serve the interest of judicial economy, and avoid

---

[67] *See* Brian Knight, *Is New York using bank regulation to suppress speech?*, FINREGRAG (Apr. 22, 2018), https://finregrag.com/is-new-york-using-bank-regulation-to-suppress-speech-ac61a7cb3bf, attached to Rogers Decl. as Ex. N; *see also* Kenneth Lovett, *NRA slapping Cuomo with lawsuit over blacklisting campaign, violating First Amendment rights*, NEW YORK DAILY NEWS (May 11, 2018), http://www.nydailynews.com/news/politics/nra-slapping-cuomo-lawsuit-blacklisting-campaign-article-1.3984861#, attached to Rogers Decl. as Ex. O; Molly Prince, *The ACLU Defends the NRA Over Andrew Cuomo's 'Blacklisting Campaign'*, DAILY CALLER (Aug. 25, 2018), https://dailycaller.com/2018/08/25/aclu-defends-nra-against-cuomo/, attached to Rogers Decl. as Ex. P.

[68] *See* ECF No. 129.

[69] *See supra* at 10-11.

[70] *See Matusick v. Erie Cty Water Auth.*, 75 F.3d 31, 49 (2d Cir. 2014) (noting certain factual findings made by an administrative agency precluded plaintiff from arguing otherwise at trial).

undue expense and waste, by averting further litigation that seeks to reconcile the procedural posture and collateral-estoppel implications of parallel, overlapping proceedings.[71]

In the alternative, if it seeks immediate adjudication of its allegation that the NRA violated various provisions of New York Insurance Law, DFS could abide by Fed. R. Civ. P. 13 and plead such claims—which "arise[] out of the [same] transaction or occurrence that is the subject matter of the [NRA's] claim[s]"—before this Court.[72] Although the NRA would be significantly prejudiced if forced to litigate key elements of its constitutional claims in a tribunal controlled by the agency it has sued—a tribunal which lacks robust procedural and evidentiary rules, and which accords *per se* deference to DFS's assertions—there would be no discernible prejudice to the State of New York if its allegations concerning the NRA's affinity-insurance conduct benefit from the full, fair, robust adjudicatory process that federal courts provide.[73]

---

[71] *Cf. Schoolcraft v. City of New York.*, 955 F. Supp. 2d 192, 200 (S.D.N.Y. 2013) (injunction of departmental proceeding serves the interest of judicial economy by preventing unnecessary, additional litigation).

[72] *See* Fed. R. Civ. P. 13.

[73] The fact that DFS stands to suffer no prejudice or monetary loss also disfavors any requirement of an undertaking or bond. District courts are given "wide discretion to dispense with the bond requirement" of Rule 65. *Deferio v. City of Syracuse*, 193 F.Supp.3d 119, 132 (N.D.N.Y. 2016) (citing Rule 65(c)) (holding no security was necessary where no plausible basis by which not removing protestor from an area would result in damage to the city). Courts in this Circuit have consistently found that where "important constitutional and public policy issues" are implicated and the enjoined party does not stand to suffer monetary loss, no security is required for issuance of a preliminary injunction. *Kermani v. New York State Bd. of Elections*, 487 F.Supp.2d 101, 115 (N.D.N.Y. 2006); *see also Donohue v. Mangano*, 886 F.Supp.2d 126 (E.D.N.Y. 2012) ("given the important potential constitutional issues, the Court, in its discretion, dismisses the bond requirement").

**D.**     **An Injunction is in the Public Interest.**

Analyzing the public-interest prong of the injunction standard, courts routinely emphasize two considerations—judicial economy[74] and the vindication of constitutional rights[75]—that strongly favor the injunction the NRA seeks.  Even if the NRA's allegations of corrupt, politically motivated selective enforcement by Defendants were wholly unfounded (they are not), the extraordinary circumstances of this case would favor a public, transparent forum for adjudicating the NRA's claims and dispelling any appearance of impropriety.   The NRA has uncovered, and now seeks to plead, unsettling facts regarding DFS's backroom exhortations to Lloyd's and other financial institutions.  Documents and testimony elucidating the truth of these claims should come before this Court, not be buried—or have their discovery forestalled or preempted entirely—by state bureaucratic mechanisms.

## V.

## CONCLUSION

For the foregoing reasons, the NRA respectfully requests a preliminary injunction enjoining The New York State Department of Financial Services from initiating enforcement proceedings against the NRA.

---

[74] *See Schoolcraft*, 955 F. Supp. 2d at 200; *see also Morgan Stanley & Co. v. Seghers*, 2010 WL 3952851, at *7 (S.D.N.Y. Oct. 8, 2010).

[75] *See Paykina ex rel. E.L. v. Lewin*, 387 F. Supp. 3d 225, 245 (N.D.N.Y. 2019) (emphasizing that public interest supports granting preliminary injunction "especially … where constitutional rights are at stake").

Dated: February 28, 2020                    Respectfully submitted,


                                            By:    */s/ Sarah B. Rogers*                    
                                                   William A. Brewer III (Bar No. 700217)
                                                   wab@brewerattorneys.com
                                                   Sarah B. Rogers (Bar No. 700207)
                                                   sbr@brewerattorneys.com
                                                   **BREWER, ATTORNEYS &
                                                   COUNSELORS**
                                                   750 Lexington Avenue, 14th Floor
                                                   New York, New York 10022
                                                   Telephone: (212) 489-1400
                                                   Facsimile: (212) 751-2849


                                                   **ATTORNEYS FOR THE NATIONAL
                                                   RIFLE ASSOCIATION OF AMERICA**