# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff,** | § § | **CIVIL CASE NO.  18-CV-00566-TJM-** |
| **v.** | § § | **CFH** |
| **ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,** | § § § § § § § | |
| **Defendants.** | § § | |

**EXPERT WITNESS REPORT OF JAMES W. SCHACHT**

i

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................. 1

II. BACKGROUND .............................................................................................. 6

    A.    State Insurance Regulation. ..................................................................... 6

    B.    What Is the Role and Responsibility of a State Insurance Regulator? ................... 7

        1.    The Purpose of Regulatory Authority. ........................................... 7

        2.    Scope of Regulatory Authority............................................................. 8

        3.    Function of Regulatory Authority. ................................................ 8

        4.    Explanation of the Investigative / Enforcement Authority and Process........... 9

    C.    Superintendent of Financial Services........................................................ 10

        1.    Coordination Among Interstate Regulatory Bodies. ...................................... 11

        2.    Examinations and Investigations. ................................................. 11

III. AFFINITY GROUP INSURANCE PROGRAMS ........................................... 13

    A.    What Is an Affinity Group Insurance Program? .................................... 13

    B.    Benefits of an Affinity Group Insurance Program................................... 14

IV. SURPLUS LINES INSURANCE MARKET OVERVIEW ................................. 15

    A.    Surplus Lines Insurance Overview. ................................................ 15

    B.    Surplus Lines Regulation................................................................. 16

    C.    Stamping Offices. .............................................................................. 18

    D.    The Easing of Statutory Requirements and Regulatory Reform. ..................... 18

V. OPINIONS ...................................................................................................... 20

    A.    Cuomo's April 2018 Press Release........................................................ 21

        1.    Background Regarding Cuomo's April 2018 Press Release. ....................... 21

        2.    Opinion Regarding Cuomo's April 2018 Press Release. .............................. 21

    B.    NYDFS Guidance Letters. ................................................................... 22

        1.    Background Regarding the NYDFS April 2018 Guidance Letters. ................ 22

    2.   Opinions Regarding the NYDFS April 2018 Guidance Letters. .................... 22

C.   NYDFS Investigation. .......................................................................................... 26

    1.   Background for the NYDFS Investigation. ...................................................... 26

    2.   Opinion Regarding the NYDFS Investigation. ............................................... 26

D.   Consent Orders ..................................................................................................... 30

    1.   Background for the NYDFS Consent Orders. .................................................. 30

    2.   Opinions Regarding the Consent Orders ....................................................... 34

# I.

## INTRODUCTION

I have been retained by the law firm of Brewer, Attorneys & Counselors , as legal counsel to the National Rifle Association of America ("NRA"), to provide an expert report and opinions on certain matters relating to National Rifle Association of America, Plaintiff, v. Andrew Cuomo, both individually and in his official capacity,  Maria T. Vullo, both individually and in her official capacity, and The New York State Department of Financial Services ("NYDFS"), Defendants (Civil Case No. 18-CV-00566- TJM-CFH in the United States District Court for the Northern District of New York).

Attached as appendix to this report are the following: (1) my biography which contains a list of the publications I have authored, list of other cases in which I have served as an expert, and a summary of my personal background and experience; (2) list of my supplemental publication from 2016; and (3) a list of the documents that I considered and reviewed in forming my opinions.

### (A)    EXPERIENCE AND QUALIFICATIONS

I believe I am well qualified to provide opinions in this matter for the following reasons:

1. I possess over thirty years of experience and service as a state government insurance regulator in Illinois, which is the home of some of the largest insurers in the United States and the world. During this time, I was appointed by two separate Illinois governors, on three occasions, to serve at the highest level of the Illinois Department of Insurance ("ILDOI"),[1] as Acting Director.[2]  I held this office for nearly five years.  For over twenty years, I was the Chief Deputy Director, which is second in command of the ILDOI. The Chief Deputy Director is responsible for managing the day-to-day activities and operation of the insurance department including insurance market conduct surveillance and

---

[1] ILDOI regulates entities involved in the business of insurance.

[2] This is Illinois' counterpart to the Superintendent of the New York Department of Financial Services. I served as 'acting' to preserve my civil service position and salary.

regulation.[3]   Throughout much of my tenure with the ILDOI I was responsible for the regulation of the surplus lines market in Illinois.   I oversaw several enforcement proceedings, administrative orders, and consent orders.

2.   In the mid-1980s, I was instrumental in the implementation of amendments to the Illinois insurance laws, which aimed to improve the oversight of the surplus lines market and created the Surplus Line Association of Illinois ("Illinois Association").[4]   The Illinois Association and the New York, Excess Line Association of New York ("ELANY"),[5] which are both non-profit industry associations created by statute, are responsible for encouraging compliance with the surplus lines insurance laws, liaising between brokers and the regulators, and conducting financial review and oversight of non-admitted markets as well as the collection of surplus lines taxes.

3.   For over twenty years, I was actively involved in the National Association of Insurance Commissioners ("NAIC").[6] I drafted numerous model laws and regulations which were considered for adoption in state legislatures across the country, including New York. Indeed, New York has implemented the regulatory tools and programs that I created to improve the surveillance and regulation of insurers.

4.   Because of my substantial knowledge and experience in insurance and its regulation, I was selected by the National Conference of Insurance Legislators ("NCOIL") to perform a two–part study of the U.S. market conduct regulation and surveillance system and develop recommendations for improving that system. The recommendations I made as a result of

---

[3] Illinois was the first state in the United States to establish an independent unit within the insurance department to perform market conduct surveillance and regulation.

[4] The Illinois Association is a liaison between the Department of Insurance and surplus line producers. It is responsible for promoting compliance with the surplus line law, accepting filings from surplus line producers, and reporting data to the Department of Insurance.

[5] Similarly, ELANY was created by statute and is a non-profit industry association.   It is responsible for encouraging compliance with the surplus lines insurance laws.  It, too, is a liaison between brokers and the regulators and, conducts financial review and oversight of non-admitted markets. http://www.elany.org/about.aspx.

[6] The NAIC sets the standard for insurance regulation for the United States.  It provides support in relation to setting insurance standards and regulating the insurance market.  It is governed by the chief insurance regulators from the 50 states, the District of Columbia and five U.S. territories. "Through the NAIC, state insurance regulators establish standards and best practices, conduct peer review, and coordinate their regulatory oversight." https://www.naic.org/index_about.htm.

this study are included in a model statute drafted by the New York insurance legislative staff. Although the model Act, adopted by NCOIL, resulted in the creation of several new working groups at the NAIC to improve the market conduct surveillance system in the U.S. it was not adopted by the NAIC for a variety of reasons. One major reason is that our report advocated for more reliance on the domestic state to minimize foreign state involvement.

5.  After leaving government service, I created the first insurance regulatory practice unit at Coopers and Lybrand, an international professional service firm. Coopers and Lybrand and Pricewaterhouse merged in 1998 to form PricewaterhouseCoopers. The insurance regulatory unit provides consulting services to insurers, insurance brokers, agents and others. I spent over ten years in this unit and provided advice to numerous clients on insurance programs and related matters. Thereafter, for three years, I served as an independent contractor at other consulting firms, advising clients on insurance and regulatory matters.

6.  In 2008, I formed my own consulting firm and continue to provide insurance and regulatory consulting services.  Recently, I conducted a review and prepared a comprehensive report that examined the activities of an insurer's U.S. subsidiary in the U.S. surplus lines market and corrective action taken to address regulatory concerns.

7.  I have also served on the Board of Directors for three U.S. insurers, two of which market and distribute affinity insurance products.

8.  As a result of my long career as a regulator, educator, receiver, contractor to state insurance departments, insurance industry consultant, author of numerous articles on insurance regulation and an insurance executive, I developed a robust understanding regarding what constitutes customary practices by insurance regulators in regulating market conduct.

9.  I have not only had the opportunity to observe the actions of regulators throughout the country, but as a regulator I set regulatory policy concerning market conduct examinations and remedies for violations of insurance laws. During my tenure, Illinois received credence and praise for its insurance-regulatory competence and vision.

**(B)   SCOPE OF ENGAGEMENT**

The NRA brought this legal action against Cuomo, Vullo, and NYDFS because of their belief that the NRA was subject to discrimination and selective enforcement, retaliation, and other unlawful conduct by the NYDFS, including in connection with the NRA's affinity insurance program.

The scope of my engagement with the NRA is to, based upon my years and expertise in creating, implementing and regulating the insurance market, in particular the surplus lines market:

- Discuss the customary practices adhered to by state insurance regulators for conducting investigations and remediating violations;

- Discuss the surplus lines market;

- Discuss affinity programs and the rules and regulations applicable to Consent Orders between regulators and Lockton Affinity, LLC and Lockton Companies, LLC (collectively, "Lockton"), Chubb Group Holdings, Inc. ("Chubb") and Certain Underwriters at Lloyd's (collectively, "Lloyd's");[7]

- Discuss the significance of Governor Cuomo's press release directing the NYDFS to "urge insurers and bankers statewide to determine whether any relationship they may have with the NRA or similar organizations sends the wrong message to their clients and their communities";

- Discuss customary practices relating to regulators' issuance of guidance letters;

- Discuss customary practices relating to consent orders between insurance regulators and regulated entities;

---

[7] Certain Underwriters is defined as KLN 0510, managing agent Tokio Marine Kiln Syndicates Limited; AUW 0609, managing agent Atrium Underwriters Limited; SAM 0727, managing agent S.A. Meacock & Company Limited; CNP 0958, managing agent Canopius Managing Agents Limited; CSL 1084, managing agent Chaucer Syndicates Limited; ROC 1200, managing agent Argo Managing Agency Limited; GER 1206, managing agent AmTrust Syndicates Limited; BRT 2987, managing agent Brit Syndicates Limited; CNP 4444, managing agent Canopius Managing Agents Limited; and LIB 4472, managing agent Liberty Managing Agency Limited.

- Analyze the Consent Orders between the NYDFS and Lockton, Lloyd's and Chubb, including the severity, or lack thereof, of the stated violations of the insurance laws; and

- In light of all of the foregoing, opine on whether, or to what extent, NYDFS can reasonably be inferred to have deviated from the practices and norms of insurance regulation in this case.

### (C)   COMPENSATION

I am being compensated in this matter at my usual rate of $500 per hour and $200 per hour for my associate's time, plus expenses.

### (D)   SUMMARY OF OPINIONS

A summary of my opinions is presented below, and detailed explanations are presented in Section V.

**Opinion 1:** Governor Cuomo's April 2018 Press Release was highly unusual, as it is not typical for a state governor to publicly direct an insurance regulatory agency, such as the NYDFS to take action against specific entities—especially entities that are insurance customers or clients, rather than regulated insurance brokers or carriers.

**Opinion 2:** The Guidance Letters issued by Vullo and the NYDFS departed from the usual and customary practices of insurance regulators, for several reasons: (1) the Guidance Letters focused on political and social issues not related to insurance; (2) despite the foregoing, the Guidance Letters invoked the NYDFS's significant authority that would otherwise compel an insurance institution within NYDFS's jurisdiction to comply with the guidance, even if the letters were not formally enforceable; (3) the Guidance Letters contravene public-policy considerations that ordinarily guide regulators' actions; (4) the Guidance Letters allege "reputational risk" attributable to a specific affinity insurance customer based on the customer's political views;  and (5) it can reasonably be inferred based on the issuance of the Guidance Letters that Defendants' enforcement actions in this case are improperly motivated by political considerations beyond the customary scope of insurance regulation.

**Opinion 3:** The NYDFS Investigation was highly unusual and did not proceed according to customary insurance regulatory practice, for a number of reasons: (1) the NYDFS Investigation originated from a complaint from a political organization whose sole purpose is to oppose the NRA; (2) the NYDFS Investigation was not justified by any instance of harm that the NRA insurance products caused consumers in the marketplace; (3) the NYDFS Investigation wrongfully made the NRA its primary target; (4) the NYDFS did not provide a report of its investigation in the subsequent Consent Orders; and (5) Vullo attempted to begin a multi-state investigation into the NRA-related insurance products without using the proper regulatory avenues through the Market Action Working Group.

**Opinion 4:** The Consent Orders entered into by Lockton, Chubb, and Lloyd's were highly unusual and not customary to insurance regulatory practice for several reasons: (1) the Consent Orders were overbroad; (2) the fines imposed against Lockton, Chubb, and Lloyd's were excessive and go well beyond any purported harm caused by the NRA affinity insurance programs; (3) the Consent Orders improperly identify the NRA, even though the NRA is not the subject of the Orders, and treat the NRA differently from other affinity organizations that were apparently found to have engaged in the same conduct; and (4) the Consent Orders treat relatively minor declination and ratings violations in a manner that dramatically departs from customary regulatory practice.

I continue to review materials and documents related to this case and reserve the right to supplement this expert report based on any additional work that I might be asked to do.

## II.

## BACKGROUND

This Section provides certain background information germane to understanding my opinions and the basis for those conclusions. It includes a brief overview of the nature and scope of insurance regulation in the United States, a description of affinity insurance programs and an explanation of the surplus lines market in the United States and the regulation of that marketplace.

### A.     State Insurance Regulation.

Since the early 1800s, the insurance industry has been subject to regulations, which cover domestic insurers and reinsurers, foreign insurers and reinsurers, alien insurers and reinsurers, surplus lines insurers, and individuals and entities that market insurance products, such as agents

and brokers. Domestic insurers are those insuring entities that are incorporated in a particular state, and foreign insurers are companies licensed by a state, but which are incorporated in another state. Reinsurers are entities that assume all or part of a risk of an insurance company. Insurers conducting business in the admitted market are required to obtain a license from each state where they seek to provide services.

Surplus lines insurers, such as Chubb, are companies that conduct business in one or more states on a non-admitted basis. The Surplus lines market (also referred to as excess lines market) is a less regulated market, which is discussed in Section IV.

## B.    What Is the Role and Responsibility of a State Insurance Regulator?

### 1.    The Purpose of Regulatory Authority.

Across the United States, the role of a customary state insurance regulator is to ensure compliance with the insurance statutes and regulations, establish a competitive insurance market, ensure the availability of insurance products that insurance consumers require, and promote the affordability of insurance. Indeed, the predecessor of the NYDFS,[8] the New York Department of Insurance, was founded with the following goals: 1) to foster the growth of the financial industry in New York and spur state economic development through judicious regulation and vigilant supervision; 2) to ensure the continued solvency, safety, soundness and prudent conduct of the providers of financial products and services; 3) to ensure fair, timely and equitable fulfillment of the financial obligations of such providers; 4) to protect users of financial products and services from financially impaired or insolvent providers of such services; 5) to encourage high standards of honesty, transparency, fair business practices and public responsibility; 6) to eliminate financial fraud, other criminal abuse and unethical conduct in the industry; and 7) to educate and protect users of financial services and ensure that users are provided with timely and understandable information to make responsible decisions about financial products and services.[9]   It is my understanding that the NYDFS still seeks to further these same goals.

---

[8] The NYDFS was created in 2011 when Governor Cuomo signed into law the Financial Services Law, which consolidated the insurance department and banking department into one state agency.

[9] *See* New York Financial Services Law §102.

2.      **Scope of Regulatory Authority.**

With few exceptions (not relevant to the actions taken here), the insurance industry is regulated at the state level.[10]  States have broad power and authority to regulate the business of insurance from "womb" to "tomb" since most insurers' activities are subject to oversight, and often require prior approval from the regulator before they can be undertaken. This authority includes the following areas: licensure of those entities seeking to engage in the business of insurance; solvency oversight and requirements to ensure insurers have adequate funds to satisfy future claims; rate and form regulation prescribing the terms of insurance contracts and prices that customers may be charged for the coverage; and, market conduct regulation which oversees the marketing of insurance contracts and the processing of claims.  Such customary powers that state insurance regulators generally possess were vested in NYDFS to ensure that insurance companies are properly organized to satisfy claim obligations and that brokers are fit and knowledgeable to sell insurance products. The power to grant a license also carries with it the authority to suspend or revoke that license.

In addition, state-based insurance regulations govern what insurance products may be sold and what insurance-contract language may (or must) be utilized in a particular state. The form review systems enacted across states vary to include state prescribed forms, prior approval of forms, or no filing of forms.

Rate regulation is another area of regulation which varies amongst the states as to the type of requirements and which lines of insurance are covered. Requirements may include prior approval, use and file, open competition or a no filing approach.

