**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § § § | |
| **Plaintiff,** | § § | **CIVIL CASE NO. 18-CV-00566-TJM-CFH** |
| **v.** | § § | |
| **ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,** | § § § § § § § | |
| **Defendants.** | § § | |

## NATIONAL RIFLE ASSOCIATION OF AMERICA'S
## SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiff the National Rifle Association of America (the "NRA") files this Second Amended Complaint and Jury Demand ("Complaint") against defendants New York Governor Andrew Cuomo ("Cuomo"), both individually and in his official capacity; Maria T. Vullo ("Vullo"), both individually and in her former official capacity; and the New York State Department of Financial Services ("DFS") (collectively, "Defendants"), upon personal knowledge of its own actions, and upon information and belief as to all others matters, as follows:

## I.

## PRELIMINARY STATEMENT

This case is necessitated by an overt viewpoint-based discrimination campaign against the NRA and the millions of law-abiding gun owners that it represents. Directed by Governor Andrew Cuomo and former DFS Superintendent Maria Vullo, this campaign involves selective prosecution, backroom exhortations, and public threats with a singular goal – to deprive the NRA

and its constituents of their First Amendment rights to speak freely about gun-related issues and defend their Second Amendment freedoms against encroachment.

Defendants' retaliation and selective-enforcement campaign surfaced with a series of threats to financial institutions that DFS, an agency created to ensure the integrity of financial markets after the 2008 credit crisis, will exercise its extensive regulatory power against those entities that have ties with the NRA. To commence their sweeping agenda, Defendants issued public demands that put DFS-regulated institutions on notice that they should avoid "arrangements with the NRA" and other "gun promotion organizations" if they planned to do business in New York.

At the same time, Defendants engaged in back-channel communications to reinforce their threats. Thus, in a stunning display of unconstitutional overreach, Defendants made it clear to banks and insurers that it is bad business in New York to do business with the NRA. Moreover, Defendants knowingly targeted NRA-related insurance programs for violations not regularly enforced and not enforced against other similarly situated insurance programs.

As a direct result of this coercion, multiple financial institutions have succumbed to Defendants' threats and determined not to do business with the NRA. Others, who were already doing business with the NRA yielded to Defendants' demands and agreed to terminate longstanding, beneficial business relationships with the NRA, in New York and elsewhere. Of course, Defendants' abuses were intended to deprive the NRA of basic bank-depository services, corporate insurance coverage, and other financial services essential to the NRA's corporate existence and its advocacy mission.

Absent relief, Defendants' blacklisting campaign will continue to damage the NRA and its members, as well as endanger the free speech and association rights guaranteed by the constitutions

of the United States and the State of New York. It is well-settled that viewpoint discrimination applied through "threat[s] of invoking legal sanctions and other means of coercion, persuasion, and intimidation" violates the United States Constitution where, as here, such measures chill protected First Amendment activities.[1] Defendants' *de facto* censorship scheme cannot survive judicial scrutiny. Nor should it.

## II.

## PARTIES

1.      Plaintiff the National Rifle Association of America is a nonprofit corporation organized under the laws of the State of New York with its principal place of business in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment to the United States Constitution. The NRA has over five million members, and its programs reach millions more.

2.      Defendant New York State Department of Financial Services is an agency of the State of New York that regulates financial services firms operating in New York in order to guard against financial crises and to protect New York consumers and markets from fraud. DFS has a regional office at One Commerce Plaza, Albany, New York 12257. Its main office is located at One State Street, New York, New York 10004-1511. It regulates more than 1,400 insurance companies with assets in excess of $4.3 trillion, including 200 life insurers, 1,100 property casualty insurers, and 100 health insurance companies. DFS also regulates over 1,900 banking and other financial institutions with assets over $2.9 trillion.

---

[1] *See, e.g.*, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 72 (1963).

3.      Defendant Maria T. Vullo is the former Superintendent of the New York State Department of Financial Services and, at all times relevant to the Complaint, was acting under color of state law. Her principal place of business is 40 West 77th Street, Apt. 16B, New York, New York 10024. Vullo is sued in her individual and official capacities.

4.      Defendant Andrew Cuomo is the Governor of the State of New York and, at all times relevant to the Complaint, was acting under color of state law. His principal place of business is The State Capitol Building, Albany, New York 12224. Cuomo is sued in his individual and official capacities.

## III.

## JURISDICTION AND VENUE

5.      Pursuant to 28 U.S.C. § 1331, the Court has subject matter jurisdiction over the claims asserted in this action because this action involves claims based on the First and Fourteenth Amendments to the United States Constitution (U.S. Const. amend. I, XIV), and because the action seeks to prevent state officials from interfering with federal rights. Further, subject matter jurisdiction is conferred on this Court by 28 U.S.C. § 1343(a)(3) because this action is brought to redress deprivations under color of state law of rights, privileges, and immunities secured by the United States Constitution. This Court has supplemental jurisdiction over all state-law claims asserted in this action under 28 U.S.C. § 1367.

6.      Pursuant to 28 U.S.C. § 1391(b), venue is properly vested in this Court because defendant Cuomo resides in this judicial district.

7.      There is a present and actual controversy between the parties.

8.      The relief requested is authorized pursuant to 28 U.S.C. § 1343(a)(4) (recovery of damages or equitable relief or any other such relief for the protection of civil rights), 28 U.S.C. § 1651(a) (injunctive relief), 28 U.S.C. §§ 2201 and 2202 (declaratory and other appropriate relief),

42 U.S.C. § 1983 (deprivation of rights, privileges, and immunities secured by the Constitution), and 42 U.S.C. § 1988 (awards of attorneys' fees and costs).

**IV.**

**STATEMENT OF RELEVANT FACTS**

A.    **The NRA: History Of Dedicated Support For Gun Safety And A Commitment To Core Political Speech.**

9.    After the Civil War, two Union Army officers created a private association to promote marksmanship among the citizenry. Many officers believed that the war would have ended significantly sooner if the Union troops had been able to shoot as well as the Confederate soldiers. Therefore, a group of them obtained a charter from the State of New York in November of 1871; thereafter, the National Rifle Association built a proud legacy in the State of New York.

10.    From the NRA's inception, it received praise from the State of New York for its many public contributions. In 1872, the New York State legislature and the NRA jointly dedicated funds for the creation of a rifle range on Creed Farm, in what is now Queens Village, Queens, New York. For many decades, the NRA partnered with the State to advance firearms safety, education, conservation, and other laudable public policy goals. For example, when New York City public schools sought to educate boys in marksmanship and gun safety, NRA co-founder Gen. George Wingate designed and headed the resulting Public Schools Athletic League (PSAL) marksmanship program.[2] Likewise, in 1949, the NRA worked with the State of New York to create the nation's first hunter education program. Similar courses were subsequently adopted by state fish and game

---

[2] *See, e.g.*, STEVEN A. RIESS, SPORTS IN AMERICA FROM COLONIAL TIMES TO THE TWENTY-FIRST CENTURY: AN ENCYCLOPEDIA 736 (Steven A. Riess ed., 2015); ROBERT PRUTER, THE RISE OF AMERICAN HIGH SCHOOL SPORTS AND THE SEARCH FOR CONTROL, 1880-1930 122 (1st ed. 2013); Robert Pruter, *Boys Rifle Marksmanship*, ILLINOIS HIGH SCHOOL ASSOCIATION, http://www.ihsa.org/archive/hstoric/marksmanship_boys.htm?NOCACHE=5:53:58%20PM (last visited May 11, 2018).

departments across the country and in Canada and help make hunting among the safest sports in existence.

11.     First among the "Purposes and Objectives" contained in the NRA's bylaws is "[t]o protect and defend the Constitution of the United States." That is not surprising, because political speech is a major purpose of the NRA, as it engages in extensive advocacy at all levels of government to promote the rights of its members and all Americans.

12.     The NRA spends tens of millions of dollars annually distributing pamphlets, fact sheets, articles, electronic materials, and other literature to advocate for its views on the Second Amendment and to assist NRA members engaging in national, state, and local firearm dialogue. The NRA's direct mail, television, radio, and digital communications seek to educate the public about issues bearing on the Second Amendment, defend the NRA and its members against political and media attacks, and galvanize participation in the political process by NRA members and supporters.

