UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA,<br><br>                    Plaintiff,<br><br>       v.<br><br>ANDREW CUOMO, both individually and in his official capacity; MARIA T. VULLO, both individually and in her official capacity; and THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES,<br><br>                    Defendants. | Case No. 18 Civ. 566 (TJM)(CFH) |

**DEFENDANT VULLO'S COMBINED BRIEF IN SUPPORT OF
APPEAL OF THE GRANT OF PLAINTIFF'S MOTION TO AMEND AND
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Defendant Maria Vullo*

<u>TABLE OF CONTENTS</u>

<u>PAGE NO.</u>

TABLE OF AUTHORITIES ....................................................................................iii-vi

PRELIMINARY STATEMENT ...................................................................................1

PROCEDURAL HISTORY...........................................................................................4

    I.    THE COURT DISMISSED THE NRA'S SELECTIVE ENFORCEMENT
        CLAIMS AGAINST MS. VULLO LAST MAY ....................................................4

    II.   THE NRA'S SHIFTING BASES FOR AMENDMENT .......................................5

ARGUMENT .................................................................................................................6

    I.    THE MAGISTRATE JUDGE ERRED IN GRANTING AMENDMENT
        WARRANTING REVERSAL UNDER RULE 72(A)...........................................6

        A.    The NRA Did Not Establish Diligence Because It Did Not Present
              Any Basis to Allege that Ms. Vullo Had the Requisite Knowledge............7

        B.    The NRA Acted in Bad Faith in Seeking Amendment...............................8

        C.    Ms. Vullo Is Prejudiced by This Untimely Amendment ..........................10

    II.   THE COMPLAINT FAILS TO STATE A CLAIM FOR SELECTIVE
        ENFORCEMENT WARRANTING DISMISSAL UNDER RULE 12(B)(6) ......11

        A.    Ms. Vullo Is Absolutely Immune from the NRA's Selective
              Enforcement Claim ...................................................................................12

            1.    Quasi-Prosecutorial Activity, Including Bringing
                  Enforcement Proceedings and Negotiating Consent Orders,
                  Is Protected By Absolute Immunity................................................12

            2.    Ms. Vullo Was Engaged in a Function Analogous to That
                  of a Prosecutor When Enforcing New York Law Against
                  Lockton, Lloyd's, and Chubb .......................................................15

        B.    The NRA Has Still Not Alleged that Defendants Had Knowledge of
               the Purported Insurance Law Violations by the Comparators Before
               DFS Launched the Carry Guard Investigation...........................................17

            1.    The NRA Makes No Allegations About Ms. Vullo's
                   Knowledge of the Lockton Affinity Violations Highlighted
                  by the Dismissal Decision..............................................................18

i

2.  The NRA Cannot Allege Similar Violations that DFS
    Did Not Prosecute ..........................................................................21

3.  The NRA Has Not Established that Lloyd's Is a Similarly
    Situated Comparator ........................................................................21

4.  The NRA's Vague Allegations Do Not Speak to Ms. Vullo's
    Knowledge When DFS "Commenced" the Investigation,
    as this Court Required......................................................................24

5.  The NRA Cannot Ignore its Obligation to Plead Knowledge
    By Making a Conclusory Allegation about "See-No-Evil"...........25

C.  Even if Not Absolutely Immune, Ms. Vullo Has Qualified Immunity......27

1.  It Is Not Clearly Established that an Entity that
    Is Not Enforced Against Can Bring a Selective
    Enforcement Claim .........................................................................28

2.  It Is Not Clearly Established that a Selective Enforcement
    Claim Can Be Based on Purported Comparators
    that Only Committed *Less Serious* Violations...............................30

3.  Ms. Vullo's Conduct Was Objectively Reasonable.......................32

III.  THE NRA'S FIRST AMENDMENT CLAIM AGAINST MS. VULLO IS
BARRED BY QUALIFIED IMMUNITY............................................................33

CONCLUSION..................................................................................................................35

TABLE OF AUTHORITIES

PAGE NO.

**Cases**

*Anderson v. Creighton,*
    483 U.S. 635, 638 (1987) ................................................................................. 28

*Ashcroft v. al-Kidd,*
    563 U.S. 731 (2011) ................................................................................. 27, 30

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................. 11, 20, 26, 27

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................. 11, 26

*Berg v. Kelly,*
    897 F.3d 99 (2d Cir. 2018) ........................................................................... 31

*Bernstein v. Village of Wesley Hills,*
    95 F. Supp. 3d 547 (S.D.N.Y. 2015) ....................................................... 25, 26

*Brookhaven Aggregates, Ltd. v. Williams,*
    No. 85–CV–0355, 1985 WL 6062 (E.D.N.Y. July 24, 1985) ......................... 13

*Butz v. Economou,*
    438 U.S. 478 (1978) ......................................................................... 13, 14, 15

*Casciani v. Nesbitt,*
    659 F. Supp. 2d 427 (W.D.N.Y. 2009) ......................................................... 29

*Cine SK8, Inc. v. Town of Henrietta,*
    507 F.3d 778 (2d Cir. 2007) ......................................................................... 22

*Council of Ins. Agents & Brokers v. Molasky–Arman,*
    522 F.3d 925 (9th Cir. 2008) ....................................................................... 30

*Cresswell v. Sullivan & Cromwell,*
    922 F.2d 60 (1990) ......................................................................................... 8

*Davidson v. Culver City,*
    No. CV04–2220, 2004 WL 5361378 (C.D. Cal. July 28, 2004) ..................... 29

*Diesel v. Town of Lewisboro,*
    232 F.3d 92 (2d Cir. 2000) ..................................................................... 32, 33

*Doe v. Sch. Bd. of Ouachita Parish,*
    274 F.3d 289 (5th Cir. 2001) ........................................................................ 30

iii

*Dory v. Ryan*,
    25 F.3d 81 (2d Cir. 1994) ................................................................................. 13, 14

*Douglas v. New York State Adirondack Park Agency*,
    895 F. Supp. 2d 321 (N.D.N.Y. 2012) ...................................................................... 13

*Goldstein v. Galvin*,
    719 F.3d 16 (1st Cir. 2013) ..................................................................................... 14

*Hammerhead Enterprises, Inc. v. Brezenoff*,
    707 F.2d 33 (2d Cir. 1983) ...................................................................................... 34

*Hunter v. Bryant*,
    502 U.S. 224 (1991) ................................................................................................ 27

*Imbler v. Pachtman*,
    424 U.S. 409 (1976) .......................................................................................... 12, 14

*Kamholtz v. Yates Cty.*,
    No. 08-CV-6210, 2008 WL 5114964 (W.D.N.Y. Dec. 3, 2008),
    *aff'd*, 350 F. App'x 589 (2d Cir. 2009) ................................................................... 22

*Kaminsky v. Rosenblum*,
    929 F.2d 922 (2d Cir.1991) ..................................................................................... 33

*Kassner v. 2nd Ave. Delicatessen Inc.*,
    496 F.3d 229 (2d Cir. 2007) ...................................................................................... 7

*Knowlton v. Shaw*,
    704 F.3d 1 (1st Cir. 2013) ................................................................................ 1, 13, 16

*Lash v. City of Union*,
    No. C–3–98–045, 1999 WL 33127974 (S.D. Ohio Sept. 27, 1999) ............................... 29

*LaTrieste Restaurant v. Village of Port Chester*,
    188 F.3d 65 (2d Cir. 1999) ................................................................................ 25, 32

*LeClair v. Saunders*,
    627 F.2d 606 (2d Cir. 1980) .................................................................................... 33

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) , *aff'd*, 159 F. App'x 756 (9th Cir.2005 .......................................... 29

*Mangiafico v. Blumenthal*,
    471 F.3d 391 (2d Cir. 2006) ............................................................................... 13, 14

*Musso v. Hourigan*,
    836 F.2d 736 (2d Cir. 1988) .................................................................................... 33

*New Creation Fellowship of Buffalo v. Town of Cheektowaga, N.Y.*,
    No. 99-CV-460A(F), 2004 WL 1498190 (W.D.N.Y. July 2, 2004),
    *aff'd sub nom. New Creation Fellowship of Buffalo v. Town of Cheektowaga*,
    164 F. App'x 5 (2d Cir. 2005) ........................................................................ 30

*Orgain v. City of Salisbury*,
    521 F. Supp. 2d 465 (D. Md. 2007) .............................................................. 29

*Penthouse Int'l, Ltd. v. Meese*,
    939 F.2d 1011 (D.C. Cir. 1991) ...................................................................... 34

*Powers v. Coe*,
    728 F.2d 97 (2d Cir.1984) ................................................................................ 17

*Reichle v. Howards*,
    566 U.S. 658 (2012) ......................................................................................... 27

*Rindley v. Gallagher*,
    890 F. Supp. 1540 (S.D. Fla. 1995) ............................................................... 14

*Schloss v. Bouse*,
    876 F.2d 287 (2d Cir.1989) .............................................................................. 14

*Singleton v. City of New York*,
    632 F.2d 185 (2d Cir. 1980) ............................................................................ 30

*Spear v. Town of West Hartford*,
    954 F.2d 63 (2d Cir. 1992) .............................................................................. 12

*Taravella v. Town of Wolcott*,
    599 F.3d 129 (2d Cir. 2010) ...................................................................... 27, 32

*Taylor v. Barkes*,
    575 U.S. 822 (2015) ......................................................................................... 27

*Taylor v. Kavanagh*,
    640 F.2d 450 (2d Cir.1981) .............................................................................. 17

