**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NATIONAL RIFLE ASSOCIATION OF AMERICA,**

                                        **Plaintiff,**

      **-against-**                                                    **1:18-CV-0566**

**ANDREW CUOMO;  MARIA T. VULLO;  and**
**THE  NEW  YORK STATE  DEPARTMENT OF**
**FINANCIAL SERVICES,**

                                        **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                              **DECISION & ORDER**

**I.      INTRODUCTION**

        Plaintiff the National Rifle Association ("the NRA" or "Plaintiff") moves for a

preliminary injunction staying a New York State Department of Financial Services ("DFS")

administrative hearing to determine whether Plaintiff violated various provisions of the New

York Insurance Law ("Insurance Law").  Dkt. No. 176.  The NRA seeks an injunction

"staying any state enforcement proceeding until its Fourteenth Amendment

selective-enforcement and First Amendment retaliation claims are adjudicated." Dkt. 176-1

at 12.  Defendants New York Governor Andrew Cuomo ("Gov. Cuomo"), former DFS

Superintendent Maria T. Vullo ("Supt. Vullo"), and DFS (collectively "Defendants") oppose

the motion.  Dkt. No. 183.  Defendants argue that the Court should abstain from issuing the

requested preliminary injunction under the holding of _Younger v. Harris_, 401 U.S. 37 (1971),

                                        1

and, if the Court reaches the merits, the Court should deny the motion because Plaintiff fails to establish its entitlement to a preliminary injunction.  Dkt. No. 183.  In reply, Plaintiff argues that it has satisfied all the elements for a preliminary injunction, and that *Younger* abstention does not apply under the retaliatory, bad faith exception to that rule.  Dkt. No. 187.  The Court heard oral arguments on the issues on June 24, 2020.  For the reasons that follow, the motion for a preliminary injunction is denied.

## II.    BACKGROUND

### a.  Pending Claims

#### 1.  November 6, 2018 Decision & Order

On November 6, 2018, the Court decided Defendants' Rule 12(b)(6) motion to dismiss the claims asserted in the Amended Complaint.  *See* Dkt. No 56.  The Court dismissed all claims except for Plaintiff's freedom of speech claims (Counts One and Two),[1] and a portion of Plaintiff's selective enforcement claims (Count Four).[2]  *See generally, id.*

### A. Freedom of Speech Claims

Count One is based on Plaintiff's allegations that "Defendants' actions—including but not limited to the issuance of the April 2018 [Guidance] Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon Chubb and Lockton, and

---

[1]Counts One and Two assert violations of the First Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983, and violations of Article 1, Section 8 of the New York Constitution.  These claims are subjected to the same analysis under federal and state law, *see, Martinez v. Sanders*, 307 F. App'x 467, 468 n.2 (2d Cir. 2008)(citing *Pico v. Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26*, 638 F.2d 404 (2d Cir. 1980), *aff'd*, 457 U.S. 853 (1982)), and are referred to as Plaintiff's freedom of speech claims.

[2]Count Four asserts violations of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983, and violations of Article 1, Section 11 of the New York Constitution.  These claims are subjected to the same analysis under federal and state law, *see Selevan v. New York Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009), and are referred to as Plaintiff's selective enforcement claims.

the issuance of the Cuomo Press Release—established a 'system of informal censorship' designed to suppress the NRA's speech." Am. Compl., Dkt. No. 37, ¶ 75.[3]   Plaintiff contends that these actions "constitute a concerted effort to deprive the NRA of its freedom of speech by threatening with government prosecution services critical to the survival of the NRA and its ability to disseminate its message," and amount to "an 'implied threat[ ] to employ coercive state power' against entities doing business with the NRA." *Id.* ¶ 77. Plaintiff maintains that Defendants' actions have caused regulated institutions doing business with the NRA "to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations," *id.* ¶ 78, that, in turn, "resulted in significant damages to the NRA, including but not limited to damages due to reputational harm, increased development and marketing costs for any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA." *Id.* ¶ 80.

Count Two alleges that these same actions by Defendants "were in response to and substantially caused by the NRA's political speech regarding the right to keep and bear arms.  Defendants' actions were for the purpose of suppressing the NRA's pro-Second Amendment viewpoint.   Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech." *Id.* ¶ 86.  Like with Count One, Plaintiff alleges that Defendants' actions have caused regulated institutions doing business with the NRA "to end their business relationships, or explore

---

[3]The Court addressed the Amended Complaint in its two decisions on Defendants' Rule 12 motions. Although Plaintiff has now been granted leave to file a Second Amended Complaint, the amended pleading only repleads selective enforcement claim against Supt. Vullo in her individual capacity, makes minor non-substantive changes to other parts of the pleading, and substitutes the current DFS commissioner for Supt. Vullo in Plaintiff's claim for injunctive relief.
     For a more thorough review of the background allegations in the Amended Complaint, reference is made the November 16, 2018 Decision & Order, Dkt. No. 56, at pages 3-14.

such action, due to fear of monetary sanctions or expensive public investigations," *id.* ¶ 87, and caused the same damages to the NRA as alleged in Count One.  *Id.* ¶ 90.

