**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF | § | |
| AMERICA, | § | |
|       Plaintiff, | § | |
| v. | § | |
| ANDREW CUOMO, both individually and | § | CIVIL CASE NO.  18-CV-00566-TJM- |
| in his official capacity; MARIA T. VULLO, | § | CFH |
| both individually and in her official | § | |
| capacity; and THE NEW YORK STATE | § | |
| DEPARTMENT OF FINANCIAL | § | |
| SERVICES, | § | |
|       Defendants. | § | |

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT VULLO'S APPEAL OF THE GRANT OF PLAINTIFF'S MOTION TO AMEND AND MOTION TO DISMISS TO SECOND AMENDED COMPLAINT

William A. Brewer III (Bar No. 700217)
Sarah B. Rogers (Bar No. 700207)
BREWER, ATTORNEYS & COUNSELORS
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone:  (212) 489-1400
Facsimile:  (212) 751-2849


**ATTORNEYS FOR THE NATIONAL RIFLE ASSOCIATION OF AMERICA**

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ...................................................................................1

II. LEGAL STANDARD .............................................................................................3

III. ARGUMENTS AND AUTHORITIES.......................................................................5

    A.    The Magistrate Judge Appropriately Granted The NRA's Motion To Amend...........................................................................................................5

        1.    The NRA Adequately Established Its Diligence, Especially In The Face of Significant Discovery Delays.......................................5

        2.    Vullo Bears The Burden To Show "Bad Faith"—And Fails.......................7

        3.    Vullo Also Fails To Demonstrate Prejudice That Would Preclude An Amendment.............................................................................9

    D.    The Second Amended Complaint More Than Sufficiently Pleads Selective Enforcement.................................................................................................9

        1.    Vullo Cannot Deny Knowledge Of, Or Escape Liability For, Actions Undertaken By DFS On Her Watch. ...............................9

        2.    The SAC Alleges That Vullo Knew of Comparator Programs And Leveraged That Knowledge To Coerce At Least One NRA Insurer.........11

        3.    The Magistrate Judge Properly Sustained the NRA's "See-No-Evil" Claim........................................................................................16

    E.    Vullo Is Not Entitled to Absolute or Qualified Immunity on Any of the NRA's Claims..............................................................................................16

        1.    Vullo's Conduct Was Investigative In Nature ...........................................17

        2.    Even If Vullo's Conduct Could Not Squarely Be Categorized As "Investigative," The Motion Fails To Demonstrate Vullo Engaged In A "Quasi-Judicial Function." ..............................................19

        3.    Any Ambiguity Regarding Absolute Immunity Should Be Resolved After Discovery.................................................................21

    F.    Vullo Is Not Entitled to Qualified Immunity.........................................................21

        1.    Qualified Immunity Is A Fact-Specific Inquiry That Should Be Undertaken After Fact Discovery. ...........................................22

        2.    The Conduct Alleged By The NRA Was Not "Objectively Reasonable" But, Rather, Violated Clearly Established Constitutional Rights.....................24

IV. CONCLUSION..................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abel v. Morabito*,
  2009 WL 321007 (S.D.N.Y. Feb. 10, 2009) ........................................................... 13, 14

*Anilao v. Spota*,
  2018 WL 6190519 (E.D.N.Y. Nov. 28, 2018) .............................................................. 16

*Anilao v. Spota*,
  774 F. Supp. 2d 457 (E.D.N.Y. 2011) ......................................................................... 19

*Aquastore, Inc. v. Pelseal Techn., LLC*,
  06–CV–0093, 2010 WL 610685 (N.D.N.Y. Feb. 17, 2010) (Scullin, J.) ...................... 1

*Astra Aktiebolag v. Andrx Pharm., Inc.*,
  208 F.R.D. 92 (S.D.N.Y. 2002) ...................................................................................... 5

*Balakrishnan v. Kusel*,
  2009 WL 1291755 (E.D.N.Y. May 8, 2009) ............................................................... 22

*Balintulo v. Ford Motor Co.*,
  796 F.3d 160 (2d Cir. 2015) ........................................................................................... 2

*Bernstein v. City of N.Y.*,
  2007 WL 1573910 (S.D.N.Y. May 24, 2007) .............................................................. 21

*Bernstein v. Village of Wesley Hills*,
  95 F. Supp. 3d 547, 571 (S.D.N.Y. 2015) ................................................................... 13

*Bertuglia v. City of N.Y.*,
  839 F. Supp. 2d 703 (S.D.N.Y. 2012) ......................................................................... 19

*Block v. First Blood Assocs.*,
  763 F. Supp. 746 (S.D.N.Y. 1991), aff'd, 988 F.2d 344 (2d Cir. 1993) ....................... 7

*Boice v. M+W U.S., Inc.*,
  130 F. Supp. 3d 677, 685 (N.D.N.Y. 2015) ................................................................... 1

*Burns v. Citarella*,
  443 F. Supp. 2d 464 (S.D.N.Y. 2006) ......................................................................... 23

*Bush v. City of Utica, N.Y.*,
  558 F. App'x 131 (2d Cir. 2014) ................................................................................. 23

ii

*Children First Found., Inc. v. Martinez*,
  2005 WL 600283 (N.D.N.Y. Mar. 14, 2005) .......................................................22

*Cleavinger v. Saxner*,
  474 U.S. 193 (1985).............................................................................................18

*Contrera v. Langer*,
  314 F. Supp. 3d 562, 567 (S.D.N.Y. 2018)............................................................5

*Cuoco v. Moritsugu*,
  222 F.3d 99 (2d Cir. 2000)..............................................................................22, 23

*DiBlasio v. Novello*,
  344 F.3d 292 (2d Cir. 2003)............................................................................18, 19

*Goel v. Bunge, Ltd.*,
  820 F.3d 554 (2d Cir. 2016)...................................................................................2

*Hafez v. City of Schenectady*,
  894 F. Supp. 2d 207 (N.D.N.Y. 2012) .................................................................13

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982).............................................................................................15

*Harris v. Mills*,
  572 F.3d 66 (2d Cir. 2009).....................................................................................2

*Hayes v. City of Amsterdam*,
  770 N.Y.S.2d 138 (2d Dep't 2003).......................................................................21

*Helft v. Allmerica Fin. Life Ins.*
  *amd Annuity Co.*, No. 1:03-CV-35, 2006 WL 839528 (N.D.N.Y. Mar. 24,
  2006) .......................................................................................................................5

*Hemphill v. Schott*,
  141 F.3d 412 (2d Cir. 1998).................................................................................22

*Hickey v. City of N.Y.*,
  2002 WL 1974058 (S.D.N.Y. Aug. 26, 2002) .....................................................19

*Hill v. City of New York*,
  45 F.3d 653 (2d Cir.1995)...............................................................................16, 19

*Holmes v. Grubman*,
  568 F.3d 329 (2d Cir. 2009)...................................................................................8

*Imbler v. Pachtman*,
  424 U.S. 409 (1976).......................................................................................15, 21

*Jennings v. Hunt Companies, Inc.,*
  367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019) ............................................................2

*Knowlton v. Shaw,*
  704 F.3d 1 (1st Cir. 2013)...............................................................................17

*Lamothe v. Town of Oyster Bay,*
  2012 WL 6720781 (E.D.N.Y. Dec. 27, 2012) ........................................................13

