**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NATIONAL RIFLE ASSOCIATION OF AMERICA,**

                                        **Plaintiff,**

        **-against-**                                                    **1:18-CV-0566**

**ANDREW CUOMO, both individually and**
**in his official capacity; MARIA T. VULLO,**
**both individually and in her official**
**capacity; and THE NEW YORK STATE**
**DEPARTMENT OF FINANCIAL**
**SERVICES,**

                                        **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                              **DECISION and ORDER**

**I.      INTRODUCTION**

        New York Governor Andrew Cuomo ("Gov. Cuomo"), the New York State

Department of Financial Services ("DFS"), and Linda A. Lacewell, the current DFS

superintendent ("Supt. Lacewell"), move to dismiss claims in the Second Amended

Complaint ("SAC"). *See* Dkt. No. 210.  Former DFS Superintendent Maria T. Vullo ("Ms.

Vullo") appeals Magistrate Judge Hummel's decision granting Plaintiff's motion to amend

the Complaint, and moves to dismiss the claims against her in the SAC.  *See* Dkt. No. 211.

Plaintiff National Rifle Association ("NRA" or "Plaintiff") opposes these motions.

**II.     PROCEDURAL BACKGROUND**

        The Court assumes the parties' familiarity with the procedural history of this case and

                                            1

the underlying claims.  It will not restate it here other than as necessary to review the pending motions.

**III.    DISCUSSION**

       **a. Ms. Vullo's Motion**

<strong>Rule 72 Objection</strong>

In moving for leave to amend, Plaintiff asserted to Judge Hummel that it sought to amend to replead its selective enforcement claims, substitute Supt. Lacewell for Ms. Vullo in its claim for injunctive relief, and make minor, nonsubstantive changes to the pleading. Dkt. No. 202 at 4-5.  Judge Hummel found that Plaintiff did not exercise due diligence in moving to amend. *See* Dkt. No. 202.  But, because mere delay absent a showing of bad faith or undue prejudice does not provide a basis to deny the right to amend, he then preceded to addressed these issues. *Id.*  He declined to find that the motion to amend was brought in bad faith, and determined that Ms. Vullo had not established that she would be subjected to undo prejudice such to warrant outright denial of the motion to amend. *Id.*  He then preceded to determine whether the proposed repleaded selective enforcement claim against Ms. Vullo was futile, using a the Rule 12(b)(6) standard and the Court's prior decision on the selective enforcement claims to assess its plausibility. *Id.*  He determined that the proposed pleading plausibly alleged that Ms. Vullo had knowledge of similarly situated comparators, either directly or through a "see-no-evil" policy, and that she declined to prosecute these comparators.  *Id.*  Thus, Judge Hummel granted the NRA's motion to

2

replead a selective enforcement claim against Ms. Vullo in her individual capacity. *Id.* [1]  He also granted Plaintiff's motion to the extent it substituted Supt. Lacewell for Ms. Vullo in Plaintiff's request for an injunction. *Id.*  He denied leave to amend to the extent Plaintiff sought to replead a selective enforcement claim against Gov. Cuomo, or to newly plead such a claim against DFS.  *Id.*

Ms. Vullo challenges Judge Hummel's determinations relative to whether the NRA acted in bad faith in seeking to amend, and whether Ms. Vullo will be unduly prejudiced by amendment.  Whether applying the clearly erroneous or contrary to law standard of review set out in Rule 72(a), or the de novo standard of review set out in Rule 72(b), *see Sokol Holdings, Inc. v. BMB Munai, Inc*., No. 05 CV 3749 KMW DCF, 2009 WL 3467756, at *3-*4 (S.D.N.Y. Oct. 28, 2009),[2] the Court finds no error in Judge Hummel's assessment of bad faith and undue prejudice.  Ms. Vullo does not challenge under Rule 72 Judge Hummel's determination that the selective enforcement claim against her was non-frivolous, but rather challenges the legal viability of that claim under Rule 12(b)(6).  Because the Court finds, as addressed below, that Ms. Vullo is entitled to immunity on the selective enforcement claim in the SAC, it need not address her arguments directed to the plausibility of the factual allegations supporting this claim.

---

[1] Count Three of the SAC brought against Ms. Vullo in her individual capacity asserts a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983, and a violation of Article 1, Section 11 of the New York Constitution.  This claim is subject to the same substantive analysis under federal and state law, *see Selevan v. New York Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009), and is referred to as Plaintiff's selective enforcement claim.

[2]("[S]ome uncertainty and arguable differences of opinion persist in this Circuit as to the proper standard of review of a Magistrate Judge's ruling denying a motion to amend."  In light of this uncertainty, "[s]ome courts have . . . considered a denial of a motion to amend to be a dispositive decision, subject to a de novo standard of review.")(internal quotation marks and citations omitted)

**Rule 12(b)(6) Motion**

On the Rule 12(b)(6) motion, Ms. Vullo argues that she is entitled to absolute and qualified immunity on the selective enforcement, and qualified immunity on the First Amendment claim. The Court starts with the arguments addressed to the selective enforcement claim.

**Selective Enforcement Claim**

In the selective enforcement claim, Plaintiff asserts that DFS received information from the New York County District Attorney's Office that the NRA was offering an affinity insurance program known as Carry Guard that was illegal under New York Insurance Law ("Insurance Law").[3] *See* SAC, Dkt. No. 203, ¶¶ 34-35. The District Attorney's Office had received its information from an organization, Everytown for Gun Safety, which has an explicit political mission to oppose the NRA. *Id.* ¶ 34. The DFS investigation into the Carry Guard insurance program initially focused on insurance companies Chubb Group Holdings, Inc. and Illinois Union (together, "Chubb") and Lockton Affinity, LLC ("Lockton") for underwriting and administering this program. The DFS investigation also looked into Lloyd's of London's ("Lloyd's") involvement in the NRA's affinity insurance programs. *See* Plt. Mem. L. in Opp., Dkt. 220, at 12 ("Lockton brokered and administered, and Lloyd's underwrote, the vast majority of non-Carry Guard policies offered to NRA members and targeted by Defendants."). "Within weeks of commencing its investigation, DFS began to target insurance programs that had nothing to do with firearms, and instead provided coverage

---

[3] The Carry Guard program provided, among other policy coverages, (1) liability insurance to gun owners for acts of intentional wrongdoing, and (2) legal services insurance for any costs and expenses incurred in connection with a criminal proceeding resulting from acts of self-defense with a legally possessed firearm, in violation of New York Insurance Law.

similar or identical to coverage endorsed by other New York affinity organizations."  SAC ¶ 36.  Plaintiff asserts that "Defendants' goal, from the outset, was to disrupt any and all business arrangements between the NRA and any insurance administrator, broker, or underwriter—indeed, any financial institution." *Id.*

Chubb, Lockton, and Lloyd's entered into consent orders with DFS in which they agreed that some of the NRA insurance programs they were involved in violated New York Insurance Laws, agreed not to provide these and other insurance programs to the NRA, and agreed to pay substantial civil monetary penalties.  *See* SAC ¶ 62 and Ex. E (Chubb Consent Order); *id.* ¶¶ 54-55 and Ex. D (Lockton Consent Order); *id.* ¶ 74 and Ex. I (Lloyd's Consent Order); *see also id.* ¶ 78.[4]  Ms. Vullo signed the consent orders on behalf of DFS. Plaintiff contends that Chubb, Lockton, and Lloyd's "were coerced to terminate their business arrangements with the NRA and its members—including arrangements having nothing to do with the allegedly unlawful conduct cited by DFS." *Id.* ¶ 21; *see also id.* ¶ 93;[5] ¶ 102.[6]  Plaintiff asserts that "DFS has not announced—even to this day—similar inquiries concerning any" other membership organizations "although their affinity programs involve

---

[4]("On January 31, 2019, almost three months after this Court had [originally] sustained the NRA's selective-enforcement claims and permitted discovery regarding them, DFS entered into a Supplemental Consent Order with Lockton that purported to admonish violations of the same statutes by Lockton's non-NRA clients, yet did not identify the clients by name or require Lockton to cease doing business with them.")(citing Ex. J, Lockton Supplemental Consent Order).

[5]("Defendants' concerted efforts to stifle the NRA's freedom of speech caused financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations. For example, Defendants coerced and caused Lockton, Chubb, and Lloyd's to cease their participation in NRA endorsed insurance programs, regardless of whether the insurance programs met all legal qualifications under New York's Insurance Law.")

[6]("Defendants' actions have concretely harmed the NRA by causing financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations. For example, Defendants coerced and caused Lockton, Chubb, and Lloyd's to cease their participation in NRA endorsed insurance programs in New York and elsewhere, regardless of whether the insurance programs met all legal qualifications under New York's Insurance Law.")

5

most, if not all, of the practices and features referenced by DFS in its investigation of the NRA's affinity programs." *Id.* ¶ 37.  Plaintiff contends that "Defendants selectively targeted the NRA because of the NRA's constitutionally protected legislative and grassroots advocacy activities.  Defendants specifically intend to undermine the NRA's ability to conduct its affairs in New York—and to advance Cuomo's anti-NRA political agenda." *Id.*

Plaintiff asserts that based on the NRA's "political views and speech relating to the Second Amendment," SAC ¶ 119, Ms. Vullo "knowingly and willfully violated the NRA's equal protection rights by seeking to selectively enforce certain provisions of the Insurance Law against Lockton's affinity-insurance programs for the NRA.  Meanwhile, other affinity-insurance programs that were identically (or at least similarly) marketed by Lockton, but not endorsed by 'gun promotion' organizations, have not been targeted by DFS's investigation." *Id.* ¶ 109.  In this regard, the NRA asserts:

> 58. Several of the purported "violations" assessed pursuant to the Lockton Consent Order concern programs commonly engaged in by numerous additional affinity associations that do not publicly advocate for Second Amendment rights and, therefore, are <u>not</u> targets of Defendants' unconstitutional conduct. Several such organizations are clients of Lockton—yet the Consent Order does not compel Lockton to discontinue its purportedly unlawful conduct with respect to these clients.

