UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NATIONAL RIFLE ASSOCIATION OF AMERICA,

*Plaintiff*,

-against-

ANDREW CUOMO, both individually and in his official
capacity; MARIA T. VULLO, both individually and in her
official capacity; and THE NEW YORK STATE
DEPARTMENT OF FINANCIAL SERVICES,

*Defendants*.

**ANSWER TO SECOND
AMENDED COMPLAINT**

18-CV-0566

TJM/CFH

      Defendant Andrew Cuomo by his attorney, Letitia James, Attorney General of the State of

New York, William A. Scott, Assistant Attorney General, of counsel, answer the second amended

complaint ("Complaint") [1] as follows:

## NATIONAL RIFLE ASSOCIATION OF AMERICA'S
## SECOND AMENDED COMPLAINT AND JURY DEMAND

      **Complaint text**:  Plaintiff the National Rifle Association of America (the "NRA") files

this Second Amended Complaint and Jury Demand ("Complaint") against defendants New York

Governor Andrew Cuomo ("Cuomo"), both individually and in his official capacity; Maria T.

Vullo ("Vullo"), both individually and in her former official capacity; and the New York State

---

[1] Defendant answers the Complaint with the understanding that the Order filed by this Court on
March 15, 2021, Dkt. No. 322, in addition to the Court's prior orders in this matter, modifies the
Complaint, such that Plaintiff's claims against the Department of Financial Services, Supt.
Lacewell in her official capacity and Governor Cuomo in his official capacity have all been
dismissed.  That the Plaintiff's claims for injunctive and declaratory relief have all been dismissed.
That the Plaintiff's selective enforcement claim has been dismissed in its entirety.  See Dkt. No.
322.

Department of Financial Services ("DFS") (collectively, "Defendants"), upon personal knowledge of its own actions, and upon information and belief as to all others matters, as follows:

**Response**: Plaintiff's unnumbered introductory paragraph is a statement of the case to which no response is required.  To the extent a response is required, Defendant denies the allegations in this paragraph to the extent they allege that Defendants engaged in any wrongdoing or violated any of Plaintiff's rights.

## I.    PRELIMINARY STATEMENT

**Response**: Plaintiff's unnumbered paragraphs constituting the "Preliminary Statement" set forth a further statement of the case, legal arguments and/or legal conclusions, and questions of law; accordingly, no response is required.  To the extent a response is required, Defendant denies that he engaged in any wrongdoing or violated any of Plaintiff's rights.

## II.    PARTIES

**Paragraph 1**: Plaintiff the National Rifle Association of America is a nonprofit corporation organized under the laws of the State of New York with its principal place of business in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment to the United States Constitution. The NRA has over five million members, and its programs reach millions more.

1.    **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 2**:  Defendant New York State Department of Financial Services is an agency of the State of New York that regulates financial services firms operating in New York in order to

guard against financial crises and to protect New York consumers and markets from fraud. DFS has a regional office at One Commerce Plaza, Albany, New York 12257. Its main office is located at One State Street, New York, New York 10004-1511. It regulates more than 1,400 insurance companies with assets in excess of $4.3 trillion, including 200 life insurers, 1,100 property casualty insurers, and 100 health insurance companies. DFS also regulates over 1,900 banking and other financial institutions with assets over $2.9 trillion.

2.      **Response**: Defendant admits the allegations contained in this paragraph of the Complaint.

**Paragraph 3**: Defendant Maria T. Vullo is the former Superintendent of the New York State Department of Financial Services and, at all times relevant to the Complaint, was acting under color of state law. Her principal place of business is 40 West 77th Street, Apt. 16 B, New York, New York 10024. Vullo is sued in her individual and official capacities.

3.      **Response**: Defendant admits that Defendant Vullo: is the former Superintendent of DFS; and, at all times relevant to the Complaint, acted in her official capacity.  Defendant denies the remaining allegations contained in this paragraph of the Complaint.

**Paragraph 4**: Defendant Andrew Cuomo is the Governor of the State of New York and, at all times relevant to the Complaint, was acting under color of state law. His principal place of  business is The State Capitol Building, Albany, New York 12224.  Cuomo is sued in his individual  and official capacities.

4.      **Response**: Defendant admits that Defendant Cuomo: is the Governor of the State of New York; maintains an office in the State Capitol Building, Albany, New York 12224; and, at all times relevant to the Complaint, acted in his official capacity.  Defendant denies the remaining allegations contained in this paragraph of the Complaint.

3

### III.   JURISDICTION AND VENUE

**Paragraph 5**:  Pursuant to 28 U.S.C. § 1331, the Court has subject matter jurisdiction over the claims asserted in this action because this action involves claims based on the First and Fourteenth Amendments to the United States Constitution (U.S. Const. amend. I, XIV), and because the action seeks to prevent state officials from interfering with federal rights. Further, subject matter jurisdiction is conferred on this Court by 28 U.S.C. § 1343(a)(3) because this action is brought to redress deprivations under color of state law of rights, privileges, and immunities secured by the United States Constitution. This Court has supplemental jurisdiction over all state-law claims asserted in this action under 28 U.S.C. § 1367.

5.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 6**:  Pursuant to 28 U.S.C. § 1391(b), venue is properly vested in this Court because defendant Cuomo resides in this judicial district.

6.   **Response**: Defendant admits that venue is properly vested in this Court and denies the remaining allegations in this paragraph of the Complaint.

**Paragraph 7**:  There is a present and actual controversy between the parties.

7.   **Response**: Defendant denies the truth of the allegations in this paragraph.

**Paragraph 8**:  The relief requested is authorized pursuant to 28 U.S.C. § 1343(a)(4) (recovery of damages or equitable relief or any other such relief for the protection of civil rights), 28 U.S.C. § 1651(a) (injunctive relief), 28 U.S.C. §§ 2201 and 2202 (declaratory and other appropriate relief), 42 U.S.C. § 1983 (deprivation of rights, privileges, and immunities secured by the Constitution), and 42 U.S.C. § 1988 (awards of attorneys' fees and costs).

8.     **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

## IV.     STATEMENT OF RELEVANT FACTS

**Paragraph 9**: After the Civil War, two Union Army officers created a private association to promote marksmanship among the citizenry. Many officers believed that the war would have ended significantly sooner if the northern troops had been able to shoot as well as the Confederate soldiers. Therefore, a group of them obtained a charter from the State of New York in November of 1871; thereafter, the National Rifle Association built a proud legacy in the State of New York.

9.     **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 10**: From the NRA's inception, it received praise from the State of New York for its many public contributions. In 1872, the New York State legislature and the NRA jointly dedicated funds for the creation of a rifle range on Creed Farm, in what is now Queens Village, Queens, New York. For many decades, the NRA partnered with the State to advance firearms safety, education, conservation, and other laudable public policy goals. For example, when New York City public schools sought to educate boys in marksmanship and gun safety, NRA co-founder Gen. George Wingate designed and headed the resulting Public Schools Athletic League (PSAL) marksmanship program. Likewise, in 1949, the NRA worked with the State of New York to create the nation's first hunter education program. Similar courses were subsequently adopted by state fish and game departments across the country and in Canada and help make hunting among the safest sports in existence.

10.   **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 11**: First among the "Purposes and Objectives" contained in the NRA's bylaws is "[t]o protect and defend the Constitution of the United States."  That is not surprising, because political speech is a major purpose of the NRA as it engages in extensive advocacy at all levels of government to promote the rights of its members and all Americans.