3.      **Function of Regulatory Authority.**

An insurance regulator's authority is not unlimited, but rather is constrained by the laws passed by the state legislature. Similar to other legislation, insurance statutes tend to be reactive to problems or issues existing at a point in time.  Often times these statutes become outdated, yet are not removed from the body of insurance law.  Thus, it is the responsibility of the regulator to

---

[10]  The federal government regulates the insurance industry in discrete areas such as flood insurance, terrorism coverage and risk retention groups, and the. Federal Insurance Office ("FIO") has been vested with authority to monitor the stability of the insurance industry.

understand the history of insurance legislation and the concern or problem the legislation sought to address.  The regulator must then apply the statute to a current situation in a thoughtful manner. An example of this can be found in the prohibition against payment of remuneration to entities other than a licensed agent or broker.  This prohibition comes from an era when agents were the principal source of business.  Today, sources of business and the manner of distribution have changed to include the internet, affinity groups, call centers and many others. Thus, while the regulator cannot ignore any statutory provisions, enforcement can and must be calibrated to reflect the realities of the current marketplace.

### 4.      Explanation of the Investigative / Enforcement Authority and Process.

Insurance departments are vested with the broad power to examine and investigate those licensed to operate insurance-related businesses in the state, to ensure that such licensees meet statutory requirements and are in compliance with insurance laws.  Insurance commissioners are given discretion to determine who should be examined, how that examination should be conducted and what the scope of that examination should include. If an examination or investigation reveals violations of the insurance laws, the commissioner has broad discretion in fixing a remedy.  Absent any statutory provision dictating the remedy for a particular violation, the remedy sought by the regulator is guided by the nature and level of the harm caused to consumers. When violations are technical and no consumers are injured, remedial actions and fines sought are typically nominal. For example, if provisions of an insurance policy form are found to be contrary to law by an examiner, the regulator will typically require that the form be withdrawn, amended, and filed for review and approval before continued use.

States regulators use a variety of methods of enforcement to deter unlawful marketplace conduct, which include monetary fines, cease and desist orders, consent orders, removal of officers or directors, and license revocation or suspension.  Regulators typically consider the violation of the insurance law and its harm to the marketplace and consumer, and then assess a penalty which aligns with the harm that such violation causes in the marketplace.  The regulated entity has a right to due process before a penalty is final. Final determinations are subject to judicial review, but in most cases considerable deference is granted the insurance commissioner by a court, except in certain cases where discretion has been abused.

Insurance regulations are designed, in significant part, to safeguard consumers of insurance products and promote fair competition in the marketplace.   Accordingly, financial solvency regulation is one of the most important aspects of insurance regulation.   Regulators routinely examine the financial status of insurers to confirm that insurers are capable of satisfying the contractual obligations of the insurance contracts that they sell. Financial solvency regulation is highly developed and standardized throughout the United States and has been in existence since the early days of regulation.   It prescribes the obligation of insurers to file certain reports, the accounting standards and practices to be observed in the preparation of the reports, the manner in which capital and surplus is to be maintained, controls on insurance holding company systems and intercompany transactions, and prior approval requirements for many material transactions.

Under various grounds, including impairment or insolvency, the insurance commissioner has the discretion to place an insurer in supervision or judicially supervised conservation, rehabilitation or liquidation.   Thereafter, the insurance commissioner is responsible for administering the receivership under the supervision of the court.

## C.     Superintendent of Financial Services.

Like other administrative agencies or officials, the insurance commissioner (sometimes referred to as the superintendent of each state) is granted only certain powers enumerated by state law. Superintendents are authorized by the legislature to promulgate rules and regulations that implement a statute (if administrative procedures for rulemakings have been followed and the rules are consistent with the policy expressed by a statute).

Domestic insurers, particularly in the area of financial regulation, are subject to greater scrutiny than foreign insurers doing business in a state.   Generally, rate and form regulation applies to all insurers doing business in that state. Again, the principal objective of insurance regulation is to establish a competitive insurance market and to ensure the availability of insurance products desired by customers at the lowest cost and offered by insurers that are financially sound and stable.

An insurance regulator is not a prosecutor. A prosecutor is a government official charged with bringing defendants in a criminal case to justice.   An insurance regulator is charged with enforcing the laws against the entire insurance industry.   Customarily, this enforcement is handled

in a fair and balanced way and consistent with the purpose and objectives of insurance regulation as previously set forth.  The insurance laws are complex, and violations can be small or serious but all, except in but a very few cases, are subject to civil remedies. These remedies are by custom fixed by regulators to fit the nature of the misdeeds.

Little has been written about the role of state insurance commissioners in the U.S., and how they develop their regulatory philosophy and agenda. Most of the studies of regulation have been written by lawyers and economists with little attention paid to the 'what', 'how' and 'why' of insurance regulation. Similarly, little has been written about the skills and qualities required to be a successful chief regulatory official. From my experience, a regulator should be an individual who can be fair, measured, balanced and who possess technical knowledge of the industry, and is not seeking headlines.  Just as important, a regulator should be able to leave personal views and preferences at the door of the insurance department.

### 1. Coordination Among Interstate Regulatory Bodies.

The NAIC is an important institution of the state regulatory system.  It creates model laws and regulations for consideration by state governments, establishes best practices, creates regulatory tools for use by regulators, and provides a forum for communication and cooperation among state regulators to effectively regulate the insurance industry which is a valuable and important part of the global U.S. economy.  Increasingly, insurance is a global business and the NAIC has created important links with insurance supervisory officials throughout the world.

Recently, enterprise risk management ("ERM") has become a significant area of insurance regulation, and thus a concern for insurance brokers and underwriters. This occurred largely as a result of Solvency II requirements initiated by the European Union. Through the NAIC, state regulators created a similar system that is called Own Risk of Solvency Assessment ("ORSA") to emulate the European model.  Since this is a new area, state regulators are learning the intricacies of ERM and ORSA so that they can be effectively applied throughout U.S. insurance regulation.

### 2. Examinations and Investigations.

A typical insurance investigation customarily proceeds as follows. As mentioned above, the state insurance superintendent is authorized to conduct examinations.  Most market conduct issues and problems are detected by periodic examinations of insurers, brokers or agents.

Typically, market conduct examinations are commenced because of consumer complaints. Market conduct examinations are performed by insurance department personnel with a background and experience in insurance industry practices, technical knowledge in claims, underwriting, marketing, distribution and related areas relevant to the line or lines of business of the entity being examined. The examination is usually conducted at the offices of the company being examined. This provides the examiners with immediate access to documents, as well as company personnel. At the conclusion of the examination, a comprehensive report is prepared by the examiners setting forth detailed findings and potential violations. Thereafter the supervisory staff reviews the findings in the report to ensure that the violations are well documented, and the application of the regulations comport with the Department's current interpretation and application of the regulations in the examination of other entities. Afterwards, an informal conference is held with officials from the company under examination to discuss findings, possible violations and corrective action. These meetings, in most cases, result in reaching an agreement between the Department and the Company. The informal conferences are not adversarial since both parties share the common goal of compliance with the insurance regulations and ensuring the issues are not repeated in the future. Indeed, the New York Department of Insurance issued a publication that best states the philosophy of insurance regulatory process, "It is better to convert the opponent by persuasion then to exercise its inherent power."[11] After the examination report is agreed to, it becomes final, and in most states, such as New York, available for public inspection. An order may be then entered to direct the company to fix law violations.

If, however, the parties are unable to reach an agreement, the company can typically request a hearing to refute the examiner's findings and/or the Department's interpretation and application of the statute. In practice, formal hearings are a rare occurrence.

Except in rare cases of suspected fraud or improper nonpayment of claims or other harm to policyholders, a formal investigation generally is not conducted using the commissioner's investigative power.

---

[11] NEW YORK STATE INSURANCE DEPARTMENT, Examination of Insurance Companies, A Series of Lectures Delivered before the Examiners of the New York State Insurance Department; Prepared under the Direction of Deputy Superintendent Adelbert G. Straub, Jr., New York, (Vol. 6 1953-1955), p. 6-7.

# III.

## AFFINITY GROUP INSURANCE PROGRAMS

**A.     What Is an Affinity Group Insurance Program?**

Affinity and specialty programs in the insurance industry provide insurance solutions for a wide variety of membership groups, which result in added value and strengthened relationships between members and their organizations.   There are tens of thousands of these programs in the insurance industry today. The Professional Insurance Marketing Association is the leading affinity group trade association and has estimated the total Affinity Market at $60 billion in insurance premium.[12] Part of the reason affinity groups have grown is the decline of the number of traditional insurance agents and brokers.

An affinity group is an established group of people having a common interest, goal, or specific purpose.   Generally, the affinity group has a solid reputation and connection with a sizeable consumer base, which allows the affinity group to reach them in a more efficient way than ordinary marketing approaches. Affinity groups typically include: membership organizations or associations, nonprofits or charities, or companies that cater to specific demographics.

There are two parties involved in an affinity group marketing campaign: the affinity group, and the business providing the group with a product or service.  Businesses who enter into affinity partnerships are varied in size, scope and products offered.  In the insurance industry, some of the biggest direct marketing programs are affinity programs.  Members of organizations like AARP or USAA, for instance, are always looking for incentives to stay in an organization, making these among the most successful affinity groups targeted by affinity marketing campaigns.

By way of example, a group insurance policy, usually life, accident, health or disability can be issued to the group with the coverage marketed to its members. Or individual auto, home or professional liability policies can be sold to group members at special rates. These group structures simplify the design and pricing of insurance products, and, of course, from a marketing perspective presents plenty of advantages.  Over the years, the definition of an affinity group has

---

[12] The Professional Insurance Marketing Association ("PIMA") is the leading affinity group trade association with a focus on propelling market growth in this area by engaging thought leaders, cultivating relationships and fostering commerce.

expanded to include groups that have little in common, other than a monthly payment relationship with some organization or some other demographic that was of interest to marketers. Thus, there are affinity programs for everything, from very tight knit organizations with high affinity like professional associations of teachers, to programs that merely have a well-known sponsor, such as a national bank credit card or checking service. One need only look at the affinity marketing success stories of the credit card industry. The credit card industry used thousands of membership groups to market credit cards, allowing for a better deal on credit cards for the middle-income market. The collective power of large numbers of members allowed for a better deal on credit cards.

**B.      Benefits of an Affinity Group Insurance Program.**

Entities of all sizes, global corporations, start-ups, small enterprises, and affinity groups realize that insurance is a way to manage risk, but often lack the time, resources, or know-how to manage a successful insurance program. Insurance carriers and marketers, however, can design customized products with attractive pricing and renewability. They can streamline the purchasing, provide dedicated support for program participants, and reduce administrative burdens in marketing, enrollment, billing, settlement, data management, and underwriting as well as customer education.

The economic advantages of affinity marketing are reflected in better response and sales rates, better persistence and overall improved marketing profitability. Carriers, brokers, third-party administrators, and active, involved affinity groups understand this. While the affinity group's objective is to generate high enough participation to cover the cost of it supporting the program (at a minimum), the affinity group also has an opportunity to generate compensation in the form of commissions, or fees and allowances.

Affinity insurance programs are well suited to insurance marketers for a variety of reasons:

- An affinity group member feels more comfortable if there are others who are already happy with buying an intangible-like insurance, especially if the policy is paired with the endorsement of an association.
- Powerful branding can be achieved quickly at low cost by teaming up with a well-known and nationally respected organization for a sponsored marketing program.

- Affinity group members feel empowered by the negotiating strength and influence of the group, particularly if it involves a substantial amount of business.  Group insurance policies, special group rates, and group discounts generally provide for a better deal.
- Customized affinity programs provide insurance product features that relate to the characteristics of the membership.  The offer for insurance is presented as endorsed by the association and facilitated by an insurer/ broker as required by insurance regulation.
- Affinity group marketing allows for multiple media opportunities to build the relationship and present the full insurance product line available to the group's members.  (Websites, newsletters, magazines, direct mail, professional journals, social media, and timely content in the form of podcasts, etc., may all be used to sustain member interest.)

Naturally, groups that sponsor affinity insurance programs want to be compensated for the insurance broker's use of their trademarks, mailing list, and other affinity group assets.  Changes to insurance laws to accomplish that have been slow in adoption; however, regulators generally acknowledge that affinity insurance is a welcome and growing presence in the marketplace and make reasonable efforts to accommodate it.

## IV.

## SURPLUS LINES INSURANCE MARKET OVERVIEW

**A.**     **Surplus Lines Insurance Overview.**

Although state insurance law is designed to maximize the degree to which insurance is written by licensed or admitted insurers, the surplus lines market in the United States (also called the non-admitted market) functions as a supplemental market for risks not acceptable to the standard insurance market.  For insureds unable to secure coverage from in-state licensed companies, the surplus lines market provides an alternative market with flexibility, additional capacity and innovative underwriting.  Every state recognizes some form of surplus lines insurance, which goes by a variety of (synonymous) names: Surplus Lines, Excess and Surplus Lines, E&S and Non-Admitted.

Surplus lines law recognizes that in each state there will be consumers that require insurance coverage who are unable to procure the necessary coverage from licensed insurers for any number of reasons.  Their risks may be characterized by a history of frequent or potentially

catastrophic losses.  Or, the desired coverage may be esoteric and outside of the licensed insurer's underwriting expertise.  Additionally, the subject risks may require insurance limits that exceed the capacity of the standard market.

The surplus lines business predominately consists of commercial lines, although some personal lines coverage can be written on a non-admitted basis, such as homeowner's insurance in catastrophe-prone areas.  This occurs because the admitted market does not offer coverage in these areas, or it does not provide coverage with policy terms that meet certain requirements.  The provision of residential coverage by surplus line carriers continues to grow since the major hurricanes in the early 2000s.

Insurers operating in the surplus lines market are generally small, such as specialty insurers, specialized divisions of larger insurance organizations, or regulated aliens (including Lloyd's). These entities typically have significant expertise and experience with the coverages and business found within the surplus lines market.

**B.**    **Surplus Lines Regulation.**

The surplus lines market is often misunderstood from a regulatory standpoint due to the common fallacy that it is regulated less than standard insurance markets.  Rather, most states have a detailed body of insurance law governing the activities of their surplus lines market.

Surplus lines insurers (non-admitted insurers) are not licensed or admitted in the state where the insured or risk is located or resides.  However, the surplus lines insurer must be licensed in its home state or country of domicile.  It is the domiciliary regulator that oversees the financial solvency and strength of the surplus lines insurer.

The insured's home state is the state responsible by federal law to oversee and regulate surplus lines transactions entered into by a particular insured.  Retail producers, surplus lines insurance intermediaries, and program managers, all as the primary distributors for surplus lines insurers, are the primary focus of state insurance regulatory mechanisms and oversight.  Generally, accounts are only written in the surplus lines market if coverage has been declined in the standard market.  Typically, three such declinations are required, but this standard can vary from state to state.  Some states compile and maintain "export lists" to regulate the flow of business between

the admitted and surplus lines markets.[13]   These export lists identify coverages and insurance products which are deemed to be generally unavailable from the admitted market, thus eliminating the need for the broker to diligently first attempt to place these in the standard admitted market.

As a non-admitted carrier, a surplus lines insurer is not subject to the rate and form review and approval requirements of the insured's home state; thus, the insurer is free to use policy forms and rates appropriate to the risks accepted.  This regulatory approach ensures an open and flexible market for insureds unable to find adequate coverage in the admitted or standard market.  While exemption from rate and form filing affords insurers the flexibility to respond to changing market conditions and coverage needs, this is offset by a risk that does not exist with an admitted insurer. Policyholders placed with a surplus lines insurer are not protected in the event of insolvency by the guaranty fund system, and the insured's only source of recovery is the estate of the insolvent insurer.  The admitted market is heavily regulated with regard to solvency, rates and forms, market conduct, investments, capital structure, surplus to premium ratios and affiliate relationships. Additionally, licensed insurers are subject to participation in government-mandated insurance programs and must pay assessments levied by state guaranty funds in the event of insurer insolvencies.

In order for an unauthorized insurer to write business under the surplus lines insurance law of the various jurisdictions, it must first become an "eligible" surplus lines insurer.  Most states periodically publish lists of eligible surplus lines insurers to be used by licensed surplus lines producers. These insurers meet the state's financial strength and other standards.  Other states simply publish general standards the non-admitted insurer must meet in order to be eligible, and then require the producer to satisfy itself that the particular insurer it wants to use meets those standards.  Prior to enactment of the federal Non-admitted and Reinsurance Reform Act of 2010 ("NRRA") which became effective July 21, 2011, eligibility standards varied widely from state to state.  The NRRA sought to address a number of underlying problems as explained further below.

As noted earlier, all states have laws that protect consumers by requiring specially licensed and trained producers, which are intermediaries or program managers that assist consumers in finding coverage unavailable in the standard markets.  Much of each state's surplus lines' legal

---

[13] *See* http://www.elany.org/coveragecodes.aspx?d=1031.

requirements are focused on those engaged in the distribution system for this coverage. The insured's home state requires a surplus lines broker to be licensed to sell, solicit, or negotiate surplus lines insurance. By way of example, a surplus lines broker would work with a consumer's agent or producer that is seeking the nonstandard insurance solution for their client. The surplus lines broker is responsible for placing the coverage with an eligible surplus lines insurer, reporting the transaction to the insurance regulator, remitting premium tax due to state authorities and ensuring compliance with all the surplus lines regulations for that particular state.