13.     To its critics, the NRA is best known as a "superlobby – one of the largest and most truly effective lobbying organizations in the country," able to mobilize its millions of members in concerted efforts to protect the Second Amendment rights of all Americans.[3] Of course, the NRA's letter-writing campaigns, peaceable public gatherings, and other grassroots "lobbying" activities constitute precisely the type of political speech which rests "[a]t the core of the First Amendment."[4]

---

[3] CHRISTINA ROBB, *HANDGUNS AND THE AMERICAN PSYCHE THE ATTEMPTED ASSASSINATION OF A PRESIDENT BRINGS THE ISSUE INTO SHARP FOCUS ONCE AGAIN. HANDGUNS – WHAT DO THEY MEANS TO AMERICANS? TO THE NRA, THEY ARE A SYMBOL OF FREEDOM; TO THOSE FRIGHTENED OF CRIME, THEY REPRESENT SAFETY – EVEN IF THE OWNER DOESN'T KNOW HOW TO USE THEM; TO GUN CONTROL ADVOCATES, THEY ARE SYMBOLS OF ULTIMATE EVIL.,* BOSTON GLOBE, 1981 WLNR 68847 (June 7, 1981).

[4] *See Brown v. Hartlage*, 456 U.S. 45, 52 (1982).

B.   <u>**Cuomo's Political Vendetta Against The NRA.**</u>

14.   Andrew Cuomo has criticized the political speech and influence of "Second Amendment types"[5] generally, and the NRA specifically, for decades. In fact, Cuomo has a history of abusing his regulatory power to retaliate against his political opponents on gun control issues.

15.   The son of former Governor Mario Cuomo, Cuomo is a political opportunist who consistently seeks to gain political capital by attacking the NRA. During his tenure as Housing and Urban Development ("HUD") Secretary in the 1990s, Cuomo famously coordinated a campaign of lawsuits (nearly all dismissed) against gunmakers that purported to hold them liable for crimes committed in public housing projects by criminals using illegally obtained firearms. Later, Cuomo admitted that his real aim was to coerce, via settlement, the "voluntary" industrywide adoption of certain equipment and sale restrictions, and warned that any manufacturer who refused to settle would suffer "death by a thousand cuts."[6] Decried by even gun-control supporters as "wrong" and

---

[5] On February 15, 2018, Cuomo appeared on the MSNBC program "The Beat," where he discussed championing legislation that some believed "trampled the Second Amendment." YOUTUBE, Gov. *Andrew Cuomo On Background Checks: "Bunch Of Boloney" | The Beat With Ari Melber | MSNBC*, https://www.youtube.com/watch?v=Tz8X07fZ39o (last visited May 7, 2018). However, Cuomo lamented that his "favorability rating" had thereafter dropped due to "backlash from conservatives and Second Amendment types." *Id.*

[6] Bill McAllister, *Gun Industry Rejects Settlement Effort*, THE DENVER POST (Feb. 1, 2000), http://www.wagc.com/gun-industry-rejects-settlement-effort/.

<u>NATIONAL RIFLE ASSOCIATION OF AMERICA'S</u>
<u>SECOND AMENDED COMPLAINT AND JURY DEMAND</u>                                    Page 7

an abuse of agency authority,[7] the HUD effort failed after the NRA and other pro-gun groups organized legislative and grassroots opposition.[8]

16.     Cuomo blamed "gun lobby extremists" for the collapse of his efforts at HUD.[9] At a press conference on June 20, 2000, he referred to gun-rights supporters as "the enemy," and announced a blueprint for defeating the NRA and its allies that would emphasize the use of state and municipal retaliatory authority: "If we engage the enemy in Washington we will lose. They will beat us in this town. They are too strong in this town. Their fortress is within the Beltway. We're going to beat them state by state, community by community."[10]

17.     As governor of New York, Cuomo has loudly supported the enactment of some of the nation's harshest gun-control laws.[11] But rather than debate opponents of his anti-gun

---

[7] In an editorial dated December 17, 1999, the Washington Post described the Cuomo campaign as "disquieting even for those who, like us, strongly support rigorous controls on handguns." *The HUD Gun Suit*, THE WASHINGTON POST (Dec. 17, 1999), https://www.washingtonpost.com/archive/opinions/1999/12/17/the-hud-gun-suit/48ee0a45-18da-4e8d-9b86-b9512172ae09/?utm_term=.9a74ce83f538. Anticipating themes that would continue to characterize Cuomo's gun-control efforts over the next nineteen years, the editorial board stated that "it . . . seems wrong for an agency of the federal government" to put "pressure on an industry . . . to achieve policy results the administration has not been able to achieve through normal legislation or regulation." *Id.*

[8] *See, e.g.*, *House Blocks Money For Gun Pact*, CBS NEWS (June 21, 2000, 11:58 PM), https://www.cbsnews.com/news/house-blocks-money-for-gun-pact/.

[9] *HUD Archives: News Releases, HUD No. 00-150, COMMUNITIES FOR SAFER GUNS COALITION JOINS CUOMO IN CRITICIZING EFFORT IN CONGRESS TO KILL THE COALITION*, U.S. DEP'T OF HOUS. AND URBAN DEV. (June 27, 2000, archived Dec. 13, 2009).

[10] *Remarks by Secretary Andrew Cuomo Handgun Control, Inc, Washington, D.C. Tuesday, June 20, 2000*, U.S. DEP'T OF HOUS. AND URBAN DEV. (Jan. 20, 2009), https://archives.hud.gov/remarks/cuomo/speeches/handguncontrl.cfm.

[11] *See, e.g.*, Teri Weaver, *Judge: NY must release Safe Act stats from assault weapons registry*, SYRACUSE (May 7, 2015, 9:09 PM), http://www.syracuse.com/news/index.ssf/2015/05/judge_ny_must_release_safe_act_data_on_assault_weapons_registry.html.

initiatives, he declared that conservative firearms advocates "have no place in the state of New York."[12] Accordingly, Cuomo has sought to banish "the enemy" from public discourse altogether, and remains dissatisfied with what he perceives to be the excessive political influence of "conservatives and the Second Amendment types."[13]

18.     In truth, Cuomo bears distinct animus toward the NRA, which he accuses of exerting a "stifl[ing] . . . stranglehold" over national gun policy.[14] For Cuomo, weakening the political advocacy of the NRA is a career strategy.

## C.   Defendants Attempt To Chill The NRA's Political Speech In Support Of Americans' Second Amendment Rights.

19.     Against the backdrop of recent tragedies and a polarized public gun-control debate, Cuomo and the other Defendants have abused their authority in an overt effort to stifle the NRA's political advocacy and to retaliate against the NRA for the effectiveness of that advocacy.

20.     Together with former DFS Superintendent Vullo, his longtime lieutenant,[15] Cuomo embarked on a campaign to chill the political speech of the NRA and other so-called "gun

---

[12] Heather Long, *Conservatives aren't welcome in New York, according to Governor Cuomo*, THE GUARDIAN (Jan. 14, 2014, 8:49 AM), https://www.theguardian.com/commentisfree/2014/jan/24/governor-cuomo-conservatives-not-welcome-new-york.

[13] YOUTUBE, *Gov. Andrew Cuomo On Background Checks: "Bunch Of Boloney" | The Beat With Ari Melber | MSNBC*, https://www.youtube.com/watch?v=Tz8X07fZ39o (last visited December 9, 2019).

[14] Kenneth Lovett, *Exclusive: Cuomo fires back at Jeb Bush for 'stupid' and 'insensitive' gun tweet*, NY DAILY NEWS (Feb. 17, 2016), http://www.nydailynews.com/news/politics/cuomo-blasts-jeb-stupid-insensitive-gun-tweet-article-1.2534528.

[15] Cuomo and Vullo have worked together since at least 2006 when Vullo served as a "top aide" to Cuomo in his role as attorney general. Cuomo nominated Vullo to be DFS Superintendent approximately ten years later. Jimmy Vielkind, *Cuomo nominates ex-aide to head Department of Financial Services*, POLITICO (Jan. 21, 2016, 5:14 AM), https://www.politico.com/states/new-york/albany/story/2016/01/cuomo-nominates-ex-aide-to-head-department-of-financial-services-030286.

promotion" organizations by leveraging state power to punishing financial institutions which maintain "business arrangements with the NRA." To achieve this, Defendants draw upon the formidable regulatory powers of DFS—an agency charged with ensuring the stability and integrity of New York's financial markets.