*U.S. v. Armstrong*,
    517 U.S. 456 (1996) ......................................................................................... 26

*Verbeek v. Teller*,
    158 F. Supp. 2d 267 (E.D.N.Y. 2001) ........................................................... 14

*Verdone v. Am. Greenfuels, LLC*,
    No. 3:16-CV-01271 (VAB), 2017 WL 3668596 (D. Conn. Aug. 24, 2017) ...................... 7

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977).................................................................................. 30

*Wandering Dago, Inc. v. Destito*,
    879 F.3d 20 (2d Cir. 2018)............................................................... 12, 21

*Ying Jing Gan v. City of New York*,
    996 F.2d 522 (2d Cir. 1993)..................................................................... 17

## Statutes and Rules

23 NYCRR § 2.10.......................................................................................... 15

23 NYCRR § 2.2(c)........................................................................................ 15

23 NYCRR Part 2........................................................................................... 16

Fed. R. Civ. P. 12(b)(6)...................................................................... 11, 12, 29

Fed. R. Civ. P. 72(a)................................................................................... 6, 7

N.Y. Fin. Servs. Law § 305....................................................................... 15, 16

N.Y. Fin. Servs. Law § 306............................................................................. 16

N.Y. Fin. Servs. Law § 308....................................................................... 15, 16

N.Y. Fin. Servs. Law § 404............................................................................. 16

N.Y. Fin. Servs. Law § 408............................................................................. 16

N.Y. Ins. Law § 2102(g)................................................................................. 16

N.Y. Ins. Law § 2110..................................................................................... 16

N.Y. Ins. Law § 2116..................................................................................... 17

N.Y. Ins. Law § 2117(g)................................................................................. 16

N.Y. Ins. Law § 2127..................................................................................... 16

N.Y. Ins. Law § 2212(a)(1)............................................................................. 17

N.Y. Ins. Law § 2324(a)................................................................................. 17

N.Y. Ins. Law. § 2405(a)................................................................................ 16

vi

## PRELIMINARY STATEMENT

The NRA's re-pleaded selective enforcement claim against Maria Vullo, the former Superintendent of the New York State Department of Financial Services, fares no better than the claim this Court dismissed over a year ago.   In May 2019, this Court found that the NRA had failed to allege the facts essential to a claim of selective enforcement, namely, that Ms. Vullo was specifically aware of and knowingly failed to prosecute violations of the Insurance Law similar to those committed by the NRA's business partners, only committed by entities that were *not* involved in firearm-related advocacy.   The NRA's amended complaint suffers from exactly the same deficiency.   And the NRA's selective enforcement claim must be dismissed for a more fundamental reason as well.   The gravamen of this claim are the enforcement decisions that Ms. Vullo made in her quasi-prosecutorial capacity as Superintendent.   For this reason, Ms. Vullo is entitled to absolute prosecutorial immunity.   Her enforcement of the State's insurance and banking laws against entities affiliated with the NRA, and the negotiation of consent orders to resolve those cases without an adversarial hearing, are prosecutorial acts that cannot give rise to personal liability.  *See Knowlton v. Shaw*, 704 F.3d 1 (1st Cir. 2013).

More prosaically, the Second Amended Complaint ("SAC") simply does not state a claim for selective enforcement under this Court's standard.   As Superintendent, Ms. Vullo ran a 1400+ person agency, tasked with regulating tens of thousands of insurance companies and banks doing business throughout the state and enforcing laws and regulations against those who violate the law.   She did not—and could not—be expected to know what every DFS employee knew or about every insurance violation in this massive marketplace.   This Court has appropriately required specific allegations of Ms. Vullo's knowledge of comparator violations to ground a claim alleging a *conscious* decision to selectively not enforce the law.   The NRA has *no greater factual basis now* to bring this claim against Ms. Vullo than it did in the last go-round.

1

Amending a complaint two years into a litigation should not be treated as a game of pleading legerdemain; the record of the NRAs shifting arguments for late amendment are the picture of gamesmanship.   A cause of action must be grounded in *facts* pleaded in *good faith*, not, as here, suspicions backed by . . . well . . . nothing.   Lacking evidence implicating Ms. Vullo—because none exists—the NRA seeks to obfuscate the SAC's inadequacy behind a veil of broad and unsupported statements.   The selective enforcement standard is a high one: to be viable, a selective enforcement claim must allege facts sufficient to show that the defendant "consciously applied a different standard of enforcement to similarly-situated entities . . . [i.e., that] the defendant was aware of similarly-situated entities, and failed to take comparable action against them."   Dkt. 112 ("Dismissal Decision") at 8.   The NRA does not and cannot meet that standard.

*First*, the NRA still has not alleged knowledge of lawlessness by the only entities this Court held were valid comparators.   In its ruling last year, this Court pointed to paragraph 59 of the First Amended Complaint ("FAC"), and held that three specific instances of Lockton allegedly violating the Insurance Law unrelated to the NRA were "similarly situated "to the NRA-related violations that DFS prosecuted.   But the FAC made no allegation that Ms. Vullo *knew about* these three violations, and that's why the selective enforcement claim was dismissed at that time.   The SAC contains no allegation that Ms. Vullo knew of, and ignored, the paragraph 59 violations involving Lockton.

*Second*, the Complaint does not plead Ms. Vullo's knowledge of *any* unenforced violations by *any* similarly-situated entities—Lockton or otherwise.[1]   It does *not* allege that Ms.

---

[1] In fact, the SAC admits, as it must, that DFS *did* enforce against Lockton's non-NRA violations, and it attaches the consent order so demonstrating.   SAC ¶ 78 and Ex. J.

Vullo knew of any *other* specific unenforced violations by a non-NRA-related entity—and it certainly does not allege that she knew of such conduct on or before October 2017, when DFS launched the Carry Guard investigation, as this Court specifically required.   Instead, the Complaint makes generic—indeed, conclusory—statements about Ms. Vullo's supposed general knowledge of "infractions plaguing the affinity-insurance marketplace."   SAC ¶ 21.   This is not nearly enough.   Absent a detailed pleading of *who* allegedly violated *which* provision of the Insurance Law—and that Ms. Vullo specifically knew about it—the Court cannot determine whether these are fair comparators for a selective enforcement claim—and thus, it cannot uphold the claim for selective enforcement.   The NRA also fails to allege, because it cannot, that Ms. Vullo was equally capable of prosecuting such claims—i.e., that she had the same or similar level of knowledge, evidence, resources, time, etc. about any alleged non-NRA-related violators —which is crucial to determining if an entity is a fair comparator who is similarly situated.[2]

*Third,* even if the NRA had pleaded a plausible selective enforcement claim that was not barred by absolute immunity, in this case, qualified immunity mandates dismissal.   The NRA's selective enforcement claim is novel at every turn: The NRA is not claiming that DFS selectively enforced against the NRA; it claims selective enforcement against *third parties*—all of whom *admit* the validity of the enforcement in consent orders.   And it is premised on purported comparators that did not commit the most serious violations that undergirded the enforcement— illegal insurance for firearms usage.   There is no Supreme Court or Second Circuit case clearly establishing liability under remotely similar circumstances.   It was objectively reasonable for a

---

[2] It also bears stating clearly that the NRA's scurrilous allegations about Ms. Vullo are completely false: Ms. Vullo never knew of any other similar violations by comparators that DFS did not prosecute, and, two years into this litigation, not a single document has been produced, and not a single witness has been identified, to say otherwise.   The NRA simply has offered no factual basis for making these allegations— because it does not have one.

regulator, when *presented* with evidence of serious violations of the Insurance Law by the

Manhattan District Attorney's office, to prosecute those violations and also to address, by way of

the same consent orders, additional Insurance Law violations DFS uncovered, instead of

devoting scarce agency resources to investigating the vast affinity insurance marketplace in

hopes of catching a different fish.   Qualified immunity exists to protect those reasonable

decisions by regulators tasked with enforcing the state's laws.

Qualified immunity also defeats the NRA's First Amendment claims.   As this Court

noted when upholding the NRA's First Amendment claims, courts have drawn a "fine line"

between permissible government speech, which is a crucial part of our democracy, and

impermissible government overstepping.   Qualified immunity exists to protect government

officials who are walking those fine lines.   It is simply not "clearly established," under even

remotely similar facts, that a government official making statements, as the NRA alleges, in the

context of an ongoing prosecution, transforms permissible statements into coercive ones.   The

law just has not recognized such a claim.

The NRA's Second Amended Complaint against Ms. Vullo should be dismissed.

## PROCEDURAL HISTORY

### I.   THE COURT DISMISSED THE NRA'S SELECTIVE ENFORCEMENT CLAIMS AGAINST MS. VULLO LAST MAY

On May 9, 2019, this Court dismissed the NRA's selective enforcement claim against

Ms. Vullo "because the [First] Amended Complaint lacks plausible allegations that Defendants

had knowledge of the purported Insurance Law violations by the comparators."   Dkt. 112 at 8.

Having found that the NRA failed to state a claim, this Court did not reach Defendants' absolute

immunity and qualified immunity arguments.   *Id.* at 11.

The Dismissal Decision allowed the NRA to re-plead its selective enforcement claim, *if* it

could specifically allege that "Vullo knew of non-firearm-related Insurance Law violations by the comparators when DFS commenced its investigation in the NRA's insurance programs, or allege facts plausibly supporting the conclusion that these defendants were aware of such violations by the comparators yet consciously declined to enforce the Insurance Law against the comparators." *Id.*   For months, Plaintiff failed to even attempt to re-plead the claim—until its discovery efforts were limited by the District Court's rulings.