In analyzing these claims, the Court noted that they "turn on the allegations that Defendants issued threats to financial institutions and insurers 'that DFS . . . will exercise its extensive regulatory power against those entities that fail to sever ties with the NRA.'" Dkt. 56 at 18 (quoting Am. Compl. at p. 2).  The Court found that "[t]he allegations in the Amended Complaint are sufficient to create a plausible inference that the Guidance Letters and Cuomo Press Release, when read together and in the context of the alleged backroom exhortations and the public announcements of the Consent Orders, constituted implicit threats of adverse action against financial institutions and insurers that did not disassociate from the NRA. " *Id*. at 26.   Ultimately, the Court concluded that "the allegations of direct and implied threats to insurers and financial institutions because of these entities' links with the NRA, and the allegations of resulting harm to the NRA's operations, are sufficient to make out plausible First Amendment freedom-of-speech claims." *Id.* at 28.

## B.  Selective Enforcement Claims

Plaintiff's selective enforcement claims in the Amended Complaint alleged that Defendants "knowingly and willfully violated the NRA's equal protection rights by seeking to selectively enforce certain provisions of the Insurance Law against Lockton's affinity-insurance programs for the NRA.  Meanwhile, other affinity-insurance programs that were identically (or at least similarly) marketed by Lockton, but not endorsed by 'gun promotion' organizations, have not been targeted by DFS's investigation." Am. Compl. at ¶ 107.  Plaintiff further contended that "Defendants' selective enforcement of the Insurance

4

Law against the NRA and its business partners is based on the NRA's political views and speech relating to the Second Amendment, " *id.* ¶ 110, resulting in damage to the NRA. *Id.* ¶ 111.   Plaintiff sought (a) "an order preliminarily and permanently enjoining Cuomo and Vullo (in their official capacities) and DFS . . . from selectively enforcing the Insurance Law by requiring Lockton or Chubb, through their respective consent orders, to forbear from doing business with the NRA which they could otherwise permissibly conduct with other affinity organizations," *id.* ¶ 113; (b) an injunction to enjoin Defendants "from further selective enforcement of the Insurance Laws to the NRA endorsed policies," *id.,* p. 44 ("Request for Relief"), ¶ a(3); and (c) monetary damages. *Id.* ¶ c.   Defendants argued that Plaintiff lacked standing for its selective enforcement claims.  *See* Dkt. 56 at 35.

        The Court found that the NRA lacked standing for the injunction sought in paragraph 113 and, therefore, dismissed the selective enforcement claims to the extent Plaintiff sought to enjoin Defendants from requiring Lockton and Chubb to abide by their Consent Orders. *Id.* at 45.  The Court also found that Plaintiff failed to allege facts clearly demonstrating a sufficient likelihood that it will be injured in the future by selective enforcement of the New York insurance laws to lawful NRA-affinity insurance programs, or that such future injury is certainly impending, real, and immediate.  Therefore, the Court granted Defendants' motion to the extent Plaintiff sought an order enjoining Defendants from selectively enforcing the New York insurance laws against the NRA.  *Id.* at 46.  Because it appeared possible that Plaintiff could allege facts demonstrating future  selective enforcement of the New York insurance laws to the NRA, or to lawful NRA-endorsed affinity programs, dismissal in this regard was without prejudice.  The Court also found that Plaintiff had alleged sufficient facts

5

to confer standing to seek monetary damages on its selective enforcement claims. *Id.* 46-48.  Thus, the Court denied Defendant's motion to dismiss to the extent Plaintiff sought monetary damages for Defendants' past acts of selective enforcement.  *See id* at 71.

### 2.  May 9, 2019 Decision and Order

On May 9, 2019, the Court decided the Defendants' Fed. R. Civ. P. 12(c) motion directed at the Amended Complaint.  *See* Dkt. No. 112.  The Court noted that only Plaintiff's First Amendment claims (Counts One and Two) and that portion of its selective enforcement claims (Count Four) seeking money damages for past acts remained to be litigated.  In response to the Defendants' argument that all Section 1983 claims against DFS must be dismissed because DFS is not a "person" under §1983, Plaintiff withdrew its Section 1983 claims against DFS resulting in dismissal of these claims.  Dkt. No. 112 at 3.  The Court also found that the Eleventh Amendment barred claims for money damages against DFS, and against Gov. Cuomo and Supt. Vullo in their official capacities.  *Id.* 4.  Thus, all such claims were dismissed. *Id.*  Consequently, after the November 6, 2018 decision limiting Count Four to claims seeking money damages for Defendants' past acts of selective enforcement, and the application of the Eleventh Amendment, the only defendants remaining on Count Four were Gov. Cuomo and Supt. Vullo in their individual capacities.  Dkt. 112 at 8-9.

Turning to the merits, the Court noted that the Amended Complaint detailed several affinity groups operating in New York whose insurance programs were similar to those of the NRA, and found that the allegations that the comparators had affinity-insurance programs that operated in ways in which non-firearm-related Insurance Law provisions were

6

enforced against the NRA was enough to plausibly establish that the NRA and the comparator-organizations were similarly situated - at least to the extent they all maintained affinity-insurance programs that violated certain non-firearm-related Insurance Law regulations.  Dkt. 112 at 9-10.  However, the Court also found that the Amended Complaint lacked plausible allegations that Defendants had knowledge of the purported Insurance Law violations by the comparators yet consciously declined to prosecute them.  *Id.*  Thus, the selective enforcement claims against Gov. Cuomo and  Supt. Vullo were dismissed without prejudice to repleading. *Id.* at 11.