*LaTrieste Rest. v. Village of Port Chester,*
  188 F.3d 65 (2d Cir. 1999)................................................................................14

*Massi v. Flynn,*
  254 F. App'x 84 (2d Cir. 2007) .........................................................................23

*McKenna v. Wright,*
  386 F.3d 432 (2d Cir. 2004)..........................................................................21, 22

*Munoz v. City of N.Y.,*
  2008 WL 464236 (S.D.N.Y. Feb. 20, 2008).........................................................21

*Norton v. Town of Brookhaven,*
  33 F. Supp. 3d 215, 230-31 (E.D.N.Y. 2014) ......................................................16

*Peters v. City of Buffalo,*
  848 F. Supp. 2d 378 (W.D.N.Y. 2012) ................................................................16

*Spiegel v. Adirondack Park Agency,*
  662 F. Supp. 2d 243 (N.D.N.Y. 2009)............................................................12, 13

*Spirit Master Funding, LLC v. Pike Nurseries Acquisition, LLC,*
  287 F.R.D. 680 (N.D. Ga. 2012)...........................................................................5

*Taylor v. Kavanagh,*
  640 F.2d 450 (2d Cir. 1981)..........................................................................15, 16

*Tompkins v. R.J. Reynolds Tobacco Co.,*
  92 F.Supp.2d 70 (N.D.N.Y.2000).........................................................................2

*United States v. Isiofia,*
  370 F.3d 226 (2d Cir.2004)..................................................................................2

*United States v. U.S. Gypsum Co.,*
  333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)...................................................2

*Wandering Dago, Inc. v. N.Y. State Off. Of Gen'l Servs.,*
  2014 WL 12797920 (N.D.N.Y. July 28, 2014) ...................................................8, 10

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ........................................................................................16, 24

**Other Authorities**

Fed. R. Civ. P. 15 ................................................................................................................6

Fed. R. Civ. P. 72(a) ...................................................................................................1, 2, 14

Fed. R. Civ. P. 12(b)(6) ...........................................................................................1, 2, 8, 21

By and through its undersigned counsel, Plaintiff the National Rifle Association of America (the "NRA" or "Plaintiff") hereby submits its Opposition to Defendant Vullo's Appeal of the Grant of Plaintiff's Motion to Amend and Motion to Dismiss the Second Amended Complaint (the "Motion"), as follows:

# I.
## PRELIMINARY STATEMENT

The core allegations in this case involve not only suppression of free speech, but malicious, discriminatory enforcement of otherwise-anodyne insurance regulations against the Governor's political enemies.  Specifically, the NRA alleges that Defendants, including Vullo, knew of widespread affinity-insurance market practices, to which they never gave any enforcement scrutiny until an opportunity arose to work in concert with an influential Democratic pressure group, Everytown for Gun Safety, to enforce technical purported insurance-market infractions in a manner calculated to harm the NRA.

Defendants moved repeatedly to dismiss the NRA's claims and, when such efforts failed, to stonewall discovery regarding their disparate enforcement approach.  On May 9, 2019, the Court granted dismissal of certain selective-enforcement claims without prejudice to re-pleading, explaining that although the NRA had adequately alleged unequal treatment, it must explicitly allege that Defendants "were aware of such violations by the comparators yet consciously declined" to treat those violators as harshly as the NRA.[1]

Thereafter, the NRA diligently sought discovery that would enable it to robustly re-plead its claims in the manner the Court outlined.  This process was not easy, particularly with regard to

---

[1] *See* ECF No. 112 at 11.

1

discovery from the Corporation of Lloyd's, an insurance marketplace which the NRA alleges was targeted by Defendants.  Although DFS is a designated agent for service of process upon Lloyd's, DFS refused to deliver the NRA's subpoena,[2] and stridently opposed any discovery or depositions that would shed light on its interactions with Lloyd's syndicates.

In June of 2019, the NRA achieved a breakthrough: in an attempt to negotiate resolution of the NRA's pending subpoena, Lloyd's America, Inc. ("LAI") provided a small number of documents voluntarily to the NRA, subject to a strict confidentiality order.[3]  Those documents, and additional details which have come to light since that time, paint a stark and troubling picture of Defendants' conduct.    As described in the NRA's amended pleading, former DFS Superintendent Vullo was fully aware of identical market conduct by non-NRA entities, yet leveraged DFS's considerable power over Lloyd's to inflict harm on "gun programs"—irrespective of whether those programs violated the law.   These threats were delivered in off-the-record conversations and surreptitious backroom meetings.  Taken aback by such conduct, insurance-industry insiders privately predicted that the NRA would sue DFS.  They were right.[4]

Noting that the NRA's proposed amended pleading (the now-operative Second Amended Complaint, or "SAC") satisfied the roadmap for amendment articulated by this Court in its May 9, 2019, Order, Magistrate Judge Hummel properly granted the NRA's motion to amend on June 1, 2020 (the "Decision").[5]  The Decision was one of a succession of recent rulings chipping away at a longstanding discovery logjam in this case—coupled with the Court's grant of the NRA's

---

[2] *See, e*.g., ECF No. 101-1.

[3] Consistent with its agreement with LAI, the NRA filed copies of certain documents under seal when this matter was briefed before the Magistrate Judge and redacted details of their contents.

[4] *See* Sealed Exhibits B, C and D, filed respectively as Exhibits F, G and H to Plaintiffs' Motion to Amend, ECF 154-7, 154-8 and 154-9.

[5] *See* ECF No. 202.

appeal of a prior motion-to-compel ruling[6] and the Special Master's recent assessment of Defendants' unfounded privilege claims, the Decision dispels any doubt that Defendants, including Defendant Vullo, will rightly face discovery and scrutiny regarding when, how, and why they chose to target the NRA and its business partners for adverse regulatory action. To forestall this outcome, Defendants have filed and intend to file a coordinated cluster of dilatory appeals and reconsideration requests,[7] including the instant Motion and the accompanying, simultaneously-filed motion by Defendants Cuomo and DFS.[8]   In addition to demanding reconsideration of Magistrate Judge Hummel's June 1, 2020, ruling under the deferential standard set forth in Fed. R. Civ. P. 72(a), Vullo argues yet again that the claims against her should be dismissed under Fed. R. Civ. P. 12(b)(6). Both sets of arguments fail, for the reasons set forth below.

## II.
## LEGAL STANDARD

Under Fed. R. Civ. P. 72(a), "[w]hen considering an appeal from a magistrate judge's ruling on a non-dispositive matter, a district court will modify or set aside any portion of the magistrate judge's ruling that it finds to be 'clearly erroneous or contrary to law.'"[9] This is an exacting standard, requiring the court to arrive at "the definite and firm conviction that a mistake has been

---

[6] *See* ECF No. 188.

[7] Defendants seek to challenge, at minimum, this Court's March 31, 2020 decision clarifying the scope of discovery, the Special Master's long-awaited report and recommendation rejecting several unfounded privilege claims, and Magistrate Judge Hummel's June 1, 2020, decision granting the NRA's motion to amend (which is one subject of this Motion).

[8] *See* ECF No. 210.