> 59.  For example:

> • DFS claims that Lockton Affinity violated Insurance Law § 2122(a)(1) by referring to the insurer's AM Best rating. Yet, at the time this lawsuit was filed, Lockton Affinity's affinity program for the American Optometric Association through AOAExcel ("AOAExcel") touted the "backing of a carrier that is rated A+ (Superior) by A.M. Best. Similarly, Lockton Affinity currently advertises that coverage for the affinity programs designed for the Veterans of Foreign Wars ("VFW") and Moose International Inc. ("Moose") was through companies "rated 'Excellent' or higher by A.M. Best."

> • DFS claims that Lockton Affinity violated Insurance Law § 2324(a) by

giving or offering to give no cost insurance to NRA members in good standing. Yet, Lockton Affinity currently made that same offer to members of both the Professional Photographers of America ("PPA") and the VFW.

• DFS claims that Lockton Affinity violated Insurance Law § 2116 by compensating the NRA based on actual premiums collected. Yet, Lockton Affinity paid AOAExcel, Moose, the VFW, the PPA, and dozens of other clients in the same or similar manner.

*Id.* ¶¶ 58-59 (emphasis is original, footnotes omitted).   As is apparent, the Insurance Law violations identified in paragraph 59 were insurance programs identified in the Lockton Consent Order that had nothing to do with firearms (which the Court refers to as the additional provisions of the Lockton Consent Order), and which purportedly  similarly existed in other entities' affinity insurance programs.  Plaintiff asserts that "[e]ven if such conduct does violate insurance law, DFS's selective enforcement of such offenses as to NRA-endorsed policies—but not as to other policies marketed by Lockton in an identical fashion—constitutes impermissible viewpoint discrimination and a denial of equal protection under the law." *Id.* ¶ 60.

To demonstrate Ms. Vullo's knowledge of comparator affinity programs,  Plaintiff alleges that Vullo had conversations and meetings with senior officials of Lloyd's in the spring of 2018 during which she learned of comparator programs. *See Id.* ¶ 110.  Plaintiff asserts that during these conversations and meetings, Ms. Vullo expressed an intention not to prosecute violations provided Lloyd's stopped providing insurance to the NRA and other

gun promotion organizations.  *See id.* ¶ 21;[7] ¶ 67;[8] ¶ 69.[9]

As an alternative to Ms. Vullo's direct knowledge of comparators, the SAC asserts that "Vullo should have known of similarly situated individuals at the time DFS launched its investigation and any purported lack of knowledge was due to a 'see-no-evil' policy of enforcement, which Vullo and DFS abandoned solely to further their vendetta against the NRA."  SAC ¶ 111.  "The 'see-no-evil' enforcement policy was confirmed by DFS's continued ignorance toward the violations of the similarly situated comparators."  *Id.*  The NRA further alleges that "[b]y virtue of the position held by Vullo at the time DFS launched its investigation, Vullo knew the actions taken by DFS against NRA affinity insurance programs were unprecedented.  No other similarly situated programs have faced even close to the same treatment for analogous violations.  However, Vullo and DFS failed to inquire about whether there were any other similarly situated affinity programs when the investigation was launched."  *Id.* ¶ 112.

**Absolute Immunity**

---

[7]("During the meetings [Vullo] discussed an array of technical regulatory infractions plaguing the affinity-insurance marketplace. Vullo made it clear, however, that DFS was less interested in pursuing the infractions of which she spoke, so long as Lloyd's ceased providing insurance to gun groups, especially the NRA.")

[8]("In the aftermath of the Parkland tragedy, Vullo met with senior executives of Lloyd's and [Lloyd's United States affiliate, Lloyd's America, Inc. (LAI)], and presented Defendants' views on gun control and their desire to leverage their powers to combat the availability of firearms, including specifically by weakening the NRA.")

[9]("During her surreptitiously held meetings with Lloyd's executives that commenced in February 2018, Vullo acknowledged the widespread regulatory issues in the excess-line marketplace. Vullo and DFS made clear that Lloyd's could avoid liability for infractions relating to other, similarly situated insurance policies, so long as it aided DFS's campaign against gun groups. Against the specter of this bold abuse of her position, Lloyd's agreed that it would instruct its syndicates to cease underwriting firearm-related policies and would scale back its NRA-related business; in exchange, DFS would focus its forthcoming affinity-insurance enforcement action solely on those syndicates which served the NRA, and ignore other syndicates writing similar policies.")

"Courts have recognized two forms of immunity: absolute and qualified." *DiBlasio v. Novello*, 344 F.3d 292, 296 (2d Cir. 2003)(citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993)). "Absolute immunity gives 'public officials entrusted with sensitive tasks a protected area of discretion within which to carry out their responsibilities.'" *Mangiafico v. Blumenthal*, 471 F.3d 391, 394 (2d Cir. 2006)(quoting *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir.1987)). "'The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties,' and hence courts are generally 'quite sparing' in their recognition of absolute immunity." *DiBlasio*, 344 F.3d at 296 (quoting *Burns v. Reed*, 500 U.S. 478, 486–87 (1991) (citations omitted)). However, "there are some officials whose special functions require a full exemption from liability." *Butz v. Economou*, 438 U.S. 478, 508 (1978). "The Supreme Court has accorded absolute immunity to a limited range of government officials whose duties are deemed, as a matter of public policy, to require that protection to enable them to function without fear of undue interference or harassment." *Mangiafico*, 471 F.3d at 394. "Absolute immunity is accorded to judges and prosecutors functioning in their official capacities and, under certain circumstances, is also extended to officials of government agencies 'performing certain functions analogous to those of a prosecutor' or a judge." *DiBlasio*, 344 F.3d at 296-97 (quoting *Butz*, 438 U.S. at 515). "In considering whether the procedures used by [an] agency are sufficiently similar to judicial process to warrant a grant of absolute immunity," the Court employs a functional approach. *Id.* at 297 (citing *Cleavinger v. Saxner*, 474 U.S. 193, 201–02 (1985), in turn citing *Harlow v. Fitzgerald*, 457 U.S. 800, 810 (1982)). Under the functional approach, the Court looks "to whether the actions taken by the official are 'functionally comparable' to that

9

of a judge or a prosecutor." *Id.* (quoting *Butz*, 438 U.S. at 513, and citing *Imbler v. Pachtman*, 424 U.S. 409, 423 n. 20, (1976);  *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir.1994)). "Government actors who seek absolute immunity 'bear the burden of showing that public policy requires an exemption of that scope.'" *Id.*  (quoting *Butz*, 438 U.S. at 506).  "However, once a court determines that an official was functioning in a core judicial or prosecutorial capacity, absolute immunity applies 'however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff.'" *Id.* (quoting *Cleavinger*, 474 U.S. at 199–200, 106 S.Ct. 496 (internal quotations and citations omitted)). Further, because the focus of absolute immunity is on the function performed, once absolute immunity is established the Court does not consider allegations of ill intent or discriminatory enforcement. *See Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)("[The Supreme Court decision in *Buckley*] indicates that absolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate. This would even include, for purposes of this case, allegedly conspiring to present false evidence at a criminal trial."); *see also Verbeek v. Teller*, 158 F. Supp. 2d 267, 282 (E.D.N.Y. 2001) (granting motion to dismiss claims against prosecutorial official because conspiracy allegation does not "negate her entitlement to absolute immunity")(citing *Dory*, 25 F.3d at 83).  New York's state law absolute immunity is essentially the same as federal absolute immunity. *See Arteaga v. State*, 72 N.Y.2d 212, 216 (N.Y. 1988).[10]

---

[10] In *Arteaga*, the New York Court of Appeals wrote:

The absolute immunity for quasi-judicial discretionary actions is founded on public policy and is generally said to reflect the value judgment that the public interest in having officials free to

(continued...)

As a general principle, a government official "is entitled to absolute immunity when functioning as an advocate of the state in a way that is intimately associated with the judicial process." *Mangiafico*, 471 F.3d at 396 (citing *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). By contrast, a government official "is entitled only to qualified immunity when functioning in an administrative or investigative capacity." *Id.* (citing *Mitchell v. Forsyth*, 472 U.S. 511, 520–21 (1985)(no absolute immunity for the Attorney General's exercise of his national security functions); *Buckley*, 509 U.S. at 274–76 (1993) (no absolute immunity when a prosecutor acts in administrative capacity); *Burns*, 500 U.S. at 492–95 (no absolute immunity for a prosecutor offering legal advice to the police regarding interrogation practices)).

The NRA's selective enforcement claim is premised on two actions: First, Ms. Vullo's decision to enter into the Lockton, Lloyd's and Chubb Consent Orders—and their precise terms. The NRA's purported comparators are based on violations agreed to in those Consent Orders. As Ms. Vullo asserts, were it not for those Consent Orders the NRA could

---

[10](...continued)
exercise their discretion unhampered by the fear of retaliatory lawsuits outweighs the benefits to be had from imposing liability. Not all discretionary actions, however, are accorded absolute immunity.