11.   **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 12**: The NRA spends tens of millions of dollars annually distributing pamphlets, fact sheets, articles, electronic materials, and other literature to advocate for its views on the Second Amendment and to assist NRA members engaging in national, state, and local firearm dialogue.  The NRA's direct mail, television, radio, and digital communications seek to educate the public  about issues bearing on the Second Amendment, defend the NRA and its members against political and media attacks, and galvanize participation in the political process by NRA members and supporters.

12.   **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 13**: To its critics, the NRA is best known as a "superlobby – one of the largest and most  truly conservative lobbying organizations in the country," able to mobilize its millions of members in concerted efforts to protect the Second Amendment rights of all Americans.[4] Of course the NRA's letter-writing campaigns, peaceable public gatherings, and other  grassroots "lobbying" activities constitute precisely the type of political speech which rests "[a]t  the core of the First Amendment."

13.    **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in the first sentence of this paragraph of the Complaint.   The second sentence of this paragraph sets forth legal arguments and/or legal conclusions; accordingly, no response thereto is required.   To the extent a response to the second sentence of this paragraph is required, Defendant denies that he engaged in any wrongdoing or violated any of Plaintiff's rights.

**Paragraph 14**: Andrew Cuomo has criticized the political speech and influence of "Second Amendment types" generally, and the NRA specifically, for decades. In fact, Cuomo has a history of abusing his regulatory power to retaliate against his political opponents on gun control issues.

14.    **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 15**: The son of former Governor Mario Cuomo, Cuomo is a political opportunist who consistently seeks to gain political capital by attacking the NRA.  During his tenure as Housing and Urban Development ("HUD") Secretary in the 1990s, Cuomo famously coordinated a campaign of lawsuits (nearly all dismissed) against gunmakers that purported to hold them liable for crimes committed in public housing projects by criminals using illegally obtained firearms.   L a t e r ,  Cuomo admitted that his real aim was to coerce, via settlement, the "voluntary" industrywide adoption of certain equipment and sale restrictions, and warned that any manufacturer who refused to settle would suffer "death by a thousand cuts."[7] Decried by even gun-control supporters as "wrong" and an abuse of agency authority, the HUD effort failed after the NRA and other pro-gun groups organized legislative and grassroots opposition.

15.     **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 16**: Cuomo blamed "gun lobby extremists" for the collapse of his efforts at HUD. At a press conference on June 20, 2000, he referred to gun-rights supporters as "the enemy," and announced a blueprint for defeating the NRA and its allies that would emphasize the use of state and municipal retaliatory authority: "If we engage the enemy in Washington we will lose. They will beat us in this town. They are too strong in this town. Their fortress is within the Beltway. We're going to beat them state by state, community by community.

16.     **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 17**: As governor of New York, Cuomo has loudly supported the enactment of some of the nation's harshest gun-control laws. But rather than debate opponents of his anti-gun initiatives, he declared that conservative firearms advocates "have no place in the state of New York." Accordingly, Cuomo has sought to banish "the enemy" from public discourse altogether, and remains dissatisfied with what he perceives to be the excessive political influence of "conservatives and the Second Amendment types."

17.     **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 18**: In truth, Cuomo bears distinct animus toward the NRA, which he accuses of exerting a "stifl[ing] . . . stranglehold" over national gun policy.[15] For Cuomo, weakening the political advocacy of the NRA is a career strategy.

18.     **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 19**: Against the backdrop of recent tragedies and a polarized public gun-control debate, Cuomo and the other Defendants have abused their authority in an effort to stifle the NRA's political advocacy and to retaliate against the NRA for the effectiveness of that advocacy.

19.  **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 20**: Together with former DFS Superintendent Vullo, his longtime lieutenant, Cuomo has embarked on a campaign to chill the political speech of the NRA and other so-called "gun promotion" organizations by leveraging state power to punishing financial institutions which maintain "business arrangements with the NRA." To achieve this, Defendants draw upon the formidable regulatory powers of DFS—an agency charged with ensuring the stability and integrity of New York's financial markets.

20.  **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 21:** At Cuomo's behest, Vullo and DFS have threatened regulated institutions with costly investigations, increased regulatory scrutiny and penalties should they fail to "discontinue[] . . . their arrangements with the NRA."16 Many of the most pernicious of these threats occurred privately. For example, beginning in February 2018, Vullo met personally with executives of regulated institutions, including Lloyd's.17 During the meetings she discussed an array of technical regulatory infractions plaguing the affinity-insurance marketplace. Vullo made it clear, however, that DFS was less interested in pursuing the infractions of which she spoke, so long as Lloyd's ceased providing insurance to gun groups, especially the NRA. The threat was clear and unambiguous. Shortly thereafter, Defendants began to deliver on it. Within a single week, DFS levied multi-million dollar fines against two insurance-industry firms that dared to do

business with the NRA. Under intense scrutiny, both firms, and later a third (together comprising all the issuers of NRA-related policies for the NRA and its members), were coerced to terminate their business arrangements with the NRA and its members—including arrangements having nothing to do with the allegedly unlawful conduct cited by DFS.

21.     **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 22:** Importantly, Defendants were fully aware by at least March 2018 (and likely earlier) that non-NRA insurance policies exhibiting the same features were being marketed on behalf of other affinity organizations. Defendants intentionally ignored such knowledge and did not undertake enforcement actions relating to these other similarly constructed programs because enforcing the Insurance Law was never their goal. Instead, as DFS explained to Lloyd's in closed-door meetings, the Cuomo administration sought to focus on "gun programmes" and gun advocacy groups generally.

22.     **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 23**: A DFS press release publicizing one recent enforcement action makes clear the gravamen of Defendants' campaign: financial institutions regulated by DFS must refrain from "[e]ntering into any . . . agreement or arrangement," which "involv[es] the NRA, directly or indirectly"—or face the consequences.

23.     **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 24**: In 2011, as part of his state budget, Cuomo announced the merger of the New York State Insurance Department and the Banking Department to create DFS. The mandate

of the new agency, which consolidated supervisory and enforcement powers previously vested in separate departments, is to "reform the regulation of financial services in New York to keep pace with the rapid and dynamic evolution of these industries, to guard against financial crises and to protect consumers and markets from fraud."

24.     **Response**: Defendant admits that in 2011, Defendant Cuomo announced the merger of the New York State Insurance Department and the Banking Department to create DFS. Defendant denies the remaining allegations in this paragraph of the Complaint.

**Paragraph 25**: The Superintendent of DFS has broad regulatory and enforcement powers, which encompass the ability to initiate civil and criminal investigations and enforcement actions. In addition, pursuant to Financial Services Law, Article 3, § 301, the DFS superintendent has the power to refer matters to the attorney general for criminal enforcement. The creation of an agency with such expansive prerogatives and capabilities "grab[bed] power and headlines," and the New York Times reported in 2015 that the first DFS superintendent, Benjamin Lawsky, was popularly caricatured as "the new sheriff of Wall Street" and an all-powerful monarch ("King Lawsky").

25.     **Response**: In response to the first two sentences of this paragraph, Defendant admits that the Superintendent of DFS has broad regulatory and enforcement powers, and respectfully refer the Court to all applicable statutes, laws, and regulations as the best evidence of and most accurate legal authority on the extent of such regulatory and enforcement powers. In response to the third sentence of this paragraph, Defendant respectfully refers the Court to the referenced article as the best evidence of what was reported by the New York Times regarding the first Superintendent of DFS and denies the remaining allegations in this paragraph of the Complaint.

11

**Paragraph 26**: New York Financial Services Law, Article 2, § 201, provides the superintendent of DFS with formidable authority to, among other things, "ensure the continued solvency, safety, [and] soundness" of banks and insurance companies. Accordingly, DFS directives regarding "risk management" must be taken seriously by financial institutions—as risk-management deficiencies can result in fines of hundreds of millions of dollars.