## C.   Stamping Offices.

A more recent statutory development in surplus lines is the creation of stamping offices. These offices are a joint and voluntary venture between the surplus lines industry and state regulators with the goal of encouraging compliance and consistency outside of the regulatory structure. The stamping office concept emerged when California formed the first Surplus Lines Association in the 1930's. Evaluating the eligibility of excess companies, offering assistance to buyers, collecting surplus lines tax and generally educating the public about the surplus lines market are among the functions of the stamping office.

It is the view of some that the stamping offices permit easy access by insureds to the approved lists of eligible carriers or disapproved lists, as the case may be. Stamping offices facilitate communication with surplus lines brokers, and they also help brokers comply with the stamping requirements. It is usually required that every surplus lines policy be stamped. For example, the surplus lines stamping fee is charged on all surplus lines insurance transactions in New York by authority of Section 2130 of the New York Insurance Law. This fee helps fund the operations of the Excess Line Association of New York. The surplus lines producer is required by law to remit this fee to the Association on all insurance contracts written under his or her license. The law also permits the producer to collect this fee from the insured.

## D.   The Easing of Statutory Requirements and Regulatory Reform.

On July 21, 2011, NRRA came into effect as part of the Dodd Frank Wall Street Reform and Consumer Protection Act. The purpose of the NRRA was to create a more simplified and efficient surplus lines tax payment and regulatory system by limiting regulatory authority of surplus lines transactions to the home state of the insured and by establishing federal standards for

the collection of surplus lines premium taxes, insurer eligibility, and commercial purchaser exemptions. All states except Michigan and Washington, D.C., have enacted legislation to implement the NRRA.[14] Here is a brief summary of how provisions of the NRRA will affect the current regulation of surplus lines insurance in the U.S.:

- Compliance Responsibility is Exclusively with the Insured's Home State:
  - No other state may require a surplus lines broker to be licensed in order to sell, solicit or negotiate non-admitted insurance with respect to such insured.
  - The laws, regulations, provisions or actions of any state that applied to non-admitted insurance sold to an insured whose home state is another state are preempted.
  - Only the insured's home state is permitted to collect premium taxes for non-admitted insurance. All other states are preempted from applying their surplus lines laws to such transactions.
  - An insured's home state is allowed to require surplus lines brokers, as well as insureds who have independently procured insurance, to file detailed annual tax allocation reports with the insured's home state.
- Uniform Standards for Surplus Lines Eligibility:
  - States are empowered to create uniform national requirements, forms and procedures for insurer eligibility for U.S. domiciled (foreign) surplus lines insurers.
  - States may not prohibit a surplus lines broker from placing non-admitted insurance with, or procuring non-admitted insurance from, a non-U.S., non-admitted insurer listed on the Quarterly Listing of Alien Insurers maintained by the NAIC's International Insurer's Department.
- Exempt Commercial Purchaser:
  - The NRRA preempts any state laws or regulations requiring a surplus lines broker seeking to procure or place non-admitted insurance for certain sophisticated commercial purchasers to satisfy diligent search requirements under certain

---

[14] *See* Wholesale * Specialty Insurance Association, Nonadmitted and Reinsurance Reform Act, Background, (last visited March 15, 2019), https://www.wsia.org/wcm/Legislative_Advocacy_Compliance___PAC/NRRA/wcm/Legislative _Advocacy___PAC/NRRA_Background.aspx?hkey=9a0a7dcb-c6bf-4f52-aa89-7e958f5320d8.

circumstances.  These transactions will still have to be reported, as only the diligent
search requirement is waived.

- States are Encouraged to Participate in National Producer Database:
  - States are encouraged to participate in the NAIC's producer database or any other equivalent uniform national database for the licensure of surplus lines brokers and the renewal of such licenses.

- Calculation of Surplus Lines Taxes:
  - Almost all of the states' surplus lines codes have been amended to incorporate many of the terms of the NRRA, yet many states have yet to agree on a consistent tax sharing arrangement for surplus line premium tax.

In 2009, states began enacting laws permitting the formation and licensure of domestic surplus lines insurers.  Illinois was the first state to enact this legislation in an attempt to address the inefficiencies of the traditional regulatory scheme for surplus lines insurers.  A company that wishes to write coverage on a surplus line basis in all fifty states faces significant administrative burdens if the insurer is domiciled in a state that has not enacted this legislation.  In such states, a U.S.-based surplus lines insurer must operate on a licensed/admitted basis in its state of domicile. Thus, to write surplus lines insurance in the insurer's home state, it is necessary to establish a separately capitalized carrier in a different state for the sole purpose of writing surplus lines coverage in the home state of the original insurer.  These inefficiencies have become increasingly apparent to the states.

As states modernized their surplus lines laws, following enactment of the NRRA, trade associations and interested insurers engaged state insurance departments and legislatures to consider the benefits and the sensible rationale for the Domestic Surplus Lines charter.  As of 2019, only a few states now offer a domestic insurer a certificate of authority to write surplus lines as a Domestic Surplus Lines Insurer.

## V.

## OPINIONS

In this section, I set forth my opinions from an insurance regulatory standpoint on several actions by the Defendants concerning the NRA, the Carry Guard Insurance Program, and other

NRA affinity insurance programs, as well as the basis for my opinions. Based on the material I reviewed, it is my opinion that the NYDFS did not follow usual and customary practices of an insurance regulatory agency.  Further, the NYDFS's actions may have been improperly influenced by bias concerning the topic of gun control and gun violence.

A.      **Cuomo's April 2018 Press Release.**

1.      **Background Regarding Cuomo's April 2018 Press Release.**

On April 18, 2018, Governor Cuomo issued a press release indicating that he had ordered the NYDFS to advise the entities it regulates—including banking and insurance institutions—to review their relationships with the NRA and similar so-called "Gun Promotion Organizations."[15] The Press Release specifically calls on regulated entities to "consider whether such ties harm their corporate reputations and jeopardize public safety.[16]  Further, Governor Cuomo urged the entities to "determine whether any relationship they may have with the NRA or similar organizations sends the wrong message to their clients and their communities who often look to them for guidance and support."[17]

2.      **Opinion Regarding Cuomo's April 2018 Press Release.**

It is extraordinary for a state governor to direct a regulatory agency, such as the NYDFS to take discrete regulatory action against an insurer or broker, let alone a specific customer, especially in such a public manner as through a press release.  In my long career as a regulatory official, I have never seen a state governor—in Illinois or any other state—take such an action.  In Illinois, for example, all communications and directives from the Governor's office to the insurance department were done privately, and the communications and directives seldom involved regulatory action that should be taken by the department. Never did they involve action relating to a social or political issue, such as gun control. The Governor and his staff understood that decisions

---

[15] New York Department of Financial Services, Press Release, *Governor Cuomo Directs Department of Financial Services to Urge Companies to Weigh Reputational Risk of Business Ties to the NRA and Similar Organizations: Insurance Companies, Banks, and Other Financial Institutions Encouraged to Review Relationships with the NRA and Similar Organizations,* dated April 19, 2018 (the "Press Release").

[16] Press Release.

[17] Press Release.

as to regulatory action to be taken or the type of action to be taken are made only by the head of the agency and may only involve legitimate regulatory concerns. Indeed, the state legislature has empowered the head of the department to take such action—not the Governor.  In most states, the governor typically appoints the insurance commissioner, and therefore the governor may be viewed as the commissioner's superior.  Nonetheless, customarily, the governor does not direct the insurance regulator to take specific actions against specific entities; instead, the state insurance regulator typically strives and is expected to act as a neutral enforcer of insurance regulations, not an instrument of the governor's office that pursues political objectives.

**B.     NYDFS Guidance Letters.**

  **1.     Background Regarding the NYDFS April 2018 Guidance Letters.**

  On April 19, 2018, Vullo issued Guidance Letters with a memorandum titled "Guidance on Risk Management Relating to the NRA and Similar Gun Promotion Organizations", which was sent to the Chief Executive Officers of all insurers doing business in the State of New York.[18] The same letter was sent to each CEO of a bank doing business in New York.  The Guidance Letters cited recent incidences of gun violence and "encouraged" insurers to evaluate their "reputational risk" that may arise from their dealings with the NRA or similar Gun Promotion Organizations.[19] As referenced above, these Guidance Letters were preceded by Governor Cuomo's April 18, 2018, Press Release indicating that he ordered the NYDFS and Vullo to disseminate the content of the Letters.

  **2.     Opinions Regarding the NYDFS April 2018 Guidance Letters.**

  It is my opinion that the Guidance Letters issued by the NYDFS were not part of the usual and customary practice of an insurance regulatory agency for the following reasons:

---

[18] Vullo, Maria T., Superintendent of Financial Services, Memorandum, *Guidance on Risk Management to the NRA and Similar Gun Promotion Organizations*, dated April 19, 2018 (the "Guidance Letters").

[19] *Id.* at 1.

### (a) The Guidance Letters Focus on Political Topics Unrelated to Insurance.

While directed to insurers, most of the content in the Guidance Letters sent to insurers does not address insurance issues, but rather, political and social controversies surrounding gun ownership and gun violence. As explained above, the primary responsibility of an insurance regulatory agency is to enforce the insurance laws and regulations, not to enact personal or political agendas unrelated to insurance and its regulation.

### (b) Nonetheless, the Guidance Letters Invoke the Regulatory Authority of the NYDFS.

As described earlier, pronouncements by a state insurance regulator typically carry great weight with the institutions it regulates, and are not ignored even if they cover an area outside the purview of the regulatory agency. An agency like the NYDFS has numerous ways to retaliate against regulated entities if they misbehave, as well as to make an insurer's "life" unpleasant. Ultimately, the regulator's licensing authority and power is a way to keep insurers "in line" and compliant, and all regulated entities are keenly aware of this. Accordingly, based on my experience as an insurance regulator, I believe it is highly unlikely that an official regulatory guidance letter urging particular action would be ignored by an insurer, even if the guidance letter were technically unenforceable, did not contain mandatory language, or commented on matters beyond the immediate scope of the regulator's jurisdiction. Instead, it is reasonably likely that an insurer wishing to remain in the good graces of the insurance regulator would comply with the guidance. Compliance would be particularly likely if the guidance urged an action that would not materially impact the insurer's bottom-line profits.

### (c) The Guidance Letters Contravene Public-Policy Considerations That Typically Guide Insurance Regulation.

The Guidance Letters were directed to insurance executives primarily responsible for managing profitable insurance enterprises, as well as providing insurance coverage of the type and nature consumers desire or need and of the type and nature for which an insurer is authorized to write. The public policy considerations that generally govern insurance regulation include an emphasis on free-market rights and liberties, including the ability of consenting parties to underwrite or purchase specifically designed coverage – irrespective of whether the insured had controversial political views. Our free enterprise system and markets in the United States, as well

as individual rights and liberties, should allow insurers to be able to make these coverages available to consumers that desire such coverage.  As explained above, insurance regulators are generally responsible for establishing a competitive market that ensures the availability of coverages suitable to consumers' desires.

> **(d) The Guidance Letters Indicate That Specific Clients Create "Reputational Risk" and Suggest Arrangements With Those Clients Be Discontinued.**

The Guidance Letters advise institutions that "dealings" with the NRA, or organizations sharing the NRA's political views, may create "reputational risk" for them.[20]  This is the first instance of which I am aware that an insurance regulator expressed any concern, directly or indirectly, regarding an insurer's reputation for transacting lawfully with particular clients based on their political speech.

Insurers are in business to sell policies. As discussed above, over the past decade, ERM was another tool created to regulate the insurance industry.  In many respects, it codifies processes and procedures insurance carriers had employed for a long time, since insurance is all about risk assumption and sharing.  Nevertheless, it introduced into insurance regulation a new lexicon of words and terms associated with enterprise risk management, including "reputational risk."  It is a part of general operational risk that may arise from rare events, such as improper treatment of policyholders caused by improper claim practices, bad behavior of key employees or management, or security breaches of policyholder data that result in adverse press coverage.  Importantly, an insurance regulator's action, such as a public announcement, should not be the source or origin of the adverse press coverage because of the consequences it may have on an insurer's financial stability or standing in the marketplace or that of its customers.  Adverse publicity could cause a "run on the bank" that would be detrimental to the insurer and require regulatory intervention.  For this reason and others, regulators do not make public announcements except in cases that warrant such disclosure such as when an insurer has been placed in receivership. Put simply, to affirmatively create reputational risk where none previously existed would contradict every reasonable customary objective of a state insurance regulator.

---

[20] *See* Guidance Letters at 1–2.

In addition, the type of "reputational risk" customarily considered by insurers and insurance regulators consists of risks to solvency, safety, or soundness—reputational concerns that might precipitate the above-referenced "run on the bank" scenario. By contrast, the risk that an insurer might be criticized for refusing to blacklist or boycott a customer who holds controversial political views has never been a cognizable risk weighed by state insurance regulators or any ERM analysis.

Notably, New York was one of the first states to require insurers to maintain an ERM program. When an insurer is examined by the NYDFS, the scope of that examination includes a review of an insurer's ERM program. The examination program does not include any reference to reputational risk or to the type of customers an insurer has that may create reputational risk. This exclusion is appropriate since reputation risk will arise when major elements of a risk management program are not effective. As stated earlier, the type of customer insured does not create risk unless someone in authority puts such a customer into issue. Based on my experience and expertise and the absence of any conventional reason to invoke ERM reputation risk in this situation, it is my opinion that the purpose for which Defendants chose the "reputational risk" language contained in the Guidance Letters was to leverage the mechanics of insurers' ERM programs in order to discourage business with the NRA or other Second Amendment groups. It is also my opinion that even if an insurer had no objection to the NRA's politics and assessed no business risk associated with boycotts or other public criticism, the receipt of the Guidance Letters could create, for the first time, an internal ERM compliance consideration that would disfavor or disallow business with the NRA.

### (e) Guidance Letters Reflect Improper Political and Personal Influences Driving Defendants' Enforcement Priorities.

For every controversial social issue like gun control, there are (at least) two sides. An insurance regulator, like any other government official or U.S. citizen, is entitled to his or her personal perspective on these issues—but it would be unusual and inappropriate for an insurance regulator to enforce the law unevenly, or prioritize punishing some alleged violators over others, based on political considerations unrelated to the solvency or soundness of insurers or insurance markets. For this reason, it is my opinion that the Guidance Letters' emphasis on political and

social concerns that have nothing to do with the business of insurance distinguishes the letters as a highly unusual and inappropriate use of the NYDFS imprimatur.

## C.    NYDFS Investigation.

It is my opinion that the investigation into the NRA insurance policies carried out by the NYDFS deviates markedly from customary insurance-regulatory practice, for the reasons set forth below.

### 1.    Background for the NYDFS Investigation.

It appears that the NYDFS commenced an investigation of the NRA insurance programs in October of 2017.[21]  This investigation appears to have been incited by a communication from an entity called "Everytown for Gun Safety."[22]  The investigation was initially filed with the New York County District Attorney before being referred to the NYDFS.  Lockton Affinity, an affiliate of Lockton Companies, LLC, was the administrator and marketer of NRA's Carry Guard and other insurance programs.  Chubb, through its affiliate, Illinois Union Insurance Co. ("Illinois Union"), an authorized surplus lines insurer in New York, underwrote the Carry Guard Insurance Program from April 2017 through November 2017.  Further, certain Lloyd's syndicates wrote various NRA insurance coverages from January 2000, through May 31, 2018.  In May 2018, Lloyd's of London announced that it would direct its underwriting syndicates to suspend all participation in the NRA programs because of the NYDFS investigation.

### 2.    Opinion Regarding the NYDFS Investigation.

In my opinion, the NYDFS investigation into the NRA insurance policies was highly irregular and did not follow standard procedure for a regulatory investigation into an insurance business practice, for the following reasons:

---

[21] Declaration of Matthew L. Levine in Opposition to Plaintiff's Motion to Compel and in Support of Defendants' Motion for a Protective Order, dated February 4, 2019, at 1 (the "Levine Declaration").

[22] *See* Everytown for Gun Safety, *NRA Carry Guard Fact Sheet & Legal Analysis*, August 2017 (the "Everytown Fact Sheet").

### (a) The Genesis of The NYDFS Investigation Was Unusual and Inconsistent with Prevailing Regulatory Practice.

The receipt of the complaint from Everytown for Gun Safety appears to have caused the NYDFS to initiate the investigation of the NRA insurance programs.   The investigation was launched within months of the NYDFS receiving the complaint.  Based on my experience in the area of insurance regulation, this is a short period of time to start a market-conduct review, especially considering the volume of consumer complaints and other inquires an insurance department typically receives.   Additionally, Everytown was not an insured under the NRA insurance programs, nor was it seeking information on insurance programs it was considering purchasing.  Rather, Everytown is an organization concerned about gun violence and changing gun laws.  Further, Everytown's statement was not a consumer complaint, nor did it allege that any consumers were harmed, the normal trigger for a market conduct exam.[23]   Instead, the statement raised a number of questions about the NRA insurance programs and urged an investigation by state insurance departments.[24]   Never in my career have I witnessed a state insurance regulator commence an investigation based on an overtly political incitement from a person or entity having nothing to do with state insurance markets  (as opposed to, for example, a complaint from an individual insured or a consumer rights group).