21.     At Cuomo's behest, Vullo and DFS have threatened regulated institutions with costly investigations, increased regulatory scrutiny and penalties should they fail to "discontinue[] . . . their arrangements with the NRA."[16] Many of the most pernicious of these threats occurred privately. For example, beginning in February 2018, Vullo met personally with executives of regulated institutions, including Lloyd's.[17] During the meetings she discussed an array of technical regulatory infractions plaguing the affinity-insurance marketplace. Vullo made it clear, however, that DFS was less interested in pursuing the infractions of which she spoke, so long as Lloyd's ceased providing insurance to gun groups, especially the NRA. The threat was clear and unambiguous. Shortly thereafter, Defendants began to deliver on it. Within a single week, DFS levied multi-million dollar fines against two insurance-industry firms that dared to do business with the NRA. Under intense scrutiny, both firms, and later a third (together comprising all the issuers of NRA-related policies for the NRA and its members), were coerced to terminate their business arrangements with the NRA and its members—including arrangements having nothing to do with the allegedly unlawful conduct cited by DFS.

---

[16] *GOVERNOR CUOMO DIRECTS DEPARTMENT OF FINANCIAL SERVICES TO URGE COMPANIES TO WEIGH REPUTATIONAL RISK OF BUSINESS TIES TO THE NRA AND SIMILAR ORGANIZATIONS*, N.Y. STATE GOVERNOR ANDREW M. CUOMO (Apr. 19, 2018), https://www.governor.ny.gov/news/governor-cuomo-directs-department-financial-services-urge-companies-weigh-reputational-risk.

[17] Vullo met with, and threatened, executives of Lloyd's of London ("Lloyd's") and its United States affiliate, Lloyd's America, Inc, ("LAI").

22.     Importantly, Defendants were fully aware by at least March 2018 (and likely earlier) that non-NRA insurance policies exhibiting the same features were being marketed on behalf of other affinity organizations. Defendants intentionally ignored such knowledge and did not undertake enforcement actions relating to these other similarly constructed programs because enforcing the Insurance Law was never their goal. Instead, as DFS explained to Lloyd's in closed-door meetings, the Cuomo administration sought to focus on "gun programmes" and gun advocacy groups generally.

23.     A DFS press release publicizing one enforcement action makes clear the gravamen of Defendants' campaign: financial institutions regulated by DFS must refrain from "[e]ntering into any . . . agreement or arrangement," which "involv[es] the NRA, directly or indirectly"[18]—or face the consequences.

### 1.     DFS And Its Regulatory Mission.

24.     In 2011, as part of his state budget, Cuomo announced the merger of the New York State Insurance Department and the Banking Department to create DFS. The mandate of the new agency, which consolidated supervisory and enforcement powers previously vested in separate departments, is to "reform the regulation of financial services in New York to keep pace with the

---

[18] *DFS FINES LOCKTON COMPANIES $7 MILLION FOR UNDERWRITING NRA-BRANDED "CARRY GUARD" INSURANCE PROGRAM IN VIOLATION OF NEW YORK INSURANCE LAW*, N.Y. STATE DEP'T OF FIN. SERVS. (May 2, 2018), https://www.dfs.ny.gov/about/press/pr1805021.htm; *see also* DFS FINES CHUBB SUBSIDIARY ILLINOIS UNION INSURANCE COMPANY $1.3 MILION FOR UNDERWRITING NRA-BRANDED "CARRY GUARD" INSURANCE PROGRAM IN VIOLATION OF NEW YORK INSURANCE LAW, N.Y. STATE DEP'T OF FIN. SERVS. (May 7, 2018), https://www.dfs.ny.gov/about/press/pr1805071.htm.

rapid and dynamic evolution of these industries, to guard against financial crises and to protect consumers and markets from fraud."[19]

25.    The Superintendent of DFS has broad regulatory and enforcement powers, which encompass the ability to initiate civil and criminal investigations and enforcement actions. In addition, pursuant to Financial Services Law, Article 3, § 301, the DFS superintendent has the power to refer matters to the attorney general for criminal enforcement. The creation of an agency with such expansive prerogatives and capabilities "grab[bed] power and headlines," and the New York Times reported in 2015 that the first DFS superintendent, Benjamin Lawsky, was popularly caricatured as "the new sheriff of Wall Street" and an all-powerful monarch ("King Lawsky").[20]

26.    New York Financial Services Law, Article 2, § 201, provides the superintendent of DFS with formidable authority to, among other things, "ensure the continued solvency, safety, [and] soundness" of banks and insurance companies.[21] Accordingly, DFS directives regarding "risk management" must be taken seriously by financial institutions—as risk-management deficiencies can result in fines of hundreds of millions of dollars.

27.    DFS's regulatory mandate does not include setting gun-control policy. Nor does any statute or other authority empower DFS to blacklist, from receipt of insurance or banking services, speakers with political viewpoints objectionable to the governor or DFS superintendent. In addition, DFS has no authority to engage in unlawful viewpoint discrimination.

---

[19] N.Y. STATE DEP'T OF FIN. SERVS. (Dec. 12, 2017), https://www.dfs.ny.gov/about/mission.htm.

[20] Jessica Silver-Greenberg and Ben Protess, *Benjamin Lawsky, Sheriff of Wall Street, Is Taking Off His Badge*, THE NEW YORK TIMES (May 20, 2015), https://www.nytimes.com/2015/05/21/business/dealbook/benjamin-lawsky-to-step-down-as-new-yorks-top-financial-regulator.html.

[21] New York Financial Services Law Article 2, § 201 ("Declaration of Policy").

2.      **The NRA Depends Upon Essential Financial Services to Fulfill Its Advocacy Mission**

28.     The NRA's direct-mail campaigns, digital media broadcasts, television and radio communications, grassroots organizing, membership recruitment, and other core political speech and associational activities are carried out by a combination of volunteers, employees, and independent contractors engaged by the NRA and its affiliates. To meet payroll obligations, purchase mailing materials and media airtime, maintain its Internet presence, and otherwise continue to advocate for the Second Amendment of the United States Constitution, the NRA must have the ability to process and retain cash, check, wire-transfer, and other donations from members and events throughout the country, as well as transmit and apply these funds to meet operational needs. Accordingly, the NRA relies upon depository services, cash management services, lockbox services, disbursement services, wire-transfer services, and remote banking services of the type generally offered by major wholesale banking institutions.

29.      To continue its existence as a not-for-profit organization and fulfill its advocacy objectives, the NRA also must maintain various corporate insurance coverage. General liability and related "umbrella" coverage allow the NRA to maintain physical premises, convene off-site meetings and events, and operate educational programs promoting the safe use of firearms which are vital to the NRA's mission. For its Annual Meeting, Great American Outdoor Show, and other major rallies, conventions and assemblies with explicitly expressive purposes, the NRA generally must also purchase event-specific coverage. Absent such coverage, the NRA could be forced to cease circulation of various print publications and magazines.

30.      In addition, like many affinity groups and organizations nationwide, the NRA seeks to make life, health, and other insurance coverage available to its members on affordable, tailored terms. To this end, the NRA contracted with multiple insurance-industry firms to develop, market,

and underwrite insurance programs endorsed by the NRA. Pursuant to these arrangements, the NRA performs none of the functions of an insurer. It does lend its valuable logos, marks, and endorsements to insurance programs brokered and serviced by others. Such "affinity" insurance plans are common and believed by many to be a suitable substitute for employer-based coverage.[22]

31.     From 2000 onward, the NRA contracted with affiliates of the world's largest privately held insurance broker, Lockton Companies, LLC (collectively with pertinent affiliates, "Lockton"),[23] for affinity-program brokerage and administration services. Lockton has provided services in the affinity-insurance market for decades and caters to a wide array of industries and clients including franchises, professional and trade organizations, fraternal organizations, and common-cause groups such as the NRA. For roughly seventeen years, Lockton entities administered and marketed NRA-endorsed insurance in New York State and across the nation without incident. In addition to its affinity-insurance transactions with the NRA, Lockton has also served for decades as the NRA's trusted insurance broker for various corporate coverage—such as general liability, umbrella and director and officer insurance.

32.     The NRA-endorsed affinity-insurance administered by Lockton consists primarily of life, health, property, and casualty policies that mirror policies offered by Lockton to other affinity groups. In addition, Lockton administers certain products, including a product known as "Carry Guard," that provide coverage for expenses arising out of the lawful self-defense use of a

---

[22] *See, e.g.*, Rachel Louise Ensign, *Affinity-Group Plans*, THE WALL STREET JOURNAL (Sept. 11, 2011), http://online.wsj.com/article/SB10001424053111904836104576563341 686006336.html.

[23] In particular, the NRA contracted with Lockton Affinity Series of Lockton Affinity, LLC (f/k/a Lockton Risk Services, Inc.) ("Lockton Affinity") and Kansas City Series of Lockton Companies, LLC ("Lockton KC").

legally possessed firearm. Illinois Union Insurance Company ("Illinois Union"), a subsidiary of Chubb Ltd., underwrote Carry Guard while doing business under the name "Chubb."