## II.    THE NRA'S SHIFTING BASES FOR AMENDMENT

The NRA's stated basis for amendment has "shifted," repeatedly, since it first sought amendment in November 2019, as the magistrate judge found.   Dkt. 202 at 14.

In a hearing before the magistrate, the NRA's counsel first asserted that "the Lloyd's documents [and] . . . DFS' recent hostilities against yet another NRA-related insurance underwriter" provided a factual basis for amendment—with no explanation about how documents from *Lloyd's* could fit this Court's mandate to allege knowledge of *Lockton's* violations.[3]   Dkt. 145 at 2–3.   In response, Defendants pointed out that the Lloyd's documents—which had been in the NRA's custody for *over five months* by that point—in no way implicated Ms. Vullo, and that the "recent hostilities" long post-dated Ms. Vullo's departure from DFS.   *See* Dkt. 146; Dkt. 147.   When pressed by the magistrate judge, the NRA admitted that the organization "couldn't just amend on the basis of the documents [from Lloyd's] themselves" and that the NRA was "not able" "to get that information [about whether Ms. Vullo has knowledge about any competitors' violations] from Lloyd's."   Dkt. 164-2 at 5, 14–15.

---

[3] "Lloyd's" is used in this brief to refer to Lloyd's of London, its United States affiliate, Lloyd's America, Inc., and the Lloyd's syndicates who were parties to the DFS consent order.

Stymied in their effort to pin a new selective enforcement claim on the Lloyd's documents, the NRA shifted gears, and asserted, for the first time, that it had obtained new, allegedly incriminating information about Ms. Vullo through "investigative efforts from non-parties," which it also described as a "consulting individual." *Id.* Yet the NRA refused to identify its "consultant" either in the conference or in response to Ms. Vullo's specific interrogatory. *Id.* at 14; Dkt. 164-3 at 2–3. To date, the NRA has not named *any person* with personal knowledge—of either the percipient or the hearsay variety—of *any* of the allegations in support of its selective enforcement claim.

In its formal motion to amend, the NRA asserted that an additional basis for its assertion that Ms. Vullo "knew," Dkt. 112 at 8, was the word of "a consulting expert [the NRA retained] to assist in interpreting the Lloyd's documents," Dkt. 155 at 7. In the vaguest terms that one can conjure, the NRA also claimed that it had "engaged in additional investigative work to uncover the factual allegations in the Second Amended Complaint regarding Vullo's knowledge." *Id.* It did not detail what this investigative work entailed, who the "consulting expert" was, or what his or her factual basis was for (falsely) alleging that Ms. Vullo knew about and had failed to act on other similar violations.

After Magistrate Judge Hummel granted amendment on June 1, 2020, the NRA filed its Second Amended Complaint on June 2, 2020. This motion followed.

## ARGUMENT

## I.   THE MAGISTRATE JUDGE ERRED IN GRANTING AMENDMENT WARRANTING REVERSAL UNDER RULE 72(A)

Judge Hummel correctly found that the NRA had not acted diligently in seeking amendment, finding that the NRA has "presented shifting reasons as the basis for its Motion to Amend" and stating that he "is not without concern" about the NRA's "varied" bases for

amendment.   Dkt. 202 at 13–14.   Nonetheless, he permitted the NRA to amend.   He held that Defendants had failed to demonstrate the NRA's "bad faith." *Id.*

Judge Hummel's grant of amendment was clearly erroneous for two reasons: *first*, he committed legal error in finding that he could not consider documents attached to the proposed Complaint—documents that, on their face, failed to support the very allegations that the NRA sought belatedly to add; and, *second*, he erroneously required Defendants to prove the NRA's bad faith, instead of requiring the NRA to prove its absence.   *See* Fed. R. Civ. P. 72(a).   This Court should reverse.

### A.   The NRA Did Not Establish Diligence Because It Did Not Present Any Basis to Allege that Ms. Vullo Had the Requisite Knowledge

It wasn't until ten months after the deadline set by the Court's scheduling order—and more than a year-and-a-half into the litigation—that the NRA sought to amend its complaint for the second time.   Accordingly, by rule, it needed to satisfy Rule 16's exacting "good cause" standard, as Judge Hummel recognized.   Dkt. 202 at 4 (citing cases).   The "primary consideration" in determining "good cause" is "whether the moving party can demonstrate diligence," *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007), "based on information that the party knew, or should have known," *Verdone v. Am. Greenfuels, LLC*, No. 3:16-CV-01271 (VAB), 2017 WL 3668596, at *2 (D. Conn. Aug. 24, 2017) (internal quotation marks omitted).   Here, the NRA, as moving party, bears the burden of showing diligence.   *Id.*

Judge Hummel correctly held that "plaintiff has not shown that it acted with due diligence," in "obtaining or 'interpreting' the information upon which it now purports to rely in seeking to replead."   Dkt. 202 at 13.   For over five months after the Dismissal Decision, the NRA sat on its hands and did nothing to re-assert a selective prosecution claim.   Then, when it belatedly did seek amendment, the NRA provided only a *single sentence* describing its ostensible

basis for amendment without offering *any* evidence of its diligence.   The sum-total of the

NRA's stated basis to amend was: (i) documents the NRA obtained from Lloyd's in June 2019;

(ii) a "consulting expert" who "interpret[ed]" those documents in an unspecified timeframe; and

(iii) unspecified "additional investigative work" the NRA did.   Dkt. 155 at 7.   No details of the

NRA's "diligence" were provided in the NRA's moving or reply brief.   *Id.*; Dkt. 169 at 3–4.

Moreover, the NRA has no documents that provide a basis to amend; it has identified no

witnesses who can support its latest allegations.   And the NRA has never claimed that it

obtained a basis to allege knowledge of *Lockton's* violations, as the Dismissal Decision required.

Judge Hummel appropriately concluded that the NRA did not meet its burden to

affirmatively demonstrate diligence because the Lloyd's documents were in the NRA's

possession five months before it surfaced the proposed amendment and the NRA provided

absolutely no detail to support its other two purported bases—the "consulting expert" and the

"investigation" that the NRA references.

### B.   The NRA Acted in Bad Faith in Seeking Amendment

But Judge Hummel permitted amendment nevertheless, holding that Defendants had not

"demonstrate[d] that plaintiff's delay was done in bad faith."   Dkt. 202 at 14.   But, under Rule

16, it was Plaintiff's burden to establish an absence of bad faith, not Defendant's burden to prove

the opposite.   *See Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (1990) ("The burden is on

the party who wishes to amend to provide a satisfactory explanation for the delay.").   Judge

Hummel's ruling to the contrary is legally erroneous.

Moreover, the NRA cannot prove the absence of bad faith as a matter of *fact*.   Not only

did the NRA "present[] shifting reasons as the basis for its Motion to Amend," as Judge Hummel

found—itself evidence of bad faith.   Dkt. 202 at 14.   But, none of the NRA's three stated bases

for amendment—the Lloyd's documents, the mysterious "consulting expert," or so-called

"investigative work"—provide *any* factual basis to support the new allegations against Ms. Vullo.   The Lloyd's documents make no reference to Ms. Vullo *or to any non-prosecuted violations by comparators at all*.   *See* Dkt. 154-7–154-9 (hereinafter "Sealed Exs. B, C, and D"). Although the NRA had attached those documents as exhibits to its proposed SAC, so they are "a part of the pleading for all purposes" under Rule 10(c), Judge Hummel did not review these documents.   Dkt. 202 at 18.   This too was error.   *See* Sealed Exs. B, C, and D; *see also* Dkt. 203-8–203-10 (same sealed exhibits attached to filed SAC).   Had Judge Hummel reviewed these documents, he would have seen that, on their face, they fail to support the allegations that the NRA sought belatedly to add.   They would surely have given him even more "concern" about the NRA's basis to amend.   Dkt. 202 at 14.

The Lloyd's documents do not mention Maria Vullo—much less her state of mind—at all.   The NRA itself admitted that it obtained *no* "information from Lloyd's" to make allegations about Ms. Vullo's knowledge.   Dkt. 164-2 at 5–6, 14–15.   The NRA admits that the "consulting expert" it relies on—who it refuses to name—only "*interpret[ed]* the Lloyd's documents."   Dkt. 155 at 7 (emphasis added).   A witness who "interprets" documents does not have personal knowledge.   There is no way to "interpret" the Lloyd's documents to claim that Ms. Vullo made statements evidencing knowledge of comparators—because the documents do not even mention Ms. Vullo *at all*.   Sealed Exs. B, C, and D.   It beggars the imagination how a stranger could "interpret documents" to determine what was in Ms. Vullo's *mind* at any point.

That leaves only the NRA's unspecified "additional investigative work."   Dkt. 155 at 7. But, other than those three words, the NRA provided absolutely no information about what the "work" was, how it provided a basis to amend, how it claims to relate to Ms. Vullo's purported knowledge, or, critically, *when* the investigation occurred.   The NRA cannot meet its burden with empty words.   How can an "investigation" that apparently did not involve a single

percipient witness provide a basis for making allegations about a defendant's knowledge and statements?   Why has the NRA's basis for amendment repeatedly changed?   The NRA offers answers to none of these questions.