### 3.  Second Amended Complaint

On June 1, 2020, Magistrate Judge Hummel granted the NRA's motion to replead selective enforcement claims against Supt. Vullo in her individual capacity, and to substitute the current DFS superintendent for Supt. Vullo in Plaintiff's request for an injunction.[4] *See* 06/01/20 Mem.-Dec. & Ord., Dkt. No. 202.  In the Second Amended Complaint, Dkt. No. 203, Plaintiff asserts that based on the NRA's political views and speech relating to the Second Amendment, *see id.* ¶ 119, Supt. Vullo "knowingly and willfully violated the NRA's equal protection rights by seeking to selectively enforce certain provisions of the Insurance Law against Lockton's affinity-insurance programs for the NRA.  Meanwhile, other affinity-insurance programs that were identically (or at least similarly) marketed by Lockton, but not endorsed by 'gun promotion' organizations, have not been targeted by DFS's investigation." *Id.* ¶ 109.  In this regard Plaintiff alleges that Supt. Vullo "was aware during

---

[4]Plaintiff requests an injunction prohibiting DFS from engaging in conduct that interferes with the NRA's rights under the First and Second Amendments and Section 8 of the New York Constitution, and prohibiting DFS from engaging in conduct that interferes with the NRA's contracts and/or business relationships. *See* 2nd Am. Compl., Dkt. No. 203, at p. 42.

the investigations of the NRA and its business partners that these other identical (or at least similar in all material respects) affinity-insurance programs had the same legal infirmities that resulted in the penalties against Lockton,[5] Chubb, and Lloyd's[6] related solely to the NRA-related affinity-insurance programs," *id.* ¶ 110, but declined to prosecute these other violations resulting in damages to the NRA. *Id.* ¶ 120.  Plaintiff also alleges a "see-no-evil" policy of selective enforcement against Supt. Vullo based on allegations that

> [b]y virtue of the position held by Vullo at the time DFS launched its investigation, Vullo knew the actions taken by DFS against NRA affinity insurance programs were unprecedented.  No similarly-situated programs have faced even close to the same treatment for analogous violations. However, Vullo and DFS failed to inquire about whether there were any other similarly situated affinity programs when the investigation was launched.

*Id.* ¶ 112.

---

[5]In addition to the Lockton Consent Order referenced in the Amended Complaint, DFS entered into a Supplemental Consent Order with Lockton on January 31, 2019.  Lockton identified to DFS "additional violations of New York laws and regulations" that did not involve NRA endorsed insurance products, Schacht Expert Witness Report ("Schacht Report"), Dkt. No. 176-4, at 32; *see* Jacobi Decl., Dkt. No. 183-1, ¶ 10 ("DFS . . . obtained additional documents from Lockton with respect to non-NRA endorsed insurance products with similar violations of New York Insurance Law. DFS and Lockton entered into a second Consent Order addressing those additional violations of law."), and agreed to pay a civil monetary fine of $400,000. Schacht Report at 32.

[6]On December 20,  2018, DFS entered into a Consent Order with Lloyd's of London ("Lloyd's") in which Lloyd's admitted to violations of New York Insurance Law with respect to the marketing and sale of non-Carry Guard NRA-endorsed policies in New York.  *See* Jacobi Decl., Dkt. No. 183-1, at ¶ 9; Schacht Expert Witness Report ("Schacht Report"), Dkt. No. 176-4, at 33.

> The settlement with Lloyd's included: (1) Lloyd's payment of a civil penalty of $5 million; (2) an agreement that Lloyd's would not issue self-defense policies; (3) an agreement that Lloyd's would not participate in any NRA affinity programs, or any other program that does not comply with the New York Insurance Laws; (4) an agreement that the Certain Underwriters at Lloyd's will not issue any group insurance program in New York; (5) a requirement to for the Certain Underwriters at Lloyd's to cancel the coverage provided by the "No Cost Arms Care Firearm Insurance Policy"; (6) a requirement for Certain Underwriters at Lloyd's to non-renew any of the NRA-related insurance programs; (7) an agreement that the Certain Underwriters at Lloyd's will not issue in  New York a policy that provides legal services coverage; and (8) an agreement that the Certain Underwriters at Lloyd's will not pay an illegal rebate.

Schacht Report at 33 (citing Lloyd's Consent Order at 7–10).

Gov. Cuomo, DFS, and Linda Lacewell, the current DFS superintendent, have moved to dismiss claims in the Second Amended Complaint. *See* Dkt. No. 210.  Supt. Vullo has appealed Magistrate Judge Hummel's decision allowing repleading, and moves to dismiss the claims against her in the Second Amended Complaint.  *See* Dkt. No. 211. These motions are not fully briefed and remain pending at this time.

### b. Administrative Charges/Notice of Hearing

DFS served the NRA with a Statement of Charges and Notice of Hearing dated February 4, 2020 to initiate an adjudicatory enforcement hearing.  *See* Rogers Decl., Dkt. No. 176-21, Ex. S (Statement of Charges and Notice of Hearing). The charges allege that on multiple occasions between 2000 and 2019 the NRA violated Insurance Law § 2102 by acting as an unlicensed insurance producer with respect to the Carry Guard and other NRA affinity-insurance programs, and by unlawfully receiving royalties from these programs; that on multiple occasions between 2000 and 2019 the NRA violated Insurance Law § 2117 by aiding an unauthorized insurer by marketing, soliciting, administering, and facilitating the provision of Carry Guard and many of the other NRA affinity-insurance programs in connection with impermissible excess line policies; that the NRA violated Insurance Law § 2122 by advertising for an unauthorized insurer in connection with the Carry Guard program; and that the NRA committed a "determined violation" under Insurance Law § 2402(c)[7] by making materially false and misleading statements during the NRA's marketing of the Carry Guard and other affinity-insurance programs. *Id.*

---

[7]Pursuant to Insurance Law § 2402(c), the term "determined violation" means "any unfair method of competition or any unfair or deceptive act or practice, which is not a defined violation but is determined by the superintendent pursuant to section two thousand four hundred five of this article to be such method, act or practice." N.Y. Ins. Law § 2402(c).