[9] *Aquastore, Inc. v. Pelseal Techn., LLC,* 06–CV–0093, 2010 WL 610685, at *2 (N.D.N.Y. Feb. 17, 2010) (Scullin, J.) (quoting 28 U.S.C. § 636[b][1][A]; Fed.R.Civ.P. 72[a] ); *see also Boice v. M+W U.S., Inc.,* 130 F. Supp. 3d 677, 685 (N.D.N.Y. 2015) (same).

committed,"[10] or else find that the challenged ruling "fails to apply or misapplies relevant statutes, case law, or rules of procedure."[11]

Just as Rule 72(a) accords substantial deference to a magistrate's determination, Fed. R. Civ. P. 12(b)(6) requires facts set forth to be construed "in the light most favorable to the plaintiff, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor."[12]  Because a motion to dismiss tests only the legal sufficiency of a plaintiff's claims, inquiry into their substantive merits is inappropriate.[13]  Moreover, because Magistrate Judge Hummel already concluded that the NRA's amended claims would withstand a 12(b)(6) motion to dismiss (when he rejected Defendants' "futility" arguments)[14], the Court upon review must accord this determination the same deference demanded by Fed. R. Civ. P 72(a).  In other words, when evaluating Vullo's dismissal arguments under Fed. R. Civ. P. 12(b)(6), the Court should only grant relief if it assesses that Magistrate Judge Hummel committed clear error, or a mistake of law, when he determined that the NRA stated plausible claims.

---

[10] *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *see also United States v. Isiofia,* 370 F.3d 226, 232 (2d Cir.2004).

[11] *Tompkins v. R.J. Reynolds Tobacco Co.,* 92 F.Supp.2d 70, 74 (N.D.N.Y.2000).

[12] *Jennings v. Hunt Companies, Inc.,* 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019), *citing Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).

[13] *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016) (citing *Global Network Commc'ns, Inc. v. N.Y.C.*, 458 F.3d 150, 155 (2d Cir. 2006)).

[14] Vullo's Motion admits that these arguments overlap (s*ee* Motion note 4), and authorities in this Circuit confirm that the "futility" analysis conducted on a motion to amend incorporates, by definition, the application of the Fed. R. Civ. P. 12(b)(6) standard.  *See, e.g., Balintulo v. Ford Motor Co*., 796 F.3d 160, 164-65 (2d Cir. 2015) (quoting *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)).

4

## III.
## ARGUMENTS AND AUTHORITIES

**A.**     **The Magistrate Judge Appropriately Granted The NRA's Motion To Amend.**

      **1.**     **The NRA Adequately Established Its Diligence, Especially In The Face of Significant Discovery Delays.**

As the Decision acknowledges, given that the Court's ruling dismissing the NRA's selective enforcement claim without prejudice to repleading did not occur until May 9, 2019—over three months after the scheduling-order deadline for amended pleadings—the NRA could not under any circumstances have amended its complaint subject to that deadline.  After its selective enforcement claims were dismissed without prejudice to re-pleading, the NRA pursued a swift, multi-pronged strategy to obtain documents and information that would substantiate the factual allegations this Court's order required.  Most significantly, the NRA sought both documents and deposition testimony from various nonparty underwriting syndicates, their managing agents, and affiliates that comprise and oversee the Lloyd's of London insurance marketplace ("Lloyd's").  Although Defendant DFS is a registered agent for service upon various overseas Lloyd's entities that do business in New York, DFS refused to effectuate service of the NRA's subpoenas, resulting in motion practice (the "Domestic Service Motion") that remained unresolved for nearly a year.[15]  During the time the Domestic Service Motion remained outstanding, the Magistrate Judge ruled on August 8, 2019, that much of the discovery sought by the NRA from Lloyd's was *per se* irrelevant to this case, which disrupted the NRA's third-party discovery efforts thereafter.  (The NRA's appeal of the August 2019 "relevance" ruling was granted on March 31, 2020).[16]

---

      [15] *See* ECF No. 170 (Feb. 18, 2020 order denying motion to compel service upon Lloyd's filed Apr. 19, 2019).

      [16] *See* ECF No. 188.

5

The NRA also sought discovery through two alternate channels: the Hague Convention, and a subpoena to the domestic Lloyd's affiliate Lloyd's America, Inc. ("LAI"). Unfortunately, LAI ceased complying with the NRA's discovery requests in the wake of the now-overruled "relevance" determination rendered in August 2019. The NRA's motion to serve discovery via the Hague (the "Hague Motion") likewise was not ruled upon until March 6, 2020 when the Magistrate Judge denied it (without prejudice to renewal) pending a ruling by this Court on the NRA's aforementioned appeal.[17] In short, the NRA only had access to a handful of documents which it obtained from LAI prior to the August 2019 "relevance" ruling, and which referenced internal Lloyd's procedures and governance mechanisms with which the NRA had little experience; the documents also referenced other, undisclosed documents and communications that the NRA was unable to obtain prior to the August 2019 "relevance" ruling and ensuing discovery stalemate. Facing these obstacles, and still awaiting resolution of its outstanding Domestic Service Motion and Hague Motion, the NRA undertook additional investigative efforts, including the retention of a consulting expert.[18] Fortunately, the NRA's efforts paid off, yielding proof that undergirds allegations with respect to which Defendants now seek to evade discovery at all costs.

The Decision suggests that the NRA could more forcefully demonstrate diligence if it could "explain . . . how any consulting or investigative work . . . discovered or revealed anything beyond the four corners of the documents" produced by LAI.[19] However, the investigative methods, findings, and opinions of counsel, or a consulting expert retained by counsel, are protected by the

---

[17] *See* ECF No. 181.

[18] *See* ECF No. 169 at 3.

[19] *See* Decision at 13.

work product doctrine.[20]   The Decision's analysis of the diligence issue also omits the subpoena to AGIA served just prior to the NRA's motion to amend its complaint, which the NRA cites in support of the allegation that selective enforcement "continues to this day." [21]   (Of course, subsequent developments since the NRA's motion to amend, including the institution of an enforcement proceeding against the NRA by DFS, likewise bolster this allegation).   In sum, in light of the significant discovery delays faced by the NRA on multiple fronts, the NRA was amply diligent in seeking its amendment.

### 2.   <u>Vullo Bears The Burden To Show "Bad Faith"—And Fails.</u>

Next, Vullo wrongly asserts that it is "[the NRA's] burden to establish an absence of bad faith, not Defendant's burden to prove the opposite;" accordingly, Vullo argues that Magistrate Judge Hummel committed clear error by requiring Vullo to substantiate her accusation of bad faith by the NRA.[22]   In truth, although "the party seeking to amend its pleadings must explain any delay, the party opposing the amendment bears the burden of showing prejudice, bad faith, and futility of the amendment."[23]   Vullo did not make the requisite showing before Magistrate Judge Hummel, nor can she do so now.

---

[20] *See, e.g., Spirit Master Funding, LLC v. Pike Nurseries Acquisition, LLC*, 287 F.R.D. 680, 686 (N.D. Ga. 2012)(sustaining work product claim regarding investigative activities by consulting expert); *Astra Aktiebolag v. Andrx Pharm., Inc.*, 208 F.R.D. 92, 105 (S.D.N.Y. 2002) (same, regarding methods of scientific analysis by consulting expert).

[21] *See* SAC at ¶ 79.

[22] *See* Motion at 8.