Whether an action receives only qualified immunity [under New York law], shielding the government except when there is bad faith or the action taken is without a reasonable basis, or absolute immunity, where reasonableness or bad faith is irrelevant, requires an analysis of the functions and duties of the particular governmental official or employee whose conduct is in issue. The question depends not so much on the importance of the actor's position or its title as on the scope of the delegated discretion and whether the position entails making decisions of a judicial nature--i.e., decisions requiring the application of governing rules to particular facts, an exercise of reasoned judgment which could typically produce different acceptable results.

*Arteaga v. State*, 72 N.Y.2d at 216 (citations and quotations marks omitted).

11

not allege selective enforcement based on Ms. Vullo's conduct.  Second, Ms. Vullo's

alleged decision not to bring charges against the purported comparators.  For reasons

discussed below, these are both prosecutorial actions premised on enforcement decisions

intimately associated with the judicial process.

There is not merit to Plaintiff's contention that absolute immunity does not apply

because Ms. Vullo's relevant conduct was investigative in nature.  As the NRA states in its

brief, "the date that DFS opened its investigation into the NRA's insurance programs is

irrelevant. The relevant date or dates is the date DFS took action against the NRA, or its

business partners."  Dkt. 220 at 15.  As explained here, the NRA's selective enforcement

claim is premised on two enforcement decisions.  Plaintiff's argument that "[t]he NRA also

alleges that Vullo violated its Equal Protection rights by selectively targeting the NRA in

DFS's *investigation* of certain affinity programs, but failing to make similar inquiries into

other similar membership affinity programs," *id.* at 18 (emphasis in original), does not

remove the selective enforcement claim and Ms. Vullo's enforcement decisions from

absolute immunity consideration.  A selective investigation claim is not asserted in the SAC,

*see* SAC ¶ 109 (specifically alleging that Ms. Vullo violated the NRA's equal protection

rights by selectively enforcing certain provisions of the Insurance Law against Lockton's

affinity insurance programs for the NRA), and the NRA cannot amend its complaint for the

fourth time through a memorandum of law.[11]  Moreover, there is no merit to Plaintiff's

---

[11]The facts that the NRA cites to support its selective investigation claim, paragraphs 36 and 37 of the SAC, reference "Defendants" and "DFS's" conduct, focus, and goals, but do not mention Ms. Vullo. There is no merit to Plaintiff's argument that Ms. Vullo has supervisory liability under the standard announced in *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995) for DFS's conduct taken "on her watch." *See* Dkt. No. 220 at 9-11 (arguing for supervisory liability under *Colon*); *see also id.* at 9 ("Vullo cannot deny knowledge of, or escape liability for, actions undertaken by DFS on her watch.").   "[T]he Second Circuit recently held that the

(continued...)

12

argument that prosecutorial immunity only attaches to "the initiation of a prosecution and the presentation of the government's case."  Prosecutorial immunity protects conduct that occurs both before and during the judicial phase. *See Burns*, 500 U.S. at 492 (immunity protects pre-indictment search warrant application during the investigative stage); *Butz*, 438 U.S. at 516 (immunity encompasses "decision to initiate" agency adjudication); *Mangiafico*, 471 F.3d at 396 (immunity encompasses "actions preliminary to the initiation of a prosecution").  The decision to reach a consented-to resolution - analogous to securing a plea bargain in a criminal proceeding - rather than "commit the state's resources, reputation, and prestige to litigation," is a prosecutorial decision.  *Mangiafico*, 471 F.3d 396; *see Knowlton v. Shaw*, 704 F.3d 1, 7–8 (1st Cir. 2013) (in an insurance enforcement proceeding, entering into consent decrees is preparatory to "the initiation of the enforcement proceeding—a proceeding that would have surely followed had no consent agreement been executed" and not "investigative"); *see also Taylor v. Kavanagh*, 640 F.2d 450, 453 (2d Cir.1981)(a prosecutor is entitled to absolute immunity for negotiating a plea bargain in a criminal case); *Powers v. Coe*, 728 F.2d 97, 103–04 (2d Cir. 1984)("The alleged breach of the agreement not to prosecute, while not technically a plea bargain which would render the prosecutor's immunity absolute under *Taylor v. Kavanagh*, 640 F.2d at 453, is so closely analogous to a plea bargain that we think the same principle of absolute immunity apply

---

[11](...continued)
*Colon* test was abrogated by the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009)." *Jeanty v. City of Utica*, No. 6:16-CV-00966 (BKS/TWD), 2021 WL 149051, at *33 (N.D.N.Y. Jan. 14, 2021)(citing *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)).  In *Tangreti,* the Second Circuit "clarified that 'there is no special rule for supervisory liability' and explained that 'a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Doe v. Zucker*, No. 1:20-CV-840 (BKS/CFH), 2021 WL 619465, at *28 (N.D.N.Y. Feb. 17, 2021)(quoting *Tangreti*, 983 F.3d at 612, in turn quoting *Iqbal*, 556 U.S. at 676).  Thus, Plaintiff has not adequately pled a "selective investigation" claim against Ms. Vullo.

13

under the functional analysis of *Kavanagh*.").  As explained below, so too is the decision not to prosecute a violation of the Insurance Law.

To determine whether the process in which the government official acts "share enough of the characteristics of the judicial process, and whether the official[] [herself was] functioning in a manner sufficiently analogous to a judge or prosecutor," the Court assesses the six non-exhaustive factors outlined in *Butz* that are characteristic of the judicial process. *DiBlasio*, 344 F.3d at 344 F.3d 297-98 (citing *Butz*, 438 U.S. at 513; *Cleavinger*, 474 U.S. at 202 (interior quotation marks and brackets omitted).  These factors are:  (a) the need to assure that the individual can perform [her] functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.  *Butz*, 438 U.S. at  at 512.

As Superintendent of DFS, Ms. Vullo was charged with the enforcement of the New York Financial Services Law, Banking Law, and Insurance Law.  The DFS Superintendent, "in the enforcement of relevant statutes and regulations, may undertake an investigation" into activities that may constitute violations of, inter alia, the Financial Services Law, N.Y. Fin. Servs. Law § 404, and/or the Insurance Law, N.Y. Ins. Law. § 308.  If a violation is found, the Superintendent is authorized to bring a statement of charges and initiate a hearing. N.Y. Ins. Law. § 2405(a); N.Y. Fin. Servs. Law §§ 305, 306.  The Superintendent presents evidence of a violation of any of these laws at an administrative hearing in which the alleged violator is given an opportunity to be heard. 23 NYCRR Part 2; N.Y. Fin. Servs.

Law § 305.  Where the hearing officer finds that a violation has occurred, the
Superintendent may impose civil penalties and other remedies. *See* N.Y. Ins. Law §§
2102(g), 2110, 2117(g), 2127; N.Y. Fin. Servs. Law § 408.  The Superintendent's function is
akin to that of a prosecutor: bringing charges, attempting to negotiate resolutions (*i.e.* the
Consent Orders), and preparing for trial (DFS hearings) before an adjudicator if a
negotiated resolution is not reached.

Absolute immunity protects officials "from personal liability for the performance of
certain discretionary acts.  Such immunity extends to prosecutors [and] to executive officers
initiating administrative proceedings." *Spear v. Town of W. Hartford*, 954 F.2d 63, 66 (2d
Cir. 1992)(citing *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976) and *Butz*, 438 U.S. at
515–17)*; see Butz*, 438 U.S. at 516 (absolute immunity encompasses "decision to initiate or
continue a proceeding subject to agency adjudication"); *Mangiafico*, 471 F.3d at 395–96
("[A]gency officials who perform functions analogous to those of a prosecutor are entitled to
absolute immunity from such liability for their participation in the decision to initiate or to
continue agency proceedings.")(citing *Butz*, 438 U.S. at 512–13); *Douglas v. New York
State Adirondack Park Agency*, 895 F. Supp. 2d 321, 340 (N.D.N.Y. 2012)(absolute
immunity for park agency officials' initiation of an agency enforcement proceeding).

The Supreme Court, in extending prosecutorial immunity to the executive
branch, explained that

agency officials performing certain functions analogous to those
of a prosecutor should be able to claim absolute immunity with
respect to such acts. The decision to initiate administrative
proceedings against an individual or corporation is very much
like the prosecutor's decision to initiate or move forward with a
criminal prosecution.... The discretion which executive officials
exercise with respect to the initiation of administrative

15

> proceedings might be distorted if their immunity from damages
> arising from that decision was less than complete.

*Spear*, 954 F.2d at 66 (quoting *Butz*, 438 U.S. at 515).  The targets of a DFS enforcement action—banks and insurance companies—are well resourced and, as Ms. Vullo argues, inclined to bring suit.  Without the protection absolute immunity affords, a DFS superintendent's "discretion" in initiating "proceedings might be distorted" due to litigation for purposes of "harassment or intimidation." *Butz*, 438 U.S. at 515; *see id.* at 510–11 (The "public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up," should not be "biased with the fear of being harassed by a vicious suit for acting according to their consciences (the danger of which might easily be insinuated where powerful men are warmly engaged in a cause and thoroughly prepossessed of the justice of the side which they espouse).").  The first *Butz* factor weighs in favor of absolute immunity with regard to Ms. Vullo's decision to initiate enforcement proceedings that resulted in the Consent Orders in issue on the selective enforcement claim.