26.   **Response**: Defendant respectfully refers the Court to all applicable statutes, laws, and regulations as the best evidence of and most accurate legal authority on the authority of the Superintendent of DFS to take certain actions as to State-regulated banks and insurance companies. Defendant denies the remaining allegations in this paragraph of the Complaint.

**Paragraph 27**: DFS's regulatory mandate does not include setting gun-control policy. Nor does any statute or other authority empower DFS to blacklist, from receipt of insurance or banking services, speakers with political viewpoints objectionable to the governor or DFS superintendent. In addition, DFS has no authority to engage in unlawful viewpoint discrimination.

27.   **Response**: In response to the first two sentences of this paragraph, Defendant respectfully refers the Court to all applicable statutes, laws, and regulations as the best evidence of and most accurate legal authority on DFS' regulatory mandate. The third sentence of this paragraph sets forth legal arguments and/or legal conclusions; accordingly, no response thereto is required. To the extent a response to the third sentence of this paragraph is required, Defendant denies that he engaged in any wrongdoing or violated any of Plaintiff's rights. Defendant denies the remaining allegations in this paragraph of the Complaint.

**Paragraph 28**: The NRA's direct-mail campaigns, digital media broadcasts, television and radio communications, grassroots organizing, membership recruitment, and other core political speech and associational activities are carried out by a combination of volunteers,

employees, and independent contractors engaged by the NRA and its affiliates. To meet payroll obligations, purchase mailing materials and media airtime, maintain its Internet presence, and otherwise continue to advocate for the Second Amendment of the United States Constitution, the NRA must have the ability to process and retain cash, check, wire-transfer, and other donations from members and events throughout the country, as well as transmit and apply these funds to meet operational needs. Accordingly, the NRA relies upon depository services, cash management services, lockbox services, disbursement services, wire-transfer services, and remote banking services of the type generally offered by major wholesale banking institutions.

28.   **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 29**: To continue its existence as a not-for-profit organization and fulfill its advocacy objectives, the NRA also must maintain various corporate insurance coverage. General liability and related "umbrella" coverage allow the NRA to maintain physical premises, convene off-site meetings and events, and operate educational programs promoting the safe use of firearms which are vital to the NRA's mission. For its Annual Meeting, Great American Outdoor Show, and other major rallies, conventions and assemblies with explicitly expressive purposes, the NRA generally must also purchase event-specific coverage. Absent such coverage, the NRA could be forced to cease circulation of various print publications and magazines.

29.   **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 30**: In addition, like many affinity groups and organizations nationwide, the NRA seeks to make life, health, and other insurance coverage available to its members on affordable, tailored terms. To this end, the NRA contracted with multiple insurance-industry firms

to develop, market, and underwrite insurance programs endorsed by the NRA. Pursuant to these arrangements, the NRA performs none of the functions of an insurer. It does lend its valuable logos, marks, and endorsements to insurance programs brokered and serviced by others. Such "affinity" insurance plans are common, and believed by many to be a suitable substitute for employer-based coverage.

30.   **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 31**: From 2000 onward, the NRA contracted with affiliates of the world's largest privately-held insurance broker, Lockton Companies, LLC (collectively with pertinent affiliates, "Lockton"), for affinity-program brokerage and administration services. Lockton has provided services in the affinity-insurance market for decades, and caters to a wide array of industries and clients including franchises, professional and trade organizations, fraternal organizations, and common-cause groups such as the NRA. For roughly seventeen years, Lockton entities administered and marketed NRA-endorsed insurance in New York State and across the nation without incident. In addition to its affinity-insurance transactions with the NRA, Lockton has also served for decades as the NRA's trusted insurance broker for various corporate coverage—such as general liability, umbrella and director and officer insurance.

31.   **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 32**: The NRA-endorsed affinity insurance administered by Lockton consists primarily of life, health, property, and casualty policies that mirror policies offered by Lockton to other affinity groups. In addition, Lockton administers certain products, including a product known as "Carry Guard," that provide coverage for expenses arising out of the lawful self-defense

use of a legally possessed firearm. Illinois Union Insurance Company ("Illinois Union"), a subsidiary of Chubb Ltd., underwrote Carry Guard while doing business under the name "Chubb."

32.    **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 33**: The NRA has been the target of activist boycott efforts in the past, including campaigns that urged insurance companies and other private actors to cease doing business with the NRA. However, because these campaigns were carried out by non-governmental activist groups who lack the government's power to punish those who refused to join the boycott, their methods have centered on persuasion—not coercion. Unaided by the brute force of state power, activists never successfully persuaded the NRA's banking or insurance partners to sever ties with the NRA. This changed in 2017, when one activist organization successfully enlisted Defendants in a joint effort to silence the NRA.

33.    **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 34**: During or about September 2017, a non-governmental activist organization known as Everytown for Gun Safety ("Everytown") contacted the New York County District Attorney's Office (the "DA's Office"), as well as state and municipal authorities in other jurisdictions, in an effort to prompt a crackdown by sympathetic government officials that would target alleged compliance infirmities in Carry Guard. Notably, Everytown is not an organization dedicated to insurance compliance; instead, its explicit political mission is to oppose the NRA. On September 13, 2017, representatives from the DA's Office met with DFS to effectuate Everytown's agenda.

34.     **Response**: Defendant denies the allegations in the last sentence of this paragraph. Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the remaining allegations contained in this paragraph of the Complaint.

**Paragraph 35**: As a result, in October 2017, DFS launched an investigation that focused ostensibly on Carry Guard, and was directed in the first instance at Lockton.  On its website, Everytown took credit for instigating the inquiry—but even if it had not, the political underpinnings and selective focus of the investigation were clear. The investigation was chronicled in the national media before the NRA received official notice of it, and it targeted none of the available self-defense insurance products except Carry Guard, which was endorsed by the NRA.

35.     **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 36**: Of course, Carry Guard was not Defendants' true focus, and the scope of the DFS investigation rapidly expanded. At first, Defendants purported to target a discrete subset of so-  called "excess line" property and casualty policies relating to firearms—a category that encompassed Carry Guard, but also included policies such as Gun Club Insurance and Hunt Club Insurance. However, Defendants' goal, from the outset, was to disrupt any and all business arrangements between the NRA and any insurance administrator, broker, or underwriter—indeed, any financial institution. Within weeks of commencing its investigation, DFS began to target insurance programs that had nothing to do with firearms, and instead provided coverage similar or identical to coverage endorsed by other New York affinity organizations such as the New York State Bar Association, the New York City Bar, the National Association for the Self-Employed,

16

the New York Association of Professional Land Surveyors, and the New York State Psychological Association.

36.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 37**: DFS has not announced even to this day  similar inquiries concerning any of these other membership  organizations, although their affinity programs involve most, if not all, of the practices and features referenced by DFS in its investigation of the NRA's affinity programs.   Instead, Defendants selectively targeted the NRA because of the NRA's constitutionally protected legislative and grassroots  advocacy activities. Defendants specifically intend to undermine the NRA's ability to conduct its  affairs in New York—and to advance Cuomo's anti-NRA political agenda.

37.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 38**: Throughout its purported investigation of Carry Guard in late 2017 and early 2018,  DFS communicated to banks and insurers with known or suspected ties to the NRA that they would face  regulatory  action  if they  failed  to  terminate  their  relationships  with  the NRA.  These  exhortations extended  far beyond Carry Guard (the policy purportedly raising regulatory   concerns), indicating that any business relationship whatsoever with the NRA would invite adverse  action.

38.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 39**: The impact of Defendants' campaign on the NRA's ability to access essential financial services has been far greater than—and, clearly distinct from—the impact of any public controversy relating to recent tragedies.