The NAIC provides guidance on this issue, stating in the Market Regulation Handbook that "low investigative priority should be given to issues that do little or no harm to consumers (i.e., advertising, rebating)."[25]  It appears the NYDFS accorded the NRA insurance program a high priority for some other reason.

---

[23] *See* Everytown Fact Sheet.

[24] *Id.*

[25] NAIC Staff, MARKET REGULATION HANDBOOK (2010), p. 103.

**(b) The NYDFS Investigation Is Not Justified by Any Consumer Harm.**

I see no evidence of harm that would warrant the actions taken by the NYDFS. None of the documents issued by NYDFS identify any harms to consumers as a result of any purported conduct by the NRA or its affinity partners, nor do any of the documents highlight nonpayment of claims or dissatisfaction by policyholders with the service they received. The main issue appears to be the nature and source of the coverage provided. As previously indicated, consumers turn to the unregulated surplus lines market for coverage they cannot obtain in the admitted market because of statutory restrictions. They should have the freedom to do so, and customarily do have such freedom.

Unfortunately, on the rare occasion, government entities undertaking any form of inquiry are tempted to see it as a badge of honor to come up with findings that chime with the favored position on any presently-relevant political or social issue. This is not the proper role of an insurance regulator, as all insurance regulators realize, but that is the role that the NYDFS appears to have taken on here.

**(c) The Primary Target of the NYDFS Investigation Was the NRA.**

Based on my background in the insurance business, and given the context of all the NYDFS's actions surrounding the NRA and the various related enforcement actions, I believe that the only way to explain the NYDFS's actions is by concluding that the primary target or subject of the NYDFS investigation was actually the NRA, and the secondary targets were Chubb, Lockton and Lloyd's. No alternate insurance-based rationale could explain the timeline and NYDS's actions:

    a.      September–October 2017: Everytown for Gun Safety compliant received by the NYDFS.

    b.      October 2017: NYDFS investigation launched.

    c.      April 2018: Governor Cuomo Press Release regarding the NRA.

    d.      April 2018: NYDFS Guidance Letter regarding the NRA.

    e.      May 2018: Lockton and Chubb Consent Orders.

    f.      December 2018: Lloyd's Consent Order.

Notably, the NRA is not in the insurance business. Rather, it is a consumer of insurance and lends its trademark to insurers for the purposes of providing insurance to NRA members. Lockton, as its broker, is obligated to ensure that insurance laws are complied with. This makes NYDFS's focus on the NRA highly unusual.

### (d) The NYDFS Does Not Include a Report of an Examination or Investigation in the Consent Order.

It is unusual that there is no mention of a report of examination or investigation in any of the Consent Orders. Preparation of such a report is usual practice. In fact, the NAIC has given guidance to the states on the contents of an investigative report, set forth in the "Market Conduct Regulation Handbook."[26] Such a report would provide information on who conducted the inquiry, specificity about the findings of the inquiry; the scope of the examination, and whether the focus was only on the NRA (or also, for example, other customers with similar insurance programs); and an explanation for why certain practices at issue were found to be contrary to the New York Insurance Law and related matters.[27]

### (e) Vullo Attempted to Initiate a Multi-State Investigation of the NRA Without Utilizing MAWG.

The NAIC has created the Market Action Working Group (MAWG) to coordinate multistate actions and to curtail duplicative actions and activities when numerous states may be involved in the same regulatory issues. The purpose is to also alert other commissioners of insurance regulation violations that it believes are pervasive nationwide. Yet, Vullo failed to utilize MAWG. Instead, in August 2018, Vullo informed fourteen state commissioners about New York's action to halt the sale of the Carry Guard Insurance Program in New York and the violations of the New York Insurance Laws related to the sale and marketing of the product in New York.[28]

---

[26] NAIC, MARKET REGULATION HANDBOOK, p. 102.

[27] Id.

[28] See Letter from Vullo to California Insurance Commissioner Dave Jones, dated August 7, 2018; Letter from Vullo to Connecticut Insurance Department Commissioner Katharine Wade, dated August 7, 2018; Letter from Vullo to Hawaii Department and Commerce and Consumer Affairs Commissioner Gordon I. Ito, dated August 7, 2018; Letter from Vullo to Massachusetts Division of Insurance Commissioner Gary Anderson, dated August 7, 2018; Letter from Vullo to Minnesota Department of Commerce Commissioner Jessica Looman, dated August 7, 2018; Letter from

Vullo urged the states to investigate the matter to determine if the Carry Guard Insurance Program violates each state's respective laws. These communications were unusual in that they were only sent to selected states, and it is unclear as to what criteria were employed to select these states. It is further unclear why, if the NYDFS viewed the matter as serious, it did not send the communications to all state insurance commissioners in the United States. It raises the question as to why the MAWG was not notified by NYDFS. The creation of MAWG was a result of the report I prepared for NCOIL, as discussed above.[29] I suspect that many of the commissioners notified by Vullo might hold views similar to Governor Cuomo and Vullo on the issue of gun control in the United States.

**D.      Consent Orders.**

It is my opinion that the Lockton, Chubb, and Lloyd's Consent Orders are questionable, unusual, and inconsistent with customary insurance regulatory practice.

**1.      Background for the NYDFS Consent Orders.**

The NYDFS entered into, and published, Consent Orders with certain Lloyd's syndicates that underwrote the policies at issue,[30] as well as with Chubb and Illinois Union,[31] and Lockton

---

Vullo to New Jersey Department of Banking and Insurance Commissioner Marlene Caride, dated August 7, 2018; Letter from Vullo to Superintendent of Insurance John G. Franchini, dated August 7, 2018; Letter from Vullo to Oregon Insurance Commissioner Andrew Stolfi, dated August 7, 2018; Letter from Vullo to Pennsylvania Insurance Department Commissioner Jessica K. Altman, dated August 7, 2018; Letter from Vullo to Rhode Island Superintendent of Insurance Elizabeth Kelleher Dwyer, dated August 7, 2018; Letter from Vullo to Virginia State Corporation Commission Commissioner Scott A. White, dated August 7, 2018; Letter from Vullo to Vermont Department of Financial Regulation Commissioner Michael S. Pieciak, dated August 7, 2018; Letter from Vullo to District of Columbia Insurance, Securities and Banking Commissioner Stephen C. Taylor, dated August 7, 2018; Letter from Vullo to Washington State Insurance Commissioner Mike Kreidler, dated August 7, 2018.

[29] See Section II (C)(1), supra.

[30] In the Matter of Certain Underwriters at Lloyd's London Subscribing to Insurance Policies Issued to the National Rifle Association of America, *Consent Order Under Sections 1102 and 3420 of the Insurance Law*, dated December 20, 2018 (the "Lloyd's Consent Order").

[31] In the Matter of Chubb Group Holdings Inc. and Illinois Union Insurance Company, *Consent Order Under Sections 1102 and 3420 of the Insurance Law*, dated May 7, 2018 (the "Chubb Consent Order").

Affinity, LLC and Lockton Companies, LLC.[32]  A Supplemental Consent Order was entered into with Lockton Affinity, LLC and Lockton Companies, LLC, subsequent to the Lockton Consent Order.[33]

Consent orders are a common way to bring to a voluntary resolution the adverse findings of an examination or investigation.  Someone unfamiliar with insurance regulation might ask why each entity would agree to such a Consent Order containing strong language and heavy fines. Based on my experience, there are likely several reasons. First, a consent order is an expedient and less costly way to bring to conclusion a dispute.  Most insurers seek a prompt conclusion and certainty when controversies arise with an insurance regulator.  Other options, such as a formal administrative hearing or a court trial, take time, can be costly, and may not produce the desired result.  Standing on principle does not produce business or profits, and a public controversy may result in less of both.  The regulated also know the regulator has a public voice that the uninvolved hear as independent, informed, and unbiased.  Companies know that the regulator wants results and is able and willing to wait for them.  As previously stated, insurance regulators have a great deal of power and authority, so the regulated need the regulator in a non-combative posture to get even routine matters addressed by the regulator in the usual course of business.  For these reasons, insurers and brokers are motivated to settle.

### (1)    The Lockton Consent Order.

The Lockton Consent Order, dated May 2, 2018, sets forth the agreement, for the purpose of settlement, that Lockton Affinity, LLC and Lockton Companies, LLC committed the following violations of the New York Insurance Law: (1) the NRA acted as unlicensed broker; (2) Lockton aided Chubb in selling illegal coverages in New York; (3) Lockton offered free, one-year NRA memberships in exchange for the purchase of Carry Guard insurance coverage;  (4) Lockton failed to obtain a declination for each of the insured under the Carry Guard Insurance Program; (5) Lockton impermissibly advertised Chubb's financial condition; and (6) Lockton offered "No Cost

---

[32] In the Matter of Lockton Affinity, LLC and Lockton Companies, LLC, *Consent Order Under Articles 21, 23, and 34 of the Insurance Law*, dated May 2, 2018 (the "Lockton Consent Order").

[33] In the Matter of Lockton Affinity, LLC and Lockton Companies, LLC, *Supplemental Consent Order Under Articles 21, 23, and 34 of the Insurance Law*, dated January 31, 2019 ("Supplemental Consent Order").

Arms Care Firearms Insurance" to NRA members.[34]   The settlement included in the Lockton Consent Order provides for the following: (1) a civil penalty of $7 million; (2) an agreement to not participate in the Carry Guard Insurance Program or similar programs; and (3) an agreement to not participate in any NRA affinity program.[35]

### (2)    The Supplemental Consent Order.

The Supplemental Consent Order between Lockton and the NYDFS, dated January 31, 2019, contains Lockton's agreement that, following the initial Lockton Consent Order, it identified to NYDFS additional violations of New York laws and regulations, including: (1) Lockton Affinity unlawfully compensated certain unlicensed entities in violation of Insurance Law § 2116; (2) Lockton aided in the unlawful provision of insurance policies that may not have been offered in the New York State surplus line market; (3) Lockton procured from unauthorized insurers impermissible group policies for insureds whose home state is New York; (4) Lockton Affinity improperly advertised the financial condition of unauthorized insurers it was working with; (5) Lockton Affinity called attention to unauthorized insurers by issuing advertising materials referencing the unauthorized insurers by name; (6) Lockton failed to properly sure declinations from authorized insurers; (7) Lockton failed to disclose and obtain the required writings when an insured was an exempt commercial purchaser; and (8) Lockton Affinity failed to properly pay surplus line premium taxes with respect to certain policies it helped to procure.[36]   The Supplemental Consent Order required Lockton to pay a civil monetary fine of $400,000.[37]

### (3)    The Chubb Consent Order.

The Chubb Consent Order, dated May 7, 2018, sets forth the agreement, for the purposes of settlement, that Chubb and Illinois Union violated the New York Insurance Laws by engaging in the business of insurance without a license by issuing or delivering policies in New York State, or otherwise offering insurance coverage not offered in the New York State surplus line market,

---

[34] Lockton Consent Order at 11–12.

[35] Lockton Consent Order at 11–15.

[36] Supplemental Consent Order at 2–3.

[37] Supplemental Consent Order at 3.

including: (1) defense coverage in a criminal proceeding not permitted by law; (2) liability coverage for bodily harm or property damage "expected or intended from the insured's standpoint in an insurance policy limited to use of firearms" that was beyond the use of reasonable force; and (3) improper coverage for expenses incurred by the insured for psychological counseling support.[38] Further, Chubb and Illinois Union admitted to issuing liability insurance coverage to New York residents that did not contain required liability insurance policy provisions.[39]   The settlement with Chubb required: (1) the payment of a $1.3 million civil penalty; (2) an agreement to not participate in the Carry Guard Insurance Program; (3) an agreement to not underwrite or participate in any NRA affinity program; and (4) the cancellation of all Carry Guard policies currently in place.[40]

### (4)    The Lloyd's Consent Order.

The Lloyd's Consent Order, dated December 20, 2018, indicates that the certain underwriters for Lloyd's, for purposes of settlement, offered coverage that is illegal in New York, including specifically: (1) defense coverage in a criminal proceeding, (2) liability coverage for bodily injury or property damage caused by self-defense action involving a firearm by the insured, and (3) the coverage provided did not contain required policy provisions for a liability policy.[41] The settlement with Lloyd's included: (1) Lloyd's payment of a civil penalty of $5 million; (2) an agreement that Lloyd's would not issue self-defense policies; (3) an agreement that Lloyd's would not participate in any NRA affinity programs, or any other program that does not comply with the New York Insurance Laws; (4) an agreement that the Certain Underwriters at Lloyd's will not issue any group insurance program in New York; (5) a requirement to for the Certain Underwriters at Lloyd's to cancel the coverage provided by the "No Cost Arms Care Firearm Insurance Policy"; (6) a requirement for Certain Underwriters at Lloyd's to non-renew any of the NRA-related insurance programs; (7) an agreement that the Certain Underwriters at Lloyd's will not issue in

---

[38] Chubb Consent Order at 6.

[39] Chubb Consent Order at 6.

[40] Chubb Consent Order at 6–8.

[41] Lloyd's Consent Order at 6–7.

New York a policy that provides legal services coverage; and (8) an agreement that the Certain Underwriters at Lloyd's will not pay an illegal rebate.[42]

### 2. Opinions Regarding the Consent Orders.

In my opinion, the Lockton, Chubb, and Lloyd's Consent Orders, as well as the Supplemental Consent Order, are questionable, unusual, and inconsistent with customary insurance regulatory practice for the following reasons:

#### (a) The Consent Orders Are Overbroad and Exceed the Authority of the NYDFS.

The scope of the Consent Orders is extremely broad, and in certain cases it appears to go well beyond the authority of an insurance regulator. The scope of the Consent Orders is excessively broad in the following ways: (a) the Chubb Consent Order precludes Chubb and Illinois Union from underwriting any NRA affinity-type program, when only the Carry Guard policy was found to be objectionable;[43] (b) Chubb is further ordered to not issue any Carry Guard Insurance Program or similar programs to residents of other states outside of New York, even though such a prohibition would be outside the authority of the NYDFS;[44] (c) the Lloyd's Consent Order requires non-renewal of policies, even though only the insured has the right to non-renew;[45] and (d) both Chubb and Lockton are directed in their respective Consent Orders to cancel the Carry Guard Insurance Policy, which only the insured can do.[46] Even assuming that a policy was issued contrary to the New York Insurance Laws, it is still enforceable under most insurance laws, if issued to insureds outside New York.

#### (b) The Civil Penalties Imposed Are Excessive.

Based on my knowledge and experience, the amount for the civil penalties imposed by the Chubb, Lockton and Lloyd's Consent Orders are excessive. These penalties were as follows:

---

[42] Lloyd's Consent Orders at 7–10.

[43] Chubb Consent Order at 7.

[44] Chubb Consent Order at 7.

[45] Lloyd's Consent Order at 8–9.

[46] Chubb Consent Order at 7; Lloyd's Consent Order at 8–9.

Lockton, $7 million; Chubb, $1.3 million; Lloyd's, $5 million.[47]  The total amount of the penalties exceeded the total insurance premium from all the NRA's insurance programs, which amounted to approximately $12 million, and far more than the NRA's revenue from such programs of which was $1.8 million.   These penalties are extreme when compared to the limited nature of the violations agreed to by these parties, especially when none of the violations harmed any consumers in any way.

### (c)  The Consent Orders Improperly Identify The NRA.

It is not typical for the name of the sponsoring organization to appear in consent orders relating to affinity programs.  The NAIC Market Regulation Handbook requires that steps be taken to protect the privacy and confidentiality of consumers.[48]   Moreover, although the Lockton Consent Order and the Supplemental Consent Order address many of the same types of alleged insurance violations, only the Lockton Consent Order names a consumer—the NRA.   In other words, it is reasonable to infer that the NRA was singled out by Defendants.

### (d)  Treatment of Purported Declination Violations.

Some of the alleged adverse findings reported in the Consent Orders are treated in a manner that diverge markedly from prevailing insurance regulatory practice.   For example, the investigators cite that Lockton failed to obtain purportedly necessary declinations for each insured covered by a surplus lines product.[49]  It is unusual and surprising to see a regulator assert that it is necessary to obtain a declination from the admitted market for each insured when the coverage sought and provided in each instance is identical.  (This also assumes that declinations are even required, which may not be the case because certain coverages are exempt from surplus lines statutes).   Even if the declinations are required, I have never seen a declination requirement enforced in the harsh manner chosen here (ordinarily, a failure to obtain a declination would not be sufficiently important to bear mentioning in a consent order), let alone punished with such large civil monetary fines.