33.     The NRA has been the target of activist boycott efforts in the past, including campaigns that urged insurance companies and other private actors to cease doing business with the NRA. However, because these campaigns were carried out by non-governmental activist groups who lack the government's power to punish those who refused to join the boycott, their methods have centered on persuasion—not coercion. Unaided by the brute force of state power, activists never successfully persuaded the NRA's banking or insurance partners to sever ties with the NRA. This changed in 2017, when one activist organization successfully enlisted Defendants in a joint effort to silence the NRA.

### 3.     DFS Commences A Politically Motivated Investigation Focused Ostensibly on NRA-Endorsed "Affinity" Insurance.

34.     During or about September 2017, a non-governmental activist organization known as Everytown for Gun Safety ("Everytown") contacted the New York County District Attorney's Office (the "DA's Office"), as well as state and municipal authorities in other jurisdictions, in an effort to prompt a crackdown by sympathetic government officials that would target alleged compliance infirmities in Carry Guard. Notably, Everytown is not an organization dedicated to insurance compliance; instead, its explicit political mission is to oppose the NRA.[24] On September 13, 2017, representatives from the DA's Office met with DFS to effectuate Everytown's agenda.

---

[24]     Aaron Blake, *Bloomberg launches new $50 Million gun control effort*, THE WASHINGTON POST (Apr. 16, 2014), https://www.washingtonpost.com/news/post-politics/wp/2014/04/16/bloomberg-aims-to-spend-50-million-on-gun-control/?noredirect=on&utm_term=.703fe67ee197 (explaining that Everytown "will attempt to combat the vast influence of the National Rifle Association").

35.     As a result, in October 2017, DFS launched an investigation that focused ostensibly on Carry Guard and was directed in the first instance at Lockton. On its website, Everytown took credit for instigating the inquiry[25]—but even if it had not, the political underpinnings and selective focus of the investigation were clear. The investigation was chronicled in the national media before the NRA received official notice of it, and it targeted none of the available self-defense insurance products except Carry Guard, which was endorsed by the NRA.

36.     Of course, Carry Guard was not Defendants' true focus, and the scope of the DFS investigation rapidly expanded. At first, Defendants purported to target a discrete subset of so-called "excess line" property and casualty policies relating to firearms—a category that encompassed Carry Guard, but also included policies such as Gun Club Insurance and Hunt Club Insurance. However, Defendants' goal, from the outset, was to disrupt any and all business arrangements between the NRA and any insurance administrator, broker, or underwriter—indeed, any financial institution. Within weeks of commencing its investigation, DFS began to target insurance programs that had nothing to do with firearms, and instead provided coverage similar or identical to coverage endorsed by other New York affinity organizations such as the New York State Bar Association, the New York City Bar, the National Association for the Self-Employed, the New York Association of Professional Land Surveyors, and the New York State Psychological Association.

37.     DFS has not announced—even to this day—similar inquiries concerning any of these other membership organizations, although their affinity programs involve most, if not all, of

---

[25] *Everytown, Moms Demand Action Statements Responding to Report That New York Department of Financial Services is Investigating NRA Carry Guard Insurance*, EVERYTOWN FOR GUN SAFETY (Oct. 25, 2017), https://everytown.org/press/everytown-moms-demand-action-statements-responding-to-report-that-new-york-department-of-financial-services-is-investigating-nra-carry-guard-insurance/.

the practices and features referenced by DFS in its investigation of the NRA's affinity programs. Instead, Defendants selectively targeted the NRA because of the NRA's constitutionally protected legislative and grassroots advocacy activities. Defendants specifically intend to undermine the NRA's ability to conduct its affairs in New York—and to advance Cuomo's anti-NRA political agenda.

### 4. <u>Over The Course Of The Investigation, Cuomo And DFS Exhort Firms To Sever Ties With The NRA.</u>

38.     Throughout its purported investigation of Carry Guard in late 2017 and early 2018, DFS communicated to banks and insurers with known or suspected ties to the NRA that they would face regulatory action if they failed to terminate their relationships with the NRA. These exhortations extended far beyond Carry Guard (the policy purportedly raising regulatory concerns), indicating that any business relationship whatsoever with the NRA would invite adverse action.

39.     The impact of Defendants' campaign on the NRA's ability to access essential financial services has been far greater than—and, clearly distinct from—the impact of any public controversy relating to recent tragedies.

40.     For example, during February 2018, the NRA issued a Request for Proposal ("RFP") to multiple banks, inviting them to submit bids to provide depository services, cash-management services, and other basic wholesale banking services necessary to the NRA's advocacy. The NRA received enthusiastic responses from several banks.

41.     Likewise, in early January 2018, the NRA began negotiating with a major DFS-regulated insurance carrier (the "Corporate Carrier") to renew its General Liability, Umbrella, and Media Liability insurance coverage policies, which were set to expire during Spring 2018. Those

negotiations remained on-course until the final days of February 2018, when Defendants sharply escalated their threats.

42.     On or about February 25, 2018, the Chairman of Lockton Companies, placed a distraught telephone call to the NRA. Lockton had been a close business partner of the NRA for nearly twenty years; its commitment to the parties' business relationship had not wavered in connection with the Parkland tragedy, nor the prior Sandy Hook tragedy, nor any previous wave of public controversy relating to gun control. Nonetheless, although he expressed that Lockton privately wished to continue doing business with the NRA, the chairman confided that Lockton would need to "drop" the NRA—entirely—for fear of "losing [our] license" to do business in New York.

43.     On February 26, 2018, Lockton publicly tweeted that it would discontinue providing brokerage services for *all* NRA-endorsed insurance programs.

44.     Days later, the Corporate Carrier abruptly reversed its position in its corporate-insurance-renewal negotiations with the NRA. Although it had previously indicated it would be willing to extend the NRA's General Liability and Umbrella coverage on favorable terms consistent with the NRA's favorable claims history, the Corporate Carrier now stated that it was *unwilling to renew coverage at any price.* The Corporate Carrier severed mutually beneficial business arrangements with the NRA because it learned of Defendants' threats directed at Lockton and feared it would be subject to similar reprisals.

45.     Defendants soon supplemented their backchannel threats with official regulatory "guidance." In April 2018, Cuomo directed DFS to publicly "urge insurers and bankers statewide to determine whether any relationship they may have with the NRA or similar organizations sends

the wrong message to their clients and their communities who often look to them for guidance and support."[26]

46.     On April 19, 2018, Vullo, as Superintendent of DFS, issued a pair of ominous "guidance" letters (the "April 2018 Letters") directed at the chief executive officers, or equivalents, of all New York State chartered or licensed financial institutions and all insurers doing business in New York. The April 2018 Letters urged recipients to sever ties with the NRA and other "gun promotion organizations."[27] The directive was packaged in a sharply worded media advisory meant to generate headlines—and apply maximum public pressure to the NRA and those with whom it associates.

47.     The April 2018 Letters are suffused with political concerns far afield from DFS's mandate to prevent financial crises and financial fraud. For example, they urge banks and insurers to heed "the voices of the passionate, courageous, and articulate young people" speaking out in favor of gun control, and to reconsider any business relationships with "the [NRA], and similar organizations that promote guns and lead to senseless violence." However, the April 2018 Letters do not merely express Defendants' own political opinions: they invoke the "risk management"

---

[26] *GOVERNOR CUOMO DIRECTS DEPARTMENT OF FINANCIAL SERVICES TO URGE COMPANIES TO WEIGH REPUTATIONAL RISK OF BUSINESS TIES TO THE NRA AND SIMILAR ORGANIZATIONS*, N.Y. STATE GOVERNOR ANDREW M. CUOMO (Apr. 19, 2018), https://www.governor.ny.gov/news/governor-cuomo-directs-department-financial-services-urge-companies-weigh-reputational-risk, attached hereto as Exhibit A (the "Cuomo Press Release").