The NRAs shifting rationales and empty statements are, in the end, the very definition of "bad faith."   And a look at the *timing* of the motion reinforces that conclusion.   For months after it obtained the Lloyd's documents in early June 2019, the NRA sat on its hands.   Then Judge Hummel, on August 8, 2019, denied several of the NRA's discovery demands because their relevance rested upon a selective enforcement claim that this Court had dismissed.   Dkt. 121.   Upset by that decision, the NRA promptly appealed the discovery ruling to this Court. When the NRA moved to amend its complaint in November 2019, the NRA knew it was at risk of having its then-pending appeal denied—a ruling which would have cut off the broad discovery it had sought to support its fishing expedition for evidence of selective enforcement.   So the NRA gambled, filing a motion to amend, not because it believed it had a basis to make fresh allegations—it didn't—but to buttress its claim to wide-ranging discovery.

This is the very essence of bad faith.

The NRA should not be permitted to revive a baseless selective enforcement claim— despite the NRA's lack of witnesses or documentary support for its false allegations—when it has demonstrated *no factual basis whatsoever* for amendment, has failed to demonstrate that it acted with diligence, and where there is ample evidence of the NRA's bad faith.

### C.    Ms. Vullo Is Prejudiced by This Untimely Amendment

Years into this case, the NRA still has no evidence to support its claims; instead, it propounds an amended complaint that provides no specific allegations of comparators and is rife with falsehoods.   Ms. Vullo is prejudiced by additional unnecessary motion practice that further delays resolution of this case—a case concerning her time as a public servant which ended 17

months ago.   She is prejudiced by permitting the NRA to make claims based on false allegations the NRA has no basis to make.   She is prejudiced by permitting a selective prosecution claim that has no basis in fact or law.   She is prejudiced by the ongoing harm that flows from this baseless lawsuit, and the additional baseless and scurrilous allegations in the amended complaint.

## II.   THE COMPLAINT FAILS TO STATE A CLAIM FOR SELECTIVE ENFORCEMENT WARRANTING DISMISSAL UNDER RULE 12(B)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see* Fed. R. Civ. P. 12(b)(6).   A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*   "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (internal quotations omitted). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . are not entitled to the assumption of truth." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (a court is "not bound to accept as true a legal conclusion couched as a factual allegation").

A plaintiff alleging a selective enforcement claim must demonstrate that: (1) "[it] was treated differently from other similarly situated businesses;" and (2) "such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the

exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 40 (2d Cir. 2018) (internal quotation marks omitted).[4]

> **A.    Ms. Vullo Is Absolutely Immune from the NRA's Selective Enforcement Claim**

As Superintendent of DFS, Ms. Vullo was charged with enforcing the State's banking and insurance laws.   Her function was akin to that of a prosecutor: bringing charges, attempting to negotiate resolutions (i.e. the Consent Orders), and preparing for trial (DFS hearings) before an adjudicator if a negotiated resolution is not reached.   Because Ms. Vullo's function in enforcing the state's insurance laws against Lockton, Lloyd's, and Chubb was prosecutorial in nature, she is entitled to absolute immunity.   Absolute immunity protects from review a target's displeasure about *how* a prosecutor exercised her prosecutorial power and, specifically, who she chose to charge and not charge.   "[A]bsolute immunity defeats a suit at the outset."   *Imbler v. Pachtman*, 424 U.S. 409, 419 (1976).   Count three should be dismissed.

> **1.    Quasi-Prosecutorial Activity, Including Bringing Enforcement Proceedings and Negotiating Consent Orders, Is Protected By Absolute Immunity**

It is well established that an executive official who initiates and brings administrative enforcement proceedings as part of her prosecutorial function is afforded absolute immunity from suit based on those proceedings.   *Spear v. Town of West Hartford*, 954 F.2d 63, 66 (2d Cir. 1992).   Absolute immunity protects executive officials engaged in the enforcement of statutes—and prosecution of violations—within their legally prescribed mandate, regardless of any administrative work that is also part of the official's role.   *Butz v. Economou*, 438 U.S. 478, 515

---

[4] While Judge Hummel considered some of these arguments in his grant of the motion to amend under the frame of "futility," Ms. Vullo is not appealing those portions of his decision and is instead moving before this Court, in the first instance, under Rule 12(b)(6).

(1978) (absolute immunity applies to administrative officials who are "performing certain functions analogous to those of a prosecutor"); *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (absolute immunity based on "the nature of the function performed, not the identity of the actor who performed it"); *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (same).

Courts have repeatedly held that officials who instigate and bring administrative enforcement proceedings in a manner analogous to prosecutors receive absolute immunity. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 395–96 (2d Cir. 2006) ("[A]gency officials who perform functions analogous to those of a prosecutor are entitled to absolute immunity from such liability for their participation in the decision to initiate or to continue agency proceedings." (citing *Butz*, 438 U.S. at 512–13 (1978)).

*Knowlton v. Shaw*, 704 F.3d 1, 3-4, 9 (1st Cir. 2013) is squarely on point.   There, the First Circuit held, on a motion to dismiss, that absolute immunity protected a state insurance regulator's enforcement of insurance law.   The Maine insurance regulator investigated an insurance company's improper marketing tactics and entered into a consent order requiring the termination of Mr. Knowlton, a branch manager.   The Court *rejected* Knowlton's claim that "negotiating and executing the consent agreements to resolve the civil violations" was investigative conduct, holding that absolute immunity applies because the "state officials took these actions in preparing for the initiation of the enforcement proceeding—a proceeding that would have surely followed had no consent agreement been executed." *Id.* at 6; *see also Douglas v. New York State Adirondack Park Agency*, 895 F. Supp. 2d 321, 340 (N.D.N.Y. 2012) (absolute immunity for park agency officials' initiation of an agency enforcement proceeding); *Brookhaven Aggregates, Ltd. v. Williams,* No. 85–CV–0355, 1985 WL 6062, at *2–4 (E.D.N.Y. July 24, 1985) (absolute immunity for a New York state park agency commissioner's issuance of

an order of suspension); *Rindley v. Gallagher*, 890 F. Supp. 1540, 1554 (S.D. Fla. 1995) (absolute immunity for state dental industry regulators' imposition of discipline on a dentist).

Absolute prosecutorial immunity encompasses "actions preliminary to the initiation of a prosecution," as well as the decision to initiate a proceeding or, conversely, decline to bring a proceedings. *Mangiafico*, 471 F.3d at 396; *see Butz*, 438 U.S. at 516 (absolute immunity encompasses "decision to initiate or continue a proceeding subject to agency adjudication"); *Schloss v. Bouse*, 876 F.2d 287, 290 (2d Cir.1989) (absolute immunity protects against "suit for not prosecuting"); *Goldstein v. Galvin*, 719 F.3d 16, 26 (1st Cir. 2013) (state official's statutory mandate to "determine whether grounds exist to believe that any person has violated" certain statutory provisions, when part of "acts that collectively comprise the pursuit of an enforcement action[,] fit snugly within the realm of prosecutorial functions").

Because the focus of absolute immunity is on the function being performed, and not the identity or motivations of the actor, once absolute immunity is established, the Court does not consider allegations of ill intent or discriminatory enforcement. *Dory*, 25 F.3d at 84 (absolute immunity applies "regardless of motivation"); *see also Verbeek v. Teller*, 158 F. Supp. 2d 267, 282 (E.D.N.Y. 2001) (granting motion to dismiss claims against prosecutorial official because conspiracy allegation does not "negate her entitlement to absolute immunity").

*Butz* identified a host of non-exhaustive characteristics to guide a court's determination that administrative enforcement is entitled to absolute immunity, and no one factor controls. *See Butz*, 438 U.S. at 515 (describing the factors). Here, those factors compel a finding of absolute immunity. The targets of a DFS enforcement action—banks and insurance companies—are well resourced and inclined to bring suit; without the protection absolute immunity affords, a DFS superintendent's "discretion" in initiating "proceedings might be distorted" due to litigation for purposes of "harassment or intimidation." *Id.*; *see also Imbler*,

424 U.S. at 438 (White, J. concurring) (absolute immunity particularly necessary to protect against "vexatious suit" "where powerful men are involved").   The DFS proceeding process is an "adversary[ial] process" with ample "safeguards": an impartial hearing officer who has not been involved in the investigation holds an adversarial evidentiary hearing; a charged entity can be represented by counsel, present evidence, and cross-examine witnesses in that adversarial hearing; and, if the charged party is displeased with the results of that hearing, there is an opportunity for "correctability of error on appeal," through a challenge in state supreme court. *Butz*, 438 U.S. at 512; *see* N.Y. Fin. Servs. Law §§ 305, 308; 23 NYCRR § 2.10; 23 NYCRR § 2.2(c).

Absolute prosecutorial immunity serves crucial policy goals.   The "public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up," should not be "biased with the fear of being harassed by a vicious suit for acting according to their consciences (the danger of which might easily be insinuated where powerful men are warmly engaged in a cause and thoroughly prepossessed of the justice of the side which they espouse)."   *Butz*, 438 U.S. at 510–11.   "The loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus."   So too here.   Ms. Vullo is being "harassed by a vicious suit," brought by a "powerful" adversary charging "unconstitutional animus."   *Id* at 512. DFS entered into consent orders with a wealth of powerful banks and insurance companies under Ms. Vullo's watch; absolute immunity is necessary to protect DFS's critical work from disgruntled adversaries.