After an adjournment because of the COVID-19 pandemic, the administrative hearing is now scheduled for July 29, 2020, bringing the matter to its present posture.[8]

## III.    Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Monserrate v. N.Y. St. Senate*, 599 F.3d 148, 154 (2d Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  It "is an equitable remedy and an act of discretion by the court." *Am. Civ. Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).  "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Trump v. Deutsche Bank AG*, 943 F.3d 627, 640 (2d Cir. 2019), *cert. granted*, 140 S. Ct. 660 (2019) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). Inasmuch as a preliminary injunction "is an extraordinary and drastic remedy," it "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir.

---

[8]The hearing was originally scheduled for April 6, 2020.  Plaintiff sought an indefinite adjournment claiming that the issues before the Court would overlap with the issues to be determined at the DFS hearing. *See* Rogers Decl.,Ex. T, Dkt. No. 176-22.  The NRA also offered to toll the applicable statute of limitations. *Id.*  The adjournment request was denied by DFS because, it contended, the request failed to show "good cause to adjourn the hearing indefinitely," and because "[t]he federal court will not be determining whether the NRA violated the Insurance Law as described in the Statement of Charges and, therefore, there is no risk of either the Department adjudicating 'core factual elements' of the NRA's claims in the Federal Lawsuit and or of inconsistent findings as you assert." Rogers Decl. Ex. U, Dkt. No. 176-23.  Nevertheless, DFS advised the Plaintiff that it still had the ability to request an adjournment from the hearing officer pursuant to 23 NYCRR §2.8(b). *Id.*
Plaintiff then proceeded by order to show cause seeking a preliminary injunction staying the hearing. The matter was placed on the Court's calendar near the end of March but on March 17, 2020, Plaintiff notified the Court that in light of the COVID-19 pandemic the April 6, 2020 hearing was adjourned to a date to-be-determined in July 2020 thus "alleviat[ing] some of the time sensitivity associated with the NRA's motion."  Dkt. No. 185.  Recently, the NRA notified the Court that the DFS hearing is scheduled for July 29, 2020.

2005)(internal quotation marks and citation omitted).

## IV. ANALYSIS

### a. Preliminary Injunction

Plaintiff contends that when DFS learned that the NRA possessed "facts and documents which will expose the full extent of its unconstitutional activities,"[9] DFS "rushed to commence an administrative proceeding which would usurp the adjudication of key factual issues before this Court—diverting them to a DFS-controlled tribunal rather than an Article III forum and a New York jury," thereby making a stay appropriate "to preserve [Plaintiff's] day in court." Pl. Mem. L., Dkt. No. 176-1, at 2.  Plaintiff argues that DFS's enforcement proceeding would raise factual issues overlapping with claims before this Court, and "purport to resolve them in a nonpublic forum lacking rigorous procedural or evidentiary safeguards and presided-over by a DFS employee." *Id.* at 3.  Plaintiff maintains that DFS's conduct implicates concerns of conventional forum shopping that should be met with skepticism by this Court. *Id.*  Plaintiff asserts that "[w]here, as here, the substance of an imminent or incipient administrative proceeding would 'overlap with factual issues' raised by an already-pending federal lawsuit (thereby creating a risk of inconsistent findings), a federal injunction halting the administrative proceeding is warranted." *Id.* (quoting *Schoolcraft v. City of New York*, 955 F. Supp. 2d 192, 195 (S.D.N.Y. 2013)).  Plaintiff maintains that because of this overlap, "DFS's charges present a risk of inconsistent adjudications that would complicate this federal case," and that could "potential[ly]

---

[9]Plaintiff is referring to a statement made by its attorney at a December 4, 2019 conference before Magistrate Judge Hummel addressed to whether the NRA should be allowed to file a second amended complaint asserting a selective enforcement claim against Supt. Vullo.  This statement indicates that the NRA possessed evidence that Supt. Vullo was aware that functionally equivalent non-NRA affinity insurance programs existed but she determined to keep the DFS enforcement focus solely on the NRA programs.

preclu[de] . . . the Court's ability to decide the case before it." *Id.* at 10, 11.  The NRA

argues that "[i]f DFS is permitted to proceed with an administrative hearing adjudicating the

same issues raised in this case . . . , the NRA's ability to prosecute its claims could be

gravely compromised, including due to potential collateral-estoppel effects." *Id.* at 20.