[23] *See Contrera v. Langer,* 314 F. Supp. 3d 562, 567 (S.D.N.Y. 2018), (citing and quoting *United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 285 F.Supp.3d 759, 766 (S.D.N.Y. 2018) (internal quotation marks and citations omitted)); *see also Helft v. Allmerica Fin. Life Ins. amd Annuity Co.*, No. 1:03-CV-35, 2006 WL 839528, at *8 (N.D.N.Y. Mar. 24, 2006) (granting motion to amend, where the defendants opposing the amendment "failed to come forth with specific evidence, as is their burden, demonstrating that plaintiffs [we]re acting in bad faith").

Although Vullo makes much of the purported "shifting" factual support for the NRA's selective-enforcement claim, Vullo cites no authority for the proposition that an expanded set of facts, set forth in an amended pleading, constitutes *per se* evidence of "bad faith" sufficient to bar an amendment and prevent adjudication of newly pleaded claims on their merits. Moreover, through no fault of the NRA, considerable time elapsed between the filing of the NRA's prior operative pleading (the First Amended Complaint dated July 20, 2018) and the NRA's first inkling that an additional amendment might be required (which occurred when the Court dismissed the NRA's selective-enforcement claim without prejudice in May 2019). It is no surprise, and no sign of "bad faith," that the long pendency of a high-profile case and the contemporaneous, continuing, diligent investigation by the NRA (including eventual access to third-party discovery) revealed facts which modified some details of the NRA's selective-enforcement allegations. Given that the NRA's "underlying claim has not drastically changed," Vullo's allegation of bad faith fails.[24]

Nor can Vullo establish bad faith by insisting that certain documents produced by LAI (which Magistrate Judge Hummel did not review, let alone rely upon) fail to prove the NRA's allegations against her. Although the LAI documents constituted a jumping-off-point for additional investigation and analysis by the NRA and its expert, and although they support the NRA's claims generally, nothing in Fed. R. Civ. P. 15 or 16 requires the NRA to attach, to a motion to amend, documentary evidence sufficient to prove its claims at trial. Such a requirement would be especially nonsensical where, as here, the NRA's amended allegations against Vullo prominently feature of backroom, off-the-record conversations that would have been unlikely to

---

[24] *See* Decision at 14.

be transcribed in any document LAI produced.[25]  Certainly, Vullo cannot show that the contents

of the LAI documents whatsoever suggest "bad faith" by the NRA.

### 3. Vullo Also Fails To Demonstrate Prejudice That Would Preclude An Amendment.

To determine whether a party will be prejudiced by an amended pleading, courts "consider

whether the assertion of the new claim[s] would (i) require the opponent to expend significant

additional resources to conduct discovery and prepare for trial; (ii) significantly delay the

resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another

jurisdiction."[26]  Of course, the party opposing the amendment carries the burden to demonstrate

the foregoing.[27]  The Motion's conclusory insistence that the Second Amended Complaint is "rife

with falsehoods" (it is not) and that the amendment may invite "additional unnecessary motion

practice" (which Vullo has already begun to instigate) do not amount to a showing of prejudice

that precludes the NRA's amended claims.

### B. The Second Amended Complaint More Than Sufficiently Pleads Selective Enforcement.

### 1. Vullo Cannot Deny Knowledge Of, Or Escape Liability For, Actions Undertaken By DFS On Her Watch.

To the extent that it purports to address the SAC's allegations on their substantive merits

(rather than invoking various forms of immunity), the Motion leans heavily on the premise that

---

[25] *See, e.g.*, SAC at ¶ 69 (describing "surreptitiously held meetings").

[26] *See, e.g.*, *Breyette v. Amedore*, 205 F.R.D. 416, 418 (N.D.N.Y. 2002) (internal citations and quotation marks omitted).

[27] *See, e.g.*, *Block v. First Blood Assocs.*, 763 F. Supp. 746, 747 (S.D.N.Y. 1991), *aff'd*, 988 F.2d 344 (2d Cir. 1993) (party opposing amendment did not "adduce[] evidence sufficient to prove" asserted prejudice, notwithstanding alleged delay).

9

Vullo "ran a 1400+ person agency"[28] and, therefore, cannot plausibly be inferred[29] to have known about, or be liable for, selective enforcement by the staff she oversaw. But as the NRA emphasized in its briefing before Magistrate Judge Hummel, the Second Circuit has carefully delineated the circumstances under which the head of an agency may be sued for constitutional violations it committed. Pursuant to a detailed, multi-pronged standard that the Motion does not even purport to address, Vullo is:

> [P]ersonally involved in a constitutional deprivation within the meaning of § 1983 if [s]he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) failure [sic] to act on information indicating that unconstitutional acts were occurring.[30]

The SAC satisfies all of these elements. It alleges that Vullo coordinated closely with her longtime mentor, Defendant Cuomo,[31] to direct a calculated campaign[32] to leverage DFS's enforcement powers to unconstitutionally target and harm the NRA. It alleges that Vullo participated personally in the alleged infraction—delivering "backroom exhortations" in meetings with Lloyd's[33]—and that she was instrumental in promulgating, and enacting, the "policy or custom" set forth in the April 2018 Letters which she signed, and which ominously conveyed

---

[28] *See, e.g.*, Motion at 1; *id.* at 19 (discounting allegations of DFS's knowledge, where Superintendent Vullo is not identified by name).

[29] On a Rule 12(b)(6) motion to dismiss, the Court must draw every reasonable inference in the non-moving party's favor. *See e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009).

[30] *See Wandering Dago, Inc. v. N.Y. State Off. Of Gen'l Servs.*, 2014 WL 12797920, at *10 (N.D.N.Y. July 28, 2014) (citing *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003)).

[31] *See* SAC at ¶ 20.

[32] *See, e.g.*, SAC at ¶ 1.

[33] *See, e.g.*, SAC at ¶ 21.

DFS's disapproval of business ties to "gun promotion organizations."[34]  Moreover, Vullo certainly received "information that unconstitutional acts were occurring."  Not only must Vullo have known that covertly and coercively negotiating disparate treatment of comparator products for political reasons was unconstitutional—she was, at minimum, put on notice of DFS's unconstitutional conduct when the NRA filed this lawsuit in May 2018.  That lawsuit specifically identified comparator insurance products featuring the exact same promotional language as the NRA-related programs that Vullo targeted—yet Vullo's team continued its aggressive, exclusive pursuit of the NRA.[35]  Vullo also personally signed the consent orders coerced by DFS from major insurance-industry firms with which the NRA did business, and it is more than plausible to infer that Vullo understood the reasons for (and worked to advance) the disparate treatment afforded to NRA and non-NRA programs.  Having personally, publicly joined with Defendant Cuomo to spearhead a partisan misuse of state regulatory power, Vullo cannot now avoid liability for the awareness and actions of the agency she led.

2.    **The SAC Alleges That Vullo Knew of Comparator Programs And Leveraged That Knowledge To Coerce At Least One NRA Insurer.**

Even excluding liability attributed to Vullo by reason of her leadership of DFS, the Magistrate Judge accurately noted that the SAC explicitly pleads Vullo's personal involvement in at least some of the "backroom exhortations" that lay at the heart of this case; of course, these allegations, when proven at trial, will establish Vullo's knowledge of similarly situated comparators.  In particular, the SAC alleges that Vullo met personally with executives of regulated institutions, including Lloyd's, to discuss certain alleged technical infractions that were common

---

[34] *See, e.g.*, SAC at ¶ 43.