The Second Circuit has also "consistently afforded absolute immunity to a government attorney's decision whether or not to initiate litigation on behalf of the state." *Mangiafico*, 471 F.3d at 396; *see Ying Jing Gan v. City of New York*, 996 F.2d 522, 530 (2d Cir. 1993) ("A prosecutor thus has absolute immunity in connection with the decision whether or not to commence a prosecution.").  "[A]s a matter of logic, absolute immunity must . . .  protect the prosecutor from damages suits based on the decision *not* to prosecute." *Schloss v. Bouse*, 876 F.2d 287, 290 (2d Cir. 1989) (emphasis in original)(citing *Dacey v. Dorsey*, 568 F.2d 275, 278 (2d Cir. 1978)(United States Attorney who chose not to seek injunction under 42 U.S.C. § 1986 to restrain alleged civil rights violation was

16

absolutely immune from damages suit by victim), *cert. denied*, 436 U.S. 906, 98 S. Ct.

2238, 56 L. Ed.2d 405 (1978)).  The Second Circuit explained in *Schloss*:

> Though not all of the concerns discussed in *Imbler* indicate a need for
> absolute immunity with respect to a decision not to prosecute, many of the
> same factors may come into play. For example, the decision not to prosecute
> could expose the prosecutor to a suit by the complainant asserting that the
> complainant was denied the equal protection of the law. Further, absolute
> protection from a damages suit for not prosecuting is warranted simply
> because the decision with respect to any given charge is an either-or
> proposition. A decision to prosecute logically eliminates the nonprosecution
> option, and vice versa. If the prosecutor had absolute immunity only for the
> decision to prosecute and not for a decision not to prosecute, his judgment
> could be influenced in favor of a prosecution that sound and impersonal
> judgment would eschew. Thus, the contours of absolute prosecutorial
> immunity should be drawn to avoid skewing the prosecutor's judgment in
> either direction, both to eliminate the appearance that personal considerations
> may be a factor, *see, e.g., Imbler v. Pachtman*, 424 U.S. at 424–25, 96 S. Ct.
> at 992 ("[t]he public trust of the prosecutor's office would suffer if he were
> constrained in making every decision by the consequences in terms of his own
> potential liability in a suit for damages"), and to avoid establishing a doctrine
> that would "discourage prosecutors from dismissing meritless actions before
> trial, since only by pursuing ... charges would the prosecutor be fully immune,"
> *Haynesworth v. Miller*, 820 F.2d 1245, 1270 n. 200 (D.C. Cir.1987).

*Id.*

These same considerations apply to Ms. Vullo's decision not to prosecute the

Insurance Law violations identified in paragraph 59 of the SAC of which she was

purportedly aware.  Without the protection absolute immunity affords, a DFS

Superintendent's discretion in declining to initiate proceedings might be distorted due to fear

of litigation, such as is the case here. Further, without absolute immunity, the

Superintendent is deprived of discretion to determine whether to invest the State's

resources in the prosecution of a particular matter no matter how inconsequential the matter

may be in the grander scheme of enforcing the Insurance Law in New York, and no matter

17

whether there is sufficient merit to a particular matter.  As the SAC indicates, DFS learned

of the additional violations in the Lockton Consent Order only after investigating whether

Lockton, Chubb, and Lloyd's were involved in offering the Carry Guard program involving

serious violations of the Insurance Law.  Without absolute immunity protecting the

Superintendent's discretion as to which violations to prosecute, the Superintendent would

be placed in the position of having to prosecute every ostensible violation so as to be

afforded immunity.  Because absolute immunity looks at the function in question and not the

motive or intent of the actor in performing that function, the first *Butz* factor also weighs in

favor of absolute immunity for Ms. Vullo's decision not to institute enforcement proceedings

against the various entities in New York that she was purportedly aware.

As to the second *Butz* factor, the NRA argues that "[a]lthough there are some

safeguards to protect parties from unconstitutional conduct by the DFS Superintendent, the

efficacy of those safeguards is diminished by other provisions of the Financial Services

Law. Specifically, although a party is entitled to notice and a hearing, the

'independence' of any hearing is severely undermined because it is held before the

Superintendent or an individual directly designated by the Superintendent. Additionally, the

hearing officer only has the power to suggest a course of action, while the Superintendent

has the final authority to reject the recommendation and issue whatever order she desires."

Dkt. No. 220, at 20 (citing N.Y. Fin. Serv. Law  § 305).  From this, the NRA argues that

"Vullo has virtually unfettered ability to act in an unconstitutional manner without appropriate

safeguards." *Id.* (citing *DiBlasio*, 344 F.3d 299).

In *DiBlasio*, in addressing the second *Butz* factor the Second Circuit held that

although some procedures of New York Public Health Law § 230 "provide some protection to physicians subjected to summary suspension proceedings, the efficacy of those procedures are seriously diminished by other features of § 230." *DiBlasio*, 344 F.3d at 298–99.  After reviewing these other features of § 230, the Circuit concluded that the Department of Health Commissioner "has virtually unfettered authority to determine whether a physician's license should be summarily suspended pending resolution of misconduct charges—a process that, in this case, took eight months. The absence of meaningful safeguards against arbitrary executive action in a summary suspension proceeding weigh against extending absolute immunity" to the Commissioner and a department fraud investigator who recommended the plaintiff's suspension. *DiBlasio*, 344 F.3d at 299.  In making this decision, the Circuit stated that "we find that § 230 inadequately protects physicians from wrongful deprivation of their professional licenses, the second *Butz* factor." *Id.* at 298.

The procedures involving Insurance Law violations are much different than the procedures involving a summary suspension of a physician's license pending a hearing as examined in *DiBlasio*, and do not give the DFS Superintendent "virtually unfettered ability to act in an unconstitutional manner."  Under applicable law, had Lockton, Lloyd's, or Chubb not admitted liability, each would have had the opportunity to proceed with a DFS evidentiary hearing, be represented by counsel in front of an impartial hearing officer not previously involved in the matter, present evidence, hold the state to its burden of proof, cross-examine witnesses, and dispute the hearing officer's findings, as well as appeal to the state Supreme Court.  At a hearing, the hearing officer must prepare a report detailing the

findings from the adversarial hearing, N.Y. Fin. Servs. Law § 305(b), and assuming the Superintendent were to make the decision disregarding the report for political reasons, as the NRA contends, the affected party could seek reversal via a state court Article 78 proceeding on the grounds of an arbitrary and capricious decision. *See, e.g., Mordukhaev v. Daus*, 457 F. App'x 16, 21 (2d Cir. 2012) ("[T]he availability of an Article 78 proceeding to challenge any alleged deficiencies in an administrative adjudication is sufficient to satisfy due process.").  As discussed below under the fifth *Butz* factor, an Article 78 proceeding following a DFS administrative proceeding could, if warranted, vacate the liability determination and any penalty imposed.  The Court finds here that the second *Butz* factor weighs in favor of immunity

The third *Butz* factor, insulation from political influence, weighs against absolute immunity because Ms. Vullo served at the will of the Governor. *See* N.Y. Fin. Serv. Law § 202(a)("The head of [DFS], . . . shall be appointed by the governor [and] . . . shall hold office at the pleasure of the governor."); *see also DiBlasio*, 344 F.3d at 298 (if "the commissioner of health 'serves at the will of the Governor,' . . . it would be improper to characterize the commissioner as insulated from political influence").

On the fourth *Butz* factor, the importance of precedent, the NRA asserts that no provision of the Financial Services Law or the Insurance Law indicates that DFS or its Superintendent place any value on precedent when making decisions with respect to violations of the Insurance Law.  Because Ms. Vullo bears the burden of establishing her entitlement to absolute immunity, and because she has not addressed this issue, the Court finds that the fourth *Butz* factor weighs against absolute immunity.

20

Finally, the fifth *Butz* factor directs the Court to assess the correctability of error on appeal. In arguing against this factor, the NRA cites to *DiBlasio* where the Circuit held:

> *Butz* also requires us to consider whether a wrongful summary suspension is "correctabl[e] on appeal." *Butz*, 438 U.S. at 512, 98 S.Ct. 2894. The district court reasoned that the hearing required by § 230(10)(f) and the availability of an Article 78 proceeding provide prompt review of a summary suspension, hence weighing in favor of absolute immunity. In the context of determining whether absolute immunity is appropriate, the hearing available under § 230, while providing an avenue for review of the charges themselves, provides no meaningful review of the summary suspension because, as happened here, the commissioner is free to ignore the hearing committee's recommendation. In addition, in the context of determining whether absolute immunity is appropriate, Article 78 proceedings are generally not considered adequate avenues for "appeal." *See* [*Young v. Selsky*, 41 F.3d 47, 54 (2d Cir. 1994)].

*DiBlasio*, 344 F.3d at 299.

As explained above, in the DFS Insurance Law enforcement context, a hearing is held and a decision rendered before adverse consequences can be imposed. This differs substantially from the situation addressed in *DiBlasio*. Further, upon the imposition of an adverse determination, a respondent is entitled to appeal the determination through an Article 78 proceeding asking to have the adverse consequences vacated. While the Circuit said that Article 78 proceedings are generally not considered adequate avenues for appeal in the context of determining whether absolute immunity is appropriate, neither the situations in *DiBlasio* nor *Young*, the case cited by the Circuit for this proposition, fit squarely with the situation following an adverse Insurance Law determination by the DFS Superintendent.