39.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 40**: For example, during February 2018, the NRA issued a Request for Proposal ("RFP") to multiple banks, inviting them to submit bids to provide depository services, cash- management services, and other basic wholesale banking services necessary to the NRA's advocacy. The NRA received enthusiastic responses from several banks.

40.   **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 41**: Likewise, in early January 2018, the NRA began negotiating with a major DFS- regulated insurance carrier (the "Corporate Carrier") to renew its General Liability, Umbrella, and Media Liability insurance coverage policies, which were set to expire during Spring 2018. Those negotiations remained on-course until the final days of February 2018, when Defendants sharply escalated their threats.

41.   **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 42**: On or about February 25, 2018, the Chairman of Lockton Companies, placed a distraught telephone call to the NRA. Lockton had been a close business partner of the NRA for nearly twenty years; its commitment to the parties' business relationship had not wavered in connection with the Parkland tragedy, nor the prior Sandy Hook tragedy, nor any previous wave of public controversy relating to gun control. Nonetheless, although he expressed

that Lockton privately wished to continue doing business with the NRA, the chairman confided that Lockton would need to "drop" the NRA—entirely—for fear of "losing [our] license" to do business in New York.

42.   **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 43**: On February 26, 2018, Lockton publicly tweeted that it would discontinue providing brokerage services for *all* NRA-endorsed insurance programs.

43.   **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 44**: Days later, the Corporate Carrier abruptly reversed its position in its corporate- insurance-renewal negotiations with the NRA. Although it had previously indicated it would be willing to extend the NRA's General Liability and Umbrella coverage on favorable terms consistent with the NRA's favorable claims history, the Corporate Carrier now stated that it was *unwilling to renew coverage at any price.* The Corporate Carrier severed mutually beneficial business arrangements with the NRA because it learned of Defendants' threats directed at Lockton, and feared it would be subject to similar reprisals.

44.   **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 45**: Defendants soon supplemented their backchannel threats with official regulatory "guidance." In April 2018, Cuomo directed DFS to publicly "urge insurers and bankers statewide to determine whether any relationship they may have with the NRA or similar organizations sends the wrong message to their clients and their communities who often look to them for guidance and support."

19

45.    **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 46**: On April 19, 2018, Vullo, as Superintendent of DFS, issued a pair of ominous "guidance" letters (the "April 2018 Letters") directed at the chief executive officers, or equivalents, of all New York State chartered or licensed financial institutions and all insurers doing business in New York. The April 2018 Letters urged recipients to sever ties with the NRA and other "gun promotion organizations." The directive was packaged in a sharply worded media advisory meant to generate headlines and apply maximum public pressure to the NRA and those with whom it associates.

46.    **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 47**: The April 2018 Letters are suffused with political concerns far afield from DFS's mandate to prevent financial crises and financial fraud. For example, they urge banks and insurers to heed "the voices of the passionate, courageous, and articulate young people" speaking out in favor of gun control, and to reconsider any business relationships with "the [NRA], and similar organizations that promote guns and lead to senseless violence." However, the April 2018 Letters do not merely express Defendants' own political opinions: they invoke the "risk management" obligations of recipients, and direct banks and insurers to "take prompt actions to manage" purported "reputational risks" arising from "dealings with the NRA or similar gun promotion organizations."

47.    **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 48**: Read in the context of the preceding months' private communications—as well as disclosures that would soon follow concerning consequences imposed on firms doing business with the NRA—the April 2018 Letters were threats that deliberately invoked DFS's "risk management" authority to warn of adverse action if institutions failed to support Defendants' efforts to stifle the NRA's speech and to retaliate against the NRA based on its viewpoint.

48.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 49**: Importantly, the April 2018 Letters contain no language clarifying that DFS would forebear from directly enforcing the letters' terms. Nor do the April 2018 Letters provide regulated institutions with any objective criteria for measuring the "reputational risks" imposed by dealings with entities that "promote guns that lead to senseless violence." This is because Defendants intended the April 2018 Letters to intimidate institutions into acceding to a political blacklisting campaign, and have nothing to do with the types of market "risks" properly regulated by DFS.

49.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 50**: To further dispel any ambiguity surrounding the April 2018 Letters, Cuomo and Vullo issued the contemporaneous Cuomo Press Release, containing and endorsing a statement by Vullo that directly "urge[s] all insurance companies and banks doing business in New York to join the companies that have already discontinued their arrangements with the NRA."

50.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 51**: Likewise, on April 20, 2018, Cuomo publicly tweeted: "The NRA is an extremist organization. I urge companies in New York State to revisit any ties they have to the NRA and consider their reputations, and responsibility to the public."

51.     **Response**: Defendant admits that on April 20, 2018, he posted a public message regarding the NRA on Twitter, and respectfully refers the Court to Twitter as the best evidence of the content of such message.  Defendant denies the remaining allegations in this paragraph of the Complaint.

**Paragraph 52**: The intended and actual effect of the April 2018 Letters, and the actions by Cuomo and Vullo, is to coerce insurance agencies, insurers, and banks into terminating business relationships with the NRA that were necessary to the survival of the NRA as a charitable organization.

52.     **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 53**: Third-party commentators immediately raised concerns about the First Amendment  implications of DFS's actions.  For example, on April 22, 2018, shortly after issuance of the April 2018 Letters, Brian Knight, a Senior Research Fellow and financial regulation expert at George Mason University, published an article expressing alarm that the April 2018 Letters "appear[ed]  to be *inherently* about political speech," and should be immediately withdrawn.[30] In the face of  such criticism (and this litigation), Cuomo doubled down, declaring that a lawsuit which alleges  unconstitutional censorship of the NRA's "dangerous agenda" means "you know you're doing  something right."

53.     **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 54**: On May 2, 2018, two weeks after Vullo issued the April 2018 Letters, Lockton entered into a consent order Under Articles 21, 23, and 34 of the Insurance Law (the "Lockton Consent Order") with DFS—signed by Vullo—which imposes a civil monetary penalty of $7 million. Although the Lockton Consent Order ostensibly addresses discrete violations by specific Lockton entities of New York's Insurance Law, its provisions go much further. Most notably, the Lockton Consent Order purports to restrict Lockton's participation in ***any*** NRA- endorsed insurance programs in New York State, irrespective of whether such programs comply with the Insurance Law.

54.     **Response**: Defendant admits that on May 2, 2018, Lockton entered into a consent order with DFS (the "Lockton Consent Order"), and respectfully refers the Court to the Lockton Consent Order as the best evidence of what is contained therein. Defendant denies the remaining allegations in this paragraph of the Complaint.

**Paragraph 55**: Specifically, the Lockton Consent Order requires that Lockton agree "not to participate in . . . any other NRA-endorsed programs with regard to New York State." Nor may Lockton "enter into any agreement or program with the NRA to underwrite or participate in any affinity-type insurance program involving any line of insurance to be issued or delivered in New York State or to anyone known to Lockton to be a New York resident." As a result, Lockton is prohibited from selling NRA affinity insurance outside New York to any individual who maintains a New York residence.

55.     **Response**: Defendant respectfully refers the Court to the Lockton Consent Order as the best evidence of what is contained therein and denies. the remaining allegations in this paragraph of the Complaint.

**Paragraph 56**: DFS and Vullo have no legal basis to restrict Lockton's involvement with insurance programs that do not violate New York's Insurance Law; nor do they have authority to regulate insurance transactions outside of New York. Nevertheless, DFS mandated that Lockton never enter into any future agreements with the NRA for legitimate and fully compliant insurance programs in New York.