---

[47] Lockton Consent Order at 12; Lloyd's Consent Order at 7; Chubb Consent Order at 6.

[48] *See generally,* NAIC, MARKET REGULATION HANDBOOK.

[49] *See* Lockton Consent Order at 10.

**(e)  Financial Rating Violations.**

States may restrict the ability of insurance brokers to advertise the financial ratings or credentials of surplus-line underwriters.  Violations of such restrictions are generally not considered severe, nor harshly punished.  I cannot recall any instance over the course of my career when a state insurance regulator imposed a six-figure fine, let alone prohibited future sales of a policy, based on an unauthorized reference to a carrier's financial rating.

The opinions set forth above are based on the documents I have reviewed, and I reserve the right to amend, by removal or additions, my opinions should I receive additional documents or information.

Date:          March 19, 2019

Prepared by:

**JAMES W. SCHACHT**
**President, The Schacht Group, Inc.**

# EXHIBIT 1



*Insurance consultants on regulation, restructuring & insolvency, litigation, and public policy*

**12271 Wiseman Street • Petersburg, Illinois 62675**
**Mobile: 312-259-4161 • Fax: 217-632-7015**
**jim@theschachtgroup.com • www.theschachtgroup.com**



Professional History
• President, The Schacht Group (2008-present)
• Managing Director, Navigant Consulting (2005-2008)
• National Director, PricewaterhouseCoopers (1995-2005)
• Director, Chief Deputy Director, Special Deputy Receiver, Illinois Department of Insurance (1964-1995)

Education
• Northern Illinois University, 1959–1960, Liberal Arts
• Elmhurst College, 1960–1962, Liberal Arts
• Walton School of Commerce, 1962–1964, Bachelor of Science – Accounting
• Northwestern University,1964–1966, Real Estate Law & Finance and Advanced Accounting

Professional Associations
• Certified Insurance Receiver - Multiple Line – Designation by International Association of Insurance Receivers
• Former Member, Natl. Assoc. of Mutual Insurance Companies, Accounting Committee, 1996–2006
• President and Member, Board of Trustees of the Financial Examiners Educational Foundation
• President and Member of the Board of Directors of the Insurance Regulator Education Foundation
• Member, International Association of Insurance Receivers
• Prior Member, Association of Insurance and Reinsurance Run-off Companies, Chair of Legislative & Amicus Subcommittee
• Official observer for International Association of Insurance Supervisors
• Member, AIDA Reinsurance & Insurance Arbitration Society (ARIAS-US)

Board of Directors Membership
• Fidelity Life Association and Affiliates including Chair of Investment Committee (2006 - present)
• Hiscox Specialty Insurance Company, Hiscox Insurance Company and Hiscox USA including Chair of the Audit Committee (2007 - 2015)

## James W. Schacht

James W. Schacht is President of The Schacht Group. The Schacht Group advises national and international clients with respect to insurance and regulatory matters.

Mr. Schacht has over fifty years of broad based experience with the insurance industry and all areas of insurance regulation, including insurance receiverships, restructuring troubled companies and run-offs, as well as solvency regulation.

Mr. Schacht served for thirty-one years at the Illinois Department of Insurance. During this tenure, he served as Director of Insurance on three separate occasions at the request of two Governors, as well as serving as Chief Deputy Director and the Special Deputy Receiver. Illinois is the home to several of the largest insurers in the United States.

For over twenty years, Mr. Schacht took an active leadership role in the National Association of Insurance Commissioners, a voluntary association of the chief insurance regulatory officials of the various states. Several of Mr. Schacht's reform initiatives garnered national attention, particularly the development of the NAIC's Insurance Regulatory Information System, an early warning system for property and liability companies, the development of the first NAIC Handbook on Statutory Accounting Practices and Procedures, the NAIC's Financial Regulation Standard & Accreditation Program, *The Troubled Insurer Handbook,* and numerous model laws, regulations, and regulatory tools.

He is a recognized authority on insurance receiverships and guaranty funds. He has vast experience in dealing with troubled insurers and developing creative rescue plans. He served for over ten years as a strategic advisor for the successful run-off of the Lumbermens Mutual Insurance Group. Also, he developed a corrective plan for Triad Guaranty Insurance Corporation, a mortgage insurer that encountered financial difficulty as a result of the mortgage and housing crisis, and advised Republic Mortgage Insurance Company.

Mr. Schacht has given deposition and court testimony on numerous occasions in civil, criminal, and tax litigation involving insurance and regulatory issues. In addition, he has testified before congressional and state legislative committees.

Mr. Schacht's clients have included American Insurance Group, Sun Life Insurance Company of Canada, Lloyds of London, American General Group of Companies, St. Paul Group of Companies, Firemen's Fund Insurance Companies, XL Insurance Group, Sears, Insurance Legislators Foundation, Vesta Insurance Group, CNA Financial Group, Swiss Reinsurance, AXA Reinsurance Group, Zurich Insurance Group, Lumbermens Mutual Insurance Group, Triad Guaranty Insurance Corporation, the American Fraternal Alliance, Old Republic Insurance Company, and Allstate Insurance Company.

Mr. Schacht prepared for the National Conference of Insurance Legislators three public policy studies on insurance regulation. The first study was a survey on how U.S. insurance regulators oversee the market practices of U.S. insurers. The second study was recommendations for improving the present system of market conduct surveillance. The study's recommendations were accepted not only by NCOIL but have formed the basis for reforming what regulators do to monitor insurer practices and institute remedial action. The third study was a comprehensive report on state authority over the insurance industry. A monograph was prepared for the American Fraternal Alliance on insurance guaranty funds.

He has served on the Board of Directors of a U.S. subsidiary of a major international property and casualty insurer and continues serving on the Board of an innovative U.S. life insurer.

2        **Previous Employment Experience**

### Navigant Consulting, Inc., 2005-2008
**Managing Director**

- Managing Director in the Financial Services – Insurance and Reinsurance practice. Led the Regulatory, Restructuring and Run-Off practice.

### PricewaterhouseCoopers LLP, 1995 – 2005
**National Director**

- Recruited by Coopers & Lybrand to create the first insurance regulatory practice within a Big 6 accounting firm.

- Served as an expert consultant and witness on a variety of insurance, reinsurance, and regulatory issues in litigation. He has advised clients on new insurance products, organizing insurance companies, financial and reporting requirements, and securing regulatory approval for a variety of transactions. He has created reorganization plans for troubled insurance companies. He developed a run-off plan for a very large property & casualty company, and continues to provide strategic advice and performs other consulting assignments.

- Directed public policy studies for legislative organizations and prepared monographs and studies for insurance trade associations on current issues in insurance and regulation.

### Illinois Department of Insurance, 1994 – 1995, 1991 – 1992, 1982 - 1983
**Director of Insurance**

- Appointed by two governors to cabinet level position as head of the state agency which oversees and regulates the insurance industry in Illinois. Illinois is the home to several of the largest insurers in the United States. Directed a staff of well over 300 people, including actuaries, attorneys, and other insurance professionals.

### Illinois Department of Insurance, 1978–1995
**Chief Deputy Director**

- Managed the 'day-to-day' operations of the insurance department and directed the regulation of the insurance industry doing business in Illinois. The Deputy Directors heading each of the functional areas of the insurance department reported to Mr. Schacht, as well as, various staff positions including public information and relations, legislative liaison and research.

### Illinois Department of Insurance, 1987–1995
**Special Deputy Receiver**

- Appointed by the Director of Insurance to oversee and manage the insurance receivership operation and the administration of well over fifty insurance companies that had been placed in receivership proceedings and subject to court supervision. Receivership staff exceeded 200 employees and consisted of claims personnel, accountants and auditors, attorneys and other insurance professionals.

### Illinois Department of Insurance, 1974–1978
**Deputy Director – Financial and Corporate Branch**

- Oversaw and directed several functions and activities, including financial examination and analysis of insurance companies; review and approval of reinsurance, mergers, acquisitions and other transactions; and dealing with troubled insurers.

### Illinois Department of Insurance, 1964–1974
**Chief Examiner and various other positions—Examination Division**

- Oversaw and directed the division that conducted examinations of insurance companies doing business in Illinois. Examinations were done to determine financial condition and compliance with statutes and regulations.

*Insurance consultants on regulation, restructuring & insolvency, litigation, and public policy*



3

### Affiliations and Awards

- 1990 – NAIC's Robert E. Dineen Award in recognition of long service and outstanding contribution to the NAIC and insurance regulation
- 1996 – National Association of Mutual Insurance Companies (NAMIC) Chairman's Award in recognition of contribution and service in regulation and to the insurance industry.

### NAIC

Mr. Schacht was a long time leader and active participant in the NAIC. At the request of the NAIC officers, he created the plan for a financial services office at the NAIC. He has written numerous model laws and regulations concerning holding companies, guaranty funds, receiverships, and reinsurance. He was actively involved in annual statement changes and statutory accounting matters.

Under Mr. Schacht's leadership, the NAIC developed *The Troubled Insurer Handbook,* which today is a guide for insurance departments in dealing with troubled insurance carriers. Over the years, he has been a strong proponent of regulatory reform to meet the demands of the new financial services marketplace. As chairman of the group which developed the legislation for an Interstate Compact for Insurance Receiverships, Mr. Schacht saw an opportunity to use the compact as a vehicle to address the problems of the existing receivership system, but also to address other areas of state insurance regulation. He also developed several manuals for the NAIC, including the following, as well as numerous model laws and regulations:

- Statutory Accounting Manuals for insurance companies;
- Requirements for independent audit opinions and actuarial opinions; and,
- Financial Regulation Standards and Accreditation Program.
- He coordinated the NAIC's activities and oversight of troubled companies, including Baldwin United Insurance Companies and Executive Life Insurance Company.

In 1990, Mr. Schacht was honored with the National Association of Insurance Commissioner's distinguished Robert E. Dineen Award in recognition of his outstanding contribution to insurance regulation. In 1996, he received the National Association of Mutual Insurance Companies' Award in recognition of his contribution and service in regulation and to the insurance industry.

### Expert Testimony, Publications & Speeches

Mr. Schacht has spoken to numerous insurance industry and association groups on insurance and regulatory subjects. In 1983, he was chosen to represent the United States as one of seven lecturers at an international seminar on reinsurance sponsored by the United Nations Conference on Trade and Development held in Singapore. He has authored numerous articles on insurance regulation and has served as a reviewer of insurance textbooks. Courts have qualified him as an expert on various insurance, reinsurance and regulatory matters.

### Expert Testimony

- Before the Arizona Insurance Department in the matter of Coronet Insurance Company Suspension Order, Docket #95-225 — October 1995

- Before the Department of Insurance of the Commonwealth of Pennsylvania in the matter of the Application for Approval of the Plans of Merger & Restructure Submitted by Certain CIGNA Cos. — December 1995

- Commonwealth Court of Pennsylvania LaFarge Corp., et. al. vs. . Commonwealth of Pennsylvania Insurance Department — January 1996

- Chancery Court of Davidson County, Tennessee at Nashville, Douglas M. Sizemore, in his official capacity as the Commissioner Of the Tennessee Department of Commerce & Insurance vs. Lloyd's Of London, et. al., Case #96-1336II — July 1996

- U.S. District Court of Eastern District of Virginia at Richmond Louis F. Allen vs. Lloyd's of London, et. al., Case #3:96 CV 552 — August 1996

*Insurance consultants on regulation, restructuring & insolvency, litigation, and public policy*



The
SCHACHT
Group, Inc.

4          **Expert Testimony (Cont'd)**

| | |
|---|---|
| • Mark Boozell, Director of Insurance vs. Lake Shore National Bank | March 1997 |
| • Insurance Commissioner of the State of California vs. Golden Eagle Insurance Company, Case No. 984502, Superior Court of the State of California for the County of San Francisco. | May 1997 |
| • Raymond T. Karsian, et. al. vs. Inter-Regional Financial Group, Inc. and Dain Bosworth, Inc. | June 1997 |
| • Keisha Johnson, et. al. vs. Aronson Furniture Company, Case No. 96C0117, U.S. District Court for Northern District of Illinois Eastern Division | August 1997 |
| • Faulkner, et. al. vs. Helig-Meyers Company, Case No. 97C1072, U.S. District Court for Northern District of Illinois Eastern Division | August 1997 |
| • Internal Revenue Service vs. Utah Medical Insurance Association, U.S. Tax Court | November 1997 |
| • Sun Life Assurance Company of Canada vs. SunAmerica, Inc., Civil Action No. 195-CV-1808-JTC, U.S. District Court for the Northern District of Georgia | December 1997 |
| • Compañia Agricola de Seguros, S.A., First Fire & Marine Insurance Co., Ltd., Lucky Ins. Co. Ltd. And Oriental Fire & Marine Insurance Col. Ltd. vs. American Centennial Insurance Co. | March 1998 |
| • National Guardian Life Insurance Co. vs. Crestar Securities Corp., Case No. 97-C-616-C, U.S. District Court for Western District of Wisconsin | January 1999 |
| • Zurich Insurance Co., et. al. vs. Commissioner, U.S. Tax Court, Docket Nos. 27200-96 and 5323-97 | January 1999 |
| • Reliance Insurance Company, et. al. vs. Forum Insurance Company U.S. Bankruptcy Court for the District of Delaware, Case No. 97-1410- JW | February 1999 |
| • George Nichols, Commissioner of Insurance of the Commonwealth of Kentucky, in his capacity as Liquidator of Delta American Re Insurance Company vs. America Risk Management, Inc. et. al., U.S. District Court of Southern District of New York, Case #89 CIV 2999 | March 1999 |
| • Centennial Management Services, Inc., et. al. vs. AXA Re Vie et. al., U. S. District Court of Kansas, Case No. 97-2509 | March 1999 |
| • Centennial Management Services, Inc., et. al. vs. AXA Re Vie et. al., U. S. District Court of Kansas, Case No. 97-2509 | April 1999 |
| • Internal Revenue Service vs. CM Holdings, Inc., Case No. 97-695 | April 1999 |
| • Internal Revenue Service vs. CM Holdings, Inc., Case No. 97-695 | May 1999 |
| • Blue Cross and Blue Shield of Kansas, Inc. vs. Carla Stovall, Kansas Attorney General, District Court of Shawnee County, Kansas, Case No. 97CV608 | July 1999 |
| • George Nichols, Commissioner of Insurance of the Commonwealth of Kentucky, in his capacity as Liquidator of Delta American Re Insurance Company vs. America Risk Management, Inc. et. al., | October 1999 |
| • U.S. District Court of Southern District of New York, Case #89 CIV 2999 | |
| • Inter-American Life Insurance Company and Alabama Reinsurance Company – Reinsurance Arbitration | September 2000 |
| • RGA Reinsurance Company and ULICO Casualty Company Reinsurance Arbitration | October 2000 |
| • Delta American Re Insurance Company, in Liquidation. Proof of Claim of First State Insurance Company. | November 2000 |

*Insurance consultants on regulation, restructuring & insolvency, litigation, and public policy*



5             **Expert Testimony (Cont'd)**

- Pryor, et. al. vs. The Fidelity & Casualty Company of New York, et. al.,    January 2001
  Cook County Circuit Court, No. 97CH 5827

- Hersch, et. al. vs. Continental Casualty Company et. al.,    January 2001
  Cook County Circuit Court, No. 97CH 8864

- Trustmark Insurance Co. vs. General & Cologne Life Re of America,    February 2001
  U.S. District Court Northern District of Illinois, Case No. 00C 1926.

- Relia Star Life Insurance Co. vs. IOA Re, Inc. and Swiss Re Life Canada,    February 2001
  U.S. District Court of Minnesota, Case No. 99-CV-2049 JMR/FLN

- State of Tennessee, Ex. Rel. Anne B. Pope vs. Xantus HealthPlan of    March 2001
  Tennessee, Inc., No. 99-917-11, Chancery Court for Davidson County Tennessee

- CR/PL Management Company et. al. vs. Commerce & Industry Insurance    August 2001
  Company, et. al., No. 98C401635, Circuit Court of Cook County Illinois,
  Chancery Division

- CR/PL Management Company et. al. vs. Allianz Insurance Company    December 2001
  Group, (Deposition)

- Lisa M. Enfield, et. al. vs. The Old Line Life Insurance Company    January 2002
  of America, No. CV-2001-01367, Second Judicial District Court,
  County of Bernalillo, State of New Mexico.

- Fortune Insurance Company, in receivership vs. Clarendon    May 2002
  National Insurance Company, Reinsurance Arbitration

- Harry W. Low, Insurance Commissioner of the State of California    October 2002
  and as Conservator, Liquidator, and Rehabilitator of Executive Life
  Insurance Company vs. Altus Finance S.A., Credit Lyonois S.A.,
  Artemis S.A., et. al., Case No. 99-02829 (CWX), United States District
  Court for the Central District of California.