[27] Maria T. Vullo, *Guidance on Risk Management Relating to the NRA and Similar Gun Promotion Organizations*, N.Y. STATE DEP'T OF FIN. SERVS. (Apr. 19, 2018), https://www.dfs.ny.gov/legal/dfs/DFS_Guidance_Risk_Management_NRA_Gun_Manufacturers -Insurance.pdf (addressed to the CEOs or equivalents of insurers doing business in the State of New York), attached hereto as Exhibit B; Maria T. Vullo, *Guidance on Risk Management Relating to the NRA and Similar Gun Promotion Organizations*, N.Y. STATE DEP'T OF FIN. SERVS. (Apr. 19, 2018), https://www.dfs.ny.gov/legal/dfs/DFS_Guidance_Risk_Management_NRA_ Gun_Manufacturers-Banking.pdf (addressed to the CEOs or equivalents of New York State chartered or licensed financial institutions), attached hereto as Exhibit C.

obligations of recipients, and direct banks and insurers to "take prompt actions to manage" purported "reputational risks" arising from "dealings with the NRA or similar gun promotion organizations."

48.     Read in the context of the preceding months' private communications—as well as disclosures that would soon follow concerning consequences imposed on firms doing business with the NRA—the April 2018 Letters were threats that deliberately invoked DFS's "risk management" authority to warn of adverse action if institutions failed to support Defendants' efforts to stifle the NRA's speech and to retaliate against the NRA based on its viewpoint.

49.     Importantly, the April 2018 Letters contain no language clarifying that DFS would forebear from directly enforcing the letters' terms. Nor do the April 2018 Letters provide regulated institutions with any objective criteria for measuring the "reputational risks" imposed by dealings with entities that "promote guns that lead to senseless violence." This is because Defendants intended the April 2018 Letters to intimidate institutions into acceding to a political blacklisting campaign and have nothing to do with the types of market "risks" properly regulated by DFS.

50.     To further dispel any ambiguity surrounding the April 2018 Letters, Cuomo and Vullo issued the contemporaneous Cuomo Press Release, containing and endorsing a statement by Vullo that directly "urge[s] all insurance companies and banks doing business in New York to join the companies that have already discontinued their arrangements with the NRA."[28]

---

[28] Ex. A.

51.     Likewise, on April 20, 2018, Cuomo publicly tweeted: "The NRA is an extremist organization. I urge companies in New York State to revisit any ties they have to the NRA and consider their reputations, and responsibility to the public."[29]

52.     The intended and actual effect of the April 2018 Letters, and the actions by Cuomo and Vullo, is to coerce insurance agencies, insurers, and banks into terminating business relationships with the NRA that were necessary to the survival of the NRA as a charitable organization.

53.     Third-party commentators immediately raised concerns about the First Amendment implications of DFS's actions. For example, on April 22, 2018, shortly after issuance of the April 2018 Letters, Brian Knight, a Senior Research Fellow and financial regulation expert at George Mason University, published an article expressing alarm that the April 2018 Letters "appear[ed] to be *inherently* about political speech," and should be immediately withdrawn.[30] In the face of such criticism (and this litigation), Cuomo doubled down, declaring that a lawsuit which alleges unconstitutional censorship of the NRA's "dangerous agenda" means "you know you're doing something right."[31]

---

[29] Andrew Cuomo (@NYGovCuomo), TWITTER (Apr. 20, 2018, 8:58 AM), https://twitter.com/NYGovCuomo/status/987359763825614848.

[30] Brian Knight, *Is New York using bank regulation to suppress speech?*, FINREGRAG (Apr. 22, 2018), https://finregrag.com/is-new-york-using-bank-regulation-to-suppress-speech-ac61a7cb3bf.

[31] Kenneth Lovett, *NRA slapping Cuomo with lawsuit over blacklisting campaign, violating First Amendment rights*, NEW YORK DAILY NEWS (May 11, 2018), http://www.nydailynews.com/news/politics/nra-slapping-cuomo-lawsuit-blacklisting-campaign-article-1.3984861#; Andrew Cuomo (@NYGovCuomo), TWITTER (May 12, 2018, 8:50 AM), https://twitter.com/NYGovCuomo/status/995330370592632832.

D.      **The Damage Done.**

1.      **DFS Permanently Restricts Lockton From Doing Business With The NRA In New York.**

54.     On May 2, 2018, two weeks after Vullo issued the April 2018 Letters, Lockton entered into a consent order Under Articles 21, 23, and 34 of the Insurance Law (the "Lockton Consent Order") with DFS—signed by Vullo—which imposes a civil monetary penalty of $7 million.[32] Although the Lockton Consent Order ostensibly addresses discrete violations by specific Lockton entities of New York's Insurance Law, its provisions go much further. Most notably, the Lockton Consent Order purports to restrict Lockton's participation in *any* NRA-endorsed insurance programs in New York State, irrespective of whether such programs comply with the Insurance Law.

55.     Specifically, the Lockton Consent Order requires that Lockton agree "not to participate in . . . any other NRA-endorsed programs with regard to New York State." Nor may Lockton "enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance to be issued or delivered in New York State or to anyone known to Lockton to be a New York resident." As a result, Lockton is prohibited from selling NRA affinity-insurance outside New York to any individual who maintains a New York residence.

56.     DFS and Vullo have no legal basis to restrict Lockton's involvement with insurance programs that do not violate New York's Insurance Law; nor do they have authority to regulate insurance transactions outside of New York. Nevertheless, DFS mandated that Lockton never enter

---

[32] The Lockton Consent Order is attached hereto as Exhibit D.

into any future agreements with the NRA for legitimate and fully compliant insurance programs in New York.

57.    Furthermore, Lockton would violate the Lockton Consent Order if it markets an ordinary property, casualty, or life insurance policy in the State of New York that was accompanied by an NRA logo or endorsement—notwithstanding that a comparable logo or endorsement referencing any other affinity or common-cause organization is permissible. This provision of the Lockton Consent Order is deliberate and intended to impair the NRA's ability to negotiate insurance benefits for its members, damage the NRA's goodwill among its membership, and unconstitutionally restrict the NRA's speech on the basis of political animus.

58.    Several of the purported "violations" assessed pursuant to the Lockton Consent Order concern programs commonly engaged in by numerous additional affinity associations that do not publicly advocate for Second Amendment rights and, therefore, are <u>not</u> targets of Defendants' unconstitutional conduct. Several such organizations are clients of Lockton—yet the Consent Order does not compel Lockton to discontinue its purportedly unlawful conduct with respect to these clients.

59.    For example:

- DFS claims that Lockton Affinity violated Insurance Law § 2122(a)(1) by referring to the insurer's AM Best rating. Yet, at the time this lawsuit was filed, Lockton Affinity's affinity program for the American Optometric Association through AOAExcel ("AOAExcel") touted the "backing of a carrier that is rated A+ (Superior) by A.M. Best.[33] Similarly, Lockton Affinity currently advertises that coverage for the affinity programs designed for the Veterans of Foreign Wars

---

[33] *Questions? We have answers for you.*, AOAINSURANCEALLIANCE, http://aoainsurancealliance.com/faq/ (last visited May 7, 2018).

("VFW") and Moose International Inc. ("Moose") was through companies "rated 'Excellent' or higher by A.M. Best."[34]

- DFS claims that Lockton Affinity violated Insurance Law § 2324(a) by giving or offering to give no cost insurance to NRA members in good standing. Yet, Lockton Affinity currently made that same offer to members of both the Professional Photographers of America ("PPA")[35] and the VFW.[36]

- DFS claims that Lockton Affinity violated Insurance Law § 2116 by compensating the NRA based on actual premiums collected. Yet, Lockton Affinity paid AOAExcel, Moose, the VFW, the PPA, and dozens of other clients in the same or similar manner.

60.     Even if such conduct does violate insurance law, DFS's selective enforcement of such offenses as to NRA-endorsed policies—but not as to other policies marketed by Lockton in an identical fashion—constitutes impermissible viewpoint discrimination and a denial of equal protection under the law.

61.     Despite the backlash concerning the expansive coercive scope and clear political agenda of the April 2018 Letters, Defendants remained undaunted in their effort to deprive the NRA of such services; as such, their overall messaging to financial institutions remained unaffected. Indeed, the DFS press release publicizing the Lockton Consent Order trumpeted the same concession by Lockton that had inspired its chairman's furtive telephone call months before:

---

[34] *FVW Post Insurance Program, Program Information*, VFW INSURANCE, http://vfwinsurance.com/wp-content/uploads/sites/29/2017/12/VFW_Post_Insurance_Information_Packet.pdf (last visited May 7, 2018); MOOSE INSURANCE PROGRAM, http://mooseinsuranceprogram.com/ (last visited May 7, 2018).

[35] INSURANCE FOR PPA, https://insuranceforppa.com/ (last visited May 7, 2018).

[36] VFW INSURANCE, http://vfwinsurance.com/life-insurance/#no-cost (last visited May 7, 2018).