### 2.    Ms. Vullo Was Engaged in a Function Analogous to That of a Prosecutor When Enforcing New York Law Against Lockton, Lloyd's, and Chubb

As the head of the agency tasked with bringing administrative enforcement proceedings against regulated entities doing business in New York, the Superintendent of DFS is responsible

for the enforcement of the New York Financial Services Law, Banking Law, and Insurance Law. The DFS Superintendent, "in the enforcement of relevant statutes and regulations, may undertake an investigation" into activities that may constitute violations of, *inter alia*, the Financial Services Law, N.Y. Fin. Servs. Law § 404, and/or the Insurance Law. N.Y. Ins. Law. § 308.   If a violation is found, the Superintendent is authorized to bring a statement of charges and initiate a hearing.   N.Y. Ins. Law. § 2405(a); N.Y. Fin. Servs. Law §§ 305, 306.   The Superintendent presents evidence of a violation of any of these laws at an administrative hearing in which the alleged violator is given an opportunity to be heard.   23 NYCRR Part 2; N.Y. Fin. Servs. Law § 305.   Where the hearing officer finds that a violation has occurred, the Superintendent may impose civil penalties and other remedies.   *See* N.Y. Ins. Law §§ 2102(g), 2110, 2117(g), 2127; N.Y. Fin. Servs. Law § 408.

These statutory responsibilities are directly analogous to those of a prosecutor.   Pursuant to this mandate, the Superintendent determines if there has been a violation under New York law, negotiates potential resolutions, and brings potential charges before an adjudicator.   *See Knowlton*, 704 F.3d at 6 (holding that state insurance regulators engaged in prosecutorial conduct as part of their "duty and authority to enforce Maine's insurance laws").

Here, DFS enforced against Lockton, Lloyd's, and Chubb for their violations of New York Insurance Law.   After months of review, DFS—and Ms. Vullo, per standard DFS practice—entered into the Consent Orders with these entities for violations of various provisions of the Insurance Law.   The entities agreed to pay civil monetary penalties and withdraw their illegal products from the insurance marketplace.   A Consent Order is analogous to a guilty plea in the criminal context, and the decision whether to enter into one from the government side is like that of a prosecutor in offering a plea.   *See Taylor v. Kavanagh,* 640 F.2d 450, 453 (2d

Cir.1981) (absolute immunity for negotiating a guilty plea); *Powers v. Coe,* 728 F.2d 97, 103–04 (2d Cir.1984) (absolute immunity for entering an agreement not to prosecute).

The NRA's selective enforcement claim is premised on two prosecutorial actions, not investigative conduct:   First, the decision to enter into the Lockton, Lloyd's and Chubb Consent Orders—and their precise terms.   *See* Dkt. 56 at 35 (plaintiff's selective enforcement claim is premised on the consent orders' terms "prohibiting Lockton and Chubb from engaging in lawful insurance business with the NRA").   The NRA's purported comparators are based on the violations agreed to in those Consent Orders.   Were it not for those Consent Orders, the NRA could not even *allege* harm from Ms. Vullo's conduct.   Second, the alleged (conclusorily pleaded) decision *not* to bring charges against those so-called comparators.   But the decision *not* to prosecute is equally immunized.   *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 531 (2d Cir. 1993) ("whether or not to institute a prosecution" is "plainly" absolutely immune).

Because Ms. Vullo's decisions to enforce against Lockton, Lloyd's, and Chubb and enter in the Consent Orders and allegedly not enforce against comparators were pursuant to her prosecutorial powers as Superintendent, she is entitled to absolute immunity.

**B.    The NRA Has Still Not Alleged that Defendants Had Knowledge of the Purported Insurance Law Violations by the Comparators Before DFS Launched the Carry Guard Investigation**

The NRA still cannot allege that "Supt. Vullo had knowledge of the specific violations identified in paragraph 59 of the Amended Complaint," as this Court required.   Dkt. 112 at 9. Paragraph 59 made *specific* allegations about Lockton's violations of three specified provisions of the Insurance Law—¶¶ 2212(a)(1), 2324(a), and 2116 (collectively the "Additional Provisions")—violations that DFS allegedly has not prosecuted: (1) referring to the "insurer's AM Best rating" for the affinity programs for the American Optometric Association ("AOAExcel"), the Veterans of Foreign Wars ("VFW"), and Moose, (2) offering to give no-cost

insurance to members of the Professional Photographers of America ("PPA") and the VFW, and (3) paying AOAExcel, Moose, VFW, and PPA based on actual premiums collected.   The Court held, at the pleading stage, that these comparator organizations were "similarly situated" to the NRA "at least to the extent they all maintained affinity insurance programs that violate certain non-firearm-related Insurance Law regulations."   Dkt. 112 at 7.[5]   This Court dismissed the selective enforcement claim because there was no allegation that Ms. Vullo knew about these comparator violations and consciously declined to prosecute them.   *Id.*

>    **1.**      **The NRA Makes No Allegations About Ms. Vullo's Knowledge of the Lockton Affinity Violations Highlighted by the Dismissal Decision**

The Second Amended Complaint does not allege that Ms. Vullo knew of the Lockton-related violations that this Court held might serve as valid comparators.   There is no evidence—zero—that she did.   In an effort to fill this yawning gap in their pleadings, the NRA makes three related factual assertions, and none reference the affinity groups that this Court held were appropriate comparators to the violations in the Lockton consent order.[6]   They are as follows:

>    •      ¶ 21: "For example, beginning in February 2018, Vullo met personally with executives of regulated institutions, including Lloyd's.[17]   Vullo met with, and threatened, executives of Lloyd's of London ('Lloyd's' and its United States affiliate, Lloyd's America, Inc, ('LAI').)   During the meetings she discussed an array of technical regulatory infractions plaguing the affinity-

---

[5] While the Court held that "non-firearm-related Insurance Law violations" are the appropriate comparator, Ms. Vullo maintains that the appropriate comparison is with other illegal firearm-related policies, as those are serious violations concerning the sale of an illegal insurance product that created a moral hazard risk and thus cannot be sold in New York, in contrast with the less serious "add on" violations in the Lockton consent order (e.g., improperly marketing an insurer's rating for the legal insurance AOAExcel sold, *see* SAC ¶ 59).   The NRA has never claimed that there is a comparator to the illegal insurance product for the use of a firearm beyond the reasonable use of force.   At a minimum, as detailed below, there is no law clearly establishing that a plaintiff can focus on only a subset of violations to fashion a comparator.   *See infra* Section II.C.2.

[6] In the prior amended complaint, Plaintiff's comparator violations focused on the Lockton consent order's violations related to commissions, free membership, and advertisements.   The Lloyd's consent order, however, does not contain those same violations.   This is because Lockton is a broker and Lloyd's is an insurance carrier, and insurance law responsibilities differ as to each.

insurance marketplace. Vullo made it clear, however, that DFS was less interested in pursuing the infractions of which she spoke, so long as Lloyd's ceased providing insurance to gun groups, especially the NRA."

- ¶ 67: "In the aftermath of the Parkland tragedy, Vullo met with senior executives of Lloyd's and LAI, and presented Defendants' views on gun control and their desire to leverage their powers to combat the availability of firearms, including specifically by weakening the NRA. These backchannel meetings began on or about February 27, 2018, in the wake of a speech by Vullo at a breakfast meeting of the New York City Bar Association; participants included Vullo herself, along with Joseph Gunset of LAI."

- ¶ 69: "Vullo and DFS made clear that Lloyd's could avoid liability for infractions relating to other, similarly situated insurance policies, so long as it aided DFS's campaign against gun groups."

These allegations do not speak of Lockton's violations at all; they speak to the conduct of *Lloyd's*.[7]   As the magistrate judge found, the NRA added only "one paragraph" about Ms. Vullo's knowledge.   Dkt. 202 at 21 (citing SAC ¶ 110: count three's allegation regarding allegation conversation with *Lloyd's*).   The SAC simply does not allege that Ms. Vullo knew of *any* of the specific violations by the Lockton "comparators" identified by the Court, as detailed in paragraph 59.   Dkt. 112 at 11.   The NRA is attempting a "bait and switch" on its selective enforcement claim.

Recognizing that it has virtually nothing to allege about Lockton or Ms. Vullo specifically, the NRA aims to distract the reader with allegations that either are conclusory and vague or simply do not answer the key question on a claim for selective enforcement, which is whether "Vullo knew of non-firearm-related Insurance Law violations by the comparators when

---

[7] We note that each of these allegations is emphatically false and the NRA has no basis to make these allegations.   Ms. Vullo ardently denies these allegations.

DFS commenced its investigation in the NRA's insurance programs." *Id.*   To begin, it is

notable, as the magistrate judge held, that the SAC's allegations of "knowledge" are vague and

non-specific—they speak only of "*Defendants*" or "*DFS*" *generally* having had "knowledge,"

but never allege that about Ms. Vullo *specifically*: ¶¶ 22 ("Defendants were fully aware"), 65

("Defendants became aware"), 66 ("they knew"), 76 ("DFS also became specifically cognizant";

"DFS verbally conveyed"), 77 ("provided a report to DFS"), 78 ("DFS already knew"), 79

("DFS recently subpoenaed"); Dkt. 202 at 21 (complaint has "only one paragraph" about Vullo's

knowledge).

Instead, the NRA hangs its hat on generic allegations that Ms. Vullo had general

knowledge of infractions "plaguing the affinity-insurance marketplace." SAC ¶ 21.   Such

conclusory allegations are not enough, as this Court already held, *see* Dkt. 112 at 9 ("conclusory

statements of Defendants' scienter," "naked assertions" and "formulaic recitations," do not

suffice).   Indeed, some of these allegations involve events that occurred *after* Ms. Vullo's

departure from DFS—and thus they are irrelevant under *any* reading.   *See, e.g.*, SAC ¶ 79.[8]

Ms. Vullo ran a 1,400+ person agency with oversight over New York's immense

insurance (and banking) industry.   She did not, and could not, know about every possible law

violation in the industry or all the activity the agency may have been involved in on a daily basis.