There is no dispute that the administrative charges arise from the DFS investigation

commenced in 2017 that pre-dates the instant action and that initially focused on the Carry

Guard program.  *See* Jacobi Decl., Dkt. No. 183-1, ¶¶ 5-17 (discussing the evolution of the

Carry Guard investigation, and the reasons for the charges and the hearing involving the

NRA); Pl. Mem. L., Dkt. No. 176-1, at 2 ("The NRA's claims arise from an investigation

commenced by DFS in 2017, based on information provided by an anti-NRA activist group,

regarding certain insurance products offered to NRA members. The DFS investigation

continued during the pendency of this case, as the NRA never asked the Court to enjoin its

progress.")(footnote omitted).  The record is also clear that since at least 2018, DFS has

suspected that the NRA was actively marketing and soliciting for its affinity-insurance

programs without a license to conduct insurance business in New York.  *See, e.g.,* 11/16/18

Dec. & Ord., Dkt. No, 56, at 10-11 (Noting that DFS's May 2 & 7, 2018 press releases

announcing the Lockton and Chubb consent orders both indicate that the NRA, "which does

not have a license from DFS to conduct insurance business in New York, actively marketed

and solicited for the Carry Guard program . . . .")(citation omitted);  Pl. Mem. L., Dkt. No.

176-1, at 11 ("Defendants have, time and again, intentionally and explicitly put into

issue—in this case—the NRA's alleged 'violations of New York Insurance Law' and 'illegal

conduct.'")(citing Defendants' July 2 and August 3, 2018 briefs on two prior motions in this

case).  Under these circumstances, the timing of the DFS hearing alone does not warrant a preliminary injunction.   That being the case, the Court turns to Plaintiff's irreparable harm arguments all of which are premised on the NRA's contentions that there will be an overlap of matters in this court and in the administrative proceeding. *See* Pl. Mem. L., Dkt. No. 176-1, at 12-15.

### 1. Irreparable Harm

"'[P]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Borey v. National Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991) (quoting *Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)).  To demonstrate irreparable harm, Plaintiff must show an "injury that is neither remote nor speculative, but actual and imminent." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citations and internal quotation marks omitted); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 111–12 (1983) (injunctive relief cannot be provided if claimed injury is speculative or remote).  A court must look to what, if any, consequences will ensue should an injunction not be issued and then assess whether those consequences would violate the plaintiff's rights. *Time Warner Cable v. Bloomberg*, 118 F.3d 917, 924 (2d Cir. 1997).

### 2. Plaintiff's Irreparable Harm Arguments

First, Plaintiff contends that because the NRA's federal lawsuit is based on First and Fourteenth Amendment rights the deprivation of which creates a presumption of irreparable harm, and because elements of its speech-based retaliation and selective-enforcement

claims overlap with issues sought to be adjudicated administratively, it will be irreparably

harmed if core constitutional issues are adjudicated in the defendant-friendly administrative

hearing.  Pl. Mem. L. at 13; *see* Miller Decl., Dkt. No. 176-24, ¶ 16.[10]   While it is true that

the loss of constitutional rights for even minimal periods of time generally creates a

presumption of irreparable harm, *see Donohue v. Mangano*, 886 F. Supp. 2d 126, 150

(E.D.N.Y. 2012), Plaintiff must establish a causal link between the injunction it seeks and

alleged deprivations of its First and Fourteenth Amendment rights.[11] *See, e.g., Bronx*

*Household of Faith v. Bd. of Educ*., 331 F.3d 342, 350 (2d Cir. 2003)("[I]n instances where a

plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the

plaintiff must establish a causal link between the injunction sought and the alleged injury,

that is, the plaintiff must demonstrate that the injunction will prevent the feared deprivation

of free speech rights. The Supreme Court instructs . . . that to establish a cognizable claim

founded on the chilling of First Amendment rights, a party must articulate a 'specific present

objective harm or a threat of specific future harm.'")(quoting *Laird v. Tatum*, 408 U.S. 1, 14

(1972)); *Time Warner Cable*, 118 F.3d at 924 ("[W]e think it often will be more appropriate

to determine irreparable injury by considering what adverse factual consequences the

plaintiff apprehends if an injunction is not issued, and then considering whether the infliction

of those consequences is likely to violate any of the plaintiff's rights.") (internal citations and

---

[10]("When there is a prima facie entitlement to relief from violations of a constitutional right, irreparable harm is presumed, and no separate showing of harm is necessary.  When a party alleges the violation of its rights under the Free Speech and Equal Protection Clauses of the United States Constitution, courts in this Circuit have recognized that the interests involved are enormously important, and the potential harms are correspondingly grave.  The NRA asserts that its constitutional rights have been violated by DFS. Subjecting the NRA to an enforcement proceeding before the very agency the NRA has alleged violated its rights surely amplifies already serious injuries.")(citations omitted)

[11]Plaintiff does not challenge the constitutionality of the Insurance Law and does not claim that its procedural due process rights will be violated by the hearing.

quotation marks omitted).  Plaintiff fails to clearly establish this causal link.

Plaintiff does not allege the DFS hearing itself will violate its equal protection rights. While the NRA asserted at oral argument that "we think there's going to be significant evidence that the state pursued this course of enforcement specifically in an effort to retaliate against the NRA for speech and inhibit the NRA's future speech," Oral Argument Trans. ("Trans."), at 18, there is no claim before the Court that the enforcement action against the NRA supports its speech-based claims.  Furthermore, Plaintiff has provided no authority for the proposition that an ostensibly valid enforcement action should be enjoined because the respondent thinks the administrative action was commenced to retaliate for speech or to inhibit future speech.  Until the administrative charges are adjudicated, any argument that the administrative action is unfounded and based on illegal retaliatory motives rests on speculation and conjecture, which is insufficient to support an irreparable harm finding.  *See* G*rand River,* 481 F.3d at 66.   Further, the sought-after injunction would delay the adjudication of the alleged Insurance Law violations for an indefinite period of time while the instant case, which has already been pending for two years and just recently saw an amended complaint filed, proceeds through to culmination.  Under these circumstances, the Court declines to enjoin the administrative hearing based solely on Plaintiff's belief the hearing will result in a deprivation of its free speech rights.