[35] *See, e.g.*, SAC at ¶ 77-79.

in the affinity-insurance marketplace.[36]  Vullo "made [] clear . . . that DFS was less interested in pursuing [non-NRA] infractions," so long as insurance relationships benefitting "gun groups," especially the NRA, could be diminished or severed.[37]  The SAC alleges a specific time and place for at least one of these meetings, which occurred on or about February 27, 2018, after Vullo gave a speech inveighing against the NRA.[38]

It is difficult to conceive of a more glaring selective-enforcement fact pattern than the one alleged here.  In response, Vullo engages in sleight-of-hand, insisting that DFS's actions with respect to Lockton, Lloyd's, and the NRA should be viewed as entirely disconnected from one another, not as components of the cohesive scheme the NRA alleges; she also argues, confusingly, that the Lloyd's insurance marketplace is not itself a "comparator."[39]

These arguments disingenuously miss the point: Lockton brokered and administered,[40] and Lloyd's underwrote, the vast majority of non-Carry Guard policies offered to NRA members and targeted by Defendants.  Thus, Lockton and Lloyd's performed complementary roles with respect to many of the **same** insurance policies.  That the NRA's allegations prominently feature both entities, and treat the enforcement efforts against them as interrelated, is an inevitable result of this affinity-insurance structure—not a "bait-and-switch" as Vullo oddly claims.[41]  Moreover, it is immaterial that "no entity similarly situated to Lloyd's [or Lockton] was not enforced against."[42] Lloyd's and Lockton were middlemen serving a broad spectrum of non-NRA clients, and were

---

[36] *See* SAC at ¶ 21.

[37] *See id.*

[38] *See id.* at ¶ 67.

[39] *See* Motion at 21.

[40] *See* SAC at ¶ 31.

[41] *See* Motion at 19.

[42] *See* Motion at 22.

targeted by Vullo and the other Defendants **only** with respect to their NRA business. Thus, the relevant "comparators" need not consist solely of non-Lockon brokers, or non-Lloyd's underwriters but, rather, include non-NRA policies and clients serviced by the same middleman firms. Indeed, the SAC alleges that Vullo offered leniency to Lloyd's regarding its non-NRA business, so long as Lloyd's acceded to abandon even lawful NRA insurance policies. Vullo's knowledge of the widespread use of near-identical contract language and affinity-insurance features[43] by Lockton and Lloyd's was an essential ingredient in these backroom conversations, and is more-than-adequately alleged in the SAC.

Vullo also challenges the time at which requisite awareness is attributed to her, insisting that the NRA fails to state a claim unless it can show detailed knowledge of **non-Carry Guard-related comparators** at the time the Carry Guard investigation "commenced" in October 2017.[44] But the SAC explicitly alleges that the scope of DFS's investigation changed after it was initially commenced, expanding from Carry Guard to encompass other NRA-related policies that "had nothing to do with firearms."[45] Thus, even if the Equal Protection Clause required that a selective-enforcement defendant possess detailed knowledge of comparators at the earliest commencement of an investigation, the Court would need to determine **which investigation**—the inquiry ostensibly focused on self-defense features of Carry Guard, or the one focused on pricing and promotional features of life, health, property and casualty insurance which ensued later. However, as detailed below, even this latter approach would create a higher pleading hurdle for the NRA than this Court's own precedent prescribes.

---

[43] *See, e.g.*, SAC ¶ 69, 72.

[44] *See* Motion at 24.

[45] *See* SAC at 36.

13

In *Spiegel v. Adirondack Park Agency*,[46] the Adirondack Park Agency (the "Agency") was alleged to have selectively enforced restrictions contained in an Agency Permit (the "Permit") against the plaintiffs.  The Agency was not aware of Permit violations by other homeowners until it began investigating a neighbor's complaint against the plaintiffs.[47] This was not fatal to the plaintiffs' selective enforcement claim in the least.   Instead, describing virtually the same circumstances found here, the Court noted:

> The parties also agree that after the Agency commenced an investigation into the Spiegel violations, the Spiegels brought other Permit violations to the Agency's attention. Although the Agency opened investigative files on each of the alleged violations, no other Fawn Ridge homeowner has received a cease and desist order, and no other enforcement proceedings have been brought.[48]

In denying the Agency's motion for summary judgment, the Court held:

> [E]vidence that the Agency consciously chose not to investigate or pursue Permit violations by similarly situated homeowners, essentially declining to take official action against the other Permit violators, could establish that the Spiegels were treated selectively. A reasonable jury could conclude that the Spiegels had received intentionally different treatment.[49]

The  same  result  obtains  here.   As  the  name  of  the  claim  implies,  it  is  the  adverse ***enforcement*** that gives rise to liability in a selective-enforcement case, and the moment of such enforcement is when knowledge of comparators must be assessed.[50]   Importantly, although this

---

[46] *Spiegel v. Adirondack Park Agency*, 662 F. Supp. 2d 243 (N.D.N.Y. 2009).

[47] *See id.* at 254.

[48] *See id.*

[49] *See id.*

[50] *See e.g., Abel v. Morabito*, 2009 WL 321007, at *6 (S.D.N.Y. Feb. 10, 2009) (plaintiff must allege "that defendants had knowledge of the similarly situated individuals ***at the time they decided to sue him***.") (emphasis added); *Hafez v. City of Schenectady*, 894 F. Supp. 2d 207, 227 (N.D.N.Y. 2012) (plaintiff "failed to put forth any other similarly situated individuals whose property taxes were not increased (during the same time period)."); *Lamothe v. Town of Oyster Bay*, 2012 WL 6720781, at *9 (E.D.N.Y. Dec. 27, 2012) (defendant "was not aware of [other] building code violations" when it enforced the building code against the plaintiffs); *Bernstein v. Village of Wesley Hills*, 95 F. Supp. 3d 547, 571 (S.D.N.Y. 2015) ("plaintiff must demonstrate that the defendant was aware of similarly-situated entities, and failed to take comparable action against them.").

14

case is at an earlier procedural stage than *Spiegel* (a summary judgment decision), facts which have emerged to date already depict starker enforcement disparities than the *Spiegel* court confronted.  Unlike the Park Agency in *Spiegel*, Defendants here did not even open investigative files on non-NRA entities engaged in identical affinity-insurance market conduct.  In any event, the date that DFS opened its investigation into the NRA's insurance programs is irrelevant. The relevant date or dates is the date DFS took action against the NRA, or its business partners.

Here, the SAC alleges that DFS became aware of "pervasive" comparator market conduct "beginning during the Fall of 2017," at the same time its investigation of the NRA commenced; the SAC even details the nature of such market conduct, and why it was known to be pervasive.[51] The NRA alleges that DFS's knowledge of this pervasive comparator conduct surfaced in surreptitious meetings conducted beginning February 2018.[52]   As 2018 wore on, Defendants (including Vullo) continued to single out the NRA's business partners in preparation for an ultimate enforcement action against the NRA—which was the outcome that Defendants (including Vullo) target from the very beginning.  By the time DFS began entering into formal consent orders with middleman entities such as Lockton and Chubb in May 2019, Defendants, including Vullo, were fully apprised—via covert meetings, and in connection with the Lockton consent-order negotiations[53]—of the existence of comparator programs.  Defendants intentionally spared those programs the unconstitutional scrutiny leveled at the NRA, amounting to selective enforcement claim.