As indicated, *DiBlasio* involved a summary suspension before resolution of the underlying charges. If Lockton, Lloyd's, or Chubb had declined to admit liability, they would have had a full evidentiary hearing that mirrors a judicial one, with the significant due

process protections described above, before any penalty or suspension could be imposed. And they would have had the right to seek to vacate an adverse decision by an Article 78 proceeding. Unlike in *DiBlasio* where an Article 78 proceeding after the fact of a summary suspension afforded the plaintiff inadequate relief, the same cannot be said of a post-hearing Article 78 proceeding.

*Young* is also distinguishable from the situation here.  In *Young,* the Circuit held that damages, which were the only viable remedy for the due process deprivation in issue, were unavailable in an Article 78 proceeding, rendering it inadequate for appellant. *See Young*, 41 F.3d at 54.[12]  The situation in *Young* is quite different than the situation that would arise if Lockton, Lloyd's, or Chubb had proceeded to a hearing, received an adverse determination, and appealed via an Article 78 proceeding. Unlike in *Young*, such an appeal could afford an entity relief from an unconstitutional or improper decision entered by Ms. Vullo.

The Court finds that an Article 78 proceeding provides a sufficient avenue for a party that receives an adverse decision in a DFS enforcement proceeding to correct an error on appeal.  Accordingly, the Court finds that the fifth *Butz* factor weighs in favor of absolute immunity.

Weighing all of the *Butz* factors, and considering Ms. Vullo's functions that underlie the selective enforcement claim, the Court finds that she is entitled to absolute immunity on the selective enforcement claim.  Accordingly, the claim, under both federal and state law, is

---

[12]("[T]he type of injury plaintiff alleged may not be adequately correctable on appeal. . . . [P]urely prospective relief on administrative appeal does not adequately cure a due process violation in a disciplinary hearing if the prisoner has already served part of his disciplinary sentence in the SHU pending administrative review.  Similarly, if the administrative appeal officer compounds the violation by unreasonably affirming, a later reversal in state court will be inadequate unless it includes monetary damages. . . . [M]onetary damages are not available in [an Article 78] proceeding.")(citations omitted).

dismissed.

### First Amendment Claims[13]

Count One of the SAC alleges that "Defendants' actions—including but not limited to the issuance of the April 2018 [Guidance] Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon Chubb and Lockton, and the issuance of the Cuomo Press Release—established a 'system of informal censorship' designed to suppress the NRA's speech." SAC ¶ 90.[14]  Plaintiff asserts that Defendants took these actions "with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech." *Id.* ¶ 91.  Count Two alleges that these same actions by Defendants "were in response to and substantially caused by the NRA's political speech regarding the right to keep and bear arms.  Defendants' actions were for the purpose of suppressing the NRA's pro-Second Amendment viewpoint.  Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech." *Id.* ¶ 101.

These are essentially the same claims that the Court examined in tandem in the November 6, 2018 Decision & Order, Dkt. No. 56.  In doing so, the Court found that "[t]he Guidance Letters and Cuomo Press Release, read in isolation, clearly fit into the government-speech doctrine as they address matters of public importance on which New

---

[13]Counts One and Two of the SAC assert violations of the First Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983, and violations of Article 1, Section 8 of the New York Constitution. These claims are subject to the same analysis under federal and state law, *see, Martinez v. Sanders*, 307 F. App'x 467, 468 n.2 (2d Cir. 2008)(citing *Pico v. Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26*, 638 F.2d 404 (2d Cir. 1980), *aff'd*, 457 U.S. 853 (1982)), and are referred to as Plaintiff's First Amendment Claims.

[14]For a more complete discussion of the April 2018 Guidance Letters and the Cuomo Press Release, reference is made to the Court's November 6, 2018 Decision & Order, Dkt. No. 56.

23

York State has a significant interest." *Id.* at 16-17.   But in analyzing these claims, the Court

wrote:

> "'First Amendment rights may be violated by the chilling effect of governmental
> action that falls short of a direct prohibition against speech.'" *Zieper v.
> Metzinger*, 474 F.3d 60, 65 (2d Cir. 2007)(quoting *Aebisher v. Ryan*, 622 F.2d
> 651, 655 (2d Cir.1980)); *see also Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160
> (2d Cir. 2013)("To plead a First Amendment retaliation claim a plaintiff must
> show: (1) he has a right protected by the First Amendment; (2) the defendant's
> actions were motivated or substantially caused by his exercise of that right;
> and (3) the defendant's actions caused him some injury.")).   As applicable to
> the allegations in Counts One and Two, "the First Amendment prohibits
> government officials from encouraging the suppression of speech in a manner
> which 'can reasonably be interpreted as intimating that some form of
> punishment or adverse regulatory action will follow the failure to accede to the
> official's request.'" *Zieper*, 474 F.3d at 65-66 (quoting *Hammerhead Enters.,
> Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir.1983)).   In determining whether
> government statements impede upon First Amendment rights, "what matters is
> the 'distinction between attempts to convince and attempts to coerce.'" *Id.*, at
> 66 (quoting *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) *(per curiam)*.

*Id.* at 18.   The Court noted that the First Amendment "require[s] courts to draw fine lines

between permissible expressions of personal opinion [by public officials] and implied threats

to employ coercive state power to stifle protected speech." *Id*. (quoting *Hammerhead*, 707

F.2d at 39).   However, after examining the totality of the allegations, and accepting the

factual allegations as true, the Court found:

> While neither the Guidance Letters nor the Cuomo Press Release specifically
> directs or even requests that insurance companies and financial institutions
> sever ties with the NRA, a plausible inference exists that a veiled threat is
> being conveyed.   Viewed in the light most favorable to the NRA, and given
> DFS's mandate—"effective state regulation of the insurance industry" and the
> "elimination of fraud, criminal abuse and unethical conduct by, and with
> respect to, banking, insurance and other financial services institutions," N.Y.
> Fin. Servs. Law § 102(e), (k) — , the Cuomo Press Release and the Guidance
> Letters, when read objectively and in the context of DFS's regulatory
> enforcement actions against Chubb and Lockton and the backroom
> exhortations, could reasonably be interpreted as threats of retaliatory
> enforcement against regulated institutions that do not sever ties with the NRA.

24

*Id.* at 24-25.

Ms. Vullo argues that she is entitled to qualified immunity on the First Amendment claims because it was objective reasonably for her to believe her statements in the Guidance Letters and press release were lawful, and there "is no case clearly establishing that otherwise protected public statements transform into an unlawful 'threat' because there is an ongoing (and unrelated) regulatory investigation." Dkt. No. 211-1 at 31.  She further maintains that at the time she made her "public statements, DFS had made no public statements about the Carry Guard investigation.    Nor do the NRA's (false) allegations that Ms. Vullo coupled her public statements with 'backroom exhortations' change the analysis, because they are vague and conclusory—there is no specific allegation that Ms. Vullo directly threatened unlawful government enforcement." *Id.*  She argues that "[r]easonable officials would believe it lawful to privately express the sentiments that are lawful to express publicly." *Id.*  The NRA counters that qualified immunity is a fact-specific inquiry that should be undertaken after fact discovery, and that the conduct alleged by the NRA was not "objectively reasonable" but rather violated clearly established constitutional rights.

The Court is inclined to agree with Ms. Vullo that there is no case clearly establishing that otherwise protected public statements transform into an unlawful threat merely because there is an ongoing, and unrelated, regulatory investigation.  *See Zieper*, 474 F.3d at 68 (granting qualified immunity against First Amendment claim because it was not "apparent to a reasonable officer that defendants' actions crossed the line between an attempt to convince and an attempt to coerce"); *see also Simon v. City of N.Y.*, 893 F.3d 83, 92 (2d Cir. 2018)("A right is clearly established when its 'contours ... are sufficiently clear that every

reasonable official would have understood that what he is doing violates that right.'")(quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))(alteration in original); *Gerard v. City of New York*, No. 19-3102, --- Fed. Appx. ---- , 2021 WL 485722, *1 (2d Cir. Feb. 10, 2021).[15]  But here the Court found that, in the context of the factual allegations asserted in the Amended Complaint, it was plausible to conclude that the combination of Defendants' actions, including Ms. Vullo's statements in the Guidance Letters and Cuomo Press Release as well as the purported  "backroom exhortations," could be interpreted as a veiled threat to regulated industries to disassociate with the NRA or risk DFS enforcement action.  This conclusion is enforced by new allegations in the SAC that can be reasonably interpreted as pre-Guidance Letters backroom threats by Ms. Vullo of DFS enforcement against entities that did not disassociate with the NRA. *See* SAC ¶ 21; ¶ 67; ¶ 69.[16]  As expressed in the Court's previous decision, the law was clearly established at the time that First Amendment rights could be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech but that can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the

---

[15]The Circuit in *Gerard* wrote:

"[C]learly established law" cannot be defined "at a high level of generality," [*al-Kidd*, 563 U.S. at 742], but "must be particularized to the facts of the case," *White v. Pauly*, —— U.S. ——, 137 S. Ct. 548, 552, 196 L. Ed.2d 463 (2017) (internal quotation marks omitted), so as to give a reasonable officer "fair notice that [the complained-of] conduct [is] unlawful," *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L.Ed.2d 583 (2004); *see also Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (explaining that, to determine whether the law is clearly established, a court should consider "the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law").

*Gerard*, 2021 WL 485722, *1.

[16]The allegations of Ms. Vullo's statements in this regard took place in February 2018 whereas the Guidance Letters were issued on April 19, 2018.