56. **Response:** Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 57**: Furthermore, Lockton would violate the Lockton Consent Order if it markets an ordinary property, casualty, or life insurance policy in the State of New York that was accompanied by an NRA logo or endorsement—notwithstanding that a comparable logo or endorsement referencing any other affinity or common-cause organization is permissible. This provision of the Lockton Consent Order is deliberate and intended to impair the NRA's ability to negotiate insurance benefits for its members, damage the NRA's goodwill among its membership, and unconstitutionally restrict the NRA's speech on the basis of political animus.

57. **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 58**: Several of the purported "violations" assessed pursuant to the Lockton Consent Order concern programs commonly engaged in by numerous additional affinity associations that do not publicly advocate for Second Amendment rights and, therefore, are not targets of Defendants' unconstitutional conduct. Several such organizations are clients of Lockton—yet the Consent Order does not compel Lockton to discontinue its purportedly unlawful conduct with respect to these clients.

58. **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 59**: For example:

- DFS claims that Lockton Affinity violated Insurance Law § 2122(a)(1) by referring to the insurer's AM Best rating. Yet, at the time this lawsuit was filed, Lockton Affinity's affinity program for the American Optometric Association through AOAExcel ("AOAExcel touted the "backing of a carrier that is rated A+ (Superior) by A.M. Best. Similarly, Lockton Affinity currently advertises that coverage for the affinity programs designed for the Veterans of Foreign Wars ("VFW") and Moose International Inc. ("Moose") was through companies "rated 'Excellent' or higher by A.M. Best."

- DFS claims that Lockton Affinity violated Insurance Law § 2324(a) by giving or offering to give no cost insurance to NRA members in good standing. Yet, Lockton Affinity currently made that same offer to members of both the Professional Photographers of America ("PPA") and the VFW.

- DFS claims that Lockton Affinity violated Insurance Law § 2116 by compensating the NRA based on actual premiums collected. Yet, Lockton Affinity paid AOAExcel, Moose, the VFW, the PPA, and dozens of other clients in the same or similar manner.

59.    **Response**: Defendant respectfully refers the Court to the Lockton Consent Order as the best evidence of what is contained therein and denies the remaining allegations in this paragraph of the Complaint.

**Paragraph 60**: Even if such conduct does violate insurance law, DFS's selective enforcement of such offenses as to NRA-endorsed policies—but not as to other policies marketed by Lockton in an identical fashion—constitutes impermissible viewpoint discrimination and a denial of equal protection under the law.

60.    **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 61**: Despite the backlash concerning the expansive coercive scope and clear political agenda of the April 2018 Letters, Defendants remained undaunted in their effort to deprive the NRA of such services; as such, their overall messaging to financial institutions remained unaffected. Indeed, the DFS press release publicizing the Lockton Consent Order

25

trumpeted the  same concession by Lockton that had inspired its chairman's furtive telephone call months before:  Lockton must "refrain from [e]ntering into any other agreement or arrangement . . . involving the  NRA, directly or indirectly"—including, but not limited to, affinity insurance.

61.     **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 62**: On May 7, 2018, Chubb Group Holdings, Inc. and Illinois Union (together, "Chubb") entered into a Consent Order Under Sections 1101 and 3420 of the Insurance Law (the "Chubb Consent Order") with DFS—signed by Vullo—which imposes a civil monetary penalty of $1.3 million. Similar to the Lockton Consent Order, in the Chubb Consent Order, DFS overextends  its authority and purports to  restrict Chubb's participation in ***any*** affinity-type insurance program with the NRA, irrespective of whether such programs comply with the Insurance Law.

62.     **Response**: Defendant admits that on May 7, 2018, Chubb entered into a consent order with  DFS (the "Chubb Consent Order"), and respectfully refers the Court to the Chubb Consent Order as the best evidence of what is contained therein.  Defendant denies the remaining allegations in this paragraph of the Complaint.

**Paragraph 63**: Although DFS restricted Lockton from participating in any affinity-type insurance  programs with the NRA in New York or with New York residents, Defendants' restrictions in the  Chubb Consent Order contain no geographic constraint whatsoever. Instead, the Chubb Consent  Order purports to limit Chubb's involvement with the NRA anywhere, and everywhere, in the  world.

63.   **Response**: Defendant respectfully refers the Court to the Chubb Consent Order as the best evidence of what is contained therein and denies the remaining allegations in this paragraph of the Complaint.

**Paragraph 64**: Nevertheless, DFS allows Chubb to continue to underwrite affinity-type insurance programs with other affinity or common-cause organizations that do not publicly advocate for Americans' Second Amendment rights, so long as Chubb undertakes "reasonable due diligence to ensure that any entity involved . . . is acting in compliance with the Insurance Law . . . ." The only plausible explanation for the DFS's complete exclusion of NRA-endorsed policies, even those "in compliance with the Insurance Law," is that Defendants seek to misuse DFS's power to deprive the NRA of insurance and financial services, on the sole ground that Defendants disapprove of the NRA's viewpoint regarding gun control.

64.   **Response**: Defendant respectfully refers the Court to the Chubb Consent Order as the best evidence of what is contained therein and denies the remaining allegations in this paragraph of the Complaint.

**Paragraph 65:** Beginning during the Fall of 2017, including through a subpoena issued to Lockton and research supplied by Everytown, Defendants became aware of pervasive, colorable regulatory infirmities affecting numerous affinity-insurance programs. For example, brokers such as Lockton frequently paid success-based royalties to their affinity clients, which DFS would later assert violated New York Insurance Law § 2116. Insurance coverage for the cost of psychological counseling had become increasingly pervasive outside a standard health-insurance context, yet DFS argues that providing such insurance violates New York Insurance Law § 2117. Similarly, DFS takes the position that the financial condition or "rating" of an out-of-state, excess-line insurer may not be advertised as a means to promote the policy—but this practice was common in the affinity-

insurance marketplace in 2017. And although New York Insurance Law § 3420 sets forth various minimum requirements for liability insurance which protects persons and property, many policies failed to meet those requirements. It is clear that confusion existed among brokers regarding the mechanics of compliance with New York Insurance Law § 2118, which requires brokers to secure declinations from authorized insurers before placing surplus-line insurance.

65.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 66:**   Confronted with a marketplace where they knew that brokerage, underwriting, and affinity-endorsement practices frequently departed from the regulators' preferred reading of certain statutes, Defendants could have issued informative guidance, or adopted an even-handed enforcement approach. Instead, Defendants selectively used these purported infractions to target the NRA, while disregarding other instances of the same conduct of which they were aware. (When Defendants did issue guidance letters to regulated institutions in April 2018, the letters reflected their enforcement approach: ignore excess-line declinations, out-of-state-carrier ratings, and other technical insurance-policy features while "urging" financial institutions to cut ties with gun groups).

66.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 67:**   Although DFS's investigation of the NRA, launched at Cuomo and Everytown's behest, had originally focused on Carry Guard, that changed by February 2018. In the aftermath of the Parkland tragedy, Vullo met with senior executives of Lloyd's and LAI, and

presented Defendants' views on gun control and their desire to leverage their powers to combat the availability of firearms, including specifically by weakening the NRA. These backchannel meetings began on or about February 27, 2018, in the wake of a speech by Vullo at a breakfast meeting of the New York City Bar Association; participants included Vullo herself, along with Joseph Gunset of LAI.