- Donald W. Abshire, et. al. vs. Department of Insurance, et. al.,    October 2002
  Case No. 377,713 C/W 412, 265; 19th J.D.C., State of Louisiana,

- Truong, et. al. vs. Allstate Insurance Company, Case No. CV-99-003474,    March 2003
  Second Judicial District court, County of Bernalillo, State of New Mexico

- Holladay vs. Allstate Insurance Company, Case No. D-0101-CV-2001-    August 2003
  00103, First Judicial District Court, County of Santa Fe, State of New Mexico

- North Carolina Industrial Commission, Hearing regarding Southeastern    September 2003
  Regional Medical Center vs. North Carolina Insurance Guaranty Fund

- University of Washington vs. Combined Insurance Company of America,    July 2004
  Case No. 02-2-32858-0 SEA, Superior Court of the State of Washington
  for King County (Expert Declaration for Combined Insurance Company
  of America

- Clarendon vs. Gerling Global Reinsurance Corporation of America    September 2004
  Reinsurance Arbitration

- Trygg-Hansa Insurance Company, AB and Burlington Insurance Group,    December 2004
  Inc. The Burlington Insurance Company and First Financial Insurance

- State of Florida, Department of Financial Services as Receiver of Caduceus    September 2005
  Self Insurance Fund, Inc. vs. The Doctors" Company, Circuit Court of
  the Second Judicial Circuit, Lean County, Florida, Case No: 2002-CA-00533

  - Chicago Institute of Neurosurgery and Neuroresearch Medical Group, S.C.    October 2005
  ("CINN") vs. Fred Geisler, M.D., Arbitration

- Florida Windstorm Underwriting Association vs. USA,    June 2006
  Case # 4:05-CV-338 WS/WCS



*Insurance consultants on regulation, restructuring & insolvency, litigation, and public policy*



6     **Expert Testimony (Cont'd)**

- Assurant Reinsurance of Turks & Caicos Ltd. (a.k.a. Assurant Re)     September 2006
  Fitch National Reinsurance Company, Ltd., Tico Reinsurance, Ltd.,
  and SoCo Reinsurance, Ltd.

- Rehabilitation of American Mutual Reinsurance Company vs. Electric     September 2006
  Mutual Liability Insurance Company

- In the Supreme Court of Bermuda, Companies (Winding-up),     November 2006
  No. 436 of 1995, Electric Mutual Liability Insurance Company, Ltd.

- United States District Court, Northern District of Ohio, Neil Stanich     December 2006
  and Bobbie Jean Stanich and Dante Frezza vs. Travelers Property
  Casualty Insurance Company

- Superior Court of New Jersey, No. L-2140-03, IMO Industries, Inc.     April 2007
  vs. Transamerica Corporation, et al.

- United States District Court for the Northern District of Illinois, Eastern     August 2007
  Division, Equity Residential vs. Royal Surplus Lines Insurance Co., et, al.

- United States District Court, Northern District of Ohio     August 2007
  No. 06 CV 0962, Neil Stanich and Bobbie Jean Stanich vs. Dante Frezza,
  Travelers Property Casualty Insurance Company and The Standard
  Fire Insurance Company

- United States District Court, Northern District of Illinois Eastern     September 2007
  Division, No. 06C3339, Jack G. Brown, an individual and Jack Brown Buick,
  Inc. vs. New York Life Insurance Company, a New York Corporation, and
  Curtis Schultz, individually and d/b/a/ Schultz Financial Group

- United States District Court, Southern District of New York vs. David E.W.     December 2007
  Lines, et al., OneBeacon America Insurance Company vs. David E.W. Lines

- United States District Court, Southern District of New York vs. David E.W.     February 2008
  Lines, et al., OneBeacon America Insurance Company vs. David E.W. Lines

- U.S. District Court of N.J. 3:07-CV-00722-JAP-JJH Everest National     July 2009
  Insurance Co. and Everest Reinsurance Co. vs Robert Sutton, et al.

- U.S. District Court for Southern District of Illinois 3:07-CV-00781-MJR-PMF     September 2009
  Robert Johnson, Anthony Richardson, Sheila Sydnor and others similarly
  situated vs. Allstate Insurance Co.

- U.S. Tax Court, State Farm Mutual Automobile Insurance Company &     November 2009
  Subsidiaries v. Commissioner of Internal Revenue

- U.S. District Court, Southern District of Illinois, Case No. 08-591-MJR,     January 2010
  Lorie J. Marshall, Debra Ramirez, et al v H & R Block Tax Services

- Commonwealth Court of Pennsylvania, Docket No. 269 MD 2001,     January 2010
  Joel S. Ario v Reliance Insurance Company

- In the Matter of the Rehabilitation of the Segregated Account of Ambac     November 2010
  Assurance Corporation, Case No. 10 CV 1576, State of Wisconsin, Dane
  County Circuit Court - affidavit and trial testimony on behalf of opposing
  Policyholders Aurelius Capital Management, LP, Fir Tree, Inc., et al and
  Freddie Mac.

- U.S. District Court, Northern District of Illinois, Eastern Division,     April 2011
  Case No. 07 CV 2898, Liberty Mutual Insurance Company, et al v
  American International Group, Inc., et al.

- U.S. District Court, Northern District of Illinois, Eastern Division,     August 2012
  Case No. 1:11-cv-00250, Fred D. Gee, on behalf of himself and all other
  similarly situated individuals v. State Farm Fire and Casualty Company.



*Insurance consultants on regulation, restructuring & insolvency, litigation, and public policy*



7

### Expert Testimony (Cont'd)

- Commissioner of Insurance State of Louisiana v. Gray Insurance Co.,
  Nineteenth Judicial District Court for the Parish of East Baton Rough,
  Case No. 625124
  <br>December 2013

- JoAnn Howard and Associates,P.C., et al v Douglas Cassity, et al.,
  Case No. 4:09-cv- 01252- ERW (E.D.Mo.)
  <br>September 2014

- Thrivent Financial for Lutherans v. Chiang, et al.,
  Case No. CGC-13-535156, Superior Court of the State of California,
  for the city and county of San Francisco.
  <br>April 2015

- FINRA Dispute Resolution, Arbitration
  No. 13-00894, Morson v. Oppeheimer & Co., Inc.
  <br>October 2015

- Travis, et al v. Allstate Insurance Company,
  Cause No. 06-L-332, Twentieth Judicial Circuit, St. Clair County, Illinois.
  <br>June 2016

- Jenkins v. Salem Township Hospital, et al,
  Cause No. 2014-L-15, Marion County, Illinois.
  <br>June 2016

### Publications

The following list excludes written testimony before congressional committees, state legislative committees, and associations. Also not included are statements and reports to NAIC committees.

- Michael P. Duncan: *"Issues in Insurance – Property and Liability Post-Assessment Guaranty Funds,"* American Institute of Insurance, 1987 (Reviewer)

- Schacht, J. and Kiverstern, I.: *"Cooperation Not Confrontation,"* ReActions, 1988

- Schacht, J.: *"The Scope of Industry Insolvencies,"* November, 1988

- Schacht, J.: *"Dealing with U.S. Insolvencies,"* March, 1989

- Schacht, J.: *"Corporate Insurance Decentralization Trends,"* March, 1989

- John E. Washburn and James W. Schacht,*"A Bold Step for Regulation,"* Best's Review, October 1989

- Schacht, J.: *"Requiem for a Ratio,"* October, 1989

- *"NAIC Troubled Insurance Company Handbook,"* 1989 (Chairman of Drafting Group)

- Schacht, J.: *"State vs. Federal Regulation,"* July, 1991

- *"New Model Law Will Strengthen Financial Exam Process,"* The Examiner, Fall 1991

- Schacht, J.: *"The Regulation of Reinsurance,"* November, 1991

- Schacht, J.: *"Fronting,"* April, 1992

- *"Report of the Focus Group on Insurer Receiverships,"* May, 1992 (Participating Drafter)

- Schacht, J. and Gallanis, P.: *"The Interstate Compact as an Effective Mechanism for Insurance Receivership Reform,"* Journal of Insurance Regulation, Winter 1993

- Schacht, J.: *"NAIC Should Return to Basics – Accreditation Program Risks Losing Sight of Original Purpose,"* Business Insurance, April 11, 1994

- Schacht, J.: *"NAIC Finances and Funding,"* January 1995

- Schacht, J.: *"The NAIC is an Instrumentality of State Government,"* May, 1995

- Schacht, J.: *"The Impact of the Compact,"* Coopers & Lybrand's Knowledgelink, May 1996

- Schacht, J.: *"Capital Enhancement Strategies for Mutual Insurance Companies,"* Monograph prepared for National Association of Mutual Insurance Companies in September 1998 by PricewaterhouseCoopers and LeBoeuf Lamb Green & McRae (contributing drafter and reviewer)

- Schacht, J.: *"Public Policy Review of Insurance Market Conduct Examination,"* July 2000 Study prepared for the Insurance Legislators Foundation (Project Leader)

*Insurance consultants on regulation, restructuring & insolvency, litigation, and public policy*



8                    **Publications (Cont'd.)**

- Schacht, J. and Manders, J., *"Compact Could Be Regulatory Solution,"* Business Insurance, May 15, 2000

- Schacht, J.: *"State Lawmakers Must Drive Regulatory Reform,"* Business Insurance, June 18, 2001

- Schacht, J. and Klein, R..: *"An Assessment of Insurance Market Conduct Surveillance,"* Journal of Insurance Regulation, Fall 2001

- Schacht J.: *"NAIC's Interstate Compact Initiative Should be Supported,"* National Underwriter, June 3, 2002

- Schacht, J. Testimony Before the Interstate Insurance Receivership Commission at a Public Hearing on the Interstate Compact, March 2002

- Schacht, J. and Klein, R. *"The Path to Reform – The Evolution of Market Conduct Surveillance Regulation,"* July 2003

- PricewaterhouseCoopers LLP (J. Schacht, Project Leader) *"Reliance Insurance Group – Report on the History and Causes of Insolvency,"* August 2003

- Best's Review (Jerry Capell and James Schacht) *"Tied Down" – Article on How Insurance Company Insolvency Laws are Still Mired in Redundancy and High Costs,"* June 2006

- Reinsurance Magazine (Schacht) *"Why the US Should Follow the UK's Lead on Solvent-Scheme Legislation,"* October 2006

- Association of Insurance and Reinsurance Run-off Companies Commutation Event, *"Reinsurance and Insolvencies – Recollections from the Front Line,"* October 2006

- Risk and Insurance Magazine *"Failing at Failures,"* January 2007

- Risk and Insurance Magazine *"Analyzing the Life Cycle of an Insolvency,"* February 2007

- Risk and Insurance Magazine *"One Long, Long Mission,"* March 2007

- Risk and Insurance Magazine *"Receiving Reform,"* April 2007

- Global Reinsurance *"Imperfect Solutions,"* June 2007

- NCOIL - *"A Study on State Authority: Making a Case for Proper Insurance Oversight,"* Prepared for the Insurance Legislators Foundation, November 2007

- *"Enhancing the Insurer Resolution Toolbox,"* Association of Insurance and Reinsurance Run-Off Companies newsletter, *AIRROC Matters,* Summer 2009

- *"Alternative Mechanisms for Troubled Companies,"* An NAIC White Paper, Contributor, February, 2010

- *Reinsurance and Insolvencies – Recollections from the Front Line,* October 2010

- *"Fixing What Isn't Broken – Are International Insurance Regulation Standards Feasible, or Even Desirable?",* AM Best Review, December 2013

- *"Making a Case for a Strengthened NAIC,"* LifeHealth Pro, April 2014

- The Geneva Association Newsletter, *"The Orderly Resolution of Lumbermens,"* August, 2014

- Auf Weidersehen Pragmatic Insurance Regulation, Life Health Pro, August, 2015

- Observations on the US Resolution System for Property/Casualty Insolvent Insurers: The Lumbermans Mutual Insurance Group Case Study, A Geneva Association Research Report, April 2016

*Insurance consultants on regulation, restructuring & insolvency, litigation, and public policy*



The
**SCHACHT**
Group, Inc.

12271 Wiseman Street • Petersburg, Illinois 62675
Mobile: 312-259-4161 • Fax: 217-632-7015 • jim@theschachtgroup.com • www.theschachtgroup.com

# EXHIBIT 2

**Expert Report of J. Schacht**                                        **Exhibit 2**

### Exhibit 2: Listing of Additional Publication Since April 2016

James W. Schacht,*"Role Review: Is the steady replacement of civil servants in state insurance departments with contracted employees eroding the integrity of the regulatory system?"* Best's Review, January 2018.

# EXHIBIT 3

**Exhibit 3: Listing of Documents Considered**

| Description | Source / Identification |
|---|---|
| NRA's 1st Amended Complaint and Jury Demand | Filed on July 7, 2018 |
| NRA's Memo of Law in Opposition to Defendants' Motion to Dismiss | Filed on August 24, 2018 |
| Defendants' Answer to NRA's 1st Amended Complaint and Jury Demand | Filed on November 20, 2018 |
| Plaintiffs MOL In Opp-MTD Amended Complaint In Part | Filed on January 8, 2019 |
| Declaration of Matthew L. Levine to Defs' Mtn for Protective Order | Filed on January 8, 2019 |
| Declaration of Nathaniel J. Dorfman to Defs' Mtn for Protective Order | Filed on January 8, 2019 |
| Affirmation of Tanisha Edwards, Esq to Defs' Mtn for Protective Order | Filed on January 8, 2019 |
| Everytown For Gun Safety NRA CarryGuard Fact Sheet and Legal Analysis | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2017-10-06_AM 10_05_Email from E. Tirschwell to M. Levine RE_ Call | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2017-10-06_PM 01_36_Email from E. Tirschwell to M. Levine RE_ Call | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2017-10-19_PM 05_05_Email to E. Tirschwell RE_Call | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2017-10-24_PM 01_36_Email from R. Loconte to E. Tirschwell RE_ | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2017-12-08_PM 04_15_Email from E. Tirschwell to M. Levine Fwd_ Photos | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-02-08_AM 09_27_Email from Michelle to S. Doody FW_ Lockton_Carry Guard | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-02-08_PM 03_10_Email from S. Doody to W. Scott _ Carry Guard | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-02-12_AM 08_29_Email from E. Tirschwell to M. Levine _ Contact info | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-02-15_PM 01_04_Email from E. Tirschwell to H. Jacobi RE_ Contact info_confidential | Documents produced by Defendants without bates stamp on January 7, 2019 |

**Expert Report of J. Schacht**                                    **Exhibit 3**

## Exhibit 3: Listing of Documents Considered

| Description | Source / Identification |
|---|---|
| 2018-02-23_PM 01_09_Email from J. Donnellan to J. Regalbuto _ Press Release Attachments_ MetLifeEnds Discount Program with NRA | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-02-23_PM 01_16_Email from R. Loconte to J. Donnellan Re_ Press Release | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-06_AM 10_46 Email from M. Vullo to K. Schnoll Fwd_ GOVERNOR CUOMO SENDS LETTER CALLING ONOTHERGOVERNORS TO FOLLOW NEW YORK'S LEAD | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-06_AM 11_09_Email from M. Vullo to K. Schnoll Fwd_ GOVERNOR CUOMO SENDS LETTER CALLING ONOTHERGOVERNORS TO FOLLOW NEW YORK'S LEAD | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_AM 09_16_Email from J. Zimmerman to N. Dorfman Re_ NRA | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_Letter from NYDFS to CA Insurance Commissioner Dave Jones re NRA CG Program | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_Letter from NYDFS to CT Insurance Commissioner Katharine Wade re NRA CG Program | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_Letter from NYDFS to HI Commissioner Gordon Ito re NRA CG Program | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_Letter from NYDFS to MA Insurance Commissioner Gary Anderson re NRA CG Program | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_Letter from NYDFS to MN Commissioner Jessica Looman re NRA CG Program | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_Letter from NYDFS to NJ Commissioner Marlene Caride re NRA CG Program | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_Letter from NYDFS to NM Superintendent John Franchini re NRA CG Program | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_Letter from NYDFS to OR Insurance Commissioner Andrew Stolfi re NRA CG Program | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_Letter from NYDFS to PA Commissioner Jessica Altman re NRA CG Program | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_Letter from NYDFS to RI Superintendent of Insurance Elizabeth Dwyer re NRA CG Program | Documents produced by Defendants without bates stamp on January 7, 2019 |