Lockton must "refrain from [e]ntering into any other agreement or arrangement . . . involving the NRA, directly or indirectly"—including, but not limited to, affinity-insurance.[37]

### 2.   DFS Purports To Prohibit Chubb From Doing Business With The NRA Anywhere.

62.    On May 7, 2018, Chubb Group Holdings, Inc. and Illinois Union (together, "Chubb") entered into a Consent Order Under Sections 1101 and 3420 of the Insurance Law (the "Chubb Consent Order") with DFS—signed by Vullo—which imposes a civil monetary penalty of $1.3 million.[38] Similar to the Lockton Consent Order, in the Chubb Consent Order, DFS overextends its authority and purports to restrict Chubb's participation in *any* affinity-type insurance program with the NRA, irrespective of whether such programs comply with the Insurance Law.

63.    Although DFS restricted Lockton from participating in any affinity-type insurance programs with the NRA in New York or with New York residents, Defendants' restrictions in the Chubb Consent Order contain no geographic constraint whatsoever. Instead, the Chubb Consent Order purports to limit Chubb's involvement with the NRA anywhere, and everywhere, in the world.

64.    Nevertheless, DFS allows Chubb to continue to underwrite affinity-type insurance programs with other affinity or common-cause organizations that do not publicly advocate for Americans' Second Amendment rights, so long as Chubb undertakes "reasonable due diligence to

---

[37] *DFS FINES LOCKTON COMPANIES $7 MILLION FOR UNDERWRITING NRA-BRANDED "CARRY GUARD" INSURANCE PROGRAM IN VIOLATION OF NEW YORK INSURANCE LAW*, N.Y. STATE DEP'T OF FIN. SERVS. (May 2, 2018), https://www.dfs.ny.gov/about/press/pr1805021.htm.

[38] The Chubb Consent Order is attached hereto as Exhibit E.

ensure that any entity involved . . . is acting in compliance with the Insurance Law . . . ."[39] The only plausible explanation for the DFS's complete exclusion of NRA-endorsed policies, even those "in compliance with the Insurance Law," is that Defendants seek to misuse DFS's power to deprive the NRA of insurance and financial services, on the sole ground that Defendants disapprove of the NRA's viewpoint regarding gun control.

### 3. Ignoring Identical Features of Comparable Affinity-Insurance Programs, Defendants Impermissibly Targeted the NRA.

65.     Beginning during the Fall of 2017, including through a subpoena issued to Lockton and research supplied by Everytown, Defendants became aware of pervasive, colorable regulatory infirmities affecting numerous affinity-insurance programs. For example, brokers such as Lockton frequently paid success-based royalties to their affinity clients, which DFS would later assert violated New York Insurance Law § 2116. Insurance coverage for the cost of psychological counseling had become increasingly pervasive outside a standard health-insurance context, yet DFS argues that providing such insurance violates New York Insurance Law § 2117. Similarly, DFS takes the position that the financial condition or "rating" of an out-of-state, excess-line insurer may not be advertised as a means to promote the policy—but this practice was common in the affinity-insurance marketplace in 2017. And although New York Insurance Law § 3420 sets forth various minimum requirements for liability insurance which protects persons and property, many policies failed to meet those requirements. It is clear that confusion existed among brokers regarding the mechanics of compliance with New York Insurance Law § 2118, which requires brokers to secure declinations from authorized insurers before placing surplus-line insurance.

---

[39] *See* Ex. E at ¶ 22.

66.     Confronted with a marketplace where brokerage practices frequently departed from the regulators' preferred reading of certain statutes, Defendants could have issued informative guidance, or adopted an even-handed enforcement approach. Instead, Defendants selectively used these purported infractions to target the NRA, while disregarding other instances of the same conduct of which they were aware. (When Defendants did issue guidance letters to regulated institutions in April 2018, the letters reflected their enforcement approach: ignore excess-line declinations, out-of-state-carrier ratings, and other technical insurance-policy features while "urging" financial institutions to cut ties with gun groups).

67.     Although DFS's investigation of the NRA, launched at Cuomo and Everytown's behest, had originally focused on Carry Guard, that changed by February 2018. In the aftermath of the Parkland tragedy, Vullo met with senior executives of Lloyd's and LAI, and presented Defendants' views on gun control and their desire to leverage their powers to combat the availability of firearms, including specifically by weakening the NRA. These backchannel meetings began on or about February 27, 2018, after Vullo spoke at a breakfast meeting of the New York City Bar Association; participants included Vullo herself, along with Inga Beale of Lloyd's and Joseph Gunset of LAI.

68.     Sometimes referred to as an insurance underwriter, Lloyd's is actually an insurance marketplace, composed of "members which underwrite insurance (each for their own account) as members of syndicates."[40] Various supervisory bodies and boards within Lloyd's set policies for

---

[40] *See Lloyd's of London in Study for N.Y. Insurance Market*, DealBook, N.Y. Times (March 25, 2010), https://dealbook.nytimes.com/2010/03/25/lloyds-of-london-in-study-for-n-y-insurance-market/; *see also The Lloyd's Market*, Lloyd's, https://www.lloyds.com/about-lloyds/what-is-lloyds/the-lloyds-market (last visited April 18, 2019), https://www.lloyds.com/about-lloyds/what-is-lloyds/the-lloyds-market (describing the structure of the Lloyd's market). Entities known as "managing agents" manage the Lloyd's syndicates on

the Lloyd's syndicates, and can issue directives that shape the availability of different types of insurance worldwide. Like most of the insurance industry, Lloyd's generally does not shy away from providing insurance that may be controversial—for example, to this day, Lloyd's syndicates are permitted to underwrite coverage for religious sexual abuse liability.[41] However, despite being based in London, Lloyd's is extremely sensitive to pressure from the New York regulators, and concerned about "reputational risks" that may incur DFS's disfavor. Since World War II, when Lloyd's sought to protect policyholders from the consequences of German attacks on England, all premiums paid by Lloyd's policyholders have deposited into trust funds in the State of New York, through a structure known as the Lloyd's America Trust Fund ("LATF"). The LATF is directly regulated by DFS, and totals tens of billions of dollars—providing massive collateral for whatever demands DFS may impose.[42]

69.     During her surreptitiously held meetings with Lloyd's executives that commenced in February 2018, Vullo acknowledged the widespread regulatory issues in the excess-line marketplace. Vullo and DFS made clear that Lloyd's could avoid liability for infractions relating to other, similarly situated insurance policies, so long as it aided DFS's campaign against gun

---

behalf of Lloyd's members. The individual Lloyd's syndicates and managing agents that served the NRA, and were targeted by DFS are: AUW 0609; BRT 2987; CNP 0958; CNP 4444; CSL 1084; GER 1206; KLN 0510; LIB 4472; ROC 1200; SAM 0727; AmTrust Syndicates Limited; Argo Managing Agency Limited; Atrium Underwriters Limited; Brit Syndicates Limited; Canopius Managing Agents Limited; Chaucer Syndicates Limited; Liberty Managing Agency Limited; S.A. Meacock & Company Limited; Tokio Marine Kiln Syndicates Limited. All are located in the United Kingdom.

[41] *See, e.g.*, http://www.britinsurance.com/~/media/files/us%20flyers%20new/public%20 entity%20%20non%20profit%20sir%20package.ashx.

[42] *See In re Lloyd's Am. Tr. Fund Litig.*, 928 F. Supp. 333, 336 (S.D.N.Y. 1996) (discussing the LATF structure and certain relevant regulations administered by DFS's predecessor agency, the New York Department of Insurance).

groups. Against the specter of this bold abuse of her position, Lloyd's agreed that it would instruct its syndicates to cease underwriting firearm-related policies and would scale back its NRA-related business; in exchange, DFS would focus its forthcoming affinity-insurance enforcement action solely on those syndicates which served the NRA, and ignore other syndicates writing similar policies. The first step of this choreographed process was a letter from DFS to Gunset, an LAI executive, sent on April 11, 2018.[43]

70.     On May 1, 2018, Lloyd's held a meeting of its Board of Directors. Among the topics discussed at the meeting were ████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████ ████████████████████████

██████████████ ██████████████████

████████████████████████████████

██████████████████.[46]

71.     On May 9, 2018, Lloyd's sent a notice to its managing agents who are responsible for all insurance policies written through the Lloyd's marketplace (the "May 9 Notice").[47] The

---

[43] Ex. F and Sealed Exhibit B.

[44] Ex. G and Sealed Exhibit C.

[45] *Id.*

[46] *Id.*

[47] Ex. H and Sealed Exhibit D.