The NRA cannot plausibly allege that she did.   *See Iqbal,* 556 U.S. at 680–81 (holding

insufficient allegations that Attorney General Ashcroft "knew of" and "was the 'principal

architect' of this invidious policy, and that Mueller was 'instrumental' in adopting and executing

---

[8] In the "Claims" section at the end of the SAC, the NRA relies on boilerplate language to plead its
selective enforcement claim.   SAC ¶¶ 110-12 (claiming that Ms. Vullo "was aware" that "other identical
(or at least similar in all material respects) affinity-insurance programs had the same legal infirmities").
Such "naked assertions devoid of further factual enforcement" are "conclusory statements" which are
entitled to no weight.   Dkt. 112 at 9 (quotations omitted).

it," as these were "formulaic" "bare assertions" (internal citations omitted)).   Even ascribing to

her some form of "general knowledge" of the industry (if that even exists and is provable) is not

sufficient to allege the specific knowledge required for a selective enforcement claim, much less

a "conscious decision" on her part not to prosecute certain violations.

### 2.     The NRA Cannot Allege Similar Violations that DFS Did Not Prosecute

Not only does the NRA not identify a specific violation that Ms. Vullo knew about and

ignored, *it admits* that DFS *did* enforce against similar (non-firearms) violations unconnected to

the NRA.   The Complaint admits that DFS investigated Lockton's NRA *and* non-NRA

violations of the rules governing affinity insurance.   SAC ¶ 78.   Under Ms. Vullo's tenure, DFS

then entered into a Supplemental Consent Order with Lockton in January 2019 (Ex. J to the

SAC) to remedy its violations for affinity programs Lockton brokered that were wholly unrelated

to the NRA.   *Id.*; *see also* Rule 10(c) (exhibits are part of pleadings for all purposes).[9]   The

NRA's selective enforcement claim is disproved by its own pleadings.

### 3.     The NRA Has Not Established that Lloyd's Is a Similarly Situated Comparator

This Court found that the NRA had demonstrated that the specific paragraph 59 affiliate

program violations (connected to Lockton Affinity) were a fair comparator, but, as detailed

above, the NRA's new allegations about Ms. Vullo's purported knowledge of violations concern

violations by Lloyd's, *not* Lockton.   Accordingly, the NRA has not sufficiently pleaded that the

(alleged) non-enforcement concerned entities that were "similarly situated."   *Wandering Dago*,

879 F.3d at 40 (internal quotations omitted).   "[T]he level of similarity between plaintiffs and

---

[9] Ms. Vullo is entitled to absolute immunity as against the NRA's challenge (SAC ¶ 78) to the *terms* of the Supplemental Consent Order.   *See supra* II.A.

the persons with whom they compare themselves must be extremely high." *Kamholtz v. Yates Cty.*, No. 08-CV-6210, 2008 WL 5114964, at *5 (W.D.N.Y. Dec. 3, 2008), *aff'd*, 350 F. App'x 589 (2d Cir. 2009); *see also Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007) (dismissing selective enforcement claim where the purported comparators did not have the same permit as plaintiff and did not suffer from similar "overcrowding" issues as plaintiff).

The distinction between Lloyd's and Lockton is material.   The NRA's selective enforcement claim is based only on violations of the Additional Provisions—*non-firearms* related violations of the insurance laws relating to commissions, free membership, and advertisements.   But DFS did not enforce against Lloyd's for such violations; the *only* violations in the Lloyd's consent order are for selling a firearms insurance policy that contained provisions that are illegal under New York law.   SAC Ex. I ¶ 16-17.   Put another way, the NRA itself admits that *no entity similarly situated to Lloyd's was not enforced against*.   This is consistent with the entities' differing role: Lockton is an insurance *broker*, which administered the affinity program, marketed the product, and collected the premiums; Lockton, therefore, was responsible for the violations of the Additional Provisions.   In contrast, Lloyd's is an excess lines insurance *carrier* that underwrote the insurance policies.   As a result, the violations in the Lloyd's consent order relate to the illegal insurance policy provisions, and not the Additional Provisions.   Given this, there is no viable selective-enforcement claim as to Lloyd's under the NRA's own theory.

Moreover, the NRA's three Vullo-related allegations concerning Lloyd's are so vague as to be meaningless.   Unlike the Lockton-related violations described in paragraph 59, these new allegations do not describe specific provisions of the Insurance Law, or specific product offerings, or specific affiliate relationships.   The NRA merely alleges that Ms. Vullo discussed "an array of technical regulatory infractions plaguing the affinity-insurance marketplace" and refers generally to "infractions relating to other, similarly situated insurance policies."   SAC ¶¶

21, 69; *see also* SAC ¶¶ 110 (referring to that alleged discussion).   There is no factual allegation about what these "other infractions" were, and none about what the "other, similarly situated insurance policies" might be.   Plainly, such loose and non-specific allegations cannot ground a selective prosecution claim.   Were it otherwise, a police officer who was told *generally* that speeding is "plaguing" the New York State Thruway could be accused of selective enforcement for pulling over any specific speeder caught by his radar gun.

These paragraphs are in marked contrast to the specifics in paragraph 59 which this Court relied on in determining that the Lockton affiliate programs were valid comparators.   Without an allegation that Ms. Vullo knew about *a specific violation*, *by a specific violator*, the Court cannot even begin to assess whether those violators are "similarly-situated entities."   Dkt. 112 at 8. The NRA's claim that the other policies are "similarly situated" are "[m]ere labels and conclusions" and "naked assertions" which are entitled to no weight.   *Id.* at 9.

The unspecified lawbreakers in "the affinity marketplace" are not similarly situated for a second, independent reason: just as the police officer will pursue the speeder who is in front of him and picked up on his radar gun, regulators with limited resources will pursue lawbreakers when the evidence of law-breaking is available or presented to it.   A lawbreaker who has not yet been identified, for whom documents probative of a violation have not made their way into the enforcement agency's hands, and who has not yet been investigated, is *not* "similarly situated" to one whose legal violations were brought to DFS for investigation.   That is the situation here. Here, the Manhattan DA's Office brought evidence of serious violations by the Carry Guard program to DFS's attention, and DFS pursued them.   *See* SAC ¶¶ 34–35 (alleging Manhattan DA's office met with DFS to launch investigation into "compliance infirmities with Carry Guard"); *id.* ¶ 65 (alleging DFS's investigation relied on "research supplied by Everytown").

The Carry Guard investigation produced evidence of other insurance law violations, including violations of the Additional Provisions.   DFS followed the evidence where it took it, prosecuting Lockton's violation of the Additional Provisions in brokering the NRA's insurance products *and,* as the SAC admits, enforcing against violations of the Additional Provisions *unrelated* to the NRA.   *See* SAC ¶ 78.   No conscientious law enforcer would ignore evidence of wrongdoing as the NRA asks this Court to hold; when law enforcement searching for a murder weapon finds a stolen bike, they properly charge the suspect with both murder and robbery.   *See infra* Section II.C.2 (law is not clearly established that less serious violations are fair comparators).   Here, there is no evidence that Ms. Vullo had evidence of either the "stolen bike," or the "murder," except as to the entities she actually enforced against.

This Court provided the NRA with a clear roadmap of how it should seek to amend, *if* it had the factual basis to do so.   Because the NRA's allegations do not meet the specific standard for what is necessary to bring a selective enforcement claim against a high-level official under the law of this case, its selective enforcement claims must be dismissed.

### 4.   The NRA's Vague Allegations Do Not Speak to Ms. Vullo's Knowledge When DFS "Commenced" the Investigation, as this Court Required

The NRA also did not comply with the *timing* requirement set forth in this Court's Dismissal Decision, *i.e.,* that the NRA must plead that Ms. Vullo knew of comparators' violations at the time "when DFS commenced its investigation in the NRA's insurance programs."   *Id.*   The NRA pleads that the DFS investigation "launched" in "October 2017." SAC ¶ 35.   Yet the Vullo-related allegations (bare bones as they are) reference alleged communications that began four months *later*—in February 2018.   *Id.* ¶¶ 21, 67, 69.   Because Ms. Vullo did not (even-allegedly) know about the purported comparators when DFS launched the investigation, she cannot be said to have "consciously decline[d]" to enforce against them.

Dkt. 112 at 11.   Even crediting the vague and conclusory allegation that Ms. Vullo learned of

other violations in February 2018, by that point DFS was well into its investigation and had

devoted its resources into that investigation; any newly-discovered infractions are not similarly

situated to infractions that were already well into being investigated and prosecuted.

> **5.     The NRA Cannot Ignore its Obligation to Plead Knowledge By
> Making a Conclusory Allegation about "See-No-Evil"**

Effectively admitting it cannot plead Ms. Vullo's knowledge, the NRA makes a bare-

bones and conclusory allegation that her "lack of knowledge was due to a 'see-no-evil' policy of

enforcement."   SAC ¶ 111.   In exceptional circumstances, a "see-no-evil" approach *might*

obviate a plaintiff's need to prove knowledge (though the law is unclear, warranting qualified

immunity, *see infra* Section II.C.2).   Nonetheless, here, the NRA makes no specific allegations

plausibly suggesting that Ms. Vullo pursued a see-no-evil policy—and the NRA cannot

overcome its failure to plead a similarly situated comparator.