Still further, Plaintiff fails to clearly demonstrate that there will be the asserted overlap of issues impacting Plaintiff's speech-based retaliation and selective enforcement claims. Plaintiff supports its argument of an overlap with an expert witness declaration from John R. Cashin, an attorney, semi-retired insurance company executive, and former NYS Deputy Superintendent of Insurance.  *See* Cashin Decl. Dkt. No. 176-26.  Mr. Cashin opines:

19. In an administrative enforcement proceeding conducted by DFS regarding purported violations of New York Insurance Law §§ 2102 and 2117, the parties are highly likely to present evidence, and the hearing officer is highly likely to make factual determinations, regarding: (i) whether, and to what extent, comparable conduct occurred in the marketplace; and (ii) if violations occurred, whether similarly situated violators were treated similarly by New York State. In other words, it is highly likely that such a proceeding would adjudicate factual issues overlapping with those before this Court.

* * *

24. When penalties are assessed pursuant to [N.Y. Ins. Law §§ 2102 and 2117] and similar provisions of New York Insurance Law, one key factual consideration is whether the allegedly violative conduct was engaged in by others in the marketplace; relatedly, the hearing officer considers whether, and to what extent, similarly situated violators were penalized. If a party charged with violations asserted selective-enforcement and retaliation arguments akin to those asserted by the NRA in this case, the party would effectively be forced to plead and adjudicate those arguments within the confines of the administrative hearing, lest a penalty be assessed which failed to consider such arguments. Similarly, regulatory counsel would be expected to present evidence of comparative fines and penalties levied for comparable conduct. Based on my experience conducting such hearings and my review of the NRA's pleadings and proposed amended pleading, it is my opinion that any DFS adjudicatory procedure regarding purported violations of N.Y. Ins. Law § 2102 or § 2117 would be highly likely to involve factual issues overlapping with those before the Court.

*Id.* at ¶¶ 19, 24.

As Defendants argue, however, the subject matter of the administrative hearing is to determine whether the NRA violated the Insurance Law, not whether Defendants retaliated against the NRA for its speech or whether Sup. Vullo selectively enforced the Insurance Law against the NRA's affinity-insurance programs.   While Mr. Cashin asserts that at the administrative hearing "the parties are highly likely to present evidence, and the hearing officer is highly likely to make factual determinations, regarding: (i) whether, and to what extent, comparable conduct occurred in the marketplace; and (ii) if violations occurred, whether similarly situated violators were treated similarly by New York State," Cashin Decl.

16

¶ 19, his opinion appears to focus on the method of setting a penalty if a violation of the Insurance Law is found. *See* Cashin Decl. ¶ 24.  Plaintiff's arguments to the Court support this interpretation.  Plaintiff's counsel referenced Mr. Cashin's opinion at oral argument as stating "a Gestalt consideration that goes into the penalty assessment," Trans. at 18, argued that DFS's treatment of comparators is relevant to a penalty assessment, *id.* at 4-5, and asserted that "as Mr. Cashin explained in his declaration . . . , the mere assessment of a violation doesn't end the tribunal's inquiry. You also have to decide how significant the violation was and how heavily it should be punished and that's where the comparator analysis comes in." *Id.* at 24.  Plaintiff also referenced Mr. Cashin's opinion in its brief when it argued that "[e]lements invariably considered at [DFS enforcement] hearings include the alleged violator's level of culpability—for example, whether the NRA formulated marketing communications itself, or simply relied on templates prepared by Lockton—and whether comparator entities engaged in the same or similar conduct." Pl. Mem. L. at 10.  The use of the phrase "level of culpability" in this context appears to presuppose a finding of guilt against the respondent and indicate that the evidence about comparator entities, if offered at the hearing, would be directed to a penalty assessment.

Plaintiff fails to clearly demonstrate how a finding about comparable conduct occurring in the marketplace for purposes of setting a penalty overlaps with or usurps the central determinations on Plaintiff's speech-based retaliation or selective enforcement claims.  To establish a speech-based retaliation claim, "a plaintiff must show: (1) [it] has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [its] exercise of that right; and (3) the defendant's actions caused [it] some injury." *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).  Plaintiff's

17

speech-based retaliation claims are based on allegations that Defendants engaged in

backroom exhortations to regulated entities to end their associations with the NRA, public

statements encouraging such conduct, and public announcement of the Consent Orders

entered into by the NRA's insurance providers.  Plaintiff's evidence indicates that

comparable conduct in the marketplace would be relevant to setting a penalty in the

administrative proceeding only if the comparators admitted to, or were found guilty of,

violating the Insurance Law.  *See* Cashin Decl. ¶ 24 ("When penalties are assessed . . . ,

one key factual consideration is *whether the allegedly violative conduct was engaged in by*

*others* in the marketplace; relatedly, the hearing officer considers whether, and to what

extent, *similarly situated violators* were penalized. . . .  Similarly, regulatory counsel would

be expected to *present evidence of comparative fines and penalties levied for comparable*

*conduct*.")(emphases added).  While the *lack* of DFS enforcement against similarly situated

comparators could conceivably demonstrate that DFS's investigation of Plaintiff's affinity-

insurance providers amounted to a pretext for illegal speech-based retaliation against

Plaintiff, *see Franzon v. Massena Memorial Hospital*, 32 F. Supp.2d 528, 533 (N.D.N.Y.