---

[51] *See* SAC at ¶ 65.

[52] *See* SAC at ¶ 69

[53] *See* SAC at ¶¶ 22, 65-66, 110.

**3.** **The Magistrate Judge Properly Sustained the NRA's "See-No-Evil" Claim.**

The Second Circuit has long recognized that even absent specific awareness of comparator conduct, a selective-enforcement claim arises where the government "did not know of prior violations because it adhered to a see-no-evil policy of not enforcing an ordinance, then abandoned that policy with respect to a violator engaged in protected activity."[54] This standard is satisfied, as in *Abel v. Morabito*, where the government "fail[s] to ask whether there [a]re any other individuals who [a]re then similarly situated to the plaintiff" before targeting the plaintiff via a novel, harsh enforcement approach.[55] The Motion utterly ignores the *Abel* and *Tower Properties*[56] decisions cited by the Magistrate Judge, and simply insists that the "see-no-evil" doctrine ought to be interpreted narrowly than those cases mandate. But Vullo's disregard for the authorities on which Magistrate Judge Hummel relies does not make those authorities (or the Decision) clearly erroneous within the meaning of Fed. R. Civ. P. 72(a).

For the foregoing reasons, the NRA adequately alleges Vullo's knowledge for selective-enforcement purposes, and the arguments set forth in Section II.B of the Motion fail.

**C.** **Vullo Is Not Entitled to Absolute or Qualified Immunity on Any of the NRA's Claims.**

Finally, Sections II.A, II.C, and III of the Motion assert various absolute-immunity and qualified-immunity arguments arising from Vullo's prior status as a state official. None suffice to bar the NRA's claims.

---

[54] *See LaTrieste Rest. v. Village of Port Chester*, 188 F.3d 65, 70 n.1 (2d Cir. 1999). *See also Abel v. Morabito*, 2009 WL 321007, at *6 (S.D.N.Y. Feb. 10, 2009).

[55] *See* Decision at 26, citing *Abel*, 2009 WL 321007 at *6.

[56] *See Tower Properties LLC*, 2015 WL 4124499.

Public policy rarely countenances immunizing civil servants for unconstitutional discrimination.[57]  Vullo insists that any official serving as a "prosecutor" must be impervious to constitutional recourse, but Vullo is wrong.  Instead, even to the extent that an official may function as a prosecutor, her immunity from suit is "based upon the same considerations that underlie common-law immunities of judges": namely, those mandating the protection of the judicial process.[58]  Thus, a prosecutor is only absolutely immune when she performs "quasi-judicial" activities that are "intimately associated with the judicial phase" of the enforcement process, such as "the initiation of a prosecution and the presentation of the government's case" before a court or administrative tribunal.[59]  Because Vullo's challenged actions here, including her backroom meetings with Lloyd's, were investigative rather than quasi-judicial, no absolute immunity exists.

## 1.    Vullo's Conduct Was Investigative In Nature.

The Supreme Court has held that absolute immunity does not apply to functions typically performed by investigative agents, even if those functions are conducted by officials, such as prosecutors, who may enjoy immunity in other contexts.[60]  The Second Circuit has made clear that prior to a "formal legal proceeding" being initiated and the existence of probable cause for the proceeding, officials' conduct is deemed to be investigative, and absolute immunity does not exist.[61]  Nor does "the mere fact that a . . . later [proceeding is] convene[d] . . . automatically serve

---

[57] *See Harlow v. Fitzgerald*, 457 U.S. 800, 809 (1982) (rejecting the application of absolute immunity to high government officials because their "greater power . . . affords a greater potential for a regime of lawless conduct") (internal quotation marks omitted).

[58] *See e.g., Imbler v. Pachtman*, 424 U.S. 409, 431 (1976); *see also Taylor v. Kavanagh,* 640 F.2d 450, 452 (2d Cir. 1981).

[59] *See Kavanagh,* 640 F.2d at 452.

[60] *See id.*

[61] *See Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir.1995); *see also Norton v. Town of Brookhaven*, 33 F. Supp. 3d 215, 230-31 (E.D.N.Y. 2014) (denying absolute immunity for the deputy town attorney with respect to investigative work prior to the filing of the formal complaint, including encouraging another defendant to file the

to cloak . . . prior investigatory actions with the protection of absolute immunity."[62]  Courts clearly

distinguish between "'preparing for the presentation of an existing case,' on the one hand, and

attempting to 'furnish evidence on which a prosecution could be based,' on the other hand—only

the former entitles a prosecutor to absolute immunity."[63]  Only the latter category of conduct is at

issue here.[64]  Therefore, with respect to absolute immunity, the Motion fails.

It is undisputed that no judicial or quasi-judicial enforcement proceeding commenced

against the NRA during Vullo's tenure.  The NRA also alleges that Vullo violated its Equal

Protection rights by selectively targeting the NRA in DFS's ***investigation*** of certain affinity

programs, but failing to make similar inquiries into other similar membership affinity programs.[65]

Aware of this defect in her absolute-immunity argument, Vullo relies extensively on a non-binding

First Circuit case, *Knowlton*,[66] which she contends is "squarely on point to" to this case.[67]  In truth,

the facts of *Knowlton* are not remotely identical to those here.[68]  Indeed, the *Knowlton* court

expressly distinguished cases, like this one, which encompass "investigative steps taken to search

---

formal complaint); *Peters v. City of Buffalo*, 848 F. Supp. 2d 378, 386 (W.D.N.Y. 2012) (opining that "'[a]ctions taken prior to the start of a formal legal proceeding are not entitled to absolute immunity because prior to the start of such a formal proceeding, the prosecutor has not stepped into his role as an advocate.'") (quoting *Simon v. City of N.Y.*, 819 F. Supp. 2d 145, 149 (E.D.N.Y.2011)).

[62] *See Anilao v. Spota*, 2018 WL 6190519, at *16 (E.D.N.Y. Nov. 28, 2018).

[63] *See Norton*, 33 F. Supp. 3d at 231 (quoting *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998)).

[64] *Cf. White v. Lee*, 227 F.3d 1214, 1228-29 (9th Cir. 2000) (United States Department of Housing and Urban Development officials could be held liable for investigation that threatened free speech).

[65] *See* SAC at ¶¶ 36-37.

[66] *See* Motion at 13.

[67] *See id.*, at 8.

[68] In *Knowlton*, an insurance-company employee who had been terminated pursuant to a consent decree between his employer and a state insurance regulator challenged his dismissal, asserting civil rights violations and various torts.  Noting specifically that plaintiff "fail[ed] to fully develop th[e] argument" that state officials' actions were investigative rather than prosecutorial in nature, the First Circuit upheld dismissal on absolute-immunity grounds. *See Knowlton v. Shaw*, 704 F.3d 1, 7 (1st Cir. 2013).

for 'clues and corroboration'" (such as the issuance of subpoenas)[69] or actions taken "during the preliminary investigation" of a potential offense (such as Vullo's alleged early coordination with Everytown and Cuomo, and later backroom meetings with Lloyd's, which sought to target the NRA for political reasons).[70]

### 2.   Even If Vullo's Conduct Could Not Squarely Be Categorized As "Investigative," The Motion Fails To Demonstrate Vullo Engaged In A "Quasi-Judicial Function."