26

official's request. *See* Dkt. 56 at 18 (and cases cited threat).  When a qualified immunity

defense is raised on a Rule 12(b)(6) motion, the Court must accept the truth of the

allegations in the complaint and may grant qualified immunity only if the facts supporting the

defense appear on the face of the complaint. *See Hyman v. Abrams*, 630 F. App'x 40, 42

(2d Cir. 2015)("Although, usually, the defense of qualified immunity cannot support the grant

of a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted, a

district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if the

facts supporting the defense appear on the face of the complaint. Consequently, a

defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion

for summary judgment must accept [that] ... the plaintiff is entitled to all reasonable

inferences from the facts alleged, not only those that support his claim, but also those that

defeat the immunity defense.")(citing *McKenna v. Wright*, 386 F.3d 432, 435–36 (2d Cir.

2004))(interior quotation marks omitted).  Here, when doing so, a question of material fact

exists as to whether Ms. Vullo explicitly threatened Lloyd's with DFS enforcement if the

entity did not disassociate with the NRA.  Based on this question of material fact, and even

assuming an objectively reasonable person would not have known that the Guidance

Letters or Ms. Vullo's statements in the Cuomo Press Release could be construed as

implied threats to regulated entities if they did not disassociate with the NRA, qualified

immunity on the First Amendment claims must be denied at this time.  Further, because Ms.

Vullo's alleged implied threats to Lloyd's and promises of favorable treatment if Lloyd's

disassociated with the NRA could be construed as acts of bad faith in enforcing the

Insurance Law in New York, a question of material fact exists as to whether she is entitled

to qualified immunity under New York law. *See Gardner v. Robinson*, No.

27

16CIV1548GBDRWL, 2018 WL 722858, at *2–3 n 7 (S.D.N.Y. Feb. 6, 2018)("Although qualified immunity only extends to public officials against whom federal causes of action are asserted, New York common law provides comparable immunity from state law claims unless 'the officials' actions are undertaken in bad faith or without a reasonable basis.'")(quoting *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006)(citations omitted)).  For these reasons, the Court will deny qualified immunity to Ms. Vullo on the First Amendment claims at this time.

### b.  Cuomo, DFS, and Lacewell's Motion

### Relevant Procedural Background

On Defendants' Rule 12(c) motion, in response to Defendants' argument that all Section 1983 claims against DFS must be dismissed because DFS is not a "person" under §1983, Plaintiff withdrew its Section 1983 claims against DFS resulting in dismissal of these claims.  Dkt. No. 112 at 12.  The Court also found that the Eleventh Amendment barred claims for money damages against DFS, and against Gov. Cuomo and Ms. Vullo in their official capacities.  *Id.*  Thus, all such claims were dismissed. *Id.* The Court also dismissed without prejudice the selective enforcement claims against Gov. Cuomo and Ms. Vullo in their individual capacities.  *Id.*  As indicated above, Judge Hummel granted Plaintiff's motion to amend only to the extent it sought to assert a selective enforcement claim against Ms. Vullo in her individual capacity, and to substitute Supt. Lacewell for Ms. Vullo on Plaintiff's claim for injunctive relief.   Thus, as Defendants assert, what remains in Counts One and Two of the SAC, as asserted against DFS, are only claims under the New York State Constitution.  What remains in Counts One and Two of the SAC, as asserted against Gov.

Cuomo in his official capacity, are Section 1983 claims of violations of the U.S. Constitution and claims under the New York State Constitution.

## Sovereign Immunity

Defendants DFS and Gov. Cuomo (collectively "Defendants") argue that all remaining claims against DFS, Supt. Lacewell in her official capacity,[17] and Gov. Cuomo in his official capacity must be dismissed as barred by Eleventh Amendment sovereign immunity.  This includes, Defendants contend, Plaintiff's claims against DFS under the New York State Constitution and the claims for injunctive and declaratory relief sought in the SAC.  Defendants also assert that "in addition to barring the NRA's claims against DFS, the Eleventh Amendment also bars all claims against the Governor in his official capacity, including requested injunctive relief."  Dkt. No. 210-1 at 3.   Plaintiff counters that "Defendants' conduct throughout this litigation is wholly incompatible with their belated claim of sovereign immunity." Dkt. No. 219 at 2.  Plaintiff contends that "[a]lthough Defendants did assert sovereign immunity regarding certain claims for money damages against DFS, and Cuomo and Vullo in their official capacities, Defendants never asserted sovereign immunity with respect to the NRA's First Amendment claims for declaratory and injunctive relief."  *Id.*  Plaintiff asserts that there is no valid reason why Defendants "should belatedly be permitted to assert" the Eleventh Amendment defense now, and thus Defendants have waived sovereign immunity. *Id.*  Plaintiff also argues that Defendants waived sovereign immunity by appearing in this case and defending on the claims asserted herein.

---

[17]In the motion, Supt. Lacewell in her official capacity is treated collectively with DFS because "[f]or the purpose of the arguments contained [in the motion] there is no difference between the office of the Superintendent and the Department which she oversees." Dkt. No. 210-1 at 1, n. 1.

The Eleventh Amendment bars suits against New York State unless it has consented to be sued, or federal legislation has overridden the State's sovereign immunity. *Will v. Michigan Dep't. of the State Police*, 491 U.S. 58, 64 (1989); *see Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009)("[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity."). Eleventh Amendment immunity also extends to suits against state officers in their official capacities. *See Will*, 491 U.S. at 71 ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself.")(citations omitted)). Eleventh Amendment immunity applies whether the claims are asserted under the United States Constitution or a court's pendent jurisdiction. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 117-118 (1984); *see, e.g., Treistman v. McGinty,* 804 F. App'x 98, 99 (2d Cir. 2020)("'[A] claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment.'")(quoting *Pennhurst*, 465 U.S. at 121); *Feng Li v. Lorenzo*, 712 F. App'x 21, 23-24 (2d Cir. 2017)(same); *see also Báez v. New York*, 629 F. App'x 116, 118 (2d Cir. 2015)(affirming dismissal of claims under New York law against the State Office of Temporary and Disability Assistance on the basis of sovereign immunity). "As to the State . . . the Eleventh Amendment bars a suit regardless of the nature of the relief sought." *Feng Li v. Rabner*, 643 F. App'x 57, 58 (2d Cir. 2016)(quotation omitted); *see Everett v. Dean*, No. 3:20-CV-1260 (FJS/ML), 2021 WL 765762, at *6 (N.D.N.Y. Feb. 26, 2021)(Rep. Rec. & Order)("Regardless of the nature of the

relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment.")(citing *Pennhurst*, 465 U.S. at 100).

There is no merit to the argument that sovereign immunity should be denied because it was belatedly asserted.  Defendants had previously raised the sovereign immunity defense in their Answer and in a motion to dismiss. *See* Dkt. No. 59, at p. 55; Dkt. No. 63-1 at pp. 4, 6-7.  The fact that it was not previously addressed to the claims for relief in the SAC is of no moment.  Sovereign immunity may be asserted at anytime in a proceeding. *See McGinty v. New York*, 251 F.3d 84, 94 (2d Cir. 2001)("[T]he Supreme Court and this Court have repeatedly held that a state may assert Eleventh Amendment sovereign immunity at any time during the course of proceedings.")(citing *Calderon v. Ashmus*, 523 U.S. 740, 745 n. 2 (1998)(the Eleventh Amendment is jurisdictional in that it limits a federal court's judicial power, and may be invoked at any stage of the proceedings); *Pennhurst*, 465 U.S. at 99 n. 8 (same); *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 449 (2d Cir.1999)(the defense of Eleventh Amendment immunity need not be raised in trial court to be considered on the merits); *Leonhard v. United States*, 633 F.2d 599, 618 n. 27 (2d Cir.1980)(sovereign immunity need not be expressly raised in the district court or on appeal since it is a jurisdictional defect and may be raised at any time)).  The fact that the NRA incurred expenses related to discovery and other matters in this hotly contested matter does not, by itself, provide a basis to deprive New York State of sovereign immunity. *See Beaulieu v. Vermont*, 807 F.3d 478, 491 (2d Cir. 2015)("It is true that Defendants changed their strategy and that earlier invocation of Vermont's immunity might

31

have resulted in earlier dismissal, sparing Plaintiffs some burden and expense. But there is no record of duplicitous conduct by Defendants or of serious unfairness to Plaintiffs resulting from the tardy invocation of immunity.").  Similarly, the fact that Defendants did not respond to Plaintiff's query whether Defendants would waive sovereign immunity on the state constitutional claims after Plaintiff conceded that DFS is not a person subject to suit under § 1983, *see* Dkt. 219 at 5,[18] provides no basis to deprive New York of sovereign immunity.  Defendants had no obligation to respond, and Plaintiff is represented by experienced counsel.  Plaintiff's counsel could have analyzed whether Defendants' silence indicted a negative response and determined whether, if it did, it was worth continuing in this court given the possibility that Defendants could later invoke sovereign immunity.