67. **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response. To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 68:** Sometimes referred to as an insurance underwriter, Lloyd's is actually an insurance marketplace, composed of "members which underwrite insurance (each for their own account) as members of syndicates." Various supervisory bodies and boards within Lloyd's set policies for the Lloyd's syndicates, and can issue directives that shape the availability of different types of insurance worldwide. Like most of the insurance industry, Lloyd's generally does not shy away from providing insurance that may be controversial—for example, to this day, Lloyd's syndicates are permitted to underwrite coverage for religious sexual abuse liability. However, despite being based in London, Lloyd's is extremely sensitive to pressure from the New York regulators, and concerned about "reputational risks" that may incur DFS's disfavor. Since World War II, when Lloyd's sought to protect policyholders from the consequences of German attacks on England, all premiums paid by Lloyd's policyholders have deposited into trust funds in the State of New York, through a structure known as the Lloyd's America Trust Fund ("LATF"). The LATF is directly regulated by DFS, and totals tens of billions of dollars—providing massive collateral for whatever demands DFS may impose.

68.    **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 69:** During her surreptitiously held meetings with Lloyd's executives that commenced in February 2018, Vullo acknowledged the widespread regulatory issues in the excess-line marketplace. Vullo and DFS made clear that Lloyd's could avoid liability for infractions relating to other, similarly situated insurance policies, so long as it aided DFS's campaign against gun groups. Against the specter of this bold abuse of her position, Lloyd's agreed that it would instruct its syndicates to cease underwriting firearm-related policies and would scale back its NRA-related business; in exchange, DFS would focus its forthcoming affinity-insurance enforcement action solely on those syndicates which served the NRA, and ignore other syndicates writing similar policies. The first step of this choreographed process was a letter from DFS to Gunset, an LAI executive, sent on April 11, 2018.

69.    **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 70:** On May 1, 2018, Lloyd's held a meeting of its Board of Directors. Among the topics discussed at the meeting were █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████

70.     **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the first four sentences of this paragraph and denies the rest and remainder of the allegations contained in this paragraph of the Complaint.

**Paragraph 71:**  On May 9, 2018, Lloyd's sent a notice to its managing agents who are responsible for all insurance policies written through the Lloyd's marketplace (the "May 9 Notice"). The May 9 Notice ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

████████████.

71.     **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant respectfully refers the Court to the May 9, 2018, notice as the best evidence of what is contained therein and denies the remaining allegations in this paragraph of the Complaint.

**Paragraph 72:**  Also on May 9, 2018, Lloyd's publicly announced that it had directed its underwriters to terminate all insurance related to the NRA and not to provide any insurance to the NRA in the future, in the wake of DFS's investigations into the NRA and its business partners.

72.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant respectfully refers the Court to the May 9, 2018, announcement as the best evidence of what is contained therein and denies the remaining allegations in this paragraph of the Complaint.

**Paragraph 73:**   By June 30, 2018, the Lloyd's managing agents and syndicates had provided materials to DFS that DFS requested in the April 11, 2018 letter.

73.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 74:**  On December 20, 2018, ten Lloyd's underwriters, acting through their managing agents, entered into a Consent Order Under Sections 1102 and 3420 of the Insurance Law (the "Lloyd's Consent Order") with DFS—signed by Vullo—which imposes a civil monetary penalty of $5 million.50 Similar to the Lockton and Chubb Consent Orders, in the Lloyd's Consent Order, DFS overextends its authority and purports to restrict Lloyd's participation in any affinity-type insurance program with the NRA, irrespective of whether such programs comply with the Insurance Law.

74.   **Response**:   The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required

Defendant respectfully refers the Court to the referenced Consent Order as the best evidence of what is contained therein and denies the remaining allegations in this paragraph of the Complaint.

**Paragraph 75:**  Pursuant to the conversations between Vullo and DFS with senior officials at Lloyd's and LAI described above, Lloyd's was not subjected to any enforcement action and/or penalties for any violation of the New York Insurance Law related to affinity-insurance programs, other than in connection with the NRA-related insurance programs.

75.    **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 76:**  Importantly, Lloyd's was not the only entity with direct exposure to DFS's selective enforcement scheme. DFS also became specifically cognizant of non-NRA policies that exhibited the same purported defects as NRA policies—and chose to ignore those violations, targeting solely the NRA—in the context of its Lockton investigation. ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████ DFS verbally conveyed to Lockton that it was only interested in pursuing the NRA. Other programs exhibiting the same issues, DFS explained,

could be quietly remediated by Lockton after consent order and penalty targeting NRA programs had been publicized.

76.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 77:**  Consistent with this agreement, on July 2, 2018, Lockton provided a report to DFS regarding the status of its remediation efforts for non-NRA programs.



77.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant respectfully refers the Court to the referenced report as the best evidence of what is contained therein and denies the remaining allegations in this paragraph of the Complaint.

**Paragraph 78:**  ████████████████████████

████████████████████████████████████

In response, DFS took no action whatsoever against any of Lockton's non-NRA clients. On January 31, 2019, almost three months after this Court had sustained the NRA's selective-enforcement

claims and permitted discovery regarding them, DFS entered into a Supplemental Consent Order with Lockton that purported to admonish violations of the same statutes by Lockton's non-NRA clients, yet did not identify the clients by name or require Lockton to cease doing business with them.

78.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant respectfully refers the Court to the referenced report as the best evidence of what is contained therein and denies the remaining allegations in this paragraph of the Complaint

**Paragraph 79:**  DFS's selective enforcement continues to this day. While taking no action against any of Lockton's other affinity clients, or the underwriters involved in those policies, DFS recently subpoenaed an underwriter known as AGIA which backs health-insurance policies administered and brokered by Lockton for the NRA. These policies have nothing to do with firearms and are identical in all material respects to policies administered and brokered by Lockton on behalf of non-NRA clients.

79.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 80**: Defendants' concerted efforts to stifle the NRA's freedom of speech and to retaliate against the NRA based on its viewpoints are causing other insurance, banking, and financial  institutions doing business with the NRA to rethink their  mutually beneficial business relationships with  the NRA for  fear of monetary sanctions or  expensive public  investigations.

80.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 81**: The NRA has encountered serious difficulties obtaining corporate insurance coverage to replace coverage withdrawn by the Corporate Carrier. The NRA has spoken to numerous carriers in an effort to obtain replacement corporate insurance coverage; nearly every carrier has indicated that it fears transacting with the NRA specifically in light of DFS's actions against Lockton, Chubb and Lloyd's.

81.   **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 82**: Defendants' threats have also imperiled the NRA's access to basic banking services, despite the absence of any alleged regulatory violations in connection with the NRA's banking activities. Multiple banks withdrew their bids in the NRA's RFP process following the issuance of the April 2018 Letters, based on concerns that any involvement with the NRA—even providing the organization with basic depository services—would expose them to regulatory reprisals.

82.   **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 83**: Defendants' campaign is achieving its intended chilling effect on banks throughout DFS's jurisdiction. Speaking "on the condition of anonymity," one community banker from Upstate New York told *American Banker* magazine that in light of the apparent "politically motivated" nature of the DFS guidance, "[i]t's hard to know what the rules are" or whom to do business with, because bankers must attempt to anticipate "who is going to come into disfavor with the New York State DFS" or other regulators. Other industry sources told *American Banker* that, "such regulatory guidelines are frustratingly vague, and can effectively compel institutions to cease catering to legal businesses."

36

83.    **Response**: Defendant lacks knowledge or information sufficient to form a belief as to the truth or veracity of the allegations contained in this paragraph of the Complaint.

**Paragraph 84**: The NRA has suffered tens of millions of dollars in damages based on Defendants' conduct described above. Such damages include, without limitation, damages due to reputational  harm, increased development and marketing costs for any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA, as well as attorneys' fees, legal expenses,  and other costs.