### Exhibit 3: Listing of Documents Considered

| Description | Source / Identification |
|---|---|
| 2018-08-07_Letter from NYDFS to VA Commissioner Scott White re NRA CG Program | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_Letter from NYDFS to VT Commissioner Michael Pieciak re NRA CG Program | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_Letter from NYDFS to WA DC Commissioner Stephen Taylor re NRA CG Program | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_Letter from NYDFS to WA Insurance Commissioner Mike Kreidler re NRA CG Program | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_PM 04_47_Email from S. Doody to S. Hedrick Re_ Thank you from Sue Hedrick in WA State Insurance Commissioner's Office Attachments_ CarryGuard Policy | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_PM 05_16_Email from M. Vullo to D. Jones _ regulator to regulator communication Attachments_Jones - CA; Lockton; Chubb | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-07_PM 05_18 Email from M. Vullo to M. Kreidler _ regulator to regulator communication Attachments_Kreidler - WA; Lockton; Chubb | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-08_PM 03_46_Email from C. Sornson to N. Dorfman FW_ NY contact carry guard | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-08_PM 08_48_Email from N. Dorfman to C. Sornson Re_ NY contact carry guard | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-17_PM 02_44_Email from C. Sornson to N. Dorfman _ Other Firearm-related Legal ExpensePrograms | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-17_PM 12_38_Email from C. Sornson to N. Dorfman _ Carry Guard | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-27_AM 09_05_Email from J. Lucashuk to V. Grunke_ NRA_Lockton | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-27_AM 11_51_Email from V. Grunke to J. Lucashuk RE_ NRA_Lockton | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-27_PM 04_11_Email from H. Jacobi to C. Sornson _ Carry Guard Materials Attachments_ 8.27.18_NJ_CG_Prod | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-08-28_PM 01_22_Email from V. Grunke to J. Lucashuk RE_ NRA_Lockton | Documents produced by Defendants without bates stamp on January 7, 2019 |

**Expert Report of J. Schacht**                                          **Exhibit 3**

### Exhibit 3: Listing of Documents Considered

| Description | Source / Identification |
|---|---|
| 2018-08-28_PM 01_26_Email from J. Lucashuk to V. Grunke RE_ NRA_Lockton | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-09-12_PM 02_15_Email from G. Simon to H. Jacobi C Somson RE_ Carry Guard Materials | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2018-09-12_PM 05_30_Email from G. Simon to M. Levine H Jacobi C Samson R Schlesinger W Leache RE_CarryGuard Materials Confidential Supervisory Communication | Documents produced by Defendants without bates stamp on January 7, 2019 |
| 2011-01-01_Lockton Risk and NRA Amd Restated Insurance Program Agmt-updates Addenda  A-H | Will be produced upon agreement on Confidentiality Order |
| 2011-04-07_KC Series Lockton and NRA Insurance Consulting Programs Mgmt Agmt-update Addendum C  2017-09-18 | Will be produced upon agreement on Confidentiality Order |
| 2018-05-02_NY DFS Lockton Consent Order | Located on the DFS Website |
| 2018-05-07_NY DFS Chubb and IL Union Ins Co Consent Order | Located on the DFS Website |
| 2018-07-02 American Family Life Insurance Company | Located on the DFS Website |
| 2018-07-02 Transamerica Life insurance | Located on the DFS Website |
| 2018-09-07 Selective Insurance Company | Located on the DFS Website |
| 2018-11-09 Oscar Insurance Company | Located on the DFS Website |
| 2018-12-05 National Integrity life Insurance | Located on the DFS Website |
| 2018-12-20_NY DFS Lloyds Consent Order | Located on the DFS Website |
| 2019-01-09 Arch Insurance Company | Located on the DFS Website |
| 2019-01-09 National union Fire Insurance | Located on the DFS Website |
| 2019-01-28 Met Life Consent Order | Located on the DFS Website |
| 2019-02-04_NY DFS Lockton Supplemental Consent Order | Located on the DFS Website |
| 2015-01-14_NY DFS Disciplinary Actions - (Lockton) | Located on the DFS Website |
| 2016-01-07_NY DFS Disciplinary Actions - (Willis of NY) | Located on the DFS Website |
| 2018-05-25_NY DFS Disciplinary Actions - (Marsh) | Located on the DFS Website |
| 2018-04-19_DFS Memo re Guidance_Risk_Management_NRA_Gun_Manufacturers-Insurance | Public Document |
| McKinney's Insurance Law § 1101 Definitions doing an insurance business | New York Legislation |
| McKinney's Insurance Law § 1102 Insurers license required issuance | New York Legislation |
| McKinney's Insurance Law § 1113 Kinds of insurance authorized | New York Legislation |
| McKinney's Insurance Law § 2101 Definitions | New York Legislation |
| McKinney's Insurance Law § 2104 Insurance brokers; licensing | New York Legislation |
| McKinney's Insurance Law § 2105 Excess line brokers; licensing | New York Legislation |

**Expert Report of J. Schacht**                                                    **Exhibit 3**

## Exhibit 3: Listing of Documents Considered

| Description | Source / Identification |
|---|---|
| McKinney's Insurance Law § 2107 Insurance consultants; licensing and duties | New York Legislation |
| McKinney's Insurance Law § 2116 Insurance brokers; commissions | New York Legislation |
| McKinney's Insurance Law § 2117 Acting for or aiding unlicensed or unauthorized insurer | New York Legislation |
| McKinney's Insurance Law § 2118 Excess line brokers; duties | New York Legislation |
| McKinney's Insurance Law § 2119 Insurance agents, brokers, consultants, life settlement brokers, and title in insurance agents; written contract for compensation; excess charges prohibited | New York Legislation |
| McKinney's Insurance Law § 2121 Broker authorized to receive premium, when | New York Legislation |
| McKinney's Insurance Law § 2122 Advertising by insurance producers | New York Legislation |
| McKinney's Insurance Law § 2128 Commission and fee sharing prohibited | New York Legislation |
| McKinney's Insurance Law § 2129 Duty to have an agent or broker at each place of business | New York Legislation |
| McKinney's Insurance Law § 2130 Excess line association | New York Legislation |
| McKinney's Insurance Law § 2324 Rebating and discrimination | New York Legislation |
| McKinney's Insurance Law § 3420. Liability insurance; standard provisions; right of injured person | New York Legislation |
| McKinney's Insurance Law § 3425 Certain property/casualty insurance policies cancellation and renewal provisions; agents' contracts and brokers' accounts | New York Legislation |
| McKinney's Insurance Law § 3426 Commercial lines insurance cancellation and renewal provisions | New York Legislation |
| McKinney's Insurance Law § 5911 Insurance agents insurance brokers and excess line brokers | New York Legislation |
| NYCRR T. 11, Ch. II, Pt. 27, Refs & Annos Regulation 41 | New York Legislation |
| NYCRR T. 11, Ch. XII, Pt. 301, Refs & Annos Regulation 134 | New York Legislation |
| NYCRR T. 11, Ch. V, Subch. B, Pt. 153, Refs & Annos Regulation 135 | New York Legislation |
| 2018-09-11_CA Ins. Comm NRA Order to Cease and Desist | Public Document |
| 2002-01-01_CA Ins. Code Section 1631 Necessity of license | California Legislation |
| 2002-01-01_CA Ins. Code Section 1631.5 Construction of article | California Legislation |
| 2006-01-01_CA Ins. Code Section 12921.8 Cease and desist orders | California Legislation |

Expert Report of J. Schacht                                                Exhibit 3

## Exhibit 3: Listing of Documents Considered

| Description | Source / Identification |
|---|---|
| CA Ins. Code Section 35 Transact defined | California Legislation |
| 2018-04-03 WA State OIC cease and desist No. 18-0109 | Public Document |
| 2009-07-26_Revised Code of Washington State 48.02.080 Enforcement | Washington Legislation |
| 2011-07-27_Revised Code of Washington State 48.17.060 License required | Washington Legislation |
| 2009-07-01_Revised Code of Washington State 48.17.063 Unlicensed activities--Acts committed in this state--Sanctions | Washington Legislation |
| Revised Code of Washington State 48.04.010 Hearings--Waiver--Administrative law judge | Washington Legislation |
| Washington Administrative Code 284-02-070 Hearings | Washington Legislation |
| Washington Administrative Code 10-08-110 Adjudicative proceedings - Filing and service of papers | Washington Legislation |
| NAIC Staff, MARKET REGULATION HANDBOOK (2010) | National Association of Insurance Commissioners |
| NEW YORK STATE INSURANCE DEPARTMENT, Enterprise Risk Management Examination Program | New York State Insurance Department |
| NEW YORK STATE INSURANCE DEPARTMENT, Examination of Insurance Companies, A Series of Lectures Delivered before the Examiners of the New York State Insurance Department; Prepared under the Direction of Deputy Superintendent Adelbert G. Straub, Jr., New York, (Vol. 6 1953-1955) | New York State Insurance Department |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff,** | § § | **CIVIL CASE NO.  18-CV-00566-TJM-** |
| **v.** | § § | **CFH** |
| **ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,** | § § § § § § § § | |
| **Defendants.** | § § | |

**REBUTTAL EXPERT WITNESS REPORT OF JAMES W. SCHACHT**

## I.

## INTRODUCTION

I have been requested by the law firm of Brewer, Attorneys & Counselors, legal counsel to

the National Rifle Association of America (the "NRA"), to provide a rebuttal expert report to those

opinions contained in the expert reports of Peter Kochenburger ("Kochenburger") and Kevin

McCarty ("McCarty") (collectively, "Defendants' Experts").[1] Defendants' Experts are engaged by

---

[1] I have known Mr. Kochenburger for several years as he revealed in his report.  I have enjoyed working with him in the past and respect his academic expertise to develop an educational program for an aspect of insurance regulation.  As he discloses, he is not now, nor has he ever been an insurance regulator.  His knowledge of insurance regulation comes not from "sitting in a regulatory chair" but from indirect experience.  With regard to Mr. McCarty, I have also known him for many years.  It is important to note that the Florida insurance regulatory scheme is different from other states.

the New York State Office of Attorney General who represents New York Governor Andrew Cuomo, in his official capacity ("Cuomo"), Maria T. Vullo, in her official capacity as Superintendent of the New York State Department of Financial Services ("Vullo"), and the New York State Department of Financial Services ("NYDFS") (collectively, "Defendants").[2]

My experience and qualifications, compensation, publications, prior expert appearances, and documents reviewed to form my opinions are set forth in my expert report dated March 19, 2019 ("Report").

I have closely reviewed the reports of Kochenburger and McCarty and offer my commentary on their positions in succeeding pages of this rebuttal report. No inference of agreement should be drawn if I do not address an issue raised by the Defendants' Experts in this rebuttal expert report.

## II.

## SUMMARY OF MY REBUTTAL OPINIONS

I disagree with Defendants' opinion that NYDFS's actions concerning the NRA were appropriate and justified for the reasons set forth in my Report, as well as the following:

A. Defendants' Experts opine that the recent events in Parkland and Las Vegas motivated NYDFS to issue the NRA Guidance Letters to entities NYDFS regulates. They also contend that NYDFS possesses the regulatory authority to issue those guidance letters. I disagree with this position for several reasons, but principally, gun violence and gun control — while important — are not *insurance* regulatory issues.

---

[2] Mr. McCarty's report states engagement by the New York State Office of the Attorney General, but Mr. Kochenburger does not specifically identify by whom he was retained. I have assumed it is the New York State Office of the Attorney General.

B. Defendants' Experts believe that an insurance regulator should require regulated entities to address "reputational risks"; and therefore, the NRA Guidance Letters are proper. I disagree. The Guidance Letters did not address an insurance issue and departed from usual and customary practice in several ways, most importantly by naming one specific affinity group customer.

C. Defendants' Experts state that the propriety of NYDFS's action was subsequently confirmed by the consent orders entered into against Chubb Group Holdings, Inc. ("Chubb"), Lockton Affinity, LLC and Lockton Companies, LLC (collectively, "Lockton"), and Certain Underwriters at Lloyd's ("Lloyd's") (collectively, "Consent Orders"). I disagree, in that the Consent Orders are unusual and inconsistent with customary insurance regulatory practices. Defendants' Experts disagree with my assertions that NYDFS's review of the NRA-sponsored insurance programs deviated from established regulatory norms. I do not agree for all the reasons stated in my Report, as well as the further explanations presented herein. I am well aware of an insurance regulator's powers to conduct investigations and their authority to employ that power to address fraudulent insurance schemes, looting of an insurer's assets and other serious violations—none of which are present in this instance.

## III.

## BASIS FOR MY REBUTTAL OPINIONS[3]

The opinions of Defendants' Experts do not directly confront and respond to the important issues in this matter, are not supported by the evidence, and, in some instances, are superfluous or contradictory.[4]

A.        **Cuomo's April 2018 Press Release**.

As stated in my Report, based upon my 50 years of experience in the insurance regulation and enforcement sector—a governor-appointed head of a state insurance regulatory and enforcement agency, thirty years as a state government insurance regulator, and as an active observer in the National Association of Insurance Commissioners ("NAIC") for an additional twenty years—I find the Cuomo Press Release extraordinary and highly unusual because the Governor ordered NYDFS to advise the entities it regulates to review their relationship with the NRA. Neither of Defendants' Experts directly addresses this issue, nor can they.  Kochenburger was never a state insurance regulator.   While McCarty acted as head of Florida's Office of Insurance Regulation, he was appointed by an independent state body[5] and cannot opine as to the appropriateness of a state governor's directive to his insurance regulatory body.[6]

B.        **NYDFS Guidance Letters.**

---

[3] As part of my assignment, I have reviewed and considered the documents listed in Exhibit A.

[4] The McCarty Report does not explain the basis or details for his opinions.

[5] McCarty was appointed by the Florida Financial Services Commission, which is comprised of the Governor, Attorney General, Chief Financial Officer and the Agriculture Commissioner of the State of Florida.

[6] Florida is unique from other state insurance regulatory bodies since they bifurcate insurance regulation between the Office of Insurance Regulation and the Florida Department of Financial Services, which is supervised by the Chief Financial Officer of the State of Florida.[6] Accordingly, McCarty did not have authority over all aspects of insurance regulation, in particular

Defendants' Experts opine that guidance letters, including the guidance letters issued by Vullo on April 19, 2018, concerning the NRA ("NRA Guidance Letters"), constitute prudent advice of the type that regulators routinely provide to entities they regulate.  Indeed, they believe that the NRA Guidance Letters exemplify NYDFS's activism in evaluating and regulating insurance operations.[7]  Defendants' Experts cite to several other regulatory guidance letters issued by NYDFS as examples of regulatory initiatives.[8]  A close review of the ten letters cited[9] reveal substantial differences with the NRA Guidance Letters, which Defendants' Experts do not explain or discuss:

- Nearly all letters reflect a willingness to further answer questions that may arise as a result of the circular letter and its contents.  The NRA Guidance Letters require "prompt action," rather than offering to answer any questions in connection to the guidance.  As a result, the NRA Guidance Letters stand out as more urgent than conventional circular letters.  Further, the NRA Guidance Letters failed to cite to any statute or regulation.  While all other circular letters referenced a statute and/or regulation for which clarification was being provided, the NRA Guidance Letters provided no such statute or regulation.

- The NRA Guidance Letters are addressed to CEOs or equivalents of all insurers doing business in the State of New York.  The other letters are directed to types of insurers and not a titled individual at the insurer.

---

to this case, insurance agents and insurance consumer services, including consumer complaints. Rather, the Florida Department of Financial Services supervised the aforementioned areas.

[7] *See* Expert Report of Peter Kochenburger, dated May 3, 2019, at 5–8 ("Kochenburger Report"); Expert Report of Kevin McCarty at 15 ("McCarty Report").

[8] *See* Kochenburger Report at 7.

[9] *See* Kochenburger Report at 7, ¶16.

- Only the NRA Guidance Letters identify a specific customer/client entity, whereas the other circular letters or similar communications speak more generally.

- The NRA Guidance Letters addressed gun control and reputation risk.  None of the other letters addressed reputational risk, especially purported reputational risk arising from a customer's political speech.

Given the stark differences between the examples highlighted by Defendants' Experts and the NRA Guidance Letters, my opinion is further bolstered that the NRA Guidance Letters do not exemplify the usual and customary practice of an insurance regulatory agency—even NYDFS. Further, the NRA Guidance Letters did not address an insurance issue, but rather the political and social controversies surrounding gun control.  The reference to "reputational risk" in the NRA Guidance Letters[10] appears to be an attempt to create some link to an insurer's enterprise risk management program ("ERM").  I am aware of no other instance in which a state insurance regulator attempted to invoke ERM in connection with a customer's political views or speech.

Mr. Kochenburger states that the NRA Guidance Letters "simply cautioned regulated entities on possible reputational risks associated with business relationships with the NRA,"[11] implying that it is routine and customary for NYDFS or any other state insurance regulator to issue guidance on the reputational risk associated with a particular entity.  Yet, there is a reason that Mr. Kochenburger offers no other instance where NYDFS, its predecessor agency, or any other state insurance regulator issued a communication concerning singling out a single customer, especially based on its political or social views.  The NRA Guidance Letters are the *only* instance where an

---

[10] Further discussed, *supra* Section III(C).