May 9 Notice ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████[48]

72.     Also on May 9, 2018, Lloyd's publicly announced that it had directed its underwriters to terminate all insurance related to the NRA and not to provide any insurance to the NRA in the future, in the wake of DFS's investigations into the NRA and its business partners.[49]

73.     By June 30, 2018, the Lloyd's managing agents and syndicates had provided materials to DFS that DFS requested in the April 11, 2018 letter.

74.     On December 20, 2018, ten Lloyd's underwriters, acting through their managing agents, entered into a Consent Order Under Sections 1102 and 3420 of the Insurance Law (the "Lloyd's Consent Order") with DFS—signed by Vullo—which imposes a civil monetary penalty of $5 million.[50] Similar to the Lockton and Chubb Consent Orders, in the Lloyd's Consent Order, DFS overextends its authority and purports to restrict Lloyd's participation in *any* affinity-type insurance program with the NRA, irrespective of whether such programs comply with the Insurance Law.[51]

---

[48] *Id.*

[49] *See, e.g.*, *Lloyd's Underwriters Told to Stop Insurance Linked to NRA*, THE NEW YORK TIMES (May 9, 2018), https://www.nytimes.com/reuters/2018/05/09/business/09reuters-lloyds-of-london-nra.html.

[50] The Lloyd's Consent Order is attached hereto as Exhibit I.

[51] *See* Ex. I at ¶ 20.

75.     Pursuant to the conversations between Vullo and DFS with senior officials at Lloyd's and LAI described above, Lloyd's was not subjected to any enforcement action and/or penalties for any violation of the New York Insurance Law related to affinity-insurance programs, other than in connection with the NRA-related insurance programs.

76.     Importantly, Lloyd's was not the only entity with direct exposure to DFS's selective enforcement scheme. DFS also became specifically cognizant of non-NRA policies that exhibited the same purported defects as NRA policies—and chose to ignore those violations, targeting solely the NRA—in the context of its Lockton investigation. ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████ DFS verbally conveyed to Lockton that it was only interested in pursuing the NRA. Other programs exhibiting the same issues, DFS explained, could be quietly remediated by Lockton after consent order and penalty targeting NRA programs had been publicized.

77.     Consistent with this agreement, on July 2, 2018, Lockton provided a report to DFS regarding the status of its remediation efforts for non-NRA programs. ██████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

78.   ████████████████████████████

████████████████████████████████████████. In

response, DFS took no action whatsoever against any of Lockton's non-NRA clients. On January

31, 2019, almost three months after this Court had sustained the NRA's selective-enforcement

claims and permitted discovery regarding them, DFS entered into a Supplemental Consent Order

with Lockton that purported to admonish violations of the same statutes by Lockton's non-NRA

clients, yet did not identify the clients by name or require Lockton to cease doing business with

them.[52]

79.     DFS's selective enforcement continues to this day. While taking no action against

any of Lockton's other affinity clients, or the underwriters involved in those policies, DFS recently

subpoenaed an underwriter known as AGIA which backs health-insurance policies administered

and brokered by Lockton for the NRA. These policies have nothing to do with firearms and are

identical in all material respects to policies administered and brokered by Lockton on behalf of

non-NRA clients.

---

[52] Ex. J.

**4.      Defendants' Actions Are Causing Other Financial Institutions To Re-Evaluate
Their Relationships With The NRA For Fear Of Significant Adverse Action
By Defendants.**

80.      Defendants' concerted efforts to stifle the NRA's freedom of speech and to retaliate

against the NRA based on its viewpoints are causing other insurance, banking, and financial

institutions doing business with the NRA to rethink their mutually beneficial business relationships

with the NRA for fear of monetary sanctions or expensive public investigations.

81.      The NRA has encountered serious difficulties obtaining corporate insurance

coverage to replace coverage withdrawn by the Corporate Carrier. The NRA has spoken to

numerous carriers in an effort to obtain replacement corporate insurance coverage; nearly every

carrier has indicated that it fears transacting with the NRA specifically in light of DFS's actions

against Lockton, Chubb, and Lloyd's.

82.      Defendants' threats have also imperiled the NRA's access to basic banking

services, despite the absence of any alleged regulatory violations in connection with the NRA's

banking activities. Multiple banks withdrew their bids in the NRA's RFP process following the

issuance of the April 2018 Letters, based on concerns that any involvement with the NRA—even

providing the organization with basic depository services—would expose them to regulatory

reprisals.

83.      Defendants' campaign is achieving its intended chilling effect on banks throughout

DFS's jurisdiction. Speaking "on the condition of anonymity," one community banker from

Upstate New York told *American Banker* magazine that in light of the apparent "politically

motivated" nature of the DFS guidance, "[i]t's hard to know what the rules are" or whom to do

business with, because bankers must attempt to anticipate "who is going to come into disfavor

with the New York State DFS" or other regulators.[53] Other industry sources told *American Banker* that, "such regulatory guidelines are frustratingly vague, and can effectively compel institutions to cease catering to legal businesses."[54]

84.     The NRA has suffered tens of millions of dollars in damages based on Defendants' conduct described above. Such damages include, without limitation, damages due to reputational harm, increased development and marketing costs for any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA, as well as attorneys' fees, legal expenses, and other costs.

85.     If the NRA is unable to collect donations from its members, safeguard the assets endowed to it, apply its funds to cover media buys and other expenses integral to its political speech, and obtain basic corporate insurance coverage, it will be unable to exist as a not-for-profit or pursue its advocacy mission. Defendants seek to silence one of America's oldest constitutional rights advocates. If their abuses are not enjoined, they will soon, substantially, succeed.

## V.

## CLAIMS

**A.     Count One: Violation Of The NRA's First And Fourteenth Amendment Rights Under 42 U.S.C. § 1983, And Article 1, Section 8 Of The New York Constitution By The Establishment Of An Implicit Censorship Regime (As To All Defendants).**

86.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

---

[53] Neil Haggerty, *Gun issue is a lose-lose for banks (whatever their stance)*, AMERICAN BANKER (Apr. 26, 2018, 1:11 PM), https://www.americanbanker.com/news/gun-issue-is-a-lose-lose-for-banks-whatever-their-stance.

[54] *Id.*

87.     The First Amendment, which applies to Defendants by operation of the Fourteenth Amendment, and Section Eight of the New York Constitution secure the NRA's right to free speech, including its right to express its viewpoints and political beliefs regarding the constitutionally protected right to keep and bear arms.

88.     The NRA has a longstanding history of political advocacy advancing the Second Amendment rights of all Americans. Although Cuomo and Vullo disagree with and oppose the NRA's political views, the NRA's freedom to express its views with respect to the gun-control debate is a fundamental right protected by the First Amendment.

89.     Defendants have regulatory authority over financial institutions and insurance entities that have done or are doing business with or are otherwise associated with the NRA, including Chubb, Lockton, and Lloyd's.

90.     Defendants' actions—including but not limited to the issuance of the April 2018 Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon Chubb, Lockton and Lloyd's, and the issuance of the Cuomo Press Release—established a "system of informal censorship" designed to suppress the NRA's speech.[55]

91.     Defendants' actions were for the purpose of suppressing the NRA's pro-Second Amendment viewpoint. Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech.

92.     Defendants' unlawful exhortations to New York insurance companies, banks, and financial institutions that they, among other things, "manag[e] their risks, including reputational risks, that may arise from their dealings with the NRA . . ., as well as continued assessment of compliance with their own codes of social responsibility[,]" as well as "review any relationships

---

[55] *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71 (1963).

they have with the NRA[,]" and "take prompt actions to managing these risks and promote public health and safety[,]" constitute a concerted effort to deprive the NRA of its freedom of speech by threatening with government prosecution services critical to the survival of the NRA and its ability to disseminate its message. Far from protected government speech, Defendants' actions constitute an "implied threat[ ] to employ coercive state power" against entities doing business with the NRA, and they are reasonably interpreted as such.[56]

93.     Defendants' concerted efforts to stifle the NRA's freedom of speech caused financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations. For example, Defendants coerced and caused Lockton, Chubb, and Lloyd's to cease their participation in NRA-endorsed insurance programs, regardless of whether the insurance programs met all legal qualifications under New York's Insurance Law.

94.     Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

95.     Defendants' intentional actions resulted in significant damages to the NRA, including but not limited to damages due to reputational harm, increased development and marketing costs for any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA.