As this Court already held, to prevail on a selective enforcement claim, a plaintiff must

generally show that the enforcing party had "knowledge of similarly situated entities" and

applied a different enforcement standard to those comparators.   *LaTrieste Restaurant v. Village*

*of Port Chester*, 188 F.3d 65, 70 (2d Cir. 1999); *see also Bernstein v. Village of Wesley Hills*, 95

F. Supp. 3d 547, 571–72 (S.D.N.Y. 2015) (collecting cases in which selective enforcement claim

was dismissed on plaintiff's failure to demonstrate knowledge of other violations).

*LaTrieste* suggested a potential narrow exception to the knowledge requirement, stating

in dicta in a footnote, that it was "*conceivable* that selective treatment could be shown where, for

example, proof was offered that a municipality did not know of prior violations because it

adhered to a see-no-evil policy of not enforcing an ordinance, and then abandoned that policy."

*Id.* at 70 n.1 (emphasis added).   Subsequent courts have similarly emphasized the extraordinary

nature of this potential "see-no-evil" exception, and the heightened burden of proof to establish such a theory.  *See, e.g.*, *Bernstein*, 95 F. Supp. 3d at 572 n.33 (collecting cases in which the "see-no-evil" theory was rejected for lack of evidence).

The SAC fails to set forth even a plausible ground for a "see-no-evil" selective enforcement claim, if such a claim even exists.   The NRA has not alleged any *specific* violations by *similarly-situated* comparators that were routinely ignored.   Instead, the NRA's allegations are "sparse," Dkt. 202 at 27, bereft of specifics, and conclusory, i.e., that "Vullo knew the actions taken by DFS against NRA affinity insurance programs were unprecedented" and she "should have known of similarly-situated individuals," SAC ¶ 111.   The NRA offers no factual basis for its conclusory claims that these actions were "unprecedented."   It offers no factual basis why the then-head of a 1,400-person state agency charged with enforcing literally hundreds of regulations, ranging from health insurance to banking to mortgages to annuities, would be aware of specific purported violations among "similarly situated individuals."   SAC ¶ 111.   Not only are these conclusory allegations barebones and factually unsupported, they are wholly implausible.  *See Iqbal*, 556 U.S. at 678-79; *Twombley,* 550 U.S. at 555.

As for the NRA's allegation that Ms. Vullo "failed to inquire about whether there were any similarly situated affinity programs when the investigation was launched," *id.*, that turns the selective enforcement standard on its head.   Courts do not require regulators to *inquire* about other programs or face civil liability for selective enforcement, they require that regulators be found to have known about the violations and, in similar circumstances, refused to move against them.  *See, e.g.*, *U.S. v. Armstrong*, 517 U.S. 456, 470 (1996) (plaintiff must show defendant knew of other violations but declined to prosecute them).

Finally, the (false) allegation that Ms. Vullo admitted *general* knowledge of industry violations does not cut it.   As detailed above, the NRA did not plead "sufficient factual matter"

as *Iqbal* requires, 556 U.S. at 678, to establish that Ms. Vullo knew of any *specific* violations or that specific violations were committed by similarly situated entities; in any case, those alleged admissions were *after* DFS commenced its investigation.   *See supra* Sections II.B.1 and B.4.

### C.        Even if Not Absolutely Immune, Ms. Vullo Has Qualified Immunity

Government officials can only be sued in their personal capacity if they are violating a right that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."   *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (internal citation omitted).   Because qualified immunity "is an *immunity from suit* rather than a mere defense to liability, [courts] repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."   *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."   *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (alterations and internal quotation marks omitted).   In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).   The Supreme Court has repeatedly cautioned courts not to define clearly established law at "a high level of generality." *Id.* at 742.

The second prong of the qualified immunity analysis is "whether a reasonable official would reasonably believe his conduct did not violate a clearly established right."   *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010) (internal quotations and alterations omitted). "Even where the law is clearly established and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was objectively reasonable for him at the time of the challenged action to believe his acts were lawful."   *Id.* at 139 (internal citation omitted).

Here, the policy considerations underlying qualified immunity are at their apex.

Qualified immunity exists to ensure that damages suits do not "unduly inhibit officials in the

discharge of their duties" by burdening officers with "personal monetary liability and harassing

litigation."   *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

The implications of the NRA's claim are chilling indeed.   As head of a state agency, Ms.

Vullo made public statements—*months after* launching the Carry Guard investigation, unrelated

to that investigation, and prompted by the Parkland shooting—decrying the scourge of gun

violence.   These statements "clearly fit into the government-speech doctrine," an "essential"

doctrine that permits government officers to "address matters of public importance on which

New York State has a significant interest."   Dkt. 56 at 16–17.   The agency Ms. Vullo ran, DFS,

ensures compliance with the Insurance Law and discovered serious violations of that law by

entities that had contracted with the NRA.   If the NRA's selective enforcement theory stands,

political foes of government regulators could simply flout state insurance laws, knowing they can

cry "selective enforcement" when regulators charged with prosecuting such laws seek to stop

their illegal conduct.   Government officials who speak on matters of "public importance" would

be inhibited in prosecuting lawbreakers.   Qualified immunity exists to avoid that result.

### 1. It Is Not Clearly Established that an Entity that Is Not Enforced Against Can Bring a Selective Enforcement Claim

Although you wouldn't know this from the calumny that the NRA has heaped on her, Ms.

Vullo never took or ordered any enforcement action against the NRA.[10]   The NRA's selective

enforcement claim is based on DFS's enforcement against Lockton, Lloyd's, or Chubb—not

---

[10] Ms. Vullo left office on February 1, 2019.   The pending DFS charges against the NRA were brought *a year later*—in February 2020.   Dkt 176-1 at 9.   To the extent there is any equal protection claim stemming out of that enforcement proceeding, Vullo would be the wrong defendant.

against the NRA, because there never was such enforcement under Mr. Vullo's watch.   But it is

not clearly established that a party who is not the subject of an enforcement proceeding at all can

even pursue a selective enforcement claim.   While this Court found, on the prior Rule 12(b)(6)

motion, that the NRA had standing to bring such a claim, it did not hold that clearly-established

law so required, nor did it cite binding precedent requiring that outcome.   Numerous courts have

held otherwise, evidencing that the law in this area is unclear and that, accordingly, qualified

immunity warranted.

As this Court recognized, *"*a party generally must assert his own legal rights and

interests, and cannot rest his claim to relief on the legal rights or interests of third parties."   Dkt.

56 at 14.   Many courts have held that a plaintiff *cannot* assert a selective enforcement claim

when it is not the party subject to enforcement by the defendant.   *Casciani v. Nesbitt*, 659 F.

Supp. 2d 427, 449–50 (W.D.N.Y. 2009) ("[T]here is no evidence—indeed, there is no allegation

in the complaint—that plaintiff has ever been sanctioned under the ordinance, or that defendants

have otherwise 'enforced' the ordinance against him. In the absence of such evidence, a claim of

selective enforcement cannot stand.").[11]

Nor is the law clearly established that a third party can bring a selective enforcement

claim where the entities actually enforced against *admitted* that their (NRA-branded) insurance

products violated the Insurance Law.   *See New Creation Fellowship of Buffalo v. Town of*

---

[11] *See also Davidson v. Culver City*, No. CV04–2220, 2004 WL 5361378, at *14 (C.D. Cal. July 28, 2004) ("Neither fear nor the mere possibility of discriminatory enforcement creates a concrete cognizable injury in fact required to satisfy Article III's case and controversy requirement for standing") (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 605–06, (1992)), *aff'd*, 159 F. App'x 756 (9th Cir.2005); *Lash v. City of Union*, No. C–3–98–045, 1999 WL 33127974, at *6 (S.D. Ohio Sept. 27, 1999) ("[C]ourts have concluded that the plaintiffs did not have standing to assert a selective enforcement claim, when the defendants had not enforced the ordinance in question against them."); *Orgain v. City of Salisbury*, 521 F. Supp. 2d 465, 476 n.34 (D. Md. 2007) (finding that nightclub LLC's financial losses stemming from suspension of liquor license did not bestow selective enforcement standing on LLC, as individual club owners—not LLC—were licensees and the parties enforced against).

*Cheektowaga, N.Y.*, No. 99-CV-460A(F), 2004 WL 1498190, at *21 (W.D.N.Y. July 2, 2004),

*aff'd sub nom. New Creation Fellowship of Buffalo v. Town of Cheektowaga*, 164 F. App'x 5 (2d

Cir. 2005) ("A § 1983 complaint must still allege a wrong to plaintiff.   This requirement is not

met by a claim seeking federal review of a state prosecution on grounds of unfairness, absent

proof of denial of due process or a finding that the defendant was maliciously prosecuted upon a

charge of which he was found not guilty." (quoting *Singleton v. City of New York*, 632 F.2d 185,

192–93, 195 (2d Cir. 1980)).

　　　While this Court previously found that Plaintiff had standing to bring a selective

enforcement claim, the cases it relied upon did not place this question "beyond debate."  *al-*

*Kidd*, 563 U.S. at 741.   None involved a claim for selective enforcement.   And none involved a

claim by a third-party to a property interest in admitted illegal products, as the NRA claims

here.[12]

　　　Given the numerous cases holding that third parties like the NRA cannot bring a selective

enforcement challenge, the law is not clearly established, and qualified immunity applies.