1998),[12] the Court fails to see, and Plaintiff fails to clearly demonstrate, how evidence that

---

[12]In *Franzon*, Dr. Franzon "specifically alleged [in the complaint] that defendants' retaliation is evidenced by the disparate treatment he has received for exercising his First Amendment rights compared to other physicians and, in the alternative, that evidence of disparate treatment would tend to establish that any legitimate reasons proffered by defendants for their actions are a pretext." *Franzon,* 32 F. Supp.2d at 533. The Court allowed discovery of certain information concerning those other physicians as potentially providing probative evidence relevant to the alleged disparate treatment. *Id.*  In reaching this conclusion, the Court referenced and distinguished its decision in a prior case, *DiMarco v. Rome Hosp.*, 88–CV–1258 (N.D.N.Y. Nov. 27, 1992), where it held that "[e]vidence that other physicians were treated differently or similarly is not necessary to the success of Plaintiff's [First Amendment retaliation] claim." *Franzon,*  32 F. Supp.2d 533 (quoting *DiMarco*).  The Court distinguished *DiMarco* because the plaintiff in that case did not allege that the First Amendment retaliation was evidenced by the disparate treatment he received after having engaged in protected speech. *Id.*  The Court noted that "the plaintiff in *DiMarco* focused solely on conduct directed at him, without any reference to or comparison with others similarly situated." *Id.*

(continued...)

other entities *violated* the Insurance Law (a presumptive precondition to the relevance of this evidence for purposes of setting a penalty) overlaps or usurps central determinations on Plaintiff's speech-based retaliation claims.

Plaintiff does no better with the selective enforcement claims. To establish a selective enforcement claim a plaintiff must show that (1) "'[it] was treated differently from other similarly situated businesses'" and (2) "'such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 40 (2d Cir. 2018) (quoting *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007)). Plaintiff's selective enforcement claims contend that Supt. Vullo violated the NRA's equal protection rights by *failing* to prosecute affinity-insurance programs similarly situated to the NRA-related programs addressed in the Consent Orders entered by Lockton, Chubb, and Lloyd's. Again, the Court fails to see, and Plaintiff fails to clearly demonstrate, how evidence that other entities *violated* the Insurance Law overlaps with or usurps the central determination on the selective enforcement claims.

To the extent Plaintiff argues that evidence other than comparators' Insurance Law violations may be offered at the hearing and will overlap with its federal claims, its arguments are unavailing. Plaintiff appears to assert that evidence from its affinity-insurance providers could establish that the enforcement proceeding against it was

---

[12](...continued)
Here, the NRA does not specifically assert in its speech-based claims that it was treated differently from similarly situated organizations. *See* 2nd Am. Compl. at ¶¶ 86-107. Even if such a contention could be inferred from the general allegations in the Second Amended Complaint, *see id.* at ¶¶ 36-37, any argument that DFS lacked legitimate reasons to investigate Plaintiff's affinity-insurance providers but instead used its investigations as a pretext for discrimination against the NRA is considerably weakened by the fact that these insurance providers entered into Consent Orders in which they admitted violations of the Insurance Law.

"pursued in a manner that is unfair, disproportionate, [and] reflects clear and constitutional selective enforcement." Trans. at 24; *see also id.* at 6.  However, and despite that Plaintiff asserts that its insurance providers were coerced into entering Consent Orders, the fact remains that these entities agreed that they violated the Insurance Law.   Plaintiff fails to clearly demonstrate how evidence demonstrating that Plaintiff's insurance providers were coerced into entering the Consent Orders would be relevant to Plaintiff's guilt or a penalty at the administrative hearing, and its contention that this issue would be entertained at the administrative hearing appears to be based on mere speculation.  Moreover, a finding against Plaintiff at the enforcement proceeding would not foreclose the NRA's claims in this court.

Further, Plaintiff's contention that it might present evidence that its conduct was no different than other entities that provide affinity-insurance programs fails to clearly establish the evidence would overlap with its federal court claims.  Such evidence, if presented, would not overlap with the core determinations on the speech-based retaliation claims that require a showing that Defendants took or threatened adverse action against entities associated with the NRA.  And while this evidence might overlap with an issue in the selective enforcement claims (*i.e.* that similarly situated programs existed), it would not overlap with the core issue that Sup. Vullo was aware of these similarly situated programs yet failed to prosecute them.  Rather, as Defendants argue, Plaintiff appears to be attempting to insert ancillary matters into the hearing in attempt to obtain an injunction and delay the enforcement hearing.  *See* Trans. at 21-22.