Although an executive official's exercise of her investigative function represents one clear situation where no "quasi-judicial function" (thus, no absolute immunity) exists, the inquiry does not end there. Even if the actions challenged by the NRA were not obviously investigative (and they are), absolute immunity would require that Vullo prove her actions were "quasi-judicial" pursuant to a six-factor test established by the United States Supreme Court. These factors, commonly known as the *Butz* factors, are:

> (1) the need to assure that the individual can perform his functions without harassment or intimidation; (2) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (3) insulation from political influence; (4) the importance of precedent; (5) the adversary nature of the process; and (6) the correctability of error on appeal.[71]

Defendants do not even mention these factors in their Motion, and factors two through six, in particular, show that absolute immunity cannot apply to Vullo in this action.

Although there are some safeguards to protect parties from unconstitutional conduct by the DFS Superintendent, the efficacy of those safeguards is diminished by other provisions of the

---

[69] *See id.* at 8 (internal citations omitted).

[70] *See id.*; SAC at ¶¶ 34-37.

[71] *See Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985).

Financial Services Law.  Specifically, although a party is entitled to notice and a hearing, the "independence" of any hearing is severely undermined because it is held before the Superintendent or an individual directly designated by the Superintendent.  Additionally, the hearing officer only has the power to suggest a course of action, while the Superintendent has the final authority to reject the recommendation and issue whatever order she desires.[72]  In short, Vullo has virtually unfettered ability to act in an unconstitutional manner without appropriate safeguards.[73]

The third *Butz* factor, insulation from political influence, weighs heavily against absolute immunity because Vullo serves at the will of the Governor.[74]  Additionally, no provision of the Financial Services Law or the Insurance Law indicates that DFS or its Superintendent place any value on precedent when making decisions with respect to violations of the Insurance Law—nor has Vullo presented any such evidence.  Furthermore, the issuance of the Consent Orders (or any future order against the NRA) lacked key elements of an adversarial proceeding, such as a hearing in front of a "neutral decision maker and evidentiary rules."[75]

Finally, *Butz* also requires the Court to consider whether Vullo's actions are "correctabl[e] on appeal."  While an action taken by Vullo could be reviewed in an Article 78 proceeding, "in the context of determining whether absolute immunity is appropriate, Article 78 proceedings are generally not considered adequate avenues for 'appeal.'"[76]

---

[72] *See* N.Y. Fin. Serv. § 305 (McKinney).

[73] *See DiBlasio v. Novello*, 344 F.3d 292, 299 (2d Cir. 2003).

[74] *See* N.Y. Fin. Serv. § 202(a) (McKinney) ("The head of [DFS], . . . shall be appointed by the governor [and] . . . shall hold office *at the pleasure of the governor*.") (emphasis added); *see also DiBlasio*, 344 F.3d at 298 (holding that if "the commissioner of health 'serves at the will of the Governor,' . . . it would be improper to characterize the commissioner as insulated from political influence").

[75] *See DiBlasio*, 344 F.3d at 299; N.Y. Fin. Serv. § 305(e) (McKinney).

[76] *See DiBlasio*, 344 F.3d at 299 (quoting *Young v. Selsky*, 41 F.3d 47, 54 (2d Cir. 1994)).

20

Accordingly, even if the Court determines Vullo's action extend beyond mere investigatory functions, her conduct still does not entitle her to absolute immunity.

### 3.   Any Ambiguity Regarding Absolute Immunity Should Be Resolved After Discovery.

Finally, "when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss."[77]   The NRA believes that Vullo's contentions regarding absolute immunity can readily be rejected based on the four corners of the SAC.  However, to the extent that any doubt remains, the Court should defer resolution of this issue until after fact discovery.

### D.   Vullo Is Not Entitled to Qualified Immunity.

Next, Vullo invokes qualified immunity with respect to both the NRA's First Amendment and Equal Protection claims.  Vullo argues that because the extensive constellation of troubling facts alleged by the NRA includes public statements by Vullo expressing viewpoint-based animus against it, Vullo could not have known that Defendants' calculated campaign to deprive the NRA of insurance and banking services by threatening and punishing its business partners violated any clearly established First Amendment[78] or Equal Protection right.[79]   Vullo further argues that the implications of failing to immunize her are "chilling indeed":   under a regime where the

---

[77] *See Hill*, 45 F.3d at 663; *see also Bertuglia v. City of N.Y.*, 839 F. Supp. 2d 703, 732 (S.D.N.Y. 2012) (delaying decision on whether a prosecutor was immune in an abuse of process claim because the role the prosecutor played "is a factual dispute that cannot be resolved on this motion [to dismiss]"); *Anilao v. Spota*, 774 F. Supp. 2d 457, 485 (E.D.N.Y. 2011) (deferring judgment on whether the prosecutors were acting as investigators or advocates in Section 1983 case); *Hickey v. City of N.Y.*, 2002 WL 1974058, at *4 (S.D.N.Y. Aug. 26, 2002) (reserving judgment on whether prosecutors were immune from false arrest and conspiracy claims since "the presence or absence of absolute immunity turns on what the prosecutor is alleged to have done, and not on the legal theory advanced or the label attached to the cause of action").

[78] *See* Motion Section III.

[79] *See id.* Section II.C.

government's open, contemporaneous expression of political hostility toward an investigative target can even be mentioned in a selective-enforcement or retaliation lawsuit, the Motion insists, "political foes of government regulators could simply flout insurance laws."[80]  This is a meritless red herring.  As the Court previously, rightly held, "Second Amendment viewpoint animus"[81] is relevant to the NRA's constitutional claims, even if pure government speech expressing such animus cannot be dispositive of those claims.  Thus, the fact that New York's head financial regulator openly declared war on the NRA cannot immunize her from constitutional scrutiny regarding her motives and methods.  Even the barest such scrutiny upholds the NRA's claims against Vullo, especially at the pleading stage.

### 1.   Qualified Immunity Is A Fact-Specific Inquiry That Should Be Undertaken After Fact Discovery.

Qualified immunity rarely supports a motion to dismiss and does not do so here.[82]  Given the nature of Defendants' attacks on the NRA, dismissal on grounds of qualified immunity would be particularly inappropriate.  Understanding the nature of Vullo's decision-making, and the circumstances and motivation giving rise to it, requires detailed factual analysis that cannot be definitively ascertained at this stage.[83]  The Supreme Court has cautioned that "[t]he fate of an

---

[80] *See id.* at 28.

[81] *See* ECF No. 188 at 9.

[82] *See McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004) (holding that a qualified immunity defense may be presented during a motion to dismiss, but "the defense faces a formidable hurdle when advanced . . . at this preliminary stage"); *see also Jones*, 465 F.3d at 63-64 (refusing to grant summary judgment on qualified immunity grounds because of factual disputes); *Hayes v. City of Amsterdam*, 770 N.Y.S.2d 138, 140-41 (2d Dep't 2003) (same); *Munoz v. City of N.Y.*, 2008 WL 464236, at *7 n.6 (S.D.N.Y. Feb. 20, 2008) (same).