There is also no merit to Plaintiff's argument that Defendants waived sovereign immunity by litigation in this matter.  "Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit." *Cosby v. LaValley*, 2015 WL 13843440, *4 (N.D.N.Y. Nov. 16, 2015).  Because of the "vital role of the doctrine of sovereign immunity in our federal system[,]" waiver will only be found where it is "unequivocally expressed." *Pennhurst*, 465 U.S. at 99.  The courts that have found that a State waived its sovereign immunity by litigation occurred in situations where a State

---

[18] Plaintiff argues:

In their third motion to dismiss under Fed. R. Civ. 12(c), Defendants alleged that the NRA's claims for money damages were barred by the Eleventh Amendment but failed to raise that same argument for the NRA's request for declaratory and injunctive relief. In its January 8, 2019 opposition to that motion, the NRA specifically raised the issue stating that "[a]t this stage, the NRA agrees to withdraw its Section 1983 claims under Counts 1, 2, and 4 against DFS. Should DFS additionally choose not to waive sovereign immunity with respect to the pending state law claims against it, the NRA will agree to withdraw those claims and will promptly re-file its claims … in the appropriate State court." Defendants completely ignored that statement in their reply.

voluntarily and affirmatively invoked a federal court's jurisdiction to resolve a claim presented by the State. *See, e.g., Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 619 (2002)("And the Court has made clear in general that 'where a State *voluntarily* becomes a party to a cause and submits its rights for judicial determination, it will be bound thereby and cannot escape the result of its own voluntary act by invoking the prohibitions of the Eleventh Amendment.'")(quoting *Gunter v. Atlantic Coast Line R. Co.*, 200 U.S. 273, 284 (1906) (emphasis added in *Lapides*); *Fifth Ave. Assocs., L.P. v. N.Y. State Dep't of Taxation & Fin.* (*In re 995 Fifth Ave. Assocs., L.P.*), 963 F.2d 503, 506 (2d Cir. 1992)(finding waiver where, after a debtor sought a declaration in bankruptcy court that it was exempt from the tax and entitled to a refund from the state, the State filed an administrative expense claim for additional gains tax liability); *Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of New York*, No. 96 CIV. 8414, 2016 WL 7320775, at *7 (S.D.N.Y. July 18, 2016), *report and recommendation adopted*, No. 96 CIV. 8414 (KMW), 2016 WL 7243544 (S.D.N.Y. Dec. 14, 2016)("[T]he cases involving waiver-by-litigation premise the waiver on a State actually appearing as a party and submitting its rights for judicial determination.")(collecting cases).  By contrast, the courts have found no waiver where a State is involuntarily a defendant in a case but proceeds only to defend itself on a claim brought by a plaintiff.  *See, e.g., McGinty v. New York*, 251 F.3d 84, 94 (2d Cir. 2001)("What distinguishes the present case from *995 Fifth Avenue Associates* is that here no affirmative claim was made by the State of New York, the Department or the Retirement System. Thus, their involvement in the EEOC proceeding constitutes no waiver of sovereign immunity."); *see also Lapides*,  535 U.S. at 622 ("[T]he Eleventh Amendment waiver rules

are different when a State's federal-court participation is involuntary.")(citing *Hans v. Louisiana*, 134 U.S. 1, 10 S. Ct. 504, 33 L.Ed. 842 (1890); U.S. Const., Amdt. 11 (discussing suits "commenced or prosecuted against" a State)).  "[T]he crucial considerations are the voluntariness of the state's choice of forum and the functional consequences of that choice."  *Mohegan Tribe v. State of Conn.*, 528 F. Supp. 1359, 1366-1367 (D. Conn. 1982).  New York has not unequivocally expressed waiver of immunity, nor has it waived this immunity simply by defending the claims against it.  To hold otherwise would mean a waiver of sovereign immunity occurs every time a State appears in federal court to defend itself in litigation.  Such a result is not supported by either case law or logic.

The Court finds no reason to deprive New York or its officers acting in their official capacities of sovereign immunity, or to deem that immunity waived.  Accordingly, all claims against DFS are dismissed.  The claims against New York's officers acting in their official capacities are also dismissed unless an exception to Eleventh Amendment immunity applies.

### *Ex parte Young*

Plaintiff contends that if immunity applies, the exception to Eleventh Amendment immunity articulated in *Ex parte Young* applies to Gov. Cuomo in his official capacity. Under the doctrine of *Ex Parte Young*, a "plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers, as opposed to the state, in their official capacities, provided that [the] complaint[:] (a) alleges an ongoing violation of federal law[;] and (b) seeks relief properly characterized as prospective." *Clark v. DiNapoli*, 510 F. App'x

49, 51 (2d Cir. 2013)(internal quotation marks and citation omitted).  The Supreme Court

has declined to extend the reasoning of *Ex Parte Young* to claims for retrospective relief.

*See Green v. Mansour*, 474 U.S. 64, 68 (1985) (citations omitted).  "The line between

prospective and retrospective relief is drawn because '[r]emedies designed to end a

continuing violation of federal law are necessary to vindicate the federal interest in assuring

the supremacy of that law,' whereas 'compensatory or deterrence interests are insufficient

to overcome the dictates of the Eleventh Amendment.'"  *Ward v. Thomas*, 207 F.3d 114,

119 (2d Cir. 2000)(quoting *Green*, 474 U.S. at 68).  "Accordingly, suits against states and

their officials seeking damages for past injuries are firmly foreclosed by the Eleventh

Amendment." *Id.* (citations omitted).   "In determining whether the doctrine of *Ex Parte

Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a

'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal

law and seeks relief properly characterized as prospective.'" *Verizon Maryland Inc. v. Public

Serv. Comm. Of Maryland*, 553 U.S. 635, 645 (2002)(quoting *Idaho v. Coeur d'Alene Tribe

of Idaho*, 521 U.S. 261, 296 (1997)).

### Past Conduct

Defendants contend that *Ex parte Young* is inapplicable because the claims in

the SAC concern only past conduct.  In this regard, Defendants argue that the First

Amendment and State Constitutional free speech claims, the only claims remaining as

to Defendants, challenge the press releases and "backroom exhortations" that

supposedly occurred in the past.  Thus, Defendants maintain, the SAC's claims rely

exclusively on past conduct.  Plaintiff asserts that its suit alleges an ongoing violation

of federal law, citing to paragraphs 93 and 102 of the SAC to support this proposition. Dkt. No. 219 at 7 (citing SAC ¶¶ 93,[19] 102[20]).   In addition, Plaintiffs points to the allegations at paragraphs 61, 80, 81, and 82 of the SAC for the proposition that Defendants' conduct is having an ongoing affect on its ability to maintain business relationships with regulated institutions.  Plaintiff also points to an allegation that DFS served a subpoena on an NRA insurance provider, SAC ¶ 79, and the fact that DFS commenced an enforcement proceeding against the NRA, as evidence that Defendants' unconstitutional conduct is ongoing.  Plaintiff also points to the SAC where it alleges that "[i]n addition to the above-described  damages, absent an injunction against Defendants, the NRA will suffer irrecoverable loss and irreparable harm if it is unable to acquire insurance or other banking services due to Defendants' actions." SAC ¶ 97; ¶ 107 (same).

Just as the Court indicated in its decision denying Plaintiff's request for a preliminary injunction, Plaintiff's First Amendment claims are premised upon actions that took place in 2018. *See* Dkt. 218 at pp. 2-4.[21]  Plaintiff's citation to paragraphs 93

---

[19]At paragraph 93, Plaintiff asserts: "Defendants' concerted efforts to stifle the NRA's freedom of speech caused financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations.  For example, Defendants coerced and caused Lockton, Chubb, and Lloyd's to cease their participation in NRA-endorsed insurance programs, regardless of whether the insurance programs met all legal qualifications under New York's Insurance Law."

[20]At paragraph 102, Plaintiff asserts: "Defendants' actions have concretely harmed the NRA by causing  financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations. For example, Defendants coerced and caused Lockton, Chubb, and Lloyd's to cease their participation in NRA-endorsed insurance programs in New York and elsewhere, regardless of whether the insurance programs met all legal qualifications under New York's Insurance Law."

[21]Although that decision examined the Amended Complaint, the allegations supporting the First Amendment claims in the SAC are essentially the same.

36

and 102 of the SAC does not change this conclusion as these allegations concern

Defendants' past actions.  Similarly, the allegations in paragraphs 61, 80, 81, and 82

of the SAC allege disruptions of the NRA's relationships with regulated industries

caused by Defendants' past conduct.  To the extent Plaintiff asserts that it still has

trouble maintaining business relationships with regulated industries, that appears to

be because of Defendants' past alleged unconstitutional acts, not because of similar

ongoing conduct.  The fact that DFS issued a subpoena to a regulated entity

associated with the NRA that Plaintiff contends demonstrates a continuation of "DFS's

selective enforcement," SAC ¶ 79, does not indicate that Defendants are continuing to

engage in conduct intended to deprive Plaintiff of its rights to free speech - the claims

that remain against DFS - or selective enforcement.  A subpoena seeks information

but it is not an enforcement action like those that form the basis of the claims in this

action.  Plaintiff's citation to the DFS enforcement action against the NRA does not

indicate that Defendants are continuing the allegedly illegal conduct that forms the

basis of this lawsuit.  Although the NRA was well aware for some time that DFS was

investigating it for Insurance Law violations, *see* Dkt. No. 56 at 4 ("As part of its

investigation, DFS learned that, although it did not have an insurance producer

license from DFS, the NRA engaged in marketing of, and solicitation for, the Carry

Guard program."), there is no allegation in the SAC that this conduct is the basis of

the free speech or equal protection claims asserted therein.[22] Plaintiff's professed

---

[22]It is worth noting that after the enforcement action against the NRA was commenced, the NRA entered a Consent Order in which it agreed to a $2.5 penalty and a five-year ban on doing incurrence business in New York.  *See* Dkt. No. 312.

need for an injunction does not provide a factual basis indicating that there is an on-going violation of Plaintiff's right to free speech. Plaintiff's fear that Defendants might repeat their past alleged conduct that violated Plaintiff's rights to free speech is insufficient to conclude that the past conduct is occurring or will occur in the future. In the end, the claims in the SAC are based on Defendants' past actions, not on an ongoing course of action.