84.    **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 85**: If the NRA is unable to collect donations from its members, safeguard the assets  endowed to it, apply its funds to cover media buys and other expenses integral to its  political  speech, and obtain basic corporate insurance coverage, it will be unable to exist as a not-for-profit  or pursue its advocacy mission.  Defendants seek to silence one of America's oldest constitutional   rights advocates.  If their abuses are not enjoined, they will soon, substantially, succeed.

85.    **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

## V.    CLAIMS

**Count One: Violation Of The NRA's First And Fourteenth Amendment Rights Under 42 U.S.C. § 1983, And Article 1, Section 8 Of The New York Constitution By The Establishment Of An Implicit Censorship Regime (As To All Defendants).**

**Paragraph 86**: The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

86.   **Response**: Defendant reincorporates his responses to Paragraphs 1 through 85.

**Paragraph 87**: The First Amendment, which applies to Defendants by operation of the Fourteenth Amendment, and Section Eight of the New York Constitution secure the NRA's right to free speech, including its right to express its viewpoints and political beliefs regarding the constitutionally protected right to keep and bear arms.

87.   **Response**: This paragraph sets forth legal arguments and/or legal conclusions, and questions of law; accordingly, no response is required.   To the extent a response is required, Defendant denies that he engaged in any wrongdoing or violated any of Plaintiff's rights.

**Paragraph 88**: The NRA has a longstanding history of political advocacy advancing the Second Amendment rights of all Americans. Although Cuomo and Vullo disagree with and oppose the NRA's political views, the NRA's freedom to express its views with respect to the gun-control debate is a fundamental right protected by the First Amendment.

88.   **Response**: This paragraph sets forth legal arguments and/or legal conclusions, and questions of law; accordingly, no response is required.   To the extent a response is required, Defendant admits that the NRA has speech rights protected by the First Amendment but denies that that Defendant engaged in any wrongdoing or violated any of Plaintiff's rights.  Defendant denies the truth of all other allegations in this paragraph of the Complaint.

**Paragraph 89**: Defendants have regulatory authority over financial institutions and insurance entities that have done or are doing business with or are otherwise associated with the NRA, including Chubb, Lockton, and Lloyd's.

89.   **Response**: Defendant respectfully refer the Court to all applicable statutes, laws, and regulations as the best evidence of and most accurate legal authority on Defendant's regulatory authority and denies the remaining allegations in this paragraph of the Complaint.

**Paragraph 90**: Defendants' actions—including but not limited to the issuance of the April 2018  Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon  Chubb, Lockton and Lloyd's, and the issuance of the Cuomo Press Release—established a "system of informal censorship" designed to suppress the NRA's speech.

90.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 90**: Defendants' actions were for the purpose of suppressing the NRA's pro-Second  Amendment viewpoint. Defendants undertook such unlawful conduct with the intent to obstruct,  chill, deter, and retaliate against the NRA's core political speech.

91.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 91:** Defendants' unlawful exhortations to New York insurance companies, banks, and  financial institutions that they, among other things, "manag[e] their risks, including reputational  risks, that may arise from their dealings with the NRA . . ., as well as continued assessment of compliance with their own codes of social responsibility[,]" as well as "review any relationships  they have with the NRA[,]" and "take prompt actions to managing these risks and promote public  health and safety[,]" constitute a concerted effort to deprive the NRA of its freedom of speech by  threatening with government prosecution services critical to the survival of the NRA and its ability   to disseminate its message.  Far from protected government speech, Defendants' actions constitute    an "implied threat[ ] to employ coercive state power" against entities doing business with the NRA,  and they are reasonably interpreted as such.

92.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 93**: Defendants' concerted efforts to stifle the NRA's freedom of speech caused financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations. For example, Defendants coerced and caused Lockton, Chubb and Lloyd's to cease their participation in NRA-endorsed insurance programs, regardless of whether the insurance programs met all legal qualifications under New York's Insurance Law.

93.     **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 94**: Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

94.     **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 95**: Defendants' intentional actions resulted in significant damages to the NRA, including but not limited to damages due to reputational harm, increased development and marketing costs for any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA.

95.     **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 96**: The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

96.     **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 97**: In addition to the above-described damages, absent an injunction against Defendants, the NRA will suffer irrecoverable loss and irreparable harm if it is unable to acquire insurance or other banking services due to Defendants' actions. Accordingly, the NRA seeks an order preliminarily and permanently enjoining Cuomo and Vullo (in their official capacities) and DFS—including its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction—from threatening or encouraging insurance companies, banks, or financial institutions to sever ties with or discontinue services to the NRA.

97.    **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Count Two: Violation Of The NRA's First And Fourteenth Amendment Rights Under 42 U.S.C. § 1983 And Article 1, Section 8 Of The New York Constitution By Retaliating Against The NRA Based On Its Speech (As To All Defendants).**

**Paragraph 98**: The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

98.    **Response**: Defendant reincorporates his responses to Paragraphs 1 through 82.

**Paragraph 99**: The First Amendment, which applies to Defendants by operation of the Fourteenth Amendment, and Section Eight of the New York Constitution, secures the NRA's right to free speech, including its right to express its viewpoints and political beliefs regarding the constitutionally protected right to keep and bear arms.

99.    **Response**: This paragraph sets forth legal arguments and/or legal conclusions, and questions of law; accordingly, no response is required.   To the extent a response is required, Defendant admits that the NRA has speech rights protected by the First Amendment but denies that

that Defendants engaged in any wrongdoing or violated any of Plaintiff's rights.  Defendant denies the truth of all other allegations in this paragraph of the Complaint.

**Paragraph 100**: The NRA has a longstanding history of political advocacy advancing the Second Amendment rights of all Americans. Although Cuomo and Vullo disagree with and oppose the NRA's political views, the NRA's freedom to express its views with respect to the gun-control debate is a fundamental right protected by the First Amendment.

100.   **Response**: This paragraph sets forth legal arguments and/or legal conclusions, and questions of law; accordingly, no response is required.   To the extent a response is required, Defendant denies that he engaged in any wrongdoing or violated any of Plaintiff's rights.

**Paragraph 101**: Defendants' actions—including but not limited to the issuance of the April 2018 Letters and the accompanying backroom exhortations, the imposition of the Consent Orders upon Chubb, Lockton and Lloyd's, and the issuance of the Cuomo Press Release— were in response to and substantially caused by the NRA's political speech regarding the right to keep and bear arms. Defendants' actions were for the purpose of suppressing the NRA's pro-Second Amendment viewpoint. Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech.

101.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 102**: Defendants' actions have concretely harmed the NRA by causing financial institutions doing business with the NRA to end their business relationships, or explore such action, due to fear of monetary sanctions or expensive public investigations. For example, Defendants coerced and caused Lockton, Chubb and Lloyd's to cease their participation

in NRA-endorsed insurance programs in New York and elsewhere, regardless of whether the insurance programs met all legal qualifications under New York's Insurance Law.

102.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 103**: Defendants had discretion in deciding whether and how to carry out their actions, including but not limited to the types of demands imposed on Chubb, Lockton and Lloyd's in the Consent Orders, whether to issue the Cuomo Press Release, and the type of guidance provided in the April 2018 Letters. They exercised this discretion to harm the NRA because of the NRA's speech regarding the Second Amendment.

103.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 104**: Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

104.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 105**: Defendants' intentional actions resulted in significant damages to the NRA, including but not limited to damages due to reputational harm, increased development and marketing costs for any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA.

105.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 106**: The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

106.    **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 107**: In addition to the above-described damages, absent an injunction against Defendants, the NRA will suffer irrecoverable loss and irreparable harm if it is unable to acquire insurance or other financial services due to Defendants' actions. Accordingly, the NRA seeks an order permanently enjoining Cuomo, Vullo, and DFS—including its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction—from threatening or encouraging insurance companies, banks, or financial institutions to sever ties with or discontinue services to the NRA.