[11] Kochenburger Report at 4–5, ¶ 9.

insurance regulatory body singled out a single customer as a reputational risk—and certainly the only instance where a regulator has done so based on the customer's political speech.

## C.     Reputational Risk

Defendants' Experts discuss ERM and Own Risk Solvency Assessment ("ORSA"),[12] which is the ERM program applicable to insurers, including those operating in New York.  Unlike other insurance statutes, ORSA is not proscriptive as to the details and content of the insurer's risk management program.  Rather, the insurer determines what is considered a risk within its business model.  It is important to note that ORSA is a surveillance tool to guide on-site, risk-focused examinations and not a requirement that an insurer either passes or fails.  Contrary to Mr. McCarty's assertions, the ORSA statute applies to only certain insurers,[13] but not other entities involved in insurance distribution and administration, such as insurance producers, agents and brokers, third-party administrators, managing general agents, or affinity group sponsors.  ORSA is only applicable to entities of a certain size.  More relevant, out of the three entities impacted by the Consent Orders, ORSA would apply only to Chubb.  Further, all ORSA reporting is confidential and not available for public inspection because disclosure would reveal competitive information and business and trade secrets.

I have served as chair of the board of directors Risk Committee of the U.S. subsidiaries of a large international group of insurers. This group was subject to the Solvency II requirements on which ORSA is based. The group's ERM program was built to satisfy both Solvency II and ORSA

---

[12] The word "Own" in the title of this program is particularly relevant since it was represented to insurers that they should assess their *own* risks based on factors emanating from their *own* business model and strategy.

[13] In order to be subject to the ORSA law, an insurer's direct annual premium volume must exceed $500 million or in the case of a group of affiliated insurers it must be greater than $1 billion. The law applies to only domestic insurers.  Accordingly, ORSA is only applicable to Chubb, and not Lloyd's and Lockton.

requirements.  As a Risk Committee, we did not directly consider "reputational risk" as a part of our risk management program.  Rather, we effectively identified and addressed other risks that would mitigate or eliminate the possibility of an event that would impact our reputation.  For example, failure by an insurer to timely, properly adjudicate claims made under its policies can adversely impact the insurer's reputation.  To manage that reputational risk, we identified various threats and risks that might interfere with adjudication.  Then, controls and procedures were enhanced to make sure that insurance claims were handled in accordance with governing contracts, applicable law, and best practices.

I have reviewed the ORSA reports of other insurers on behalf of an insurance regulator. Additionally, as member of the boards of directors of several other insurers, I have overseen the development of risk-management programs.  In both instances, we did not identify "reputational risk" as a direct element of our ERM program.  This is not to say "reputational risk" is not something an entity might be concerned about. In this day and age, as Mr. Kochenburger notes, "bad news" can travel in seconds through the internet and social media.  However, it is strongly inconsistent with regulatory norms and practices for the regulator itself to create and stoke "bad news," especially "bad news" that singles out and stigmatizes a single customer purchasing an insurance arrangement in the marketplace.  Based on my experience, no insurer would organically consider an entity's political views or speech to constitute "reputational risks" that ought to impact its ERM or ORSA program.  Explicit prodding from a regulator, however, could change the insurer's calculus.

Mr. McCarty expresses the opinion that a company engaged in the business of insurance in any capacity should, as a part of its risk assessment process, look at emerging public policy

trends in the areas of social controversy.[14]   However, in this instance, NYDFS—an insurance regulator—determined the social issue for which insurers should be concerned.  It also determined which entities should be disfavored—and disassociated with—and delineated those entities based explicitly on their viewpoint ("gun promotion").  For these and other reasons, NYDFS's conduct exceeded the scope, responsibility, and discretion typically exercised by an insurance regulator.[15]

Mr. Kochenburger attempts to support his position on the propriety of NYDFS Guidance Letters by referencing other events that purportedly demonstrate that the reputational risks to insurers and brokers in the NRA insurance program was a real issue.  In my opinion, the fact that some major corporations voluntarily ended their business relationships with the NRA would not customarily justify a regulator getting involved and urging its regulated entities to join a boycott or blacklisting effort.  As a matter of general custom and practice, insurance regulators operate within the parameters of the statutes that grant their regulatory authority and enforce the policies and priorities adopted by the legislature.  If the state government decides to place its thumb on the scale regarding a political or social controversy, the insurance regulator would typically follow the legislature's lead. Accordingly, despite high-profile recent tragedies and related public criticism of the NRA, it is unusual and questionable that NYDFS acted against the NRA because NYDFS appears to have acted based on concerns (here, concerns relating to Second Amendment speech) that are not customarily within the purview of an insurance regulator.

Mr. Kochenburger states that "climate change" reporting is another example of NYDFS's involvement in other controversial social and political issues similar to gun control.  While I am not an expert on the Climate Risk Disclosure Survey reporting form, I understand that New York

---

[14] *See* McCarty Report at 17.

[15] The discretion of an insurance regulator is discussed in Section IV.

and a few other states participate in this program, which asks insurers to describe how they assess and manage risks relating to climate change. However, based on my experience, the NRA Guidance Letters are entirely different than the circular letter on climate change. The NAIC Climate Risk Disclosure Survey Questions and Guidance document published online provides additional details, explaining that insurers are encouraged to provide "quantitative information where it offers additional clarity on trends in the intensity or attenuation of natural hazards, insured losses, investment portfolio composition, policyholder risk reduction or improvements in computer modeling."[16] This makes sense, and is consistent with my experience. If insureds are reporting, or insurance companies are modeling, increased property-damage claims from rising sea levels (for example), this is of direct financial concern to the insurance industry. It is, therefore, within the customary purview of an insurance regulator.

Notably, however, the NAIC does not caution insurers against providing coverage to organizations that engage in disfavored political speech regarding the climate change issue. Analogously, in this case, Defendants' Experts do not identify any systemic solvency threats to the insurance industry that arise from allowing the NRA to promote gun rights. A more direct analogy to the climate program would arise if NYDFS asked insurers to explain whether their quantitative models forecast increased costs associated with gun crime. That is not what occurred here. Nor do Defendants' Experts identify any case where a state insurance regulator singled out a not-for-profit advocacy group for its climate-related speech, then cautioned insurers that doing business with the climate-advocacy group could pose "reputational risks" and, consequently,

---

[16] *Climate Risk Disclosure Survey Guidance, Reporting Year 2018*, available at http://www.insurance.ca.gov/0250-insurers/0300-insurers/0100-applications/ClimateSurvey/upload/QUESTIONS-AND-GUIDELINES-CLIMATE-RISK-SURVEY-REPORTING-YEAR-2018.pdf (last visited May 17, 2019).

"prompt action" should be taken to discontinue any business arrangements with the target organization.

Mr. Kochenburger states that reputational risk is a significant business and regulatory concern and that it extends to a company's clients and business partners.[17]  I do not believe I understated the importance of reputation and the value of an insurer's brand in my Report. However, "reputational risk" for private insurance-industry firms generally refers to the firm's reputation among customers for integrity and reliable payment of claims.  Here, the NRA is a nonprofit organization that advocates for the Second Amendment.  The NRA is generally viewed favorably by its members.  Indeed, NRA members have purchased NRA-endorsed products for nearly 20 years.  The NRA's valuable reputation among its members and supporters is the very reason that NRA-endorsed insurance products are profitable to the insurance community. Conversely, those opposed to the NRA's Second Amendment advocacy will have an unfavorable view of the NRA's reputation, irrespective of an offer of insurance.  Thus, from an insurer's perspective, it does not create a reputational risk to insure NRA members that desire NRA-endorsed products.  Rather, failing to offer insurance coverage to NRA members would result in a business opportunity loss.

Mr. Kochenburger is incorrect in his assertion that I do not recognize the possibility of reputational risk arising from an insurer's business partners and clients.[18]  I have noted in both of my reports that I understand reputational risk. Yet, where an insurance commissioner speaks unfavorably about an entity through an official, public communication, the commissioner creates an artificial reputational risk.  Vullo created an artificial reputational risk when she specifically

---

[17] *See* Kochenburger Report at 12, ¶ 29.

[18] *See* Kochenburger Report at 12, ¶ 28.

named the NRA, rather than any other gun promotion organization in New York.  NYDFS could

have issued a general statement that insurers should be conscientious and consider how business

partners and insurance clients may impact its reputation.  NYDFS, however, went beyond that and

specified a particular political and social issue and the advocacy organization at the forefront of

the political and social issue, stating in the NRA Guidance Letters that the entity had been singled

out on the basis of its political "gun promotion" speech.

## D.      NYDFS Investigation

Mr. Kochenburger concludes that NYDFS did not pursue Chubb, Lockton, and Lloyd's

because of their relationship with the NRA but, rather, based upon clear violations of New York

law.[19]   However, Mr. Kochenburger offers no basis for this conclusion other than the Consent

Orders executed months after the start of the investigation, of the investigation into Chubb,

Lockton, and Lloyd's.  Indeed, there is no indication that NYDFS's investigation arose based on

a discovery that Lockton, Chubb, and Lloyd's had violated the law—rather than based on the

discovery that these entities did business with the NRA.

Mr. Kochenburger stated that Mr. McCarty would address this matter in more detail, yet I

did not find such information in the McCarty Report.  Mr. Kochenburger does not indicate in his

compilation of "Information Reviewed" that he inspected NYDFS regulatory files; thus, he has no

basis for opining regarding the reason for NYDFS's commencement of its investigation.  As stated

in my expert report, based upon my review of the evidence produced and my experience in the

insurance-regulatory sector, I believe it can be inferred that the prime target of NYDFS was the

NRA and the secondary targets were Chubb, Lockton, and Lloyd's.  This is consistent with the

fact that Lockton appears to have paid far more significant penalties, and acceded to more

---

[19] *See* Kochenburger Report at 1–2, ¶ 1.

significant restrictions, with regard to the NRA than non-NRA programs.  With respect to Chubb and Lloyd's, there is no indication that any regulatory action was taken at all that targeted identical violations exhibited by non-NRA programs.

Mr. McCarty states in his report that states are moving away from market conduct examinations, since they were not designed to identify and address significant consumer protection issues.  I disagree, and I am shocked that he would be so dismissive of the market conduct surveillance and examination system of insurers that exists today.  As a former NAIC President,[20] Mr. McCarty knows the NAIC has promulgated a two-volume set of over 1000 pages entitled "Market Regulation Handbook" (the "Handbook").  The Handbook provides guidance to state insurance departments on assessing the insurance marketplace, as well as assessing the compliance of individual insurers, insurance producers, and administrators with state insurance laws and actions to be taken if problems are identified.  Ultimately, the goal of the Handbook is to conduct uniform, standardized reviews of an insurer's practices.  Thus, it covers precisely the matters at issue with the NRA-sponsored group insurance program.

As Mr. McCarty knows, the NAIC is the standard setter for insurance regulation in the United States.  Contrary to the Defendants' Experts' assertions,[21] my statements concerning market conduct examinations and investigations addressing violations are in line with the best practices set forth by the NAIC.  There was not a legitimate reason for NYDFS to deviate from these practices.

I concur with Mr. Kochenburger that the NAIC is not a regulatory body and does not have regulatory power, even though its members are all regulators.  However, the NAIC does

---

[20] The NAIC is the National Association of Insurance Commissioners, an association of the chief insurance regulators of every state and territory.

[21] *See* Kochenburger Report at 8, ¶ 18, and 9, ¶¶ 20-21; McCarty Report at 4, 6.

promulgate best practice handbooks and manuals and issues model laws and regulations, all of which are typically enacted in state insurance laws.

As stated in my Report, the fact that the alleged violations did little or no harm to consumers meant that there was no need for the aggressive treatment and deviation from the standards and best practices set forth by the NAIC.  Notably, Mr. McCarty indicates in his Report that the State of New York chose to allocate its "limited resources" to NYDFS Investigation in order to prevent "irreparable harm to the reputation of the regulated entities," as well as "prevent the loss of life."[22] Again, Defendants' Reports lack any legitimate indication of how the Carry Guard program would result in consumer harm or financial harm to the entities regulated by NYDFS.  Further, Mr. McCarty provides no specific basis for these offensive statements.

The consumer protection initiatives described in Mr. McCarty's report are not relevant to this matter since they all are instances where significant abuses of insurance consumers occurred.[23]

## E.   Consent Orders

Mr. Kochenburger disagrees with my opinion that the Consent Orders were questionable, unusual, and inconsistent with customary insurance regulatory practice for the reasons I have cited in my Report.  As previously stated, none of the alleged violations are associated with consumer harm, an important consideration, especially as it relates to the amount of civil penalties.   Mr. Kochenburger's sole basis for his disagreement with me is that New York specifically prohibits coverage for defense costs in a criminal proceeding, as well as coverage for intentionally caused injuries.[24]

---

[22] *See* McCarty Report at 3.

[23] *See* McCarty Report at 4-6.

[24]*See* Kochenburger Report at 9-10, ¶ 23.

Surplus lines insurance law is a complex subject and is ever-changing.  Requirements vary substantially from state to state, and, in some instances, applicability is not always clear.  New York laws and regulations are particularly thorny.  Contrary to Mr. Kochenburger's opinion, some may view the surplus lines market as a place to export risks that cannot be written in the admitted market because of statutory prohibitions.  Historically, one of the reasons for the surplus lines market is to provide desired consumer coverage that is absent in the admitted market.  Where inadvertent violations occur, the regulatory response must be measured and recognize the realities of a situation; often, remediation is favored.  This is the use of regulatory discretion that is usual and customary.  For example, both California and Washington considered the Carry Guard program, but responded in a more tempered manner than NYDFS.  Each issued a cease and desist order to the NRA based on an allegation that the NRA was soliciting insurance business in the state without an insurance producer's license.  In neither instance did the insurers incur substantial fines or punitive measures.  Indeed, both states' approaches were fundamentally remedial— directing the NRA to cease and desist from the alleged conduct.  While Kochenburger intimated that NYDFS response was not political,[25] it is clear that more measured alternatives were available to NYDFS to remedy any perceived issues with the Carry Guard program.  While other regulators' approach in remedying the alleged insurance violations may be too "quiet" for Kochenburger, such approach effectively accomplished a regulatory purpose without politicizing alleged insurance violations.

---

[25] *See* Kochenburger Report 11, ¶ 25.

15

# IV.

## Regulatory Authority and Discretion

Mr. Kochenburger states: "Insurance law and regulation have long reflected public policy and social goals beyond the minimum regulatory standards required in a state's insurance code."[26] This view does not comport with my understanding of insurance regulation formed after more than fifty years of professional experience, as well as drafting and implementing numerous insurance statutes.

First, each state legislature has authorized the supervision of insurance transactions and institutions by a governmental agency headed by an administrative officer, called an insurance director, insurance commissioner, or superintendent, depending on the state involved. In some states, this officer is appointed by a state governor, elected by the citizens of the state, or appointed by the head of a super agency that has jurisdiction over various financial and other institutions. The administrative officer charged with insurance regulation does so with powers and authorities granted by the state legislature—not the political goals of the executive. These laws reflect the public policy and social goals of the state, and they form the nature and scope of the state's insurance regulatory body. These laws are not minimum standards, nor is there any other state authority that provides additional powers to meet other public policy goals.

Insurance regulation primarily exists to protect the public welfare, but such regulation must be performed within the requirements set forth by the state legislature. These laws give the administrative officer a great deal of discretion in certain areas such as licensing of insurers, approval of corporate transactions, and determinations as to when to examine an insurer to name only a few examples. But it does not include, for example, initiating regulatory action based on a

---

[26] Kochenburger Report at 1, ¶ 1(a).

controversial social issue which the legislature has not yet addressed through state law. Absent specific legislative action to empower an insurance regulatory entity, the entity cannot act with the presumption that it is properly acting in the best interests of the public welfare.  Indeed, such a presumption, while perhaps well intended, lacks the underlying legislative mandate that would render it consistent with insurance-regulatory custom and practice.

## V.

### Conclusion

Defendants' Experts have not disclosed any facts or reasoning that requires me to alter or modify any of my opinions expressed in my Report.  No inference of agreement should be drawn if I did not address an issue raised by Defendants' Experts.

Date:           May 17, 2019


Prepared by: _____
                    James W. Schacht
                    President, the Schacht Group, Inc.

**EXHIBIT A**

**Documents Considered**

Expert Witness Report of James W. dated March 19, 2019
Expert Witness Report of Kevin M. McCarty
Expert Witness Report of Peter Kochenburger, dated May 3, 2019
NAIC Climate Risk Disclosure Survey Guidance Reporting Year 2018, which can be found at:
http://www.insurance.ca.gov/0250-insurers/0300-insurers/0100-applications/ClimateSurvey/upload/QUESTIONS-AND-GUIDELINES-CLIMATE-RISK-SURVEY-REPORTING-YEAR-2018.pdf

4850-5955-7015, v. 2