96.     The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

97.     In addition to the above-described damages, absent an injunction against Defendants, the NRA will suffer irrecoverable loss and irreparable harm if it is unable to acquire

---

[56] *Okwedy v. Molinari*, 333 F.3d 339, 342 (2d Cir. 2003).

insurance or other banking services due to Defendants' actions. Accordingly, the NRA seeks an order preliminarily and permanently enjoining Cuomo and Vullo (in their official capacities) and DFS—including its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction—from threatening or encouraging insurance companies, banks, or financial institutions to sever ties with or discontinue services to the NRA.

**B.      Count Two: Violation Of The NRA's First And Fourteenth Amendment Rights Under 42 U.S.C. § 1983 And Article 1, Section 8 Of The New York Constitution By Retaliating Against The NRA Based On Its Speech (As To All Defendants).**

98.      The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

99.      The First Amendment, which applies to Defendants by operation of the Fourteenth Amendment, and Section Eight of the New York Constitution, secures the NRA's right to free speech, including its right to express its viewpoints and political beliefs regarding the constitutionally protected right to keep and bear arms.

100.     The NRA has a longstanding history of political advocacy advancing the Second Amendment rights of all Americans. Although Cuomo and Vullo disagree with and oppose the NRA's political views, the NRA's freedom to express its views with respect to the gun-control debate is a fundamental right protected by the First Amendment.

101.     Defendants' actions—including but not limited to the issuance of the April 2018 Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon Chubb, Lockton and Lloyd's, and the issuance of the Cuomo Press Release—were in response to and substantially caused by the NRA's political speech regarding the right to keep and bear arms. Defendants' actions were for the purpose of suppressing the NRA's pro-Second Amendment

viewpoint. Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech.

102.    Defendants' actions have concretely harmed the NRA by causing financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations. For example, Defendants coerced and caused Lockton, Chubb, and Lloyd's to cease their participation in NRA-endorsed insurance programs in New York and elsewhere, regardless of whether the insurance programs met all legal qualifications under New York's Insurance Law.

103.    Defendants had discretion in deciding whether and how to carry out their actions, including but not limited to the types of demands imposed on Chubb, Lockton and Lloyd's in the Consent Orders, whether to issue the Cuomo Press Release, and the type of guidance provided in the April 2018 Letters. They exercised this discretion to harm the NRA because of the NRA's speech regarding the Second Amendment.

104.    Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

105.    Defendants' intentional actions resulted in significant damages to the NRA, including but not limited to damages due to reputational harm, increased development and marketing costs for any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA.

106.    The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

107.    In addition to the above-described damages, absent an injunction against Defendants, the NRA will suffer irrecoverable loss and irreparable harm if it is unable to acquire

insurance or other financial services due to Defendants' actions. Accordingly, the NRA seeks an order permanently enjoining Cuomo, Vullo, and DFS—including its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction—from threatening or encouraging insurance companies, banks, or financial institutions to sever ties with or discontinue services to the NRA.

**C.    Count Three: Violation Of The Equal Protection Clause Of The Fourteenth Amendment Under 42 U.S.C. § 1983, And Article 1, Section 11 Of The New York Constitution (As To Vullo).**

108.    The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

109.    Vullo knowingly and willfully violated the NRA's equal protection rights by seeking to selectively enforce certain provisions of the Insurance Law against Lockton's affinity-insurance programs for the NRA. Meanwhile, other affinity-insurance programs that were identically (or at least similarly) marketed by Lockton, but not endorsed by "gun promotion" organizations, have not been targeted by DFS's investigation.

110.    Vullo was aware during the investigations of the NRA and its business partners that these other identical (or at least similar in all material respects) affinity-insurance programs had the same legal infirmities that resulted in the penalties against Lockton, Chubb, and Lloyd's related solely to the NRA-related affinity-insurance programs. Specifically, Vullo was aware of these comparators from her involvement in the conversations she had with senior officials of Lloyd's in the spring of 2018 described above.

111.    Alternatively, Vullo should have known of similarly situated individuals at the time DFS launched its investigation and any purported lack of knowledge was due to a "see-no-evil" policy of enforcement, which Vullo and DFS abandoned solely to further their vendetta against

the NRA. The "see-no-evil" enforcement policy was confirmed by DFS's continued ignorance toward the violations of the similarly situated comparators.

112.    By virtue of the position held by Vullo at the time DFS launched its investigation, Vullo knew the actions taken by DFS against NRA affinity insurance programs were unprecedented. No other similarly situated programs have faced even close to the same treatment for analogous violations. However, Vullo and DFS failed to inquire about whether there were any other similarly situated affinity programs when the investigation was launched.

113.    There is an extremely high level of similarity between the NRA-related affinity-insurance programs and those of the comparator affinity-insurance programs, including AOAExcel, Moose, the VFW, and the PPA, such that no rational person would perceive the NRA-related programs to be different enough to justify the differential treatment by Vullo and DFS.

114.    Vullo and DFS discriminated against the NRA and its business partners because of Vullo's personal animus toward the NRA and its Second Amendment advocacy.

115.    The similarity between the NRA-related programs and the comparators and the sharp differences in Vullo's and DFS's treatment of them are sufficient to exclude the possibility that Vullo and DFS acted on the basis of a mistake.

116.    Alternatively, there is at least a reasonably close resemblance between the NRA-related affinity-insurance programs and those of the comparator affinity-insurance programs, including AOAExcel, Moose, the VFW, and the PPA.

117.    The disparate treatment of the NRA-related programs and the comparators was caused by Vullo's intent to punish and/or inhibit the NRA because of the NRA's constitutionally protected speech.

118.    Vullo's selective enforcement of the Insurance Law against the NRA and its business partners has been knowing, willful, arbitrary, capricious, unreasonable, discriminatory, and undertaken in bad faith and without a rational basis. Vullo's conduct does not further any legitimate government interest.

119.    Vullo's selective enforcement of the Insurance Law against the NRA and its business partners is based on the NRA's political views and speech relating to the Second Amendment. These considerations are impermissible bases for an enforcement action.

120.    Vullo's actions have resulted in significant damages to the NRA, including but not limited to damages due to reputational harm, increased development and marketing costs for any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA.

121.    The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Laws and Rules § 8601.

## VI.

## DEMAND FOR JURY TRIAL

122.    The NRA hereby demands a trial by jury on all issues so triable.

## VII.

## REQUEST FOR RELIEF

WHEREFORE the NRA respectfully requests that the Court enter judgment in the NRA's favor and against Defendants, as follows:

a.    Declaring, pursuant to 28 U.S.C. § 2201, that Defendants have violated the NRA's rights to free speech and equal protection under both the Federal and New York Constitutions;

b.    Granting a preliminary and permanent injunction, pursuant to 28 U.S.C. § 1651(a), 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure, ordering DFS, its agents, representatives, employees and servants and all persons and entities in concert or participation with

it, Cuomo (in his official capacity) and the current Superintendent of DFS (in her/his official capacity):

    (1)    to immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with the NRA's exercise of the rights afforded to it under the First and Second Amendment to the United States Constitution and Section 8 to the New York Constitution; and

    (2)    to immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with, terminating, or diminishing any of the NRA's contracts and/or business relationships with any organizations;

b.    Granting such other injunctive relief to which the NRA is entitled;

c.    Awarding the NRA actual damages, including compensatory and consequential damages, in an amount to be determined at trial;

d.    Awarding the NRA exemplary or punitive damages;

e.    Awarding the NRA pre-judgment and post-judgment interest at the highest lawful rates;

f.    Awarding the NRA such costs and disbursements as are incurred in prosecuting this action, including reasonable attorneys' and experts' fees; and

g.    Granting the NRA such other and further relief as this Court deems just and proper.

Respectfully submitted,

By:    /s/ Sarah B. Rogers            
    William A. Brewer III (Bar No. 700217)
    wab@brewerattorneys.com
    Sarah B. Rogers (Bar No. 700207)
    sbr@brewerattorneys.com

BREWER, ATTORNEYS & COUNSELORS
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 489-1400
Facsimile: (212) 751-2849

**ATTORNEYS FOR THE NATIONAL RIFLE
ASSOCIATION OF AMERICA**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 2, 2020, I caused a copy of the foregoing to be served upon the following counsel electronically through the ECF system:

William A. Scott
Assistant Attorney General, Of Counsel
New York State Attorney General's Office
Albany Office, The Capitol
Albany, New York 12224-0341
Email: William.Scott@ag.ny.com

Debra L. Greenberger
EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue,
New York, New York 10020
dgreenberger@ecbalaw.com

/s/ Sarah B. Rogers
Sarah B. Rogers