> **2.**　　**It Is Not Clearly Established that a Selective Enforcement Claim Can Be Based on Purported Comparators that Only Committed *Less Serious* Violations**

　　　The NRA's selective enforcement claim is based on a wholly novel—indeed, contorted—

theory: it alleges that DFS's enforcement effort was focused on Carry Guard (an admittedly

*illegal* insurance product providing covering for use of a firearm *beyond* reasonable use of

---

[12]  *See* Dkt. 56 at 47 (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 262–63 (1977) (third-party development corporation had standing to challenge a village's racist zoning decision that affected developer); *Doe v. Sch. Bd. of Ouachita Parish*, 274 F.3d 289, 292 (5th Cir. 2001) (public school students had standing to challenge state statute allowing prayer in schools); *Council of Ins. Agents & Brokers v. Molasky–Arman*, 522 F.3d 925, 931 (9th Cir. 2008) (nonresident insurance agent had Article III standing to challenge state's "countersignature" statute prohibiting nonresident agents from finalizing policy without countersignature of resident agent)).

force), and admits no other entity offered a product like Carry Guard with its significant moral hazard concerns.   It thus admits it could not allege a similarly-situated comparator that was not enforced against.   So instead the NRA's selective enforcement claim ignores the heart of DFS's enforcement effort which was to stop an *illegal* insurance product.   It seeks to focus only on DFS's enforcement against Lockton of violations of the Additional Provisions (marketing, advertising, commission structure, *see* SAC ¶ 59) that DFS discovered during the Carry Guard investigation.   And it claims that (unidentified) Lockton affinity programs that allegedly violated only those Additional Provisions—that did not sell an illegal insurance product—are similarly situated (though the NRA's own Complaint admits DFS enforced against Lockton's violations of the Additional Provisions for all its affinity programs, SAC ¶ 78 & Ex. J).

There is no Supreme Court or Second Circuit case clearly establishing that a regulator must treat less serious violations discovered during an ongoing enforcement proceeding similarly to serious violations that motivate an enforcement action.   *See Berg v. Kelly*, 897 F.3d 99, 114 (2d Cir. 2018) (qualified immunity protects against selective enforcement claim where "reasonable officer could believe that [plaintiff] protesters were engaged in conduct different from that of regular pedestrians and that the protesters therefore were not similarly situated to those pedestrians").   All regulators have limited resources.   A regulator acts reasonably in focusing its limited resources on matters brought to its attention.   If, in the midst of that enforcement action, other violations are discovered it is reasonable for a regulator to address them without focusing limited enforcement resources to attempt to discover similar violations by unnamed *third parties* "in the industry."   That is particularly true here, where the violations of the Additional Provisions, though serious, did not present the grave safety concerns attendant to the sale of an insurance product that removed the law's intended consequences from improper firearms use.   Moreover, while the NRA claims in paragraph 59 that DFS overlooked Lockton's

Insurance Law violations connected to other affinity groups, its own complaint alleges that DFS required Lockton to self-report them and entered into a Supplemental Consent Order to resolve those violations.   SAC ¶ 78 and Ex. J.

Second, there is similarly no case clearly establishing that the "see no evil" theory is a basis for a selective enforcement claim.   *See supra* II.B.5.   The leading Second Circuit case, *LaTrieste,* only "left open the possibility," in a footnote, that "selective treatment could be shown" under "a see-no-evil policy of not enforcing an ordinance."   *Diesel v. Town of Lewisboro*, 232 F.3d 92, 105 (2d Cir. 2000) (quoting *LaTrieste*, 188 F.3d at 70 n. 1).   Leaving "open" that a claim may exist is the opposite of clearly establishing the existence of the claim.

The question is not, at a high level of generality, whether the right to be free from selective enforcement is clearly established, but rather whether it is clearly established that an entity that was *not* enforced against by a defendant, can bring a claim where it admits that its comparators did not commit the most serious misconduct that warranted the enforcement—the sale of an illegal insurance product—and admits there was a consent order addressing the less serious misconduct.   Ms. Vullo is protected by qualified immunity because there is no clearly established law that would put all reasonable officials on notice that her conduct was unlawful.

### 3.    Ms. Vullo's Conduct Was Objectively Reasonable

Even if the law were "clearly established," it still was "objectively reasonable" for Vullo to believe her "conduct did not violate a clearly established right."   *Taravella*, 599 F.3d at 135. Government regulators cannot pursue law-breakers unless they are presented with, or otherwise discover, *specific* violations.   When she was Superintendent, the District Attorney presented DFS with evidence of Carry Guard's very serious violations of the Insurance Law.   SAC ¶¶ 34-35.   It is reasonable for her to focus on investigating violations that were squarely presented to DFS, rather than unearth *unknown* violations by *unknown* violators that—crediting the NRA's

allegations—were generally "plaguing the affinity-insurance marketplace." *Id.* ¶ 21. "[E]qual protection does not require that all evils of the same genus be eradicated or none at all." *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980). DFS, like every state agency has limited resources, and if it invested those resources on attempting to discover every violation in the affinity insurance marketplace, it would have no resources left to regulate health insurance or banking or the many other areas DFS oversees. Indeed, with the two public Lockton Consent Orders, DFS broadly addressed concerns in the affinity marketplace.

Even taking the NRA's allegations as true, it was reasonable for Ms. Vullo to prosecute the violations that were squarely presented to DFS instead of using the agency's limited resources to uncover violations that were never presented to DFS. And when, during the Carry Guard investigation, DFS learned of *other,* less serious violations of Insurance Law, it was reasonable, lawful and prudent to remedy those *admitted* violations through Consent Orders. No competent regulator would sit on her hands faced with such evidence of unlawful conduct. *See, e.g.*, *Diesel*, 232 F.3d at 104 (denying selective enforcement claim where "[e]ssentially [plaintiff] claims that he was entitled to have his misconduct ignored or concealed").

## III. THE NRA'S FIRST AMENDMENT CLAIM AGAINST MS. VULLO IS BARRED BY QUALIFIED IMMUNITY

Qualified immunity also warrants dismissal of Plaintiff's First Amendment retaliation claim. *See supra* section II.C (describing qualified immunity standard); *see also Musso v. Hourigan*, 836 F.2d 736, 743 (2d Cir. 1988) (holding that a government official is not liable for failing to prevent another from violating a party's First Amendment rights, unless the official is charged with an affirmative duty to act); *see also Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir.1991)) (granting qualified immunity to city officials on a motion to dismiss landlord's claim that enforcement action against tenant's topless bar violated his freedom of expression).

Ms. Vullo is protected by qualified immunity because it was objective reasonably for her to believe that when she engaged in protected—and "essential"—government speech to "address matters of public importance" her conduct was lawful.   Dkt. 56 at 16-17.   This Court appropriately held that the "Guidance Letters and Cuomo Press Release, read in isolation, clearly fit into the government-speech doctrine."   *Id*.   Nonetheless, the Court held that the NRA stated a First Amendment claim because when these documents are "read in the context in which they were issued, amount to 'threats that deliberately invoked DFS's 'risk management' authority to warn of adverse action."   *Id.*   Ms. Vullo is not asking this Court to revisit that decision, but the qualified immunity analysis is far different.

By the Court's own analysis, courts must draw "fine lines" between permissible government speech and impermissible threats.   Dkt. 56 at 18; *Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) ("statements made by public officials will require courts to draw fine lines between permissible expressions of personal opinion and implied threats to employ coercive state power to stifle protected speech").   Qualified immunity exists to protect government officials where the exact contours of the law are unclear.   It protects officials who reasonably believe they are engaging in "essential" First-Amendment protected speech, even if a court were to find the speech crossed that "fine line."

In *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1015 (D.C. Cir. 1991), the D.C. Circuit dismissed First Amendment claims against the Attorney General based on letters he sent to adult magazine publishers demanding a response to what he termed "allegations" of distributing pornography.   Qualified immunity applied though the recipients may have believed they were threatened with prosecution given the context, because the letters "contained no threat to prosecute."   *Id.* ("[T]he Supreme Court has never found a government abridgement of First Amendment rights in the absence of some actual or threatened imposition of governmental

power or sanction.").   It was objectively reasonable for Ms. Vullo to believe her statements in the Guidance Letters and press release were lawful.   There is no case clearly establishing that otherwise protected public statements transform into an unlawful "threat" because there is an ongoing (and unrelated) regulatory investigation.   Indeed, at the time of Ms. Vullo's public statements, DFS had made no public statements about the Carry Guard investigation.   Nor do the NRA's (false) allegations that Ms. Vullo coupled her public statements with "backroom exhortations"[13] change the analysis, because they are vague and conclusory—there is no specific allegation that Ms. Vullo directly threatened unlawful government enforcement.   Reasonable officials would believe it lawful to privately express the sentiments that are lawful to express publicly.

No case has resolved this "fine line" under analogous facts.   Qualified immunity requires dismissal of counts one and two.   *See* Dkt. 56 at 15 (addressing counts one and two together).

## CONCLUSION

For the reasons stated above, the magistrate judge's decision granted leave to replead should be overturned and the NRA's Second Amendment Complaint should be dismissed in its entirety as against Ms. Vullo.

Dated: New York, New York
         June 23, 2020

                                         EMERY CELLI BRINCKERHOFF
                                            & ABADY LLP

                                         By:        */s/ Andrew G. Celli, Jr.*
                                            Andrew G. Celli, Jr.
                                            Debra L. Greenberger
                                            Marissa R. Benavides

---

[13] Notably when Defendants sought the details of these alleged "threats" and "backroom exhortations" in discovery, the NRA could identify no such secret threat or exhortation (because there are none), citing only the publicly-issued Guidance Letters and Press Release, and claiming any additional information was privileged.

600 Fifth Avenue
New York, New York 10020
(212) 763-5000

*Attorneys for Defendant Maria Vullo*