Absent a clear demonstration that there will be an overlap of material issues on the claims in this court and those that will be adjudicated in the administrative hearing, Plaintiff's

argument that it will suffer irreparable harm to its constitutional claims if the hearing

examiner rules upon comparable industry conduct is without merit.   The same conclusion is

reached as to Plaintiff's argument that it will suffer irreparable harm because NRA

personnel may testify "'on the very topics at issue in this pending litigation [] but outside the

bounds of the judicial process and on defendant's terms.'" Pl. Mem. L. at 13 (quoting

*Schoolcraft*, 955 F. Supp. 2d at 199).  For reasons discussed above, Plaintiff has not clearly

demonstrated that there will be an overlap of material issues on the claims in this court and

those that will be adjudicated in the administrative hearing.  Thus, *Schoolcraft*, the case

Plaintiff primarily relies on, is inapposite.  Further, even assuming that the rules of

discovery, evidence, and relevance in the administrative proceeding are not on par with

comparable federal rules, Plaintiff has not clearly demonstrated that issues central to its

constitutional claims will be addressed in the administrative hearing.  Plaintiff's claim of

irreparable harm in this regard is remote and based on the unsupported speculation that

this testimony will occur, which is an insufficient basis for an irreparable harm finding. *See*

G*rand River,* 481 F.3d at 66.

Plaintiff also argues that it will suffer irreparable harm because an appeal of an

adverse administrative ruling under Article 78 of the New York Civil Practice Law and Rules

would cause "vital constitutional claims that the NRA pleaded nearly two years ago [to] be

waylaid indefinitely, and . . . be irreparably compromised, subject to the whims of the exact

state agency the NRA has sued," resulting in the lose of access to plenary appellate review

on Plaintiff's constitutional claims. Pl. Mem. L. at 14.  Again, as discussed, the likelihood

that issues central to Plaintiff's constitution claims will be ruled upon at the administrative

hearing is remote and speculative.  Accordingly, there is an insufficient basis for an

irreparable harm finding related to an asserted inability to appeal constitutional issues in an

Article 78 proceeding following a finding of guilt at the administrative hearing. *See* G*rand*

*River,* 481 F.3d at 66.  Moreover, as Defendants argued, the standard of review on an

Article 78 appeal generally is whether there is substantial evidence supporting the core of

the finding at the administrative hearing, "not substantial evidence as to whether somebody

else violated the insurance law, not substantial evidence as to whether or not there was bad

faith in the commencement." Trans. 21;  *see, e.g.,* N.Y. C.P.L.R. 7803(4).[13]

    In addition, Plaintiff argues that "[i]f DFS is permitted to proceed with an

administrative hearing adjudicating the same issues raised in this case . . . , the NRA's

ability to prosecute its claims could be gravely compromised, including due to potential

collateral-estoppel effects." Pl. Mem. L. at 20.  As  addressed above, Plaintiff fails to clearly

demonstrate that issues overlapping with its constitutional claims will be adjudicated in the

administrative hearing.  Without adjudication in the administrative proceeding on issues

impacting the federal claims, collateral estoppel would not preclude Plaintiff from litigating

these issues in federal court. *See Boguslavsky v. Kaplan*, 159 F.3d 715, 719-720 (2d Cir.

1998)(Collateral estoppel "precludes a party from relitigating in a subsequent proceeding an

---

[13] N.Y. C.P.L.R. 7803 provides:

The only questions that may be raised in a proceeding under this article are:
1. whether the body or officer failed to perform a duty enjoined upon it by law; or
2. whether the body or officer proceeded, is proceeding or is about to proceed without or in excess of jurisdiction; or
3. whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed; or
4. whether a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence.

issue of law or fact that has already been decided in a prior proceeding."); *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995)(Collateral estoppel requires four elements: "(1) the issues of both proceedings must be identical, (2) the relevant issues were actually litigated and decided in the prior proceeding, (3) there must have been 'full and fair opportunity' for the litigation of the issues in the prior proceeding, and (4) the issues were necessary to support a valid and final judgment on the merits.").

In the end, the Court finds that Plaintiff has failed to adequately demonstrate that it will suffer irreparable harm if the administrative hearing goes forward.   Absent a clear demonstration of irreparable harm if the sought-after injunction is not issued, Plaintiff's motion for a preliminary injunction must be denied and the Court need not address the remaining preliminary injunction elements.

## V.      PLAINTIFF'S ALTERNATIVE ARGUMENT

Upon finding that preliminary injunction should not issue thereby allowing the administrative hearing to go forward, Plaintiff's alternative argument that DFS's Insurance Law charges should be included as counterclaims in the instant action under Fed. R. Civ. P. 13 is rendered moot.

## VI.     *YOUNGER* ABSTENTION

Because the Court has determined to deny the motion for a preliminary injunction, it need not determine whether to abstain under the *Younger* doctrine.  *See Spargo v. N.Y. State Comm'n on Judicial Conduct*, 351 F.3d 65, 74 (2d Cir. 2003)(*Younger* abstention "is not a jurisdictional bar based on Article III requirements, but instead a prudential limitation

23

on the court's exercise of jurisdiction grounded in equitable considerations of comity."); *see also Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)("Abstention from the exercise of federal jurisdiction is the exception, not the rule."); *Middlesex County Ethics Committee v. Garden State Barr Ass'n*, 457 U.S. 423, 431 (1982)(There is a "strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." ); *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988)("[F]ederal courts have a virtually unflagging obligation to exercise their jurisdiction except in those extraordinary circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest.")(quotation marks omitted).

## VII.   CONCLUSION

For the reasons discussed above, Plaintiff's motion for a preliminary injunction staying the New York State Department of Financial Services administrative hearing to determine whether Plaintiff violated various provisions of the New York Insurance Law, Dkt. No. 176, is **DENIED**.

**IT IS SO ORDERED.**

Dated: July 13, 2020

Thomas J. McAvoy
Senior, U.S. District Judge