[83] *See Munoz*, 2008 WL 464236, at *7 n.6 ("Clearly, without a factual resolution of the sharply conflicting versions of these events, it is not possible to determine whether defendants are qualifiedly immune.") (internal quotation marks omitted); *see also Bernstein v. City of N.Y.*, 2007 WL 1573910, at *9 (S.D.N.Y. May 24, 2007) ("Because the qualified immunity defense necessarily involves a fact-specific inquiry, '[i]t is generally premature to address the defense of qualified immunity in a motion to dismiss pursuant to [Rule] 12(b)(6).'") (quoting *Walker v. Mendoza*, 2000 WL 915070, at *7 (E.D.N.Y. June 27, 2000) (alterations in original)).

official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence *at trial*."[84]

The Second Circuit has explained that "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route."[85]  "Not only must the facts supporting the defense appear on the face of the complaint, but . . . the motion may be granted *only where it appears beyond doubt* that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."[86]  Therefore, the Court is bound to not only make all reasonable inferences in the NRA's favor, but may only rely on allegations in the SAC to *support* any application of qualified immunity.[87]  Defendants fail, however, to identify any allegations in the SAC that warrant granting qualified immunity.

It would be error for the Court to dismiss the NRA's Equal Protection or First Amendment claims on the grounds of qualified immunity because such a defense is highly fact specific.[88] Accordingly, the Court should require them to prove entitlement to this defense at a later stage.[89]

---

[84] *See Imbler*, 424 U.S. at 419 n.13 (emphasis added).

[85] *See McKenna*, 386 F.3d at 436.

[86] *See id.* (internal quotation marks and citation omitted) (emphasis added).

[87] *See id.*

[88] *See Balakrishnan v. Kusel*, 2009 WL 1291755, at *9 (E.D.N.Y. May 8, 2009) (determining that "genuine issues of material fact preclude summary judgment on plaintiff's selective enforcement claim also preclude a grant of qualified immunity"); *see also Hemphill v. Schott*, 141 F.3d 412, 419 (2d Cir. 1998) (refusing to apply qualified immunity and explaining that "application of the doctrine [of qualified immunity] to claims in which an element of the violation is an unconstitutional motive or intent . . . creates the difficulty of . . . denying litigants the opportunity to present proof of that intent").

[89] *See Children First Found., Inc. v. Martinez*, 2005 WL 600283, at *3 (N.D.N.Y. Mar. 14, 2005) (determining that defendants "should assert qualified immunity in their answer and then proceed to a motion for summary judgment").

## 2.    The Conduct Alleged By The NRA Was Not "Objectively Reasonable" But, Rather, Violated Clearly Established Constitutional Rights.

A defendant may not invoke qualified immunity with respect to violations of clearly established constitutional law.[90]  This standard does not require that an official commit specific acts which have "previously been held to be unlawful;"[91]  instead, wherever the unlawfulness of the alleged conduct would be "apparent" based on pre-existing law, qualified immunity vanishes.[92]  Here, the NRA alleges that Vullo, in concert with the other Defendants, deliberately tailored New York's enforcement of its Insurance Law to target one of Cuomo's political adversaries, as part of a coordinated, multi-pronged campaign to suppress a disfavored political viewpoint.[93]  The SAC further alleges that Vullo conducted covert meetings conveying to regulated entities that comparator conduct (even if it violated the law) would continue to receive minimal or no scrutiny, so long as the NRA could be deprived even of lawful insurance services.[94]  Courts have routinely found that it is "clearly established that selective enforcement of a facially valid law based on an official's dislike of protected expression is unlawful;"[95] certainly, a sophisticated attorney and regulator like Vullo would have known that such conduct was improper.  Vullo insists that the

---

[90] *See Cuoco v. Moritsugu*, 222 F.3d 99, 109 (2d Cir. 2000) ("A government official is entitled to qualified immunity from suit for actions taken as a government official if (1) the conduct attributed to the official is not prohibited by federal law, constitutional or otherwise; (2) the plaintiff's right not to be subjected to such conduct by the official was not clearly established at the time of the conduct; or (3) the official's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.").

[91] *See Anderson*, 483 U.S. at 640.

[92] *See id.*; *see also Saucier*, 533 U.S. at 201(opining that the legal right violated by the public official need not have been specifically articulated by a court to be clearly established at the time of the violation).

[93] *See* SAC at ¶¶ 20-23.

[94] *See e.g.,* SAC at ¶¶ 21, 67-69, 76.

[95] *See Burns v. Citarella*, 443 F. Supp. 2d 464, 470 (S.D.N.Y. 2006) (quoting *Field Day, LLC v. Cnty. of Suffolk*, 2005 WL 2445794, at *17 (E.D.N.Y. Sept. 30, 2005)); *see also Massi v. Flynn*, 254 F. App'x 84, 87 (2d Cir. 2007) (holding that "there can be no dispute" that the constitutional right to be free from selective treatment is clearly established); *Bush v. City of Utica, N.Y.*, 558 F. App'x 131, 134-35 (2d Cir. 2014) (same).

comparator conduct overlooked and excused at her direction was "less serious" than NRA-related conduct[96]—but Vullo and the other Defendants continue to stonewall discovery that would allow the fact-finder to assess the veracity of that claim.[97]   Vullo also argues that the NRA was not formally "enforced against" on her watch, but it is likewise clearly established that the conduct of an invasive, expensive investigation, even one which has not yet culminated in formal charges, may violate the target's constitutional rights if the investigation is discriminatory or retaliatory.[98]

## IV.
## CONCLUSION

For the foregoing reasons, the NRA respectfully requests that the Court affirm the Magistrate Judge's grant of leave to amend and deny Vullo's motion to dismiss the NRA's amended claims.

---

[96] *See* Motion at 30.

[97] Even at this stage, it is apparent that Vullo's emphasis on the "grave safety concerns" (Motion at 31) posed by NRA-related insurance products will not hold water at trial: as the SAC alleges, Vullo's team aggressively targeted life, health, property and casualty policies that were marketed to NRA members, but had nothing to do with firearms, and were substantively identical to insurance products associated with other affinity groups. *See e.g.*, SAC ¶ 32, 59.

[98] *See e.g.*, *White v. Lee*, 227 F.3d 1214, 1228-29 (9th Cir. 2000).

25

Dated:  July 13, 2020                    Respectfully submitted,

                                          By: ___/s/ Sarah B. Rogers_____

                                               William A. Brewer III (Bar No. 700217)
                                               wab@brewerattorneys.com
                                               Sarah B. Rogers (Bar No. 700207)
                                               sbr@brewerattorneys.com

                                          **BREWER, ATTORNEYS & COUNSELORS**
                                          750 Lexington Avenue, 14th Floor
                                          New York, New York 10022
                                          Telephone:  (212) 489-1400
                                          Facsimile:  (212) 751-2849

                                          **ATTORNEYS FOR THE NATIONAL RIFLE
                                          ASSOCIATION OF AMERICA**

26

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 13, 2020, I caused a copy of the foregoing to be served upon the

following counsel electronically through the ECF system:


William A. Scott
Assistant Attorney General, Of Counsel
New York State Attorney General's Office
Albany Office, The Capitol
Albany, New York 12224-0341
Email:  William.Scott@ag.ny.com

Debra L. Greenberger
EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue
New York, New York 10020
Email:  dgreenberger@ecbalaw.com

*/s/ Sarah B. Rogers*
Sarah B. Rogers

2277-05
4835-2309-2674, v. 1

27