### Injunctive Relief[23]

Defendants argue that even if it could be construed that there is an ongoing constitutional violation asserted in the SAC, Plaintiff seeks an improper "obey the law" injunction. The injunction that Plaintiff seeks is, at least in part, an improper "obey the law" injunction. Further, the totality of the sought-after injunction is improper because it violates the specificity requirements set forth at Rule 65(d) of the Federal Rules of Civil Procedure. Under Rule 65(d), "[e]very order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail--and not by referring to the

---

[23]In its Request for Relief, Plaintiff seeks:

[A] preliminary and permanent injunction . . . ordering DFS, its agents, representatives, employees and servants and all persons and entities in concert or participation with it, Cuomo (in his official capacity) and the current Superintendent of DFS (in her/his official capacity):

(1) to immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with the NRA's exercise of the rights afforded to it under the First and Second Amendment to the United States Constitution and Section 8 to the New York Constitution; and

(2) to immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with, terminating, or diminishing any of the NRA's contracts and/or business relationships with any organizations[.]

SAC at pp. 41-42.

complaint or other document--the act or acts restrained or required." Fed. R. Civ. P.

65(d).  As the Second Circuit has instructed:

> "[U]nder Rule 65(d), an injunction must be more specific than a simple
> command that the defendant obey the law." *Peregrine Myanmar Ltd. v.
> Segal*, 89 F.3d 41, 51 (2d Cir.1996).  "To comply with the specificity and
> clarity requirements, an injunction must 'be specific and definite enough
> to apprise those within its scope of the conduct that is being
> proscribed.'" *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339,
> 1352 (2d Cir.1989)(quoting *In re Baldwin–United Corp.*, 770 F.2d 328,
> 339 (2d Cir.1985)). "This rule against broad, vague injunctions 'is
> designed to prevent uncertainty and confusion on the part of those to
> whom the injunction is directed,' and to be sure 'that the appellate court
> knows precisely what it is reviewing.'" *Rosen v. Siegel*, 106 F.3d 28, 32
> (2d Cir.1997)(quoting *Calvin Klein Cosmetics Corp. v. Parfums de
> Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir.1987)).

*S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240–41 (2d Cir. 2001).

Plaintiff's request for a injunction requiring Defendants to "immediately cease

and refrain from engaging in any conduct or activity which has the purpose or effect of

interfering with the NRA's exercise of the rights afforded to it under the First and

Second Amendment to the United States Constitution and Section 8 to the New York

Constitution" is vague and does not describe in reasonable detail the act or acts

sought to be restrained.  The injunction is not specific and definite enough to apprise

those within its scope of the conduct that is being proscribed. *See id.*  Further, the

injunction does "not require a defendant to do anything more than that already

imposed by law," subjects the defendants to contempt for unspecified conduct, and is

"not readily capable of enforcement." *See Dublino v. McCarthy*, No. 9:19-CV-0381

(GLS/DJS), 2019 WL 2053829, at *20 (N.D.N.Y. May 9, 2019).  As such, it is an "obey

the law" injunction that is "not favored" in the law, *id.* (citing cases), and fails to comply

with Rule 65(d)'s specificity requirements.

The second part of the requested injunction also seeks an injunction that fails to comply with Rule 65(d)'s specificity requirements.  Plaintiff requests an injunction that requires Defendants to "immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with, terminating, or diminishing any of the NRA's contracts and/or business relationships with any organizations[.]"  This does not define with any specificity what conduct or activity could be deemed to have "the purpose or effect of interfering with, terminating, or diminishing any of the NRA's contracts and/or business relationships with any organizations."  While the injunction does not necessarily command that the Defendants comply with some specific provision of law, the injunction is not specific and definite enough to apprise those within its scope of the conduct that is being proscribed, *see S.C. Johnson & Son, Inc.*, 241 F.3d at 240–41, subjects Defendants to contempt for non-specific reasons, and is unenforceable.  As such the sought-after injunction is improper because it fails to comply with Rule 65(d)'s specificity mandate.

Because the SAC fails to allege an ongoing violation of federal law, and seeks an improper injunction as prospective relief, *Ex parte Young* does not avoid an Eleventh Amendment bar to suit against either Gov. Cuomo or Supt. Lacewell in their official capacities relative to the sought-after injunction.

### Declaratory Relief[24]

Defendants argue that because Plaintiff's Section 1983 claims against DFS

---

[24]Plaintiff seeks a judgment "[d]eclaring . . . that Defendants have violated the NRA's rights to free speech and equal protection under both the Federal and New York Constitutions."

have been withdrawn and any requests for monetary or injunctive relief are barred by

the Eleventh Amendment, "Plaintiff's bald request for a declaration pursuant to the

[Declaratory Judgment Act (DJA)] that Defendants have violated the NRA's rights to

free speech and equal protection under both the Federal and New York Constitutions

is insufficient to confer subject matter jurisdiction over DFS."  Dkt. 210-1 at 12; *see*

*also id.* at 11-12 (citing cases for the propositions that the DJA does not expand the

jurisdiction of the federal courts, the DJA does not provide an independent basis for

jurisdiction, and a plaintiff seeking relief under the DJA must have an independent

basis for jurisdiction). Based on the cases cited by Defendants, the Court agrees.

Defendants also argue that even if there were a jurisdictional basis to entertain

Plaintiff's request for declaratory relief, the NRA's sought-after declaration would be

barred as against Defendants by the Eleventh Amendment.  *Id.* at 12-13.  The Court

agrees.

As indicated above, the two counts that remain against Defendants allege that

DFS violated the NRA's rights to free speech in the past. The declaration Plaintiff

seeks would declare that Defendants' past conduct violated Plaintiff's rights under

both the Federal and New York Constitutions.  The Second Circuit has explained that

in circumstances like these where a declaration "could say no more than that [a State]

had violated [the] law in the past," that relief is barred by the Eleventh Amendment.

*Ward*, 207 F.3d at 120; *see id.* ("'A declaratory judgment is not available when the

result would be a partial end run around' the Eleventh Amendment's bar on

retrospective awards of monetary relief.")(quoting *Green*, 474 U.S. at 72).  Here,

because Plaintiff seeks retrospective declaratory relief against Defendants, it is barred by the Eleventh Amendment. *See Treistman v. McGinty*, 804 F. App'x 98, 99 (2d Cir. 2020)(*"*The complaint sought declaratory relief that was properly characterized as retrospective. Treistman sought a declaration stating that the defendants violated state regulations and that the family courts had a policy to violate state regulations. This is entirely retrospective and is barred by Eleventh Amendment immunity.")(citing *Ward*, 207 F.3d at 120); *Kaminski v. Semple*, 796 F. App'x 36, 38 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 434, 208 L. Ed. 2d 130 (2020)("[A] declaration dealing only with past events would be retrospective and barred.")(citing *Ward,* 207 F.3d at 120 ("Any declaration could say no more than that Connecticut had violated federal law in the past ... [and] would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment.")(internal quotation marks omitted)); *H.B. v. Byram Hills Cent. Sch. Dist.*, 648 F. App'x 122, 125 (2d Cir. 2016)("[T]he requested declaratory relief is aimed at past conduct, a target that is impermissible.")(citing *Ward*, 207 F. 3d at 120 (declaratory relief unavailable because "[a]ny declaration could say no more than that [the state] had violated federal law in the past"); *Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 53 (1st Cir. 2013)("With limited exceptions, not present here, issuance of a declaratory judgment deeming past conduct illegal is also not permissible as it would be merely advisory.")); *see also Szymonik v. Connecticut*, 807 F. App'x 97, 101 (2d Cir. 2020)("The Eleventh Amendment bars federal courts from issuing retrospective declaratory relief against

42

state officials for past violations of federal law.")(citing *Green*, 474 U.S. at 68; *Ward*, 207 F.3d at 119, 120 (declaratory relief unavailable because "[a]ny declaration could say no more than that Connecticut [and the defendant official] had violated federal law in the past"); *Am. Civil Liberties Union of Mass*., 705 F.3d at 53).

## IV.    CONCLUSION

For the reasons set forth above, the motion by DFS and Gov. Cuomo in his official capacity seeking to dismiss claims in the Second Amended Complaint, Dkt. No. 210, is **GRANTED**.  Plaintiff's claims in the Second Amended Complaint against DFS, Gov. Cuomo in his official capacity, and Supt. Lacewell in her official capacity, including the claims for injunctive and declaratory relief, are **DISMISSED** as barred by the Eleventh Amendment**.**

Ms. Vullo's motion appealing Magistrate Judge Hummel's decision granting leave to amend, and seeking to dismiss the claims against her in the Second Amended Complaint, Dkt. No. 211, is **GRANTED in part** and **DENIED in part**.  The selective enforcement claim against Ms. Vullo is **DISMISSED**, the motion is denied as to the First Amendment claims, and the appeal of Judge Hummel's decision granting leave to amend is denied.

**IT IS SO ORDERED.**

Dated: March 15, 2021

Thomas J. McAvoy
Senior, U.S. District Judge