107.    **Response**: Defendant denies the truth of the allegations in this paragraph.

**Count Three: Violation Of The Equal Protection Clause Of The Fourteenth Amendment Under 42 U.S.C. § 1983, And Article 1, Section 11 Of<br>The New York Constitution (As To Vullo).**

**Paragraph 108**:  The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

108.    **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent a response is required, Defendant reincorporates his responses to Paragraphs 1 through 106.

**Paragraph 109**: Vullo knowingly and willfully violated the NRA's equal protection rights by seeking to selectively enforce certain provisions of the Insurance Law against Lockton's affinity-insurance programs for the NRA.  Meanwhile, other affinity-insurance programs that

were identically (or at least similarly) marketed by Lockton, but not endorsed by "gun promotion" organizations, have not been targeted by DFS's investigation.

109. **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response. To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 110:** Vullo was aware during the investigations of the NRA and its business partners that these other identical (or at least similar in all material respects) affinity-insurance programs had the same legal infirmities that resulted in the penalties against Lockton, Chubb, and Lloyd's related solely to the NRA-related affinity-insurance programs. Specifically, Vullo was aware of these comparators from her involvement in the conversations she had with senior officials of Lloyd's in the spring of 2018 described above.

110. **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response. To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 111:** Alternatively, Vullo should have known of similarly situated individuals at the time DFS launched its investigation and any purported lack of knowledge was due to a "see-no-evil" policy of enforcement, which Vullo and DFS abandoned solely to further their vendetta against the NRA. The "see-no-evil" enforcement policy was confirmed by DFS's continued ignorance toward the violations of the similarly situated comparators.

111. **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response. To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 112:** By virtue of the position held by Vullo at the time DFS launched its investigation, Vullo knew the actions taken by DFS against NRA affinity insurance programs were unprecedented. No other similarly situated programs have faced even close to the same treatment for analogous violations. However, Vullo and DFS failed to inquire about whether there were any other similarly situated affinity programs when the investigation was launched.

112.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 113:** There is an extremely high level of similarity between the NRA-related affinity insurance programs and those of the comparator affinity-insurance programs, including AOAExcel, Moose, the VFW, and the PPA, such that no rational person would perceive the NRA related programs to be different enough to justify the differential treatment by Vullo and DFS.

113.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 114:** Vullo and DFS discriminated against the NRA and its business partners because of Vullo's personal animus toward the NRA and its Second Amendment advocacy.

114.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 115:** The similarity between the NRA-related programs and the comparators and the sharp differences in Vullo's and DFS's treatment of them are sufficient to exclude the possibility that Vullo and DFS acted on the basis of a mistake.

46

115.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 116:** Alternatively, there is at least a reasonably close resemblance between the NRA related affinity-insurance programs and those of the comparator affinity-insurance programs, including AOAExcel, Moose, the VFW, and the PPA.

116.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 117.** The disparate treatment of the NRA-related programs and the comparators was caused by Vullo's intent to punish and/or inhibit the NRA because of the NRA's constitutionally protected speech.

117.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 118**: Vullo's selective enforcement of the Insurance Law against the NRA and its   business partners has been knowing, willful, arbitrary, capricious, unreasonable, discriminatory,  and undertaken in bad faith and without a rational basis.  Vullo's conduct does not further any  legitimate government interest.

118.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 119**: Vullo's selective enforcement of the Insurance Law against the NRA and its business partners is based on the NRA's political views and speech relating to the Second Amendment.  These considerations are impermissible bases for an enforcement action.

119.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 120**: Vullo's actions have resulted in significant damages to the NRA, including but  not limited to damages due to reputational harm, increased development and marketing costs for  any potential new NRA-endorsed insurance programs, and lost royalty amounts owed to the NRA.

120.   **Response**: The allegations in this paragraph relate to claims that have been dismissed by the Court and therefore require no response.  To the extent that a response is required Defendant denies the truth of the allegations in this paragraph of the Complaint.

**Paragraph 121**: The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Laws and Rules § 8601.

121.   **Response**: Defendant denies the truth of the allegations in this paragraph of the Complaint.

## VI.   <u>DEMAND FOR JURY TRIAL</u>

**Paragraph 142**:  The NRA hereby demands a trial by jury on all issues so triable.

122.   **Response**: This paragraph contains a jury demand; accordingly, no response is required.  To the extent a response is required, Defendant admits that the NRA demands a jury trial.

## VII.   <u>REQUEST FOR RELIEF</u>

**Complaint text**: WHEREFORE the NRA respectfully requests that the Court enter judgment in the NRA's favor and against Defendants, as follows:

a.      Declaring, pursuant to 28 U.S.C. § 2201, that Defendants have violated the NRA's rights to free speech and equal protection under both the Federal and New York Constitutions;

b.      Granting a preliminary and permanent injunction, pursuant to 28 U.S.C. § 1651 (a), 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure, ordering DFS, its agents, representatives, employees and servants and all persons and entities in concert or participation with it, Cuomo (in his official capacity) and the current Superintendent of DFS (in her/his official capacity):

(1)      to immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with the NRA's exercise of the rights afforded to it under the First and Second Amendment to the United States Constitution and Section 8 to the New York Constitution; and

(2)      to immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with, terminating, or diminishing any of the NRA's contracts and/or business relationships with any organizations;

b.      Granting such other injunctive relief to which the NRA is entitled;

c.      Awarding the NRA actual damages, including compensatory and consequential damages, in an amount to be determined at trial;

d.      Awarding the NRA exemplary or punitive damages;

e.      Awarding the NRA pre-judgment and post-judgment interest at the highest lawful rates;

49

f.     Awarding the NRA such costs and disbursements as are incurred in prosecuting this action, including reasonable attorneys' and experts' fees; and

g.     Granting the NRA such other and further relief as this Court deems just and proper.

123.   **Response**:  Defendant denies the truth of the allegations in this paragraph of the Complaint.

## AFFIRMATIVE DEFENSES

124.   The Complaint fails to state a claim upon which relief can be granted.

125.   The Complaint fails to establish that Plaintiff has standing to assert First Amendment claims.

126.   Defendants Cuomo is entitled to immunity.

127.   The Complaint is barred, in whole or in part, by the Eleventh Amendment.

128.   At all relevant times Defendant acted under the reasonable belief that his conduct was in accordance with clearly established law.  He is, therefore, protected under the doctrine of qualified immunity.

129.   Plaintiff's claims are barred in whole or in part because it failed to mitigate its damages, if any.

## ADDITIONAL DEFENSES

150.   The NRA violated NY law by marketing insurance without a license.

151.   Chubb, Lockton and Lloyd's violated NY law as set forth in the consent orders, and nothing in those consent orders can reasonably be interpreted to violate NRA's constitutional rights.

152.   The guidance letters were issued as part of the clear regulatory authority held by the Superintendent and the Department of Financial Services.

153.    Defendant Cuomo has First Amendment rights that protect the speech challenged in the Complaint.

**WHEREFORE**, Defendant respectfully request that this Court deny the relief requested, dismiss the Complaint with prejudice, and grant such other relief as the Court shall deem is just and proper.

Dated: Albany, New York
      April 16, 2021

                                    LETITIA JAMES
                                    Attorney General of the State of New York
                                    Attorney for Defendants
                                    The Capitol
                                    Albany, New York  12224-0341
                                    By: s / *William A. Scott*
                                    William A. Scott
                                    Assistant Attorney General, of Counsel
                                    Bar Roll No. 512434
                                    Telephone:  (518) 776-2255
                                    Email: William.Scott@ag.ny.gov

TO:    All Counsel of Record via ECF